```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   BRIGHT RESPONSE LLC      )(

 5                            )(   CIVIL DOCKET NO.

 6                            )(   2:07-CV-371-CE

 7   VS.                      )(   MARSHALL, TEXAS

 8                            )(

 9   GOOGLE, INC., ET AL      )(   APRIL 1, 2010

10                            )(   11:30 A.M.

11                  MOTION TO COMPEL HEARING

12          BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM

13                 UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFF:   (See attached sign-in sheet.)

18

19   FOR THE DEFENDANTS:  (See attached sign-in sheet.)

20

21
     COURT REPORTER:      MS. SHELLY HOLMES, CSR
22                        Deputy Official Court Reporter
                          2593 Myrtle Road
23                        Diana, Texas  75640
                          (903) 663-5082
24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on a CAT system.)
```

I N D E X

2

```
 1

 2   April 1, 2010

 3                                              Page

 4        Appearances                          1

 5        Hearing                              3

 6        Court Reporter's Certificate         30

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                 COURT SECURITY OFFICER:  All rise.

 2                 THE COURT:  Please be seated.

 3                 All right.  Where are we on the motions to

 4     compel?

 5                 MR. SPANGLER:  Your Honor, Andrew Spangler,

 6     on behalf of the plaintiff.  We do not have it resolved.

 7                 THE COURT:  All right.  Let's hear it.  I

 8     mean, what's -- you know, what's the problem?  What are

 9     we -- I mean, what are we really fussing about?

10                 MR. SPANGLER:  What we're fussing about --

11     sorry, Your Honor.  What we're fussing about is we

12     still don't have the code that we've asked from day

13     one --

14                 THE COURT:  Okay.  What is it, and how does

15     it relate to this case exactly?  Exactly what don't you

16     have?

17                 MR. SPANGLER:  Your Honor, well, part of it

18     is we don't know.  We've had to go through every month,

19     every week, every review, and find out more stuff they

20     didn't produce.  So it's reached the point now -- and

21     this is what's happened in other cases.  It's three

22     months before trial, and we still don't have all the

23     code.

24                 For example, for Google, we've specifically

25     accused AdSense for Search.  We don't have all the code

1    for AdSense for Search.  What has happened is we've

2    accused, for example, Mr. Verhoeven used an example of a

3    car.  We accuse a car, a Volkswagen, we get the

4    carburetor six months ago.  And we go, "Well, there's

5    two connections here.  What are they?  You didn't

6    provide them."

7                    "Well, here's the muffler.  Here's an engine

8    block."

9                    Okay.  Well, the engine block has lots of

10   connections.  What goes to the engine block?

11                   And for Yahoo, that's been exacerbated

12   because they violated the protective order and didn't

13   produce this in the ordinary course of the business.  We

14   have no idea the structure and where they fit.

15                   For Google, they've produced it, for

16   example, with what are called include statements in

17   files, and they didn't produce the include statements.

18   We have to go through and find those, send a letter and

19   say, "You didn't produce these.  Please do it."  And

20   it's over and over and over again.

21                   And the goal is very simple.  Hundreds of

22   thousands of costs that we've done in -- with our

23   experts.  We still don't have all the code.  We still

24   don't know how it all works, and we're three months from

25   trial.

1              So we're asking for -- for the accused

2    product, the code.  They don't have to produce

3    historical versions because we've already reached

4    agreement on that, but we need the code.  We've -- we've

5    tried to compromise.  We've tried to narrow, and what's

6    happened is, is we've been -- the process has been

7    abused.

8              THE COURT:  Okay.  I think I understand the

9    fuss.

10             Has all the code for the accused products

11   been produced?

12             MS. AINSWORTH:  Your Honor, this is Jennifer

13   Ainsworth on behalf of Google and AOL.  Your Honor, all

14   of the code for the accused products has not been

15   produced.

16             THE COURT:  Okay.

17             MS. AINSWORTH:  The code for the accused

18   instrumentalities and functionalities has all been

19   produced.

20             What -- to -- to follow up on the example

21   that Mr. Spangler gave, they have accused a carburetor,

22   and they're asking for the code for the car, for the

23   entire car.

24             Your Honor has asked him to provide exactly

25   what they still need, and he can't do that.  We have

1   tried to work those issues out and have worked all

2   through this case.

3              Your Honor, to start out with, the local

4   rules require that a party produce and disclose all

5   documents and information relevant to the claims or

6   defenses, and under Rule 3-4 in the patent rules, all

7   source code relevant to the accused instrumentalities

8   and functions.

9              When we got the plaintiff's contentions

10  originally, when Google and AOL did, we went through and

11  said, "We've got to get some more information from you

12  guys on what is really accused."  They said they could

13  not provide us any more information, so we went

14  through, decided what was relevant, and produced it.

15  That started -- that process started almost a year ago

16  in May of 2009.  They started reviewing the code after

17  that.

18             Your Honor, there have been requests made

19  for further details from the code, the majority of which

20  have not been relevant.  And all of this information --

21  the example that Mr. Spangler gave with regard to

22  Google -- with regard to one part of the Smart Ad

23  selection system is not something that's relevant.

24  Google has produced all of the relevant code for the

25  accused instrumentalities.

```
 1              What -- when we discussed this in response
 2      to Your Honor's request in the last 15 minutes,
 3      Mr. Spangler made clear that he is asking for all code
 4      that could possibly exist with regard to anything that
 5      is mentioned.  And that reads out the relevance
 6      requirement from our local disclosure rules.
 7              THE COURT:  Well, here's the problem, okay?
 8      I mean, this isn't a car accident case.  I mean, what
 9      you're asking me to do if -- is accept your view of
10      what's relevant and what isn't relevant insofar as the
11      code is concerned.  And I'm -- I'm not in -- inclined in
12      something that's as sophisticated a problem as source
13      code to just baldly accept one side's or the other
14      side's view of they don't really need this, or, yes, we
15      really do need this.
16              And what y'all are -- the position y'all are
17      putting me in is that I'm going to have to appoint a
18      source code expert to review all of the code and then
19      determine whether or not one side or the other is
20      overreaching in -- in either what they want to be
21      produced or what they don't want to be produced and then
22      tax the entire costs of that review against whichever
23      side is overreaching.
24              And it's -- I mean -- I mean, I'm not -- I'm
25      frustrated with the problem.  I'm not frustrated with
```

1   you, but this is a recurring theme that I'm seeing in

2   these types of cases, and I -- and it's recurring

3   insofar -- it's been about the last six months.  I

4   hadn't seen it before the last six months, but it's

5   starting to become a recurring problem.

6           MS. AINSWORTH:  Your Honor, Google would

7   agree to that procedure to the degree that that's

8   something the Court's considering, but --

9           THE COURT:  Well --

10          MS. AINSWORTH:  -- in this situation, Your

11  Honor -- back up.  Under the local rules, it always --

12  the local rules always put the burden on the disclosing

13  party, whether that be the plaintiff or the defendant,

14  to make the call as to what's relevant.  And then the

15  other side can come back and say, "No, you've missed

16  something."

17          Well, when you look at what's happened in

18  this case with regard to the Google, what does the

19  evidence show us?  The evidence shows us that Google has

20  produced 2.6 millions lines of code, more than we've

21  produced in any other lawsuit, first of all, which is

22  recognized by the plaintiff.

23          Second, if -- if you look at the question

24  about whether there's something missing, can the

25  plaintiff tell us there's anything missing?  They can't.

1    And, second, what evidence is there that they have

2    gotten the information that they've needed, that they've

3    gotten the relevant information?

4            We look at their amended infringement

5    contentions.  For almost every claim asserted, they have

6    referred back to source code.  So that's evidence that

7    Google has produced the relevant code in this case.

8    What they're asking for is everything that could

9    possibly exist if they even name a product or service.

10   And that -- the problem is -- and I understand the

11   Court's frustration.

12           The problem is that totally reads out

13   the relevance requirement of the disclosure rules and

14   puts parties in a situation of being able to create

15   serious abuse by requiring source code production

16   potentially for an entire company just because of

17   something they mentioned with -- with no regard to

18   relevance.

19           THE COURT:  Of course, he stipulated that

20   historical source code is not at issue, so it doesn't

21   really remove the relevancy requirement entirely, does

22   it?

23           MS. AINSWORTH:  It does --

24           THE COURT:  For instance, historical source

25   code, I think he's agreed, isn't relevant in this case,

1    or at least he's not seeking it.

2            MS. AINSWORTH:  At least he's not seeking

3    it.  But I don't think that necessarily reads out the

4    relevance requirement because it should only be for --

5    the stipulation is for those portions that we have

6    produced they're not seeking the -- the historical code

7    for those.  I mean, we think it still has to be tied to

8    relevance.

9            And in -- in this case, Google has gone, we

10   believe, above and beyond providing relevant

11   information.  Every time they've asked for something

12   else, whether it has not been relevant, we have

13   investigated every single request, most of which we have

14   produced, even though it wasn't relevant.

15           There have been a couple of times where

16   there's been something that fell so far outside of

17   relevance or was so extremely protected, that we talked

18   to them about it and said, "You don't need this

19   because," or "You don't want this because," and we've

20   worked it out.  And there hasn't been a problem until

21   now.

22           And to conclude -- and we can answer any

23   more specific questions that the Court has.

24           THE COURT:  Well, but --

25           MS. AINSWORTH:  The plaintiff --

1          THE COURT:  -- but there -- there has been

2     other problems, hasn't there?  I mean, not in this case

3     yet, but, I mean, there have been other problems.

4          MS. AINSWORTH:  There were problems in

5     the -- in the PA Advisors case.

6          MR. PERLSON:  Your -- Your Honor, sorry to

7     interrupt here.  It's David Perlson, but Ms. Ainsworth

8     wasn't our local counsel in -- in the PA Advisors case,

9     and so I wanted to address that, if that's okay.

10          THE COURT:  That's fine.

11          MR. PERLSON:  Okay.  In the PA Advisors

12     case, plaintiff made similar complaints.  And what Judge

13     Rader did in that case -- well, first of all, this --

14     what Judge Rader did in that case is he said -- in

15     response to plaintiff's request, basically, that they

16     get everything regarding the accused products,

17     basically the same thing they're asking for here, Judge

18     Rader said -- "I mean, I can state I want everything

19     that Google's got.  You're not going to get that.  So

20     tell me what you want and make it specific."

21          Whenever plaintiff has done that, we have,

22     as Jennifer -- as Ms. Ainsworth said, we have

23     investigated and cooperated with them.  If you note in

24     their --

25          THE COURT:  Well, when they tell you what

1  they want, have you produced everything that they've

2  asked for?

3          MR. PERLSON:  As far as I know, there are

4  two instances -- two specific instances in which -- that

5  we haven't been able to resolve the dispute, one of

6  which is regarding a request regarding the refill code

7  which we just frankly don't understand.  We thought that

8  we produced all the code regarding refill that was

9  relevant or that related to a request of refill.  And

10 they seem to be requesting it.  We asked them to explain

11 it.  They refused.

12         There was another line of code -- aspect of

13 code regarding a map engine that relates to how data is

14 stored.  That does not -- from our review of their

15 contentions, we can't tell at all --

16         THE COURT:  What --

17         MR. PERSON:  -- that's relevant.

18         THE COURT:  -- type of data?

19         MR. PERLSON:  I'm sorry?

20         THE COURT:  What type of data?

21         MR. PERLSON:  It's data that's used by the

22 SmartASS system, which is one of -- part of what's

23 accused, but it doesn't -- it's not related to how

24 SmartASS uses the system or uses this data which is

25 accused.

1                    It relates to how the system that the

2         SmartASS server calls, how it stores the data.  It's

3         completely irrelevant.  And all we asked them, we just

4         said, "Look, we're -- we're willing to talk to you.

5         Just please -- just explain to us why you think it's

6         relevant."  They refused.

7                    And in -- in their initial motion, they

8         raised two specific issues.  They didn't ask for all the

9         source code in their initial motion.  That's not really

10        what they requested.  The -- the request was all code

11        related to SmartASS and all code related to

12        normalization.  We pointed out in our opposition, we've

13        produced that stuff.

14                   And if you look at their infringement

15        contentions, they have source code related to all of

16        it.  And then faced with the evidence that we've

17        actually either produced or offered to cooperate on

18        the very, very minimal specific pieces of code that

19        they are still raising, they now come back and say,

20        "Oh, we need all," pointing to this PA Advisors case

21        again.

22                   But, again, it's -- the same -- and another

23        thing that -- that Judge Rader actually pointed out the

24        problems that we had in that case because we had a hard

25        time finding out what code was relevant because they

1   were having a hard time providing their contentions.

2          Judge Rader said, "I'm seeing a little

3   pattern here that goes back to before I came in the case

4   where you give contentions, you conduct discovery, you

5   amend contentions, you request more discovery, you amend

6   contentions, you request more discovery, and then based

7   on discovery, you request more discovery.  When does

8   this end?"

9          And what Judge Rader did was to simply say,

10  "Plaintiff, tell -- say specifically what you need.

11  Google, you know, work it out with them in response to

12  that."

13         We stand ready to do that as we have been in

14  the case.  We -- we have produced code, as far -- as far

15  as we can tell, for all relevant aspects of the code.

16  You look at their contentions.  They cite code for

17  almost every single element.  So that's the best proof,

18  Your Honor, that Google has done everything.

19         And -- and just to clarify one thing, what

20  Ms. Ainsworth had said, is that Google, Ya -- and Yahoo

21  would both agree to the proposal regarding this third

22  party.  I understand that that's not the ideal proposal.

23  We think the motion should be denied, but, you know,

24  both -- all parties would agree to that.

25             THE COURT:  All right.

1           MR. SPANGLER:  Your Honor, may I have a

2    short rebuttal?

3           THE COURT:  Yes.

4           MR. SPANGLER:  Thank you.

5           And do I have your permission to put up a

6    few documents?

7           THE COURT:  Well, before you do that.

8           Ms. Ainsworth, he interrupted you.  Did you

9    have anything else you wanted to tell me?

10          MS. AINSWORTH:  I had one point I had wanted

11   to make, just in -- in conclusion, which was that I

12   thought -- with regard to the motion against Google, the

13   main point that the plaintiff was trying to make they

14   made in their first substantive sentence which was that

15   we're filing this motion so that you can't later say we

16   didn't file a motion.

17          And there was not a real pending dispute

18   over particular sections of code because every time

19   they've asked for particular sections of code, we've

20   worked with them for months on getting them everything

21   that they wanted.  But that's why the motion was really

22   filed, not because there was a serious dispute.  And I

23   thought that there -- they were really rather

24   straightforward about that, which is not the purpose of

25   the discovery and disclosure rules or of the motion to

1    compel practice.

2              THE COURT:  Well, but neither is it the

3    purpose to have these things linger on for months.  I

4    mean, that's --

5              MS. AINSWORTH:  That's correct, and --

6    and we don't think that it should have lingered on

7    for months.  We think that the original production

8    was what was relevant.  And as in most productions I've

9    been involved with, there's usually one or two

10   follow-ups where they say, "Hey, you forgot this, or we

11   think that this links to something else, produce it."

12   And that usually occurs within a reasonable period of

13   time.

14             We think what's gone on since then has been

15   information that's not been relevant.  Anything that

16   links or calls to something else, they've asked for, but

17   it doesn't mean that it's relevant.

18             So thank you, Your Honor.

19             THE COURT:  All right.  Appreciate it.

20             MR. SPANGLER:  Your Honor, let me address

21   really quickly -- but, first, to clarify for the Court,

22   the issues with Google and their conduct are very

23   different than that with Yahoo.  Yahoo's conduct is far

24   worse, and I'll -- I'll bring that to the Court's

25   attention.

1            Do I have permission to put the document I

2    showed you up on the screen?

3            MR. PERLSON:  Yes.

4            MR. SPANGLER:  Thank you.  They said -- for

5    example, there's still some stuff they haven't produced,

6    even though everything we've asked for has been

7    produced.  One of the accused products is called

8    AdWords, okay?  And what they mentioned -- part of

9    AdWords is a SmartASS server, okay?

10            Is the ELMO working here?

11            So this is the overall system architecture

12    for AdWords and the components of the SmartASS system.

13    They're the SmartASS mapper.  We have the SmartASS

14    server.  We asked for the map engine.  They go, "It's

15    not relevant.  Why do you need it?"  Well, it's

16    integrated with the two servers and map.  We need to see

17    what exactly it does.  Haven't gotten that.

18            There is no question that we have raised

19    some issues since the motion to compel was filed.

20    That's because it keeps changing.  There's no question

21    that we had the include statements on very relevant

22    files, files they produced at the very beginning, but

23    they -- I guess they didn't have an engineer go through

24    and actually review it.  They just went and grabbed it

25    and threw it out there.

1              The fact that they've done 2.5 million lines

2      of code, the volume, to me, doesn't matter.

3              And in the PA Advisors case -- I'm glad they

4      brought that up, because we are still getting relevant

5      code after expert reports were due and after summary

6      judgment motions have been filed against us.  And the

7      fact that source code -- and to address

8      Ms. Ainsworth's point -- reviewing source code, this

9      isn't my first rodeo either -- either.  I mean, I've

10     reviewed it with an expert side-by-side, so I know how

11     it works and I know that sometimes there's follow-up.

12     I've never seen this much follow-up.

13             The protective order in this case was

14     entered nearly two years ago, agreed protective order,

15     and we still didn't get it all.  And that's for Google,

16     explain that.

17             But I want to raise some specific issues

18     with respect to Yahoo if the Court will allow me.

19             One, not only do we not have the source code

20     for Yahoo, that they've engaged in the same sort of

21     conduct, but they've refused to produce it in the

22     ordinary course of business which, again, is a violation

23     of that protective order.  It says you have to do it

24     that way.

25             They've disabled search features on their

1    review computers.  Again, a violation of the

2    protective order.  They just start doing it, don't tell

3    us.  But more importantly is the structure.  If the

4    Court wants to find, for example, a particular song on

5    his computer, you can go to the C drive, you can go to

6    program files, you can go to iTunes, you can go to the

7    library.  When you finally get there, at the very top is

8    an address bar with all the layers that took you to that

9    bottom part, right?  And that helps tell you where

10   iTunes fit -- that music file fits with the overall

11   system, what subset it's in, how it's tied.  They didn't

12   do that.  They didn't -- we don't know how it's set up.

13            Now, the rules require them to produce in

14   the ordinary course of business.  In their motion,

15   they're saying it's too problematic now.  It's too

16   difficult now because we've done a rolling production.

17   If they'd done it from the very beginning, instead of

18   waiting until October of last year to start, then it

19   wouldn't have been overly burdensome.

20            So, again -- and -- and their perception of

21   the local rules, I completely disagree with.  They have

22   in their brief any suggestion by Bright Response that

23   the Court's order -- that was the one from November

24   5th -- was broader as inaccurate.  Yahoo was only

25   ordered to produce specifically listed source code.  So

1   Yahoo's position is when the Court says, "You need to

2   produce this code that they're asking for," it means

3   they can ignore the other Court's order that says,

4   "You'll produce mandatory disclosure requirements.

5   You'll produce it."

6           Now, we've been trying to work with them.

7   The historical code is all relevant.  We said, "Okay, we

8   don't want you to have to produce all that extra stuff.

9   We'll -- we'll agree to a stipulation."  We went to them

10   to try and save them from that extra burden so we didn't

11   have to do that.

12           Now, they say they'll jump all over the

13   Court's offer of hiring an extra expert.  If the Court

14   wants to do that, of course.  You're the Court.  We

15   don't know if we're overreaching or not because we

16   didn't get it.  And now they've waited until the last

17   second and in fact, admonished me, because I made the

18   call on behalf of my client to file, for filing so soon.

19           We're three months from trial, and we still

20   don't have it all.  And they're putting the burden on us

21   to identify still what's missing.  We don't know because

22   they didn't produce it all, and they didn't start until

23   August of last year for Google and October of last year

24   for Yahoo.

25           THE COURT:  Response from Yahoo?

```
 1                MR. PERLSON:  I just want to correct one

 2   factor -- misrepresentation.  We actually made our code

 3   available I believe it was April or May, not August.

 4   They made that misrepresentation in their briefing.

 5   He's done it here again.

 6                MR. SPANGLER:  Can I address that one

 7   specific point, Your Honor?  Or -- I'll let it go.

 8                MR. WHITE:  Your Honor, if may I respond on

 9   behalf of Yahoo?

10                THE COURT:  Yes.

11                MR. WHITE:  I want to pick up with his last

12   point first because we were here previously on a motion

13   to compel, and at that time, we represented to the Court

14   that we believed that we had produced all of the

15   relevant source code, and there was some discussion back

16   and forth.

17                And you told plaintiff's counsel that they

18   were to give us a list of things that they thought were

19   missing.  And you said they needed to be specific, and

20   that when we left, Yahoo -- when we left that hearing,

21   we would know what additional files the plaintiff was

22   requesting.

23                We got that list.  We complied with the

24   order, and we produced that code.  There have been

25   additional follow-ups since then for additional code.
```

1    We've never refused any of those.  We've -- we've looked

2    for, identified, and produced any relevant code that

3    they've asked for after that initial order that you

4    gave.

5            So, again, we believe that all the relevant

6    code has been produced, and we've gone beyond -- above

7    and beyond that to produce additional code.  The same is

8    true for Yahoo that it is for Google, that this case has

9    involved more production of code than any other case.

10   They've spent hundreds of days reviewing it.  They've

11   got full access -- we will give them access to anything

12   else that they deem relevant that they think they need.

13   We think they have it all already.

14           We're happy to provide them and talk with

15   them further about specific requests, but at this point,

16   we don't have it.  All we have is that we want

17   everything.  We think they have what they need, and

18   we're happy to work with them further if they think they

19   need additional things.  But at this point, we're just

20   at -- at our wit's end as to what else to give them.

21           THE COURT:  Well, does the protective order

22   require it to be produced as it's kept in the ordinary

23   course of business?

24           MR. WHITE:  It does, and that's --

25           THE COURT:  Was it -- well, and was it

 1   produced?

 2            MR. WHITE:  It was.  Your Honor, it was.  I

 3   know they keep talking about a direct restructure.  As

 4   we told them before, there is no index of our code.  We

 5   have individual sets of code that reside on servers.

 6   We've pulled that code off.  We haven't stripped it out

 7   or redacted.  There's internal references to code

 8   in the code.  If someone calls for another file, it's

 9   referenced there, and so you've got one piece of code

10   that may call another piece of code, but it -- it's

11   mentioned in a call.  We haven't redacted that or

12   somehow impeded their ability to receive the code.

13   They've got all the sections of code.  They can figure

14   out how it works together.

15            Their complaint is that we haven't given

16   them some index that we simply don't have, and I think

17   we've explained to them before.  So our position is

18   that, yes, we have produced it as it's kept in the

19   ordinary course of business.

20            THE COURT:  Okay.  All right.  Reply?

21            MR. SPANGLER:  Your Honor, first of all,

22   to be clear, we're not asking for an index.  This is why

23   every time we've asked for a directory, the code be

24   produced in its directory structure, that's what they've

25   come back with.

1            I'm not asking for an index of all their

2      files.  What I'm asking for, instead of taking a

3      specific picture and then putting it on a disk without

4      me knowing where it came from, that that's not how it's

5      kept in the ordinary course.  You copy it, you paste it

6      as part of that overall directory, it must be served

7      on -- it must be located on their server.  I assume they

8      don't have five million lines of code just sitting

9      horizontal.  It's not laying horizontal.  We're not

10     asking for an index.  We're asking that it be produced

11     in the ordinary course.

12            They didn't do that.  They've still not done

13     that despite our request.  We stopped reviewing

14     actually, Your Honor, a couple of weeks ago because we

15     were -- the money was crazy, but they had turned off the

16     search features on the computers.

17            I mean, I think it's great that they can

18     stand here and say they've got lots of code in the

19     contentions.  That doesn't mean we have all their code.

20     It means we found some.  I think it's great that they

21     say, "Yeah, we've produced what we think we have," but

22     every time they say they're done, every time, we found

23     more code.  More code that specifically call -- and this

24     is Google and Yahoo.  They've represented over and over

25     again to us, "We think you have everything.  We think

1    you have everything."  We can't wait any longer.

2                    And in another case with Judge Bush, I was

3    admonished for not moving faster and for sitting on my

4    rights.  That's why we're here.

5                    THE COURT:  Well, is there always going to

6    be some other feature or place in the code that's being

7    called by what you've had produced to you, if you've

8    had -- if you've not had all of it produced to you?

9                    MR. SPANGLER:  I'm sorry, re -- reask that

10   the question.

11                   THE COURT:  Well, you just said every time

12   you get something, there -- you know, there's a call to

13   some other thing that you haven't gotten -- hadn't had

14   produced to you.

15                   And my question is, isn't that always going

16   to be the case in a situation where you've received a

17   portion of the overall code, as opposed to all of the

18   overall code?

19                   MR. SPANGLER:  It depends.  It depends on

20   what code is produced.

21                   And early on, Your Honor, when we started

22   getting the code, we tried to narrow which includes we

23   asked for, okay?  We reached a point with our expert --

24   and if the Court wants to bring in our expert and have

25   her sit at the witness stand and you ask questions, we

1    are glad to do that.

2            She -- one, said it's not as unwieldily as

3    they say, although the computers that -- that Yahoo sent

4    that were antiquated caused real problems, that now due

5    to speed stuff, we're three months away.  Expert reports

6    are probably going to be due in six weeks.  We need to

7    have it all.  So, yes, in this case, yes.  If we had

8    gotten it when we were supposed to, it's possible that

9    we wouldn't even be here and we would have had it worked

10   out.

11           But time constraints and what's happened in

12   other cases and Judge Bush's order forced us to step

13   this up.  And I'd like to address the April/May issue.

14   The April/May issue came about because Google said, "You

15   only get one review."  And it's based on statements that

16   I made at a hearing.

17           Now, Mr. Perlson is shaking his head and

18   making negative comments, but he wasn't at the hearing.

19   I argued the hearing in front of Judge Folsom.  And the

20   issues was there are going to be some features in the PA

21   Advisors case and some in this case that were slightly

22   different, okay?  And under the current protective order

23   where Google was not agreeing to Dallas, our expert was

24   going to have to look at the information here for Bright

25   Response and then go to California.

1              Now, the parties were going back and forth

2    in e-mail correspondence on "When you say one review,

3    what do you mean?"  "Well, it means one review."  "Does

4    that mean we have to sit at one time and do them all?"

5    "It means one review."

6              Finally, the parties worked it out and said,

7    "Okay.  Yeah, you can have it."  But we weren't going to

8    access it.  We weren't going to review it unless we knew

9    we were going to get multiple shots at it because a

10   review that big takes time.

11             So, yes, technically, it was in a file on a

12   computer before August, but it didn't start up until

13   August.  And, of course, Yahoo, it didn't start until

14   October.

15             THE COURT:  All right.  I'll give you an

16   order as quickly as I can.

17             MR. PERLSON:  Excuse me, Your Honor.  We

18   have one more housekeeping issue.

19             MR. VERHOEVEN:  I don't know if this needs

20   to be decided right now, but since I'm here, Your Honor,

21   I just wanted to note that the trial -- jury selection,

22   I believe, has been set for July of this year, and I

23   just wanted to let Your Honor know that I -- there's a

24   case, Acqis, A-c-q-i-s, versus IB -- and one of the

25   defendants is IBM, which is a client of mine.  And it's

1   before Judge Davis.

2            The Markman is set for the week after the

3   jury selection, so we submitted a paper sug --

4   suggesting that we set the trial for the last two weeks

5   in July which I could do, but if it gets set for that

6   following week, I'm going to have a conflict with Judge

7   Davis and the Markman.

8            THE COURT:  Well --

9            MR. VERHOEVEN:  July 8th is the Markman.

10           THE COURT:  The rule around here is that

11  I'll yield to Judge Davis' settings, but if I have to

12  give you -- I mean, if I have to --

13           MR. VERHOEVEN:  I'm not sure it's a problem

14  at all because I know the last trial we did, we did the

15  jury selection and did the trial three weeks later.

16           THE COURT:  That's -- that's --

17           MR. VERHOEVEN:  I just wanted --

18           THE COURT:  I mean, I'll -- I'll schedule

19  the trial around the Markman hearing.  I don't know if

20  I'm going to schedule it for the end of the -- end of

21  the month.  I may just take a day off or something.

22  That way you'll be able to argue your Markman hearing in

23  front of Judge Davis.

24           MR. VERHOEVEN:  Thank you, Your Honor.

25           MR. SPANGLER:  Thank you.

29

1                    THE COURT:  Okay.

2                    COURT SECURITY OFFICER:  All rise.

3                    (Recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a

 4    true and correct transcript from the stenographic notes

 5    of the proceedings in the above-entitled matter to the

 6    best of my ability.

 7

 8

 9
      SHELLY HOLMES                         Date
10    Deputy Official Reporter
      State of Texas No.: 7804
11    Expiration Date:    12/31/10

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```