1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2                 MARSHALL DIVISION

3  BRIGHT RESPONSE, LLC        *   Civil Docket No.
                               *   2:07-CV-371
4  VS.                         *   Marshall, Texas
                               *
5                              *   August 2, 2010
   GOOGLE, INC., ET AL         *   3:00 P.M.
6
                TRANSCRIPT OF JURY TRIAL
7      BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
              UNITED STATES MAGISTRATE JUDGE
8

9  APPEARANCES:

10 FOR THE PLAINTIFF:     MR. ANDREW SPANGLER
                          Spangler Law
11                        208 North Green Street
                          Suite 300
12                        Longview, TX   75601

13                        MR. MARC A. FENSTER
                          MR. ANDREW WEISS
14                        MR. ADAM HOFFMAN
                          MR. ALEX GIZA
15                        Russ, August & Kabat
                          12424 Wilshire Boulevard
16                        12th Floor
                          Los Angeles, CA   90025
17
                          MR. DAVID M. PRIDHAM
18                        Law Office of David Pridham
                          25 Linden Road
19                        Barrington, RI  02806

20 APPEARANCES CONTINUED ON NEXT PAGE:

21
   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
22                        MS. JUDITH WERLINGER, CSR
                          Official Court Reporter
23                        100 East Houston, Suite 125
                          Marshall, TX   75670
24                        903/935-3868

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:        MS. ELIZABETH A. WILEY
                          The Wiley Firm
                          P.O.  Box 303280
                          Austin, TX   78703

                          MR. PATRICK R. ANDERSON
                          Patrick R. Anderson, PLLC
                          4225 Miller Road
                          Building B-9, Suite 358
                          Flint, MI   48507

                          MR. JOHN C. HUESTON
                          MR. ADAM S. GOLDBERG
                          Irell & Manella, LLP
                          840 Newport Center Drive
                          Suite 400
                          Newport Beach, CA   92660

FOR THE DEFENDANT:        MR. CHARLES K. VERHOEVEN
(Google)                  MR. DAVID A. PERLSON
                          MS. AMY H. CANDIDO
                          Quinn Emanuel Urquhart & Sullivan
                          50 California Street
                          22nd Floor
                          San Francisco, CA   94111

                          MS. JENNIFER PARKER AINSWORTH
                          Wilson Robertson & Cornelius
                          P.O.  Box 7339
                          Tyler, TX   75711

FOR THE DEFENDANT:        MS. JENNIFER HALTOM DOAN
(Yahoo!)                  Haltom & Doan
                          6500 Summerhill Road
                          Suite 100
                          Texarkana, TX   75503


APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:      MR. WILLIAM ROOKLIDGE
(Yahoo!)                Howrey, LLP
                        4 Park Plaza, Suite 1700
                        Irvine, CA   92614

                        MR. JASON WHITE
                        Howrey, LLP
                        321 North Clark Street
                        Suite 3400
                        Chicago, IL   60610

                *       *       *       *       *       *


P R O C E E D I N G S

LAW CLERK:  All rise.

(Jury in.)

THE COURT:  Please be seated.

All right.  Ladies and Gentlemen, thank you again for being here on time.

I'm going to start this afternoon with some preliminary instructions from the Court.  Then we will move from the instructions into opening statements, and then get you a little bit of the testimony before we break this evening.

Members of the Jury, you have previously been sworn as the jury to try this case.  As the jury, you will decide the disputed questions of fact.  As the Judge, I will decide all questions of law and procedure.

From time to time during the trial and at the end of the trial, I will instruct you on the rules of law that you must follow in making your decision.

Now, this case involves a dispute relating to a United States patent. Before summarizing the positions of the parties and the legal issues involved in the dispute, let me take a moment to explain what a patent is and how one is obtained.

The United States Constitution grants Congress the powers to enact laws to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

With this power, Congress enacted the patent laws.

Now, patents are granted by the United States Patent & Trademark Office. Sometimes it's called the PTO. The process of obtaining a patent is called patent prosecution.

A valid United States patent gives the patent owner the right, for up to 20 years from the date the patent application is filed, to prevent others from making, using, offering to sell, or selling the patented invention within the United States or from importing it into the United States without the patent holder's

permission.

A violation of the patent owner's rights is called infringement.

The patent owner may try to enforce a patent against persons believed to be infringers by a lawsuit filed in federal court.

To obtain a patent, one must file an application with the PTO.  The PTO is an agency of the federal government and employs trained examiners who review applications for patents.

The application includes what is called a specification, which must contain a written description of the claimed invention telling what the invention is, how it works, how to make it, and how to use it so others skilled in the field will know how to make and use it.

The specification concludes with one or more numbered sentences.  These are the patent claims. When the patent is eventually granted by the PTO, the claims define the boundaries of its protection and give notice to the public of those boundaries.

After the applicant files a patent application, a PTO Patent Examiner reviews the patent application to determine whether the claims are patentable and whether the specification adequately

describes the invention claimed.

In examining a patent application, the Patent Examiner reviews records available to the PTO or what is referred to as prior art.  The Examiner also will review prior art, if it is submitted to the PTO by the applicant.

Prior art is defined by law, and, at a later time, I will give you specific instructions as to what constitutes prior art.  However, in general, prior art includes things that existed before the claimed invention that were publicly known or used in a publicly accessible way in this country or that were patented or described in a publication in any country.

The Examiner considers, among other things, whether each claim defines an invention that is new, useful, and not obvious in view of the prior art.

A patent lists the prior art that the Examiner considered, and this list is called the cited references.

After the prior art search and examination of the application, the Patent Examiner then informs the applicant in writing what the Examiner has found and whether any claim is patentable and thus will be allowed.  This writing from the Patent Examiner is called an office action.

1          If the Examiner rejects the claims, the

2  applicant then responds and sometimes changes the claims

3  or submits new claims.  This process, which takes place

4  only between the Examiner and the patent applicant, may

5  go back and forth for some time until the Examiner is

6  satisfied that the application and claims meet the

7  requirements for a patent.

8          The papers generated during this time of

9  communicating back and forth between the Patent Examiner

10  and the applicant make up what is called the prosecution

11  history.

12          All of this material becomes available to

13  the public no later than the date when the patent

14  issues.

15          Now, the fact that the PTO grants a

16  patent does not necessarily mean that any invention

17  claimed in the patent, in fact, deserves the protection

18  of a patent.

19          For example, the PTO may not have had

20  available to it all the information that will be

21  presented to you.  A person accused of infringement has

22  the right to argue here in federal court that a claimed

23  invention in the patent is invalid, because it does not

24  meet the requirements for a patent.

25          Now, let's take a moment to look at the

patent at issue in this case.  I think you've been
provided with a notebook.

You've got a cover there, and then if you
will flip past the cover to the first page of the
patent, it provides identifying information, including
the date the patent issued and patent number along the
top as well as the inventors' names, the filing date,
and a list of the cited references considered by the
PTO.

You'll see over to the far right there's
the patent number, the date that it issued.  And then
over on the left-hand side, it lists who the inventors
are.

This particular patent, I believe on the
very last page behind Tab 1, has what's called a
certificate of correction that adds to the list of
inventors that is included on the original cover page of
the patent.

You will also see down on the left-hand
side the references cited, and there's a list of
references, both patent documents and other
publications, that constitute the cited references in
the patent.

Now, the specification of the patent
begins with an abstract.  The abstract is also found on

the cover page of the patent over on the right-hand side.  The abstract is a brief statement about the subject matter of the invention.

Next come the drawings.  There's several drawings.  Flip through Figure 2A and 2B over to the portion of the patent where the text--- textual description begins, and it's organized in two columns.

The drawings that are included with the patent illustrate various aspects or features of the invention.

The textual information appears next, and it's organized into two columns on each page.  That's referred to in the patent laws as the written description of the invention.

If you'll flip over the next several pages, you will see over at Column 12 about the middle of the column, the specification ends with numbered paragraphs.  These are the patent claims.

The patent claims determine the scope of the invention.  The claims, you will see in this particular patent, has a total of 66 claims.  And those carry over through Column 18.

That's an overview of the patent at issue in this case.

Now, to help you follow the evidence, I'm

going to give you a summary of the positions of the parties.

The Plaintiff in this case is Bright Response, LLC. The Defendants in this case are Google, Incorporated, and Yahoo!, Incorporated.

The patent involved in this case is United States Patent No. 6,411,947. Now for convenience, the parties and I will often refer to the patent by the last three digits of the patent number. So in other words, this case involves the '947 patent.

The Plaintiff filed suit in this Court seeking money damages from the Defendants for allegedly infringing Claims 30, 31, and 33 of the '947 patent.

The Defendants deny that they infringe the asserted claims of the '947 patent. The Defendants also contend that the asserted patent claims are invalid.

Your job will be to decide whether Claims 30, 31, and 33 of the '947 patent have been infringed.

If you decide that any of these claims have been infringed, you must consider the Defendants' defenses and then determine any money damages to be awarded to the Plaintiff to compensate it for the infringement that you've found.

It's my job as Judge to determine the

meaning of any claim language that needs interpretation. You must accept the meanings I give you and use them when you decide whether any claim of the patent has been infringed and whether any claim is invalid.

You've been provided with a copy of the meanings I've adopted for certain claim terms. Behind Tab 2, there's a glossary of claim terms that you've been provided. Those are the definitions that you as jurors are bound to apply to your decisions on infringement and validity.

Now, I'll give you a brief outline of the trial. Soon, the lawyers for the parties will make what is called an opening statement. Opening statements are intended to assist you in understanding the evidence. What the lawyers say is not evidence.

After the opening statements, the parties will present their evidence. After all the evidence is presented, the lawyers will again address you to make final arguments. Then I'll instruct you on the applicable law, and you'll then retire to deliberate on a verdict.

I need to say a few words about your conduct as jurors.

First of all, you're not to discuss this case with anyone, including your fellow jurors, members

of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.

If anyone approaches you and tries to talk to you about the case, you need to report that either to the Clerk's Office or to me immediately.  I don't think that will happen in this case.  It would be very unusual for someone to reach out and contact you about your jury service during your actual jury service.  So I don't think it will happen, but should it happen, you need to report that to either the Clerk's Office or to me immediately.

Second, do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Third, do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials.  And do not make any investigation about the case on your own.

Fourth, if you need to communicate with me, simply give a signed note to the bailiff to give to me.

Fifth, do not make up your mind about what the verdict should be until after you've gone into

the jury room to decide the case and you and your fellow

jurors have discussed the evidence. Keep an open mind

until then.

        Now, during the trial, it may be

necessary for me to confer with the lawyers out of your

hearing or to conduct a part of the trial out of your

presence. I will handle these matters as briefly and as

conveniently for you as I can, but you should remember

that they are a necessary part of any trial.

        Let's talk about what constitutes

evidence.

        The evidence that you are to consider in

deciding what the facts are consists of, one, the sworn

testimony of any witness; two, the exhibits which are

received into evidence.

        And I'll stop here and compliment the

parties.

        These cases are very complex, and the

parties to this case have worked well together in

reducing the number of what are called evidentiary

disputes. So we had a hearing to resolve a lot of the

evidentiary disputes that remain, and there weren't very

many.

        But it's my expectation that your time is

going to be spent actually listening to the evidence and

1  not listening to a lot of lawyers debate whether or not

2  a particular item of evidence should come in the case.

3  So I'm complimenting the lawyers.  I want you to know

4  that they've been working hard to streamline the case.

5  They recognize how valuable your time is, too.

6            You are also bound to consider -- and

7  this also constitutes evidence -- any facts to which the

8  lawyers stipulate.

9            Now, a stipulation of fact occurs when

10 the lawyers to both sides of the case agree that a

11 certain fact exists.  And you're bound to accept that

12 stipulation of fact just as though it had been proven

13 with evidence or the testimony of a witness.

14            Now, what is not evidence?

15            The following things are not evidence,

16 and you must not consider them as evidence in deciding

17 the facts of this case.

18            No. 1, statements and arguments of the

19 attorneys; 2, questions and objections of the attorneys;

20 3, testimony that I instruct you to disregard; and,

21 finally, anything you may see or hear when the Court is

22 not in session, even if what you see or hear is done or

23 said by one of the parties or by one of the witnesses.

24            Let's talk about direct and

25 circumstantial evidence.

1          Evidence may be either direct or

2 circumstantial.  Direct evidence is direct proof of a

3 fact, such as testimony by a witness about what that

4 witness personally saw or heard or did.

5          Circumstantial evidence is proof of one

6 or more facts from which you could find another fact.

7          You should consider both kinds of

8 evidence.

9          Let me give you an example of the

10 difference between direct and circumstantial evidence.

11          I've got a nine-year-old little boy and

12 he really likes cake.  Started thinking when I was

13 looking through these instructions today, when I started

14 giving them he was six, but he still likes cake, okay?

15 So picture a nine-year-old boy who likes cake.  Now

16 occasionally on Sunday afternoon, his mother will bake a

17 cake.  Her expectation is it will be dessert after

18 Sunday supper.

19          Well, she'll set it out on a rack to

20 cool, and she'll frost it.  I may come into the kitchen

21 before dinner and find a corner of that piece of cake

22 missing.  There might be crumbs across my dining room

23 floor into my son's bedroom.

24          And let's say I find him in his closet

25 with frosting on his cheeks and a smile on his face.  I

might ask him, son, did you eat the piece of cake?  Now
he might tell me no, okay?

That would be direct evidence.  That's
the testimony of an eyewitness to an alleged event.

Now, as a parent, I might choose to
disbelieve that direct evidence in favor of the
circumstantial evidence of the missing piece of cake,
the crumbs across the floor, and the frosting on his
cheeks.

So that's why the law allows jurors to
consider both direct and circumstantial evidence.  The
law makes no distinction to the weight to be given
either to direct or circumstantial evidence, and it's up
for you to decide how much weight to give to any
evidence.

Now, in deciding the facts in this case,
you may have to decide which testimony to believe and
which testimony not to believe.  You may believe
everything a witness says, part of it, or none of it.

In considering the testimony of any
witness, you may take into account, one, the opportunity
and ability of the witness to see, hear, or know the
things testified to; two, the witness' memory; three,
the witness' manner while testifying; four, the witness'
interest in the outcome of the case and any bias or

prejudice; five, whether other evidence contradicted the

witness' testimony; six, the reasonableness of the

witness' testimony in light of all of the evidence; and

seven, any other factors that bear on believability.

The weight of the evidence as to a fact

does not necessarily depend on the number of witnesses

who testify.  You must consider only the evidence in the

case.  However, you may draw such reasonable inferences

from the testimony and exhibits as you feel are

justified in the light of common experience.

You may make deductions and reach

conclusions that reason and common sense lead you to

make from the testimony and the evidence.

That's a long way of saying do not check

your common sense at the courthouse door when you get

here.  It's your collective common sense that will be

your most valuable tool in deciding the facts which

you're going to be called upon to decide here in this

case.

Now, the testimony of a single witness

may be sufficient to prove any fact, even if a greater

number of witnesses may have testified to the contrary,

if, after considering all the other evidence, you

believe that single witness.

I'm going to talk about the burdens of

proof that apply to this case.

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more likely true than not true.  You should base your decision on all of the evidence, regardless of which party presented it.

Now, when a party has the burden of proving any claim or defense by clear and convincing evidence, it means the party must persuade you that it is highly probable that the facts are as that party contends.  Such evidence requires a higher standard of proof than proof by a preponderance of the evidence.

Again, you should base your decision on all of the evidence, regardless of which party presented it.

Now, when knowledge of technical subject matter would be helpful to the jury, a person who has special training or experience in that technical field, called an expert witness, is permitted to state his or her opinion on those technical matters.  However, you're not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely on it.

1       Now, during the trial of this case,
2  certain testimony may be presented to you by way of
3  deposition.  The testimony of a witness, who, for some
4  reason, cannot be present to testify from the witness
5  stand, is usually presented either in writing or by way
6  of video under oath in the form of a deposition.  Such
7  testimony is entitled to the same consideration, and
8  insofar as possible, is to be judged as to credibility,
9  weighed, and otherwise considered by the jury in the
10 same way as if the witness had been present and had
11 given from the witness stand this testimony that was
12 read or shown or played to you from the deposition.

13       It's the duty of the attorney on each
14 side of a case to object when the other side offers
15 testimony or other evidence which the attorney believes
16 is not properly admissible.

17       Upon allowing testimony or other evidence
18 to be introduced over the objection of an attorney, the
19 Court does not, unless expressly stated, indicate any
20 opinion as to the weight or effect of such evidence.

21       As stated before, the jurors are the sole
22 judges of the credibility of all witnesses and the
23 weight and effect of all the evidence.

24       When the Court has sustained an objection
25 to a question addressed to a witness, the jury must

disregard the question entirely and may draw no
inference from the wording of it or speculate as to what
the witness would have said, if permitted to answer any
question.

Now, the law of the United States permits
the Judge to comment to the jury on the evidence in the
case. Such comments are only expressions of the Judge's
opinion as to the facts, and the jury may disregard them
entirely, since the jurors are the sole judges of the
facts.

There are two judges in here. I'm the
judge of the law, and you're the judge of the facts. My
first boss out of law school used to refer to the jury
as you are the Supreme Court of the facts.

That concludes my preliminary remarks and
instructions.

Plaintiff ready to proceed?

MR. FENSTER: We are, Your Honor.

THE COURT: Defendants?

MR. VERHOEVEN: Yes, Your Honor.

MS. DOAN: Yes, Your Honor.

THE COURT: All right. Is the Rule to be
invoked?

MR. VERHOEVEN: Yes, Your Honor.

THE COURT: Okay. Are their witnesses

who are in the courtroom who could be sworn at this
time?

MR. FENSTER:  Yes, Your Honor.

THE COURT:  If you want to bring all the
witnesses who will testify who are in the courtroom,
they can go ahead and come inside the bar and be sworn.

Just come on inside the bar up close.

Okay.  If y'all will raise your right
hand and be sworn.

(Witnesses sworn.)

COURTROOM DEPUTY:  Thank you.

THE COURT:  Okay.  You can put your hands
down and just hold on just for a second.  I've got some
instructions for you.

Each of you has been designated as a
witness in this case, and you've been placed under the
Rule of the Court, which means this:  You need retire
from the courtroom and remain outside the presence and
hearing of the proceedings here in the Court during the
testimony.

During the course of the trial, do not
discuss the case among yourselves, and do not discuss
the case with anyone else.  Do not permit it to be
discussed in your presence.

And there's one exception to this rule,

1  and that is you may discuss your testimony with the

2  lawyers for the case.

3              Now, I am going to exclude from operation

4  of the Rule the representatives, the party

5  representatives in the case, as well as any witness who

6  has been designated as an expert witness in the case.

7              I will also allow any witness to remain

8  in the courtroom for the duration of opening statements,

9  but after opening statements, if you are a fact witness

10 and you don't fall into the category I just outlined,

11 you need to excuse yourselves from the courtroom, okay?

12             You can step back now.

13             Ladies and Gentlemen, you will now hear

14 opening statements from the attorneys.

15             Mr. Fenster, you may address the jury.

16             MR. FENSTER:  Thank you, Your Honor.

17             THE COURT:  I will let you know when you

18 have five minutes remaining.

19             MR. FENSTER:  Thank you.

20             Ladies and Gentlemen of the Jury, good

21 afternoon.

22             As you heard before, my name is Marc

23 Fenster, and I'm proud to represent Bright Response in

24 this case.

25             This is an important case.  This is an

important case involving an important invention about

something that you-all see every day and use when you're

using the internet.

Before I get started, I want to thank

you.  This is Bright Response's day in court, and it's

because you-all are here that we're going to get that

day in court.  And I ask you to keep an open mind.

I thank you for your service today.  I thank you for

your attention.  And I really want to extend that.  We

will make this as short as possible.  I know that this

is an inconvenience for you.

Ladies and Gentlemen, the purpose of

patents is to promote science.  Just like jury service

was built into our Constitution, as Judge Everingham

explained earlier, so was the patent system.

The founding father's wrote it into the

Constitution, because they believed that patents promote

science.  If you reward invention with patents, it will

promote science.

In the Constitution, the patent system

was one of the very first federal institutions back in

1792.  But the patent system can only work -- it can

only work to promote science if people respect patents.

And that's why we're here.

Bright Response has a patent.  It is the

Rice patent.  They believe that Google and Yahoo! are
infringing it, and it is up to you to determine whether
they are.

Now, this is an opening statement; it's
not an argument.  I'm not allowed to argue the case.
What I'm allowed to do is give you a preview of the
evidence.

Slide 2, please.

And that's what we'll do.  I'm going to
give you a preview of what you're going to hear.  You'll
hear evidence about the Rice invention that led to the
Rice patent.

You're going to hear evidence from
Dr. Rhyne as to how Google and Yahoo! infringe, and
you'll see lots and lots of evidence.  There will be
documents and witnesses.

You'll hear evidence about the damages
that are owed, and you'll hear lots of evidence about
Google's and Yahoo!'s defenses.  And ultimately, it will
be up to you to determine whether or not those defenses
are valid and whether we've proved our case to you.

This case is about the Rice patent.  You
have it in your jury notebooks.  And as the Judge told
you, there are three claims at the back.  Those three
claims that are at issue are Claims 30, 31, and 33.

It is the claims that define the scope of the invention that's able -- that's being protected here today.  It is like the property boundary.  This is a deed to property.  It's intellectual property, and you have a right to exclude others from trespassing.

And it is the claims that define the outline of that property just like our homeowner's deeds that define the property and define the tracts that we own.  It is not anything else in the claim, as Judge Everingham explained to you.  It is the claims at the back, and that's what you need to concentrate on.

Now, Amy Rice, who's sitting in the first row, is the inventor.  And I told you earlier during voir dire that she is a knowledge engineer, and she used to work for a company called Bright Response (sic).

Brightware was a very innovative software company.  They had worldwide offices, including one in Dallas that you'll hear about, and they had won lots of awards.

No. 4, please.

One of their clients in 1996 was Chase Manhattan Bank, a big reputable institution.  And they had a problem back then, and that was that they started getting hit with lots and lots of e-mails.  Customers started e-mailing them faster than they could keep up

with, but it was important that they give good, accurate
responses to those e-mails.  It was important for
customer relations.

So they needed a way to deal with it, and
they called on Brightware, and Amy Rice got assigned the
project.  She was the project leader.  She was the
person in charge at Brightware for the Chase project.

And what Brightware was called on to do
was to develop an automatic computerized system for
automatically interpreting all of these e-mails that
came in, figuring out what the customer wanted, and
determining what the proper response was, automatically
receive that, retrieving it and delivering it without
any further input from the user.

Now, that's kind of a tall order for a
computer to do, to get an e-mail that has a bunch of
text, and you can't ask questions.  It has to be
non-interactive.  And the computer has to figure out
what is the user saying.

Now, if each of us sent e-mails to a bank
asking a question, well, we'd probably have 20 different
ways to ask the same question.

This had to be a really smart system.  It
had to be a really smart knowledge engine.  And that is
what the knowledge engine was that Amy Rice and her team

invented.

Now, Amy Rice's invention back in 1996 received recognition. She was awarded a paper by the American Association for Artificial Intelligence. It's called the AAAI. Because that's a mouthful, we call it the Triple AI.

And that was a conference. In fact, it was the premier conference for artificial intelligence. And they asked her to write a paper and present this invention at the conference, and she did. She wrote the article in 1995, late 1995, for publication later at the conference, which wasn't until August 1996. That will be important later.

Slide 6, please.

The other recognition that Amy Rice and her team got for their invention was the '947 patent. We also call it the Rice patent, and that's not a very good picture of it. You have it in your jury notebooks. But this is the '947 patent. As the Judge explained to you, we refer to it as the '947 here.

You see Amy Rice is listed as the first inventor, and that's why I refer to it as the Rice -- Rice patent.

Notably, it was filed in 1998, but it relates back to a provisional application that was filed

1 on April 3, 1997. And there's no dispute that that is

2 the effective filing date of this patent.

3 The effective filing date of the patent

4 is April 3, 1997. And what that means is that there's a

5 critical date that I'll tell you about later that's a

6 year earlier. And that's April 3, 1996.

7 Now, Bright Response, the Plaintiff in

8 this case. Bright Response is a Texas company. They're

9 based here in Marshall. Bright Response now owns the

10 Rice patent. They bought it. They bought it as an

11 investment.

12 You'll hear from Mr. Sheafe, who I

13 introduced you to earlier. Mr. Sheafe is the president

14 and manager of Bright Response.

15 Now, Mr. Sheafe is a pretty amazing guy,

16 and I'm really proud to know him. He's an American

17 patriot. He served in the -- he served his country in

18 the armed forces, and he served with the FBI.

19 When our country was attacked on

20 September 11th, 2001, Mr. Sheafe was one of the first

21 responders. He had boots on the ground in New York,

22 Ground Zero, within 36 hours after the attack or so.

23 Mr. Sheafe specialized in cyber

24 investigations at the FBI in several different units,

25 including one dedicated to fighting terrorism. He's

1 well-versed in computers and technology, and he'll tell

2 you about Bright Response, how it came to own the

3 Bright -- the Rice patent, and why we're here.

4 Mr. Sheafe will tell you, when he

5 testifies, that when he was with the FBI, he learned

6 that the FBI never backed away from a case. Didn't

7 matter how powerful the target was. If they were crime

8 bosses, if they were a senator, it didn't matter who the

9 target was. They never backed away from a case.

10 Now, he'll tell you honestly that Bright

11 Response's business is to find patents that are valuable

12 and then to enforce them.

13 Now, you'll hear evidence from the other

14 side that Bright Response got a great deal on the Rice

15 patent, that they acquired it for a low price. And they

16 will argue that because of that, they shouldn't be

17 entitled to any compensation.

18 But Mr. Sheafe will testify that there is

19 a huge risk in buying a patent that's infringed by

20 companies as big as Google and Yahoo!. He learned in

21 the FBI that you have to be prepared to fight to the

22 finish. And the truth is, Ladies and Gentlemen, that

23 Bright Response is here with a heavy but determined

24 heart.

25 It was not lightly that Bright Response

filed this lawsuit back in 2007, more than three years

ago. But Mr. Sheafe will tell you that it has taken an

investment of years of labor and a lot of money to bring

this -- to bring this case to you to be able to enforce

the patent.

Mr. Sheafe believes in the patent system

of this country. He believes it makes this country

stronger by fighting to make big companies respect

patents, even when they're held by little companies.

Now, I want to talk a little bit about

the Defendants in this case.

No. 9, please.

So Google and Yahoo! have search engines,

and when you go to google.com, you'll see this website.

Next slide.

If you -- let's say that you wanted to

find out about trucks, and let's say you were interested

in an Explorer -- or an Explorer or a Chevy Tahoe. You

typed in Explorer/Tahoe, and you press enter. In the

blink of an eye -- it's actually .17 seconds. I don't

know if you can see it there, but in .17 seconds, you

get this page or something like it.

Now, you get the results, but that's not

what this case is about. These are the natural search

results from the engine. Those don't infringe. That's

1  not what this case is about.

2           But there are ads.  Do you see the ads?

3  The ads are over here called sponsored links.  Google

4  calls them sponsored links, and those are the ads.

5           And the key is, is that they have to find

6  ads that are relevant to the query and serve them with

7  the response.  It has to be quick and relevant.

8           Now, let's say you changed one letter and

9  did explore Tahoe.

10          Next slide.

11          Now -- next slide, please.

12          Okay.  So now the search comes back, and

13 there are no ads.  So Google figured out in that split

14 second that if you typed in Explorer/Tahoe, you're

15 probably looking for trucks.  But if you put in explore

16 Tahoe, maybe you're looking to explore Tahoe and there

17 are no ads there.

18          Yahoo! does the same thing.

19          Next slide, 13.

20          So if you type in a search for Suburban

21 Tahoe, you'll get a search results page that has ads.

22          Now, you probably imagine that Google and

23 Yahoo! have lots of ads.  Well, the evidence will show

24 that they actually have billions of ads in these links.

25 And you might imagine that they get lots of search

requests.  The evidence will show that they actually get millions of search requests every day.

Now, I don't know if you've ever wondered how they find the right ads to serve so fast.  That's what this case is about.  It is the Rice invention that allows them to find the relevant ads quickly to serve them like that.

Now, Slide 14.

So it turns out that the Rice invention was suited perfectly for doing what Google and Yahoo! do.  Remember, with Chase they were getting lots of electronic messages, and they had to automatically interpret them quickly, find the right response, and automatically serve them.

So it turns out that's what happens with Google and Yahoo!  They get hit with millions of search requests, electronic messages.  They have to automatically figure out what the user is looking for, whether it's trucks or search Lake Tahoe or what, and automatically serve the response quickly and accurately.

Now, Bright Response is asserting the three claims that I told you about:  30, 31, and 33. Dr. Rhyne -- if you go to Slide 15, please.

Dr. Rhyne is an expert.  He's actually sitting way back in the cheap, cheap seats.

1          If you would stand up, Dr. Rhyne.

2          He's right back there, Ladies and

3 Gentlemen.

4          Dr. Rhyne will tell you about the

5 infringement case in this case.  I want to assure you,

6 Ladies and Gentlemen, that we're not here to waste your

7 time.  This is not a case that's built on conjecture.

8 In a civil litigation, we are entitled to discovery, and

9 discovery means discovery of evidence.  And what that

10 means is that Google and Yahoo! had to turn over

11 thousands, hundreds of thousands, of pages of documents

12 describing their system.  Their documents describing

13 their system.

14          Now, they also had to turn over their

15 engineers and make them testify under oath and answer

16 questions in depositions describing exactly how their

17 systems work, detailed descriptions of how the systems

18 work, both Google and Yahoo!.

19          Now, they also had to produce source

20 code.  The source -- this is all computerized stuff.  It

21 works on computers, and the end all/be all of how it

22 works is in the source code.  You can ask people who

23 testify about it, and you can have documents about it,

24 but, really, if you want to know how it works, you've

25 got to go to the source, and that's the source code.

1          Well, Google and Yahoo! produced millions

2  of code that has been reviewed in this case.  And Dr.

3  Rhyne has reviewed thousands and thousands of lines of

4  code, and that will be the basis of his testimony.

5          Now, after reviewing all of that

6  evidence, he carefully and meticulously compared the

7  accused products to every single element of Claims 30,

8  31, and 33.  And he concluded that every single one of

9  those elements is met by Google and Yahoo!'s accused

10 products.

11          And he's going to go through -- and it

12 will take a little bit of time, so I apologize in

13 advance and ask you to pay attention -- but he will go

14 through and lay out the basis for his conclusions and

15 what the evidence is that supports it.  He's going to

16 show you the findings and exactly how Google's products

17 and Yahoo!'s products map the asserted claims.

18          And he will give you the evidence to back

19 it up, I promise you that.  You will hear it.

20          Now, Slide 16, please.

21          Now, there are two Defendants here and

22 there are two systems.  They operate similarly.  They

23 both do the same -- they both serve ads in the same kind

24 of way as I showed you.

25          Google's accused system that Brightware

1 believes infringes Claims 30, 31, and 32 (sic) is called

2 the AdWord system.  This sets on a server -- a couple of

3 servers at Google.

4 And on the left here, you see the source.

5 That's the user -- you and me -- entering a search

6 request for an Explorer/Tahoe.  That search request is

7 sent electronically over the air, over the internet, to

8 Google and Yahoo!, and it's received at AdMixer.

9 Now, on the right, what this is, is the

10 advertiser entering the ad.  Now, when the advertiser

11 enters the ad, he doesn't just -- he or she or the

12 company doesn't just enter the ad.  They enter

13 information about the ad, including keywords that they

14 think that you might search for.

15 So let's say that it's an advertisement

16 for a Chevy Suburban.  They will enter Suburban as the

17 keyword or Chevy as the keyword, or they may even offer

18 Explorer as a keyword, because they think that if you're

19 searching for Explorer, you might want to see their ad

20 on a Suburban.

21 So they enter information about what they

22 anticipate, what they expect that you might put in your

23 search request.  That will be important later as Dr.

24 Rhyne will explain.

25 Google and Yahoo! pull out other

information that's important, geo-targeting information

for location.  If you're searching in Marshall, for

example, or East Texas, they'll have targeting

information for Longview.

They'll have demographic information.

They might think that people who are looking for trucks

have to fit a certain demographic and put demographic

information in that advertisement.

All of that information is put into the

AdWord system, and then the AdWord system compares it,

you'll hear from Dr. Rhyne, using a rule-based and

case-based knowledge engine, that is, as claimed in the

patent.

And I'll leave it to him to go through

the details, because my time is short.

Yahoo! -- let's go to the next slide,

please.

Yahoo!'s accused product -- next slide --

is called Sponsored Search.  Sponsored Search is their

system for searching ads.  And, similarly, they get

search requests on the left, users entering the search

requests.

On the right, the advertisers enter their

information and what they expect people will be

searching for.  All of that goes into Sponsored Search.

1   It's processed by a knowledge engine that's called

2   rule-based and case-based knowledge engine that you'll

3   hear more than you want to about.

4               And then it gets processed, serves an

5   automatic response back to the source, and it also gets

6   classified.  And Dr. Rhyne will tell you how it meets

7   the classification step.

8               Now, Slide 20, please.

9               Dr. -- Judge Everingham -- Judge

10  Everingham told you a little bit about the burden of

11  proof.  It is up to us to prove infringement.  That's

12  our job.

13              They don't come in being -- you can't

14  presume that they infringe, and neither do we.  We have

15  to prove it to you.  And the burden of proof that we

16  have for you -- that we have to satisfy to prove that to

17  you is a preponderance of the evidence.

18              If, after all the evidence that you hear

19  from Dr. Rhyne and the other experts and witnesses in

20  this case, you believe it's even slightly more likely

21  that they infringe, then we've satisfied our burden.

22  I think you'll be pretty clearly convinced, but the

23  burden is only preponderance of the evidence.

24              17.

25              Okay.  Now, Slide 22, please.

1           Now, the evidence that you'll hear from
2  the witnesses in this case will show you that serving
3  relevant ads accurately and quickly is the key.  They
4  have a split second to return those ads.  And if those
5  ads aren't relevant to you or to the search -- to the
6  search request that's been entered, then they won't get
7  clicked on.  And if they don't get clicked, Google and
8  Yahoo! doesn't (sic) get paid.
9           Now, Google and Yahoo! will make an
10 interesting argument for you.  They'll tell you that
11 because they don't get paid -- they don't get clicked
12 until -- they don't get paid until someone clicks on the
13 ads, that somehow -- and the patent does not cover the
14 clicking.  It really doesn't.
15          In fact, it has to be non-interactive.
16 But they'll tell you that because they don't get paid
17 until you click on the ads that they serve using the
18 right system, that somehow we're not entitled to any
19 damages for that.
20          Now, I want you to imagine that you had a
21 patent for a diesel engine, and GM started making trucks
22 using this diesel engine.  And they used it for years
23 and made lots of trucks and made lots of money.  And
24 then when you went to ask for your royalty, they said,
25 sorry, your patent covers the engine, and it doesn't

cover the sale, and we didn't make any money until we
sold it.

That's kind of what that argument is
like.

Now, the evidence will show that the Rice
patent is involved in serving every ad that Google and
Yahoo! serve using the accused products.

I don't want to oversell the Rice
invention. Amy Rice did not invent search engines. She
didn't invent serving ads. And this patent does not
infringe any time anyone serves an ad. It's not.

This is an improvement patent. It helps
companies do it better, faster, and more accurately. It
is an incremental advance.

Yes, you will hear from them that they
used to serve ads even before this patent. That's true.
They didn't do it as well, and they didn't use the right
invention to do it.

You'll hear evidence they didn't start
using the Rice invention until 2004. Yes, they served
ads before that, but they served ads before the Rice
patent. Do not be distracted by this.

Judge Everingham will instruct you, I
believe, at the end of the case that the way you
determine infringement is by comparing the accused

products to the claims, and that is all.  It does not
matter if they practiced it before.  And you will get an
instruction to that effect.

They are trying to distract you with
that.  Please do not be distracted from the facts and
what Judge Everingham will ask you to do, which is to
compare at the end of the day, after you've heard all
the evidence, the accused products to the claims.  And
that's all you need to compare.

Now, you'll hear from -- when we get to
the damages portion of the case, you will hear that a
reasonable royalty for Amy Rice's invention is less than
half of 1 percent.  Less than a penny on a dollar.
Actually, between a fourth and a half of a penny of
every dollar that Defendants make using AdWords and
Sponsored Search.

Now, even though it's a tiny fraction of
Defendants' earnings that are accused, we're only
talking about the accused earnings in this case.  That
means the only earnings at issue are the ones from
AdWords and Sponsored Search.  It still is a significant
amount of money.

The evidence will show that Google has
made over $25 billion.

Slide 26, please.

1           $25 billion from AdWords in the relevant

2  period of time.  This is from 2004, when they started

3  infringing, to March of this year.  And when you apply

4  the relevant percentage, a quarter of a penny on every

5  dollar.

6           Next slide.

7           THE COURT:  You've got five minutes

8  remaining.

9           MR. FENSTER:  Thank you, Your Honor.

10          The relevant damages are $64 million.

11 For Yahoo! -- next slide -- they have made $5 billion

12 from the Sponsored Search.  And when you apply the

13 relevant percentage, the revenue -- the damages

14 attributable to that, one-quarter of 1 percent

15 -- next slide -- are 13.7 million to 27 million.

16          Now, 31, please.

17          The Defendants have lots of defenses.

18 They have lots of excuses.  They say they don't

19 infringe.  And they will give you lots of reasons.

20          Now, the first reason -- in fact, the

21 only one mentioned by Mr. Verhoeven was that the patent

22 is limited to e-mail.

23          Now, you just heard Judge Everingham tell

24 you that the only one to tell you what the claims mean

25 is Judge Everingham and that he has construed the claims

1   and that you are to apply the Court's constructions.

2                   The witnesses have to apply the Court's

3   constructions.

4                   Now, when you look in your glossary and

5   you look for a definition of non-interactive electronic

6   methods, it is not going to say that it's limited to

7   e-mail.

8                   Mr. Verhoeven, Google and Yahoo! and

9   their witnesses are not applying the Court's

10  constructions.  And when you weigh the evidence at the

11  end of the day, you will apply the Court's

12  constructions, I hope.  You will determine who has

13  applied faithfully the Court's constructions and

14  consider that when you're weighing the evidence.

15                  Now, the next defense that I need to tell

16  you about is important.  So Defendants claim that the

17  patent is invalid.

18                  Let's go to the timeline, please.

19                  They claim that the patent is invalid and

20  they've got lots of reasons.

21                  Now, the effective filing date, as I told

22  you, is 1997, and the critical date is April 3, 1996.

23                  Now, Ms. Doan, I think, told you in voir

24  dire -- and she's absolutely right -- and Mr. Verhoeven

25  that within the rules of patents is that a patent is not

valid if it was in public use more than one year prior.

So Defendants are going to try to show you that the EZ Reader system that Amy Rice developed for Chase Bank was in public use -- public use prior to the critical date of April 3, 1996.

Now, testing environments don't count. What you'll hear from Amy Rice is that it was being tested at Chase, subject to a confidentiality order. And that doesn't count, and there's no dispute about that.

The question is, when, if ever, did it ever go live.

Now, there's an important document that I want to preview for you, and that is Exhibit 861.

Both Plaintiff and Defendants will tell you about this document. It's March 29th, 1996, four days before the critical date.

And do you know what this e-mail says? It's ready for production. So it's undisputed -- it's really beyond disputed; I won't say it's undisputed -- that the document shows that it hadn't gone live before March 29, 1996.

And the Defendants are going to put on a witness named Chuck Williams, who is two steps removed from Ms. Rice, about the EZ Reader project to say it

went live on March 30, 1996, because they have to shoot this gap.

I mean, this is like a rifle shot a thousand yards away in the rain around the hill. It wasn't live up until March 29, 1996. They have to prove it before April 3, so they're going to try to prove to you by clear and convincing evidence that this invention went live in this three-day period, 107 hours and 44 minutes, 14 years ago.

Now, I want you to listen to the evidence from Amy Rice and the others and pay attention to who's got personal knowledge about this. And you weigh the evidence with the documents to see whether they've met their burden of proving that.

That's their key defense in this case, that this patent, that this invention is invalid. They're trying to destroy the patent, because they think it went live here.

Now, Amy Rice is going to tell you that not only it hadn't gone live up to March 29, it didn't go live after that. Tim Bank -- or Chase Bank --

THE COURT: Mr. Fenster, I hate to interrupt you, but you need to wind it up. You're out of time.

MR. FENSTER: Yes. Thank you, Your

Honor.

Ladies and Gentlemen of the Jury, you'll hear lots of evidence.  I thank you for your attention in this case, and ask you to keep an open mind and weigh the evidence and wait until the end to make up your minds.

On behalf of Bright Response, thank you very much.

THE COURT:  All right.  Thank you, Mr. Fenster.

MR. FENSTER:  Thank you, Your Honor.

THE COURT:  Mr. Verhoeven.

MR. VERHOEVEN:  Thank you, Your Honor.

THE COURT:  You may address the jury.

Give him just a second to remove his material.

MR. VERHOEVEN:  Yes, Your Honor.

THE COURT:  I will let you know when you have five minutes remaining.

MR. VERHOEVEN:  Thank you, Your Honor.

Good afternoon, Members of the Jury.

Again, my name is Charlie Verhoeven, and I'm an attorney for one of the two Defendants in this case, Google.  Ms. Doan, who you've heard speak, is going to speak on behalf of the other Defendant in the

1  case, Yahoo!.

2            We're each going to take about 20 minutes

3  of your time to present our opening statement, and we've

4  coordinated, so I'm going to -- we have two defenses in

5  this case, as I mentioned, when I spoke to you earlier.

6  The first is non-infringement and the second is

7  invalidity.  I'm going to address primarily the

8  non-infringement, and Ms. Doan is going to address

9  invalidity.  These are common defenses that we both

10  have.  So that we can save some time and move on, we're

11  splitting it up.

12            So I'm going to address non-infringement

13  arguments that Google has.  Before I do that, I'd like

14  to spend a second and just talk about who Google is.

15            Google is a technology company.  Google's

16  lifeblood is building new technology, inventing new

17  technologies.  Google highly respect patents and

18  technology.  Has its own.  It takes any complaint for

19  patent infringement very seriously, including this case.

20  And we have devoted a lot of resources to looking at the

21  complaint in this case and investigating it.  And we

22  believe the evidence is going to show you that Google

23  does not infringe any of the asserted claims in this

24  patent.

25            But before I get into the specifics on

non-infringement -- if we can turn on the screen, Ryan. I'll tell you a little bit about Google.  Google was started back in September of 1998.  It actually started up in a friend's garage in Menlo Park, California, by a couple of grad students of Stanford University:  Larry Page and Sergey Brin.

Now, I assume that many of you have heard of Google.  You've actually used their products on the internet, if you've used Google search engine.  You know that's a free service that you can type in search queries and get responses.

Google also offers a number of other services.  If you like to use e-mail, Google has a service called Gmail, which you can use for free.  You just put in a password and a user name and, voila, you have an e-mail account you don't have to pay for.  You can use it to talk to other people.

Google also has a map service where you can type in an address to another address, and you'll hit a button, and it will tell you how to get from one point to the other with a map and turning instructions.

So there are a number of products that Google offers to people like you and me, users of the internet, for free.

But when Google started back in 1998, the

idea that Mr. Page and Mr. Brin had was to organize
information on the internet and bring it back to users
through the use of search queries.  That was their
initial idea.  And they came up with that in 1998.

This picture you're looking at here,
Members of the Jury, is a screen shot from the first
Google site back in 1998.

As you can see, it's got the search box
there, and that's where you would type your search
query, and then you get back results.

If you go fastforward to about 2000,
Google augmented its search processes.  By that time,
Google had become successful, and people all over the
place were using its search engine.

And Mr. Brin and Mr. Page were able to
move out of the garage and get some office space in Palo
Alto, California.  And by that time, they had several
hundred employees, and they were all working hard to
build the system.

And Google came up with the AdWord
system.  That's the system that is accused in this case
by the Plaintiff.  So Google developed that in 2002,
which is two years before the patent at issue in this
case was issued by the Patent Office.

Now, this -- what we're looking at here

is, just by way of background, how the Google search

engine using AdWords works.  And you see up there, that

box there is where a user would enter a search query.

So in our example, the search query is Dallas Cowboys.

And when you click on that, you'll get results.  And

Google actually tells you how many results it found,

11,600,000, and how fast it brought them back, .22

seconds.

Now it ranks these as most relevant.  And

so as you can see, in this box, this part of the screen

is where the search results come back.  So if you

want -- if you're interested in the Dallas Cowboys in

this example, it brings you back in .23 seconds, and it

lists the sites that relate to what you asked for.

These are what we're going to refer to in this case as

native search results, and they're not accused of

infringement in this case.

At the same time, Google, using AdWords,

brings back on this side some links that are basically

advertisements.  And a user could click on those, and it

would bring to you an ad.

So just so you have some background and

understanding, this is essentially the technology at

issue here.  This part is not accused of infringement,

but this part here is (indicating).

Now, I just want to reiterate the timeline we're dealing with here. So here we've created a timeline, and you can see that Google was founded in 1998. In 1999, the evidence will show it began development of its advertising system. It launches the AdWords program -- that's the program that's accused of infringement in this case -- in 2000.

And it improved it in February of 2000 (sic) and releases a new version that was even more sophisticated.

All of this happened through the hard work and efforts of the employees of Google, building the technology, building the search engine. It's truly a remarkable product.

They had no notice of the patent. They didn't know that there was any patent that was around. In fact, the patent didn't issue -- and this is the patent at issue in this case, the '947 -- until June 2002.

Now, Google had already made AdWords before this patent issued.

Now, I'd like to switch and talk about how this '947 patent works.

Now, what you're looking at here is a -- this is in your binder actually. If you open up the

patent, this is a picture of Figure 1 from the patent,

which gives a detailed description, which provides

examples for what's called preferred embodiment.

And you'll see here what the patent is

talking about, and the patent is talking about a system

where a customer will send an electronic message, a

question or a problem, something like that. And it will

send it to the system, and then the system -- this is

the back-end system.

So up there is the customer sitting at

his or her terminal, just like you might sit at your

terminal at home. And then it goes through the network

into the back-end system. And this is a box from the

patent. It's a blowout of what's going on internally in

the back-end system.

And here the system interprets that

message, that electronic message that was sent. And it

uses, among other things, a case-based engine. And

we'll talk about that in a second.

Then the message is classified, and we'll

talk about that in more detail in the case as well. The

message is classified as either being able to be

responded to automatically, or if you can't respond to

it automatically, so you have to have a human being look

at it and review it.

1    In the event that you have to have a
2 human review it, you'll see it goes up to here, and it
3 says manual review inbox.  And that comes down to here
4 and you see a picture of a human being.  And that's the
5 manual review, and that's a human being that reviews the
6 message, if it can't be responded to automatically.
7 And then either way, whether it can be responded to
8 automatically or a human has to review it, the last step
9 is that the -- a response to the electronic message is
10 delivered back to the customer.
11    So that's the example in the patent of
12 what the patent is talking about.  It's a system where
13 you take an electronic message and you run it against a
14 database.  It's rule-based and case-based, and see if
15 you can respond to it automatically.
16    Then the next step is you have to
17 classify that.  Can it be responded to automatically or
18 not?  And if it can't, a human looks at it.  If it can,
19 it just goes automatically back.  But in all cases, even
20 after the human reviews it, it has to go back.
21    Now, we've presented an illustration to
22 help make it simple and explain it to you, so I'll just
23 run through this.
24    So here is a person sitting at a terminal
25 typing up -- and the example in the patent is an

e-mail -- and they type that up.  And then it gets --
and this is the case-based part.  We're focusing on
this, because this is the important part of the case.
And you can see that they're taking a presented case,
which is an e-mail the person wrote, and they're
comparing it against stored cases.  In the patent, the
illustration is stored e-mails.

They're comparing the e-mail to these
stored cases to see if they're similar enough to have an
automatic response.  And if they are, each case is
paired to a response, and the response will be sent back
automatically.

So here in the first step, this one is
not similar enough, and then it goes to the next case.
That one is not similar enough.  Then it goes to the
next case.  That one is similar enough.

So then the next step, as I told you, is
the classification.  You go to the classification step
and the system says, can this be responded to
automatically or not?

Answer:  Yes.  So then the system takes
the response that's associated with that and
automatically sends it back to the person who's sent the
request or problem in the first place.

Now, in the second example here is a good

1  example of where it can't be responded to automatically.

2  So it's the same thing.  You take -- the user sends an

3  e-mail, gets compared to stored, exemplar cases.

4           And in this example, none of them match.

5  So when it gets done, the classification step says, can

6  this be responded to automatically or not?  The answer

7  is no, we need to have a human look at it.

8           And so it gets classified that way.  And

9  then the message goes over here to the human being.  The

10  human reads it, responds to it, and it's supposed to

11  get -- it's not working, but it's supposed to get sent

12  back over here automatically.  It goes to the human.

13  There you go.  It goes back automatically.

14           So that is an illustration we prepared to

15  try to explain what the gist of this invention is.

16           Now, I'd like to --

17           THE COURT:  Ladies and Gentlemen --

18  excuse me, Mr. Verhoeven.

19           During jury selection, I explained to you

20  that what the lawyers say is not evidence.  And I also,

21  in the preliminary instructions, gave you some

22  instructions about the fact that the claims of the

23  patent define the scope of the invention that the patent

24  is entitled to protect.

25           And Mr. Verhoeven is showing you some

examples that are in the written description of the

patent of examples of how the invention might be used.

Now, unless I instruct you differently,

the claims of the patent are not limited by the examples

that are shown in the specification.

So the claims are -- I will give you

definitions, and you've been provided definitions for

the various claims. But the claims themselves are not

limited by the examples that are shown in the

specification that come out of the patent.

Go ahead, Mr. Verhoeven.

MR. VERHOEVEN: Thank you, Your Honor.

Yes, that's true. And this is just an

example. This is the example that -- the figure from

the patent, and I'm just trying to walk it through and

explain it to you.

Now, I'd like to take a step -- a

second -- I'm going to get to the claims in a minute.

Before I do that, I want to give you a

big picture overview of the Google system, all right?

So here's the Google system that's being

accused. And what happens is, a user types in a search

query, and the search query goes to the Google server.

And then what happens in the Google system is Google

processes that query down two different paths.

1                    One path is the path that leads to those

2   native search results we talked about.  And in that

3   task, Google processes the query against over 200

4   billion web pages, the internet.

5                    And the other path is the AdWord system

6   that is accused of infringement.  And that one, it

7   crosses the query against over 2.2 billion ads in the

8   database.

9                    And then what happens is, it puts those

10  back together on the other end, and what you see is what

11  we saw earlier, which was the native search results

12  combined with the advertisements.

13                   And so this part is not accused of

14  infringement; this part is (indicates).  So I'm going to

15  show you a couple of slides on how this part works.

16                   Three steps on how it works to try to

17  keep it simple.

18                   The first step --

19                   THE COURT:  You're got about five minutes

20  remaining.

21                   MR. VERHOEVEN:  Thank you, Your Honor.

22                   The first step is this AdMixer.  As you

23  can see, what's happening is the query is -- the AdMixer

24  takes the query, crosses it against two billion ads, and

25  isolates a small number of ads that are candidates for

being returned.  That's the first step.

The second step is the -- it moves on to Google SmartAd's system, which makes predictions, and we've illustrated how that happens.  There's a gigantic table with statistics in it that Google uses and processes the query together with the ads and calculates statistics.

Again, it's a completely different process than what's being described in the patent.

And the third step is, Google runs an auction, and it takes -- because all these advertisers submit bids.  It looks at all those bids and ranks the ads.

So it's a completely different system than the system that's described in the patent.

Now, I want to talk about non-infringement real quickly here, Members of the Jury.

You'll be instructed that it's the Plaintiff's burden of proof to prove that every single element is infringed on any given claim.  If there's a single element that the Plaintiff can't prove that Google meets, you must find non-infringement under the law.

And here, because they're taking a system designed with electronic messages and responding and

trying to classify those as human responses or automatic responses, because that's so different from the Google system, there's a whole bunch of reasons.  And let me go through three of them real quick.

First, the claims require that the electronic message be non-interactive.  And the Court has construed that an electronic message that's non-interactive is an electronic message in which the sender does not provide any additional information after the message has been received.

Well, on the Google system, it's the most interactive system you could have.  Even when you're just typing your search query, immediately Google sends back interactive responses.  Every single character that you type is interactive with the system.

So the Google system is totally interactive.  That element is not met.

The second element, the case base knowledge engine.  You see in the patent -- this is from the patent.  It's only Figure 1 in the patent that has this, other than the flow chart.  It talks about what a case base interpretation is.  You take a presented case against the stored cases.

That's not the way the Google system works.  Google processes a query against ads and then

applies that to statistical numbers.  It's a completely different process.

Third reason.  And this one is really important.  Classified.  The patent -- every claim that's at issue here requires classifying electronic messages being able to be responded to automatically or not.

In the Google system, every single time you type in a query, you get an automatic response, 100 percent of the time.  There is no step in the Google system that says:  Can I respond to this automatically or not?  100 percent of the time, the evidence will show there is an automatic response.

We have several other arguments that in the interest of time, I'll skip over, but suffice it to say, there are a number of arguments for non-infringement in this case.

Do I have two minutes, Your Honor?

THE COURT:  Yes, sir.

MR. VERHOEVEN:  And we'll cover those when we present the evidence and in our closing arguments.

Now, I'd like to take one minute before I concede the rest of my time to my co-defendant to talk about damages.

1          Now, I want to be crystal clear that I'm

2  talking about -- just because I'm talking about damages

3  and criticizing the Plaintiff's damages, you should not

4  interpret that to mean that Google concedes any sort of

5  liability.

6          We are not liable.  This patent is not

7  infringed.  But I have to talk about damages now if I

8  want to criticize the Plaintiff's calculation.  And so

9  I'm going to do that, but I urge you not to draw any

10  inferences from that.  I have to do it or else I won't

11  have another chance.

12          Now, the Judge is going to instruct you

13  that if you decide that there is infringement or

14  validity, that you need to go on and talk about a

15  reasonable -- think about a reasonable royalty.

16          And the way to do that is to imagine

17  what's called a hypothetical negotiation between the

18  Defendant and the Plaintiff at the time of first

19  infringement.

20          Well, in this case, that time, the

21  Plaintiffs allege, is in 2004.  In 2004, the patent is

22  actually owned by a different company called Orion.  So

23  your job, if you get that far, is to imagine Orion and

24  the Defendants having a hypothetical negotiation.

25          Now, the Plaintiff says that in that

1 hypothetical negotiation, Google would agree to pay $64

2 million.  What the Plaintiff didn't mention to you is

3 that just a few months before the hypothetical

4 negotiation was supposed to take place, this company,

5 Orion, bought this '947 patent for a million dollars.

6 And that's not all.  They bought 13 other patents, 14

7 patents for a million dollars.

8 And so what the Plaintiff is asking you

9 to believe is that in this hypothetical negotiation,

10 Google, with knowledge that the Plaintiff had bought 14

11 patents, including the patent at issue, for a million

12 dollars, just a few months later would nevertheless say:

13 Okay, we'll pay $64 million.

14 Now, some of you have probably bought

15 houses.  And when you go looking for a house, what do

16 you do?  You compare the cost.

17 If you knew that a house had been

18 purchased just a few months before for a million

19 dollars, and the list price was $64 million, do you

20 think you'd pay that?  We don't think so.

21 The evidence in this case will show that

22 the damages the Plaintiff is asking for is highly

23 excessive and that no reasonable entity would ever have

24 paid anything near that amount of money given the facts

25 in this case.

 1                     I thank you for your time, and I'll have

 2    one more chance to talk to you at the end of the case,

 3    and I look forward to doing that.

 4                     THE COURT:  All right.  Thank you,

 5    Mr. Verhoeven.

 6                     Ms. Doan?

 7                     MS. DOAN:  Thank you, Your Honor.

 8                     Good afternoon.  The Plaintiff is

 9    accusing the Yahoo! search advertising system of

10    infringing their patent.

11                     Now, like I told you this morning, Yahoo!

12    has been offering search advertising, they've been

13    serving up advertisements in response to search queries,

14    since 1996; that is, one year -- more than one year from

15    when they started this program to when this patent was

16    ever applied for.

17                     In addition, Yahoo! has been using its

18    current sponsor search system since 2001.  Now, that's a

19    year before this patent was ever issued.

20                     What Plaintiff is trying to do here is,

21    they're trying to put a square peg, the '947 patent, and

22    shove it and do some type of -- a round peg and shove it

23    into a square hole.

24                     It doesn't fit in this situation.  The

25    patent is completely different from what we do, and

we're going to hear -- be able to talk to you about it.

Now, in the Yahoo! system, Yahoo! started back in -- I believe it was 1994. There were two graduate students who were getting their Ph.D.s. One of them was David Filo, who's down from around Lake Charles, Louisiana; the other was Jerry Yang. And they were going to come up with an index of the worldwide web.

Now, you know, the worldwide web was a little bit smaller in 1994, so I guess it's somewhat possible to be able to do it, but that's what they started out doing. And the next year it grew into what is now incorporated as Yahoo! in 1995.

March 5th, 1995, is when Yahoo! was incorporated. August 5th -- August 1995, it was Yahoo! who started selling advertisements on web pages.

Now, why did Yahoo! sell advertisements on web pages? That's how they make their money for -- to be able to serve free services to people like you and me.

Yahoo! has Yahoo! mail, Yahoo! content, Yahoo! media. Just like newspapers, they sell advertisements in order to advertise to the public. And there's 248,000 registered Yahoo! users just in our area alone.

1          Now, a year later, March 1996, Yahoo!
2  started selling search ads.  The difference between
3  selling ads -- ad advertisements on web pages -- this is
4  like an ad in the newspaper.  You just place an ad and
5  put it online.
6          Search ads, it would be if you start
7  searching for something specific, and the advertisement
8  comes up in response to your search.  It's different
9  than the search results just like Mr. Verhoeven showed
10 you.  There's search results, and then there's ad
11 results.
12         Then in November of 2001, Yahoo! began
13 providing Sponsored Search through Overture.  And then
14 in 2003, July of that year, Yahoo! acquired Overture and
15 all of its technology, all of its search advertisement
16 technology, and all of its search patents.
17         And Mr. Rooklidge can show you that
18 Overture dated patents that we acquired for search
19 advertising that Yahoo! owns.
20         We also have additional Overture patents
21 that we acquired, and we also have additional patents
22 that we licensed.  And these are all U.S. patents.
23 And then down here on the floor, we've got all of our
24 foreign counterparts for the patent worldwide that we
25 have on search ad technology.

1          So why are we here?  Given this history
2 for Yahoo!, we are the oldest company in this courtroom
3 that's been able to do search advertising.  And
4 everybody in this courtroom knows who Yahoo! was before
5 you came in here today.
6          So why are we here?  Because in 2007,
7 Polaris IP, which is now Bright Response -- they changed
8 their name.  Don't be confused with Brightware.  The
9 evidence will show you that they are not in any way
10 affiliated with Brightware.  But they sued Yahoo! under
11 this '947 patent.
12          And I know that Mr. Fenster called it the
13 Rice patent.  We call it the '947 patent, because
14 there's four other inventors, two of which will come to
15 testify to you during this case.
16          There was no contact.  There was no phone
17 call.  We had no notice whatsoever about the '947 patent
18 or who Bright Response was or that they thought we in
19 any way remotely infringed.  You can imagine why we
20 thought that we would not think that.  We owned the
21 patents on our Sponsored Search technology.
22          So what is accused here?
23          Alan, would you go to the next slide?
24          I'm not going to spend a lot of time on
25 this slide.  I think y'all get the content.  These are

the native search results.  So, for example, on the

Yahoo! website page, and it has auto insurance at the

top.

This would be the normal search results,

what Mr. Verhoeven called the native search results

right here (indicates), and then the block across the

top that's kind of with a vanilla background, that is

the Sponsored Search results.  That's a portion where

you can bid to place advertisements.

Now, under the Yahoo! Sponsored Search

system, you can bid for the top of the page, over on the

right-hand side of the page -- or if you'll just scroll

on down, Alan -- you can also bid at the very bottom of

the first page for another block down here (indicates).

That's what's being accused here.  Not the real results

and not Yahoo!'s e-mail system.  That's not being

accused here.  And not Yahoo!'s help desk and not

Yahoo!'s -- anything else about Yahoo!, just the

advertisement system, the Sponsored Search system.

Now, Mr. Verhoeven told you there's two

reasons why the Defendants here are not liable.

Number one, we do not infringe the '947

patent, and number two, the '947 patent is invalid.

Let's talk really quickly about the

reasons why we don't infringe.  Mr. Verhoeven covered

these for you.

Neither one of us have a non -- neither one of us have a non-interactive electronic message, and he showed you why, and you'll hear the testimony in this case.

Number two, it's not rule-based, case-based. He showed you what that is. That is not how our systems work. Our systems are different, and our systems are confidential, but neither one of us do rule-based or case-based.

Number three, there is no classification. Mr. Verhoeven showed you that. And he didn't get this over, but there's no score by normalizing either.

So let's talk a little bit more about the bottom one. There is no predetermined response, Claim 26 in your patent. And the three claims the Plaintiffs are accusing are Claims 30, 31, and 33.

Now, Claim 30, 31, and 33 all incorporate Claim 26 and 28. And you saw Mr. Fenster's slide where he shows you that road sign, and we had all these signs going out here, and look at all the defenses. Oh, my goodness, they're going to claim everything.

Do you know why? Because they have to prove every element in Claim 26, 28, and 30 to be able to get you to say that we infringe Claim 30. And then

they add elements on for Claim 31, and then they add

elements on for Claim 33.  They have to prove every

single one.

We don't do these things.  We want to

show you why.  You will see the evidence; you will hear

from the engineers; and we will show you the documents.

But let's talk quickly about why we know we don't have a

predetermined response.

We have a huge database of ads.

Mr. Fenster told you how large it was.  Ours is not

quite as big as Google's, but we like to think it's

really large.  We have millions of ads in this database.

And it's a dynamic database.  It's changing all the time

(snapping fingers).  There's a hundred million changes a

day to our database.  Ads are coming in; ads are going

out.  Ads are getting changed every day.

Now, that's a dynamic database, so there

is no predetermined response to any type of message

that's going to come in on a search.

Number two, we know that it's not a

predetermined response because of all this dynamic

database, you don't get all those ad results when you

type in a search.  You only get about zero to twelve-ish

that will fit on a page.

Some people don't bid on any terms, so

1  you're not going to have anything.  But they come out of
2  the database, and then they go through an auction
3  process like advertisers do, and they figure out:  Okay.
4  How much am I going to bid, or how much is somebody else
5  going to bid against me to get those top spaces that
6  they want.
7            It's a dynamic thing (snaps fingers) that
8  they can change at any time they want.  You wouldn't
9  want the same advertisements every single day for every
10 single search, and you don't get them either on Yahoo!
11 or on Google.
12           But number three, and the most important
13 reason why we don't have a predetermined response, is
14 because Judge Everingham has given you a Court
15 construction.
16           Now, look in your glossary, the very back
17 of your jury notebook.  You have a glossary of terms,
18 and these are the rules that the Court has given you to
19 interpret -- these are the terms in the glossary he's
20 going to tell you to use here.
21           And for a predetermined response, he has
22 said:  They are responses prepared prior to receipt of
23 the electronic message.  Prior to the receipt of the
24 electronic message.  That's the important part to focus
25 on.

1            There is no way, with our dynamic

2   database and our auction system, that they can already

3   be decided prior to you ever sending in a search

4   request.  That does not happen under the Yahoo! system.

5   And the Plaintiff knows it, and his expert, Dr. Rhyne,

6   knows it, sitting in the back of the courtroom.  And

7   this is the testimony he gave and you'll hear this week

8   in Court.

9            Well, I think they're -- they're

10  identified, to the best of my current knowledge, after

11  the query has been received.

12            Prior to is what the Court is going to

13  tell you is the rule you have to apply.  Their expert

14  knows it's after.  We don't have a predetermined

15  response.

16            Neither do Google or Yahoo! infringe this

17  '947 patent, and this predetermined response is applied

18  to every single claim.

19            Well, let's move on to the second issue

20  of why we don't infringe.  The '947 patent is invalid.

21            Now, what does invalid mean?  That means

22  the patent is no good.  And that means it's not

23  enforceable.

24            Now, I know you're asking me:  Well, then

25  how did the Patent & Trademark Office ever issue the

1  patent if you're going to stand up here and tell me it's

2  not any good?

3           Because you're going to hear things this

4  week, testimony, and see documents that the PTO never

5  saw.  We don't get to put documents into the PTO.  So

6  it's only what the patentee puts in.  They can only

7  decide what -- whether to issue a patent by what they

8  have in front of them.

9           So if they don't hear all the evidence,

10  they may go ahead and issue a patent.  And that patent

11  may be out there, just like this '947 patent was.

12  And until the inventor or until somebody buys the

13  patent, who's not associated with the inventor, and

14  comes into the Court and decides to try to enforce it

15  against a search engine that doesn't do anything like

16  the '947 patent does, no one can tell anybody about all

17  this additional evidence.

18           We're bringing it to you.  And what will

19  you see?  There's three reasons why this patent is

20  invalid.

21           Number one, the defense of a prior public

22  use.  Mr. Fenster told you the one-year rule, you're

23  going to hear about it here in just a minute, and you

24  will see the evidence of it today.

25           Any time that it's used publicly -- if

it's used publicly one year before, then the patent is invalid.

Now, why do we have this? We have this because you do not want an invention just hanging out there in the public, and then all of a sudden, nobody goes and patents it, and in three or four years, they go and patent it.

So Congress decided, you have a one-year bright line. Once it's being used in the public, you have to apply for the patent within that one year. It puts the burden on the patentee to go get their patent, if they want to have it patented.

Otherwise, it's deemed to be given to the public, and the patent is invalid. And you are the arbiters of those facts.

Number two, printed publications. Bradley Allen's patent we'll put in front of you and as long -- together with the CBR Express 2.0 manuals. And you'll see in these documents -- and Bradley Allen will be here to testify -- that this -- there was already obvious technology out there in the marketplace at the time.

And number three, written description. This patent's claims are invalid for written description, because these three claims are too broad as

1 written.

2 Now, let's talk about the first one,

3 prior public use.

4 April 3rd, 1997, is when the '947 patent

5 application was filed.  So you go back one year, and

6 it's April 3rd, 1996.  Upon that, we agree with

7 Mr. Fenster.  That's the one-year grace period.

8 So any public use prior to April 3rd, 1996, would

9 invalidate the '947 patent.  So what do we have?

10 In 1996, in April of 1996, we had the EZ

11 Reader system.  And the EZ Reader article -- and you'll

12 see it's by Amy Rice, Julie Hsu -- now, those are the

13 two inventors that are listed on the first page of your

14 patent.  And then Anthony Angotti and Rosanna Piccolo

15 are two of the other three inventors that are listed, I

16 think, on Page 14 of your patent in the back, together

17 with Fred Cohen.

18 Four of the five patent inventors wrote

19 this article describing the EZ Reader system.

20 If you'll go to the next page, Alan.

21 And this is what the EZ Reader system

22 did.  It was -- a customer sent a message to the system.

23 The system interpreted the message using rule base -- or

24 using a case-based knowledge engine.

25 The system classified it for automatic or

human review.  The human review happened if it was so

classified.  And then a response was delivered back to

the customer.

This was the system that was developed

for Chase Manhattan Bank, you know, the parent company

of Chase Bank across the square over here.  This was a

system developed for them in 1996 because they were

getting in so many e-mails, that they couldn't respond

to them all.  They didn't have enough people.

So they said:  Could we figure out how to

make it either automated, or could we figure out to how

make it an human review that you have to actually send

an e-mail back by a human.  That's the EZ Reader system

that the two -- and Anthony Angotti and Rosanna Piccolo,

two of the inventors on this patent, are Chase

employees.

THE COURT:  You've got five minutes

remaining.

MS. DOAN:  Thank you, sir.

The EZ Reader article says it's deployed

in the first quarter of 1996.  That's on the EZ Reader

article itself -- and on to the next line.

It's in the EZ Reader article itself.  On

the very next page, it tells you:  Phase 1 of EZ Reader

was deployed in the first quarter of 1996.  This article

was publicly -- was finally approved in April -- no --
sorry -- April of 1996.  It was presented at a major
conference in August '96.

Ms. Rice -- this article -- won an award
for this article.  She accepted that award.  And the
paper itself says it was deployed the first quarter of
1996.

But what else do we have?

We also have, in November 20th, 1995, a
paper that says:  The EZ Reader tested with 93 percent
accuracy.  Now, that's in testing phase.

So right after that, on April 11th, 1996,
the EZ Reader application is scheduled for installation
and system testing on Friday, January the 19th.

And then next we have, on February 6th,
Chase Manhattan Bank prepared a users guide.  And in the
front page of the users guide, the front page is -- the
second page is dated February 6th, 1996, and then a
couple of pages over, it's got the same date, and it
says:  This document describes EZ Reader currently in
use by the Chase direct unit of Chase Manhattan Bank.
A special unit of the bank that was interfacing with
customers and potential customers, people like you and
me, members of the public were interfacing with Chase
Bank using this EZ Reader system.

1          And then in March of 1996, there's an

2 e-mail that says:  The Chase EZ Reader is automatically

3 responding to e-mail for Chase.

4          And then on March 29th, 1996 -- and I

5 think we have a dispute over what this document means --

6 it's EZ Reader extensions into the remainder of Chase

7 Bank, but it was already being used in Chase Bank.

8          Brightware is pleased that EZ Reader is

9 now approved for production and installation at Chase.

10 That's the documents that you will see.

11          And what else do we have showing the

12 first quarter of 1996?  We have four people that are

13 coming to testify for you, three by video, and then

14 Mr. Williams will be here live.

15          Rosanna Piccolo, she was in charge of the

16 Chase production system.  I know Ms. Rice was over at

17 Brightware, but Ms. Piccolo was actually there at Chase.

18 And what is she going to tell you?  She will tell you

19 this EZ Reader system was deployed in the first quarter

20 of 1996 to customers and to non-customers, potential

21 customers.

22          Then Anthony Angotti, he also confirms

23 the EZ Reader system was deployed in the first quarter

24 of 1996.

25          Now, they are both at Chase at the time.

Chuck Williams, he was not at Chase.  He was CEO of

Brightware.  He's Amy Rice's boss.  And he'll tell you

it was deployed in the first quarter of 1996 and at

least by March the 29th, 1996.

And then Phil Klahr, he's here, because

he was on the program committee for the AAAI conference

that year.  And he'll tell us that they only accepted

papers for inventions and for technology that was

already deployed to the public and in use and was

serving a benefit.

They would not have accepted some type of

paper for a tested product or that was only in testing.

That would have been rejected, and there's no

exceptions.

So of all this overwhelming evidence, it

is clear that the EZ Reader system was deployed the

first quarter of 1996 and that this patent is invalid.

But it's invalid -- quickly, Your Honor -- for two other

reasons.

Number one, you'll hear about the Bradley

Allen patent, and we'll go through that technology.

Alan, if you'll just scroll through that,

please.

We'll go through that technology.  And

Bradley Allen will be here live to tell you about his

patent in person.

And we also have a written description. And written description is -- that's the third reason it's invalid. Written description is like what Mr. Fenster was -- or Mr. Hueston was telling you earlier today.

You know how in Texas -- and I know he's not from Texas; he's from California. But in Texas, we take land rights really personally. So when you have a fence, four corners around your land, we know what that means, metes and bounds.

Now, if you're writing a claim on a patent and it's not really clear -- and we're talking about 30, 31, and 33 -- you might only have three fences. That's what these have. Only three sides are fenced, and the fourth side says, it's out there somewhere by that oak tree. But the problem is, there's four oak trees.

They use a term called electronic message, and they want you to apply that to almost anything from Morris Code to satellite communications. It's too broad to be applied to these particular claims -- this particular claim, and for that reason, also, we think it should be invalid.

We appreciate your time here this

morning, Your Honor -- I mean, the jury.

One other thing, Your Honor.

We have other expert witnesses to come in to talk to you, and I don't want there to be any misunderstanding before I sit down. Yahoo! does not infringe this patent, and we do not believe this patent is valid, and we think the damages should be no damages in this case.

But because the Plaintiff is asking for so much money in this case, we are bringing Mary Woodford, and she's our expert --

THE COURT: Ms. Doan, excuse me. You've used your time.

MS. DOAN: Thank you, Your Honor.

THE COURT: Ladies and Gentlemen, in light of some of the things that were said in opening statements, I'll give you just another brief instruction. Then we'll get right to the testimony.

There was a suggestion made that both Google and Yahoo! also have patents. And that is certainly true, but the fact that a company has a patent on a product or a service is not a defense to patent infringement.

If you find that the products or services that are accused in this case satisfy all of the

1  limitations of the asserted claims as I have construed

2  them for you, then the products or services can

3  infringe, even if they're covered by other patents that

4  are owned by the accused infringer.

5                 So I'll allow evidence of the parties'

6  ownership of patents, because it's relevant to the

7  question of whether the party respects intellectual

8  property rights, and you should limit your consideration

9  to the patents that are owned by the Defendants for that

10 purpose, okay?

11                Now, then with that, you may call your

12 first witness.

13                MR. FENSTER:  Your Honor, Bright Response

14 would be happy to call Amy Rice to the stand, please.

15                THE COURT:  If you don't mind, pull the

16 microphone toward you and keep your voice up and try to

17 talk into the microphone for me.

18                MR. FENSTER:  Your Honor, I have an

19 exhibit binder that we intend to use with the witness.

20                May I approach?

21                THE COURT:  Yes.

22      AMY RICE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

23                     DIRECT EXAMINATION

24 BY MR. FENSTER:

25      Q.   Good afternoon, Ms. Rice.

1     A.   Hi.

2     Q.   Can you state your name for the record,

3 please.

4     A.   Amy Rice.

5     Q.   And where do you live?

6     A.   I live in Richfield, Connecticut.

7     Q.   And can you tell the jury why you traveled so

8 far to come here today?  Why are you here?

9     A.   I'm here because I understand that this is

10 about a patent that was -- I came here because this is

11 about a very important invention of which I was the

12 patent developer.

13    Q.   Can you tell the jury a little bit about

14 yourself, a little bit about your family maybe.

15    A.   I'm married.  My husband's name is Brian.  He

16 is a salesperson for software.  And I have two children

17 with Brian, Christine and Mark, no grandchildren.

18    Q.   All right.

19    A.   And --

20    Q.   Okay.  Oh, go ahead.

21    A.   -- I live in a country town in Connecticut.

22    Q.   Can you tell the jury a little bit about your

23 educational background, please.

24    A.   Sure.  I have a bachelor's degree in

25 comparative literature in English and Spanish where we

1 took literature and compared it with like themes from

2 different countries.

3            THE REPORTER: Can you speak up, please?

4            THE WITNESS: I'm sorry.

5     A. Bachelor's degree in comparative literature

6 and in English and Spanish, and a master's degree in

7 national security with an emphasis on intelligence.

8     Q. (By Mr. Fenster) What is a master's in

9 national security?

10     A. A master's in national security is a

11 relatively new kind of offering offered by the

12 University of New Haven, and it deals with a study of

13 the intelligence organization and the law enforcement

14 organization working together for Homeland Security.

15     Q. What do you do for a living, Ms. Rice?

16     A. I'm currently a knowledge engineer and

17 programmer. And a knowledge engineer is someone who

18 takes knowledge from people who have special business

19 functions and puts it into a computer program so that

20 that computer can give the same kind of advice as the

21 person.

22     Q. How did you come to knowledge engineering with

23 a background in literature and national security?

24     A. I felt that it was ideal to go into that, into

25 artificial intelligence, because the study of

comparative literature makes you try to understand the

true meaning behind words and what is -- what's being

written about in terms of themes and topics.

And in national security, we went deeply into

the subject of what was meant by certain communications.

So how that feeds into knowledge engineering is where

you need to have an ear for listening to what people

have to say and understanding meanings underneath that

and to draw out through interviewing what should be put

into a system that you might be inventing in artificial

intelligence.

Q.   Ms. Rice, have you received any awards or

distinctions in your professional life?

A.   Yes.   I have received an award for an

innovative application of artificial intelligence, and

that was for an application we called EZ Reader.  And it

was from an organization called AAAI, which is the

American Association for Artificial Intelligence.

Q.   And can you tell the jury just a little bit

about what artificial intelligence is.

A.   Sure.  Artificial intelligence is a

combination of technologies, rule base and case base

systems that take words in and then try to construe

meanings from what's being said in a message and then

develop some kind of a response or an understanding of

1  what that is.

2      Q.    Now, you mentioned the AAAI, the American

3  Association of Artificial Intelligence.  What is that

4  organization?

5      A.    That's an international organization.  It's

6  got about -- well, it's got at least 9,000 members.

7  They have an annual conference every year, and it's an

8  important organization for people who are involved in

9  the artificial intelligence technology, commerce.

10     Q.    This is a prestigious conference related to

11  artificial intelligence?

12     A.    Very prestigious.  And the company I was

13  working for encouraged everyone to try to write articles

14  for it to show off the applications that they -- that

15  they developed for our large commercial customers.

16     Q.    Can you tell the jury a little bit about your

17  professional life, where you've worked in your career.

18     A.    Yes.  After I got my bachelor's degree in

19  comparative literature, I went into compliance in

20  Travelers Insurance Company.  I moved on to different

21  jobs at Travelers during my 16-year career there,

22  especially in budget and finance for applications.

23  Travelers had about 3,000 systems that they kept budgets

24  on, and I helped manage how that money would be spent

25  according to how the company needed systems to be

1  operated.

2        But then I changed over -- I changed over to

3  the information technology area because I had a mentor

4  at the Travelers who saw that I had IT or information

5  technology talent.

6        And when I went to work for him, he told me

7  about a conference he attended, and that was the AAAI

8  conference.  And when I read the binders he brought back

9  from that, I got really excited, and I said this is what

10 I want to do.

11       At the time -- at that time, at about 16 years

12 of working at Travelers, Travelers got bought by

13 Citigroup, and Travelers was offering severance

14 packages.  So I figured, well, you know, I'll go to a

15 real technology -- artificial intelligence company at

16 that point.

17       So I took the severance package they offered,

18 and I went and found a job at a company called Inference

19 Corporation.  And at the time, Inference Corporation was

20 one of the top -- it was the top commercially.  I guess

21 you could call it the top commercial application

22 development company using artificial intelligence

23 technology at the time.

24 Q.   Now, are you the inventor on any U.S. patents?

25 A.   Yes.  I have two U.S. patents.

Q.   And if you turn to -- in your binder, which
you have in front of you, to Plaintiff's Exhibit 1, do
you recognize that document?

A.   Yes, I do.

Q.   And is it the '947 patent?

A.   Yes.

Q.   Is this the -- and you're the named inventor
on this; is that right?

A.   Yes, me and Julie Hsu.

MR. FENSTER:  Ladies and Gentlemen, this
is in your jury notebooks.

Q.   (By Mr. Fenster) Now, when did you first learn
about patents?

A.   Oh, I learned about patents very early.  My
dad, who was in the Army for several years, he was in --
working with -- he was a mechanical engineer and worked
with the Army -- actually, it was the Army/Air Force to
work on the B-29 airplane engines.

So he had a great interest in mechanical
engineering, and he built a workshop in our basement,
and I frequently would visit him while he was working in
his spare time, away from his regular job, to build
several inventions.

And I think the last time I checked, he -- I
was able to track down over ten inventions that he got

U.S. patents for.

A couple of examples was a heavy lifting rotor for a helicopter that could be used by the Army. And one of the funnier ones that he told us about was -- and that I actually found the patent for -- was the impact screwdriver.

And that's a really nifty tool for -- before we had these electronic devices where you could just use a hammer and hit a screwdriver, and the screwdriver could be -- could be flipped around to either screw in a screw or unscrew a screw without having to turn your wrist so often.

So if you were an airplane mechanic like he was and you had to do that, then, you know, it was of great help.

So I learned very early about patents.

Q. And did you get to see the invention process firsthand?

A. Yes, I did. Yes.

Q. How old were you when you started seeing it?

A. As early as I can remember up until he had a heart attack and passed away, uh-huh.

Q. You mentioned that you worked for a company called Inference?

A. Yes.

1    Q.   Can you tell the jury what your job was at

2 Inference.

3    A.   Yes.

4         At Inference, I was a knowledge engineer, and

5 what that was, was I would go to our clients' work

6 sites, and I would investigate, well, what kinds of

7 knowledge problems are they having that our technology

8 could resolve or help with and --

9    Q.   What kinds of projects did you work at while

10 you were at Inference?

11   A.   They were -- they were what we call

12 knowledge-based projects.  They were projects in which

13 human intelligence had to be -- had to be shored up in

14 order to make a process better.

15        So it wasn't like a better way to make a

16 widget; it was a better way to give advice or some kind

17 of a human -- human interaction, like sales or service.

18   Q.   Can you tell the jury some of the projects

19 that you worked on, some of the companies or clients

20 that you worked for?

21   A.   Well, we were under a confidentiality

22 agreement.  I don't know if it's all right to say that.

23   Q.   Did you work for -- did you have a project at

24 some point for Chase Manhattan Bank?

25   A.   Yes.  Chase Manhattan Bank was one of our...

1   Q.   And did you have -- were there any agreements

2  in place between -- when you did the Chase Manhattan

3  project, were you still working for Inference at that

4  time?

5   A.   I started out as working for Inference, and

6  then the company spun off its Professional Services

7  Division, which I was a part of and renamed that company

8  as Brightware.

9   Q.   And so you worked for the company Brightware

10 when you did the Chase project?

11  A.   Yes.  I started out with Inference maybe a

12 couple of weeks and then Brightware.

13  Q.   Were there any agreements that you're aware of

14 between Brightware and Chase covering the project?

15  A.   Yes.  I mean, the standard confidentiality

16 agreement that we always had to sign so that we wouldn't

17 talk about what we were doing to help the company.

18  Q.   And can you describe any -- did you do any

19 specific business solutions for Chase?

20  A.   Yes.  We did several projects for Chase.

21 One of the projects that we worked on was the

22 application I talked about before, the EZ Reader, and

23 that was an automatic e-mail interpretation and routing

24 system.

25  Q.   And what was the business problem that EZ

1  Reader was addressed to?

2      A.   It was addressed to the huge business problem

3  of having to answer all the e-mails that started coming

4  in during -- when the internet first launched.

5          The internet gave Chase great trepidation.  I

6  guess they were really afraid of what would happen when

7  they opened up their company to internet access, because

8  they had a lot of requests come in to systems they

9  already had in place, but they knew that the internet

10 would probably replace those -- all those systems.

11         So they wanted a way to interface with the

12 internet and through -- get information through their

13 Lotus Notes, which is an e-mail system, and be able to

14 at least -- at least answer some of those inquiries

15 automatically, so they wouldn't have to hire people on

16 the weekends and, you know, 24 hours a day.

17     Q.   Now, who did you work with on the EZ Reader

18 project?

19     A.   We worked with several people.  The Chase

20 Manhattan team was instrumental in bringing us in to

21 help solve their problems.

22         Anthony Angotti was our champion.  He was our

23 sponsor.  And he had started a big project, kind of

24 challenging.  Chase Manhattan's Information Technology

25 Department, he thought they worked too slowly, and so he

was given free rein to go ahead and start an emerging

technologies area.

　　　　　And so our job was to go in and find projects

that we could use artificial intelligence technology to

help solve their big business problem.

　　　Q.　　Now, can you tell us a little bit about the

development timeline of EZ Reader?

　　　A.　　Sure.　I started working on the EZ Reader

project.　Once we identified a list of candidate

projects, it was one of the top ones selected by Chase

that we should work -- we were instructed to work on.

The EZ Reader project started in July 1995 -- maybe it

started in June.　But June, July 1995.

　　　Q.　　And were there -- did the EZ Reader project

proceed with different phases?

　　　A.　　Oh, yeah.　The phases that were in the EZ

Reader project were similar in most of the projects that

we did.　The first phase was always to understand the

business process that we were trying to put into the

computer.

　　　　　So the first thing we did is we went around

and we talked to the people that had the expertise in

answering e-mails that came in to -- or messages that

came in to Chase for help.

　　　　　Examples of that would be:　I really want to

open an internet-based banking account with you.  How
can I do that?

         Another example would be:  I lost my ATM card.
What shall I do?

         In addition --

    Q.   And this was Phase 1?

    A.   This was -- yes.  This was the knowledge
acquisition phase, Phase 1.

    Q.   Okay.

    A.   And then Phase 2 was to take that information
and to put it into the artificial intelligence
technologies of our case-based reasoning and rule-based
reasoning.

         Phase 3 was --

    Q.   Actually, before you go on to Phase 3, when
did Phase 2 occur?

    A.   Phase 2 occurred almost immediately after we
started Phase 1.

         So by September, I think we were starting to
build up the knowledge base big enough so that we could
test it internally amongst our developer team to see if
it would work.

    Q.   And when you said September, is that September
1995?

    A.   Yes.

1    Q.    And then what was the next phase after that

2  phase?

3    A.    The next phase was to do a formalized test,

4  and that was where we took -- we took some e-mails that

5  Chase had actually gotten in and put them through our

6  system and tested their accuracy and tried to meet the

7  goals that Chase had set out for responding quickly and

8  accurately to those -- to those requests.

9    Q.    Now, when you say put them through the system,

10  what do you mean?

11    A.    We took the -- the text of the inquiries, and

12  we -- we put it into a -- I think it was a text file,

13  just like you would type on a typewriter, and then put

14  it through our application.

15    Q.    Okay.  What kind of environment was your

16  application running?

17    A.    As I recall, it had a -- it was on

18  Windows 3.1, which was a very early version of Windows,

19  and -- let's see -- it had -- it was a very small

20  computer.  It was a standalone kind of box with a

21  monitor, and the software was just standard Windows

22  software and ART*Enterprise was the knowledge engine

23  that we used for that.

24    Q.    What do you mean a standalone computer?

25    A.    Standalone meant that we were isolated from

1  the Chase production environment, which was -- which is

2  the environment that the messages were coming from.

3       Q.   Now, this was a system that was known to

4  respond to e-mail; is that right?

5       A.   Yes.

6       Q.   And did it -- at this point, were you testing

7  it with Chase's actual e-mail system?

8       A.   No.  We were testing it with the e-mails that

9  were provided to us by Chase for testing.

10      Q.   But was the standalone system, was that

11  connected to the e-mail system?

12      A.   No.  The standalone system was not.

13      Q.   And during the testing phase, was EZ Reader

14  actually responding to actual e-mails to customers?

15      A.   No.

16      Q.   Now, when did -- did Phase 3 -- did you finish

17  Phase 3?

18      A.   We ran into a -- what you would call a regular

19  project delay, and that was caused by the merger of

20  Chase and Chemical Bank at the time.

21           MR. FENSTER:  Can you put up 3, please?

22      Q.   (By Mr. Fenster) I just want to put this in

23  context a little bit.  We've got sort of a blank

24  timeline here, and this is the critical date that we've

25  heard some testimony -- or some lawyer argument about so

far.

At this point in time, where relative to the critical date, were these phases occurring?

A.   Well, the first phase was in -- was in 1995, so that was well before then.

Q.   Okay.

A.   We started coding almost immediately and had something to internally test in September, '95.  The --

Q.   Now -- and when was the -- the Phase 3 testing?

A.   The Phase 3 testing was done in mid March '96.

Q.   And did that -- did that -- did that -- was that finished by the critical date?

A.   We -- we got an accuracy of 93 percent at that time.  Chase's goals were really specific.  They wanted a 99-percent accuracy before they would let a system just answer all their e-mails.

Q.   What was the accuracy rate that they wanted?

A.   They wanted a 99.5-percent or 100-percent accuracy.

Q.   99.5, so 93 is pretty good.

A.   Yeah.  We were very encouraged.

Q.   Okay.  And had you reached the goal at that point?

A.   No, we hadn't reached the accuracy goals.  We

1  were really, really excited about the speed.  It was

2  able to run through about 7,000 e-mails in one minute.

3  So everyone was very enthusiastic.

4      Q.   Now, did there come a time when EZ Reader was

5  approved for production?

6      A.   Yes.  There -- there was an e-mail sent out

7  about approval -- approval of the application for

8  production.

9      Q.   If you'll turn in your binder to Exhibit 1025.

10     A.   (Complies.)

11     Q.   Do you recognize this document, Ms. Rice?

12     A.   Yes.

13     Q.   And what is -- what is this document?

14     A.   This is an internal memo written in an e-mail

15  from me to several people at Chase and copies to Anthony

16  Angotti, who was our sponsor.

17     Q.   And what's the date of this e-mail?

18     A.   This is March 29th, 1996.

19     Q.   And in the first line -- can you read the

20  first line of the e-mail?  Actually, yeah, right there

21  (indicates), the first paragraph.

22     A.   As your strategic knowledge-based technology

23  partners, Brightware is pleased that EZ Reader is now

24  approved for production/installation at Chase.  This is,

25  apparently, an award-winning achievement we should all

1  be proud of.

2      Q.   Okay.  Now, what does this mean, that it was

3  approved for production?

4      A.   That means that based on their tests of

5  running through those test cases, that they were very

6  happy with the results and that as soon as we met their

7  goals of accuracy and speed, that we could install the

8  application.

9          There was one other thing that we had to do.

10  We still had to hook it up to their technical

11  environment.  So we hadn't done that yet, but we were

12  planning to do that, and we needed this to go ahead.

13  So this was a letter of confidence that they gave us,

14  that they wanted us to keep going, even though they were

15  merging with Chemical Bank.

16      Q.   So when you started the project, had Chemical

17  Bank merged with Chase yet?

18      A.   No.  It was a long process.  The merger was

19  announced in -- I believe it was August of 1995.  So

20  right away, at the very beginning of the project, there

21  was, I guess, what you would call uncertainty in the

22  Chase world of where people were going to be working and

23  if they were going to be working and what was going to

24  happen to existing projects or applications that were

25  under development.  People were worried about their job

stopping and things like that.

Q.   So as of March 29, 1996, had the EZ Reader
system been hooked up to Chase's e-mail system?

A.   No, it had not been hooked up to Chase's
e-mail system.

Q.   Now, you mentioned that two things had to
happen, that this was a letter of confidence, one, as
soon as the accuracy goals were met.

Now, what -- as of March 29, 1996, had you met
the accuracy goals at that point?

A.   No, we hadn't met the accuracy goals.

Q.   And had Chase or Chem Bank allowed you to hook
it up without meeting the accuracy goals?

A.   Chemical Bank had announced that there was
going to be a big reorganization.  And this is in answer
to your question.  The reorganization included
statements such as:  We want to make Lotus Notes, this
new version of Lotus Notes, the corporate standard for
all new applications.

So we were using an earlier version of Lotus
Notes that we expected to write an API for, an interface
for, but then they came on and said:  Everyone stop what
you're doing.  We don't want to deploy anything else
until, you know, we get to take a look at it and decide
whether or not we want to do that as a corporation.

1  Q. Okay. Does this e-mail, which is Exhibit

2 1025 --

3    MR. FENSTER: And, Ladies and Gentlemen,

4 I apologize, but during the opening statement, I

5 referenced an Exhibit 861, and it should have been 1025.

6    So if you put it in your notes, it was

7 actually 1025, and I apologize for the error.

8  Q. (By Mr. Fenster) 1025 is the March 29, 1996,

9 e-mail. So as of March 29, 1996, had EZ Reader ever

10 been used to send any e-mails to any Chase customers?

11  A. No.

12  Q. Now, you mentioned another thing that had to

13 happen. You said that we had to hook it up to the

14 technical -- to the actual technical environment at

15 Chase?

16  A. Uh-huh.

17  Q. Can you explain a little bit about that? What

18 did you mean?

19  A. Well, like in most corporations, there are a

20 lot of, you know, systems here and there that they use

21 to communicate to customers, and there were a lot of

22 different products that they had.

23    And all of them seemed to use different

24 interfaces, and it was all very complicated in a

25 technical sense. They -- they tried to resolve the

complication by saying:  We only want to use Lotus

Notes 4.0.

        And what that meant to us was:  Well, you

know, should we wait for a 4.0 interface, or should we

go ahead and do it for this version only for it to be

thrown away?

        And we did not get an answer to that at that

time.

    Q.   So let me get this straight.

        So before the merger, the old Chase system

used Lotus Notes 3.3?

    A.   I think it was 3.3.  It wasn't 4.0.  It was

some earlier version.

    Q.   But Chem Bank planned to move to a different

version?

    A.   Yes.

    Q.   And what --

    A.   That was clearly 4.0.

    Q.   And did there come a time when Chem Bank gave

you any instruction as to which version to design for?

    A.   They told us to design for 4.0, but this

was -- you know, I don't remember when that was.

    Q.   Do you have any idea, relative to April 3,

1996, about when that -- when that was?

    A.   Well, I know that our sponsor, Anthony

1   Angotti, didn't even know who his boss was in January of

2   that year.  So that's how up in the air things were.

3   I -- I don't know what their -- I don't think it was

4   anytime around that date.

5      Q.   Okay.  Now, prior to April 3, 1996, had you

6   been testing the EZ Reader system?

7      A.   Sure.  Yeah.  Yeah.  We were very excited

8   about it, and all of our early results were showing that

9   it was going to be really fast.  And it was more

10  accurate than we thought, because we had a very small

11  segment that we were working with at Chase.

12     Q.   Where was that testing environment?

13     A.   You mean physically?

14     Q.   Yes.

15     A.   Okay.  That testing environment was in our

16  test lab, which was like a work lab with, you know, four

17  or five people working in it.

18     Q.   Was it at Chase, or was it at Brightware?

19     A.   It was at Chase.  It was in New York City.

20     Q.   So you referred -- you might have seen

21  Ms. Doan refer to some e-mails and other documents

22  talking about the EZ Reader system being in use at Chase

23  prior to March 29, 1996.

24     A.   Uh-huh.

25     Q.   What were those referring to?

1    A.   Those were referring to us testing the

2  application internally.

3    Q.   Are you sure that it wasn't hooked up, that it

4  wasn't referring to a live production?

5    A.   I'm positive.

6    Q.   How do you know?

7    A.   Because I was the project manager for the

8  application, and I would have known if it were being

9  used in that way.

10    Q.   Now, did --

11         THE COURT:  Excuse me.  We're going to

12  stop there for today, and we'll pick up there at 8:30 in

13  the morning.

14         MR. FENSTER:  Very well, Your Honor.

15         THE COURT:  Ladies and Gentlemen, I'm

16  going to excuse you for this evening.  Thank you again

17  for your patience all day.  Again, I know it's been a

18  long day.

19         If you'll be here about 8:20, 8:25 in the

20  morning, it will help us to get started promptly at

21  8:30.

22         A couple of parting instructions.

23  Remember my instruction, don't talk about the case,

24  okay?  When you get home and you're asked about it,

25  please just tell them that the Judge said I couldn't

talk about it, all right?

Y'all are free to leave now.  Thank you again for your patience, and I'll see you in the morning.

LAW CLERK:  All rise.

(Jury out.)

THE COURT:  You may step down.

Y'all have a seat.

How quickly can you give me your deposition clips for tomorrow?  5:30?

Okay.  5:30 it is.  We talked about that at the evidentiary hearing.  I'm going to assume you've got somebody working on it.

(Sotto voce discussion.)

MR. FENSTER:  Your Honor, I understand that they are at the office working for 5:30.

THE COURT:  All right.  I'll see them at 5:30 then.

What else do we -- I hope -- well, I've got a couple of other things on my plate this evening.

I'll get you orders before we roll out in the morning on the Daubert motions related to -- both to Dr. Rhyne, and there's a couple of issues on his infringement opinions, as well as the damages expert to the extent that at least the expectation was we would

1   hear from him tomorrow.

2                   So what else do y'all need before

3   tomorrow from the Plaintiff's side?

4                   MR. FENSTER:  Your Honor, I don't believe

5   we need anything before tomorrow.

6                   THE COURT:  All right.  Google?

7                   MR. VERHOEVEN:  Nothing, Your Honor.

8                   THE COURT:  Yahoo!?

9                   MS. DOAN:  Nothing, Your Honor.

10                  MR. PERLSON:  I do have the Williams'

11  documents you requested, the e-mails.

12                  THE COURT:  Great.  Thank you.

13                  Y'all avoid misleading the jury about

14  what the scope of the invention is.  If you do it again,

15  I'm going to push you back again, Mr. Verhoeven.  I'm

16  not going to put up with that in this case, okay?

17                  We're in recess.

18                  LAW CLERK:  All rise.

19                  (Court adjourned.)

20                  *       *       *       *       *

21

22

23

24

25

1

2                          <u>CERTIFICATION</u>

3

4            I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10

11   /s/_____              _____
     SUSAN SIMMONS, CSR                   Date
12   Official Court Reporter
     State of Texas No.:  267
13   Expiration Date:  12/31/10

14

15

16   /s/_____                 _____
     JUDITH WERLINGER, CSR                 Date
17   Deputy Official Court Reporter
     State of Texas No.:  731
18   Expiration Date:  12/31/10

19

20

21

22

23

24

25