```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3  BRIGHT RESPONSE, LLC        *    Civil Docket No.
                                *    2:07-CV-371
 4  VS.                         *    Marshall, Texas
                                *
 5                              *    August 3, 2010
    GOOGLE, INC., ET AL         *    8:30 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7        BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
                UNITED STATES MAGISTRATE JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:     MR. ANDREW SPANGLER
                           Spangler Law
11                         208 North Green Street
                           Suite 300
12                         Longview, TX   75601

13                         MR. MARC A. FENSTER
                           MR. ANDREW WEISS
14                         MR. ADAM HOFFMAN
                           MR. ALEX GIZA
15                         Russ, August & Kabat
                           12424 Wilshire Boulevard
16                         12th Floor
                           Los Angeles, CA   90025
17
                           MR. DAVID M. PRIDHAM
18                         Law Office of David Pridham
                           25 Linden Road
19                         Barrington, RI  02806

20  APPEARANCES CONTINUED ON NEXT PAGE:

21
    COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
22                         MS. JUDITH WERLINGER, CSR
                           Official Court Reporter
23                         100 East Houston, Suite 125
                           Marshall, TX   75670
24                         903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:        MS. ELIZABETH A. WILEY
                          The Wiley Firm
                          P.O.  Box 303280
                          Austin, TX   78703

                          MR. PATRICK R. ANDERSON
                          Patrick R. Anderson, PLLC
                          4225 Miller Road
                          Building B-9, Suite 358
                          Flint, MI   48507

                          MR. JOHN C. HUESTON
                          MR. ADAM S. GOLDBERG
                          Irell & Manella, LLP
                          840 Newport Center Drive
                          Suite 400
                          Newport Beach, CA   92660

FOR THE DEFENDANT:        MR. CHARLES K. VERHOEVEN
(Google)                  MR. DAVID A. PERLSON
                          MS. AMY H. CANDIDO
                          Quinn Emanuel Urquhart & Sullivan
                          50 California Street
                          22nd Floor
                          San Francisco, CA   94111

                          MS. JENNIFER PARKER AINSWORTH
                          Wilson Robertson & Cornelius
                          P.O.  Box 7339
                          Tyler, TX   75711

FOR THE DEFENDANT:        MS. JENNIFER HALTOM DOAN
(Yahoo!)                  Haltom & Doan
                          6500 Summerhill Road
                          Suite 100
                          Texarkana, TX   75503


APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:     MR. WILLIAM ROOKLIDGE
(Yahoo!)               Howrey, LLP
                       4 Park Plaza, Suite 1700
                       Irvine, CA   92614

                       MR. JASON WHITE
                       Howrey, LLP
                       321 North Clark Street
                       Suite 3400
                       Chicago, IL   60610

                *     *     *     *     *     *


                    P R O C E E D I N G S

            (Jury out.)

            LAW CLERK:  All rise.

            THE COURT:  Please be seated.

            All right.  I understand there are a

couple of preliminary matters to take up.  What are

they?

            MR. PERLSON:  Your Honor, one is the

Plaintiff intends to call or use the deposition

testimony of Eric Spangenberg.  He is one of two

employees of Bright Response.

            And it -- it doesn't seem like that's

something that they should be able to do by deposition,

they should be able to have him here.  But we asked last

night why he isn't here, why he's unavailable, and we

```
 1  didn't get any response.

 2              THE COURT:  Okay.  What's the response?

 3              MR. PRIDHAM:  Good morning, Your Honor.

 4  David Pridham for the Plaintiff.

 5              THE COURT:  Where does he live?

 6              MR. PRIDHAM:  He lives in Dallas, Your

 7  Honor.  He's traveling this week.

 8              THE COURT:  Where to?

 9              MR. PRIDHAM:  He's going to be in Austin,

10  but I can represent to the Court that to the extent the

11  Defendants will object to the clips, he can be here

12  live.

13              THE COURT:  Okay.  I don't know.  You

14  need to bring him here live.  He's not exactly an

15  unavailable witness.

16              MR. PRIDHAM:  We can do that, Your Honor.

17              THE COURT:  All right.  Okay.  Leave is

18  granted to the extent you need to designate him as a

19  witness that will testify live, okay?  I don't know how

20  you designated him in the pretrial order.

21              MR. PRIDHAM:  Thank you, Your Honor.

22              THE COURT:  But that leave is granted.  I

23  don't know what his travel schedule is, but if you need

24  to call him out of order at a later time, you know, in

25  the case, that leave is granted as well.
```

1          MR. PRIDHAM:  I understand he can be here

2   by Thursday.

3          THE COURT:  Okay.

4          MR. PRIDHAM:  By at least Thursday of

5   this week.

6          THE COURT:  All right.

7          MR. PRIDHAM:  Thank you, Your Honor.

8          THE COURT:  What's the other issue?

9   Anything else?

10          MR. ROOKLIDGE:  Your Honor, you had

11  requested proposals on closing the courtroom, and we had

12  a number of exchanges last night about the proposal for

13  that.

14          Google presented their proposal that in

15  order to protect their highly sensitive trade secrets,

16  the courtroom needs to be closed for testimony or

17  argument disclosing, one, any Google source code; two,

18  any specific feature templates; or, three, any specific

19  attribute templates.

20          And there was some discussion about

21  deposition designations for today.

22          Yahoo!'s proposal as to its highly

23  confidential information was that the courtroom be

24  closed during testimony or argument disclosing any

25  Yahoo! source code and the payment amounts, running

royalty rates, or business terms of any agreements to

which Yahoo! or Overture were the licensor.  In other

words, licensed-out agreements.

Of course, we've argued that those

agreements aren't relevant, but the Court has allowed --

has allowed those in.

And those were the proposals that we made

last night.  We didn't reach agreement on that, but we

did work out a compromise agreement with Plaintiff,

wherein we could get the deposition excerpts that are --

that were slated for this afternoon to come in today.

THE COURT:  Well, what do I need to rule

on for today's purposes?

MR. ROOKLIDGE:  For today's purposes, you

don't need to make a ruling.  We understand, unless Dr.

Rhyne goes on and starts talking about source code.  At

least for the deposition clips, I think we're square.

But I just don't know what we're going to be seeing from

Dr. Rhyne as far as source code and the other technical

items that Google has identified.

THE COURT:  Okay.  What evidence is in

the record that those portions of the source code that

would be discussed or have been discussed in Rhyne's

report?

I don't know the magnitude or the extent

1  of that.  You requested closure at any time source code

2  is discussed.  And I need you to tell me what evidence

3  is in the record that any time source code is discussed,

4  it would result in disclosure of something that would

5  justify closing the courtroom.

6              MR. PERLSON:  Well, this -- for -- I'm

7  speaking for Google.  I think actually looking at

8  Dr. Rhyne's direct that the only source code that's

9  mentioned in here relates to Google's attributes and

10 features of the SmartAd system.  These are the

11 features that -- I mean, this is what Google used

12 essentially to help it determine which ads are going to

13 be the most relevant, and it's part of the prediction

14 model.

15             And if -- people are all the time trying

16 to figure out what Google is doing to link ads and, you

17 know, simply, quote/unquote, game the system.  And if

18 this type of information was out, it would, you know --

19 it would be extremely damaging to Google.

20             Only 1 percent --

21             THE COURT:  Well, I've got your

22 representation of the case.  What proof is in the record

23 about that?

24             MR. PERLSON:  Well, Your Honor, I don't

25 know if Plaintiff took deposition testimony on how --

how confidential our source code is.  I mean, I made --

we discussed it with Plaintiff, and they've been -- you

know, in particular Mr. Fenster, we've been dealing with

this in the very way.  He recognizes the confidentiality

of it.

                 This is essentially, you know, the recipe

for Coke, for Google, and if we want to get a --

                 THE COURT:  Well, carbonated water is one

portion of the recipe for Coke, but the disclosure of

that isn't going to cause -- manifest injury to

Coca-Cola Company.

                 I need you to tell me exactly what

portions of the code you want me to seal the courtroom

for, rather than just a blanket request for any time

source code is discussed we need to close the courtroom,

because that's going to result in a very disjointed

presentation, just as it was in the last Google case

that I tried.

                 I'm trying to prevent that, Counsel.

                 (Mr. Fenster and Mr. Perlson's discussion

off the record.)

                 MR. PERLSON:  Mr. Fenster is trying to

cooperate, and I appreciate that.  Maybe if I could just

give -- we are not -- how the system works, actually, is

not what we're -- I don't actually think there's going

to be any source code about that, and he's going to be
able to testify about that.

To use the Coke analogy, it is the
formula, not the carbonated water.  And this is a very
limited thing.  And -- and so, there are -- there's one
portion of it for Dr. Rhyne's testimony.  I think he
would only mentioned it briefly.

And then in the deposition of Daniel
Wright, he talks about these specific attribute features
that are the triggers, essentially, that Google uses to
determine when an ad is relevant.  And that is -- and
those are very specific things.

It's actually not how the system works,
but it's the specific data points that are fed into it.
I mean, Mr. Fenster has been cooperative, and I think
that he recognizes that this is very confidential
information.  And I think that maybe we would be talking
about once -- maybe only even once for Dr. Rhyne, and
then maybe just Daniel Wright's deposition.  I think
that there's about one portion of it -- there's two
portions of it that have it.

MR. FENSTER:  Your Honor, Marc Fenster.

I -- I don't know, but I will
represent -- I will accept and have accepted
Mr. LaBarre's representation.  He's a representative of

Google.  We spoke.

This source code was produced.  There's one piece of source code in an attribute file, one particular file that was produced during the Furrow deposition, F-U-R-R-O-W.  And I will agree that that is confidential, and the sealing of the courtroom should be limited to that.

Now, there's one other deposition, and that's Mr. Wright.  Mr. Wright testified at length about the feature attribute templates.  He -- his depo is designated.  I don't mind if the courtroom is sealed for that.

Dr. Rhyne goes through only a few examples that I don't believe should be super-secret. And so I would object during -- to interrupt Dr. Rhyne's testimony and seal the courtroom, with the exception of that one piece of source code, and the depositions, which will be done later.  And we can do them at the end of the day or something.

THE COURT:  Okay.  Well --

MR. PERLSON:  That's fine with Google, Your Honor.

THE COURT:  All right.  That will be the procedure.  It's incumbent upon y'all to ask to approach the bench, though, before this issue actually comes up.

1          MR. PERLSON:  Absolutely, Your Honor.

2          MR. ROOKLIDGE:  Correct.

3          And as to Yahoo!, Your Honor, we're

4 squared away, as I said before, on the deposition clips.

5 On the testimony, that testimony regarding the

6 particular problematic area of the traffic protection

7 wouldn't go on, if at all, until this afternoon.

8 So Counsel and I have agreed to loop back together and

9 talk about that and make sure we know exactly what the

10 problematic areas will be.  And we'll be back to the

11 Court with that.

12          THE COURT:  All right.  Anything further?

13          MR. PERLSON:  We filed -- I believe that

14 there's an order coming.  In Mr. Sheafe's testimony,

15 there was a motion filed on that last night.

16          THE COURT:  I have denied that.

17          MR. PERLSON:  Okay.  And then we also

18 filed a request for relief regarding the Angotti and

19 Rice and other materials that hadn't been produced.

20          THE COURT:  You're requesting a jury

21 instruction relating to discovery misconduct?

22          MR. PERLSON:  Correct.

23          THE COURT:  That's your request?

24          MR. PERLSON:  Right.

25          THE COURT:  I will consider that.

1           MR. PERLSON:  Okay.

2           THE COURT:  It's -- but I mean, I'm

3   going to -- when I fashion such an instruction, taking

4   into account, you know, misconduct is bound to have

5   occurred in other areas of the case, okay?

6           All right.  Bring them in.

7           LAW CLERK:  All rise.

8           (Jury in.)

9           THE COURT:  All right.  Please be seated.

10          Good morning, Ladies and Gentlemen.

11  Thank you for being here timely.

12          Mr. Fenster.

13          MR. FENSTER:  Good morning, Your Honor.

14          THE COURT:  Bring Ms. Rice back around.

15          MR. FENSTER:  Yes.  Ms. Rice, if you will

16  take the stand, please.

17          Good morning, Your Honor.

18          Good morning, Ladies and Gentlemen.

19      AMY RICE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

20          DIRECT EXAMINATION (CONTINUED)

21  BY MR. FENSTER:

22      Q.   Good morning, Ms. Rice.

23      A.   Good morning.

24      Q.   So I think we've got you set up with a new

25  microphone today so, hopefully, we'll have a little -- a

little more volume today.

So yesterday, we -- we were going through the testing phase, and you had taken us through the development of EZ Reader at Chase Manhattan Bank.  You told us that it was deployed in a testing environment. We had gone up through the critical date, and you had told us that it was still in the testing environment at that time; is that right?

A.   That's correct.

Q.   All right.  Now, some of the documents, Ms. Rice, talk about EZ Reader being deployed.

So what does deployment mean?

A.   Deployment means that the knowledge-based application would have been hooked up to all of the other components that were needed to communicate with the outside world, to Chase's customers and back into Chase for additional human activity, if needed.

Q.   And yesterday, Ms. Rice, we looked at that March 29, 1996 e-mail that said it was approved for production, and you said that there was a technical interface that had to be built to interface with the Chase e-mail system?

A.   Yes.

Q.   So tell us about what that interface was and whether that was required for deployment.

A.    In the application that we were developing,

that interface was very important, because that was the

mechanism to talk from their -- their data message --

messages coming in and also the EZ Reader application.

So it was -- sat in between EZ Reader and the outside

world.

Q.    And as of April 3, 1996, had that technical

interface to Chase's e-mail system been developed?

A.    No.

Q.    Now, when was EZ Reader actually deployed with

the Chase actual e-mail system?

A.    I'm not aware that it was deployed at all.

Q.    Is there any chance that it was deployed by

April 3, 1996?

A.    No.

Q.    And how do you know that?

A.    I was the project manager on the project.  I

was in charge of the technical group, and we knew the

database was still in testing, because we still had to

achieve the accuracy requirements of Chase.  And we also

had to meet goals for quickness and ability to answer

the customers quickly.

Q.    Now, Ms. Rice, can I ask you to take a look in

your binder, if you have that, to Exhibit 1078.

          MR. FENSTER:  Your Honor, this is one of

the exhibits that we spoke about yesterday.

Q.   (By Mr. Fenster) Do you recognize this document?

A.   Yes, I do.  These are notes in my own handwriting.

Q.   Okay.  And there are two -- two pages.  One --

MR. PERLSON:  Objection, Your Honor.

THE COURT:  Is there an objection?

MR. PERLSON:  There's an objection, Your Honor.

THE COURT:  Overruled.

Q.   (By Mr. Fenster) One is Wright 1793, and the next is Bates-labeled Wright 1794; is that right?

A.   Yes, I see that.

Q.   I'm going to --

MR. FENSTER:  May I, Your Honor, put up 1794, or should I authenticate it first?

THE COURT:  Well, it hasn't been offered yet.

MR. FENSTER:  Yes.  Thank you.

Q.   (By Mr. Fenster) So, Ms. Rice, turning to 1794, can you tell me what that page is?

A.   These are the meeting notes from a meeting that Brightware and my project team had with Chase Manhattan Bank, trying to figure out some problems that

1  we were having.

2      Q.   And whose handwriting is this?

3      A.   This is my handwriting.

4      Q.   And are these notes dated?

5      A.   Yes, there's a date.

6      Q.   And what is that date?

7      A.   It's in the upper right-hand corner.  It's

8  April 2nd, 1996.

9      Q.   And is that the date on which you wrote these

10 notes?

11     A.   Yes.

12     Q.   And did you take these notes contemporaneously

13 with a meeting on April 2nd, 1996?

14     A.   I did.

15         MR. FENSTER:  Your Honor, what I propose

16 is to offer only the second page that's actually dated

17 as Exhibit 1078.

18         THE COURT:  Okay.  Objection?

19         MR. VERHOEVEN:  Objection, Your Honor.

20         THE COURT:  Okay.  Overruled.

21 1078 is admitted.

22         MR. FENSTER:  Thank you.

23         Can you pull up 1078, second page,

24 please?

25     Q.   (By Mr. Fenster) So, Ms. Rice, again, these

1  are your handwritten notes, and in the top right-hand

2  corner, that was the date, April 2nd, 1996?

3      A.   That's right.

4      Q.   Okay.  Now, what -- what -- what do these

5  notes tell you about whether EZ Reader was actually

6  deployed as of April 2nd, 1996?

7      A.   That it was not deployed to the outside world.

8      Q.   And where do you see that?  What tells you

9  that?

10     A.   I see notes here about the Chemical Bank

11 restrictions on putting EZ Reader in and some of the

12 technical problems that we were having.

13     Q.   Okay.  And down here, it says:  Rochester

14 receives everything routed to Chemical, quote,

15 webmaster, end quote, direct receipts not through EZ

16 Reader, webmaster at chase.com.

17          Do you see that?

18     A.   Yes.

19     Q.   What does that mean?

20     A.   That means that we were under the impression

21 that we were going to be able to route the e-mails in

22 one -- through one server, but Chemical Bank had told us

23 that we needed to change all the technical environment

24 to route through their servers.

25     Q.   So you were up until this time you had been

working to develop EZ Reader to work with the old e-mail
system; is that right?

    A.   Yes; that's correct.  They wanted to us use
the existing Lotus Notes application, but then Chemical
Bank said stop everything, we want to migrate to a new
environment.

    Q.   So -- and what did they tell you in terms of
continuing with your development and deployment with
respect to the old system?

    A.   From what I heard from Anthony, he had said
that we were to stop deployment of any applications,
that -- that all of Chase was being stopped from
deploying any applications, because Chemical Bank said
they wanted to change the corporate e-mail system to the
new Lotus Notes 4.0 before anything else could be
implemented.

               MR. VERHOEVEN:  Sorry, Your Honor.

               Objection to that answer as hearsay and
move to strike.

               THE COURT:  Overruled.

    Q.   (By Mr. Fenster) Now, Ms. Rice, did -- once
Chem Bank told you that you needed to start development
on the interface for the new system, what did that --
what did that require you to do?

    A.   Well, that required us to start all over.  The

new system apparently had different technical ways of

talking to other applications, so we had to use the new

way of doing things.

Q.   And did you start work on developing the

interface for Lotus Notes 4.0?

A.   As the project manager at that time, I decided

that we needed to reschedule that application

development project phase.

Q.   And if I can ask you to turn in your notebook

to Exhibit -- Plaintiff's Exhibit 1085.

          MR. FENSTER:  And I believe this is

already in evidence, Your Honor.

          1085, Joseph, please.

Q.   (By Mr. Fenster) Do you recognize this

document, Ms. Rice?

A.   Yes, I do.

Q.   And what is this?

A.   This is the plan that I developed for our

project, showing the new schedule for Lotus Notes 4.0

interface.

Q.   And what date is this -- was this document

created?

A.   This was created, according to this page, on

September 25th, 1996.

Q.   And is that the date -- it's kind of hard to

1  read -- that's in the lower left corner of the document?

2      A.    That's in the lower left corner, yes.

3      Q.    And did -- was this your project plan for EZ

4  Reader as of September 1996?

5      A.    Yes.  This was the project plan.

6      Q.    Now, is there an entry on this project plan

7  that relates to the interfaces for the API for the new

8  Lotus Notes 4.0 e-mail system?

9      A.    Yes.  It's -- if you look on the left-hand

10  corner -- or left-hand side, there's rows -- row

11  numbers.

12      Q.    Yes.

13      A.    And No. 32 is the beginning of the -- the

14  Lotus Notes Response Link Plan.

15              MR. FENSTER:  Shouldn't have touched it,

16  Your Honor.  I apologize.

17              Ms. Lockhart, can you help me get it

18  back?

19              MR. VERHOEVEN:  It's over here.

20              MR. FENSTER:  Go back to the first page

21  of 105, please.

22              Okay.  Now I won't touch anything, I

23  promise.

24      Q.    (By Mr. Fenster) So this is -- on the

25  left-hand list, you were pointing to No. 32, and it says

1  Lotus Notes Response Link?

2      A.   Yes.  That's the line.

3      Q.   Okay.  And what is that?

4      A.   That's a heading for the project part that we

5  were going to develop the Lotus Notes 4.0 interface.

6      Q.   And to the right of that, there are two

7  columns.  One is duration, and what is duration?

8      A.   Duration is the amount of work time --

9  actually, that was the elapsed time that we needed to

10  complete the Lotus Notes link.

11      Q.   And there's a next column that says start --

12      A.   Right.

13      Q.   -- at the top.  At the top of this column, it

14  says start.

15      A.   Uh-huh.

16      Q.   And what does that mean?

17      A.   Start means the date that we had planned to

18  start working on that application interface.

19      Q.   And what date did you plan to start -- as of

20  September 1996, what date did you plan to start working

21  on that interface?

22      A.   We scheduled that to start on December 17th,

23  1996.

24      Q.   Now, that's significantly delayed from early

25  1996 when EZ Reader was originally scheduled for

1  deployment.

2       What happened?

3    A.   Well, we originally thought that we were going

4  to be developing for the 3.3 environment, but when

5  Chemical Bank came in and said to stop everything, we

6  had -- we didn't know whether we should go ahead and,

7  you know, do all that work for 3.3, or to hold off and

8  make sure the plans were going to be more solid.

9       Chemical Bank then said, no, you have to

10  develop it for 4.4 (sic), so we scheduled that

11  development project.

12    Q.   Now, do you recall at some point the Chase --

13  that the ChaseDirect development website was going to go

14  live?

15    A.   The ChaseDirect development website was going

16  to go live?  Yes.

17    Q.   And what does it mean -- and did the Chase

18  website actually go live?

19    A.   Their Chase home page went live, yes.

20    Q.   What do you mean that their home page went

21  live?

22    A.   Well, the first step in putting a company into

23  the internet is to develop what's called a home page.

24  And the home page is the first page you see when you

25  navigate to that website.

1          So for Chase, it would be just like a page

2    with Chase -- you've reached the Chase Manhattan Bank

3    website.

4          Q.    And, Ms. Rice, when did the ChaseDirect

5    website go live?

6                MR. VERHOEVEN:  Objection, foundation.

7          Q.    (By Mr. Fenster) Ms. Rice, do you know?

8                THE COURT:  Rephrase your question.

9          Q.    (By Mr. Fenster) Ms. Rice, do you know

10   approximately when the ChaseDirect website went live?

11         A.    Yes.  It went live in late March 1996.

12         Q.    So referring to this timeline, we looked at

13   Exhibit 1078.  These were your notes on April 2nd, and

14   it was still in the experimental environment at that

15   time?

16                THE COURT:  Just a second, Mr. Fenster.

17   Counsel needs you to move over where they can see the

18   diagram during the questioning of your witness.  Go

19   ahead and do so.

20                MR. FENSTER:  Okay.

21                THE COURT:  Proceed.

22         Q.    (By Mr. Fenster) And the ChaseDirect website

23   went live sometime right at the end of March 1996?

24         A.    Yes, it did.

25         Q.    Okay.  Now, when the ChaseDirect website, the

1  home page went live, was EZ Reader part of that

2  homesite?

3      A.   It was not.

4      Q.   And how do you know that?

5      A.   I know that because we were still in the

6  testing phase of the application and that the API had

7  not been developed to -- in order to hook it up.

8      Q.   Now, Ms. Rice, I'd like to ask you to take a

9  look at Exhibit 855.

10               MR. FENSTER:  Your Honor, this is in

11 evidence.

12               Can you display 855 for the jury, please?

13     Q.   (By Mr. Fenster) Now, Ms. Rice, do you

14 recognize Exhibit 855?

15     A.   Yes, I do.

16     Q.   And what is Exhibit 855?

17     A.   It was a list that was provided by me to Chase

18 to explain how they could further extend EZ Reader

19 throughout the Chase organization, once it was in

20 operation.

21     Q.   Okay.  Now, does this -- and this is an e-mail

22 that you sent on March -- on May 13, 1996?

23     A.   It is.

24     Q.   Okay.  And what does this e-mail indicate

25 about whether EZ Reader had been deployed as of May 13,

1  1996, after the critical date?

2      A.   It doesn't indicate anything, because we were

3  talking about the testing results that we got from the

4  early EZ Reader for ChaseDirect.

5         It indicates that -- it's only telling the

6  Chase people what they had to do to get other areas of

7  Chase ready for the implementation of the EZ Reader,

8  because for each different implementation, it had to be

9  managed through different management.

10      Q.   Okay.  So as of May 13, 1996 -- this is

11  Exhibit 855 -- as of May 13, 1996, had EZ Reader been

12  deployed at that point at Chase Bank?

13      A.   No, it didn't.

14      Q.   Now, I'd like to ask you about Exhibit 586.

15         MR. FENSTER:  Would you put 586, please?

16  This is in evidence.

17      Q.   (By Mr. Fenster) Do you recognize Exhibit 586?

18      A.   Yes, I do.

19      Q.   And what is this document?

20      A.   This is a document draft that we were asked to

21  provide to Chase so that they could train and help the

22  users of EZ Reader, the e-mail people, use EZ Reader.

23      Q.   And if you turn to the second page of Exhibit

24  586, what date is shown on that page?

25      A.   That was 5th of February, 1996.

1      Q.   Now, let's look at Page 6 of Page (sic) 586 in

2  the very first paragraph.

3      A.   Yes.

4      Q.   And it says:  This document describes EZ

5  Reader currently in use by ChaseDirect Unit, Chase

6  Manhattan Bank.

7           Do you see that?

8      A.   Yes, I do.

9      Q.   Now, as of February 6th, 1996, was EZ Reader

10 in use by ChaseDirect -- by ChaseDirect Unit?

11     A.   No, it was not.

12     Q.   And why does it say that?

13     A.   It says that because we are asked very early

14 on to prepare a documentation for management review to

15 look at, so that they could look at it and approve it

16 for -- for just distribution to their -- to their e-mail

17 people.

18     Q.   Now, if you could turn to -- it's actually

19 Exhibit 585, which is the continuation of the same

20 document, Page 56, please.

21           So this is the appendix in the same EZ Reader

22 Guide?

23     A.   Yes.

24     Q.   Okay.  Now, in the middle, it says --

25           MR. FENSTER:  Page 56.

1   A. Okay.

2   Q. (By Mr. Fenster) Under the bullet point, can

3 you read the first two lines into the -- for the jury,

4 after quality?

5   A. After quality:  As initially verified, we

6 envision sending automatic responses directly to

7 customers without human intervention.

8   Q. So as of April 3, 1996, or the date that this

9 was written in February of 1996, would the software

10 application as described there be able to send responses

11 directly to customers?

12   A. No.

13   Q. Now, let's go to the article that you did for

14 the AAAI, which is Exhibit 56.

15   Now, this is the article that you wrote for

16 the AAAI?

17   A. Yes, it is.

18   Q. Now, are there any portions of this article

19 that aren't accurate?

20   A. Yes, there are.

21   Q. Can you describe them?

22   A. They're sprinkled here and there through the

23 document.  They refer to deployment of the EZ Reader

24 application, and they refer to how the API works.

25   Q. Now, when was this article written?

1      A.    This article was written in December of 1995.

2      Q.    And when was the conference for which this

3 article was written?

4      A.    The conference was scheduled to be August

5 1996.

6      Q.    So this paper wasn't going to be published

7 until later?

8      A.    Until August.

9      Q.    Now, at the time that you wrote this article

10 in late '95/early '96, did you expect that EZ Reader

11 would be deployed?

12      A.    Yes, we did expect it would be deployed.

13      Q.    And did you expect that this article would be

14 truthful by the time it was presented in August 1996?

15      A.    Yes, fully.

16      Q.    And then -- but as it turned out, other things

17 intervened, and was it actually deployed by August 1996?

18      A.    It was not.  And, you know, part of the reason

19 that we were doing the user guide and stuff like that

20 was because we were sitting around waiting for the

21 interface specification to come to us.

22      Q.    Now, at the time that you submitted the

23 article, was the AAAI aware that EZ Reader had not yet

24 been deployed?

25            MR. VERHOEVEN:  Objection, foundation.

1          THE COURT:  Sustained.

2     Q.   (By Mr. Fenster) Let me ask you to take a look

3 at Exhibit 1026.

4     A.   I have 1025 here, but I don't have 1026.

5          MR. FENSTER:  I believe 1026 is in

6 evidence.

7     Q.   (By Mr. Fenster) So, Ms. Rice, do you

8 recognize Exhibit 1026?

9     A.   Yes, I do.

10    Q.   And what is this -- what is Exhibit 1026?

11    A.   Exhibit 1026 is an e-mail thread, which is a

12 series of e-mails, written between Brightware and AAAI.

13    Q.   So this goes in reverse chronological order;

14 is that right?

15    A.   Yes, it does.  So the way this one was -- at

16 the top.

17    Q.   Now -- and this e-mail thread you received?

18    A.   Yes.

19    Q.   Now, we're going to go to the third page of

20 this exhibit.  This is the second page, and we'll go to

21 the first e-mail in the string.

22         So this says it was from John Knightly at the

23 bottom to Phil Klahr, and the subject is IAAI, and then

24 the text of the e-mail is actually on the next page.

25 The text of the e-mail is dated December 1995.

1          Now, this is from John Knightly to Phil Klahr.

2    Who's John Knightly?

3       A.    John Knightly was our product -- I'm sorry --

4    Marketing Director at Brightware.

5       Q.    Okay.  He was at Brightware.

6             And who was Phil Klahr?

7       A.    Phil Klahr was a high-level executive at

8    Brightware at the time.

9       Q.    Okay.  And this says in the second line:  One

10   of our candidates is an application that is not yet

11   deployed.  It is scheduled to be deployed in the

12   January/February timeframe.  The knowledge base has

13   already been built and the app has been run with

14   successful results on test data, but it's still awaiting

15   completion of the integration with the customer's

16   network.

17            In your experience, how stringently does the

18   panel enforce the criterion of deployment?

19            Now -- then the next e-mail was forwarded from

20   Phil Klahr, and then it goes up -- there's an e-mail

21   from Howard Shrobe to Klahr and someone named Senator in

22   December of 1995?

23      A.    Yes.

24      Q.    So who is Mr. Shrobe?

25      A.    Mr. Shrobe was the person at IAAI that -- I'm

1    sorry -- at AAAI who looked at all of the papers coming

2    in and decided which ones would get awards.

3        Q.    So he was sent an e-mail that has this whole

4    string that says:  Given the recent discussions on

5    broadening the scope of IAAI papers, yet having the

6    current call out requiring deployment, at least to a

7    stage where benefits have been achieved and can be

8    discussed, how would you like me to respond?

9            So what did you understand this to be?

10       A.    I understood that to mean they were -- that

11   they were questioning their rule of having applications

12   to be deployed for six months before they could be

13   presented.

14            MR. VERHOEVEN:  Objection, Your Honor,

15   speculation.  The witness is not listed on this e-mail.

16   There's no foundation.

17            THE COURT:  I'll sustain the objection.

18            MR. FENSTER:  Okay.

19       Q.    (By Mr. Fenster) Is it -- does this document

20   indicate to you that the IAAI was told that at the time

21   the article was submitted, EZ Reader was not deployed?

22            MR. VERHOEVEN:  Same objection and

23   leading.

24            THE COURT:  I'll sustain the leading

25   objection.

1    Q.    (By Mr. Fenster) Ms. Rice, what was your

2  understanding, based on this e-mail, as to whether or

3  not the IAAI was informed -- or what were they informed

4  about regarding the deployment of the EZ Reader

5  application at the time the article was submitted?

6    A.    They were informed that the application had

7  not been deployed but that we were asking for a waiver

8  or an exception for handing in this paper.

9    Q.    Now, Ms. Rice, the Defendants are contending

10 that this application was actually deployed in late

11 March 1996.

12         If that had happened, what documentation would

13 you expect there to be, based on your experience on --

14 with the documentation of both Chase and Brightware?

15    A.    If it were deployed, I would expect we would

16 have had a big party, and it would have been in the

17 corporate newspaper.  And, you know, I know that Chase

18 was very happy about the application of what it might be

19 able to do for them.

20         So I would also expect some kind of

21 recognition from my immediate managers, if not higher

22 up-level people at my company telling me

23 congratulations, you did it.

24    Q.    Would there have been any reports evaluating

25 the performance once it went live?

1    A.    Yes.   There would have also --

2              MR. VERHOEVEN:  Objection.  Calls for

3    speculation, Your Honor.

4              THE COURT:  Overruled.

5              You can answer the question.

6    A.    There would have been reports, because they --

7    every day, they collected statistics about how many

8    calls they got in and how much work they had to do to

9    answer customer service, because they were very

10   concerned about their staffing and how it -- if they

11   were increasing numbers of those, they would have to put

12   more staff on.

13   Q.    (By Mr. Fenster) And, Ms. Rice, have you ever

14   seen any documents evaluating any performance of the EZ

15   Reader system deployed live, responding to live e-mails

16   at Chase Bank?

17   A.    Never.  All the statistics refer to tests,

18   standalone testing.

19             MR. FENSTER:  Thank you, Your Honor.  No

20   further questions at this time.

21             THE COURT:  Cross-examination?

22             MR. VERHOEVEN:  Yes, Your Honor.

23             I have a couple of brief items I'd like

24   to approach the bench, so there's no interruptions.

25             THE COURT:  Okay.

1          MR. VERHOEVEN:  May we do that?

2          THE COURT:  Certainly.  Counsel.

3          (Bench conference.)

4          MR. VERHOEVEN:  Thank you, Your Honor.

5  One of the questions that I would like to ask the

6  witness -- but I want to make sure that it's okay -- is

7  that she testified at deposition that in her opinion

8  with respect to the EZ Reader -- well, her understanding

9  of case-based reasoning, if you type in a keyword that

10 searches a database looking for documents that contain

11 that keyword, that that is not case-based reasoning.

12 The reason I'm asking is because I don't -- I want to be

13 mindful of Your Honor's instruction.  We're not supposed

14 to try to interpret the claims, but I think that's fair

15 game, because the claim construction is just as exemplar

16 cases.  And I'd like to ask her that.

17         THE COURT:  I appreciate you asking, but

18 I'm going to let you ask that question.  But you need to

19 ask it not in the context of the way she said it in the

20 deposition.  You need to just ask it.

21         MR. VERHOEVEN:  Of course.  Of course.

22         THE COURT:  Unless you get an answer

23 that's different from what she said in the deposition.

24 You can impeach her with a deposition.  I just don't

25 want you to start playing clips of depositions --

```
1              MR. VERHOEVEN:  Of course.

2              THE COURT:  -- up there if there's no

3   real inconsistency.  But that's -- I'm going to allow to

4   you answer that -- or ask that question.  I think

5   it's -- it's fairly within the scope of what's in

6   dispute.  It doesn't tread on the admonishment that I

7   gave you yesterday.

8              MR. VERHOEVEN:  Thank you, Your Honor.

9              And then the other one is, the witness

10  had a consulting agreement with the predecessor company,

11  and the signatory to that agreement is Mr. David

12  Pridham.  And there was an MIL that Your Honor granted

13  generally about e-mails and referring to counsel.

14  And I just want to make sure that if I ask who he was,

15  that's okay.

16             THE COURT:  That's -- that's -- that's

17  fair game for cross-examination, okay?

18             Is everybody clear, though, as far as

19  timing goes?  I'm keeping track of time up here.  I'm

20  charging bench conferences against the party that

21  requests them.

22             MR. VERHOEVEN:  Yes, Your Honor.

23             THE COURT:  There's nothing improper

24  about this one.  Just so I had you up here, I just

25  wanted to let you know.
```

1          MR. VERHOEVEN:  Thank you, Your Honor.

2              (Bench conference concluded.)

3          MR. VERHOEVEN:  Are we set?  Okay.

4                    CROSS-EXAMINATION

5    BY MR. VERHOEVEN:

6      Q.   Good morning, Ms. Rice.

7      A.   Good morning.

8      Q.   I'd like to start by putting up DX260, please.

9    This is a picture of the '947 patent, right?

10     A.   Yes.

11     Q.   Is it up on your screen there, too, right in

12   front of you?

13     A.   Yes, it is.  It's really small.

14     Q.   Okay.  But you recognize that as the patent

15   you're listed as the inventor on, correct?

16     A.   Yes.  At Line 75, it says inventors, Amy Rice

17   and Julie Hsu.

18     Q.   All right.  Now, Ms. Rice, you've never

19   actually read the whole patent, have you?

20     A.   I've read most of it.

21     Q.   Well, you had your deposition taken just March

22   19th of this year; is that right?

23     A.   (Nods head.)

24     Q.   You have to answer out.  If you would answer

25   out, we would appreciate it.

1  A. Yes, I did.

2  Q. Okay.

3  A. I believe it is the 19th.  I don't have it

4 right in front of me.

5  Q. And you understood that that was a proceeding

6 where you were giving testimony under oath?

7  A. Yes.

8  Q. Similar to your testimony today?

9  A. Yes.

10  Q. Okay.  Now, as of March 19th, 2010 when your

11 deposition was taken, a little over two months ago, at

12 that point in time, you had never read the whole patent

13 at that point, had you?

14  A. I don't remember what I testified.

15  Q. Do you remember whether you had read it or

16 not, prior to March of 2010?

17  A. I don't think I read all of it.  I don't

18 believe I did.

19    MR. VERHOEVEN:  Your Honor, I would ask

20 to play -- to refresh the witness' recollection, Page

21 25, Lines 6 through 16 of her deposition.

22    THE COURT:  Okay.

23    MR. FENSTER:  No objection.

24    THE COURT:  Okay.

25    (Video clip playing.)

```
 1                QUESTION:  Can you describe for me
 2   generally what you understand to be the invention of the
 3   '947 patent?
 4                ANSWER:  That's -- that's a long
 5   document.  I have not read the whole thing.
 6                QUESTION:  You've never read the whole
 7   thing?
 8                ANSWER:  No.
 9                QUESTION:  Were you asked to read the
10   whole thing in connection with obtaining the patent?
11                ANSWER:  No.
12                (End of video clip.)
13      Q.  (By Mr. Verhoeven) Ms. Rice, at the time of
14   that deposition, a little over two months ago, you had
15   never even seen the final issued patent; is that right?
16      A.  Can you explain by what you mean the final
17   issued patent?
18      Q.  Yes.  This patent we're looking at on the
19   screen here.
20      A.  I had seen the first pages.
21                MR. VERHOEVEN:  Your Honor, I would like
22   to play Page 63, Lines 1 through 6 of the witness'
23   testimony in March.
24                THE COURT:  Okay.
25                (Video clip playing.)
```

1    QUESTION:  Let me give you for reference

2 another exhibit.  I have handed you what has previously

3 been marked as Cohen Exhibit 3.

4    Do you recognize this document?

5    ANSWER:  I haven't seen this document, if

6 this is what I think it is, in this form before, no.

7    (End of video clip.)

8    Q.   (By Mr. Verhoeven) Now, Ms. Rice, is it

9 correct that you don't know what the invention that's

10 listed in the '947 patent is?

11    A.   No, it's not correct.

12    MR. VERHOEVEN:  Your Honor, I would like

13 to play another excerpt from the deposition, Page 25,

14 Lines 24 through Page 26, Line 5.

15    THE COURT:  Counsel, approach.

16    (Bench conference.)

17    THE COURT:  I'm not sure what she's going

18 to say in response to this question, but if it is what I

19 think it is, it's probably going to prompt an

20 instructions from me that the claims define the scope of

21 the invention on the issued patent as construed by the

22 Court.

23    So I'm just -- these types of questions

24 are frequently asked at depositions that occurred well

25 before the claim construction order issues.  So -- I

1    mean, you can proceed on this line, if you want, but

2    that's where you're headed, okay?

3                   MR. VERHOEVEN:  Yes, Your Honor.

4                   (End of bench conference.)

5         Q.   (By Mr. Verhoeven) Ms. Rice, you've offered

6    testimony on direct examination about the EZ Reader,

7    correct?

8         A.   About the EZ Reader, yes.

9         Q.   Yes.  That's the system that you worked on,

10   correct?

11        A.   Yes, that's the system I worked on.

12        Q.   Is that your -- is it your understanding that

13   the EZ Reader is an example or embodiment of the '947

14   patent?

15        A.   The EZ Reader application was one way of

16   implementing the ideas and concepts in the '947 patent.

17        Q.   And the EZ Reader, understanding it's an

18   example -- and the claims define the scope of the

19   patent.

20             And with that understanding, though, the EZ

21   Reader that you developed in the real world, that

22   compared e-mail examples to a database of the actual

23   e-mails, correct?

24        A.   It did so.  It also used a rule-based engine

25   as well.

1    Q.   And the comparing of e-mail examples to actual

2  e-mails was the case-based reasoning functionality of

3  the EZ Reader?

4    A.   When you say actual e-mails, in the sense that

5  they were testing e-mails, yes.

6    Q.   So that was the case-based functionality of

7  the EZ Reader?

8    A.   It was.

9    Q.   Okay.  Now, as you understand case-based

10  reasoning, if you had a program that allowed you to type

11  in a keyword and then search the database looking for

12  documents that contain that keyword, that would not be a

13  case-based reasoning, would it?

14    A.   A keyword search can be a part of a case-based

15  reasoning engine.

16        MR. VERHOEVEN:  Your Honor, I would like

17  to play from Page 40 of Ms. Rice's deposition, Lines 15

18  through 241, Line 2.

19        (Video clip playing.)

20        QUESTION:  Well, let's just say that

21  if -- if -- if there's a program that -- you know, if

22  you typed in a keyword and then it just searched a

23  document database looking for documents that contain

24  that keyword, is that case-based reasoning?

25        ANSWER:  No.

1              (End of video clip.)

2      A.   Right.  It's not the entire embodiment of

3  case-based reasoning.

4      Q.   (By Mr. Verhoeven) You would agree that

5  case-based reasoning is different from keyword matching,

6  wouldn't you, Ms. Rice?

7      A.   If you take key-based -- key-based search

8  alone, it's different.  But it's embodied within the

9  case-based reasoning technology.

10            MR. VERHOEVEN:  Let's display what you

11  said at Page 24, Lines 6 through 9 of your deposition.

12  Page 41, Lines 6 through 9, please.

13            MR. FENSTER:  Your Honor, objection.

14            THE COURT:  Let's --

15            MR. FENSTER:  Beyond the scope.

16            THE COURT:  Overruled.

17      Q.   (By Mr. Verhoeven) Before we play this --

18            MR. VERHOEVEN:  Excuse me.  I'm sorry.

19  If Your Honor doesn't mind, I'd like to reask the

20  question.  Is that okay?

21            THE COURT:  I don't mind.

22      Q.   (By Mr. Verhoeven) Isn't it true, Ms. Rice,

23  that you would agree that case-based reasoning is

24  different from keyword matching; isn't that right?

25      A.   As a whole, it is.

Q.   Okay.  So case-based reasoning, in your view,
is not keyword matching as a whole, right?

A.   I think you're combining the two concepts
there when you say keyword search and case-based
reasoning.

Q.   I'm -- I'm --

A.   One of them is inside the other.

Q.   Go ahead.  I'm sorry.  One is inside?

A.   Keyword search works within a case-based
reasoning framework, but case-based reasoning is much
more than just keyword research.

Q.   Case-based reasoning is different from keyword
matching, isn't it, Ms. Rice?

A.   Yes, it is.

Q.   Ms. Rice --

MR. VERHOEVEN:  Do we have a binder?

Q.   (By Mr. Verhoeven) I'd like to hand up a
binder for you.

MR. VERHOEVEN:  Two copies, Your Honor?

THE COURT:  One's fine.  Otherwise, I'll
look like I'm collecting notebooks up here.

MR. VERHOEVEN:  May I approach your
Honor?

THE COURT:  Yes.

MR. VERHOEVEN:  If we could put up DX260

1  again, please, Ryan.

2      Q.   (By Mr. Verhoeven) Ms. Rice, if you could look

3  back to the back of the patent at Claim 26.

4           MR. VERHOEVEN:  And, Ryan, maybe we can

5  put that back up, the back of the patent.

6      A.   I'm sorry.  Can you tell me what column you're

7  looking at?

8      Q.   (By Mr. Verhoeven) Looks like it's Column 14,

9  Ms. Rice.

10     A.   Thank you.  Okay.

11     Q.   You see Claim 26 there?

12     A.   Yes, I do.

13     Q.   And there's a Step A -- well, actually, in the

14  preamble, it says:  A method for automatically

15  processing a non-interactive electronic message.

16          Do you see that?

17     A.   Yes, I do.

18     Q.   And then Step A says:  Receiving the

19  electronic message from a source.

20          Do you see that one?

21     A.   Yes, I do.

22     Q.   Now, before you developed the EZ Reader

23  program, would you agree with me that there were other

24  programs that could receive a message from the source?

25     A.   When you say other programs, can you define

1  that?

2      Q.   Well, would you agree that before the

3  development of the EZ Reader program -- or the EZ

4  Reader, that messages were received from a source in

5  other programs that existed in the art?

6      A.   Maybe from other utilities, yes, I can think

7  of those.

8      Q.   So before you developed the EZ Reader, there

9  were other programs out there where messages were

10 received from a source, correct?

11     A.   Sure.  I mean, if you consider a TV broadcast

12 a message from a source.

13     Q.   All kinds of different ways that messages can

14 be received from sources, right?

15     A.   Yes.

16     Q.   Computer programs as well, right?

17     A.   Yes.

18     Q.   Okay.  Now, if you look at Step B, it says,

19 quote:  Interpreting the electronic message using a

20 rule-based and case-based knowledge engine.

21          Do you see that?

22     A.   Yes, I do.

23     Q.   Now, you would agree that rule-based reasoning

24 existed before you started work on the EZ Reader,

25 correct?

1      A.    Some rule-based -- there were different

2  rule-based systems out there, but they did exist.

3      Q.    So the answer is yes, rule-based reasoning

4  existed before you started work on the EZ Reader,

5  correct?

6      A.    Yes, multiple ways.

7      Q.    Okay.  And before the EZ Reader, electronic

8  messages had been interpreted using rule-based knowledge

9  engines, correct?

10      A.    I'm sorry.  Could you repeat?

11      Q.    Yes.

12            Before you developed and worked on the EZ

13  Reader, there were systems out there in which electronic

14  messages had been interpreted using rule-based knowledge

15  engines, right?

16      A.    According to some of the references in the

17  patent, yes.

18      Q.    So the answer is yes?

19      A.    Yes.

20      Q.    Okay.  And you would agree with me, also, Ms.

21  Rice, that before you started working on the EZ Reader,

22  that case-based reasoning existed out there in other

23  programs, right?

24      A.    What do you mean by in other program?

25      Q.    Well, let me rephrase the question.

An aspect of the EZ Reader that you developed was case-based reasoning, correct?

A.   Yes, it was.

Q.   And case-based reasoning existed before the development of the EZ Reader, correct?

A.   Are you talking about commercial case-based reasoning?

Q.   Any kind of case-based reasoning, Ms. Rice.

A.   Okay.  Case-based reasoning was a theory that was developed in academia and then commercialized in ART*Enterprise.

Q.   So the idea of case-based reasoning was developed and conceived and published before you began working on the EZ Reader, correct?

A.   Yes, that's right.

Q.   Okay.  And there were actual applications out there using case-based reasoning before you developed the EZ Reader, right?

A.   Yes.  I wrote some of them.

Q.   Now, you mentioned that you worked at a company called Inference?

A.   Correct.

Q.   And Inference was the predecessor to -- can you remind me?  Inference was the predecessor to what company?

1       A.    To Brightware.

2       Q.    To Brightware.

3             And when you worked at Inference, is it

4   correct that there were already -- they already had

5   technology at Inference for both rule-based reasoning

6   and case-based reasoning?

7       A.    Yes, they had technology.

8       Q.    So that existed before you started work on the

9   EZ Reader, right?

10      A.    Yes, it did.

11      Q.    Okay.  Would you agree with me that as far

12  back as the 1980s, there were applications that used

13  both rule-based and case-based knowledge engines?

14      A.    I don't have personal knowledge of that.

15      Q.    Do you have personal knowledge of whether

16  there were commercial applications out there that used

17  both rule-based and case-based knowledge engine?

18      A.    I don't have personal knowledge of that

19  either.

20      Q.    Okay.  I'd like to play from your deposition

21  in March of this year Page 25, Lines 7 through 17.

22            (Video playing.)

23            QUESTION:  So had knowledge-based systems

24  been used in the '80s?

25            ANSWER:  Oh, yeah.

1              QUESTION:  And would that be both

2  rule-based and case-based knowledge engines?

3              ANSWER:  Yes.  Are you talking about

4  commercial -- commercial applications?

5              QUESTION:  Yes.

6              ANSWER:  Yes.

7              (End of video clip.)

8      Q.   (By Mr. Verhoeven) So does that refresh your

9  recollection that there were applications -- commercial

10 applications out there that used both rule-based and

11 case-based reasoning?

12     A.   Yes.  Could I explain?

13     Q.   You could explain on redirect.

14             THE COURT:  Hold on a second.  I promise

15 you, I'm going to let the Plaintiff's lawyers ask you

16 some additional questions.  If you need to explain any

17 of the answers you give on cross, I'll let you do that,

18 okay?

19             THE WITNESS:  Yes, sir.

20     Q.   (By Mr. Verhoeven) But in answer to my

21 question, you would agree with me that there were

22 commercial applications out there, before you started

23 working on EZ Reader, that used both case-based and

24 rule-based knowledge engines?

25     A.   (Nods head.)

1     Q.   Yes?

2     A.   Yes.  Before, yes.

3     Q.   That's yes?

4     A.   Yes.

5     Q.   Okay.  Now, Ms. Rice, I'd like to switch

6  subjects to the development of the EZ Reader.

7               MR. VERHOEVEN:  So we can take the --

8  Ryan, we can take that off the screen, please.

9     Q.   (By Mr. Verhoeven) Now, your -- on your direct

10 testimony, you testified before this jury that the EZ

11 Reader was never used to respond to e-mails from live

12 customers.

13          Is that your testimony?

14    A.   Absolutely.

15    Q.   Okay.  But you do admit that the EZ Reader was

16 tested, correct?

17    A.   Yes.  We tested it for a very long time.

18    Q.   And during what you describe as this testing,

19 you would take all of the e-mail communications sent to

20 the ChaseDirect banking website and load those messages,

21 correct?

22    A.   That's not correct.

23    Q.   Okay.

24               MR. VERHOEVEN:  I'd like to play from

25 Page 29 of your deposition, Lines 18 through 25.

1          MR. FENSTER:  Your Honor, can I just ask

2  that -- one second.  Just let -- just ask for a quick

3  pause and let me get there.

4          THE COURT:  Yes.

5          MR. FENSTER:  What's the line number?

6          MR. VERHOEVEN:  18 through 25.

7          MR. FENSTER:  Okay.

8          THE COURT:  Let's go.

9          (Video playing.)

10          QUESTION:  And can you describe for me

11  what -- what the testing involved?

12          ANSWER:  Yes.

13          QUESTION:  Please do so.

14          ANSWER:  Let me get this all -- the

15  testing involved taking electronic mail communications

16  sent to Chase, to their direct banking website, and

17  loading those into a framework that processed them.

18          (End of video clip.)

19      Q.   (By Mr. Verhoeven) So at your deposition, you

20  testified that, quote:  The testing involved taking

21  electronic mail communications sent to -- sent to Chase,

22  to their direct banking website, and loading those into

23  a framework that processed them, correct?

24      A.   (No response.)

25      Q.   Is that right?

1     A.   Before I testified to this jury yesterday that

2  I had taken 200 of those actual e-mail messages and

3  tested them in a test environment.

4     Q.   Ms. Rice, is it true or is it not that the

5  testing involved taking electronic mail communications

6  sent to Chase, to the direct banking website, and

7  loading those into a framework that processed them?

8     A.   That is true, some of them.

9     Q.   Some of it or all of it?

10    A.   No.  Some.  200.

11    Q.   And in this test environment, Ms. Rice, EZ

12  Reader processed 50 to 80 percent of all incoming

13  electronic messages, correct?

14    A.   In our test environment, yes.

15    Q.   And you would agree that the EZ Reader

16  prototype could reply to e-mail messages automatically,

17  correct?

18    A.   Yes, it could reply --

19    Q.   Okay.

20    A.   -- to us.

21    Q.   Now, Ms. Rice, you gave some testimony about

22  the timeline and the deployment of the EZ Reader project

23  on direct examination, but isn't it true that you were

24  taken off the EZ Reader project before testing was

25  complete?

1    A.    Testing was an ongoing activity, so yes, I was

2 taken off before it was complete.

3    Q.    So the answer is yes, you were taken off the

4 EZ Reader project before testing was complete, correct?

5    A.    That's right.

6    Q.    And you personally were not even involved in

7 the EZ Reader test, were you?

8    A.    I was involved in the EZ Reader test.

9    Q.    You were not personally involved in the

10 experiment that was used to test the EZ Reader, were

11 you?

12    A.    I don't know what you mean by experiment.

13    Q.    Well, let's play your answer to that very

14 question.

15              THE COURT:  Page and line.  Page and line

16 number first.

17              MR. VERHOEVEN:  Yes, Your Honor.

18              I'd like to play, Your Honor, from

19 Page 144, Lines 18 through 21, of Ms. Rice's deposition

20 on March 2010.

21              MR. FENSTER:  No objection.

22              (Video playing.)

23              QUESTION:  But just to be clear, you were

24 not personally involved in the experiment?

25              ANSWER:  That's right.

1          (End of video clip.)

2     Q.   (By Mr. Verhoeven) You don't have personal

3  firsthand knowledge of the experiment that was run in

4  Rochester, New York, do you?

5     A.   I wasn't in Rochester, no.

6     Q.   So the answer is, you do not have personal

7  knowledge about that testing, right?

8     A.   With that particular test, yes.

9     Q.   Okay.  And you don't recall ever getting any

10 documents about that testing, right?

11    A.   On the contrary.  I do.

12          MR. VERHOEVEN:  I'd like to play, Your

13 Honor, from Page 150, Lines 10 through 12 of Ms. Rice's

14 deposition from March of 2010.

15          THE COURT:  All right.

16          MR. VERHOEVEN:  Thank you.

17          (Video playing.)

18          QUESTION:  Going back to your declaration

19 in Paragraph 11 of Rice Exhibit 4 --

20          ANSWER:  Uh-huh.

21          QUESTION:  -- do you have any

22 documentation of the testing that you're referring to in

23 that paragraph?

24          ANSWER:  I can't remember whether or not

25 I got actual documentation.

1           (End of video clip.)

2      Q.   (By Mr. Verhoeven) Now, Ms. Rice, you

3  testified that the EZ Reader system never went live to

4  interact with external customers.  Is that your -- that

5  was your testimony on direct, right?

6      A.   That's correct.

7      Q.   But isn't it true, Ms. Rice, that you didn't

8  have access to the part of the EZ Reader system that

9  interacted with external customers through e-mail, did

10  you?

11      A.   No, I didn't, because it wasn't in operation.

12      Q.   So you didn't have access to that part of the

13  system, did you?

14      A.   I didn't have personal access, no.

15      Q.   And you also weren't involved in developing

16  the driver interface to Lotus Notes, were you?

17      A.   No, I wasn't.  I was in more of a managerial

18  role.

19      Q.   So you weren't involved in the -- developing

20  the driver for Lotus Notes, were you?

21      A.   No.  I was only there for scheduling and

22  technology.

23      Q.   Isn't it true, Ms. Rice, that you can't even

24  remember the year when you were taken off the EZ Reader

25  project, can you?

1      A.    The year?

2      Q.    That's right.

3      A.    1996.

4            MR. VERHOEVEN:  Your Honor, I'd like to

5  play from the witness' deposition, Page 32, Lines 1

6  through 6.

7            THE COURT:  Okay.

8            (Video playing.)

9            QUESTION:  That was going to be when were

10  you off the project.

11            ANSWER:  I think it was in my affidavit.

12  I'm not sure.  It was March or April, maybe May.

13  March -- I think it was April of -- I guess it would be

14  '95, '96.  I can't remember what year.

15            (End of video clip.)

16      Q.    (By Mr. Verhoeven) At your deposition just a

17  couple of months ago, you couldn't remember what year,

18  could you?

19      A.    No.  That was the first time I had been

20  deposed, and actually, I guess I was a little nervous.

21  No, I couldn't remember what year at the time.

22      Q.    Isn't it true that you can't really tell this

23  jury for sure whether or not messages generated by EZ

24  Reader could be sent to customers?  Because you weren't

25  there; isn't that true, Ms. Rice?

1    A.   No.  I was in the -- I was the project manager

2  of most of their projects during that whole period.

3                  MR. VERHOEVEN:  Your Honor, I'd like to

4  play from Page 143, Lines 14 through 23 of Ms. Rice's

5  deposition from March of 2010.

6                  THE COURT:  All right.

7                  (Video playing.)

8                  QUESTION:  Right.  But when the EZ Reader

9  was there, they were able to take what was generated by

10  the EZ Reader and send it to customers.

11                  ANSWER:  I can't say for sure, but, I

12  mean, I -- I can't say that there wasn't.  I wasn't

13  there, so...

14                  (End of video clip.)

15    Q.   (By Mr. Verhoeven) You weren't there, were

16  you?

17    A.   No.  I was there, but I don't remember being

18  there.

19    Q.   Ms. Rice, isn't it true that you don't know

20  what Chase Manhattan Bank did with the EZ Reader, do

21  you?

22    A.   I don't know what Chase Manhattan Bank did

23  with the EZ Reader after I left the -- that company.

24    Q.   So that's correct?

25    A.   Yes.

1      Q.   Okay.  And it's possible that the EZ Reader

2   was deployed by Chase without your knowledge, isn't it?

3      A.   We didn't have access to the technical people

4   who might -- may have taken a copy of that application,

5   so that's correct.

6      Q.   That's correct?

7      A.   Yeah.

8      Q.   So then you agree that it's possible that

9   Chase deployed the EZ Reader without your knowledge,

10  right?

11     A.   Only if I wasn't at the application site at

12  that time.

13     Q.   So is that a yes?

14     A.   That's a yes, as long as I wasn't there.

15     Q.   They could have deployed it, and you wouldn't

16  have known about it, because you weren't there, right?

17     A.   Yeah.  That's what I'm trying to get at.

18     Q.   Okay.

19     A.   I don't see how they could have kept it a

20  secret.

21     Q.   Well, if you don't have access to it and you

22  weren't there, you think that's keeping it a secret?

23     A.   I don't know.  It could be.

24     Q.   Let's go to -- let's switch subjects again,

25  Ms. Rice, and go to the AAAI article that's been

1  discussed in this case.

2            MR. VERHOEVEN:  This is DX30, please.

3       Q.  (By Mr. Verhoeven) and this should be in your

4  binder as well.

5       A.  Yes, sir.

6            MR. VERHOEVEN:  Ryan, if you could just

7  highlight the first two-thirds down at the bottom of the

8  abstract on the first page, please.

9            No.  I'm sorry.  The whole document down

10  about -- just a little bit over -- right there.  Thank

11  you.

12      Q.  (By Mr. Verhoeven) Now, what is the AAAI?

13      A.  The AAAI was an international organization of

14  professionals in the field of artificial intelligence.

15      Q.  And this is an article that they published?

16      A.  They published this article in August 1996.

17      Q.  This is an article they published then, right?

18      A.  Yes, it is.

19      Q.  Okay.  And the title says:  EZ Reader:

20  Embedded A -- is that AI?

21      A.  Are you talking about the title?

22      Q.  Yes, I am.

23      A.  Oh, I'm sorry.  Embedded AI, yes.

24      Q.  EZ Reader:  Embedded AI for Automatic

25  Electronic Mail Interpretation and Routing.

1           Do you see that?

2      A.   Yes, I do.

3      Q.   And this article is a description of the EZ

4  Reader system that you were working on, right?

5      A.   Yes, that's a description of EZ Reader.

6      Q.   Okay.  And that's your name, together with

7  Julie Hsu at Brightware; is that right?

8      A.   That's correct.

9      Q.   And you two were authors?

10     A.   Yes.

11     Q.   Okay.  And then below that is Anthony Angotti

12 and Rosanna Piccolo.

13          Do you see that?

14     A.   Yes, I do.

15     Q.   And they are also authors?

16     A.   We put their names on the paper as a gesture

17 of -- like business, you know, friendliness, I guess you

18 would say.  They were our managers for the project,

19 so...

20     Q.   Well, did -- I think you said yesterday

21 Mr. Angotti was your hero --

22     A.   Yes.

23     Q.   -- or your champion?

24     A.   Yeah.

25     Q.   Okay.

1      A.    That's a business term for, you know, someone

2  who advocates your -- bringing you into a company.

3      Q.    Okay.  The AAAI, that's a prestigious

4  organization, isn't it?

5      A.    Yes.  It's the premiere organization for

6  people who are working in either research or commerce

7  with artificial intelligence.

8      Q.    And the article here we're looking at was a

9  selective article, meaning that it was actually selected

10 for publication by the AAAI, right?

11     A.    Yes.  They had a -- they had several

12 submissions that year, and they picked about a third of

13 them for awarding.

14     Q.    So it was sort of an award to get published by

15 the AAAI?

16     A.    Yes.

17     Q.    Okay.  And you and Ms. Hsu wrote this article

18 to tell people in the AI community about what you had

19 developed, right?

20     A.    Yes, what we had developed in a test

21 environment.

22     Q.    Now, when you wrote this article, you believed

23 it was important to be accurate, didn't you?

24     A.    Yes.

25     Q.    Ms. Rice, do you see --

1          MR. VERHOEVEN:  If we could just pull out

2    the -- Ryan, just -- just -- go back to just the

3    abstract, like you did initially.

4          And about two-thirds of the way down,

5    Ryan, I'll ask you to highlight this, if you could.  It

6    says:  Phase 1 of the EZ Reader.

7          Do you see that sentence?  Just bring the

8    whole thing out, Ryan, please.

9        Q.   (By Mr. Verhoeven) Okay.  And do you see that

10   on the screen, Ms. Rice?

11       A.   Yes, I do.

12       Q.   Okay.  Can you read it okay?

13       A.   Yes, I can.

14       Q.   Okay.  It says, quote:  Phase 1 of EZ Reader

15   was developed (sic) in the first quarter of 1996 and

16   handles up to 80 percent of incoming mail automatically,

17   depending on message content.

18          Do you see that?

19       A.   Yes, I do.

20       Q.   You know, I was just pointed out that I

21   misread the quote, so for the record, I'm going to read

22   it again.  I -- so you know what I misstated.  I said

23   developed, and the word is deployed.  So let me try it

24   one more time.

25          The phrase says -- excuse me -- the words here

1    say, quote:  Phase 1 of EZ Reader was deployed in the

2    first quarter of 1996.

3            Do you see that?

4        A.    Yes, I do.

5        Q.    And then it goes on and says:  And handles up

6    to 80 percent of incoming mail automatically, depending

7    on message content.

8            Do you see that?

9        A.    Yes, I do.

10       Q.    Now, you testified on direct examination that

11   the EZ Reader was not deployed in the first quarter of

12   1996, didn't you?

13       A.    That's correct.

14       Q.    So would you agree with me that this sentence

15   that you authored in this AAAI article is inconsistent

16   with the testimony you gave to your jurors -- to the

17   jury?

18       A.    Yes.  This was -- what I had written in

19   December of 1995 is inconsistent.

20       Q.    Okay.  Is it your testimony today that back in

21   1996 when you wrote this statement, that you knew it was

22   false when you drafted it?

23       A.    We fully believed that it would be true by the

24   time the paper was published in August 1996.

25       Q.    Did you know that it was false when you

1    drafted it?

2        A.    Yes.

3        Q.    And you submitted it to the AAAI anyway,

4    didn't you?

5        A.    Yes, we did.

6        Q.    Now, when you submitted this article to the

7    AAAI, you personally, Ms. Rice, didn't inform anyone

8    that this statement was untrue, did you?

9        A.    Well, my management looked at the entire

10   article.  They knew that this wasn't deployed, and so we

11   were very concerned with AAAI not accepting the paper --

12            MR. VERHOEVEN:  Move to strike.

13       A.    -- even though it hadn't been deployed.

14            MR. VERHOEVEN:  I move to strike as

15   nonresponsive.

16            THE COURT:  I'll sustain the objection.

17            Ma'am, the question was whether you

18   personally informed anyone that this statement was not

19   true.

20       A.    I personally did not inform anyone.

21       Q.    (By Mr. Verhoeven) So you personally -- even

22   though you knew this was an untrue statement, according

23   to your testimony, you didn't tell anybody about it

24   personally, did you?

25       A.    I can't be sure if I didn't tell anybody, but

1  I don't believe I did.

2      Q.   You didn't have any discussions with your

3  co-author, Ms. Hsu, about this allegedly inaccurate

4  statement, did you?

5      A.   I may have.  I was aware of the -- of the

6  requirement.

7      Q.   Do you remember telling Ms. Hsu that this was

8  an inaccurate statement?

9      A.   I don't remember.

10     Q.   And isn't it true that you don't have any

11 recollections of any discussions with Ms. Hsu to the

12 effect that this was an inaccurate statement?

13     A.   I really can't recall what I was -- what

14 conversations I may or may not have had in 1995.

15     Q.   No one told you to write this sentence in the

16 article, did they?

17     A.   No one told me to write this sentence?

18     Q.   That's correct.

19     A.   Yes, that's correct.

20     Q.   So the answer to the question is yes, no one

21 told you?

22     A.   No one told me to write any of these --

23     Q.   Okay.

24     A.   -- statements.

25     Q.   Now, after you submitted this article to this

prestigious organization in 1996 and after it was

selected, you attended a AAAI conference, correct?

     A.    That's right.

     Q.    And that was in August of 1996, right?

     A.    Yes, in Portland, Oregon.

     Q.    And that's a big deal, right?

     A.    It was a very big deal.

     Q.    And you gave a speech about your article at

that conference, didn't you?

     A.    Yes.  Julie Hsu and I and Rosanna Piccolo all

spoke at that conference.

     Q.    And there are about, what, 450 people at that

conference?  Is that about right?

     A.    The whole conference itself is about 9,000,

and they had a choice of which to attend, and ours was

about 450.

     Q.    Okay.  And you stood up there in front of all

those 450 people and you didn't tell any of them that

this statement in your article about EZ Reader's

deployment was incorrect, did you?

     A.    No, I didn't tell any of them, because that

would have been misleading.

     Q.    You didn't tell any of them that it had not --

excuse me.

          You did not tell any of them that Phase 1 of

1 the EZ Reader, in fact, had not been deployed, did you?

2     A.   No, I didn't.

3     Q.   Now, you testified on direct that:  Oh, well,

4 when I originally wrote this, we thought it would be

5 deployed by the time of the conference, right?  Remember

6 that?

7     A.   Yes, I do.

8     Q.   And it's your testimony that it wasn't

9 deployed by the time of the conference, right?

10     A.   That's correct.

11     Q.   That's your testimony on direct, right?

12     A.   Uh-huh.

13     Q.   But you didn't -- when you attended this

14 conference and accepted the award, you didn't mention,

15 Oh, by the way, this hasn't been deployed, did you?

16     A.   No, and I was not required to.

17     Q.   So you accepted -- it's your testimony, you're

18 asking the jury to believe that you accepted an award at

19 a prestigious organization back in 1996 under the

20 assumption that this entire system had been deployed and

21 didn't mention that, in fact, it had not been deployed,

22 right?

23     A.   Could you repeat that, please?

24     Q.   Yes.

25         You're asking the jury to believe that you

1   remember today that the system wasn't deployed, but you

2   admit, Ms. Rice, don't you, that you attended this

3   conference with 450 people going over this paper, which

4   says it's deployed, and didn't once mention back in 1996

5   that it wasn't deployed?

6       A.   That's correct.

7       Q.   Okay.  Now, let's look at some other parts of

8   the article here.

9            MR. VERHOEVEN:  Ryan, if we could go back

10  to the first page again.

11      Q.   (By Mr. Verhoeven) Now, if you look down at

12  the bottom, on the right-hand column, the bottom

13  paragraph, you see the sentence that says:  The

14  application continually retrieves?

15      A.   Yes.

16           MR. VERHOEVEN:  Ryan, if you could

17  highlight that sentence all the way to the end.

18      Q.   (By Mr. Verhoeven) And I'll just read it for

19  the record, Ms. Rice.

20           The application continually receives (sic)

21  incoming internet e-mail from Chase prospects and

22  customers through an interface to Lotus Notes and also

23  acts as a filtering and a routing --

24           MR. VERHOEVEN:  Go to the next page.

25      Q.   (By Mr. Verhoeven) -- a filtering and routing

mechanism either applying to the e-mail automatically or
attaching a suggested response and referring the message
for manual review.

       MR. VERHOEVEN:  Could we put those two
side by side, Ryan, so that we can have the whole
sentence there?

   Q.  (By Mr. Verhoeven) Now, this sentence says --
and this is the article you wrote back in 1996, right?

   A.  1995, yes.

   Q.  '95, right.

       And this sentence says in the present tense:
The application continuously receives (sic) incoming
internet e-mail from Chase prospects --

       THE COURT:  Mr. Verhoeven, does it say
receives or retrieves?

       MR. VERHOEVEN:  Oh, I'm sorry, Your
Honor.

       THE COURT:  Okay.

       MR. VERHOEVEN:  I misspoke.  I'll try to
be more careful.

       THE COURT:  I just want to make sure the
record's right.

       MR. VERHOEVEN:  Thank you, Your Honor.

   Q.  (By Mr. Verhoeven) It says, quote:  The
application continuously retrieves incoming internet

e-mail from Chase prospects and customers through the
interface to Lotus Notes and also acts as a filtering
and routing mechanism, either replying to the e-mail
automatically or attaching a suggested response and
referring the message for manual review.

Do you see that?

A.    Yes, I do.

Q.    And that's in the present tense, right?

A.    It is.

Q.    And this is what you wrote way back in 1995,
right?

A.    Right.

Q.    Now, according to your direct testimony
today -- is it 15 years later?  Is that right?

A.    About that.

Q.    Yeah.  So according to your recollection
today, 15 years later, on direct examination, you're
asking the jury to believe, in fact, notwithstanding
this sentence that EZ Reader never mailed any automatic
responses back to the senders; is that right?

A.    That's correct.

Q.    Okay.  And according to your testimony to the
jury on direct, not withstanding this sentence, at the
time this article was submitted, the Lotus Notes
interface had not even been developed.

1    Is that what your testimony is?

2    A.   Yes.

3         MR. VERHOEVEN:  Now, let's go back to

4    the -- Page 1508.  That's the second page, Ryan, on the

5    right.

6         And if we could go down to the -- Ryan,

7    if we could just pull the first full -- the first

8    carryover paragraph underneath -- on the left side

9    underneath the graphic?

10        Thank you.

11   Q.   (By Mr. Verhoeven) And now, Ms. Rice, do you

12   see the last sentence in that paragraph?

13        MR. VERHOEVEN:  And, Ryan, I'd ask you to

14   highlight that and pull that out, please.

15        And I'll read it to the record.  I'll try

16   to do it accurately this time.

17   Q.   (By Mr. Verhoeven) Quote, EZ Reader's

18   automated reasoning capabilities enabled ChaseDirect to

19   reach these goals and significantly reduce the manual

20   effort needed for e-mail processing, close quote.

21        Do you see that?

22   A.   Yes, I do.

23   Q.   And you wrote that in 1996, right?

24   A.   1995.

25   Q.   1995.  I'm sorry.

1          And this is written in the present tense,
2   right?
3       A.    Yes, it is.
4       Q.    And this tells all those people reading the
5   AAA (sic) article that the system you developed, quote,
6   enabled ChaseDirect to reach these goals and
7   significantly reduce the manual effort needed for e-mail
8   processing, correct?
9       A.    Yes.  We were very enthusiastic at the time.
10      Q.    Now, according to your testimony today, over
11  14 years later, on direct examination, it's your
12  recollection that contrary to this statement, EZ Reader
13  was never actually used to reduce the manual effort
14  needed for e-mail processing?
15      A.    Yes.
16      Q.    You would admit that this statement is
17  inconsistent with your direct testimony.
18      A.    Inconsistent.
19      Q.    You would agree?
20      A.    Maybe I misunderstood you.  Could you read it
21  again?
22      Q.    Would you agree with me that the sentence that
23  you wrote back in 1996 and submitted to a large
24  organization is inconsistent with your testimony 14
25  years later about your recollection?

```
 1      A.    Is the testimony somewhere for me to look at?

 2      Q.    I'm talking about the testimony you gave

 3 yesterday and this morning on direct examination.

 4            You don't remember it?

 5      A.    Well, I'm not sure what you're referring to.

 6      Q.    Ms. Rice, I'm asking you, if this sentence,

 7 which says that the EZ Reader's automated reasoning

 8 enabled ChaseDirect to reach its goals and significantly

 9 reduce the manual effort needed for e-mail processing

10 that you wrote back in 1996 is inconsistent with your

11 testimony on direct examination to this jury?

12      A.    I can't answer that.

13      Q.    You can't answer that.

14            Well, you did testify to the jury on direct

15 that EZ Reader was never deployed by Chase, right?

16      A.    Oh, okay.  Yes.  In that sense, yes.

17      Q.    Okay.  So it is inconsistent with the

18 testimony you gave on direct examination, this sentence

19 here.

20      A.    It was never deployed, yes.  So that

21 sentence is -- whatever.

22      Q.    It's inconsistent with your direct testimony,

23 correct?

24      A.    It's inconsistent with anything about

25 deployment.
```

1    MR. VERHOEVEN:  Let's go to Page 15511

2  (sic) of the article, please.

3    Q.   (By Mr. Verhoeven) This should be in your

4  binder, Ms. Rice.

5    MR. VERHOEVEN:  And, Ryan, if we could

6  pull out the -- after the heading, AI Enables E-mail

7  Classification, there's a third paragraph down that

8  says:  Automated -- Automatic Response.  If you could

9  pull that paragraph out.

10    Q.   (By Mr. Verhoeven) Ms. Rice, can you take a

11  second and look at that, please?

12    A.   (Complies.)

13    Q.   And I'll read it for the record.

14    Quote, Automatic Response.  EZ Reader assigns

15  a category of automatic response to items that can be

16  associated with a response from the Lotus Notes

17  repository of standard responses and directly mailed

18  back to the sender without manual review or revision.

19    Do you see that?

20    A.   Yes, I do.

21    Q.   So this sentence is describing the automatic

22  response of the EZ Reader in the present tense, right?

23    A.   Yes.  This refers to our test environment.

24    Q.   This doesn't say test environment, does it,

25  Ms. Rice?

1   A.   No, it doesn't.

2   Q.   Okay.  So when you wrote this back in 1996,

3   you didn't think to say, well, this is a test

4   environment, did you?

5   A.   No.  No.  We wrote it in 1995.

6   Q.   That's correct.  I apologize.

7        When you wrote it in 1995, you didn't think to

8   say, Well, this is just a test, did you?

9   A.   No.

10  Q.   You said it was actually deployed, right?

11  A.   That's correct.

12  Q.   And you say here in the present tense that the

13  system gives responses directly back to the sender.

14       Do you see that?

15  A.   Yes, I do.

16  Q.   Now, this -- this sentence as well is

17  inconsistent with your direct testimony about your

18  recollection of things given over 14 years later, right?

19  A.   Yes.

20  Q.   This sentence is saying that the program was

21  live, and it directly responded to senders, right?

22  A.   Yes.

23  Q.   And you wrote that way back in 1995, right?

24  A.   Uh-huh.  Yes, eight months before the

25  conference.

1    Q.   And you didn't tell anybody at the conference

2  that, oh, by the way, it never got deployed, and these

3  statements in the article are actually not true, did

4  you?

5    A.   Well, these statements are true only to the

6  extent of the test system that was never deployed, yes.

7    Q.   Ms. Rice, you never told anyone at that

8  conference that, in fact, the system was never deployed

9  and these statements about how it reduces Chase --

10  ChaseDirect's burden and how e-mails are directly mailed

11  back, that none of that was actually happening, did you?

12         Never told anyone about that at the

13  conference, did you?

14    A.   I never told anyone about that, and neither

15  did Julie Hsu or Rosanna Piccolo that I can remember.

16         MR. VERHOEVEN:  Let's go to Page 1514 of

17  the AAA article -- AAAI article.

18         Now, if we could bring out the

19  paragraph -- or the -- on the left-hand column, Ryan,

20  you see where it says:  Application benefits?  From

21  there down to the bottom.  Perfect.

22    Q.   (By Mr. Verhoeven) Are you with me, Ms. Rice?

23    A.   Yes, I am.

24    Q.   Okay.

25         MR. VERHOEVEN:  And then the -- could we

highlight the first sentence under application benefits?

Q.   (By Mr. Verhoeven) And I'll read that for the record.

Quote, EZ Reader played a critical role in establishing ChaseDirect's ability to provide and maintain a responsive online marketing and service channel, close quote.

Do you see that?

A.   Yes, I do.

Q.   This is written in the present tense, right?

A.   It is.

Q.   Actually, I misspoke.  This is written in the past tense, isn't it?

A.   Ability to provide and maintain...

Yes, that's correct.  Played, that would be past.

Q.   So in this -- in this article that you wrote in 1995, you told all the folks reading the AAAI that the EZ Reader played a critical role in establishing Chase's -- ChaseDirect's ability to provide and maintain a responsive online marketing and service channel, right?

A.   Yes, we did.

Q.   And this sentence, as I read it, is saying that the EZ Reader's already deployed.  Is that the way

1  you read it?

2      A.    That's -- that's what it implies.

3      Q.    Right.  And you wrote that sentence in 1995 at

4  about the time you were actually developing this

5  program, right?

6      A.    We expected to deploy shortly after that, yes.

7      Q.    That's yes?

8      A.    Yes.

9      Q.    Okay.  And would you agree with me that your

10  testimony 14 years later on direct examination as to

11  your recollection is inconsistent with this sentence as

12  well?

13      A.    It is.

14              MR. VERHOEVEN:  Go down -- if we can go

15  down to the next paragraph.  You can leave that

16  highlighted, Ryan.  That's fine.  Go down to the next

17  paragraph and highlight the first sentence.

18      Q.    (By Mr. Verhoeven) Quote, EZ Reader increased

19  the speed of response to the customer.

20              Do you see that?

21      A.    Yes, I do.

22      Q.    And that's written in past tense as well,

23  isn't it?

24      A.    Increased, yes.

25      Q.    And the response to the customer is a

1  reference to Chase's customers, right?

2      A.   That implies Chase's customers, yes.

3      Q.   And what you're saying here when you wrote

4  this in 1995 to all those folks at the AAAI is that in

5  the past tense, EZ Reader had achieved the ability to

6  increase the speed of response to the customer, correct?

7      A.   Yes.  At the time, we thought it was going to.

8      Q.   So that's a yes to my sentence (sic)?

9      A.   Yes.

10     Q.   Okay.

11             MR. VERHOEVEN:  And then if we go down

12  two sentences --

13             THE COURT:  Mr. Verhoeven --

14             MR. VERHOEVEN:  Yes.

15             THE COURT:  -- before we move into a

16  different area, let's take our morning recess at this

17  time, okay?

18             MR. VERHOEVEN:  Thank you, Your Honor.

19             THE COURT:  All right.  Ladies and

20  Gentlemen, I'm going to excuse you at this time until

21  10:25 for the morning recess.  Remember my prior

22  instructions, and don't talk about the case.

23             Have a nice recess.

24             LAW CLERK:  All rise.

25             (Jury out.)

1          THE COURT:  All right.  We'll be in

2 recess until 10:25.

3          (Recess.)

4          (Jury in.)

5          THE COURT:  All right.  Please be seated.

6          Ms. Rice, if you'll come on back around,

7 ma'am.

8          All right.

9          MR. VERHOEVEN:  Your Honor, may I briefly

10 approach?

11          THE COURT:  Yes.

12          (Bench conference.)

13          MR. VERHOEVEN:  I just wanted to give a

14 heads up that I'm going to go into the witness signed a

15 declaration with the PTO that -- that incorporates this

16 AAAI -- article, yes.

17          I'm not going to ask about inequitable

18 conduct, Your Honor.

19          THE COURT:  Well, that's fair game.

20          MR. VERHOEVEN:  Okay.  And one -- just to

21 avoid objections, one really quick thing.

22          I believe she also testified that the

23 Chase people listed as inventors were not inventors.

24 I'm not going to go into inequitable conduct, but I'd

25 like to establish that, because we have competing

versions of events from the different inventors to show

it goes to the bias and the credibility of the

witnesses.

THE COURT:  Well, I guess I don't

understand the line of questioning you're --

MR. VERHOEVEN:  For example, she

testified at deposition that Mr. Angotti did not

contribute anything to --

THE COURT:  You're absolutely entitled to

go into that.

MR. VERHOEVEN:  I am?  Okay.  Thank you,

Your Honor.

(Bench conference concluded.)

Q.   (By Mr. Verhoeven) Ms. Rice?

A.   Yes.

Q.   The EZ Reader system was not tested for

purposes of filing the patent application that led to

the '947 patent, correct?

A.   I don't have personal knowledge of that.

Q.   Well, let's play -- let's play your answer at

your deposition when I asked you that question or when

we asked you that question.

This is from the March 2010 deposition,

Page 154, Lines 15 through 18.

(Video clip playing.)

1                    QUESTION:  So just to be clear, based on

2    your understanding, the testing was not done to enable

3    the inventors to prepare the patent application?

4                    ANSWER:  Correct.

5                    (End of video clip.)

6         Q.   (By Mr. Verhoeven) So at your deposition, you

7    said that was a correct statement, right?

8         A.   Yes, because it wasn't -- it wasn't done to do

9    that --

10        Q.   Okay.

11        A.   -- basically.  It was done as part of our

12   project.

13        Q.   Would you agree with me that the EZ Reader was

14   not tested for the purpose of filing a patent

15   application, correct?

16        A.   I would agree with that.

17        Q.   All right.  Now, let's go to Exhibit DX84 in

18   your binder, please.

19             Are you there?

20        A.   Yes, sir.

21        Q.   Okay.  If you turn to the fourth page of this

22   document, Defendants' Exhibit 84, do you see the title

23   up there?  It says Provisional Application for Patent

24   Cover Sheet.

25        A.   Yes, I see that.

1    Q.   Do you see that?

2    A.   I see that.

3    Q.   This was the first patent application that

4 resulted in the '947 patent, right?

5    A.   I'm unfamiliar with this document.

6    Q.   Well, let's turn to the third page -- or two

7 more pages back.

8         It says Additional Inventors Application

9 Continue -- Applicants Continued.

10        Do you see that?

11   A.   Yes, I do.

12   Q.   Do you see you're listed as Inventor No. 3?

13   A.   Yes.

14   Q.   And if you turn to the next page, one more

15 page over, please, and then you see it says AAAI '96,

16 Thirteenth National Conference of Artificial

17 Intelligence.

18        Do you see that?

19   A.   Yes, I do.

20   Q.   Then if you turn to the next page, do you

21 recognize that document?

22   A.   Yes, I do.

23   Q.   And what is that document?

24        Let me ask the question a different way.  That

25 document is the AAAI article that we were just looking

1  at, right?

2      A.   I would have to look through to see if

3  everything is included in here.

4      Q.   Is that the first page of it that we're

5  looking at on the screen?

6      A.   That's the first page of it, yes.  That's the

7  title page.

8      Q.   All right.  And if we go back to the very

9  first pages of Defendants' Exhibit 84, you see up in the

10  top left, it says Provisional Application.  In the top

11  left?

12     A.   Yes, I see that.

13     Q.   And do you see below that, it says application

14  number?

15     A.   Yes.

16     Q.   And that ends in '494.  Do you see that?

17     A.   Yes.

18     Q.   So this is the provisional application that

19  was filed in connection with the patent on which you're

20  listed as an inventor.

21          Would you agree with that?

22     A.   Yes, but I've never seen it, though.

23     Q.   So it's your testimony you never, ever saw

24  this document?

25     A.   I don't recall seeing this document.

1    Q.   Okay.  I'm going to refer to this as the

2 provisional application, the '494 provisional

3 application.  When I ask some questions going forward,

4 you understand I'm referring to this document?

5    A.   Okay.

6    Q.   Okay.  Now, let's go back to DX260, which is

7 the '947 patent.

8         Are you there?

9    A.   Yes, I am.

10    Q.   Now, if you go to Column 1 of that patent and

11 if you look at the very top paragraph of that patent, it

12 says:  This application is based on and claims priority

13 to U.S. patent application -- there's a bunch of numbers

14 that end in '074 -- and then it says comma.  And then it

15 says:  U.S. provisional application No. 60/'042,494.

16         Do you see that?

17    A.   Yes, I do.

18    Q.   So that's saying that the application that

19 issued in the patent claims priority to the U.S.

20 provisional application, that was the '494 application

21 we just looked at.

22         Would you agree with that?

23    A.   It appears to say that.

24    Q.   Okay.  Now, let's go to -- and this is the

25 '947 patent.  That's the patent at issue in this case,

1  right?

2      A.   The '947 patent, yes.

3      Q.   And you see at the bottom of the last column

4  in this paragraph, it says, quote:  Each of which are

5  incorporated herein by reference for all purposes.

6      A.   Yes, I see that.

7      Q.   Do you see that?

8      A.   Yes.

9      Q.   So the '947 patent incorporates by reference

10  U.S. Provisional Application '494, right?

11      A.   It appears to say that, yes.

12      Q.   And the U.S. Provisional Application '494 is

13  the application that attaches the AAAI article, correct?

14      A.   I don't know what you mean by attaching it.

15      Q.   All right.  Well, let's go back to DX84.  This

16  is a provisional application '494, right?

17      A.   Okay.  Yes.

18      Q.   Okay.  And doesn't it attach the AAAI article?

19      A.   By that, are you saying that includes this

20  AAAI article?

21      Q.   Do you understand what attaches means?

22      A.   Do you mean that the combined -- the documents

23  are combined?

24      Q.   I mean it's attached to the actual

25  application.

1    A.   Okay.  So it was somehow like labeled as an

2 attachment or stapled to it or something?

3    Q.   I mean that it comes together with the actual

4 application; it's attached to it.

5         Do you not understand that?

6    A.   If it's -- if it's attached, I guess that

7 means it's along with it.

8    Q.   Yes.  Do you agree with that?

9    A.   Yes.

10         MR. FENSTER:  Excuse me, Your Honor.  May

11 we approach briefly?

12         THE COURT:  Yes.

13         (Bench conference.)

14         MR. FENSTER:  I'm not sure where this is

15 going -- this line of questioning is going, but I think

16 it goes into inequitable conduct.  I think that what

17 he's getting at is that she submitted a false statement

18 and it is attached --

19         THE COURT:  That's right.  And I'm going

20 to allow it for her credibility.

21         (Bench conference concluded.)

22    Q.   (By Mr. Verhoeven) Okay.  So let's go back to

23 the patent again -- this is DX260 -- and back to Column

24 1 that we were just looking at.

25         MR. VERHOEVEN:  Bring that back up again,

1  Ryan, and highlight the state -- the words U.S.

2  provisional application No. '494.

3      Q.   (By Mr. Verhoeven) Do you see that, Ms. Rice?

4      A.   Yes.

5      Q.   And then the last clause, do you see that?

6      A.   Yes.

7      Q.   So this is saying the provisional '494

8  application is incorporated into the patent by

9  reference, correct?

10     A.   Okay.

11     Q.   Okay.  Now, that '494 application attaches the

12  AAAI article, right?

13     A.   It appears to be, yes.

14     Q.   Okay.  Now, let's go to DX4 in your binder,

15  please.

16     A.   Okay.

17     Q.   Now, if you turn to Page 2 of this exhibit.

18         MR. VERHOEVEN:  Go to Page 2, Ryan,

19  please, and highlight the signature there.

20     Q.   (By Mr. Verhoeven) That's your signature,

21  Ms. Rice, right?

22     A.   Yes, it is.

23     Q.   And you read this declaration before you

24  signed it?

25     A.   Yes.

1      Q.   And you made sure it was truthful?

2      A.   Yes, it was truthful as much as I could tell.

3      Q.   Okay.  Now, let's go back to the first page.

4 And do you see the second table there?

5           MR. VERHOEVEN:  If we could bring that

6 out, please.

7           Yeah, there you go.

8      Q.   (By Mr. Verhoeven) And you see on the

9 left-hand column, it says application number?

10     A.   Yes.

11          MR. VERHOEVEN:  Would you highlight that,

12 please, Ryan?

13     Q.   (By Mr. Verhoeven) Then below that, there is a

14 number for the provisional '494 application.

15        Do you see that?

16     A.   Yes, I do.

17     Q.   Okay.  And, again, that's the application that

18 has the AAAI article attached, right?

19     A.   Uh-huh.  Yes.

20     Q.   But above that, on this document you've

21 signed, you state, quote:  I hereby claim the benefit

22 under Title 35 United States Code, Section 119(e) of any

23 United States provisional application listed below.

24        Do you see that?

25     A.   Yes, I do.

1    Q.   So when you signed this document, you were

2    claiming the benefit of the provisional application that

3    included the AAAI article, right?

4    A.   Okay.

5    Q.   Is that right?

6    A.   Yes.

7    Q.   Okay.  If we go to the second page and

8    highlight the paragraph between the two tables, you say,

9    quote:  I further declare that all statements made

10   herein of my knowledge are true and all statements made

11   on information and belief are believed to be true.

12        Do you see that?

13   A.   Yes, I do.

14   Q.   Now, you told the Patent Office -- you

15   submitted this declaration to the Patent Office, right?

16   A.   I didn't personally do that, no.

17   Q.   But somebody did, right?

18   A.   Somebody did, yes.

19   Q.   Okay.  And you knew it was going to be

20   submitted to the Patent Office, right?

21   A.   I only knew after it was submitted to the

22   Patent Office.

23   Q.   You read it before you signed it, right?

24   A.   I don't remember whether I signed this before

25   the patent application went in or after.

1    Q.    Did you read this document before you signed

2  it?

3    A.    Yes.  In 1998, it looks like I did.

4    Q.    And you were telling the Patent Office, when

5  you signed this, that the provisional application and

6  the documents attached to it were true, weren't you?

7    A.    Yes.

8    Q.    Okay.  And the provisional application

9  attaches the AAAI article, right?

10    A.    Yes, it appears to be.

11    Q.    So you told the Patent Office, when you signed

12  this way back in the '90s, statements in that article

13  were true, didn't you?

14    A.    It looks like that's what it involves.

15    Q.    Yet over 14 years later, you're testifying on

16  direct examination that all those statements we went

17  through before the break, in that article, were not

18  true; is that right?

19    A.    That's correct.

20    Q.    This is inconsistent about your direct

21  testimony as well, isn't it?

22    A.    Looks like it is, yes.

23    Q.    Let's go back to the patent, Exhibit 260.

24  If you could go to the last page of that exhibit.

25              MR. VERHOEVEN:  And if we could just

1  highlight...

2      Q.   (By Mr. Verhoeven) Now, you see here, there is

3  a certificate of correction, right?

4      A.   Yes, I do.

5      Q.   And you see that the certificate of correction

6  adds some additional inventors.

7           Do you see that?

8           Under the title page, it says:  Inventors,

9  please insert, Anthony M. Angotti and Rosanna Piccolo

10 and Fred Cohen.

11          Do you see that?

12     A.   Yes, I do.  It was dated 2005.

13     Q.   And you understand that they are -- as a

14 formal matter, they are listed as co-inventors on this

15 patent, right?

16     A.   Yes, I do.

17     Q.   Okay.

18     A.   And this document was dated in 2005.

19     Q.   Now, is it your testimony that, in fact,

20 Mr. Angotti is not -- should not be an inventor on this

21 patent?

22     A.   No, it's not.

23          MR. VERHOEVEN:  I'd like to play, Your

24 Honor, from Page 27, Lines 2 through 8 of Ms. Rice's

25 deposition taken in March of 2010.

1          (Video clip playing.)

2          QUESTION:  And do you know why

3  Mr. Angotti was listed as an inventor of the '947

4  patent?

5          ANSWER:  No.

6          QUESTION:  Do you think that Mr. Angotti

7  was an inventor of the '947 patent?

8          ANSWER:  No.

9          (End of video clip.)

10     Q.   (By Mr. Verhoeven) You don't think that

11  Mr. Angotti contributed anything to the '947 patent, do

12  you?

13     A.   At the time this deposition was taken, I was

14  thinking only of the EZ Reader application.

15     Q.   Ms. Rice, isn't it correct that you don't

16  think that Mr. Angotti contributed anything to the '947

17  patent?

18     A.   I can only say that at the time of the

19  deposition, when I looked at the patent, it only had

20  Julie Hsu and my name on it.

21     Q.   And you hadn't read the whole patent at that

22  time, had you?

23     A.   The whole patent wasn't modified until 2005,

24  and that was not an attachment on the patent that I was

25  looking at.

1     Q.   You had never read the whole patent as of

2 March 2010, had you?

3     A.   No.  I haven't ever read the entire, every

4 word of the patent.

5     Q.   And it's your testimony that you can't think

6 of anything that Mr. Angotti contributed to the '947

7 patent, correct?

8     A.   I don't have personal knowledge of what he

9 might have contributed to the patent.

10     Q.   So sitting here today, if I were to ask you

11 what did Mr. Angotti contribute, your answer would be I

12 don't know, right?

13     A.   Right.  I don't know.

14     Q.   In fact, you don't even think Mr. Angotti was

15 part of the development of EZ Reader, do you?

16     A.   When you say part of the development, I assume

17 you're only talking about the technical task, and in

18 that sense, no, he wasn't a part of it.

19     Q.   Did you ever tell anyone that you didn't think

20 Mr. Angotti should be listed as an inventor?

21     A.   I don't recall when or where, but I probably

22 did.

23     Q.   You did tell someone, didn't you?

24     A.   I can't remember.

25          MR. VERHOEVEN:  I would like to play from

Ms. Rice's deposition, Page 27, Lines 18 through 22.

         (Video clip playing.)

         QUESTION:  Did you ever tell anyone that you thought that -- that you thought that Mr. Angotti was not an inventor of the '947 patent?

         ANSWER:  Yes.

         QUESTION:  And who did you tell?

         ANSWER:  David.

         (End of video clip.)

  Q.   (By Mr. Verhoeven) That's Mr. Pridham?

  A.   Yes.  That was counsel.

  Q.   Sitting in the courtroom today?

  A.   I'm sorry?

  Q.   Sitting in the courtroom today?

  A.   Yes.

  Q.   Now, Ms. Piccolo is also listed here.

         THE COURT:  Counsel, approach.

         (Bench conference.)

         THE COURT:  That was directly covered by my motion in limine.

         MR. VERHOEVEN:  I'm sorry, Your Honor. I'm trying to avoid that as much as I could.  I was asking her earlier about Mr. Pridham.  I'm sorry.  I thought it was important, the fact that she had told others about it.

THE COURT:  Well, I understand that, but others can be a lot of people other than Mr. Pridham.

MR. VERHOEVEN:  That's the only one she testified to, Your Honor.

THE COURT:  I didn't know that.  That's why you should approach the bench.

MR. VERHOEVEN:  I'm sorry.  All I can do is I apologize.  I caught that earlier one, and I thought, based on our conversation, that this would be okay.

THE COURT:  Which earlier one are you referring to?

MR. VERHOEVEN:  Well, the consulting agreement she signed with him.

THE COURT:  You approached the bench on that, and I allowed it.

Step back.  Move on to something else.

MR. VERHOEVEN:  I will, Your Honor.

THE COURT:  I will take it up at the break.

(Bench conference concluded.)

THE COURT:  Ladies and Gentlemen, you need to disregard that last portion of testimony that you heard that was solicited in violation of the Court's order.

1            Occasionally when a party does something

2   that violates one of the Court's orders, he does so

3   because he perceives there to be some problem with his

4   case.  And I don't know whether that's what happened in

5   this case or not, but you can consider that in the

6   evaluation of the testimony.

7            But that last portion of the testimony

8   you just heard was elicited in violation of one of the

9   Court's orders.

10           Proceed.

11      Q.   (By Mr. Verhoeven) Now, if we go back to

12  Exhibit 260, the last page, please, do you see that

13  Ms. Piccolo is also listed as an inventor?

14      A.   Yes, I do.

15      Q.   And is it correct that you don't believe that

16  Ms. Piccolo actually contributed to the '947 patent as

17  well?

18      A.   I know she was not involved in the technical

19  development, but I don't know of any other contribution

20  she may have made.

21      Q.   Do you think that she was involved in the

22  development in the '947 patent?

23      A.   She helped us develop the system in terms of a

24  managerial role and testing.

25      Q.   I would like to play an excerpt from your

deposition, Page 27, Lines 10 through 13.

(Video clip playing.)

QUESTION:  What about Ms. Piccolo?  Do you think that Ms. Piccolo was an inventor of the '947 patent?

ANSWER:  No.

(End of video clip.)

Q.  (By Mr. Verhoeven) And the last person listed here is Mr. Cohen.

Do you see him?

A.  Yes.

Q.  Is it correct that you don't know anything that Mr. Cohen did in relation to the '947 patent?

A.  I don't know of what he may have done to get his name on the '947 patent, but I was thinking of the '947 patent, meaning the EZ Reader application.

Q.  Sitting here today, do you know anything that Mr. Cohen did in relation to the '947 patent?

A.  I'm not personally aware of what he may have done to have his name on the patent.

Q.  Your testimony is that Mr. Cohen wasn't even part of the development of EZ Reader?

A.  Right.  I didn't know Fred Cohen.

Q.  Your testimony is that he wasn't part of the development of EZ Reader?

1    A.    As far as I know, I don't know what Chase may

2 have done in the background in terms of doing anything

3 with the '947 patent.

4         He was not part of our development team, and

5 his name wasn't in any of the managerial information

6 that I have.

7    Q.    I'd like to switch subjects now and go to

8 DX81.

9         Now, we saw this document on direct exam,

10 correct?

11    A.    Yes.

12    Q.    And the title of this is EZ Reader User's

13 Guide and Reference Manual?

14    A.    Yes.

15    Q.    You said on direct examination in your direct

16 testimony to the jury that this was a draft.

17         Do you remember that?

18    A.    Yes, I do.

19    Q.    It doesn't say it's a draft, does it?

20    A.    No, it doesn't.  It also says it was written

21 by Chase Manhattan Bank, but it was written by

22 Brightware.

23    Q.    Doesn't say it's a draft, does it?

24    A.    No, it doesn't, sir.

25    Q.    If you go to the second page up in the top

1    right-hand corner, the document has a date, correct?

2         A.    Yes.

3         Q.    And what is that date?

4         A.    February, 1996.

5         Q.    This document -- do you have any reason to

6    dispute that this document is properly dated February

7    6th, 1996?

8         A.    No.  This draft was dated probably around

9    there.

10        Q.    Now, if you'd turn to Page 15, please.

11        A.    Okay.

12        Q.    And you see there, it says EZ Reader

13   Version 1.0 Environment?

14        A.    Yes.

15        Q.    And then you see the first paragraph to the

16   right.

17               Do you see that?

18        A.    Yes, I see that.

19                 MR. VERHOEVEN:  If you would just

20   highlight that, please, Ryan.

21        Q.    (By Mr. Verhoeven) It says, quote:  EZ Reader

22   Version 1.0 was developed using ART*Enterprise 2.0 for

23   Windows, interfacing with Lotus Notes via the VIM

24   protocol and Notes API, close quote.

25               Do you see that?

1    A.   Yes, I do.

2    Q.   Past tense, right?

3    A.   That's past tense listed out.

4    Q.   So this document dated February of 1996 states

5 that EZ Reader 1.0 had already been developed, doesn't

6 it?

7    A.   EZ Reader Test Version 1.0 was developed, yes.

8    Q.   It doesn't say test version, does it?

9    A.   No.

10    Q.   It just says EZ Reader Version 1.0, right?

11    A.   Yes, it does.

12    Q.   It says it was developed, in the past tense,

13 correct?

14    A.   That's correct.

15    Q.   Now, I believe you testified on direct that

16 the notice -- the Lotus Notes interface was not

17 functional, right?

18    A.   That's correct.

19    Q.   But this says that it was developed, quote,

20 interfacing with Lotus Notes.

21         Do you see that?

22    A.   Yes.

23    Q.   That's inconsistent with your direct

24 testimony, right?

25    A.   It's inconsistent, but...

1     Q.   Yes?

2     A.   It's only inconsistent because this was meant

3 to be a training manual that was to be distributed in

4 the future.

5     Q.   It says it's a user's guide and reference

6 manual, right?

7     A.   Yes.

8     Q.   It doesn't say it's a draft or it's to be

9 distributed in the future, does it?

10    A.   No, it doesn't say that.

11    Q.   Okay.  And this sentence is inconsistent with

12 what you testified to on direct exam, right?

13    A.   Yes.

14          MR. VERHOEVEN:  If we could go back to

15 that page, Ryan.

16          I'm sorry.  Page 18.  And bring up the

17 paragraph retrieval.

18    Q.   (By Mr. Verhoeven) Do you see that sentence

19 there?

20    A.   Yes, I do.

21    Q.   It says, quote:  Chase's corporate e-mail

22 router passes the message to ChaseDirect's Lotus Notes

23 mail management system.  EZ Reader checks the Lotus

24 Notes mail database for new mail throughout the day.

25          Do you see that?

1      A.   Yes, I do.

2      Q.   And this is in the February 1996 document.

3 It's talking in the present tense, right?

4      A.   Yes.  It's talking in the present tense.

5      Q.   This document is saying that Chase is using

6 the EZ Reader, right?

7      A.   Yes, it does.

8      Q.   And it says that Lotus Notes is working,

9 doesn't it?

10      A.   Yeah, it appears to say that it is.

11      Q.   So this document is dated back in 1996 is

12 also -- excuse me -- let me start over.

13           This sentence in the document from 1996 is

14 also inconsistent with your recollection on direct

15 testimony today, 14 years later, right?

16      A.   Exactly.

17      Q.   Okay.  Let's go to DX480.

18           Do you recognize this document as well?

19      A.   Yes, I do.

20      Q.   This is a document that you were shown on

21 direct examination, correct?

22      A.   Correct.

23      Q.   Now, this is the document that says -- that

24 Counsel pointed you to that said EZ Reader is now

25 approved for production installation at Chase.

1    MR. VERHOEVEN:  That's in the first

2 paragraph, Ryan.  Could you bring that up, please?

3    Q.   (By Mr. Verhoeven) Do you see that?

4    A.   Yes, I do.

5    Q.   And that's -- you looked at that on your

6 direct exam, correct?

7    A.   Uh-huh.  Yes.

8    Q.   Now, let's go back to the document and to the

9 paragraph that starts with to meet our long-term

10 business requirements.

11    A.   Okay.

12    Q.   And that says:  To meet our (sic) long --

13    MR. VERHOEVEN:  If we could just

14 highlight that first sentence, please.

15    Q.   (By Mr. Verhoeven) To meet our (sic) long-term

16 business requirements, the EZ Reader application is

17 designed to be easily expandable so that it could

18 interpret an endless variety of messages.

19    Do you see that?

20    A.   Yes, I do.

21    Q.   That's talking about expanding the existing EZ

22 Reader application, isn't it?

23    A.   Yes.  It's talking about expanding it.

24    Q.   Now, Ms. Rice, I'd like to switch subjects

25 again.

1          Is it correct that you have a consulting

2    agreement with the predecessor, Bright Response?

3        A.   Who would that be?

4        Q.   Are you aware of having any consulting

5    agreement related to this case in any way?

6        A.   Yes.  Yes, I do.  I do have a consulting

7    agreement.

8        Q.   All right.

9             MR. VERHOEVEN:  Let's go to DX3, please.

10       Q.   (By Mr. Verhoeven) And do you see the first

11   paragraph?

12       A.   Yes, I do.

13       Q.   It says:  This letter confirms Merchant &

14   Gould's agreement with you on behalf of Firepond.

15            What's Firepond?

16       A.   Firepond was the company that bought

17   Brightware, I think.

18       Q.   So it says:  This letter confirms Merchant &

19   Gould's agreement with you on behalf of Firepond, Inc.,

20   to retain you as a consultant with regard to U.S. Patent

21   No. 6,182,059 and 6,411,947.

22            Do you see that?

23       A.   Yes, I do.

24       Q.   And the '947, that's the patent in this case,

25   right?

1      A.    '947, yes.

2      Q.    And so you were retained as a consultant under

3 this agreement; is that correct?

4      A.    Yes, because of my unique knowledge about it,

5 about the EZ Reader application.

6      Q.    If you turn to the second page of this

7 document, please, you see the signature there under Amy

8 Rice?

9      A.    Yes, I do.

10      Q.    Is that your signature?

11      A.    That's my signature.

12      Q.    Now, if you go back to the first page, the

13 first paragraph.

14            MR. VERHOEVEN:  I'm sorry.  Second

15 paragraph, Ryan.

16      Q.    (By Mr. Verhoeven) You'll see that this talks

17 about what you will charge for your time?

18      A.    Charge for my time, yes.

19      Q.    Okay.  And you did some work in connection

20 with this consulting agreement, didn't you?

21      A.    As I recall, yes.

22      Q.    And you were compensated for that work?

23      A.    Yes, I was.

24      Q.    And this employment has never been terminated;

25 is that right?

1    A.    As far as I know it has not, but I haven't

2 talked with them in a very long time.

3    Q.    Haven't talked with who?

4    A.    Merchant & Gould.

5    Q.    Okay.  So let me conclude, Ms. Rice, by asking

6 you, we've looked at some documents that you've admitted

7 are inconsistent with your direct testimony.  Those

8 documents were created in or around the time we're

9 talking about, '95/'96, right?  Correct?

10    A.    Most of them are, I guess.

11    Q.    The documents that the user manual was in

12 February of '96, right?

13    A.    Yes, that one was.

14    Q.    The AAAI article was in '95, correct?

15    A.    Yes; that's right.  '95/'96.

16    Q.    And those documents say that the EZ Reader

17 system was deployed, right?

18    A.    That's correct.

19    Q.    And those documents say that Lotus Notes was

20 working, right?

21    A.    Those do say that it was working.

22    Q.    And those documents say that Chase was able to

23 achieve significant efficiencies based on its already

24 deployed technology, correct?

25    A.    Yes, prospectively, we believed that at the

time it was written.

Q. Now, you admit that the testimony you gave on direct is inconsistent with those documents, correct?

A. It is inconsistent, yes.

Q. And you admit that?

MR. VERHOEVEN: Withdraw the question.

Q. (By Mr. Verhoeven) And your testimony you gave today is based on your recollection, right?

A. Yes.

Q. Over 14 years later?

A. Yeah. Kind of hard.

Q. Thank you, Ms. Rice.

MR. VERHOEVEN: I have no further questions.

THE COURT: Redirect, or is there additional cross?

MR. ROOKLIDGE: Your Honor, Mr. Verhoeven has asked all the questions that Yahoo! would have as well, so no further questions.

THE COURT: Okay. Redirect?

MR. FENSTER: Thank you.

REDIRECT EXAMINATION

BY MR. FENSTER:

Q. Ms. Rice, did anything that you heard from the questioning from Mr. Verhoeven or any of the documents

that you looked at shake your confidence about your
belief regarding whether EZ Reader was deployed?

        A.    Not at all.

        Q.    So, first, he talks about the article that was
written in 1995.

              Now, is it your testimony that the IAAI --
AAI --

        A.    AAAI.

        Q.    Or the AAAI article was written in '95?

        A.    Yes.

        Q.    Now, in 1995, that article was written past
tense, right?

        A.    Yes.

        Q.    That it's already in place, right?

        A.    Yes; that's correct.

        Q.    And they even said -- and Mr. Verhoeven
pointed out -- that the Chase Bank website was already,
past tense, right?

        A.    The Chase Bank website?  You mean when it
opened up?

        Q.    Yes.

        A.    Yes.

        Q.    You remember he showed you in the article in
1995 that referred to the Chase Bank being live, in the
past tense?

1    A.    Yes.

2    Q.    Now, was Chase Bank live in 1995?

3    A.    The Chase Bank internet website?

4    Q.    Yes.

5    A.    As I recall, it went into -- it became live at

6    the end of March -- near the end of March.

7    Q.    And -- excuse me one second.

8          So the website went -- the website went live

9    in March '96?

10   A.    That's what I was told.

11   Q.    And yet the Chase article in 1995 referred to

12   it in the past tense.

13         Why?  Was it a lie in the article?

14         When you wrote in the AAAI article that the

15   website was already live, past tense, why did you write

16   that in 1995?

17   A.    I don't believe I wrote that the website was

18   live.  I wrote that the EZ Reader application was live.

19   Q.    Okay.  And was it actually live in 1995?

20   A.    It was not.

21   Q.    Now -- and so was it a lie when you wrote it?

22   A.    No.

23   Q.    Why not?  Why did you write that in 1995?  Why

24   wasn't it a lie?

25         Mr. Verhoeven wants everybody to believe that

1  was a lie in 1995.  Tell us why it wasn't.

2      A.    It was because the -- it was written for the

3  EZ Reader application, which was the knowledge base,

4  because we hadn't finished the testing or the Lotus

5  Notes API yet.

6      Q.    And was it supposed to be published in 1995?

7      A.    The website?

8      Q.    I'm sorry.  It was a bad question.

9            Was the article supposed to be published in

10  1995?

11     A.    No.  It was -- it was meant for publication at

12  the conference in August of '96.

13     Q.    Now, he asked you at the conference whether

14  you gave a talk.

15           Do you recall that?

16     A.    Yes.

17     Q.    And you did give a talk at the conference in

18  August 1996, right?

19     A.    Yes, I did, the one with Rosanna Piccolo and

20  Julie Hsu.

21     Q.    Now, did you read the article during your

22  presentation, or did you give a PowerPoint?

23     A.    I gave a PowerPoint presentation about the

24  article, because everybody already had a copy of the

25  article.

1    Q.   Okay.  And is this -- and was that Exhibit 861

2  that we looked at earlier?

3         Is this is a copy of your PowerPoint

4  presentation?

5    A.   It appears to be.

6    Q.   Okay.  And did you, in your speech, say that

7  it had been deployed in August with -- when you gave

8  your speech --

9              MR. FENSTER:  Strike that.  Sorry.

10   Q.   (By Mr. Fenster) When you gave your speech in

11 August 1996 at the AAAI conference, did you tell the

12 audience that it had been deployed live at Chase?

13   A.   No, I don't recall ever saying that.  I

14 don't -- I don't think I would have, because it wasn't.

15   Q.   And does your PowerPoint presentation anywhere

16 say that it actually went live?

17   A.   No, I don't think so.

18        Let me look.  Excuse me.

19        Projections of the business problem was; why

20 our products were suitable for solving that business

21 problem of the e-mail -- too much e-mail.

22        It showed business benefits that would be

23 expected from deploying the application.  And those were

24 based on our early testing, and also on our testing

25 formally with the Chase e-mails that they gave us, the

1  200.

2      Q.   Now, going back to your article, when you

3  wrote it in 1995, when you wrote the article in 1995,

4  what phase of development was the EZ Reader system in?

5      A.   We were close to putting it in production.

6      Q.   Back in 1995?

7      A.   Yeah.  We expected to deploy the application

8  in early '96.

9      Q.   Now, Mr. Verhoeven asked you about your

10  knowledge of the testing that went on, right?

11           And his questions were a little bit vague

12  because he didn't ask you about when.  He didn't give

13  you a timeframe, did he?

14      A.   Huh-uh.

15      Q.   Now, when -- when did you leave Brightware?

16      A.   Well, Brightware spun off again to become

17  Mindbox.  I left the organization as it was in 2001.

18      Q.   And when did you stop working on the Chase

19  project?

20      A.   It was like late summer '96.

21      Q.   Was it after the critical date?

22      A.   Yes.  It was after that date.

23      Q.   It was sometime after the critical date, you

24  left the Chase project?

25      A.   Yes.  I mean, I was still involved in --

1  because it was my baby, you know.  I mean, I was

2  involved in the aspect, if anyone had a question, that

3  they could ask me about it.

4      Q.    So then after you left the Chase project, then

5  would you have any basis for knowing whether it was

6  deployed after that?

7      A.    Absolutely.  I mean, we were a very close

8  team, and I would have known.

9      Q.    Okay.  And up until the time that you left

10 Chase, would you have known whether it was deployed

11 prior to that?

12     A.    Oh, sure.

13     Q.    And were you familiar with the testing that

14 happened up until then?

15     A.    I guess most of it, until, you know, I left

16 the test lab.

17     Q.    Now, do you remember that Mr. Verhoeven asked

18 you if you remembered any test documents and he showed

19 you a portion of your deposition saying that you didn't

20 recall any test documents?  Let me just put it up.

21          Do you remember he showed you -- or he played

22 your deposition:  Do you have any documentation of the

23 testing that you're referring to in that paragraph?

24          And they stopped after the answer:  I can't

25 remember whether or not I got actual documentation.

1    A.    Yes.

2    Q.    He didn't read a few lines down that says:

3          QUESTION:  Okay.

4          ANSWER:  I do remember test

5    documentation.  It could have been from Rochester, but

6    I'm not sure.

7    A.    Yes.

8    Q.    He didn't show you that, did he?

9    A.    (No response.)

10   Q.    Now, I want to ask you a little bit about your

11   declaration that you signed with the Patent Office,

12   okay?

13         Now, that was signed when the patent

14   application was filed in '97?

15   A.    I believe so.

16   Q.    Okay.  And that attached in reference to --

17   referenced the provisional article, didn't it -- or the

18   provisional application, didn't it?

19   A.    Yes.  From what I saw today, yes.

20   Q.    Now, did the provisional application describe

21   the functionality of the EZ Reader?

22   A.    It described the proposed functionality of EZ

23   Reader --

24   Q.    Okay.

25   A.    -- that we were seeing in our test

environment.

Q.   And when you signed that declaration, were you focused on the fact that it hadn't been -- the statement saying that it had been deployed when it hadn't?

A.   Not at all.

Q.   Did you intend -- did you intend to mislead anybody in signing that declaration?

A.   No.

Q.   The declaration actually says that what we're doing is referring and claiming priority to a provisional application, right?

MR. VERHOEVEN:  Objection, leading.

THE COURT:  Sustained.

Q.   (By Mr. Fenster) What did you understand the declaration to actually be -- what did you understand that you were declaring to?

A.   I was -- I understood I was declaring about the EZ Reader product, the application.

Q.   And that the application claimed priority to the earlier one?

A.   Yes.

Q.   Now, are you familiar with patents?  I mean -- strike that.

Are you a patent lawyer?

A.   No, I'm not a patent lawyer.

1    Q.   And who handled the preparation of the patent

2 application?

3    A.   The original patent attorney firm was Townsend

4 Townsend and Crew.

5    Q.   Okay.  And were you involved in drafting the

6 claims for the patent?

7    A.   No, I wasn't involved in that.

8    Q.   Now, do you know the legal test for

9 inventorship?

10    A.   The legal test for inventorship.  I mean, I

11 could speculate on what I know, but I can't say for sure

12 what I know that is.

13    Q.   Who actually filed the original patent -- the

14 original provisional application?  Was it Chase or

15 Brightware?

16    A.   I think it was Chase.  I don't know if they

17 filed it, no.  Chase and Brightware filed them pretty

18 much like at the same time, so I don't know who was

19 first.

20    Q.   Okay.  Did you determine who should be listed

21 as -- as inventors on the patent?

22    A.   No, I didn't determine that.

23    Q.   And who did determine that?

24    A.   I suppose the patent lawyers did.

25    Q.   Now, Mr. Verhoeven referenced that you had a

1  consulting agreement at one time?

2      A.   Yes.

3      Q.   Now, had you always had -- have you always

4  been fully employed throughout this period?

5      A.   Can you specify what period you're talking

6  about?

7      Q.   Sure.  Since you were hired as a -- since you

8  were retained as a consultant, do you have another job,

9  a day job?

10      A.   Sometimes I did, and sometimes I didn't.

11      Q.   Okay.  So have you been retained as a

12  consultant before?

13      A.   No, not before that that I can remember.

14      Q.   Do you get -- were you getting compensated for

15  your time?

16      A.   At what period of time?

17      Q.   Why did you enter into the consulting

18  agreement, that consulting agreement that he referred

19  to?

20      A.   I was -- I was asked -- I was questioned about

21  what my knowledge was of EZ Reader, and they said:  Oh,

22  sounds good.  We want to -- we want to dig into what you

23  know about your experience with Chase and Brightware.

24      Q.   Okay.  And why did you -- why was it

25  reasonable for you to get paid for that?

1     A.   They offered to pay, and I accepted.

2     Q.   Okay.  Has your -- has your payment in any way

3 ever been dependent upon your testimony or what you say?

4     A.   No.  I understood -- understand that that is

5 strictly to be separate.

6     Q.   And when you came here today, you took an

7 oath.

8     A.   Yes, I did.

9     Q.   And you swore to tell the truth.

10    A.   Yes -- well, yesterday I did, yes.

11    Q.   Okay.

12    A.   But it's -- today, yeah.

13    Q.   You understand you're still under oath?

14    A.   Yes.  I swear to tell the truth, and I tried

15 to tell the whole truth.

16    Q.   And did you tell the truth today?

17    A.   Yes, I did.

18    Q.   Now, in the article that you wrote, this was

19 written prospectively?

20    A.   That means --

21    Q.   I'm sorry.  The AAAI article you wrote in 1995

22 for publication later?

23    A.   It was meant to be published much later.  So

24 prospectively, if it's that definition, yeah.

25    Q.   Now, were you involved in negotiating the

1  submission of the article or the acceptance with the

2  AAAI?

3       A.   Yes, I was.

4       Q.   Okay.

5       A.   I submitted drafts, and, you know, several

6  entities had to approve it and then select it for an

7  award.

8       Q.   Now, we looked at the EZ Reader reference

9  manual.  Tell me a little bit about the preparation of

10 documentation that goes along with software at

11 Brightware.

12           When you were at Brightware, what was the

13 policy with respect to preparing documentation for

14 software?

15      A.   It was an option that our customers could

16 choose for us to write for them, and Chase chose for us

17 to write all of their end-user documentation.

18      Q.   And how long does it take to write

19 documentation?

20      A.   Longer than you think.  Well, longer than you

21 plan, usually.

22           For a document that size, I mean, it goes

23 through several iterations.  You write an original

24 draft, you give it to the customer, and they -- you

25 know, they go, we don't understand what this means, and

1  then you go back and change it.

2      Q.   And do you start writing the documentation

3  before it's actually going to be given to the customer?

4      A.   Usually, we start writing it a few weeks

5  before.

6           In this particular case, we wrote it because

7  we didn't have the information we needed to write any

8  other technical interfaces with the EZ Reader product.

9      Q.   Okay.  Now, Mr. Verhoeven asked you a lot of

10  questions about whether your test -- whether documents

11  were inconsistent with your testimony.  Your testimony

12  on direct was as to what -- I'll withdraw that line.

13          Ms. Rice, when you look at this timeline, you

14  see the critical date of April 3rd, 1996.  Can you tell

15  the jury with absolute conviction that you know whether

16  or not EZ Reader was deployed before April 3, 1996?

17      A.   Absolutely not.  I mean, with conviction, yes.

18  It was not deployed before that date.

19      Q.   And -- and with all the documents that we've

20  seen that were written, the AAAI article and the EZ

21  Reader reference manual, how can you be so sure 14 years

22  later?

23      A.   Well, it was a very important application that

24  I always will remember.  You know, I kept a lot of

25  documentation on it over the years just to go back and

1  look at.

2          So I'm sure because the testing hadn't been

3  right up to the accuracy that they wanted.  They wanted

4  99 percent to 100 percent accuracy.  And Chemical Bank

5  was, you know, telling our bosses what to do.

6          Everything was up in the air at the time.

7          And API to Lotus Notes, which was their e-mail

8  system, was not written by that time.

9      Q.   Now, since you've been involved with this case

10  and preparing for trial, have you had the opportunity to

11  review a bunch of documents that were contemporaneously

12  along this timeframe?

13      A.   Yes, I have.

14      Q.   So are you relying only on your recollection

15  from something 14 years ago?

16      A.   In preparing for this, I was supplied with all

17  the documents that I was able to find about EZ Reader.

18      Q.   And what did those documents tell you about

19  whether or not it was deployed?  What did they -- did

20  they refresh your recollection?  And if so, how?

21      A.   Those documents told me that -- well, it was

22  kind of conflicting for me, because I read the paper,

23  and it said it was deployed, and then I saw it in the

24  documentation that it was impossible to have been

25  deployed.

1          So in looking at the date -- dates on my

2    handwritten notes and my timelines and my project plans

3    and e-mails and things like that, I -- I was just

4    surprised that the timeline was that way.

5          Q.   Okay.  And when you see the document 861, that

6    it was approved for production, what did that tell you?

7    What did the actual document tell you about whether --

8    when EZ Reader went -- whether it was deployed or not?

9          A.   We were --

10               MS. DOAN:  Objection.

11               THE COURT:  Excuse me.

12               Yes?

13               MS. DOAN:  Objection, Your Honor,

14    leading, and the document can speak for itself.

15               THE COURT:  Overruled.

16         A.   We were asked to supply that e-mail to Chase.

17    I was directed by my management to write an e-mail to

18    Chase saying that the application was approved for

19    production.

20         Q.   (By Mr. Fenster) Okay.  And what did that tell

21    you about whether or not it had been deployed by that

22    time, just four days before the critical date?

23         A.   It told me that they were very enthusiastic

24    about the application based on the early testing that we

25    did and that they wanted us to shore up the database so

1  that we could complete it with the accuracy goals in

2  mind and also to build whatever API we needed to build

3  in the future to hook it up to their systems.

4      Q.   And your notes from your meeting just one day

5  before the critical date, what did those tell you about

6  whether or not EZ Reader had been deployed?

7      A.   Those notes told me at that meeting that I had

8  a lot of questions still that were unresolved about

9  deploying that application.

10      Q.   And what does Exhibit 855, the May 13, 1996,

11  e-mail tell you about whether or not EZ Reader had been

12  deployed previously?

13      A.   I'll have to look at that.  Which one was it?

14      Q.   Well, that's okay.  Let's go even further out.

15  Let's go to September, your project plan in September of

16  '96.

17          What did that document tell you about whether

18  it had actually been deployed previously?

19      A.   It told me that it couldn't have been deployed

20  since we didn't have the Lotus Notes API ready.

21      Q.   All right.

22              MR. FENSTER:  Nothing further, Your

23  Honor.

24              THE COURT:  Recross?

25              MR. VERHOEVEN:  May I have one second to

```
 1  talk with my co-counsel, please?
 2                  THE COURT:  Yes.
 3                  (Pause in proceedings.)
 4                  MR. VERHOEVEN:  Nothing further, Your
 5  Honor.
 6                  THE COURT:  All right.  May this witness
 7  be excused?
 8                  MR. FENSTER:  Yes, Your Honor.
 9                  THE COURT:  Any objection?
10                  MR. VERHOEVEN:  No, Your Honor.
11                  MS. DOAN:  No, Your Honor.
12                  THE COURT:  All right.  You may step
13  down.
14                  Who will be your next witness?
15                  MR. FENSTER:  Your Honor, Bright Response
16  calls Dr. Rhyne.
17                  THE COURT:  Okay.  Is there an issue,
18  Mr. Perlson?
19                  MR. PERLSON:  I think we can table it for
20  now.
21                  THE COURT:  Proceed.
22                  MR. FENSTER:  Thank you, Your Honor.
23    VERNON THOMAS RHYNE, III, Ph.D., PLAINTIFF'S WITNESS,
24                      PREVIOUSLY SWORN
25                      DIRECT EXAMINATION
```

BY MR. FENSTER:

Q.   Good morning, Dr. Rhyne.

A.   Good morning, Mr. Fenster.

Q.   Dr. Rhyne, can you state your full name for the record, please.

A.   My full name is Vernon Thomas Rhyne, III.  I go by Tom.

Q.   And are you also sometimes known as Dr. Rhyne?

A.   In formal situations such as these, I'm often referred to as Dr. Rhyne.  I have a Ph.D.

Q.   And what's that Ph.D. in?

A.   It's in electrical engineering.  I earned it at Georgia Tech in 1967.  It's what today would be called computer engineering, but back then, the field of computer engineering hadn't really been formalized very well, and so it was in the Department of Electrical Engineering at Georgia Tech.

Q.   And, Dr. Rhyne, what will you be testifying about in this case?

A.   Today I'm going to be testifying about infringement and offering my opinions and the bases for those opinions as to why I believe that certain products of Google and Yahoo! infringe three of the claims of what we've been referring to as the Rice patent.

     I may be brought back later in the trial to

talk about -- in response to some of the things that are

going to be raised, I believe, by experts who represent

the Defendants in what's commonly called rebuttal

testimony, but I will not be doing that today.

Q.   Okay.  And, Dr. Rhyne, do you have an expert

opinion as to infringement by the accused products in

this case?

A.   I do.  I have formed that opinion.

Q.   And what's a brief summary of that opinion?

A.   I have found two products, one for Google --

I'll use the term AdWords, and I'll explain as best I

can what that is, and I found a product for Yahoo!

that's called Sponsored Search, and I'll explain what

that is.

And based on my comparison between those

products, how they work, and the Claims 30, 31, and 33

of the Rice patent, as those claims have been construed

or interpreted or defined by Judge Everingham, I have

found that there is infringement of those three claims.

Q.   All right.  Before we get to the details of

your opinions on infringement, I'd like to talk a little

bit about your background and experience and tell the

jury a little bit about yourself.

So have you prepared slides for your

presentation today?

1    A.    What you'll see, Ladies and Gentlemen, is a

2 sequence of slides with one exception, and I'll point

3 that slide out, that I personally sat down with the

4 graphics people that work with your law firm and

5 created.

6         And so yes, these -- I intend them to be

7 demonstrable slides that will assist me in explaining to

8 the jury what the technology is, what the patent

9 works -- how it works, and why I believe there's

10 infringement.

11    Q.    And you have a set of these up at the table

12 there?

13    A.    I have a set with me.  I do.

14    Q.    All right.  So what are the main parts of your

15 presentation today?

16    A.    Well, I'm going to talk about just the general

17 technology.  You've heard comments about artificial

18 intelligence and case and rules and things like that.

19 I'm going to explain a general understanding of what the

20 patent describes as what's commonly called its preferred

21 embodiment.

22         When you have a patent, you have to show at

23 least one example of the best way you know to build the

24 invention that you're setting forth.

25         I'm going to then give an overview of the two

products, this AdWords product and this Sponsored Search product.

And then I'm going to go blow by blow through each and every limitation of the claims that are at issue here, including two additional claims that are not directly being asserted against Google and Yahoo!, and explain why I think there's infringement of those claims.

Q.   Okay.  You told us a little bit about your educational background, but during -- during your education, did you specialize in any particular area of technology?

A.   Once I began to figure out what it was -- I actually had started building computers while I was in high school.  I went to high school in La Marque.  It's a small town down near Galveston.

And here in Texas, we have a science fair, and so back in 1958 and '59, I built a small computer and entered it in the science fair and did fairly well.

When I went to college, surprisingly, I found out there weren't many courses on how to build computers.  This is in 1958, '59, but once I got to my master's degree and particularly by the time I got to my Ph.D., I was able to find courses that focused primarily on both computer science and computer hardware.

1          And so, you know, today I offer myself up
2  generally as a computer engineer, but I'm also certainly
3  a well-qualified electrical engineer with a good bit of
4  experience in computer science as well.
5      Q.   Now, are you licensed as -- licensed as an
6  engineer?
7      A.   I am.  I have a professional registration here
8  in Texas and have had that since 1969.
9      Q.   And are you a member of any professional
10 organizations?
11     A.   Currently, I'm a member, and have been for a
12 very long time, of the IEEE, which is the Institute of
13 Electrical and Electronics Engineers.  It's the largest
14 professional society in the world, and I've been a
15 member of that society -- institute since 1962, while --
16 I got that right after I got out of college.
17          And I've been elected to a variety of
18 positions.  I was treasurer there for a couple of years.
19 I was on the Board of Directors.  And I also was on the
20 Board of Directors of a subsociety called the IEEE
21 Computer Society.
22          And I've just done a lot of service to the
23 IEEE.  It's nonpaid.  It's what I guess you lawyers call
24 pro bono.  It's just where you volunteer your time.
25 I've been all over the world doing work for the IEEE.

1    Q.   Now, I notice at the bottom of your slide, one

2 of the things that you have is an IEEE life fellow.

3    A.   Uh-huh.

4    Q.   What is that?

5    A.   Well, you get to be a life member of the IEEE

6 if you don't die.  The sum of your age and the number of

7 years you belong to the IEEE have to equal a hundred.

8 And I think I hit that mark a few years ago.

9         The fellow award is different, though.  It's

10 restricted to 2 percent of the membership of the

11 organization, and it's an honorary award that you can't

12 nominate yourself for.  I didn't even know I had been

13 nominated until I got a phone call once from a coworker

14 of mine, and he said:  Hey, you've been nominated and

15 approved as a fellow.

16         When you get that award, they always give

17 what's called a citation, and it basically says:  Here's

18 the reason we think your work in the profession has been

19 noteworthy.

20         And mine says for my contributions to computer

21 engineering and to computer engineering education,

22 fields that I've been involved in for, as the second

23 line says, almost 50 years.

24    Q.   Tell us about some of your industry work

25 experience.

1    A.   I've worked with a variety of computer

2   companies.  I worked with Texas Instruments.  I worked

3   for Motorola.  I worked for NASA right after I got out

4   of college on the early Mercury programs.  I did data

5   acquisition on those projects.

6           And then in 1983, I left where I was teaching

7   at A&M and went to Austin to work for a company with a

8   very long name.  I worked for the Microelectronics and

9   Computer Technology Corporation, commonly known as MCC.

10          And it was an interesting place to work,

11  because 13 other U.S. companies had gone together and

12  formed MCC, and they pooled their money and a lot of

13  their employees.  They sent research engineers to Austin

14  to work together to try to develop very leading-edge

15  technology.

16          MCC had programs in computer-aided design,

17  which is the one I worked in, designing integrated

18  circuit, the little chips.

19          Next door was the artificial intelligence

20  program.  And we did a lot of cooperative work between

21  our CAD program and the AI program.  It had other

22  programs in packaging of semiconductors and other

23  things, but those are the areas that I've worked in in

24  industry.

25    Q.   And can you tell us what kind of teaching

1  experience you have?

2      A.    Well, I was on the faculty of electrical

3  engineering at Texas A&M for 18 years.  I was on what's

4  called the evening school faculty at the University of

5  Texas after I moved to Austin.

6           UT teaches a lot of classes after 6:00 o'clock

7  in the evening, so people who are working full time, as

8  I was, can go get additional degrees, generally working

9  on their master's degree or their Ph.D.

10           And I taught in the computer engineering part

11  of the EE Department's evening school as a faculty

12  member.  Not a tenure track faculty member, but just a

13  faculty member to be able to teach in that department.

14           I've also been on the faculty at Georgia Tech

15  for a while while I was studying there and also at

16  George Washington University.

17      Q.    And what's your current employment status?

18      A.    I do a lot of this kind of consulting work.

19  I'm retired from Texas A&M.  I draw insurance benefits

20  from Texas A&M, but other than that, I just occasionally

21  get asked to do this kind of expert witness work, and I

22  do it.

23      Q.    Okay.  And how long have you been doing

24  consulting work as an expert witness?

25      A.    I think over 30 years.  About 30 years ago, I

had somebody walk into my office while I was teaching at

Texas A&M, and they were looking for an expert who had

experience in a particular technology that I knew a lot

about, and they wanted someone with a Texas accent,

because they had a trial in Dallas.

And I said:  I'm guilty on both counts.  I

know that stuff, and I certainly have the accent.  And I

did that case, and I figured:  Well, I'll never do that

again.

And then one of the attorneys who had been

working in that case, about two years later, sometime in

the late' 70s, called me up to work on another case, and

it's kind of been like that ever since.

I don't seek this kind of work, but I get

probably two calls a week almost these days about

somebody looking for an expert witness in a patent

lawsuit.

Q.   How do you decide which cases you're going to

accept, which engagements you'll accept?

A.   Well, I keep telling everybody these days I'm

trying to cut down.  I'm like somebody trying to quit

smoking.

But I have a process I go through.  When

somebody calls me about a case, the first thing I ask

about are who are the parties and who are the law firms

so that I don't end up in what is commonly called a

conflict.  I don't want to work for or against the same

company at the same time or for or against the same law

firm at the same time.

Then I ask them about the technology, and I

always say:  Send me the patents that are at issue,

e-mail them to me.  And I sit down and read them and try

to understand, is it technology that I think I'm

comfortable with being an expert, quote/unquote, in.

And then I try to find out what the schedule is.  Is it

something that I have time to do?  Is it something --

occasionally -- I've been called a time or two when

somebody needed an expert report written in two weeks,

and I can't do that.  I have to take my time to prepare

my thoughts and prepare my opinions.

And usually, I try to look for cases that are,

oh, a year out in the future or something like that and

make sure they fit into my own personal schedule and to

my schedule in my consulting work.

Q.    What kind of criteria do you use about -- do

you go through -- do you use any other criteria in

evaluating what cases you're going to take?

A.    Well, I'm not sure what you're asking about.

I want to be absolutely sure that I have the technical

skills to be able to do whatever it is that case is

1    about.

2           And I usually ask them to explain to me as

3    much as they will, since we're not under confidentiality

4    yet in these early discussions, as to what positions --

5    are they the owner of the patent and they're trying to

6    sue somebody; are they a defendant against being sued

7    about what the patent is, because I've had a number of

8    cases that once I began -- had begun to understand what

9    it was they needed, I've had to say:  I'm the wrong guy

10   for this.  I've got to back out of that.

11          And so I would prefer not to waste their time

12   or my time at the beginning, and I just -- as much as

13   they're willing to tell me, I try to understand what the

14   issues in the case are going to be.

15       Q.   Now, have you authored any papers or books?

16       A.   I'm sure you've all heard publish or perish.

17   During my years at A&M, I published 30 papers in what

18   are called archived journals, and I published a

19   textbook.

20          It's the second thing up from the bottom here

21   in italics.  It was published by Prentice-Hall in 1973.

22   Its title is:  Fundamentals of Digital Systems Design.

23   It's a book on how to design computer hardware.

24       Q.   And has that -- has that book been cited by

25   any institutions?

1    A.    Sure.  It was adopted in its timeframe in

2  about, oh, 40 or 50 universities around the world, as

3  well as a good number of schools here in the United

4  States, and it's also been cited, as I've seen a couple

5  of times, by the U.S. Patent Office as a reference --

6  for reference in a patent.

7          And we'll see in a minute that when you get a

8  patent, there's certain references that the Patent

9  Examiner looked at.

10          And interestingly enough, once when I did a

11  search on my own name on the patent website, I popped my

12  book up four or five times.  So it's been cited there.

13    Q.    Now, you've been hired as an expert in this

14  case by Bright Response?

15    A.    I have.

16    Q.    And are you being compensated for your work on

17  behalf of Bright Response?

18    A.    I am.  I'm being paid by the hour.

19    Q.    Okay.  And how much are you being compensated?

20    A.    I'm charging $695 an hour for anything that I

21  do in this case.  That's just the straight rate that I

22  charge.

23    Q.    Okay.  And is that -- is that your normal

24  hourly rate?

25    A.    Absolutely.  In fact, it's -- based on my

experience, it's about what people who have my level of
experience and qualifications are charging for this kind
of work.

Q.   How did you arrive at that rate?

A.   I'll say this with all due respect.  One of
the things I found out was how much the lawyers charged.
And I also -- as I say, I know a lot of people who do
this work, both in Texas and nationally.

And I know people who are less experienced
than I -- you know, the first case I ever did back in
the '70s, I had no idea what to charge.

I asked the attorney who walked in my office,
I said:  Well, what do you pay?

They said:  We pay $150 an hour.

And I said:  Okay.  That sounded pretty good.

And I've just gradually raised my rate over
the years as I've gotten additional qualifications.  You
can see up here, I'm a patent agent.  That's something
that I've studied to become familiar with patents and
how they work.  And that's about what people charge who
have my experience and qualifications.

Q.   And when you had just a few cases under your
belt, did you charge less?

A.   A whole lot less.

Q.   Now, is any of your compensation tied to the

1  results obtained in this case?

2      A.   No.  Whoever prevails, I'm going to get the

3  same amount of money either way based strictly on the

4  amount of time that I will spend working on this case.

5      Q.   Now, you've been sitting in the courtroom, and

6  as you've heard, this case involves computer technology

7  and artificial intelligence.

8           Do you have any experience with that

9  technology?

10     A.   Yes, I do.  Mainly at MCC, a little bit before

11 that when I was teaching at Texas A&M, but at MCC, I

12 mentioned that I worked in a program, the computer-aided

13 design program, that was directly associated, next door,

14 to the artificial intelligence program.

15          And it was impressive to me that some of the

16 luminaries in artificial intelligence came to MCC, and a

17 gentleman named Woody Bledsoe, who is, I believe,

18 deceased now, but was just a very, very well-respected

19 academic artificial intelligence expert, and a few other

20 people who came in that brought real skill in that area.

21 We drew on their skill in my computer-aided design

22 program.  In fact, we bought for our hardware the same

23 kind of hardware that they were using in the artificial

24 intelligence program.

25          It was specialized computer equipment that

implemented a computer language -- I'm going to

pronounce this very carefully -- called LISP, L-I-S-P,

which is the standard, at that time, computer language

used by artificial intelligence, that artificial

intelligence community.

          And we developed all of our initial

computer-aided design software in LISP using what were

called LISP machines.  And we primarily focused on

rule-based, which we'll talk about some more.

          We used rules to control the way designers did

their job when they were designing integrated circuit

chips so that we made sure that they took every step so

that they -- when they got ready to make the actual

chip, they had done all the testing that needed to be

done before they went out and spent, you know, at that

time, 50 to a hundred thousand dollars to make the very

first wafer of those chips.

          Later on while I was at MCC, I took over the

position as the vice president of research and

development for the whole software development group at

MCC.

          And in that job, I personally managed the

rule-based work and a program in what's called Neural

Networks, and that's an attempt to model some of the way

that the brain organizes itself when it thinks.

1       And that's not exactly case-based work, which

2  is the other thing we'll talk about, but it's pretty

3  close to it.

4       In fact, we had a very interesting project.

5  We were retained by Bank of America for their credit

6  card studies in that there's a, as you know, fraudulent

7  use of credit cards.

8       And they gave us a lot of data, a bunch of

9  cases, where computer -- computer records of credit card

10  purchases, some of which were fine, but some of which

11  were fraudulent, and we used our Neural Network

12  technology to learn how to sort those things out such

13  that you could apply a new credit card purchase case to

14  that Neural Network and believe with high reliability

15  that that network could produce at its output okay or

16  fraudulent.

17       And it was interesting that when we gave that

18  prototype over to Bank of America, I was told -- I

19  didn't see the data, but I was told by one of the

20  researchers that within the first month of using our

21  prototype, they saved enough fraudulent purchases, they

22  identified them and blocked them, to pay for the

23  contract.

24       So that was kind of a fun process.  But I

25  worked on that for about two years, primarily, rule base

1   and Neural Networks.

2       Q.   Now, Dr. Rhyne, given your experience in

3   artificial intelligence and with knowledge engines, do

4   you feel qualified as an expert in artificial

5   intelligence as applied to the Rice patent and the

6   related prior art?

7       A.   Yes, I do.

8               MR. FENSTER:  Your Honor, at this time,

9   we would like to offer up Dr. Rhyne as an expert in

10  artificial intelligence as applied to the Rice patent

11  and the related prior art.

12              MR. VERHOEVEN:  No objection.

13              MR. ROOKLIDGE:  No objection.

14              THE COURT:  All right.  The Court and the

15  jury will hear his opinions.

16              MR. FENSTER:  Thank you, Your Honor.

17      Q.   (By Mr. Fenster) Have you prepared a slide

18  summarizing the materials that you've used in --

19              THE COURT:  Mr. Fenster, I should amend

20  that to say that we will hear his opinions after the

21  lunch recess.  We'll break a little bit earlier today

22  for lunch.

23              Ladies and Gentlemen, take until 1:15, as

24  you ordinarily would.  If you would be back just shortly

25  before 1:15, it would help us get started on time.

```
 1                    Remember my prior instructions, and don't
 2  talk about the case.  Have a nice lunch break.
 3                    LAW CLERK:  All rise.
 4                    (Jury out.)
 5                    THE COURT:  Step down.
 6                    All right.  Y'all have a seat.
 7                    Mr. Verhoeven, this is my Miranda warning
 8  to you, sir, about violating my orders in limine, okay?
 9  You approached the bench appropriately on some areas but
10  not on others.  Now it's going to be a long week, I can
11  assure, if that continues.
12                    Do you understand what I'm saying?
13                    MR. VERHOEVEN:  Crystal clear.
14                    THE COURT:  All I ask is that you
15  approach the bench, okay?
16                    I'm not going to go further in this case
17  with the instruction, other than the instruction I've
18  already given the jury, because I'll just tell you, had
19  you approached the bench, I would have been inclined to
20  allow you to elicit that testimony, okay?
21                    MR. VERHOEVEN:  I apologize, Your Honor.
22                    THE COURT:  But it's going to be a
23  long -- it's going to be a long week for both of us,
24  sir, if that happens again, okay?
25                    I don't want to get in the middle of this
```

case in front of the jury, but I'm not going to let you
blow by my orders, okay?

MR. VERHOEVEN:  Yes, Your Honor.

THE COURT:  You've tried a case in front
of me before.

MR. VERHOEVEN:  Yes, Your Honor, and I
don't want to take any time on how I interpreted it, but
if you're interested, I could try to explain it.

THE COURT:  Well --

MR. VERHOEVEN:  I'll do my best, Your
Honor.  I hear you crystal clear.

THE COURT:  You need to err in your
interpretation on the side of caution, okay?

MR. VERHOEVEN:  Yes, sir.

THE COURT:  Yes?

MR. FENSTER:  Your Honor, I understand
that there are a few issues raised by Defendants
regarding the demonstratives that might be heard by
Dr. Rhyne.  So we have a few issues to address.

And I'd also like to address the Court's
interim order that we just got -- I got just a few
minutes ago regarding the interim claim construction.
I'd like to ask some clarification about that.

THE COURT:  Okay.

MR. FENSTER:  Do you want to do that now?

1              THE COURT:  Well, we can do it now, sure.

2              MR. VERHOEVEN:  I'm sorry, Your Honor.

3  We haven't seen it yet.  I haven't seen a copy.

4              MS. DOAN:  We don't have it.

5              THE COURT:  Let's do it at 1:00 o'clock.

6              MS. DOAN:  Thank you.

7              THE COURT:  Y'all talk about it over the

8  lunch hour.  If you need my help, I'll be available here

9  over the lunch hour.

10             LAW CLERK:  All rise.

11             (Recess.)

12             *      *      *      *      *

1

2

3

4

5                           CERTIFICATION

6

7             I HEREBY CERTIFY that the foregoing is a

8  true and correct transcript from the stenographic notes

9  of the proceedings in the above-entitled matter to the

10 best of my ability.

11

12

13

14 /s/_____            _____
   SUSAN SIMMONS, CSR                  Date
15 Official Court Reporter
   State of Texas No.:  267
16 Expiration Date:  12/31/10

17

18

19 /s/_____              _____
   JUDITH WERLINGER, CSR               Date
20 Deputy Official Court Reporter
   State of Texas No.:  731
21 Expiration Date:  12/31/10

22

23

24

25