```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   BRIGHT RESPONSE, LLC        *    Civil Docket No.
                                 *    2:07-CV-371
 4   VS.                         *    Marshall, Texas
                                 *
 5                               *    August 3, 2010
     GOOGLE, INC., ET AL         *    1:00 P.M.
 6
                     TRANSCRIPT OF JURY TRIAL
 7        BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
               UNITED STATES MAGISTRATE JUDGE
 8

 9   APPEARANCES:

10   FOR THE PLAINTIFF:      MR. ANDREW SPANGLER
                             Spangler Law
11                           208 North Green Street
                             Suite 300
12                           Longview, TX    75601

13                           MR. MARC A. FENSTER
                             MR. ANDREW WEISS
14                           MR. ADAM HOFFMAN
                             MR. ALEX GIZA
15                           Russ, August & Kabat
                             12424 Wilshire Boulevard
16                           12th Floor
                             Los Angeles, CA    90025
17
                             MR. DAVID M. PRIDHAM
18                           Law Office of David Pridham
                             25 Linden Road
19                           Barrington, RI  02806

20   APPEARANCES CONTINUED ON NEXT PAGE:

21
     COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
22                          MS. JUDITH WERLINGER, CSR
                            Official Court Reporter
23                          100 East Houston, Suite 125
                            Marshall, TX    75670
24                          903/935-3868

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:     MS. ELIZABETH A. WILEY
                       The Wiley Firm
                       P.O.  Box 303280
                       Austin, TX   78703

                       MR. PATRICK R. ANDERSON
                       Patrick R. Anderson, PLLC
                       4225 Miller Road
                       Building B-9, Suite 358
                       Flint, MI   48507

                       MR. JOHN C. HUESTON
                       MR. ADAM S. GOLDBERG
                       Irell & Manella, LLP
                       840 Newport Center Drive
                       Suite 400
                       Newport Beach, CA   92660

FOR THE DEFENDANT:     MR. CHARLES K. VERHOEVEN
(Google)               MR. DAVID A. PERLSON
                       MS. AMY H. CANDIDO
                       Quinn Emanuel Urquhart & Sullivan
                       50 California Street
                       22nd Floor
                       San Francisco, CA   94111

                       MS. JENNIFER PARKER AINSWORTH
                       Wilson Robertson & Cornelius
                       P.O.  Box 7339
                       Tyler, TX   75711

FOR THE DEFENDANT:     MS. JENNIFER HALTOM DOAN
(Yahoo!)               Haltom & Doan
                       6500 Summerhill Road
                       Suite 100
                       Texarkana, TX   75503


APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:      MR. WILLIAM ROOKLIDGE
(Yahoo!)                Howrey, LLP
                        4 Park Plaza, Suite 1700
                        Irvine, CA   92614

                        MR. JASON WHITE
                        Howrey, LLP
                        321 North Clark Street
                        Suite 3400
                        Chicago, IL   60610

                 *      *      *      *      *      *


                       P R O C E E D I N G S

                (Jury out.)

                LAW CLERK:  All rise.

                THE COURT:  Be seated.

                All right, Mr. Fenster.  What's the issue
with the order that I signed?

                MR. FENSTER:  Your Honor, this relates to
document 594, the order regarding the claim steps that
20 -- 28(b1) must occur before 28(c).

                So first, with respect to the original
claim construction, it only addressed steps in order --
that only 26 had to be in order.

                Yahoo!'s expert's testified that the
steps in 28 didn't have to be in order.

                Now, what I want to clarify --

1              THE COURT:  You said that my construction

2  didn't recite that.

3              MR. FENSTER:  I think that that's fair,

4  Your Honor.

5              What I wanted to clarify is, 28(b1) has

6  (i) and (ii).

7              THE COURT:  All right.

8              MR. FENSTER:  Okay.  So I agree that

9  (ii), which is the -- interpreting it as being able to

10  be responded to automatically, that has to happen before

11  (c), because (c) is retrieving if --

12              THE COURT:  When.

13              MR. FENSTER:  -- when the classification

14  step indicates that the electronic message can be

15  responded to automatically.

16              THE COURT:  That's right.

17              MR. FENSTER:  So my question, Your Honor,

18  is, I don't believe that there's anything in the claims

19  or the specification or the file history that would

20  require the classification step of 28(b)(ii) to occur

21  before 28(c).

22              And so what I would request is that this

23  be clarified.

24              THE COURT:  Well, it doesn't have to

25  occur at all under the claim.

1          MR. FENSTER:  That's right.  But if -- I

2    agree with you a hundred percent.  But if it does occur,

3    it can be met before 28(c) -- or after, I mean.  It

4    doesn't say when relative to 28(c) that 28(b)(ii) needs

5    to occur.

6          THE COURT:  Well -- okay.  What's the

7    response?

8          MR. ROOKLIDGE:  Your Honor, it's very

9    simple.  It's a single classification step.  To read it

10   that way, that only in some circumstances, that

11   classification step would have to occur before -- this

12   has just taken a very tortured approach to that

13   language.

14          This Court has, throughout this case,

15   taken a plain language approach to this language, and

16   that plain language approach should continue here.

17          MR. PERLSON:  Actually, Your Honor --

18   sorry to tag team, but Your Honor had ruled before and

19   the parties had agreed that Steps 26(a), (b) and (c)

20   need to be in order, and Your Honor also ruled that --

21          THE COURT:  I'll agree that (a), (b), and

22   (c) needed to be --

23          MR. PERLSON:  Okay.  Let me finish, and

24   I'll --

25          THE COURT:  Y'all didn't address this in

the Markman proceeding that happened months ago.

MR. PERLSON: Well, actually, Your Honor, we said that it was indefinite because it didn't integrate. And what happened is, is that you said that -- the Court said that -- that 28(c) replaced 26(c) and that all of the (b) -- little b's supplement 26(b). As a matter of logic, it has to occur in that order, and the patent -- it's very clear the figures -- there's no disclosure anywhere in the patent of a classification ever happening after retrieval. It doesn't make any sense.

The whole point of the invention is that you would classify the message so that you would decide whether it needs to be responded to automatically or whether a human is involved to respond.

And that's -- that's what the plain language requires.

THE COURT: Well, is the issue -- is the issue whether the -- there is infringement if only one of the classification steps occurs before the retrieval?

MR. PERLSON: The issue -- I don't think so. I think the issue is when the -- the classification, whatever it is, has to occur before the retrieval. That's what the plain language of the claim requires, and the fact that it goes (a), (b), (c).

                    THE COURT:  Well, but if there's a -- if
there is a classification under (b1)(i) that occurs
before (c), then it's generally my view that if there's
another step that's performed, a classification of
requiring assistance from a human operator that would
occur after (c), then that would not preclude
infringement.

                    MR. PERLSON:  But I -- that's -- I don't
think we're arguing anything to the contrary of that.  I
think what we're arguing is, is that whatever they're
pointing to as the classification has to occur before
the retrieval.

                    And -- and their -- and, you know, as we
showed in the Daubert motion, they're pointing to this
click spam or click fraud stuff that happens, you know,
long after it's responded to.  It doesn't make any
sense.

                    It has to -- the classification, whatever
it is, whether it's for classifying as automatic or
classified for human, it has to occur before the message
is retrieved.

                    And that's by virtue of the fact that --
as the Court ruled, that (a), (b), (c) go in order and
that (b1), (b2), (b3), whatever those are, supplements
(b).  It just has to be that way.  And that's what

1  every -- what the patent discloses.

2          And, you know, Dr. Rhyne has actually

3  admitted that there is no disclosure in the patent of

4  any classification ever happening after the retrieval,

5  and there isn't.

6          MR. ROOKLIDGE:  Your Honor, it's our

7  understanding that they're making two arguments.

8  They're saying classification happens as to the

9  automatically and that as a backup argument, that

10  classification happens for the human intervention.

11  But both for Yahoo! and Google, the only classification

12  that they've argued for the human intervention is

13  something that occurs long after the ads have been

14  returned.

15          And so our position is that under the

16  Court's claim construction, the proper claim

17  construction, the only argument that they should be

18  making is the first:  Whether there's that automatic

19  classification.

20          THE COURT:  Okay.  All right.  Well,

21  let's hear a brief response, and then I'll visit with my

22  staff about it.

23          MR. FENSTER:  Sure.

24          Your Honor, there is -- the claims make

25  sense that it requires -- it literally requires (b1)(i).

1  Up until this point, we have never had a claim

2  construction that said (b1)(ii) could not be met

3  afterwards.

4          So --

5          THE COURT:  Yeah, you're right.  We

6  haven't had that claim construction.  Y'all developed

7  your cases -- I'll visit with my staff about it.  We'll

8  get you an answer shortly.

9          MR. FENSTER:  All right.  Thank you,

10  Judge.

11          LAW CLERK:  All rise.

12          (Recess.)

13          (Jury in.)

14          THE COURT:  Please be seated.

15          Counsel, approach.

16          (Bench conference.)

17          THE COURT:  All right.  We had a

18  discussion in chambers of which I expressed my

19  displeasure that the claim construction issue is

20  manifesting itself in the middle of this case.

21          What I'm going to do is take Dr. Rhyne's

22  testimony, and I'll construe the claims and decide that

23  issue before I submit it to the jury.

24          MR. FENSTER:  Thank you.

25          THE COURT:  In connection with the jury

charge, you just need to put on whatever proof you think

is appropriate.

(Bench conference concluded.)

THE COURT:  Continue.

VERNON THOMAS RHYNE, III, Ph.D., PLAINTIFF'S WITNESS,

PREVIOUSLY SWORN

DIRECT EXAMINATION (CONTINUED)

BY MR. FENSTER:

Q.  Good afternoon, Dr. Rhyne.

A.  Good afternoon.

Q.  Referring to your Slide No. 3, can you take a

look -- can you tell us about the materials that you

reviewed in forming your opinions in this case?

A.  Yes.  I just wanted to prepare a slide that

summarized the large amount of material that I've

reviewed.

Obviously, the patent itself, which is the

first bullet.  I've reviewed the Court's claim

construction order, which I believe you have a copy of

in your witness notebook.  I've reviewed this file

history, which is the documentation that went back and

forth between the person who filed Ms. Rice's patent and

the Patent Office Examiners who looked at it and finally

approved it.

I've read a large number of Google and Yahoo!

technical documents, many of which were under seal.

They were confidential documents that were internal to

those companies.

I've read the depositions of a number of

Google and Yahoo! witnesses. I think the rogues'

gallery down here are just head shots of those guys.

I've read the litigation reports and

depositions of the experts who are representing Google

and Yahoo!. I have also written four reports myself and

been deposed three times by the attorneys for Google and

Yahoo!.

I've reviewed much of the source code focusing

on the parts of the source code that I felt like would

either -- would somewhat clarify my opinions as to how

the Google and Yahoo! systems work.

I have used what's call the AdWords interface

to actually create an ad as if I were an advertiser and

I wanted to sell something on -- on the Google system.

I have not been able to create a full ad on

the Yahoo! system, but they have a number of

instructional videos available on the internet. And I

have been through all of these Sponsored Search

interface instructional videos. And I've also reviewed

the reexamination of the Rice patent.

Q. What is the reexamination of the Rice patent?

1    A.   There's a procedure available at the Patent

2 Office where someone who has found a piece of prior art

3 that they feel like invalidates a patent, that they can

4 submit that prior art to the Patent Office and ask the

5 Patent Office to reconsider whether or not that patent

6 should have been issued in the first place over that

7 piece of prior art.

8         And in this case, that reexamination process

9 has been requested twice, once by Google and once by

10 Yahoo!, over a couple -- I think in the Google case, one

11 piece of prior art called the Allen patent.  You heard

12 mention of Mr. Bradley Allen, who will testify here.

13         And I think in the Yahoo! case, it was the

14 Allen patent plus one other piece of prior art.

15    Q.   Did the Patent Office agree to reexamine the

16 Rice patent?

17    A.   Right.  The initial decision the Patent Office

18 makes is whether or not -- and I'll use the precise

19 language -- there's a substantial, new question of

20 validity.  If this piece of prior art that they haven't

21 looked at before comes in and they think that there is

22 something worth investigating, then they grant the

23 reexam.

24         And they did grant the reexam for the first

25 request by Google.  They did not agree that there was a

1  substantial, new question of patentability for the

2  subsequent request by Yahoo!

3     Q.   Now, did the Patent Office reach any

4  conclusions with respect to Claims 30, 31, and 33, the

5  ones that are asserted in this case in the Google

6  reexamination?

7              THE COURT:  Excuse me just a second,

8  Dr. Rhyne.

9              THE WITNESS:  Yes, sir.

10              MR. ROOKLIDGE:  Objection, Your Honor.

11              May we approach?

12              THE COURT:  Sure.

13              (Bench conference.)

14              MR. ROOKLIDGE:  We're launching off into

15  validity.  It was our understanding that they would be

16  testifying only about infringement today.  And they have

17  said that they would also bring testimony about --

18              THE COURT:  Sustain that objection.

19  Yes, sir?

20              MR. FENSTER:  We're actually -- okay.

21              THE COURT:  It's not within the scope of

22  infringement.

23              MR. ROOKLIDGE:  I understand.

24              THE COURT:  It's sustained.

25              (Bench conference concluded.)

1    Q.   (By Mr. Fenster) We're going to get to that

2  later in the case when we come up for rebuttal.

3    A.   Okay.

4    Q.   Now, Dr. Rhyne, based on the material that

5  you've reviewed in this case, on which accused products

6  are you providing infringement opinions?

7    A.   A set of services that collectively I call the

8  AdWords system from Google and a similar advertising

9  service provided by Yahoo! that they call Sponsored

10 Search.

11   Q.   Before we get to the nitty-gritty of the

12 infringement case, have you prepared a tutorial of the

13 technology involved in this case?

14   A.   I have.

15        MR. FENSTER:  Can you pull up Dr. Rhyne's

16 Slide 5, please?

17   Q.   (By Mr. Fenster) So one of the concepts that

18 is at issue in this case is artificial intelligence.

19 Can you tell the jury what that is?

20   A.   Well, I can't do much better than John

21 McCarthy, who I believe was a professor at Stanford for

22 a number of years.  He defined artificial intelligence

23 as the science and engineering of making intelligent

24 machines.

25        And that's -- that's basically what you're

trying to do.  You're trying to create an automation or a robot, if you will, that will act as a human being would act in that situation.  If certain conditions are applied to it, that it will respond in some way -- the way you would think an intelligent human being would have responded.

Q.   Now, what was the problem that was being addressed by the Rice patent?

A.   Well, it's pretty clear that what her patent was trying to do was to define appropriate responses to these, what we'll see in a moment, are non-interactive electronic messages, as an example, e-mail.

And I think the bank that they were dealing with, originally Chase Bank, was concerned that they were getting a higher and higher number of electronic messages.  Once the internet got there, it seems like most everybody stopped writing letters and started sending e-mail.  And it just was getting out of hand, and the volume of it was becoming quite high.

And what they needed was some way to provide quick, accurate, and efficient responses to these messages, which were coming in electronically, without having to continually add more and more customer service representatives.

And if you've ever -- I don't know -- when you

call your bank on the phone, you know, hang on for 10
minutes or whatever it's going to be, it's a problem.
And so particularly for e-mail, where people send in
messages, I think somewhere I heard the example, I lost
my credit card and what do I do, or would you send me an
application for a new account.

Those things nowadays are quite often handled
by electronic mail rather than actually stopping at the
bank or phoning in.

That's the problem they were trying to produce
a solution for.

Q.   So the problem that Chase had was one example
of an application for artificial intelligence.

What other kinds of areas or applications
could artificial intelligence have?

A.   Oh, you see them in vehicle control.  I have
worked on process control for chemical plants.  I
personally have worked on -- I mentioned controlling
engineers who are doing design work on integrated
circuits so you make sure that if they're going to go
out and spend a large amount of money to make a sample
wafer that they've done all the testing that needs to be
done to, hopefully, get a good wafer the first time you
make it.

It's been used to classify things, like how do

1  you match up applicants for loans, to various loans.

2  All of these -- almost anything where you have a lot of

3  people trying to contend for a service, and up to now,

4  it's taken a human being to do it.  They're trying to

5  replace that human being with an intelligent machine.

6      Q.   Now, have you described -- have you prepared a

7  slide to describe the particular types of artificial

8  intelligence at issue in the Rice patent?

9      A.   I have.  As we'll see when we start looking at

10  that claim language, two things come up:  Rule-based

11  knowledge engines and case-based knowledge engines.

12          Now, the term knowledge engine, just

13  basically, that's a reference to some hardware and/or

14  software which implements the rule-base capability, or

15  in the second case, the case-base capability.

16          The rule base is a fairly straightforward

17  situation where it says that if you have a condition --

18  I'll try to use this without shaking too much.  Let me

19  see if I can -- okay.

20          If you have some condition that you can

21  measure with a computer, if that condition exists, I'm

22  going to take an action.  And the classic way would be

23  written in a computer program is if X, then do Y.

24      Q.   Can you give us an example?

25      A.   Sure.  I used to be a private pilot.  I don't

1  see well enough anymore to do that.  Don't have the

2  time.

3          But one of the things that I heard somebody

4  talk about is, if you have a retractable airplane wheel

5  and you have the wheels up, okay, and you are under 500

6  feet above the ground and your air speed falls below a

7  hundred miles per hour, then they would sound an alarm

8  that says if you are landing, you probably ought to put

9  the wheels down.

10         The old joke was there are only two kinds of

11 pilots:  Those that have landed with their wheels down

12 or those who are going to.

13         So that would be a system that would say

14 respond.  That would be a simple case of a couple of

15 rules and an action to take.

16     Q.   Okay.  And what's case-based knowledge?

17     A.   Case base is more where you try to use prior

18 experience.  We all have experiences where we've had

19 things happen, whatever they may be.

20         A case-based system tries to collect a bunch

21 of prior events and figure out and store those away and

22 say, when this event occurred, what happened?  How did

23 they solve it?  How did they respond to it?  The cases

24 are sometimes called solved problems.

25         And now when you apply a new case, some new

event occurs.  Let's say it's a problem that maybe,

hopefully, it's like one of the old cases.  What they do

in a case-based system is they analyze the input.

　　　　As the first bullet says, one way of building

it is you analyze the input, and then you compare the

features that you found in the input with the features

of all the cases that store the knowledge that you've

gained up to now.  And you use the response that's

associated with the best-matching case.

　　　　An example would be if you were trying to bake

a cake, okay, and maybe you had made one kind of cake

and you get a recipe for a new kind of a cake, you could

call upon your experience to know that maybe for this

kind of cake you really have the butter and flour on the

inside of the pan or it's going to stick.

　　　　You would be using your prior experience in

the new situation to help you do a better job of

responding to the new situation.

　　Q.　Now, are rule base in a case-based knowledge

engine all that's required to solve the problem that was

addressed by the Rice patent?

　　A.　No, it's not that simple.  As we'll see, the

claims have sequences of steps.  These are what are

called method claims.  They're talking about how you do

something.

1          And each of the methods will have steps.
2   We'll have -- I think one of the claims has six steps in
3   a row.  And in order to implement that claim, you have
4   to perform all of those steps.
5          Some of the steps refer to a rule-based
6   knowledge engine and a case-based knowledge engine, but
7   there's much more to it than just simply saying, hey,
8   I'm going to use rule base or case base.
9          To infringe these claims, I had to look
10  carefully at every single step across all of those
11  claims.
12              MR. FENSTER:  And can we see Rhyne Slide
13  No. 9?
14     Q.   (By Mr. Fenster) And, Dr. Rhyne, can you tell
15  us a little bit about the Rice patent now?
16     A.   Sure.  This is the top part of the first page.
17  I know you've got a copy of it in your booklet, and I
18  remember during the opening part that Judge Everingham
19  walked you through it.  So I won't go through all of
20  that.
21          But there's some interesting things here.
22  You'll see the number of the patent up here, '947.  This
23  is the 6,411,947th patent that's been issued since the
24  Patent Office opened.  They are up, I think, into the
25  seven millions, probably getting close to eight right

now.

So we could have referred to this as the '947 patent, but I think it's been kind of agreed by both sides that we would call it the Rice patent, because she was the first named inventor over here.

Here's the date that it was issued, July -- excuse me -- June the 25th of 2002. Interesting enough, that's a Tuesday.

How do I know that?

All patents issue on a Tuesday. I know why, but it's not really important. You know, it was a Tuesday.

The title of the patent is Automatic Message Interpretation and Routing System. You can see where it named the two inventors, and later three other inventors were identified. At the time it issued, it was owned by Brightware. It's now fully owned by Bright Response.

An important part of this is that down here, even though it was filed on April the 2nd of 1998, there's this related U.S. application section. And you've already heard a little bit about these provisional applications.

A provisional application is an opportunity, if you think you're going to have a patent, but you don't either have the time or the -- or whatever, you

don't want to write up the full patent application right

now, you can seal up in an envelope some information

that pretty fully describes what your invention is

eventually going to be when you write your application.

You can send it to the Patent Office, and they will hold

it for you, and they'll give you one year less one day

to file your full application.

And if you look, they did that in this case.

There was a provisional application filed on April the

3rd of '97, and they filed the full application one year

and one day -- I guess they felt some pressure, okay?

If they had waited two more days, then they would have

lost the date on the provisional, but...

MR. VERHOEVEN:  Objection.  This is a

narrative, and it's also --

THE COURT:  Overruled.

A.   So this --

THE COURT:  Proceed in question and

answer to the extent you can.

THE WITNESS:  Okay.

Q.   (By Mr. Fenster) All right.  So the day it was

filed.

Anything else about the front of the patent

that you wanted to share?

A.   No, except I mentioned earlier that there are

other publications.  Part of the patent process is that

the Patent Examiner looks at other prior art that they

think might be relevant.

But in this case, that prior art did not

prevent the issuance of the patent.  It was issued, as

they say, over that prior art.

MR. FENSTER:  Now, if we can turn to

Rhyne Slide 10.

Q.   (By Mr. Fenster) Can you tell us a little bit

about the substance of the patent?  How would you

describe a summary of what's described in the Rice

patent?

A.   I can't do any better than the summary of the

invention, which is found -- and if you had looked at

that patent in your book, Ladies and Gentlemen, you'll

see that it's written in columns.  And the way that

little notation means is if you go to the column that's

No. 3 and you work down the page to Lines 19 through 23,

you'll find this text.

And it says:  For the summary of the

invention, the method and system of the present

invention emulates the recursive nature of evolving

interpretation by utilizing a knowledge base to execute

reasoning tasks.

Now up to that point, it's basically saying

1  we're applying artificial intelligence techniques.

2  Which automatically classify incoming electronic

3  messages.  So I get an electronic message.  I'm going to

4  classify it and decide what to do with it.

5          And then finally, to automatically obtain

6  responses to the message.  That's what Ms. Rice and the

7  other inventors set out to do.

8      Q.    Now, is this summary of the invention a

9  limitation of the invention?

10     A.    No.

11     Q.    What defines the -- the -- what defines the

12 scope of the invention?

13     A.    The claims.

14     Q.    Now, have you prepared a block diagram to kind

15 of explain the Rice patent?

16     A.    I have.

17               MR. FENSTER:  21.

18     Q.    (By Mr. Fenster) Can you walk us through this

19 diagram you prepared?

20     A.    What I've tried to do is to sort of lump

21 together, from the claim point of view, what these

22 claims say about the inventions of the Rice patent.

23 And they say that there's a source where the electronic

24 message came from.  We'll see that one of the claim

25 steps requires a rule-based and case-based knowledge

1    engine.

2         Other steps in the claim require -- and I'll

3    just work my way down the bullets -- interpreting,

4    classifying, flagging of attributes about the message,

5    comparing text and attributes.  And also there's a step

6    that requires assigning a score to each stored case

7    model that is compared.

8         The rule base in particular is going to do a

9    comparison to exemplar cases -- excuse me -- the case

10   base is going to do a comparison to exemplar cases.  And

11   then the patent also implies that there is an archive or

12   a repository where the information is stored.

13        And under some circumstances, there's also the

14   possibility, in addition to the artificial intelligence

15   machine, to invoke the use of human assistance.

16        Q.   Okay.  Now, you said that when the source

17   sends a message, it sends an electronic message?

18        A.   Yes.

19        Q.   How do you understand -- what do you

20   understand the electronic message to be?

21        A.   I think I was asked that question at my

22   deposition.  I think it's almost self-explanatory, at

23   least to me.

24        It's a message that comes in electronic form.

25   It's not like a piece of paper, okay?  Typically, it

would be a message typed in on a computer maybe and sent

over the internet or sent over telephone lines.  It's

represented -- the text and other parts of the message

are represented electronically.

Q.   Right.  And we have a claim construction in

the glossary for non-interactive electronic message that

we will get to later.

A.   Yes.

Q.   But before that, I wanted to ask you what the

patent discloses about the electronic message.

A.   It disposes -- discloses a fairly broad set of

possibilities.  And I've pulled out places in the patent

file and the file history of the patent that deal with

that.

May I?

Q.   Sure.  What's the first quote that you refer

to?

A.   It's from the patent specification at

Column 4, Lines 10 to 13.

THE COURT:  Excuse me just a second.

Yes, sir?

MR. ROOKLIDGE:  Your Honor, we -- as the

title of this slide, in the last side-bar we addressed

it.

THE COURT:  All right.  Overruled.

1    Q.   (By Mr. Fenster) So, Dr. Rhyne, what is --

2  just take us through that first quote that you pulled

3  out from the patent as to what it discloses about

4  electronic messages.

5    A.   Okay.  It says at Line 26 -- I can't

6  remember -- 26 is actually just left over from something

7  preceding it.  Ignore it.

8         But it says:  It is preferred that the

9  electronic messages are e-mail messages and are so

10  referred to herein.  It being understood, however, that

11  other types of electronic messages are contemplated as

12  being within the scope of the invention.

13    Q.   And you have a second quote that's also

14  describing electronic messages.

15         What does it say there?

16    A.   That's at Column 11, Lines 29 through 34.

17  There the specification says:  The electronic message is

18  preferably an e-mail message in ASCII, text data format.

19  ASCII is an abbreviation for the American Standard Code

20  for Information Interchange.  It's the code that almost

21  every electric typewriter, electronic typewriter uses to

22  represent the letters and punctuation marks.

23         It says it's preferably an e-mail message in

24  that format.  It being understood that the invention is

25  not so limited.  Indeed, the electronic message may take

1  on a variety of data formats, including digital formats,

2  voice data, something that's called a dual-tone

3  multifrequency, or DTMF, tone.

4          That's the way you send data over a

5  conventional telephone or the like.

6      Q.   Okay.  Now --

7              THE COURT:  Excuse me a second,

8  Mr. Fenster.

9              Ladies and Gentlemen, you're hearing the

10 expert's testimony hearing about what constitutes an

11 electronic message in the written description of the

12 patent.

13             I'm going to give you a specific

14 definition of the type of cases submitted to you

15 concerning what constitutes the definition rather of an

16 electronic message.  And you should rely on that

17 definition rather than any that you will infer from the

18 experts' testimony, okay?

19             Proceed.

20             MR. FENSTER:  Thank you, Your Honor.

21     Q.   (By Mr. Fenster) So now with a little bit of

22 background and tutorial about the technology and what

23 the patent discloses, let's go ahead and get to the guts

24 of the case and what your infringement analysis is.

25             So, first of all, what are the three asserted

1    claims?

2        A.    Well, I put this on my Slide 17, I think.

3    Here are the three claims, Ladies and Gentlemen.  Claim

4    30, which depends on two other claims, Claims 26 and 28;

5    Claim 31, which depends on 26, 28, and 30; and Claim 33,

6    which depends on 26, 28, 30, and 31.

7        Q.    What do you mean -- what is a dependent claim

8    and what does it mean for one claim to depend on

9    another?

10       A.    Well, if -- what you can do is you can start

11   claim -- in this case, 30 off by saying all of the stuff

12   that's in Claims 26 and 28, plus some other stuff.

13           So when a claim depends on another claim, it

14   incorporates all the limitations of the preceding claim.

15           And in this case, for example, the reason I've

16   grayed out Claims 26 and 28 is that they are not being

17   asserted by themselves.  But in order to get to Claim

18   30, you have to go through Claims 26 to 28 to 30, and

19   you have to accumulate the steps of Claims 26 and 28,

20   and then Claim 30 adds additional steps.

21           So to infringe 30, you have to do everything

22   in 26, everything in 28, although there's kind of an

23   overlap between them, and then you have to do all the

24   stuff in 30.

25       Q.    So if you turn to Slide 19, can you just

1  describe -- show how that illustrates the incorporation

2  of the dependent claim?

3      A.   Sure.  The point here is that if I have an

4  independent claim to start with, like Claim 1, it says

5  the method with steps (a), (b) and (c).  Then if I have

6  a dependent claim that says the method of Claim 1

7  further comprising steps -- step (d) in this case, in

8  order to infringe Claim 2, you have to do (a), (b), and

9  (c) from Claim 1, plus you have to do (d) from Claim 2.

10  You just get more and more steps as you keep going

11  through the dependency.

12      Q.   So even though we're only asserting Claims 30,

13  31, and 33, we're going to have to talk about 26 and 28;

14  is that right?

15      A.   Yes.

16      Q.   All right.  So turning to your Slide 20, can

17  you tell us what types of infringement analysis you

18  performed?

19      A.   I have generally done only literal

20  infringement for most of the steps.  And literal

21  infringement is a situation where every limitation

22  recited in the claim appears in the accused device.

23  What the claim says and what the accused system do are

24  the same.

25          But there's an alternative view that you can

use that's called the Doctrine of Equivalents.  And it's
for a situation where there's some differences between
what the accused product does and what the claim says,
but they are not substantial.

          And one of the ways to address that is to find
out or form the opinion that the accused device performs
substantially the same function as the claim in
substantially the same way to achieve substantially the
same result.

          That's called the function-way-result test for
equivalents.

     Q.   And did you analyze the accused products for
literal infringement?

     A.   Yes, in every case.

     Q.   And did you find literal infringement of
Claims 30, 31, and 33 for the AdWords system?

     A.   Yes.

     Q.   And did you find literal infringement of
Claims 30, 31, and 33 for the Sponsored Search?

     A.   Yes, I did.

     Q.   Did you also analyze to both systems for
Doctrine of Equivalents?

     A.   Yes.  In a couple of specific cases where
there have been issues raised that would be another way
to look at the claim or maybe another way to view it.

1 And in those cases, I looked at that alternative view of

2 the claim limitation from the point of view of the

3 Doctrine of Equivalents.

4     Q.   Okay.  And did you find that any elements of

5 the AdWord system -- any elements of the claim were met

6 by the AdWord system under -- under the Doctrine of

7 Equivalents as well?

8     A.   Okay.  As I said, I found that they were all

9 met by literal, but I believe I addressed two

10 limitations out of the steps of some of the claims under

11 the Doctrine of Equivalents as well.

12     Q.   Okay.  And did you also find in addition to

13 literal infringement for Sponsored Search for Yahoo!

14 that any of the claim limitations were also met under

15 the Doctrine of Equivalents?

16     A.   Yes, I did.  For a couple of the steps, I

17 think I also looked into the Doctrine of Equivalents for

18 the Yahoo! system.

19     Q.   All right.  So let's take a look at the Google

20 AdWords system.

21             MR. FENSTER:  If you can put up 22,

22 please.

23     Q.   (By Mr. Fenster) Now, you told us that the

24 accused product and the product that you've analyzed and

25 found infringement for is the Google AdWords system.

What is Google -- what do you mean by the Google AdWords
system?

    A.   Well, as one of the people who was deposed
from Google said, in Google terminology, they use the
terminology AdWords, capital A-D, capital W-O-R-D-S, to
mean a lot of things.

       I'm using it to basically describe the system
at Google that when you ask to do a search on a
particular topic, it returns the results of the search,
but also returns some matching advertisements with the
hope that you will be interested in the products that
those advertisements are trying to sell.

       And this is the starting point for that
system.  It's the Google search page, and this little
rectangular box is the search window, and you can type
into it.  And when you've typed in one or two or three
or four, five words, whatever phrase or words you want,
you then hit carriage return, or enter, and send it off
to Google, and it will send back search results.  And if
it can find any appropriately matching ads, it will also
send back advertisements.

    Q.   And before we get into the inner workings of
the AdWords system, can you show us a demonstration of
how Google AdWords works from the user side or from the
outside?

    A.   Right.  I had a video made sitting with one of
the graphics experts that showed a couple of examples of
what happens when you try different variations of
search.

              MR. FENSTER:  23, I think.

    A.   Now, this is a live video, and what I did is I
typed in Explorer/Tahoe.  And you can see me typing that
in.  That's about as well as I do.

         And the Google system is then going to try to
figure out some interesting things to do.

         If we could just stop it there.

         It gave me a bunch of responses.  These are
called the natural search responses in response to
Explorer/Tahoe.

    Q.   Now, is that at issue in this case?

    A.   No.  No.

    Q.   Go ahead.  I'm sorry.

    A.   Okay.  What's at issue are the advertisements.
And there's one ad up here at the top, okay?  You can
see if you can read it right there (indicates), it says
sponsored link.  That's an advertisement that
somebody -- that whoever this chevydealer.com/fresno is.
They entered that ad and they're willing to pay if
somebody ever clicks on that ad, because that will give
them a lead to a possible customer.

1          And then also, there are several other

2   sponsored links over here on this side that Google also

3   returned along with the natural search results.  And

4   here they gave ads to places that are trying to sell

5   Chevy Tahoes, or down here an Explorer.

6          Q.   Anything else about this search that -- was

7   the video done?

8          A.   I think we can go to the next search.

9          Just for the heck of it, I tried a slight

10  variation and I tried explore Tahoe.  Yeah, I think I

11  did pull down to the bottom just to show some of the

12  different places on the screen.

13         But the next thing I did was explore.  And the

14  list below are some alternate opportunities.  If you see

15  something there, you can click on that and make that

16  your search query.  But here explore Tahoe.

17         A couple of points here.  No ads, okay?  And

18  now the Google system was smart enough to think that you

19  probably meant Lake Tahoe as opposed to the car Tahoe.

20  And you can see that it's now talking about places that

21  you can go, like South Lake Tahoe.

22         Q.   All right.  So that's basically how it works

23  from the outside?

24         A.   Uh-huh.

25         Q.   Now, take us behind the curtain and tell us

how it works from the inside.

                    MR. FENSTER:  If you could turn to Rhyne

Exhibit -- or Demonstrative 28, please.

    A.   Okay.

    Q.   (By Mr. Fenster) So what does this figure

show?

    A.   This is a Google -- from a Google document,

and I might mention that this kind of a number down here

is very common in cases like this.  They assign

alphanumeric identifiers.  They are called Bates numbers

to the documents.

          And so this is the document that has that

particular Bates number, GOOG0097193.

          And this was a diagram that Google provided

under the title, Serving Ads in General, but it's very

difficult to read.  So what I had the graphics people do

was to remake this document in a more readable fashion.

    Q.   Actually, before you go on, when you see a

Bates-number GOOG, does that tell who you produced the

document?

    A.   That means it came from Google.  If it said

B-R, it would be from Bright Response, I think.  Yahoo!

was Y-A-A-H, or something like that.

    Q.   Okay.  Now -- so go ahead and take us to the

next slide, which is the cleaned-up version of this

1    Google document?

2        A.    All this is, is the same document but with

3    readable text and figures.  And this shows two different

4    ways of producing ads, but I'm only interested in

5    discussing one of them.

6        Q.    Actually, let's go to 30.  I think you grayed

7    out --

8        A.    I did.

9            So I'm not addressing everything that's been

10   grayed out, but what the point here is that they

11   describe their system at a very high level as having

12   information flowing to and from the internet to

13   something that's called the Google web server.

14           I always called it G-W-S.  I understand some

15   of the people at Google call it GWS (pronouncing), okay?

16   I just learned that.

17           But from the Google web server, they go down

18   here to the AdServer, which is where the AdWord system

19   that I'm talking about is located.

20           And then they have an ad database where they

21   keep their ads.  And during that search process, when

22   the search comes in to the Google web server, it goes to

23   AdServer, the serv -- the searching part of the system

24   is also finding the search results, but the AdServer is

25   finding ads.

1        And when they get the ads and the search

2   results together, they make a page and send it back to

3   you, and you get both of them to see.

4        Q.   And did you prepare an overview block diagram

5   to give an overview of the AdWords?

6        A.   I did.

7             MR. FENSTER:  Rhyne 31, please.

8        Q.   (By Mr. Fenster) So what did you prepare here?

9        A.   Here we have the source, okay?  Somebody like

10  myself sitting there entering a query into the Google

11  search page.

12            I will show that Google has rule- and

13  case-based knowledge -- a rule- and case-based knowledge

14  engine.  And the particular subsystems I will talk about

15  are AdMixer, Query Rewrite, and something called the

16  SmartAd Selection System.

17            They do their comparison to exemplar cases,

18  which is a term that has come up in the Court's

19  construction.  And the exemplar cases that I will

20  identify are something that are called keywords and

21  something called geographic, or geo-targeting.

22            And that previous diagram showed this ads

23  database, which is where the ads are kept waiting to be

24  selected and sent back to the source.  And then I'll

25  also talk about how they provide a form of human

assistance for certain situations that can arise when

people are abusing the system.

Q.   Now, Dr. Rhyne, you mentioned that the AdWords

system in this big black box compares the search request

that it got from a source to the exemplar case on that

side?

A.   Yes.

Q.   Where in the rule-based and case-based

knowledge engines in the AdWord system is that

comparison?

A.   It occurs in the AdMixer, and it also occurs

in the SmartAd Selection System.  Really, there are two

different points in the system where it does that

exemplar case comparison.

The SmartAd Selection System does a little

more, but in terms of specifically looking at comparing

the keywords and geo-targeting, that's done in two

places in the Google system.

Q.   Okay.  And you will take us through that in

more detail later?

A.   I hope to.

Q.   All right.  Well, let's launch into the

claims.  And let's -- if you turn to Rhyne 32, can you

describe your analysis with respect to Claim 26 --

A.   I can.

1    Q.    -- in the Google AdWords system?

2    A.    Well, this is the claim, and we're going to go

3    through each and every step of this claim and the claims

4    that follow.  And I want to start with this first

5    paragraph, which is commonly called the preamble of the

6    claim.

7    Q.    Okay.

8          MR. FENSTER:  And let's go to Slide 33,

9    please.

10    Q.    (By Mr. Fenster) And does this show the

11    preamble of Claim 26?

12    A.    Yes.  I took it right out of the patent at

13    Column 14.

14    Q.    Okay.  Now, you've highlighted non-interactive

15    electronic message.

16          Why did you highlight that?

17    A.    Well, that term has been construed by the

18    Court.  Judge Everingham has said this is what it means

19    to talk about a non-interactive electronic message.  He

20    said that it means an electronic message in which the

21    sender does not provide any information -- any

22    additional information after the message has been

23    received.

24    Q.    And did you apply the Court's construction in

25    your analysis?

1     A.   I did.

2     Q.   Now, you have also highlighted comprising.

3 Why did you highlight that?

4     A.   Well, this is a term of the patent art.  As a

5 patent agent, I have used it in some of the claims that

6 I've written.

7         And it means that you infringe this claim when

8 you do everything that's listed in the claim itself.  It

9 says the steps of.  When you do all those steps, you

10 infringe the claim.

11        But if you do something else, like if the

12 claim calls for one comparison and you do two, it

13 doesn't matter.  It's what's called an open claim.  So

14 to infringe it, you have to do what the claim says, but

15 if you do more, that doesn't stop infringement.

16     Q.   Okay.  So if you do steps (a), (b), and (c)

17 and also (d), (e), and (f), what does that mean?

18     A.   Well, if (d), (e), and (f) don't show up in

19 any other claim, like if they're just out there, it

20 makes no difference.  If you do (a), (b), and (c),

21 you've done it.  You infringe.

22     Q.   Now, what did you find with respect to your

23 comparison of Google AdWords with the preamble of

24 Claim 26?

25     A.   I found that what I call the AdWord system,

1  the system that returns ads with search requests, is a

2  method for automatically processing a non-interactive

3  electronic message, as Judge Everingham has defined that

4  term, using a computer.

5          MR. FENSTER:  If we can bring up Rhyne

6  Exhibit 34, please.

7      Q.   (By Mr. Fenster) Dr. Rhyne, what is the

8  evidence that you relied on, including that Google

9  AdWords meets the preamble, meaning that it uses a

10 method that's designed to automatically process a

11 non-interactive electronic message using a computer?

12     A.   Well, this is a portion of a Google document

13 that deals with how ads are served to people who request

14 them.  And I've just highlighted some portions of it,

15 because I felt like these portions make clear that they

16 do meet the preamble of the claim.

17     Q.   Okay.  And did you rely on any other evidence?

18 I'm sorry.  Before we get there, what was the source of

19 this document?

20     A.   It -- well, it's Plaintiff's Exhibit 401.

21     Q.   And that's in evidence?

22     A.   It is.  And you can see, I've highlighted the

23 relevant parts of it.

24          It starts out with Step 1.  A user visits a

25 page somewhere that results in a request being sent to

Google.

Are you with me there?

Q.   Yeah.

A.   That request is the non-interactive electronic message, and we'll look at some -- at some examples of that in a little while.

The next part I highlighted says the simplest cases are that a user directly enters a search query on google.com.  That's what I showed in the video when we entered Explorer/Tahoe.

Q.   And what do you have highlighted next?

A.   No. 2 says where Google receives the request depends on the request type.  And the first type that they identify is search queries are received by one of the Google web servers.

That's what I showed you in the diagram earlier that Google had drawn.

Q.   Okay.

MR. FENSTER:  And if we go to the next slide.

Q.   (By Mr. Fenster) I guess this document continues?

A.   Yes.

Q.   And what's -- what does this document show with respect to the preamble of Claim 26?

1      A.    Well, this carries you through it a bit.  It

2   says Step 4.  At this point, the system has a query and

3   possibly hits on candidate ads.  It passes that

4   information to an AdServer to choose the set of ads to

5   return.

6            This process is described in another document

7   entitled, Picking the Ads.  It results in a final set of

8   creatives.  Now that's a term you'll hear again.

9            As I understand it, it's a term of the

10  advertising business where the ad itself, the text or

11  pictures or whatever it is -- in our case, it will be

12  text -- they call that the creative.

13           It says the final set of creative ads to

14  return.

15           May I go on?

16      Q.    Okay.  So now you're at Point 5?

17      A.    Yes.

18      Q.    And what does that show with respect to --

19      A.    Well, it really -- it's carrying us on past

20  the preamble, but while we're here, I'll show it.

21           It says the AdServer returns the selected ads

22  to GWS, the Google web server.  It says for query

23  results pages, GWS combines the ad with the query

24  results to create an entire page to show the user.

25           We try very hard for finding ads to be faster

than finding search results.  If GWS gets search results

before it gets ads to go with them, it only waits 800

milliseconds -- that's .8 seconds -- before giving up.

If ads don't appear by then, GWS only displays the

search results.  We saw that when I did Explorer/Tahoe.

It only got search results and no ads.

Q.   Now, I want to stop on this point for a

minute.

So this says that they try to find ads faster

than the search results.  Now, if they don't find the

ads fast enough, then what happens?

A.   They give up.  They say this is a query for

which I don't have any ads that I can show, and they

return the search results -- search results with no

query, no ads.

Q.   Okay.  Now, if you turn to Rhyne Exhibit 36,

did you find any other evidence that you relied on?

A.   I thought -- this is a document entitled,

PMetrics Team's Goals, with their taxonomy, etc. by

Google.  It's Plaintiff's Exhibit 748.

And I thought it was interesting with respect

to this issue of is the query a non-interactive message

or not.  And it says here you submit a query and it

gives you results and that's it, end of the interaction.

And that's exactly what I've observed hundreds and

1 hundreds of times when I've used both the Google and

2 Yahoo! web servers to do search. I enter my query; I

3 hit carriage return; and within a fraction of a second,

4 results come back. And I didn't have to do anything

5 further to get the results or the ads that went along

6 with them.

7     Q. And what element of the Court's claim -- of

8 the claim does that go to?

9     A. Non-interactive.

10     Q. Okay. So once you enter -- once the user

11 presses enter, does the user provide any additional

12 information before Google finds an ad?

13     A. No.

14     Q. Now, when you were typing in what we saw on

15 the video and you were typing in Explorer/Tahoe and

16 explore Tahoe, you saw that it had some suggestions?

17     A. Yes.

18     Q. Now, do those suggestions make the Google

19 system interactive?

20     A. No.

21     Q. Why not?

22     A. Well, if I -- it's showing me something. And

23 if I want to click on one of those, it's just an

24 alternate to what I would have typed in in the search

25 box.

1        If I click on the alternate that's in that

2   list below, I'm just starting the search from that point

3   with that click instead of from where I typed in and hit

4   the carriage return with that click.

5        But from that point on, when I click on one of

6   those alternatives, it's going to send back the search

7   results and the ads without me doing anything else.

8        Q.   Okay.

9             MR. FENSTER:  Joseph, can you go back to

10  Rhyne Slide 33, please?

11       Q.   (By Mr. Fenster) I just want to put the

12  Court's claim construction back up.  The Court's claim

13  construction was an electronic message in which the

14  sender does not provide any additional information

15  after -- after the message has been received.

16            Now, at what point is the message received by

17  Google?

18       A.   It's very soon after I either click on

19  something or hit enter, after I've completed typing in

20  that search window.  It goes through the internet at

21  almost the speed of light.  Very fast.

22            And it's received by that Google web server,

23  and it's from that point on that we really measure

24  whether the system is interactive or not.

25       Q.   So during the video when you were entering

1  Explorer and you were spelling E-X-P-L and it was giving

2  you the search results, had the message been received

3  yet?

4     A.   No.

5     Q.   When was it received?

6     A.   Whenever I hit carriage return, or if I had

7  liked one of those suggested queries, if I had pulled

8  the mouse down and clicked on that query.

9     Q.   Now, it also -- the preamble also requires

10  that it be done by a computer?

11     A.   Yes.

12           MR. FENSTER:  If we turn to Exhibit 37 --

13  Demonstrative 37, I apologize.

14     Q.   (By Mr. Fenster) Can you show an illustration

15  of how that works?

16     A.   Well, it is a computer, but we can certainly

17  show here, if we click on Google search with Texas

18  Rangers, click, okay, that's -- that's what the computer

19  at Google -- in fact, it's a whole bunch of computers --

20  has returned to me in response to my inquiry about the

21  Texas Rangers.

22     Q.   And do you have an opinion, based on your

23  review of the evidence, as to whether Google's AdWords

24  system meets the preamble, including the Court's

25  construction, of non-interactive electronic message?

1    A.    I really do.  And one of the bases for that is

2  this piece of information right here.  They went out and

3  found 11,300,000 search results in less than 2/10 of a

4  second, and they returned those search results, and they

5  returned these advertisements at that speed.

6          And I didn't do anything.  I didn't have a

7  chance to do anything.  It just (snaps fingers) came

8  back after I hit carriage return, or in that case, after

9  I clicked on search.

10    Q.    Now, Dr. Rhyne, were you here for the opening?

11    A.    I was.

12    Q.    Okay.  Do you recall that Mr. Verhoeven for

13  Google argued that the system was -- that it was

14  interactive because, one, it gave you the suggestions

15  that we've already talked about, and he also said it was

16  interactive because you can click on one of these ads or

17  one of these other links.

18          Do you remember that?

19    A.    I believe, as best I understood what he said,

20  that was part of his opening.

21    Q.    What's your response to that, Dr. Rhyne?

22    A.    That doesn't have anything to do with the

23  claim.

24    Q.    Why not?

25    A.    Because the claim doesn't actually deal with

returning anything.  As we'll see, all the claim does is it deals with retrieving from memory, from a data repository, an advertisement.  It's going to refer to it as sort of a solution.

And once you've gotten it out of memory, that's the point at which you stop dealing with the claim.  The claim doesn't say anything about actually returning an ad and waiting for you to click on it to go see -- to go buy a ticket at the Texas Rangers.

That's after the claim's been infringed, and there's no interaction during the process of infringing the claim.

Q.   Now, Dr. Rhyne, I want to ask you if you can turn to Exhibit -- Plaintiff's Exhibit 161R.

Did you prepare a summary of the evidence that you relied on?

A.   Yes, I did.  I basically have worked over weeks here to pare down those documents.  There was an original version, and it had some additional stuff in it besides just the pure evidence.

And what I've done to get 161R is -- is essentially, except for a few cases where there's some transitional phrases, made this document collect together the evidence that I think, on a step-by-step basis for all the claims at issue, describes what I

1 found in -- in the Google documents, the Google

2 depositions, and the Google software to support my

3 opinions.

4    Q.    Now, can you give us an idea of the volume of

5 material that's summarized in this chart?

6    A.    Well, if I were to get all the documents and

7 all the pages of software -- I mean, I've never actually

8 seen it printed out.  I'd be afraid to print it, okay?

9 But my guess is, it would amount to something at least a

10 foot tall, if not more, if I had the whole documents

11 from which I pulled out these pieces.

12    Q.    And, Dr. Rhyne, we're going to discuss some of

13 the evidence in your charts, but if we were to go

14 through and describe it all in Court, how long would

15 that take?

16    A.    Another day, I think, at least, to go through

17 all of the evidence that I've kind of encapsulated in

18 this exhibit and a similar exhibit dealing with the

19 Yahoo! evidence.

20    Q.    Now, can you describe the documents that are

21 summarized here?  Are these technical documents?  What

22 kind of documents are these?

23    A.    The documents are highly technical.  They

24 generally were written by Google engineers or Yahoo!

25 engineers -- in this case, Google -- to each other.

1  They're filled with complex terminology.  In many cases,

2  they have diagrams that are difficult to read in the

3  first place.

4         The software, of course, is software, and the

5  Google software is written in three or four different

6  languages, which, in and of themselves, are difficult to

7  understand.

8         So they're complex, technically-oriented

9  documents.  And what I've tried to do in this exhibit is

10  to pull out of them the parts of the document that I

11  think are as understandable as they can be, particularly

12  where it reads directly on my opinions of infringement.

13     Q.   And is this summary chart a summary of the

14  documents in evidence that you relied on in forming your

15  opinions?

16     A.   Yes.  I think -- certainly, my goal here has

17  been -- you know, I wrote a report, and I cited much of

18  this in the report.

19         But I think everything that I've found in the

20  documents, deposition transcripts, and software that is

21  relevant to my opinions over -- including some stuff

22  that did not make it into my report just for the sake of

23  brevity, I have put into this extensive summary of that

24  information.

25     Q.   And where did you get the documents in

1  evidence that are in that summary?

2      A.    Everything that's in here, except for a few

3  transitional phrases just to explain the movement from

4  one -- one part of Claim 26 to the next part came

5  directly out of either a Google document, quoting a

6  Google deposition transcript, or -- I tried not to copy

7  a lot of the lines of code, because as has come out,

8  that's some of the most highly confidential parts of

9  what Google and Yahoo! have made available for me to

10  review.

11          And there were, in fact, some legal

12  restrictions on how many lines of code I should put into

13  a document.  But I have, in every case, made reference

14  to a page of the printed Google code and the line

15  numbers and in some cases have carried out maybe one or

16  two lines of code.  But everything that's in here came

17  from Google.

18      Q.    Now, when did you prepare a summary of your

19  findings in this chart, Exhibit 161R?

20      A.    The version of this chart that I took

21  responsibility for was produced with my supplemental

22  reports which were produced to Google, and I'll have --

23  I'll have to -- I think sometime around July -- July the

24  21st.

25      Q.    And these were provided to Google?

1      A.   Yes.

2                MR. FENSTER:  Your Honor, we would offer

3  161R into evidence pursuant to Federal Rule of Evidence

4  1006.

5                MR. VERHOEVEN:  Objection, Your Honor.

6  May I approach?

7                THE COURT:  Yes.

8                (Bench conference.)

9                MR. VERHOEVEN:  This is an exhibit to the

10 expert report.  It's hearsay.  It's not admissible, just

11 like the expert report is not admissible.  It's hearsay,

12 Your Honor.

13               MR. PERLSON:  We've actually already had

14 a hearing on this.  This was already moved --

15               THE COURT:  I'm sorry?

16               MR. PERLSON:  Actually, this was

17 discussed at the evidentiary hearing, and Your Honor

18 issued a ruling on that.  It wasn't admissible.

19               MR. FENSTER:  It lacked foundation.

20               THE COURT:  The ruling was I'd let him

21 try to lay a foundation at trial.  I'll continue my

22 prior ruling, though.  I'm going to let you use it for

23 demonstrative, though.  I'm not going to allow experts'

24 exhibits to their reports as substantive evidence in

25 this case, okay?

1          It's hearsay, and I'm going to sustain

2 that objection.  I also don't find that it qualifies as

3 a summary exhibit.

4          (Bench conference.)

5     Q.   (By Mr. Fenster) Now, Dr. Rhyne, is there

6 anything in this chart, other than direct quotes from

7 the evidence, that you relied upon?

8     A.   As I said, I think there still may be a --

9 like a transitional phrase that says moving from here to

10 here.  This also shows that.  But the body, the meat of

11 what's in here, is all directly out of the Google

12 documents, deposition transcripts, or software sites.

13     Q.   And does this contain any bits of your

14 opinion, or is it just the evidence that you relied on?

15     A.   To the best of my knowledge, my attempt has

16 been to take anything that would be opinion out of this,

17 and that opinion information I have retained in my

18 expert report.

19     Q.   And if we turn to --

20          MR. FENSTER:  May I display it?

21          THE COURT:  Yes.

22     Q.   (By Mr. Fenster) And so this is a chart, and

23 on the left, this is the preamble of Claim 26?

24     A.   Yes.

25     Q.   And on the right, you have some of the

evidence that you've relied on?

A.    Yes.  You can see this is the same diagram that I showed in a slide a little while ago that I had redrawn.

Q.    Thank you, Dr. Rhyne.

So, Dr. Rhyne, may I check off that you have found that Google AdWords meets Claim 26(a) -- 26, the preamble?

A.    Yes.

Q.    All right.  Let's talk about 26(a).

Have you formed any opinions with respect to whether Google AdWords meets 26(a)?

A.    Yes, I have.

Q.    And can you walk us through the evidence that you relied on, turning to Exhibit 40, please.

A.    If we could go back to 39 for a moment.

Q.    Sure.

A.    I just want to clarify that in reading this element, it says:  Receiving the electronic message from the source, and I have used the Court's construction of a non-interactive electronic message in reading this limitation, even though it doesn't have all those words.

Q.    Okay.

A.    So I've used the Court's construction here, and now I can go to 40.  This would be a piece of

1  evidence.

2      Q.   Okay.  And what is this piece of evidence that

3  you relied on?

4      A.   This is a quote from the transition --

5  transcript of a deposition of a Google engineer named

6  Menzel, and he was asked the following question:

7           Okay.  So if I understand you correctly,

8  Google search will receive a search request from a user

9  as the Google -- I think that should say at -- at the

10 Google front end that will be passed to the Google web

11 server.

12          And he said yes, it does that.

13     Q.   Okay.  Now, how does Google receive an

14 electronic message from a source?  What does that look

15 like?

16     A.   Well, if we go forward a couple of slides.

17     Q.   42?

18     A.   42 is fine.

19     Q.   Okay.

20     A.   It's a little hard to see up at the top, but

21 in this area is what that message looks like, okay?  And

22 I'll try to read that as best I can.  It begins with

23 four letters, http.  That's the hyper text transfer

24 protocol.

25     Q.   What is that?

1    A.    It's the way people on the internet send

2  messages to each other.  Well, let me rephrase that.

3  It's the way computers on the internet send messages to

4  each other.

5    Q.    Okay.

6    A.    People don't generally type that way.

7    Q.    So when you type pizza in the search box, what

8  does Google actually receive?

9    A.    This string of text, http:\www.google.com and

10 so forth.

11        And it's a little hard to see, but right in

12 the middle is the pizza part.  But the rest of it is --

13 oh, okay.  Great.  Okay.  Good.

14        Here's pizza.  That's the query, and the rest

15 of this is information that say things like where is the

16 person who entered this pizza request located.

17    Q.    The location of the user when they type in the

18 request?

19    A.    Right.  It's called the URL, the universal

20 resource locator.  And using that piece of numerical

21 information, you can look up and get an approximate

22 address.

23    Q.    Does it use any other information, like an IP

24 address?

25    A.    That's -- yes.  And it also has settings

1  like -- you can set your -- your -- it's called the

2  browser, the tool that's being used here, to say:  I

3  want safe search.  I don't want to get any adult

4  material.  I don't want to get something about gambling.

5  I don't want to see ads for something along those lines.

6  Those kinds of information -- what language is the

7  preference of the person who's entering this command.

8  And under certain circumstances, some users it can also

9  tell you your gender, your age maybe, if you entered

10 this information, and your approximate earnings per

11 year, other kinds of things that advertisers would want

12 to know about.

13      Q.   So when the user types in pizza and presses

14 enter, Google actually receives a message called an http

15 message with additional information beyond just the word

16 pizza?

17      A.   Yes.  It's also called an http request, and

18 that's all packaged into that non-interactive electronic

19 message.

20      Q.   Okay.  And you found that that is the

21 non-interactive electronic message that's received in

22 this case?

23      A.   That's what's sent to and received by the

24 Google web server.

25      Q.   Dr. Rhyne, may I check off that 26(a) has been

1    met?

2         A.   Yes, you can.

3                   MR. FENSTER:  That's 43, please.

4         Q.   (By Mr. Fenster) All right.  Did you form any

5    opinions with respect to Claim 26(b)?

6         A.   Yes.

7         Q.   And what is that?

8         A.   Well, first, I believe there's a Court's claim

9    construction for two of the terms.

10                  MR. FENSTER:  So let's go to 44, please.

11        Q.   (By Mr. Fenster) So this is the claim language

12   from 26(b):  Interpreting the electronic message using a

13   rule base and case base knowledge engine.

14                  So which terms were construed by the Court?

15        A.   Well, I already mentioned that the Court

16   construed electronic message, and I've used that

17   construction.

18                  But in addition, Judge Everingham provided a

19   definition of rule base, the rule base knowledge engine.

20   And he said that means:  A knowledge engine that tests

21   whether one or more conditions are met, and if so,

22   applies certain specified actions.

23                  That's kind of what I said earlier about a

24   rule base, that you do an if then.  If this condition is

25   true, then you do that action.

1     Q.   And when you do your analysis, did you apply

2 the Court's claim construction?

3     A.   Exactly.

4     Q.   And what was the Court's claim construction

5 for case base knowledge engine?

6     A.   He said that a case base knowledge engine

7 means a knowledge engine that processes electronic

8 messages by comparing them to a stored set of exemplar

9 cases.

10          I said that we would see that term again.  I

11 showed it on a slide earlier.  It came up in the Court's

12 construction as to what exemplar cases -- that's what

13 you must compare the electronic message to.

14     Q.   Now let's talk about the first part, the rule

15 base knowledge engine.

16          So 26(b) requires interpreting the electronic

17 message using a rule base and case base knowledge

18 engine.  So let's talk first about the rule base

19 knowledge engine.

20          Did you find that AdWords satisfies the first

21 part of 26(b)?

22     A.   Yes, I did, in something called the AdMixer.

23     Q.   Okay.

24          MR. FENSTER:  Let's go to Slide 45,

25 please.

1    A.   This just re-explains the Court's concept,

2  that if you have a condition that's met, then you apply

3  some action.

4    Q.   (By Mr. Fenster) Now, did you analyze the part

5  of the system called the Query Rewrite?

6    A.   Yes, I did, uh-huh.

7    Q.   Okay.

8    A.   You're right.  I misspoke.  The Query Rewrite

9  is the first part that does this using the rules.

10    Q.   Okay.  And which -- which part of the AdWords

11  system meets the rule base knowledge engine, the first

12  part?

13    A.   The Query Rewrite where they take the words

14  that come in, and they modify them by applying a set of

15  rules.

16    Q.   Okay.  Now, can you give some examples of how

17  Google meets the rule base knowledge engine?

18    A.   I can.  I've put some on the next slide.

19         MR. FENSTER:  46, please.

20    A.   The puppies, one of the Google deponents said

21  that if you were searching for pictures of puppies --

22  that was probably something that he had used as his

23  examples when he spoke about it before, but the rule

24  base part of the Query Rewrite system would look at a

25  plural term, a keyword like puppies, and say, if you're

interested in puppies, I bet you'd also be interested in
search results and advertisements that have the key word
puppy equally as much.

If you said cars, it might say car. It would
take a word like puppy, and it uses syntactical analysis
to say: Well, if you meant puppy, you probably would
also be interested in search results or ads about dogs.

If you said you want to see something about
Robert Thompson, and I've got ads that are related to
Rob or Bob Thompson, I might want to show you those.

Then it has something called stop words, which
are words that are generally viewed to not have a lot of
meaning. Like if I say, what is puppies or show me
puppies, they'll probably throw those out. So if you
say the dog, it will throw out dogs.

But as an example, it's smart enough -- and I
don't -- I didn't know it, but, apparently, there is a
band named The Band, okay?

And so if you ask to see The Band, an example
that was provided, it says it would be smart enough not
to strip the The off, because that's part of the name of
The Band, and it's not just a loose word. It's kind of
like New York. It will probably keep that together
rather than thinking that you're looking for New and
York.

1    Q.    (By Mr. Fenster) And did you review any Google

2 engineer testimony, deposition testimony, that gave

3 additional examples of how Google AdWords meets the

4 rule-based knowledge engine of 26(b)?

5    A.    I did.  I found another quote from

6 Mr. Menzel's deposition.  He was asked:  So one example

7 of an operation that's done by the Query Rewrite is

8 changing a plural to a singular.

9         And he said:  That's right.

10    Q.    And, Dr. Rhyne, do you summarize additional

11 evidence in Exhibit 161R?

12    A.    I did.

13    Q.    Now, this is at Page 3.  26(b) starts at the

14 back -- or at the very bottom and then continuing.  Is

15 this all the evidence that you found in Google documents

16 and testimony and source code that supports your

17 findings with respect to 26(b)?

18    A.    Yes.  There's testimony -- other testimony

19 from Mr. Menzel, there's some cites to the source code

20 in a couple of places, and I think through another

21 document in that section of that exhibit.

22    Q.    And there's a cite to a Furrow deposition and

23 Gilbert.

24    A.    That's a document.

25    Q.    Right.  And then it continues on Page 5.

1        A.    Yes.

2        Q.    And we're still in 26(b).  It continues on

3  Page 6; is that right?

4        A.    Yes.

5        Q.    Is that additional evidence that you relied on

6  in finding that it meets 26(b)?

7        A.    Yes.

8        Q.    With respect to Page 7, is that additional

9  evidence that you found?

10       A.    It is.

11       Q.    Okay.  And this document, this summary

12  document, 35 pages, this is all evidence you found --

13       A.    Yes.

14       Q.    -- for this report?

15             Now let's talk about the second part of 26(b),

16  which is the case base knowledge engine.

17             Did you find evidence that Google AdWords

18  meets the second part --

19       A.    I did.

20       Q.    -- the case base knowledge engine?

21       A.    I certainly did.

22             MR. FENSTER:  And let's turn to 48,

23  please.

24       Q.    (By Mr. Fenster) All right.  So what evidence

25  did you find -- or explain your findings with respect to

the case base knowledge engine.

    A.    Okay.  Well, I repeated at the top of this
slide the Court's construction of case base knowledge
engine as meaning a knowledge engine that processes
electronic messages, like the search queries that we've
looked at, by comparing them to a stored set of exemplar
cases.

         Now, a good example of an exemplar case is if
you think of the query coming in as having a keyword,
like puppies, and the advertisements have keywords
associated with them.

         MR. VERHOEVEN:  Objection.  Objection,
Your Honor, outside the report.

         THE COURT:  Overruled.

    A.    The advertisements have keywords associated
with them.

         And so if you do a comparison between the
keyword and the query and the keyword associated with an
advertisement, you're clearly comparing to an exemplar
case.

         And what this picture at the bottom is, is an
example of me creating an initial advertisement -- I
think I called it Tom's Guitars, but I got to this point
where the Google AdWords interface allowed me -- it
says:  Select your keywords.  Your ad can show on Google

when people search for the keywords you choose here.

Then I underlined this because I thought it was relevant

to the question of exemplar cases. It says: When

creating your keyword list, think like your customers.

How would they describe your products or services?

So when you're entering, I'm -- I'm -- I was thinking,

if I've got a -- if I'm selling guitars, people might

probably come in and enter a query guitar or guitar

lessons.

    Q.   (By Mr. Fenster) Now, let me just -- let's --

let me back up and just get clear for a minute.

        So you used the AdWords system as if you were

an advertiser.

    A.   I was doing that when I created this screen

shot.

    Q.   Okay. So you were -- you entered an ad.

    A.   Yes.

    Q.   And Google gave you some instructions about

what information to enter along with your ad?

    A.   Yes.

    Q.   And it told you that -- to think like your

customer.

    A.   Think like your customers. Imagine what

queries would a customer who would be interested in your

ad, in your product, what would they put in, okay?

1    Q.   Now, what kind of information, other than the

2   actual ad text, does the advertiser enter when they

3   submit an advertisement to Google?

4    A.   They -- they can enter constraints.  For

5   example, they can say:  I would only like to have

6   responses -- I would only like to have my ad shown to

7   people who live in Texas or Austin or Marshall or the

8   United States or Switzerland, those kinds of things.

9   Those are called those geo-tracking targets.

10    Q.   Okay.  So they can -- so the advertiser can

11   enter geographical limitations of what they expect to

12   find in the query?

13    A.   Well, what they expect to see in that

14   electronic message, and they can say:  I don't want to

15   show my ad -- it's a waste of my time to show my ad to

16   somebody in Botswana, okay?

17    Q.   Okay.  And in addition -- in addition to the

18   geographic targeting information, can they add any

19   additional information?

20    A.   Well, if they -- they can put gender

21   information, if it's available, coming in from the

22   message; they can put language preferences, things like

23   that.

24    Q.   Okay.  Now, you mentioned keywords.  I want to

25   focus on keywords.

1          So what are keywords, and what is -- and tell

2     us again what Google tells the advertisers about what to

3     put with respect to keywords.

4          A.    Okay.  From a query point of view, when I

5     typed in pizza or Texas Rangers, those are keywords in

6     the query.  Those were things I'm asking about.

7          On the advertisement side, you can see here,

8     Google says:  Think what you would like your

9     customers -- what would they be using if they're going

10    to be querying about something that relates to your

11    product or service.

12         So what the two guys -- what the advertiser is

13    trying to do is say:  Boy, if somebody is interested in

14    guitar lessons, I'd sure like to show them my ad.  So

15    they enter that along with the ads.

16         Like Tom's Guitars, free lessons, first time,

17    you know, acoustic and electronic, something like that

18    would be the ad, but then they attach these keywords

19    with their ad to try to identify people who are querying

20    who would be interested in their ad.

21         Q.    Okay.  Is it fair, Dr. Rhyne, that what the

22    advertiser enters as a keyword is what they expect to

23    see in the electronic message representing the search

24    request?

25         A.    Exactly.  That's right.  And the same thing is

1  true if they say only for Texas.  They're looking for

2  people who are in Texas who are sending in messages that

3  might be of interest -- interested in their ad.

4      Q.    Now, Dr. Rhyne, you have the Court's claim

5  construction at the top, and it requires, for a case

6  base knowledge engine, comparing the electronic messages

7  to a stored set of exemplar cases.

8          Did you find anywhere in the Google AdWords

9  system where they compare the electronic message to a

10 stored exemplar case?

11     A.    Found two places.

12     Q.    Where was that?

13     A.    The first place is -- and I misidentified it

14 earlier in this -- this AdMixer.

15     Q.    Okay.

16     A.    And I can describe what that does, if you

17 wish.

18          The second place is in this Smart Ad Selection

19 System as well, which follows the AdMixer and does the

20 final ad selection.  And in both of those systems, they

21 compare to exemplar cases, in particular, to keywords.

22     Q.    Okay.  So you found not one, but two places in

23 the AdWords system where they meet the limitation of the

24 case base knowledge engine?

25     A.    Yes, I did.

     Q.   And that was in AdMixer and in the Smart Ad
Selection Server; is that right?

     A.   I did.

     Q.   Okay.  Now, did you give -- now, you mentioned
that you had one slide that wasn't prepared by you.

               MR. FENSTER:  Let's go to 49.

     Q.   (By Mr. Fenster) And can you show what's being
shown here?

     A.   Yeah.  This -- this is kind of interesting to
me.  I sat down with a much younger graphic engineer,
and I said:  I want you to come up -- I don't do this
kind of fancy graphics, and I said:  I'd like for you to
come up with a graphical representation of what an
advertiser would be thinking about when they created
their ad, and then they picked their keywords, and what
would they be hoping somebody would query with?

               And I said:  I'm going to have an ad.  I gave
him this much.  Tom's Guitar Shop, free first lesson,
the -- what they call the URL, the website, was
www.tomsguitars.com.

               He said:  Well, what kind of keywords?

               And I said:  Well, you know, like guitar
lesson and then put down some other searches that they
might be doing.

               And he came up with Bonnie Raitt, Stevie Ray

1  Vaughan, and ZZ Top.  I was thinking Les Paul, Mary

2  Ford, and Chuck Berry maybe.  I kind of knew who a

3  couple of those people were, but that just shows how far

4  off I am.

5         But maybe that's more appropriate.  In other

6  words, I might have missed it, because I doubt if there

7  are very many people working the internet today who even

8  knows who Les Paul was.

9         But this is the idea that the way you enter

10  your keywords as an advertiser is, you think like the

11  person you're trying to see and show your ad to.  That's

12  all I was trying to do here.

13      Q.   All right.  Now, did you find any other

14  evidence that you relied on that indicated that AdWords

15  meets the limitation of the case base knowledge engine

16  in 26(b)?

17      A.   Yes.  I found -- in Plaintiff's Exhibit 401 --

18           MR. FENSTER:  No. 50, please.

19      A.   Right.  Under the heading Matching Queries, a

20  list of things that says:  Conditions for matching

21  include:  Words in the query -- that's what I typed in,

22  pizza -- match keywords for the ad.  Marshall Pizza

23  Shop, okay, if they put in pizza as one of their

24  keywords.

25           And then from a geographic targeting point of

1    view, it also says, in Step No. 4, that the origin of

2    the query -- where did the query come from?  That's part

3    of the electronic message -- does it match the regional

4    targeting constraint of the ad?

5            That's also one of these exemplar cases.  It's

6    not the ad itself, but it's information about the ad.

7    And in the bottom here, I highlighted an advertiser can

8    specify conditions 2 to 4 in the ad campaign as well,

9    okay?

10       Q.   (By Mr. Fenster) Now, that's another important

11   point, Dr. Rhyne, that I wanted to just bring out.

12           You said that what was compared -- you said

13   that the electronic message was compared to the keyword

14   or information about the ad and not compared to the ad

15   itself.

16       A.   Well, it --

17       Q.   Can you explain that?

18       A.   Okay.  Well, in the AdMixer, that's what

19   happens, okay?

20           In the SmartAd Selection System, they do more

21   than that.  They actually compare the keywords to some

22   of the words in the ad and a bunch of other stuff in the

23   Google system.

24       Q.   So they do both.  In the SmartAd selection

25   receiver, they compare both to the ad and other

1   information --

2       A.   Yes.

3       Q.   -- about the ad?

4       A.   But in both AdMixer and SASS, SmartAd

5   Selection System, they compare to the keywords and to

6   the geo targeting, which I believe meets the

7   construction the Court put forward as being exemplar

8   cases.  Certainly, the keywords do.

9       Q.   Now, in your summary chart, we went through

10  four pages that have -- of evidence where -- that you

11  relied on for meeting 26(b), both rule base engine and

12  case base knowledge engine, but can you show us one more

13  document for the jury?

14      A.   I have one more.

15      Q.   All right.

16              MR. FENSTER:  No. 51.

17      A.   Now, I believe that the previous quote dealt

18  with AdMixer, because it talks about -- among other

19  things, there's a term called adChars.

20              Okay.  This deals with the SmartAd Selection

21  System, and the point, I guess, I wanted to make is that

22  there are two places.  This is the second place where

23  there's a case base knowledge engine that meets the

24  Court construction.

25              Here it says:  For an ad to be displayed,

several things must occur.

First, the system finds all ads relevant to the query.  To do so, it matches the incoming query to keywords associated with ads.

I think that's the reference to the AdMixer.

Second, the system chooses amongst the candidates.  And that's the SmartAd Selection System, and it does a lot more.  Among other things, it comes up with how much money the people are willing to pay.

But in the process of making that secondary choice, my study has shown that they compared the keywords again for a smaller set of ads than they started out with in the first place, but they also go beyond that and compare the text of the ad, for example, to the keywords.

Q.    Okay.  So can we check off 26(b)?

A.    Yes, you can.

Q.    And we can check it off -- is it accurate that you found that 26(b) was actually met in two places, in the AdWords system and the AdMixer and in the SmartAd -- SmartAd Selection Server?

A.    Well, the case base part was found in both of those.  I found the rule base part in the query rewrite, okay?

And I found that both of those -- I believe

1   there's an ordering requirement that those steps be done

2   before we even get to Step (c), and I found that as

3   well.

4       Q.   Okay.  So -- that's right.  In the Court's

5   claim construction, the Court required that Steps (a),

6   (b), and (c) of 26 be performed in order; is that right?

7       A.   Yes.

8       Q.   And did you find that the Steps (a), (b), and

9   (c) of Claim 26 are performed in order in the Google

10  AdWords system?

11      A.   Yes, I did.

12      Q.   Okay.  Let's go ahead and go to 26(c).

13  And did you form any opinions with respect to whether

14  the AdWords system meets 26(c)?

15      A.   I have.  But first, I used the Court's claim

16  construction.

17      Q.   All right.

18          MR. FENSTER:  Let's go to 53, please.

19      Q.   (By Mr. Fenster) Now, which claim

20  construction -- tell us what 26(c) requires, and which

21  claim construction you used, please.

22      A.   Okay.  Well, but just to read to the jury the

23  claim language, it says:  Retrieving one or more

24  predetermined responses corresponding to the

25  interpretation of the electronic message from a

1 repository for -- and it's specific that the purpose

2 here is for automatic delivery to the source.

3          And the Court said that the predetermined

4 response was responses prepared prior to the receipt of

5 the electronic message.  He went on to say that the

6 responses may be modified and/or altered based on the

7 interpretation of the electronic message.

8          And he gave a definition of repository to mean

9 a place where data is stored.  That's a very broad

10 definition.

11     Q.   Okay.  Now, did you apply the Court's claim

12 construction for predetermined response in doing your

13 analysis?

14     A.   I did.

15     Q.   And did you apply the Court's claim

16 construction with respect to repository?

17     A.   I did.

18     Q.   Okay.  And did you find any evidence that

19 supported a conclusion that Google AdWords meets

20 Element 26(c)?

21     A.   Quite a bit.

22          MR. FENSTER:  Let's go to Slide 54,

23 please.

24     Q.   (By Mr. Fenster) What evidence did you find

25 here?

```
 1      A.   And this is a quote from Mr. Furrow's
 2   transcript.  When he was deposed, he was asked the
 3   following questions:  So the Google ad serving system
 4   has some ads that it has stored somewhere in the system;
 5   is that right?
 6          He said:  I would say that the storage of
 7   those ads isn't necessarily a function of the serving
 8   system.  I guess it's fair to say that there are parts
 9   of the serving system that store various aspects of
10   these ads.
11                QUESTION:  Where are the ads stored?
12                ANSWER:  The ads that we consider for
13   storing on google.com queries are stored in multiple
14   different places.  The main place is what's called --
15   probably should be called -- the ads database, which
16   is ads -- I'm sorry -- he said the ads DB, which is
17   short for ads database.
18      Q.   And just for the record, this is from Furrow
19   deposition on Page 17 at Lines 20 through Page 18,
20   Line 9.
21          Did you find -- actually, before we get there,
22   I wanted to show you one slide from Mr. Verhoeven's
23   opening.
24          Do you remember this slide?
25      A.   I do.
```

     Q.    And what is this -- he was using this slide to
illustrate the Google AdWords system?

     A.    I believe so.

     Q.    And what does this slide indicate to you as to
whether or not Google returns predetermined response?

     A.    Well, from a repository.  I believe this
represents the ads database, okay?  So here's the
repository, all the ads that are stuck in that storage
area that Mr. Furrow identified.

          And then the way it works is the system will
identify one or more ads, which it will then return,
along with the search results, and he identified that up
here (indicates).

          And each of those ads, in my opinion, given
the claim construction -- or the claim itself, it says,
one or more predetermined responses -- is a
predetermined response.

          It was previously stored in this database when
somebody wrote that ad and put in it there, as I have
done, and it's already there.  And when they match that
ad to the search query, then they'll pull that ad out
for the purpose of eventually sending it off to the
person at the source, the one who asked for the query.
But each one of those ads, I thought this illustrated it
very well.  They come out one at a time.  They're put

1  together, and then they're sent.  But each of them is

2  one or more predetermined responses.

3      Q.   So, Dr. Rhyne, these are the ads on the

4  right-hand side?

5      A.   Yes.

6      Q.   And based on your understanding and your

7  review of the evidence, what are the predetermined

8  responses that meet the claim limitation?

9      A.   Well, I think there's a difference of opinion

10  between what I believe is the predetermined response and

11  what I think the Defendants are arguing is the

12  predetermined response.

13      Q.   What's your opinion?

14      A.   I think they believe that it's all this whole

15  set together, okay?

16           But I think, because of the one or more

17  predetermined responses, each of those ads by itself,

18  when it's pulled out of the ads database, meets the

19  Court's construction of a predetermined response as set

20  forth in the claim.

21      Q.   Now, Dr. Rhyne, in order to serve one of these

22  ads, does that ad already have to be in the database?

23      A.   Yes.

24      Q.   Could it be served on a results page if it

25  wasn't already in the database?

1    A.    No.

2    Q.    And so let's go back to your slides, and I

3  think you had an illustration of the individual ads

4  being the predetermined response.

5    A.    55.

6              MR. FENSTER:  55, please.

7    Q.    (By Mr. Fenster) Okay.  So what are you

8  illustrating here as to how Google AdWords meets 26(c)?

9    A.    Well, I think this is where the difference of

10  opinion is.  I think each one of those ads, Texas

11  Rangers tickets, Texas baseball, is a predetermined --

12  is one more or more predetermined responses.

13             I believe that the Defendants are going to

14  argue, or already have in their opening, that the

15  predetermined response is the collection of the multiple

16  ads.

17             And I just disagree with that.  I think the

18  claim language says one or more, and it means one or

19  more.

20    Q.    Okay.  Now, you say that it says one or more.

21             MR. FENSTER:  Let's go back to 53,

22  please.

23    Q.    (By Mr. Fenster) Now, what language are you

24  relying on from the actual claim language to support

25  your conclusion that an individual ad can be the -- is

1  the predetermined response?

2      A.  Well, it says:  Retrieving one or more

3  predetermined responses.  So you have met that claim

4  when you retrieve one, and then I'll pick up the Court's

5  construction:  One response prepared prior to the

6  receipt of the electronic message.  And that would be an

7  ad in the ads database.

8          You can do more.  The claim says one or more,

9  but that's enough.

10     Q.  Okay.  And now, Dr. Rhyne, you were here for

11 Ms. Doan's opening statement?

12     A.  I was.

13     Q.  You saw she put a lovely picture of you up

14 from your deposition?

15     A.  Yeah.  I've seen a couple of lovely pictures

16 of myself here.

17     Q.  One of them was on our side.  I apologize.

18     A.  That's okay.

19     Q.  So she argued that you admitted in your

20 deposition that the responses were not predetermined.

21          How do you respond?

22     A.  I didn't do that, okay?  What -- in fact, if

23 you look -- what I said was that if you think of the

24 whole set of ads together as they happened to be

25 ordered, did I get a Texas Rangers ad; did I get a

1 different one; did I get this piece, the sequence of ads

2 can't be predicted in advance, but the individual ads,

3 each one of them comes right out of that ads database.

4 And I think if you look at the question and the answer

5 in context, you'll see what I actually -- what she

6 said -- omitted.

7     Q.   Okay.  So this is at Page -- this is from your

8 deposition on July 9 that she quoted, although -- that's

9 right.  And she quoted from Page 71, Lines 4 through 6;

10 is that right?

11     A.   That's right, uh-huh.

12     Q.   Now, if we expand that a little bit and take a

13 look at the actual question and answer, it started at

14 Page 70, Line 21 and goes through 71, Line 8.

15     A.   That's correct.

16     Q.   All right.

17           MR. FENSTER:  Let's put that up.

18 Okay.

19           MR. VERHOEZEN:  For the record, did we

20 have the date of the transcript?

21           MR. FENSTER:  July 9, 2010.

22     Q.   (By Mr. Fenster) So the actual full question

23 and answer was:

24           Question by Mr. White:  Do you understand that

25 the specific ads that are returned in response to a

query are only identified as the time the query is received?

And then it's repeated, and then your answer is:  Well, I -- I took -- I think they're -- they're identified, to the best of my current knowledge, after the query has been received as the -- as part of the rule-based and case-based processing that I discuss in my report.

So what does the full question and answer actually describe?

A.    It was plural.  I was asked by Mr. White:  Do you understand that the specific ads, in the plural, the whole set of ads -- could be as many as 11 or 12 of them -- are picked out in response to the query?  But I was never asked about an individual ad.

And so my answer -- if admission is the right word, I agreed that if you're going to get five ads, you don't know which of that set of five ads they're going to be.

But each of those five was stored as a predetermined response in the ads database.  It existed there before it was pulled out.

And I keep coming back to the fact that the actual claim language says one or more predetermined responses.

1    Q.   All right.  So every one of the predetermined

2  responses in your view, Dr. Rhyne, was in a database

3  prior to the receipt of that message?

4    A.   Yes.

5    Q.   And, Dr. Rhyne, may we check off Claim 26(c)

6  and finish the first of the prerequisites?

7    A.   We can.

8    Q.   Okay.  Now, the next claim upon which 30

9  depends -- and I apologize for the -- for leading you

10  through this step by step, but that's the way we've got

11  to do it.

12        So did you analyze Claim 28?

13    A.   I did.

14    Q.   And did you analyze whether the Google AdWords

15  systems meets Claim 28?

16    A.   I did.

17    Q.   And what did --

18          MR. FENSTER:  Let's take a look at 59.

19  59 is up there.

20    Q.   (By Mr. Fenster) So, first of all, what about

21  the preamble?

22    A.   The preamble just says that Claim 30 -- or 28

23  depends on Claim 26.  We've already looked at all of the

24  limitations of Claim 26.  I think they're all met, so we

25  can proceed to 28, Step (b1) and 28, Step (c).

1       Q.   Okay.   Now, 28(b1) is classifying the

2  electronic message.

3                  MR. FENSTER:  Let's go to No. 60, please.

4       Q.   (By Mr. Fenster) So all of the elements of 26

5  were met, so that's the preamble of 28, and now we're

6  moving on to (b1).  And (b1) it has two parts, so why

7  don't you walk us through the language of that.

8       A.   Sure.

9            It says:  Classifying the electronic message

10 as at least one of, and then there are two little

11 substeps, as I call them.

12           Step (i) is being able to be responded to

13 automatically; and Step (ii) is requiring assistance

14 from a human operator.

15           And the reason I underlined the at least one

16 is because it says you have to do one of these.  You

17 don't have to do both.

18           So I'd like to deal with the first one first

19 and then come back and deal with the second one, because

20 I consider them to be separate classifications.

21      Q.   Okay.

22                  MR. FENSTER:  So let's go to 61.

23      Q.   (By Mr. Fenster) And did you form an opinion

24 as to whether Google AdWords meets Step 28(b1)(i), which

25 is classifying the electronic message as at least one of

1  being able to be responded to automatically?

2      A.   Yes.

3      Q.   And tell us about the claim language in the

4  Court's construction.

5      A.   The Court construed classifying the electronic

6  message to mean determining whether the electronic

7  message falls into one or more categories.  And that's

8  what I've used.

9           One of those categories is responded to

10  automatically, and the other one is going to be

11  requiring assistance from a human operator.

12      Q.   And you -- and did you apply Court's claim

13  construction absolutely in your analysis?

14      A.   Yes, I did.

15      Q.   Okay.

16           MR. FENSTER:  So let's go to 62.

17      Q.   (By Mr. Fenster) And can you describe some of

18  the evidence that you found showing that Google AdWords

19  satisfies the classifying step in 28(b)(i) classifying

20  it as being able to be responded to automatically?

21      A.   Yes.  We had testimony again from Mr. Furrow

22  that explains my opinion -- the basis for my opinion

23  exactly.

24           And my opinion is this:  If they have a query

25  come in, and there are some ads that they can find that

sufficiently match that query, then they have classified

that query as being able to be responded to

automatically.  And they respond to it automatically by

sending the ads back.

But what happens if they get a query, and they

can't find any ads?  They search for them; they run out

of time; they run out of ads.  In that case, they've

classified that query as not being able to be responded

to automatically because they can't find any ads to

respond to automatically.

And this is what he said.  He was asked this

question:  If the google.com ad serving system

determines that there are no ads that it deems good

enough to serve in response to a query, then what?

He said -- Answer:  Then no ads will be

served.

Next question:  Okay.  And if it does

determine that there are some ads that it deems good

enough to serve in response to a query, then what?

And he said in answer:  In that case, the ads

will be served.

Q.   Now, how does that testimony show that Google

AdWords makes a classification as the Court construed

it?

A.   Well, they make a decision based on whether or

1  not they were able to find ads within a short period of

2  time, and they've determined that the message falls into

3  one of two categories in this case:  I have ads to

4  return automatically, or I don't have ads to return

5  automatically.

6      Q.   Okay.

7      A.   And if they have them, they do; and if they

8  don't have them, they don't.

9      Q.   Now, this is one example of the evidence that

10 you relied on.  Do you have additional evidence in --

11     A.   I do.

12     Q.   -- in Exhibit 161R?

13     A.   I do.

14     Q.   And, in fact, it looks like you have evidence

15 summarized on Pages 9 through 17 of that chart

16 summarizing the evidence that you found in support of

17 Step 28(b1); is that right?

18     A.   Yes, I believe that's correct.

19     Q.   All right.

20     A.   For the being able to being responded to

21 automatically, the (i) part.

22     Q.   Okay.

23          MR. FENSTER:  Now let's go to Slide 63.

24     Q.   (By Mr. Fenster) So did you find that Google

25 makes the first determination in (b1)(i)?

1       A.    Yes.

2       Q.    And is that determination alone enough to

3  check off 28(b1)?

4       A.    Yes.

5       Q.    Why is that?

6       A.    It says:  At least one of.  You don't have to

7  do both of these things.  You've met little -- 28(b1)

8  when you do either of those, and Google does the first,

9  and they do it on time.

10      Q.    Now, does Google AdWords do the classification

11 step in (b1)(i) classifying it as being able to be

12 responded to automatically or not before it performs

13 Step (c)?

14      A.    Yes.

15      Q.    All right.  Now let's go on -- did you also

16 analyze -- even though that's enough for (b1), did you

17 also analyze whether Google also meets the

18 classification step in (b1)(ii)?

19      A.    I did, requiring assistance from a human.

20      Q.    All right.  And what does that mean?

21      A.    Well, we've got a court construction.

22            MR. FENSTER:  64, please.

23      A.    The Court said:  Requiring assistance from a

24 human operator means requiring that a manual reviewer

25 review the electronic message or information derived

1  from the electronic message or review, revise, or

2  compose the response to be delivered to the source.

3  And out of those choices, what I found that Google does

4  is the first one.  They classify certain queries,

5  certain non-interactive electronic messages, as

6  requiring that a manual reviewer review the message or

7  information derived from the message.

8      Q.   (By Mr. Fenster) Okay.  And can you give us

9  some of the evidence that you found --

10             THE COURT:  Well, before you do that,

11  we're going to take our afternoon recess.

12             Ladies and Gentlemen, be back ready to

13  come in the courtroom at 3:20 this afternoon.  Take 20

14  minutes.  Remember my prior instructions.  Don't talk

15  about the case.

16             LAW CLERK:  All rise.

17             (Jury out.)

18             THE COURT:  Step down.

19             Y'all have a seat.

20             Mr. Perlson, what's your view, while

21  we're on this recess, as to going back to the order of

22  steps in Claim 28?

23             MR. PERLSON:  Uh-huh.

24             THE COURT:  If the classification is made

25  under (b-2) -- or (b1)(i) -- (ii).

1          MR. PERLSON:  Okay.

2               THE COURT:  The second set.

3          MR. PERLSON:  The second one, yeah, yeah,

4    yeah.  Okay.

5               THE COURT:  What's your view as to

6    whether there has to be retrieval for infringement to

7    occur at all, retrieval at all?

8               MR. PERLSON:  Well -- well, if -- if

9    26(c) is -- is part of it, which they went over, it

10   would seem that you would still need to do a retrieval.

11   It's not entirely clear, frankly, as to whether you

12   need -- whether you need retrieval under (c), but that

13   reading essentially would mean that when there's a

14   human, then 28(c) would eclipse 26(c), and 26(c)

15   wouldn't exist.

16               THE COURT:  That's right.  You answered

17   my question, given the language of 26 -- or 28(c).

18               MR. PERLSON:  Well, part of the inherent

19   ambiguity in the -- in the claim itself.  I actually --

20   I don't think it's clear.  I don't think there's an

21   answer to the question.  But I do think that the

22   classification, whenever it occurs, needs to be before

23   (c).

24               So you need to --

25               THE COURT:  To the extent (c) is required

1  under that prong in the classification.

2         I'll give on you -- I'll give you a

3  written order as quick as I can on the claim

4  construction.  I understand your argument.

5         I'll see you at 3:20.

6         LAW CLERK:  All rise.

7         (Recess.)

8         (Jury in.)

9         THE COURT:  Please be seated.

10         Continue.

11    Q.   (By Mr. Fenster) All right.  Dr. Rhyne, if we

12  could look at Rhyne Exhibit 64, I think that we were

13  talking about Step 28(b1)(ii).  That's what we were

14  about to talk about?

15    A.   Yes, sir.

16    Q.   All right.  So tell us what this claim step

17  requires and what the -- did we already go through the

18  Court's claim construction on that?

19         Why don't you remind us.

20    A.   I think we did.

21         Okay.  But it basically just says that when

22  you do this path, classifying the electronic message as

23  requiring assistance from a human operator, you have to

24  classify it into one of two categories.

25         Those categories are, it does require

assistance from a human operator or it doesn't.  Then

what that -- if you do fall into the requiring

assistance category, Judge Everingham said that means

requiring that a manual reviewer review the electronic

message or information derived from the electronic

message.

And that's the part of the -- he has some or

some other stuff, but that's the part that I've relied

on.

Q.   All right.  And you found that -- did you

form -- did you form an opinion as to whether Google

AdWords meets 28(b1)(ii) classifying as requiring human

assistance?

A.   I did.

Q.   Okay.

MR. FENSTER:  And could we go to

Slide 55, please?

Q.   (By Mr. Fenster) Now, what does Slide 55 show?

A.   Well, it talks about something that they call

query/impression spam right up here at the top, okay?

And I need to tell you a little bit about what

this is.

When you start putting ads on the -- on the

open internet, not everybody plays the game fair, okay?

And some of these people who are putting up

advertisements are bitter competitors with each other.

And they can do things like there's this thing called

clickspam, which I'm not really going to deal with in my

infringement analysis, but I'll just take a moment to

tell you about it.

If you see your opponents ad, you can go click

on it, and every time you click on it, you cost them a

little bit, typically 25 cents to a dollar.  Sometimes

in political campaigns, it's been known that candidates

will open up a website, and their opponent will get one

of their supporters to sit there all day long and click

on their opponent's website, if they have an ad up, just

to charge them a bunch of money.

And one of the things that happens is most

people will put a limit as to how much they're willing

to pay per day, and when they get up to that limit,

their ad doesn't show.  So that's clickspam.

Impression spam is a little trickier.  It's a

situation where you come up with a query that is so

precisely organized that it generally brings up a

specific ad.  It's either maybe your ad or you can do

impression spam with your competitor's ad.

Let's say it's yours.  If you can get somebody

to sit there all day -- and they call this robotic -- if

they just sit there and enter that query and enter that

query and they keep bringing up your ad, and every time they bring it up they go click on it, one of the things you'll see in a minute is that they judge ads based on what's called their clickability.

If an ad when it's shown to somebody gets clicked on, that's an attractive ad, and that means that Google will make money, the advertiser hopefully will make money. So they'd rather show an ad that's going to get clicked on than some ad that's just not very popular and attractive.

Well, you can make your ad look more attractive by entering that query. And an impression means that they show the ad to somebody. So an ad impression means I put it on the screen.

So every time it impresses and you go click on it, your clickability ratio goes up. You look more popular, more attractive.

You can do it the other way around with your opponent. You can bring up their ad on a query and not click on it. And theirs looks less popular and gets pushed down. So they're looking for this.

You can see here it says at the top here: Spammer -- spam -- query/impression spam: A spammer enters a query designed to have specific ads shown and so inflate the impression rate. Some advertisers

1    impression spam a competitor to reduce the competitor's

2    effective CTR -- that's an acronym for click-through

3    rate -- thus lowering the competitor's position in the

4    rankings.

5            Now, they do several different ways of trying

6    to detect this kind of spam.  They have --

7            THE COURT:  Dr. Rhyne, let me interrupt

8    you.  I know you know a lot about this, but we need to

9    proceed in question and answer --

10           THE WITNESS:  I apologize.

11           THE COURT:  -- as opposed to a narrative.

12           THE WITNESS:  I should know that better,

13   Your Honor.  I apologize.

14           THE COURT:  Let's try to shorten your

15   answers, all right?

16       Q.   (By Mr. Fenster) Let me ask.  So now, does

17   Google AdWords classify messages as requiring human

18   assistance?

19       A.   Yes.

20       Q.   And how do they do that?

21       A.   They do that through offline filtering to

22   detect impression spam.

23       Q.   Okay.  Now, does this -- does the filtering

24   happen automatically by the computer?

25       A.   Yes.

1     Q.   Okay.   So the computer system, the AdWord

2 system, automatically classifies the messages as

3 requiring human assistance?

4     A.   Yes.

5     Q.   But you said that happens offline.

6          What does that mean?

7     A.   They don't do it while the ads are being

8 displayed, but they log a bunch of information about

9 what's going on all the time, what queries came in, what

10 ads are being shown, which ads got clicked on.

11         And they run filters against those data.   And

12 if they find certain conditions in those data as a

13 result of their offline filtering, they say, you know,

14 that's probably impression spam, and that's where they

15 make this classification.

16     Q.   Now, you have a citation here.   The source for

17 this particular evidence is Plaintiff's Exhibit 405.

18         And that's in evidence?

19     A.   Yes, it is.

20     Q.   And that supported your conclusion that Google

21 AdWords meets 28(b1)(ii)?

22     A.   Yes.   In particular, the quote that's there

23 about offline filtering.

24     Q.   Okay.   Now, did you find any other evidence,

25 any testimonial evidence from the engineers that

supported your conclusion that Google classifies its

messages as requiring human assistance?

    A.   Yes, I did.

          MR. FENSTER:  And let's go to 66, please.

    Q.   (By Mr. Fenster) And this is a quotation from

the Rudys deposition; is that right?

    A.   Yes, a gentleman named Algis Rudys.

    Q.   And who's Algis Rudys?

    A.   He's an engineer with Google.

    Q.   Okay.  And this is a quote from his deposition

at Lines (sic) 35, 1 to 5, Page 35, Lines 14 through 17,

and Page 36, Lines 12 to 16.

    A.   Yes.

    Q.   Okay.  And what did he say?

    A.   Well, he was talking about an e-mail-based

monitoring system that they call -- their internal name

for it is Borgmon.  And he asked this question:  Does

it -- meaning that e-mail monitoring system -- does it

provide alerts related to ad spam events for statistics?

          His answer was:  It does.

          Later, he was asked:  And -- and who does that

alert go to?

          And he said:  Our team has a pager carrier, so

that individual gets paged in some cases.  In other

cases, it's sent to an e-mail list, a mailing list,

which is monitored by the same person.

Q. All right. So, Dr. Ryan, may I put -- did you find that Google meets Claim Element 28(b1)(ii)?

A. Yes.

Q. All right. Now, this is important. You found that Google meets both (b1)(i) and (ii); is that right?

A. Yes.

Q. So they perform both classifications?

A. Yes.

Q. Now, in order to infringe Claim 28, do they only have to do one, or do they have to do both?

A. Only one.

Q. Okay. Now, with respect to the first classification, (i), being able to determine or responding to automatically.

Now, you testified earlier that that step is performed before Step (c)?

A. Yes.

Q. Now, is Step (ii) performed before or after Step (c)?

A. After.

Q. Okay. So, Ladies and Gentlemen and Dr. Rhyne, if the Court's claim construction and instructions to the jury require Step (b1) to be performed before Step (c), do they meet -- does Google AdWords meet that

1   limitation?

2        A.   Yes.

3        Q.   Based on what?

4        A.   On their classifying the electronic message as

5   at least one of (i) being able to be responded to

6   automatically.

7        Q.   Okay.  So if the Court determines that the

8   claim construction requires (b1) to be performed before

9   (c), then which of those classifications will support an

10  infringement finding?

11       A.   (i) being able to be responded to

12  automatically.

13       Q.   Only that one?

14       A.   Yes.  The other one is not done before (c).

15       Q.   Okay.  And if -- if the Court determines that

16  Step (b1)(ii) does not have to be determined or be done

17  before Step (c), it could be determined -- it could be

18  done at any time, then do you find infringement?

19       A.   Under that alternate, yes.

20            Google does classify electronic messages as

21  requiring assistance from a human operator, but they

22  don't do it before (c).  So that would be infringement

23  only if the Court decides that 28(b1)(ii) can be done

24  later.

25       Q.   Okay.  So depending on how the Court construes

1 Claim 28 and whether (b1)(ii) has to be performed before

2 Step (c) or not, you find infringement either by the

3 classification of one or both (i) and (ii); is that

4 right?

5     A.   The way I would say it is, depending on what

6 the Court does, they either infringe it once, or they

7 infringe it twice in two different ways.

8     Q.   All right.  Did you reach any conclusions as

9 to whether or not the Google AdWord system meets 28(c)?

10     A.   Yes.

11     Q.   And what is that claim -- what does that claim

12 require?

13     A.   Well, it's very much like the 28 -- excuse

14 me -- 26(c) that we saw before, except at the very end.

15 The first part is word-for-word the same:  Retrieving

16 one or more predetermined messages corresponding to the

17 interpretation of the electronic message from a

18 repository for automatic delivery to the source.  That's

19 the same as 26(c).

20         But then they add this when requirement.  When

21 the classification step indicates that the electronic

22 message can be responded to automatically.

23     Q.   Okay.  What does that mean?

24     A.   Well, it means that when you do 28(b1)(i) and

25 classify the message as being able to be responded to

1   automatically, then clause (c) -- Step (c) comes in, and

2   it just says, in that case, you'd better do the

3   classification before you do the retrieval.

4          And then you just have to retrieve it, but you

5   retrieve it for a specific purpose.  You retrieve it for

6   automatic delivery to the source, just like was the case

7   in 26(c).

8       Q.   And just as you relied on the deposition of

9   Google's own engineer, Mr. Bartholomew Furrow, whose

10  deposition I took, to support 26(c), did his testimony

11  also support 28(c)?

12      A.   Yes.  I think I repeated that.

13      Q.   Okay.  And so this, Ladies and Gentlemen, is

14  from the Furrow deposition at Page 17, Lines 20 through

15  18 at 9 -- 18, Line 9.  Sorry.

16         And we already read this into the record, and

17  this supports your finding with respect to Claim 28(c)?

18      A.   Yes.

19      Q.   All right.  So did you find that Claim 28(c)

20  is met?

21      A.   Yes.

22      Q.   Now, we finally get to the claims at issue in

23  this case.

24         Okay.  So let's take a look at Claim 30.  And

25  did you reach any conclusion whether Google AdWords

satisfies all the elements of Claim 30 of the Rice

patent?

    A.   Yes, I have.

    Q.   All right.  So let's start with the preamble.

        Did you find that the preamble is met?

    A.   Yes.  I carefully have taken -- at least I've

explained my opinion that all the steps of Claim 26 are

met as they relate to Claim 28.

        So now the preamble of Claim 30 simply says

the method of Claim 28 wherein the step of interpreting

the electronic message further includes, and now we have

six more steps.

    Q.   All right.  Well, let's start with the first

step, 30(b1).

        What does that step require?

    A.   Well, if we go to Slide 72, here's the Court's

construction of the term case model.  The limitation

says producing a case model of the electronic message

including, first, a set of attributes for identifying

the specific features of the message, and, second, the

message text.

        And the Court has said that a case model of

the electronic message means text and attributes derived

from the electronic message.

    Q.   Okay.  So Claim (b1) (sic) requires producing

1  a case model of the electronic message.

2       Now, the electronic message was the search

3  request of the http message, right?

4       A.   It's hard to say that.  Yes, it is.

5       Q.   All right.  So what 20 -- what 30(b1) requires

6  as producing a case model of the search request and the

7  case model, according to the Court's construction, means

8  text and attributes derived from the electronic message?

9       A.   Yes.

10      Q.   Now, did you find any evidence that Google

11 AdWords meets 28(b1)?

12      A.   I did.

13           If we could for a moment, before we go there,

14 I think it would be useful, to me at least, to go back

15 to 42 for a moment.  That's where we showed that http

16 request.  We had it blown up at the top.

17           Okay.  This is the message.  This is the

18 non-interactive electronic message.  And the text that

19 we will derive from the message is pizza, okay?  Up in

20 the middle there, it says and query -- and Q equals

21 pizza, et cetera.

22           Then I mentioned that other parts of this

23 message tell you things like what language is the person

24 using, where are they, and those types of things.  And

25 those are the attributes that we would be looking at.

And what happens is they will read through this http --

they meaning Google -- and pull out the text, the pizza,

and the other information, and that's -- that's what

I've been pointing to as text and attributes derived

from the electronic message.

Q.   Okay.  And did you find any testimony from the

deposition of Google's engineers that supported your

finding that Google does produce a case model of the

search request?

A.   Yes.  This is Mr. Furrow.

Q.   And this is on page -- or Slide 73?

A.   Yes.  Mr. Furrow at Pages 52 and 53.

Q.   And he says -- the question is:  Generally

speaking, is it fair to say that some of the generated

attributes can relate to the text of either the ad, the

query, or both?

ANSWER:  Yes.

QUESTION:  And is it fair to say that,

generally, the attributes can relate to information

other than the text related to either the query, the ad,

or both?

And Mr. Furrow answered:  Yes.

Now, how does that testimony support your

finding that Google produces a case model of the search

request?

1    A.   Google developed something they call features,

2  and they use the features to generate attributes.  And

3  those features in particular relate both to the text of

4  the message, which they pull out and identify, as well

5  as other attributes such as the keywords and the --

6  excuse me -- in the message that text is the keywords.

7  But they get other attributes, such as location,

8  language, possibly such things as -- well, SafeSearch is

9  on, so they don't want adult ads and things like that.

10  Those are the things that they pull out.

11    Q.   Now, Dr. Rhyne, did you find anything in

12  Google's source code that supported your conclusion that

13  Google AdWords produces a case model as the Court's

14  construed it for that search request?

15    A.   I did.

16    Q.   And is that in your summary chart?

17    A.   Yes, it is.

18    Q.   And where is that?

19    A.   I have a different version from the one that

20  you have, so you're going to have to help me with the

21  Bates numbers.  But it's a set opposite the producing a

22  case model of the electronic message, including the

23  attributes.

24         And it talks about the Gilbert document.  It

25  talks about other parts of the Furrow deposition.  And

1  then later down, it talks about a software object that

2  they create called the Ad request object and the query

3  event message.  It identifies that software and

4  describes that part of the text.

5        And then there's a site to a Google document

6  at GOOG0008357 as well.

7     Q.   All right.  So we've got the Google site up

8  here?

9     A.   Uh-huh.  If you go down past the reference to

10 Furrow, there's a paragraph that says -- okay.

11        There you see it, ad request object fields.  I

12 mentioned the query event message, and that's a

13 particular piece of software.  And that last little

14 reference to the AdMixer server, AdMixer control flow.cc

15 is -- it says set geographic -- it says geo --

16 geographic location data into query event object.

17 That's our reference.

18     Q.   So, Dr. Rhyne, these are citations to Google's

19 actual source code?

20     A.   Yes.

21     Q.   And their source code -- and you found

22 evidence in their source code showing that they produced

23 a case model, including text and attributes, for the

24 search request?

25     A.   Yes.

1    Q.   So did you find that Claim 30(b1) is met by

2  Google's AdWords?

3    A.   I did.

4         MR. FENSTER:  Can we go back and take a

5  look at No. 2?

6    Q.   (By Mr. Fenster) Did you find that (b2) was

7  met?

8    A.   Yes.  The language here is detecting at least

9  one of text, combinations of texts, and patterns of text

10 of the electronic message using character matching.

11   Q.   And did you find any evidence from the Google

12 engineers that supported your findings here?

13   A.   I found a particular question and answer from

14 Mr. Menzel.

15        MR. FENSTER:  75.

16   A.   This is from his deposition at Page 29, Lines

17 5 through 15.

18   Q.   (By Mr. Fenster) And the question was:  So in

19 the end, is it true that the Google Query Rewrite does a

20 character-by-character analysis?

21        ANSWER:  So I think that -- so I won't -- I

22 won't just say yes, because it's a weird -- it's a weird

23 question, because -- so I'll say here's my -- my

24 statement is we do.  We do character-by-character to the

25 extent that we also do byte-by-byte, because that's the

1   way that a computer work -- computers work.

2           Now, what does that testimony mean and how

3   does it support your conclusion with respect to 30(b2)?

4       A.   Well, characters are like the letters or

5   punctuation or numbers that you have in a message.  And

6   he's agreeing that they work their way across the

7   message character-by-character when they do some of that

8   Query Rewrite clean-up that we talked about earlier.

9       Q.   Now, do you have some examples of how Google

10  does character matching to meet 30(b2)?

11      A.   Yes.

12                  MR. FENSTER:  76, please.

13      Q.   (By Mr. Fenster) What did you find?

14      A.   The examples that we talked about before

15  include detecting plurals, and they do that by analyzing

16  the endings of words.  Sometimes it's just an S;

17  sometimes like with puppy, it changes a Y to an I-E.

18  They detect relating words.  We mentioned that.  They

19  detect these stop words like the dog, changing it to

20  dog.  But, again, they have sophisticated stop word

21  detection that can recognize when a word that might be a

22  stop word in a different context is not a stop word

23  here.  And all of that involves character analysis.

24      Q.   Okay.  So did you find, based on your analysis

25  of the evidence regarding Google AdWords, that Google

1  does meet 30(b2)?

2     A.   Yes, I did.

3     Q.   All right.  Can you tell us your conclusions

4  with respect to 30(b3)?

5     A.   Okay.  30(b3) reads as follows:  Flagging the

6  attributes of the case model which are detected in the

7  electronic message.

8     Q.   Okay.  Now, so what does it mean to flag the

9  attributes of the case model which are detected in the

10  electronic message?

11     A.   Okay.  That message came in with all that

12  complex letters and numbers and symbols and --

13     Q.   This is the http request you're talking about?

14     A.   Yes.  The http request that we looked at has

15  what are called keyword value pairs.  There are certain

16  things in there that say here's a keyword and I've got

17  to value -- like there's some particular part of that

18  message that says the querying individual uses the

19  English language as opposed to French or Italian or

20  something.

21          And that's what -- when they go in and find

22  those kinds of characteristics from the message itself

23  and extract them and place them in a software object,

24  they are flagging -- I write identifying and marking the

25  attributes of the case model.



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

Q.   Now, this is just one example of the source code from Plaintiff's Exhibit 603; is that right?

A.   Yes.

Q.   Now, what is Exhibit 603, which is in evidence?

A.   It's about six pages -- five or six pages that list a lot of these combinations of features, which Google refers to as attribute templates.  I've had to be kind of careful, because the claims talk about attributes, and Google talks about attributes.  And I've tried to be very careful not to mix that.

Q.   So let me just clarify that, and I'm sorry to interrupt.

So which is it from Google that meets -- that matches up with the attributes language, the requirement for attributes in the claim?  Is it the feature -- is it the Google's feature or their attributes?

A.   Interestingly enough, it's not what Google calls attributes that are the attributes that I've identified, but it's what Google calls feature templates and specific values for the features.

**REDACTED BY ORDER OF THE COURT**

Q.    So there are other examples in Exhibit 603 in the source code showing examples where Google is flagging the attributes of the http request?

A.    Yes.  And that request meets the

1  non-interactive electronic message definition that the

2  Court gave.

3      Q.  Dr. Rhyne, this is an important element.  And

4  so, if you don't mind --

5              MR. FENSTER:  Ladies and Gentlemen, I

6  apologize.

7      Q.  (By Mr. Fenster) But I actually want to go

8  through the source material and the evidence that you

9  found that supports Claim Element 30(b3), flagging the

10  attributes, so...

11      A.  Can I ask if I can get a copy of 161R?

12  I'm --

13      Q.  Oh, sure.

14      A.  I'm unarmed here.

15      Q.  Let me give you --

16              MR. FENSTER:  May I approach?

17              THE COURT:  Yes.

18      A.  Thank you.  I have something very similar, but

19  my page references are different.

20      Q.  (By Mr. Fenster) Okay.  So this is from

21  Exhibit 161R, and we're at Page 21.  And pardon our

22  messy handwriting.

23          Okay.  So this is the evidence that -- a

24  summary of the evidence that you relied on in finding

25  that 30(b3) was met?

1    A.   Yes.

2    Q.   So first there's a reference to Bauer.

3    A.   Uh-huh.

4    Q.   Bates No. GOOG7825, and that's in Exhibit 422.

5 Did that support your finding?

6    A.   Yes.  That's -- I believe that's a document,

7 okay, as I recall.

8    Q.   Right.  And then there's another one at -- I'm

9 going to call it GOOG, G-O-O-G, 6461, and that's in

10 Exhibit 768, which is in evidence.

11    A.   Right.  And that one refers to -- describes

12 the distinction between attribute/keys and features.

13 Again, that's that Google terminology, okay?

14    Q.   And then you have a lot of citations to Google

15 depositions.

16    A.   Yes.

17    Q.   You have Furrow deposition, Exhibit 20.  This

18 was an exhibit from Mr. Furrow's deposition?

19    A.   Yes.  I'm fairly certain that that is -- we've

20 had a couple of copies of that attribute-templates.gcl.

21 And this is one that was produced during his deposition.

22    Q.   Okay.  And then you cite an Exhibit 4 to the

23 Wright deposition?

24    A.   Yes.

25    ■■   ■■   **REDACTED BY ORDER OF THE COURT**

**REDACTED BY ORDER OF THE COURT**

Q.    Yes, right here?

A.    Uh-huh.

Q.    Okay.  And then we have some more source code

cited and circled in red here.

Did that support -- did you find evidence of

flagging of attributes of the search request there?

A.    Yes.  To be -- you know, it's not the kind of

thing I can keep in my head, but I remember when we made

these cites, but they basically were -- it's a section

of some C++ code that deals with selecting and combining

features in a function called get impression keys --

Q.    Okay.

A.    -- which deals with the message -- excuse

me -- with the ad and the message, I think.

1    Q.   Okay.  Now, as I said, this is kind of an

2  important element.  Google disputes infringement here.

3  So let's continue through the evidence that supports

4  this.

5             So this was the first page --

6    A.   Okay.

7

8             REDACTED BY ORDER OF THE COURT

9

10

11

12

13

14

15

16    Q.   Okay.

17             MR. FENSTER:  And that's in Exhibit 401,

18  Ladies and Gentlemen, and that's in evidence as well.

19    Q.   (By Mr. Fenster) There are other citations.

20  There's a response to a first interrogatory.

21             Now, what's an interrogatory?

22    A.   If I'm the right person to answer that, I'll

23  tell you what I understand.

24    Q.   Sure.

25    A.   It's more of a legal thing.  It's my

understanding that the parties to a lawsuit like this

can file requests for information with each other under

the auspices of the Court, and they're called

interrogatories.

And they say would you list all of the things

you know about this or who was the most important person

to talk to about that.

And this was a response to a first set of

interrogatories that I gather was sent from Bright

Response to Google to be filled out.  And they were

asked -- and in their answer, they defined a couple of

things, particularly clickthrough rate and SmartASS and

more, okay?

Q.    Thank you, Dr. Rhyne.

So -- and these are -- do you understand that

interrogatory responses are verified under oath by a

corporate representative of Google?

A.    That's correct.  Somebody has to sign on

behalf of Google officially.  I'm -- this kind of a guy,

I have this authority, and these are correct.

Q.    Okay.  So their answers under oath to Bright

Response's interrogatories supported your conclusion

that 30(b3) was met; is that right?

A.    They just gave me additional information about

clickthrough rate and what they call SmartASS.

1      Q.   Now, this is the third page of evidence that

2  you have cited in your report, and this is quoting --

3  let's go to the next page -- from Exhibit 768, which is

4  in evidence.

5           And there's a question and answer that was

6  quoted from that page that supported your finding?

7      A.   Okay.  Yeah, I don't -- I see 768.  This is

8  Google document, right?

9      Q.   Yes.

10      A.   To Doug Vail?

11      Q.   We don't have the exhibits in there, but it's

12  GOOG6458?

13      A.   Yes.

14      Q.   And I'll represent that that is from

15  Exhibit 768, and you've got a citation to 97199.  We saw

16  that earlier.  That was Exhibit 481, and No. 7 -- and

17  7823, which was Exhibit 422.

18      A.   Okay.

19      Q.   So that summarizes the evidence that led you

20  to conclude that Google had met 30(b3)?

21      A.   Yes.

22      Q.   So can we check that off?

23      A.   You certainly can.

24      Q.   Okay.  Then -- now, (b4) is another important

25  element.  This is comparing the flagged attributes of

the case model with the stored attributes of a stored case model of the case base.

So did you find that Google meets the elements -- Google AdWords meets the element of 30(b4)?

A.    I did.

Q.    And what is -- what's your understanding of what 30(b4) requires?

A.    It requires that you first produce a case model; that you flag the attributes of the case model; that you have a set of stored case models in the case base, which have attributes; and that you compare the attributes between the messages attributes and the attributes of the stored case model.

The purpose of doing that is not set forth here, but, generally, that's done to try to find ads that match the query based on attributes.  Later, we'll look at text, but that's what they do.

Q.    All right.  You know, we haven't actually walked through this claim language, and you said it earlier.  And I apologize to the Ladies and Gentlemen. Ladies and Gentlemen.  I think it was my oversight. This is -- these are steps in a method?

A.    Yes.

Q.    All right.  So let's just walk through the overview what these steps are and what it requires.

So first you produce -- this is in 30(b1), okay?  So
30(b1) requires producing a case model of the electronic
message that includes a set of text messages.

Now, you testified earlier that this is on the
search request side --

A.  Yes.

Q.  -- right?

So you take the search request; you get it
from the user?

A.  Yes.

Q.  And then you extract text and attributes from
that, and you create a case model, which is the case
model of the electronic message?

A.  And the Court said that those are text and
attributes extracted from the message, like pizza and
Marshall, okay?  Location or country, USA and Texas
Rangers.

Q.  Okay.  And step (b2) is detecting at least one
of text, combinations of text.

Now, this is detecting text in the -- from
what?

A.  From the message, okay?

Q.  Okay.  And then Step (3) requires flagging
attributes, and you've talked about the different
attributes that were in the http message --

1    A.   Okay.

2    Q.   -- that were flagged.

3    A.   Well, you flag them when you identify them and

4  move them over to make a feature, okay?  They're in the

5  message, but when Google's software looks through that

6  complex http message and comes down and say, okay, I've

7  got the country.

8         It's not quite that obvious looking at the

9  message itself.

10   Q.   Okay.  So Steps (1) through (3) you're dealing

11 all with the http message, right?

12   A.   Yes.

13   Q.   Okay.  So by the time you get to Step (3) in

14 the method, you have extracted text and attributes from

15 the query from the search request; is that right?

16   A.   Yes.

17   Q.   All right.  Now, let's get to 30(b4), and that

18 requires comparing the flagged attributes of the case

19 model -- so that's the text and attributes that were

20 pulled from the http request -- and comparing that with

21 stored attributes of stored case models of the case

22 base.

23        All right.  So now we're comparing that to

24 something on the -- related to the ads?

25   A.   Right.  This is where you make the cross or

the combination in comparing -- something about the

message to something about a potential ad that you might

want to send back ultimately with that message.

Q.   Now, remember earlier, we distinguished

between comparing to the ad and comparing to information

about the ad?

A.   Yes.

Q.   And is that what this step relates to?

A.   Information about the ad.

Q.   Okay.  So you're comparing attributes from the

case models of the http message with attributes of

the -- of the stored case model, which is the -- relate

to the ad?

A.   Yes.

Q.   So did you find that Google does step 30(b4)?

A.   Yes.

MR. FENSTER:  And can we turn to No.

80, please?

Q.   (By Mr. Fenster) Okay.  So did you find

evidence in the source code for Step 30(b4)?

A.   Yes.

Q.   And what is that?

**REDACTED BY ORDER OF THE COURT**



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

4    Q.    And they're comparing that --

5                THE COURT:  Excuse me.

6                Yes?

7                MR. VERHOEVEN:  I was just going to

8    object to leading.  He didn't finish the question, so

9    I --

10               THE COURT:  I understand.  Avoid leading.

11               MR. FENSTER:  Yes.  Thank you, Your

12   Honor.

22   Q.    Okay.  Thank you for pointing that out.

23           So where in the Google AdWord system is the

24   comparison step of 30(b4) met?

25           You just said it was met in the SmartASS

1  Selection --

2      A.   It is.  It is.  And the only reason I pause is

3  that we already looked at a comparison of keywords that

4  was done in AdMixer, and I don't want to discount that.

5      Q.   Okay.

6      A.   Because there they're comparing and there's a

7  case-based knowledge engine there.

8          But now we're talking about the specific

9  software that's running in SASS.  And that's a second

10 place where a comparison is done, but this kind of

11 comparison wasn't done up in AdMixer.  ███ ██ █

12 ████████

13      ██    **REDACTED BY ORDER OF THE COURT**

14 ██  ██ ██████ ████ █████ ██ ██████

15     Q.   But did you find evidence that Google -- that

16 the AdMixer in Google AdWord is also meeting 30(b4)?

17     A.   If I said that in my report, I did, but I

18 don't remember saying that.

19          I think I focused at this point for Claim 30

20 on SASS, whereas for Claims 28 -- I would have to go

21 back and look at my report.

22     Q.   All right.  We'll walk through Exhibit 161 as

23 well.

24     A.   It may be -- I don't think I ever looked at

25 30(b4) for AdMixer in the context of all of Claim 30

1  with the scoring and things like that.

2       Q.    Got it.  You're right.

3       A.    Okay.

4       Q.    So -- now -- so we went through one example in

5  SmartAd Selection Server where -- from the source code

6  where Google compared the attributes.

7             Is that the only example?

8       A.    Of attributes?

9       Q.    I don't mean is -- I don't mean is that the

10 only example you give.  Is that the only place where

11 they do it?

12      A.    No.  I think that if we look at that full list

13 of attributes and features in that place -- and I think

14 maybe I had an alternate name for that list -- there are

15 others.

16      Q.    Okay.  And that list of attributes is in

17 Exhibit 603?

18      A.    Yes.

19      Q.     Now, an attribute -- these are attributes,

20 right?

21      A.    The things between the square brackets are

22 what they call attribute templates made up of feature

23 templates.  When you plug in feature values, you get an

24 attribute value.

25      Q.    Okay.  Now, this is important.  This is what

1 Google calls an attribute, and in Google's vernacular,

2 an attribute is comprised of a couple of features,

3 right?

4             MR. VERHOEVEN:  Objection, leading.

5             THE COURT:  Sustained.

6     Q.   (By Mr. Fenster) So when -- does the

7 attribute -- does the definition of the attribute

8 compare the features that are in that attribute?

9     A.   Yes.

10             MR. VERHOEVEN:  Same objection.

11             THE COURT:  The objection is overruled.

12     Q.   (By Mr. Fenster) Now, Dr. Rhyne, we'll hear

13 some testimony later from Google engineers.  Google

14 engineers actually dispute that this is a comparison.

15 They dispute that these attributes are compared.

16             What's your response?

17     A.   Well, I think I can understand why they are

18 very careful at choosing their wording.

19             I mean, basically what Google is going to do

20 with that information is come up with an estimate that

21 we're going to talk about in a little bit called an odds

22 multiplier that's going to say, for that combination of

23 conditions, one from the message and one from the ad,

24 what's the likelihood that that ad is going to be

25 clicked on.

1    And that -- that information, that data says,
2  if I put these two things together, how good is it.  And
3  to me, that's a comparison between -- it's a situation
4  where somebody entered a query from the United States
5  and somebody's trying to match it to an ad from the
6  United States.

7    And I -- I can't think of it as anything but a
8  query -- excuse me -- a comparison.  That's what it is.

9    Q.   Let me lead you through, if I can, Exhibit 161
10  just to identify the evidence for the record.

11    THE COURT:  Let's do it without leading
12  questions.

13    THE WITNESS:  I thought that was a bad
14  choice of words.

15    Q.   (By Mr. Fenster) Can you summarize -- okay.

16    So what is on Page 24 of Exhibit 161R in terms
17  of the evidence that you relied on?

18    A.   Okay.  I had a longer quote from Mr. Furrow.
19  I had a cite to the version of that little
20  attribute-templates.gcl that was produced during his
21  deposition.  I had another quote and another quote from
22  Mr. Furrow.  Then I had a cite.

23    Q.   Dr. Rhyne, let me just, if I can, read the
24  evidence that you relied on, because this relates to the
25  attributes and features.

1   So this is from the Furrow deposition as
2 Exhibit -- or at Page 86?
3   A.   Yes.
4   Q.   QUESTION:  Earlier, you defined attribute
5 templates as -- as combinations of feature templates; is
6 that right?
7        ANSWER:  That's correct.
8        QUESTION:  And is it the case that attributes
9 can include combinations of features that relate only to
10 the query with features that relate only to the ad?
11       ANSWER:  Yes.  Excuse me.  You said attributes
12 that contain features that relate only to the query and
13 features that relate only to the ad?
14       QUESTION:  Yes.
15       ANSWER:  Yes; that's correct.
16       And so what is Mr. Furrow, Google's engineer,
17 saying there in terms of the -- of his testimony?
18   A.   That Google does create attributes, as they
19 call them, that have features, one of which -- at least
20 one of which came from the message, the query, and at
21 least one of which dealt with the advertisement and some
22 characteristics of it.
23   Q.   And what other evidence do you have cited that
24 you relied on in 161R?
25   A.   Well, the next little paragraph is that

attribute templates listing.  The next was another

question and answer of Mr. Furrow.

Q.  Now, this is from his deposition at Pages 126

to 135; is that right?

A.  Yes.

Q.  And the question was:  So Google maintains

information about past query impression pairs, correct?

ANSWER:  Yes.

Later question:  So during training, Google

generates attributes using attribute templates and

features created during flagging -- flogging -- excuse

me -- for past query impression pairs; is that right?

ANSWER:  That's correct.

Now, what is Dr. -- what is Mr. Furrow's

testimony saying here?

A.  Well, the first thing is you need to

understand what a query impression pair is.  That's a

search message that came in; that's the query.  And an

impression is an ad that would be shown in response to

that query.

And he's saying, yeah, Google keeps

information about them, and that's going to end up being

this thing we're going to call an odds multiplier.  It's

a statistical relevance of those two things occurring

together.

1    Q.   Let me just skip ahead in the interest of

2    time.

3         You have a citation to the document 97199,

4    which we saw was Exhibit 401.

5         Does that support your conclusion with respect

6    to 30(b4)?

7    A.   That's the Gilbert document, yes, sir.

8    Q.   All right.  So did you -- can we check off

9    30(b4)?

10   A.   Yes.

11   Q.   All right.  So -- 30(b4) was comparing the

12   flagged attributes.  What does 30(b5) compare?

13   A.   It's text-comparing, comparing the text of the

14   case model which is what we got from the message with

15   stored text of the stored case models of the case base.

16   Q.   And did you find evidence that Google does

17   this?

18   A.   Yes, in SASS.

19   Q.   Okay.  And this is --

20        MR. FENSTER:  82, please.

21   ████ ██ ████ ██ ███ ██ ███ ████ ██

22   ██ ▪  **REDACTED BY ORDER OF THE COURT**

23   ███

24   ███ ███ ███ ███ ███ ███ ███

25   ██ ██ ██ ███ ██ ██ ██ ███



REDACTED BY ORDER OF THE COURT

REDACTED BY ORDER OF THE COURT

Q.   And there are other examples in Exhibit 603?

A.   I believe that there's some more cited in this Exhibit 161R.

Q.   All right.  So can we check off that Google AdWords meets 30(b5)?

A.   Yes.

Q.   All right.  Now, after you go through all the steps, 30(b1), (2), (3), (4), and (5), comparing text attributes, then what happens in 30(b6)?

A.   There's two things.  The first thing you do is you assign a score to each stored case model, which is compared with the case model.

Q.   Okay.  Does Google AdWords do that?

A.   Yes.  Just to kind of simplify that language, you assign a score to each ad from the ads database, which is compared with something to do with the message or the query that came in.  And you're trying to pick a good ad, a quality ad, that might be sent back.

Q.   Now, is it -- is it assigning a score to the ad or the information associated with that ad?

A.   Well, it's just assigning a score to each stored case model.  So in a sense, it makes no difference.  You're trying to judge how well a potential ad that might be returned matches the query that came

1  in.

2      Q.    Okay.  And does Google meet that limitation?

3      A.    They do.

4      Q.    Okay.  And what evidence do you have of that?

5      A.    I've got a fairly mathematical slide on the

6  next page.

7            MR. FENSTER:  84.

8      A.    Right.  And this is something that's done in

9  that SASS system.

10            For each one of these attributes, they pull

11  out something called an odds multiplier.

12      Q.    (By Mr. Fenster) What's that?

13      A.    Well, I never know what's a nice example to

14  use.

15            If you're going to make a wager with

16  somebody -- everybody talks about odds -- the odds

17  multiple is related to the odds.  And let's say if the

18  odds multiplier is 3, what this means is 3 out of 4

19  times, you take the 3 and you add 1 to it and put it in

20  the denominator.

21            So 3 out of 4, that would say 75 percent of

22  the time you're going to win your bet.  It's not a --

23  it's not like a probability, but it's related to a

24  probability.

25            And what they do, for every one of a set of

attributes -- and I haven't gotten a specific answer
yet -- it's somewhere between 20 and 32 or so of
attributes that they use right now.  They change that
set of attributes apparently from time to time.

        But for those attributes that have maybe one
or two or three or four features in them, they've kept
up with data that says every time I have that particular
query, guitar, and I have that particular ad, Tom's
Guitars, and I showed them to somebody, did they click
on it or not?  What's the percentage of that?

        And then they express that percentage of
clickthrough as -- as odds, okay?  And for every one of
the attributes, they pull up that odds multiplier, and
they multiple them altogether.

    Q.   Okay.  So what is the score that's assigned to
each stored case model?

    A.   Well, they're going to get -- it says here
overall odds of a click right here.

        Okay.  That's going to be expressed as an odds
multiplier.  And what's missing from this equation is
that they multiply all the odds multipliers by something
they call ECTR, which is the estimated clickthrough
rate, for that particular ad based on -- whenever
they've shown that ad to somebody ever before,
regardless of how it got shown, did it get clicked on?

And they then multiply that estimated clickthrough rate to all these odds multipliers, and they come up with the odds that if they show that ad to the person who entered that query that it's going to get clicked on.

Q.   Okay.  So is it the -- so what exactly is the score that --

A.   It's -- it's this overall odds of a click when it's expressed as an odds multiplier.

Q.   Okay.

A.   But they have a formula that lets them convert it to a probability of a click, a simple formula that involves a division.  And that's what they really are going after.  And they call that PCTR.  That's the probability of the clickthrough rate.

Q.   So PCTR, that's P is for probable or probability.

A.   Uh-huh.

Q.   C-T-R is clickthrough rate?

A.   Right.

Q.   And that is the score that's assigned to each ad; is that right?

A.   That's right.

Q.   All right.  Now, where is this score -- where in the AdWords system is this score being assigned?

A.   It's being assigned in the SmartAd Selection

1  System --

2      Q.   Okay.

3      A.   -- based on extracting the odds multipliers

4  for each of the attributes using the features that they

5  got out of the message and the ad, and they pull those

6  out, multiply them together, multiply them by the

7  estimated clickthrough rate, and come up with an odds,

8  which they flip over to come up with PCTR, the

9  probability of a click on that ad in combination with

10 the message.

11                 THE COURT:  Excuse me just a second.

12                 MR. FENSTER:  Sure.

13                 THE COURT:  Ladies and Gentlemen, the

14 clerk has bottled water available to you, if you would

15 like some.  If you would raise your hand, if you want

16 any.

17                 It just seems everybody else has water

18 available, and it was unfair that y'all didn't.  If you

19 want some, just raise your hand, and she's got some.

20                 Raise your hand.

21                 Nobody?

22                 All right.  Thank you, Ms. Anderson.

23                 Go ahead.

24      Q.   (By Mr. Fenster) Now, we've heard evidence --

25 or we actually haven't heard evidence yet; we've heard

suggestions in opening statement, which is not evidence,

that the Google AdWords -- the Google ad database has

billions of ads.

Is that -- did you find anything --

A.   I didn't know about with the b, but I know it

has a whole lot of ads, okay?  I didn't know how many

they had, but I'm perfectly happy to accept that.

Q.   All right.  Now, are all of the ads from the

database that it has available to it in the database

been evaluated in the SmartAd Selection Server?

A.   No.

Q.   Tell us about that.

A.   Okay.  We talked about three basic features,

Query Rewrite, which is where they kind of clean up the

query and maybe add --

THE COURT:  Excuse me just a second.

There's an objection.

MR. VERHOEVEN:  It's beyond his report.

THE COURT:  Approach the bench.

(Bench conference.)

MR. VERHOEVEN:  I don't see the --

MR. FENSTER:  In his report?

MR. VERHOEVEN:  Yes.

MR. FENSTER:  He goes through and he says

that --

1        THE REPORTER:  Get closer to the

2  microphone.

3        MR. FENSTER:  30(b6).  Your Honor, it's

4  Paragraph 104, Your Honor.

5        Google AdWords assigns a score to each

6  scored case model that's compared with a case model --

7  with the case model, the score increasing when at least

8  one of the attributes and text match the stored case

9  model; for example, assigns a score to advertisements in

10  three ways.

11        MR. PERLSON:  He makes the statement, but

12  the explanation that he's providing in his report, he

13  does -- I agree that he makes the statement that the

14  elements met.  He says that.  But the explanation that

15  he's providing right now, I don't think it's in his

16  report.

17        THE COURT:  Well, I'll look at his report

18  after we break tonight.  I'm going to allow him to

19  testify.  If I need to strike it out tomorrow, I will.

20        (Bench conference concluded.)

21    Q.    (By Mr. Fenster) So, Dr. Rhyne, you were

22  explaining how the number of ads that get fed into the

23  SmartAd Selection Server is less than the total number

24  of ads there?

25    A.    Okay.  I mentioned three systems:  Query

1  Rewrite where they clean up the query.  If you have a --
2  they offer you an opportunity to correct a misspelling
3  or singular for plurals, maybe an alternate word.
4       The second one is AdMixer.  And what the
5  AdMixer does is it compares the keyword, like pizza, in
6  the query to ads that have the same keywords and
7  basically is subject to a little bit of additional
8  filtering, like maybe adults -- you don't want adult
9  ads, and you don't want ads about gambling or something.
10 It's going to produce a set of ads that's much, much,
11 much smaller than the large ad set that's in that ads
12 database, typically, around 200 ads, and, again, if it
13 can find them.
14       And that's where they make the decision as to
15 whether or not it's going to be responded to
16 automatically, because if they can't find any, then they
17 give up.
18       But if they can find something up to about 200
19 ads that based on the keyword match look okay, then they
20 hand them over to this SmartAd Selection System where
21 all this odds multiplier stuff comes in.

22  ████ ██ ████ ████ ████ ████ ██ █ ██
23  ██ ██
24  ██ ██     **REDACTED BY ORDER OF THE COURT**
25  ████ ██ ██ ██ ████ ██ ████ ████

And so out of those 200 ads, it's going to rank them based on the likelihood that if I show them to the person who sent in this query, they're going to click on it.

They then have something called the bid auction so that people who want to pay more to get their ad on the screen can pay more, but I'm not dealing with that in terms of infringement.

Q.   Okay.  So --

A.   I'm dealing with the probability of clickthrough rate as part of the process.

Q.   So out of the whole bunch of ads, however many are in the database -- and we'll hear evidence later -- out of that whole bunch, how many is fed into and evaluated by the SmartAd Selection Server?

A.   No more than -- again, the testimony has been a little iffy, but somewhere around 198 or 200.  No more than that.  Maybe less than that, if they can't find that many.

Q.   Okay.

A.   But if they find even one, they're going to go on.  But it's something up toward no more than 200.

Q.   Okay.  And are each of those ads that are evaluated by the search -- by the SmartAd Selection Server compared to the stored -- the -- the case model

of the electronic message?

A.   Yes.   That's what we saw with country to country, et cetera.   They take the information they extracted about the message, and they work through each one of those ads.

Q.   Okay.   Now, for which of the ads that are evaluated by SmartAd Selection Server does the SmartAd Selection Server calculate a score or assign a score?

A.   I believe it's for all of them, every single one of them.

Q.   All of the ones that are compared in the SmartAd Selection Server?

A.   That's certainly been the testimony that I've seen, and that's my current understanding.

Q.   Now, the second part of 30(b6) requires that the score increasing --

MR. FENSTER:   If we can go back to 83.

A.   Right.

Q.   (By Mr. Fenster) So the score increasing when at least one of the attributes and text match the stored case model.   So let's stop there.

Would you explain what that means?

A.   What they're saying is, whatever score you've got, you'd like to have that score increase, if you've got a better match.

So what they're looking for are ads that match real well. So they want to use a score that goes up when they get a better match, and that's what that -- that point says.

Q. Okay. And what about when -- and then it goes on to say: And the score not increasing when at least one of the attributes and the text do not match the stored case model.

What does that mean?

A. Just the opposite. Although there's this statement in the patent -- and, in fact, there's a claim that says they're willing to accept not increasing as just meaning it stays the same, okay?

So it means what it says. You have to increase it when you get a better match. When you get less of a match, you either stay the same or you can go down.

Q. Okay.

A. Either one.

Q. Now, it says the score increasing when at least one of the attributes and the text match the stored case model.

What's your understanding of what that requires?

A. Well, I read that as at least one on each one

1  of those odds multipliers, okay?

2          And like I say, the best I know right now,

3  there's somewhere between 25 and 32 of them that they

4  use for those attributes so that -- all those

5  combinations of things, country/country is the first

6  line, all that.

7          Each one of them has an odds multiplier

8  number, and I think this says that if you look at one of

9  those odds multiplier numbers by itself, since you're

10 multiplying them all together, if when you get a better

11 match, it goes, let's say, from .2 to .25, it got a

12 little bigger, that meets the requirement right there.

13 And if when you have the better match, it's .25, it will

14 make it bigger.  And if you have less match, it will be

15 back to .2, and it will make the overall score smaller.

16 So you have to look at the overall score, but you have

17 to -- only have to look at the contribution of the

18 individual odds multipliers, I believe, relative to the

19 literal meaning of that claim limitation.

20      Q.   Okay.

21          MR. FENSTER:  Now, if you can go back to

22 84.

23      Q.   (By Mr. Fenster) Now, there was some testimony

24 from Mr. Furrow at Page 118, Line 16 to 22 of his

25 deposition, where the question was:  Is there an odds

1  multiplier for each attribute template, or is there a

2  specific odds multiplier for each generated attribute

3  using that template?

4        Answer:  There's a specific odds multiplier --

5  multiplier for each generated attribute, period.

6        Okay.  Now, how does this relate to meeting

7  30(b6)?

8     A.   Well, if you look in the little equation,

9  although it's kind of hard to read, each one of those

10 little M's, M sub 1, M sub 2, up to M sub D is an odds

11 multiplier.  And each one of those odds multipliers

12 relates to one of those attributes that compare the

13 message to the ads.

14       I don't know what more to say about it.  He's

15 just saying that there are individual odds multipliers

16 for each one of these attributes that they extracted in

17 the SmartAd Selection System where they compared the

18 message to the ads that were in that small set and tried

19 to rank them based on that numerical value.

20    Q.   Okay.

21            MR. FENSTER:  So go back to 80, please,

22 8-0.

23

24        **REDACTED BY ORDER OF THE COURT**

25

**REDACTED BY ORDER OF THE COURT**

You would expect to get a much lower odds multiplier, and that's what there's been testimony about.

Q.   So does Google, in its scoring, increase when at least one of the attributes and text match the stored case model?

A.   That's the testimony of the -- of the Google engineers who were asked about this.

Q.   Okay.  And does the score not increase when at least one of the attributes and text do not match the stored case model?

A.   That just flips over, okay?  If I've got an attribute and the more matching, it gets bigger, then the overall product will be bigger.  If the less match,

1 it gets smaller, then the overall, it will be smaller.

2     Q.   All right.  Without leading you through it,

3 can you lead us through the evidence that you cited in

4 161R that you relied on in forming the conclusion that

5 Google AdWords met 30(b)6)?

6     A.   Okay.  The first thing on Page 29 is some

7 testimony of Mr. Daniel Wright.  And I believe,

8 actually, I had prepared a slide that had a portion of

9 that testimony.  You can read it in or -- he was

10 basically talking about the way in which matching

11 affects the odds multiplier.

12     Q.   Let's switch over to that.  This was your

13 Slide 86?

14     A.   Yes.

15     Q.   Okay.  And what do you see at the top, and

16 what does his testimony show?

17     A.   Let me just -- I'm trying to see if I

18 specifically cited it.

19

20

21 **REDACTED BY ORDER OF THE COURT**

22

23

24

25

**REDACTED BY ORDER OF THE COURT**

Q.   All right.  And now going back to your summary --

A.   Uh-huh.

Q.   -- what else do you rely on?  What other evidence do you rely on?

A.   You can see there's a cite to the Furrow deposition, a cite to the Wright deposition.

Q.   This is Exhibit 4 from the Wright deposition.

A.   Okay.

Q.   Yeah.

A.   Exhibit -- well, continuing with Wright all the way through on the next page --

Q.   And here you have a cite to an exhibit -- or a document at GOOG14732?

A.   Yes.

1  Q. That's in Exhibit 402 in evidence.

2  A. Okay.

3  Q. Does that support your conclusion?

4  A. Yes. This is where, in that Gilbert II

5 article, there was a discussion about what he called

6 query coverage, okay?

7  Q. Okay. And going down further, there's a

8 cite -- you've got some testimony quoted from the Wright

9 deposition here.

10  A. Yes. I think it would be helpful if you read,

11 or I do, the second part of that that begins: Yes, I

12 would say it's accurate.

13  Q. Sure. So this is at the Wright deposition at

14 Pages 26 through 27.

15  And the question: Okay. So is it accurate to

16 say that the probability of a good click score is based

17 on features and attributes of the query and the ad.

18  Answer by Mr. Wright: Yes, I would say that's

19 accurate.

20  Question by Mr. Giza: And it's a value

21 between 0 and 1; is that correct?

22  Answer: That's correct.

23  Question: And what's the significance of the

24 higher score?

25  Answer: A higher probability of a good click

basically indicates that we are more confident that we

show the ad -- that if we show the ad and the user

clicks on it, that they will have a good experience on

the landing page so that that landing page corresponds

to what the user is looking for.

And how did that support your conclusion with

respect to 30(b6)?

A.    There are two things I need to explain about

that.

First off, he's being questioned, not about

the odds multiplier version, but the probability, which

is sort of the flip of the odds multiplier, but they

work together.

And he's saying that the higher the

probability, which corresponds to a higher odds

multiplier value, means that we're more confident that

if we show the ad -- now, when he says the landing page,

what that is, is if I see an ad and I click on it, the

next screen that I see is the landing page.

Like if I tried to buy Texas Ranger tickets, I

would go to tickets.com or something.  And he's just

saying that this whole concept of scoring is related to

the likelihood that we're going to get a good match.

Q.    So, Dr. Rhyne, you told us that there are

between 198 or 200 ads or so evaluated by the SmartAd

1    Selection Server.

2        A.    Yes.

3        Q.    And that the number of attributes generated is

4    somewhere between 25 and 32.

5        A.    I believe I'm recalling the testimony

6    correctly there.

7        Q.    Does Google AdWords and the SmartAd Selection

8    Server generate those attributes for each of the ads

9    compared in the SASS system?

10        A.    I don't -- your question is a little

11    malformed.

12        Q.    I'm sorry.

13        A.    They generate an odds multiplier for each of

14    the ad/query combinations.

15        Q.    Well, first, the -- do they generate -- don't

16    they generate attributes first?

17        A.    Yes.

18        Q.    Okay.  And then for the generate -- then for

19    the attributes for each ad that's compared, do they look

20    up odds multipliers?

21        A.    Now I understand your question, and I

22    apologize.

23            For every ad that they have, they will

24    generate attributes.  For every message or query that

25    they have, they will generate certain attributes in the

1  form of those features to put the features together and

2  get what Google calls an attribute.

3          And for every one of those attributes, they

4  will have an odds multiplier value that's been computed,

5  stored away, and they will pull it out, and that's what

6  they multiply together to get the score expressed as an

7  odds multiplier.

8      Q.   Okay.  Now, you showed us an equation on 84,

9  which I've got to get back to here.

10          Now, this was an overall odds multiplier?

11     A.   Yes.

12     Q.   Is that what you call by the score?

13          And does Google -- for what ads that are

14  compared in the SASS system does Google calculate the

15  odds multiplier?

16     A.   Every one of the ones that made it out of the

17  AdMixer into that set of about 200 ads, for every one of

18  those.

19     Q.   Okay.  Now, you testified about a PCTR, a

20  probability of clickthrough rate.  Well, for which ads

21  that are compared in the SASS system does Google

22  calculate the PCTR score?

23     A.   Same answer, for every one of them.

24     Q.   And you also mentioned an ECTR, an estimated

25  clickthrough rate.

1     A.   Right.

2     Q.   Same question:  For which ads that are

3 compared by the SASS system does Google calculate the

4 ECTR?

5     A.   They have that ECTR for every ad, and then

6 they multiply it by the odds multiplier that -- for

7 all -- by all the odds multipliers, and that gives them

8 the probability of clicking on the ad expressed not as a

9 probability yet, but as an odds multiplier, which is

10 sort of -- it's not exactly the reciprocal of the

11 probability, but it's related to it by a reciprocal

12 ratio.

13     Q.   And for each of those scores, does that score

14 increase when at least one of the text or attributes

15 match between the case model and the stored case model?

16     A.   For each of the odds multipliers?

17     Q.   No.  For each of -- I'm sorry.  The question

18 was ambiguous.

19         For each -- so you've told us about three

20 scores:  The overall odds multiplier, the ECTR, and the

21 PCTR.  Those are the three there.

22     A.   Yes.

23     Q.   For each of those scores, does the score

24 increase when at least one of the text or attributes

25 match?

                    MR. VERHOEVEN:  Objection, leading.

                    THE COURT:  Overruled.

     A.    The ECTR is not a score.  It's used to compute

the PCTR by multiplying it by the odds multipliers.  And

I realize I probably sound like I'm speaking gibberish.

It is the testimony of the Google engineers that the way

they've designed the system and the way they believe it

works is that if you have a query and an ad that match

better, the odds multiplier version of the predicted

clickthrough rate will be higher, and as a result, the

actual predicted clickthrough rate as a probability will

be higher, that that score, whether you look at it as

the odds multiplier score or the predicted clickthrough

ratio, will be higher when there's more match.

     Q.    (By Mr. Fenster) So did you find that 30(b6)

is met by the AdWords system?

     A.    Yes, it is.

     Q.    And specifically where in the AdWords system

is that met?

     A.    In the SmartAd Selection System when it takes

the 200 or so ads from the AdMixer and goes through the

scoring process.

     Q.    Okay.

                    MR. FENSTER:  87, please.

     Q.    (By Mr. Fenster) So, Dr. Rhyne, in your

1   opinion, based on all the evidence that you've reviewed

2   and that you've summarized in Exhibit 161R, is it your

3   opinion that the Google AdWords system infringes

4   Claim 30 of the Rice patent?

5       A.   Yes, it does.

6       Q.   All right.  Let's turn quickly to 31.  This is

7   Claim 31 of the Rice patent.  We're getting to the meat

8   here.

9                MR. FENSTER:  No. 88.

10      Q.   (By Mr. Fenster) So did you form an opinion

11  with respect to 31?

12      A.   It depends on Claim 30, which depends on 28,

13  which depends on 26, and we've painstakingly been

14  through all of those.

15      Q.   All right.

16               MR. FENSTER:  So the next slide.

17      Q.   (By Mr. Fenster) Do you find that 31 is met by

18  the Google AdWords system?

19      A.   Yes.

20               MR. FENSTER:  Let's go to the next slide.

21      Q.   (By Mr. Fenster) And walk us through what

22  Claim 31 requires.

23      A.   Well, let's start with the language first.

24  There are two parts.

25               The first part is:  When at least -- let me

1 back up a minute and get the predecessor part.

2      It says:  Wherein, when at least one of the

3 attributes and the text match the scored -- stored case

4 model -- that means, in terms of my infringement

5 analysis, when at least one of the attributes and text

6 of the case model match the stored case model, is the

7 way it works out -- the score is increased by a

8 predetermined match-weight.

9      And the Court says that -- in its

10 construction, a predetermined match-weight is a

11 predetermined factor that arithmetically increases a

12 stored case model's match score when a feature from the

13 stored case model matches text and attributes of the

14 presented case model.

15      And then the flip side of that is the second

16 phrase:  When at least one of the attributes and the

17 text does not match, the score is decreased by a

18 predetermined mismatch-weight.

19      And the Court construed that to mean a

20 predetermined factor that arithmetically -- it should

21 say decreases.

22    Q.   Decreases.

23    A.   I believe that's a typo -- a stored case

24 model's match score when a feature from the stored case

25 model does not match text and attributes from the

1  presented case model.

2      Q.    All right.

3              THE COURT:  Excuse me just a second.

4              MR. VERHOEVEN:  Your Honor, I'm just

5  going to object that the -- I think there's a typo on

6  here.  It says increases.

7              THE COURT:  That's what he was just

8  referring to.

9              MR. FENSTER:  Yes.

10             THE COURT:  Okay.  There's a

11 typographical error on the slide, Ladies and Gentlemen.

12             The second definition states increases,

13 and the second line should say decreases.

14     Q.    (By Mr. Fenster) And did you find that Google

15 meets the predetermined match- and mismatch-weight

16 elements?

17     A.    Yes.

18             MR. FENSTER:  Slide 91, please.

19     Q.    (By Mr. Fenster) Okay.  So can you explain

20 your analysis with respect to how AdWords meets

21 Claim 31?

22     A.    Basically, what we find is, if for any one of

23 those odds multipliers, if that multiplier increases in

24 its value, like I said, from .2 to .25, when there's a

25 better match, that's going to increase the score.

1        And if the testimony of the Google witnesses

2  is correct where they say, that's the way we designed

3  the system to be; that's what we think it's going to do,

4  then every time you get a better match, one of the odds

5  multipliers will be -- somewhere amongst those odds

6  multipliers, there will be an odds multiplier that got

7  bigger in its magnitude since you're multiplying

8  everything by them together, if one of them gets a

9  little bigger, the overall score gets bigger.

10        And if one of them gets a little smaller

11  because of less of a match, the overall score will get

12  smaller.  And that meets this requirement.

13     Q.    And does all the evidence that we went through

14  with respect to 30(b6) also support your conclusion with

15  respect to 31?

16     A.    Right.  In both of those cases, you will

17  either have an arithmetic increase or an arithmetic

18  decrease.

19     Q.    Okay.  And in your chart for Claim 31, you

20  show -- you relied on a lot of things, including

21  document GOOG14732, which is Exhibit 402.  That's on

22  Page 33 of your summary; is that right?

23     A.    Yes, uh-huh.  That's the Gilbert II document.

24     Q.    And there's also -- on Page 34 of your

25  summary, you reference to this document GOOG21585, which

1  is in Exhibit 776.

2      A.    Uh-huh.

3      Q.    Does that support your conclusion with respect

4  to 31 as well?

5      A.    It did as well, uh-huh.

6      Q.    All right.  So do you find, going to Slide 92,

7  that the Google AdWords system infringes Claim 31 of the

8  '947 patent?

9      A.    Yes, I have.

10     Q.    All right.  Let's finish up with Claim 33.

11           Now, what does Claim 33 require?

12     A.    You have to infringe every -- you have to meet

13  every limitation of 26, 28, 30, 31, and I've shown that

14  again carefully, and then you must add:  Wherein each

15  score is normalized by dividing the score by a maximum

16  possible score with a stored case model where the

17  maximum possible score is determined when all of the

18  attributes and text of the case model and the stored

19  case model match.

20     Q.    Okay.  And if we go to 94, does the Court have

21  a claim construction on this point?

22     A.    It did.  The Court said:  Wherein each score

23  is normalized, and so forth, must mean wherein each

24  matched score is divided by the maximum possible score

25  for the stored case model.

1     Q.   And did you apply that Court's claim -- the

2 Court's claim construction in doing your analysis?

3     A.   Yes, I did.

4     Q.   And did you find that Google AdWords satisfies

5 Claim 33 of the '947 patent?

6     A.   Yes, I did.

7          MR. FENSTER:  No. 95.

8     Q.   (By Mr. Fenster) Can you explain how?

9     A.   Well, they convert that odds multiplier value

10 to a probability.  And probabilities mathematically

11 range from 0 to 1, okay?

12          A probability of 1 means something is always

13 going to happen.

14          A probability of 0 means it's never going to

15 happen.

16          A probability of .5 means half the time it's

17 going to happen.  It's like flipping a coin:  Heads or

18 tails.  Probability is .5.

19          Having computed that odds multiplier, they

20 used the top of these two formulas, the one that's shown

21 here, to compute the probability of a click, and they do

22 that by taking the odds and dividing that by 1 plus the

23 odds.

24          I said earlier that if I told you that the

25 odds was 3, okay, we would tend to say 1 plus the odds

1  is 4, and so you would say it was 3 to 4.

2         If you got a perfect match, you'd do that.  If

3  you use that particular value, you would have 4 times

4  out of 4.

5         When I tell you the odds multiplier is 3 out

6  of 4, I'm telling you that out of those 4, 1 plus 3

7  times that you're going to get three successes and one

8  failure.

9         If the probability were 2, I'd be saying it's

10 2 out of 3 or two thirds of the time.  If it's 1, it

11 would be 1 out of 2.

12        And so what's in the denominator here, since

13 you take one more than the odds, is the best you can do.

14 If you say 3 out of 4, the best you could do would be 4

15 out of 4.

16    Q.   Okay.

17    A.   So they're doing a division to get that

18 probability, and they're calculating it such that when

19 they get their probability, it's on a 0 to 1 range, and

20 it's been normalized such that the best you can ever do

21 would be a probability of 1.

22        And they do that by dividing the odds over the

23 1 plus the odds, which is as -- that's all that you can

24 get, okay?

25    Q.   It's the maximum score possible.

1      A.    It is --

2      Q.    All right.

3      A.    -- when you express it as an odds multiplier.

4      Q.    Now, you've got --

5            THE COURT:  Hold it just a second.

6 Yes?

7            MR. VERHOEVEN:  I apologize, Your Honor.

8 We believe this is outside the scope of the report.

9            THE COURT:  Approach.

10           (Bench conference.)

11           THE COURT:  Tell me where any of this is

12 in his report.

13           MR. PERLSON:  Specifically, I don't think

14 that equation is here.

15           THE COURT:  I read a response to the

16 motion to strike as it related to this.

17           MR. FENSTER:  He cites at Paragraph 129

18 of his report to Bates No. GOOG7767, which is exactly

19 the document that's on the screen.

20           THE COURT:  Well --

21           MR. FENSTER:  And he says that it

22 computes -- it normalizes by performing computations

23 using odds multipliers, including computing a final odds

24 multiplier as a product.

25           The odds is defined as the ratio, the

positive events and negative events, and then normalizes

the score by converting the final odds back into a

probability, which has the effect of dividing the ratio

of positive events by the total number of events, a

maximum score possible.

THE COURT:  I'll take this up at the

break.  I'm going to let him finish the testimony.

MR. FENSTER:  Okay.

(Bench conference concluded.)

Q.   (By Mr. Fenster) Where does this equation come

from?

A.   A Google document.  It's GOOG007767.

Q.   And that's Exhibit 403.

Do you find --

MR. FENSTER:  Let's go to 96.  No.  96.

Q.   (By Mr. Fenster) Do you find that Google

AdWords literally infringes Claim 33?

A.   Yes.

Q.   And did you also perform an analysis with

respect to the Doctrine of Equivalents?

A.   For this one?  Yes.

Q.   And what did you find with respect to 33?

A.   Well, the way I -- the way I approached it was

whether or not -- if you were to argue that what they

didn't actually do was to go through and look at all the

possible scores to see what all the maximum possible

odds multiplier they could get was.

And having found that, divide by some number

that was the -- for this particular combination of -- of

queries and possible ads, but simply by having the odds

multiplier -- like I said, it was 3 to 4, and they just

took 4 as the maximum, because that's the way odds

work -- that the function that they did was to -- was to

come up with a score that indicated the clickability.

The way that they did it was that they used

the odds multiplier divided by 3 over 4 or 2 over 3 or

whatever it's going to be.  And I just felt that since

they end up with exactly the same odds multiplier,

regardless of whether they -- it's kind of like when you

think about a batting average.

If you say a guy's batting 200, okay, or 20

percent, you don't know whether he's going to be

hitting -- if he's been to bat a hundred times, he's had

20 hits, or if he's been to bat 400 times, he's had 80

hits.

You don't know because you've converted it to

a percentage, and I don't -- I don't think that's a

substantial difference.  The whole purpose here was to

normalize so that you could compare each one of the

individual ads and their probability of clicking in a

1  way that is equal to each other.

2        And the thing about a batting average is, it

3  lets you compare the effect of hitting of a guy who's

4  had a hundred times at bat to a guy that's had 400 times

5  at bat, and you've kind of gotten rid of the fact that

6  one guy had 100 and one guy had 400.

7        80 over 400, 20 over 100, I think you're doing

8  the same math.  3 over 4, you end up with a probability

9  that is exactly the same in the end.

10        So you're doing the same function in a way

11  that is effectively the same.  I don't think it's

12  insubstantially different here, and you end up with the

13  same result exactly.

14        So I think that that meets it -- I think it

15  meets it literally.  But if you make some

16  counterargument, as best I understand any

17  counterargument that might be made, I believe I would

18  find it to be equivalent under the Doctrine of

19  Equivalents because you end up in the same place.

20     Q.   All right.  So to summarize, which claims --

21  which of the asserted claims of the '947 patent have you

22  found that Google AdWords infringe?

23     A.   They meet 26 and 28, but they infringe 30, 31,

24  and 33.

25              MR. FENSTER:  Your Honor, at this point,

I'm going to move on to Yahoo!

Q. (By Mr. Fenster) So what product of Yahoo! --
we'll run through this faster, because we've already
talked about the claim construction.

What -- what product of Yahoo! did you
evaluate?

A. Sponsored Search.

Q. Okay.

MR. FENSTER: And let's go to 97.

Q. (By Mr. Fenster) So what do you mean when you
refer to Sponsored Search?

A. When you go to the Yahoo! website, just like
when you go to the Google website, they give you this
little search window and you can type in something and
hit carriage return or click on search like this, pizza
in Marshall, and you click on search, and you're going
to get back two things.

You're going to get a set of native search
results. That's this stuff (indicates). But you're
also -- for most searches, you're going to get
advertisements. And that's what I mean by sponsored
search, the process by which they match those ads to
your query.

Q. All right. And turning to Demonstrative 99,
can you give us an overview of the Sponsored Search?

A.   This is a block diagram from a Yahoo!
document.  It's a little out of date to what --
apparently, from some of the testimony from some of
their engineers, but it's pretty close.

And you can see, this is the person over on
the side who was the source, who has sent in a query
called flights to Paris cheap to the Yahoo! front end
right here, much like the Google front end or a Google
web server.

It gets processed a bit, goes into -- and the
keyword here is the affiliate server.  That's where a
bunch of software exists that does a set of things that
in many ways are similar to what we've talked about with
Google.

There's this Canonicalize query.  That's kind
of like Query Rewrite.  They clean up the query, and
they end up with what they call a phase canon -- excuse
me -- phrase canon and an exact canon and a raw canon,
and they're basically just different ways of processing
the original text that was sent in.

They go through a process of finding and
matching ads initially, which is much like what Google
did with AdMixer.  They get a smaller set of ads, and
then they come down and look at clickability scores and
rank price filter and determine placement, and then they

1  send the ads back.

2          The systems that find the matching ads have

3  interesting names.  There's a database called Elcaro.

4  There's --

5       Q.    What is Elcaro?

6       A.    Where did that name come from, or what is it?

7       Q.    What is it?

8       A.    It's a database.  It's a place where they

9  store a lot of ads, and they also have some software

10 computing capabilities, as best I've been able to

11 understand.

12         Okay.  Then they have QBERT, which is part of

13 a query rewriting software.  And then they have King

14 Kong, and they have a new version of King Kong not shown

15 here called Yellowstone.

16         They've got a system called capital Q, little

17 U, capital AD, which I think stands for quality ads,

18 which is sort of a place where they've stored a lot of

19 ads that have been matched to certain queries, and they

20 think, if I see that query again, here's some good ads

21 to send with it.

22         All of these external things participate in

23 the process of helping to find the matching ads, okay?

24      Q.    And did you -- did you have something further

25 on this slide?

1  A. No.

2  Q. Did you prepare an overview of the Yahoo!

3 Sponsored Search?

4  A. Yes.

5  Q. Is that 100?

6  A. I used that same generic block diagram.

7 There's a person who's a source.  They send it in to the

8 Yahoo! front end.  I have found that in that system,

9 there are rule bases and case bases running on knowledge

10 engines, the things that I've pointed to.

11   And it's hard for me to say that, the

12 Canonicalizer, and then there's a system called Exact

13 Match that looks for an exact match between keywords and

14 ad keywords.  There's an Advanced Match, all of which

15 come back through the Affiliate Server.

16   They use exemplar cases in terms of keywords,

17 and they do geo targeting, location targeting, and they

18 have this archive of ads they call Elcaro.

19  Q. All right.  So let's run through Claim 26.

20 Did you find that -- did you reach any conclusions with

21 respect to whether Yahoo!'s Sponsored Search meets Claim

22 26(a)?

23  A. I found that based on my experimentation with

24 it and the testimony and documents I've looked at, that

25 it is a method for automatically processing a

non-interactive message, electronic message using a
computer that is comprised of these three steps that
make up Claim 26.

Q.   And let's go to 104 real quick.

     Now, what does this show?

A.   This is the result of entering one of those
non-interactive electronic messages in the form of Texas
Rangers, clicking on search, and what I got was -- it's
a little hard to see, but there is a top ad -- oh -- a
top ad right here that says sponsored results.  That's
the term they use for their ads.

     And this -- this top entry is what they
call -- somebody calls a north ad, and then there are
these individual ads over here that are also returned on
the east side.

     In the middle is the real search results, but
that's not something that I focused on.

Q.   And is the Yahoo! system also non-interactive?

A.   Yes, sir.  It's the same way.  It returns in a
fraction of a second these ads.  And I did nothing
whatsoever between the time I entered that message and
sent it to Yahoo!, and the systems at Yahoo! retrieve
ads for the purpose of sending them back to me.

Q.   And does the Yahoo! system even allow the user
to submit or provide additional information after you

1  press click and before the ads are served?

2      A.    I've never seen the possibility of doing it.

3  The time is so short, I can't imagine, even if I tried,

4  what would happen, but...

5      Q.    And what is the electronic message, the

6  non-interactive electronic message, that Google --

7  Yahoo! actually receives?

8      A.    Well, you can see at least a version of it up

9  here.  That's not all of it.  There's that

10 http://search.yahoo.  It is an http request.

11     Q.    And is that http request similar to what was

12 received for Google?

13     A.    Yes.  It contains the query and other

14 information about the querier and the nature of the

15 message itself.

16     Q.    Did you also buy -- or prepare a summary

17 document for Yahoo!

18     A.    Yes, I did.

19     Q.    And is that Exhibit 163?

20     A.    I believe it is.  And, again, I don't have a

21 current copy of that, so if I can borrow one from

22 somebody, it will be of help.

23     Q.    I think I've got one right here.

24              MR. FENSTER:  May I approach?

25              THE COURT:  Yes.

1          MR. ROOKLIDGE:  Objection.

2          MS. DOAN:  Your Honor, this says 1

3   through 47 on this.  We don't have a supplemental

4   report.  We have 1 of 61 pages, and we have 1 of 58

5   pages.  It's not the same one we received.

6          MR. FENSTER:  This has been stripped of

7   all -- any text other than the --

8          MS. DOAN:  We haven't seen it.

9          THE COURT:  Well, provide a copy to -- do

10  you have another copy?

11         MR. VERHOEVEN:  For the record, the same

12  is true of Google, so we would request a copy.

13         THE COURT:  Just an annotated version of

14  what you previously provided?

15         MR. FENSTER:  It's actually a

16  stripped-down version.

17         THE COURT:  Stripped down.

18              Hand it to the witness.

19              Proceed.

20     Q.   (By Mr. Fenster) So what is Exhibit 163,

21  Dr. Rhyne?

22     A.   It's a collection of the citations from a

23  variety of documents from Yahoo! of Yahoo!'s witness

24  deposition testimony and some point cites to some of the

25  Yahoo! software, which I have identified, much of which

1　has been cited in my reports.

2　　　　But there's more here than I -- than I recite

3　in my reports, but these are all the things that I found

4　that support my opinions in terms of evidence that those

5　opinions are based on.

6　　　Q.　And is this a lot of information that was

7　cited?

8　　　A.　It's maybe not quite as big as what I had from

9　Google, but if I were to look at all these documents in

10　paper form, it would -- I think it would approach more

11　than a foot of documentation.

12　　　Q.　And if we were to go through every one of

13　those in court, about how long would that take, based on

14　your estimation from what we've experienced so far?

15　　　A.　Asking me at this point of the day, it would

16　take a while, okay?　Probably it would -- it would come

17　close to doubling the amount of time that I will spend

18　in the witness stand today.

19　　　Q.　And are these technical documents?

20　　　A.　Absolutely.　They are complex technical

21　documents, many of which are confidential, internal to

22　Yahoo!.　All the software, of course, is confidential.

23　And the documents were written by Yahoo! engineers to

24　other Yahoo! engineers, and they're written in

25　engineer-speak.

1    Q.   And is this a summary of the evidence that you

2 relied on in forming your opinions in this case?

3    A.   It is.  What I have tried to do here, as I did

4 in the Google case, is to pull out just the evidence

5 with a little bit of transitional text and match each

6 set of evidence exactly to -- on the left column of this

7 table to say this is for 26, 26(a), and so forth.

8    Q.   And where does -- where did you get the

9 documents and evidence that's summarized in Exhibit 163?

10    A.   I didn't understand that question.

11    Q.   Did -- were -- is this document in evidence

12 that was provided by Yahoo!?

13    A.   Yes.  Yes.  I think it -- except, of course,

14 for like the depositions, which were -- you know, people

15 were subpoenaed or something to do those.  But the

16 documents and the software all was provided by Yahoo!,

17 and the testimony and the depositions were by sworn

18 Yahoo! representatives.

19    Q.   And did you prepare this summary?

20    A.   There was a starting summary, and what I have

21 worked diligently to do is to add stuff to that and to

22 strip out of it anything from the original one, which

23 had some argumentation and some other text in it.  I

24 tried to make this be nothing but the citations to the

25 key evidence that support my opinion.

1    Q.   And would -- the summary chart that had the

2 additional explanation but with all the evidence, was

3 that provided to the other side?

4    A.   Actually, there's been two versions of that.

5 There was a way-back version, and then there was a --

6 there was an intermediate version, which I got almost

7 out of it -- almost all of it cleaned up, that was

8 provided with my supplemental reports.  I gave you that

9 date.  I think it was July the 21st.

10    Q.   And in terms of the evidence that is

11 summarized here, is that the same evidence that was

12 summarized in the earlier version?

13    A.   In the version on -- the way-back version or

14 the 21st version?

15    Q.   The latest version.

16    A.   The latest version, I think this should be

17 exactly the same documents, citations.  I believe the

18 only thing that's come out is the last little bit of --

19 of wording in between the cites.

20    Q.   Now, on the first page, you cite to

21 Plaintiff's -- a document that is in Plaintiff's 924,

22 and it goes on --

23    A.   Uh-huh.

24    Q.   -- to cite a document that's in --

25    A.   Yeah.  The first page is a very key document,

1 the Sponsored Search Overview, which I relied on a lot,

2 both here and in my expert report.

3          And then there's the Search Functional

4 Technology Overview, another key document, and that's

5 what I've cited in these two places.

6     Q.   And that's in Exhibit 937 and 939.

7     A.   Okay.

8     Q.   So do you -- did you conclude that Yahoo!

9 meets Claim Element 26(a)?

10    A.   Yes, sir.  They have a method -- in Sponsored

11 Search is a method for automatically processing a

12 non-interactive electronic message using a computer.

13    Q.   Did you find that Yahoo! meets Claim

14 Element 26(a)?

15    A.   I did.

16          MR. FENSTER:  Let's go to 106.

17    Q.   (By Mr. Fenster) And did you find support in

18 the deposition of Mr. Kolm, one of Yahoo!'s engineers?

19    A.   I did.

20    Q.   And this is from his deposition at Page 11,

21 Line 24 through Page 12, Line 6.

22          The question:  What is Sponsored Search?

23          Answer:  Sponsored Search is a software system

24 that allows advertisers to enter advertisements and bids

25 associated with search phrases and will return

1   appropriate ads based on a search phrase received.

2          Question:  And does Sponsored Search --

3   Sponsored Search serve ads in response to queries

4   entered on yahoo.com?

5          Answer:  Yes, it does.

6          Does that support your conclusion that Yahoo!

7   meets Claim Element 26(a), receiving the electronic

8   message from a source?

9      A.   Yes.

10             MR. ROOKLIDGE:  Objection to leading.

11             THE COURT:  Overruled.

12     A.   Yes, it does.  And if you'll go to the next --

13  there.  That shows that http -- http message in more

14  detail, much like I did in the Google case.

15     Q.   (By Mr. Fenster) So what is the actual

16  electronic message that is received by Yahoo! that meets

17  Claim Element 26(a)?

18     A.   It's this guy right here (indicates).  This

19  was a query for pizza.  You can see the pizza.  It's

20  kind of cut out, but the rest of the thing will show up

21  further outside.

22         But this is -- this message contains

23  attributes like where did the guy enter it, and other

24  information that includes the actual text of the

25  keywords.

```
 1      Q.   Now, did you find --

 2                MR. FENSTER:  Turn to 108.

 3      Q.   (By Mr. Fenster) Did you find --

 4                THE COURT:  Hold on just a second.

 5                Before we turn to 108, we're going to

 6   break for the evening, okay?  We'll pick up there

 7   tomorrow.

 8                Ladies and Gentlemen, thank you again for

 9   your attention today.  I'm going to excuse you at this

10   time until 8:30 in the morning.  We'll start as close to

11   8:30 as I can possibly get.

12                Thank you again for your patience.

13   Please travel safely.  Remember my prior instructions.

14   Don't talk about the case.

15                LAW CLERK:  All rise.

16                (Jury out.)

17                THE COURT:  All right.  Step down,

18   Dr. Rhyne.

19                THE WITNESS:  Yes, sir, I am.

20                THE COURT:  All right.  Y'all can have a

21   seat.

22                How quickly can you have whatever

23   deposition cuts you want me to rule on to me tonight?

24                MR. SPANGLER:  6:00 o'clock, Your Honor.

25                THE COURT:  All right.  Is that feasible
```

1   for Google and Yahoo!?

2               MR. PERLSON:  I don't think we have any

3   to give you for tomorrow.

4               THE COURT:  Okay.

5               MS. DOAN:  I don't think we do, but if we

6   do, we'll get them to you by --

7               THE COURT:  6:00 o'clock.

8               MS. DOAN:  -- 6:00 o'clock.

9               THE COURT:  All right.  I'll await the --

10  you know, is it fairly in dispute at all what documents

11  and testimony the expert relied on in forming his

12  opinions?

13              I mean, I know the opinions are in

14  dispute, but is anybody really disputing what he relied

15  on in forming his opinions?

16              MR. PERLSON:  Your Honor, I think the

17  only issue with -- with what -- the difference between

18  what was shown and what we had was just that there was a

19  narrative portion of it in the supplemental report, and

20  that was taken out, and we just hadn't seen a copy of

21  it.

22              THE COURT:  It's not -- I appreciate

23  that, but my question goes more to -- you-all objected

24  to the summary exhibits, and I sustained that.

25              But if it's not fairly in dispute, what

1  the expert relied on, then I'm going to allow him a

2  great deal of latitude to lead the witness through those

3  items, you know, unless y'all want to reconsider your

4  objection to the summary exhibits.  Then I'll let him

5  offer them, you know, and they'll be in evidence.

6              But, you know, that cuts -- I'm going to

7  sustain your leading objections when they're made to his

8  opinions and things that are in dispute, but what isn't

9  in dispute, as near as I can tell, is what he relied on

10  in forming these opinions.

11              MR. PERLSON:  If I can just address real

12  quick, the one thing I'll say is that at his deposition,

13  he said that the summary was not -- did not have his

14  opinions in it and that he just thought that it had a

15  lot of the evidence that he relied on.

16              MS. DOAN:  Well, as far as the version

17  I'm looking at, it still has summary opinions in it,

18  Your Honor.

19              So -- I mean, I'd like to do a

20  cross-compare, but we'll be able to visit with you on

21  that in the morning.

22              MR. VERHOEVEN:  Google maintains its

23  objection, and if the choice is that there's a little

24  bit of leading going on, then that's preferable.

25              THE COURT:  I mean, I'm just -- I'm not

trying to cut you off of your leading objections, but --

MR. VERHOEVEN:  I mean --

THE COURT:  -- he's just reading into the record --

MR. VERHOEVEN:  We would prefer, rather than putting up the slide and then reading the text and then saying it, that the question would be:  Did you rely on anything?

Yes.

Did you prepare something?

Yes.

But if that takes too long, then we understand, Your Honor.

MR. FENSTER:  Your Honor, I just -- I laid the proper foundation under Federal Rule 1006, and I urge your reconsideration.  It's prejudicial to us. One way to alleviate it, Your Honor, which I'd be happy to do -- I think the record needs to reflect the evidence is in the record that supports his opinion.  I think it's boring, and I don't think it's going to affect the jury one way or the other, but I need it in the record for appeal.

I'd be happy to read into the record outside the presence of the jury, you know, all the evidence that he relied on, and that would probably take

1  a couple of hours, but I'd be happy to do that and not

2  have the jury consider it, but -- I mean --

3              THE COURT:  I'll -- I mean, I'm not going

4  to tell you what you do or don't need in the record for

5  purposes of appeal or how you want to proceed with your

6  expert in developing what he did rely on.

7              I'm just -- you know, all I'm telling you

8  is you're going to have a great deal of latitude in

9  leading the witness through the items that he relied on

10  in light of the objection to the summary exhibits that

11  I've sustained --

12             MR. FENSTER:  Okay.

13             THE COURT:  -- okay?

14             Let me see a couple of people in

15  chambers.  Mr. Spangler, Mr. Smith, Ms. Ainsworth, can I

16  see y'all downstairs.

17             LAW CLERK:  All rise.

18             (Court adjourned.)

19              *      *      *      *      *

20

21

22

23

24

25

1

2

3                              <u>CERTIFICATION</u>

4

5              I HEREBY CERTIFY that the foregoing is a

6    true and correct transcript from the stenographic notes

7    of the proceedings in the above-entitled matter to the

8    best of my ability.

9

10

11

12   /s/_____              _____
     SUSAN SIMMONS, CSR                       Date
13   Official Court Reporter
     State of Texas No.:  267
14   Expiration Date:  12/31/10

15

16

17   /s/_____              _____
     JUDITH WERLINGER, CSR                   Date
18   Deputy Official Court Reporter
     State of Texas No.:  731
19   Expiration Date:  12/31/10

20

21

22

23

24

25