<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  BRIGHT RESPONSE, LLC         *    Civil Docket No.
                                 *    2:07-CV-371
 4  VS.                          *    Marshall, Texas
                                 *
 5                               *    August 4, 2010
    GOOGLE, INC., ET AL          *    8:30 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7       BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
               UNITED STATES MAGISTRATE JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:      MR. ANDREW SPANGLER
                            Spangler Law
11                          208 North Green Street
                            Suite 300
12                          Longview, TX    75601

13                          MR. MARC A. FENSTER
                            MR. ANDREW WEISS
14                          MR. ADAM HOFFMAN
                            MR. ALEX GIZA
15                          Russ, August & Kabat
                            12424 Wilshire Boulevard
16                          12th Floor
                            Los Angeles, CA    90025
17
                            MR. DAVID M. PRIDHAM
18                          Law Office of David Pridham
                            25 Linden Road
19                          Barrington, RI   02806

20  APPEARANCES CONTINUED ON NEXT PAGE:

21
    COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
22                          MS. JUDITH WERLINGER, CSR
                            Official Court Reporters
23                          100 East Houston, Suite 125
                            Marshall, TX    75670
24                          903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
</pre>

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:    MS. ELIZABETH A. WILEY
The Wiley Firm
P.O.  Box 303280
Austin, TX   78703

MR. PATRICK R. ANDERSON
Patrick R. Anderson, PLLC
4225 Miller Road
Building B-9, Suite 358
Flint, MI   48507

MR. JOHN C. HUESTON
MR. ADAM S. GOLDBERG
Irell & Manella, LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA   92660

FOR THE DEFENDANT:    MR. CHARLES K. VERHOEVEN
(Google)    MR. DAVID A. PERLSON
MS. AMY H. CANDIDO
Quinn Emanuel Urquhart & Sullivan
50 California Street
22nd Floor
San Francisco, CA   94111

MS. JENNIFER PARKER AINSWORTH
Wilson Robertson & Cornelius
P.O.  Box 7339
Tyler, TX   75711

FOR THE DEFENDANT:    MS. JENNIFER HALTOM DOAN
(Yahoo!)    Haltom & Doan
6500 Summerhill Road
Suite 100
Texarkana, TX   75503

APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:        MR. WILLIAM ROOKLIDGE
(Yahoo!)                  Howrey, LLP
                          4 Park Plaza, Suite 1700
                          Irvine, CA   92614

                          MR. JASON WHITE
                          Howrey, LLP
                          321 North Clark Street
                          Suite 3400
                          Chicago, IL   60610

                *       *       *       *       *       *


                    P R O C E E D I N G S

          (Jury in.)

          THE COURT:  All right.  Please be seated.

          Good morning, Ladies and Gentlemen.

          I think we may have gotten the air
conditioning fixed, but we'll see.  It's early yet, so
no promises.

          Couple of preliminary matters.  I'm going
to give you some -- quite a few final instructions at
the end of the case, some of which will talk about the
difference between literal infringement and infringement
under the Doctrine of Equivalents.

          But just for present purposes, literal
infringement of a patent claim requires that the accused
products or systems meet each of the claim limitations

exactly as they're found in the claims and as they've been construed by the Court.

Infringement under the Doctrine of Equivalents occurs when a claim limitation, although it's not met exactly, may be insubstantially different from what's found in the claim as construed by the Court.

Now, yesterday you heard some testimony from Dr. Rhyne concerning infringement, both literally and under the Doctrine of Equivalents of Claim 33 insofar as Claim 33 was asserted against the Defendant Google's accused products.

Now, for procedural reasons, I need to ask you to disregard Dr. Rhyne's opinion on literal infringement as to Claim 33, but you may still and are entitled to consider fully his opinions concerning infringement of Claim 33 under the Doctrine of Equivalents.

With that, Mr. Fenster, you may proceed.

MR. FENSTER:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. FENSTER:  And, Your Honor, can we just clarify that the instruction applies only with respect to his testimony with respect to Claim 33?

THE COURT:  That's correct.

1          MR. FENSTER:  Thank you very much.

2          THE COURT:  Of course.

3          MR. FENSTER:  Good morning, Ladies and

4   Gentlemen.

5   VERNON THOMAS RHYNE, III, Ph.D., PLAINTIFF'S WITNESS,

6                   PREVIOUSLY SWORN

7              DIRECT EXAMINATION (CONTINUED)

8   BY MR. FENSTER:

9      Q.   Good morning, Dr. Rhyne.

10     A.   Good morning.

11     Q.   We were -- we had just started yesterday with

12  the evidence of Yahoo!'s Sponsored Search.  Today I

13  promise we'll go much faster.  We don't have to go

14  through the claim language and claim constructions that

15  we did yesterday.  We've already laid a lot of the

16  foundation for today's testimony.

17          MR. FENSTER:  So with that, if we can

18  bring up Dr. Rhyne's Slide 108, please.

19     Q.   (By Mr. Fenster) Dr. Rhyne, can you just give

20  us a recap briefly, first, what is the accused product

21  from Yahoo! that you're -- that you're opining on?

22     A.   It's called Sponsored Search.  It's the

23  product that when someone sends a search request to

24  Yahoo!, they get back both the results of the search and

25  certain advertisements that are matched to their search.

1     Q.   And did -- can you just give us a recap of the

2  first two elements and your findings with respect to

3  Sponsored Search just to bring us up to speed.

4     A.   Okay.  I think we covered yesterday that it's

5  my finding that that Sponsored Search is a method for

6  automatically processing a non-interactive electronic

7  message using a computer, using the Court's construction

8  of the term non-interactive electronic message, and that

9  it is a part of the Yahoo! system called the Yahoo!

10 front end that receives that electronic message from a

11 source, such as a human sitting there typing at their

12 computer, and when they hit search, off goes the message

13 to Yahoo! Sponsored Search system.

14    Q.   And, Dr. Rhyne, have you made any findings

15 with respect to whether Sponsored Search meets Claim

16 Element 26(b)?

17    A.   (b)?  Yes, I have.

18    Q.   And what did you find?

19    A.   I found that they do interpret the electronic

20 message using a rule-based and a case-based knowledge

21 engine.

22    Q.   Okay.

23         MR. FENSTER:  Briefly, Slide 109.

24    Q.   (By Mr. Fenster) We went through yesterday --

25 yesterday that the claim construction of a rule-based

1  knowledge engine and a case-based knowledge engine.

2          And, Dr. Rhyne, did you apply the Court's

3  claim construction with respect to your analysis of

4  Yahoo! Sponsored Search as well?

5      A.   Yes, I did.

6      Q.   And did you find a rule-based knowledge engine

7  in Sponsored Search?

8      A.   Yes.

9          MR. FENSTER:  Let's go to Slide 110.

10     Q.   (By Mr. Fenster) So what is -- can you tell us

11  some of the evidence that you found that meets 26(b)?

12     A.   This was some descriptive information from a

13  Yahoo! document.  You can see down at the bottom here

14  there's the Yahoo! -- okay.  There's the Yahoo!

15  information.

16          And it was interesting that they actually used

17  the word rules in describing this pre-processing that

18  they do to kind of clean up the query, the keywords in

19  the query.

20          And they do things like they have a lowercase

21  converter that has a rule that says if I search along

22  the query and I see an uppercase character, just to

23  clean it up, they're going to make it lowercase.

24  They're going to take the capitals out.  They're going

25  to have a punctuation stripper that if it sees -- the

rule there would be if I see a piece of punctuation that
is meaningless to the claim -- to the query, then they
will remove it.

They remove prefixes that have, as it says
here, little semantic value, like show me or how can I,
and these other things.

They strip noise words.  Google calls those
stop words, but words that add little value to the
process.

And then Yahoo! takes the step of
re-sequencing all the keywords in the search in
alphabetical order.  That's something they do that I
don't believe that Google does, but it's just another
part of cleaning up the query keywords before they're
going to pass them on into the rest of their Sponsored
Search system.

Q.  And which part of claim element 26(b) is this
evidence that Yahoo! Sponsored Search meets?

A.  This is a rule-based knowledge engine that
uses rules like, if it's uppercase, make it lowercase,
if then.  That's what it does.

Q.  Okay.  And if we can go to your next slide,
No. 111, please.

What did -- what does this evidence show?

A.  Well, from the same document, they actually

had an example of how these things worked.  And it

started with someone who entered a fairly lengthy query,

all DVDs -- show me all DVDs featuring Paul Newman.

And then they went through -- you can see the lowercase

converter got rid of the capital DVD and the capitals in

Paul Newman.  They got rid of the punctuation, like the

colon, okay?  They stripped out phrases that were not

important, like show me.  They swapped the words around.

They cleaned up some phrases, got rid of the noise

words, like all, and finally put them in alphabetical

order.

        So what the Sponsored Search system actually

will see is the four keywords:  DVD featuring Newman

Paul.

    Q.   Okay.

              MR. FENSTER:  And this is from Exhibit --

Plaintiff's Exhibit 937 for the record.

    Q.   (By Mr. Fenster) So just to summarize with

Slide 112, does Yahoo! have a rule-based knowledge

engine as the Court has construed it?

    A.   It does.  And here are some examples just

couched as rules.  If I see a plural word, change it

singular, et cetera.  If I see a noise word, like all,

then take it out.

    Q.   And did you find any evidence from the

deposition testimony of Yahoo!'s own engineers that
supported your conclusion that 26(b) rule-based
knowledge engine was met?

A.    Yes, I did.  From Mr. Kolm's deposition,
here's a segment of that.  He was asked the following
question:  Do you know how those rules are implemented,
for example, how the rules for lowercase converter are
implemented?

He said:  Yeah.  The different rules are
implemented in slightly different ways.  That particular
one just walks through the characters of the string, and
if it is an uppercase character, it changes it to a
lowercase character.

And at another point in his deposition, he was
asked:  Okay.  And what information about the query is
compared to the attributes of the ad?

And his answer was:  At a high level, any
information about the query we have.  So we can look at
the query and look at it at a character basis, how often
the character shows up.  We can look at it on a word
basis.  We can identify words that are phrases that
belong together.

Q.    Okay.  And so did you find, based on all the
evidence that you reviewed, that Yahoo! has a rule-based
knowledge engine?

1        A.    Yes, I did.

2        Q.    Now, what about the second part of 26(b), the

3    case-based knowledge engine?

4        A.    I did.  And if you remember, the Court's

5    construction says it was a knowledge engine that

6    compares to exemplary cases.  And an excellent example

7    of an exemplary case would be a keyword entered by an

8    advertiser sort of like hoping that's going to be a

9    query keyword at some point in the future.

10            And I found some evidence that that takes

11   place as well.

12       Q.    Okay.  Now, Dr. Rhyne, remember with doc --

13   with Google, you walked us through where you had entered

14   an ad and the advertiser interface for Google told you

15   to provide information that you might expect to see in a

16   query?

17       A.    Yes.

18       Q.    Did you find anything similar with respect to

19   Yahoo!

20       A.    Yes.  I mentioned that I went through two

21   detailed videos that Yahoo! provides on the internet

22   showing potential advertisers how you create

23   advertisements and enter them into the Yahoo! system.

24            And there is a point in the Yahoo!

25   advertisement interface, much like the one for Google,

1  where you are prompted to enter keywords that will go

2  along with your ad. And those, again, are words that

3  you hope some future searching individual will enter,

4  and as a result, you can show your ad to them and have a

5  likelihood that they will be interested in your product.

6      Q.   And does the Yahoo! advertiser interface allow

7  the advertiser to add any other information besides

8  keywords that they might expect the user to search on?

9      A.   Yes. You can select territory. You can make

10 other types of restrictions as to the types of queries

11 that are received that you would want your ad to either

12 be shown or not to be shown.

13     Q.   And does Yahoo! also extract or derive other

14 information from the ad that it expects --

15     A.   Yes.

16     Q.   -- to be in the user search request?

17     A.   There are cases where it looks at words in the

18 ad itself to try to find out is there likely to be a

19 match between what's called a creative part of the ad

20 and the query.

21     Q.   And did you find, Dr. Rhyne, that Yahoo!'s

22 Sponsored Search compares text and attributes from the

23 search request with an exemplar case?

24     A.   Yes.

25     Q.   And tell us about that and where does that

happen.

    A.   Well, if we can go to, I believe, it's 114. This is taken from a Yahoo! document, and they were giving examples of how they do matches between queries and advertisements. And the text says, if the bidded term -- that's a keyword that the advertiser said they would like to have associated with their ad --

    Q.   Let me stop you right there, just to clarify. So the bidded term, that's the keyword that the advertiser enters that they think the user might search on?

    A.   Yes. That's Yahoo!-speak for what I previously have called a keyword associated with the ad.

    Q.   Thank you. I'm sorry to interrupt. Go ahead.

    A.   No problem.

    They say if the bidded term is diamond ring and the query that's been entered is diamond engagement ring, that would be a match based on what they do in their comparison software, because keywords from the bidded term are present somewhere in the query.

    So they've got a fairly smart comparison system that can recognize that diamond ring is very much like diamond engagement ring.

    Q.   Okay. And did you find other evidence showing that Yahoo! Sponsored Search has a case-based knowledge

1   engine required in 26(b)?

2       A.   I did.  And I pulled out of what is

3   essentially a little older Yahoo! document.  There's

4   some aspects of the next picture that I believe you have

5   on 115.

6           For example, over here on this side, it says

7   Live Search database.  It's my understanding that that

8   has now been replaced by this thing that they call

9   Elcaro now.

10          But I was -- the purpose of bringing this in

11  in a slide is to look at this middle area.  This is

12  something Yahoo! uses to try to find an initial set of

13  advertisements.  They call it a result test.

14          And a good example is Exact Match.  That's a

15  piece of software that says, is there an exact match

16  between the keywords in the query and the bidded

17  keywords or terms that have been identified by the

18  advertiser?

19      Q.   Okay.  So let me stop you right there.

20          So Exact Match is comparing two things:

21  Something from the query.  And what was that?

22      A.   The keywords in the query.

23      Q.   Okay.

24      A.   Like pizza.

25      Q.   Okay.  And are -- the keywords of the query,

1   are those attributes to the query?

2       A.    The keywords of the query are text of the

3   query, is the way I look at it.

4       Q.    Okay.

5       A.    Attributes would be something like the

6   geographic location that came in as part of that http

7   message.  It's additional information.

8       Q.    So those keywords from the query were compared

9   to what in the ad -- from the ad?

10      A.    What Yahoo! calls the bidded keywords, the

11  keywords that the advertiser entered and said I hope

12  this is something somebody will search on, and if they

13  do, they would probably like to see my ad.

14      Q.    Now, are there other comparisons in the Yahoo!

15  Sponsored Search, other than Exact Match, that satisfy

16  the case-based knowledge engine requirement?

17      A.    Yes.  There are some other things.  We talked

18  just briefly about King Kong.  There's a newer version

19  of King Kong called Yellowstone.

20            There's this Q-U-A-D, Quad system, all of

21  which use the information in the database where it says

22  the ad -- here's where the ad listings are.  It's got --

23  let me reset that.

24            They've got bidded terms.  They've got

25  markets, titles, descriptions, other things.  And you

can see the flow here.  They come over and look, and
then they bring back the matching ad listings.  And,
ultimately, after they select that result set, they come
over here.  That result set is then processed by the
part of the Sponsored Search system called the Affiliate
Server.

And it then also does comparisons and matching
to try to rank the ads that are in the result set so as
to get the best of those ads to send back to the
querying source.

Q.   Okay.  Now, when we go through --

MR. ROOKLIDGE:  Objection, report.

THE COURT:  Approach.

(Bench conference.)

THE COURT:  Okay.  What's the objection?

MR. ROOKLIDGE:  The objection is that he
didn't identify the Affiliate Server as one -- in his
report as one of the structures that provided the
case-based knowledge engine.

He talked about Exact Match, QBERT, King
Kong, Yellowstone, Quad, but he did not talk about the
Affiliate Server, so he's going beyond his report.

THE COURT:  All right.  What's the
response?

MR. FENSTER:  Your Honor, what is accused

1  in his report is the Sponsored Search engine.  He

2  describes that the comparisons take place in King Kong,

3  Quad, Yellowstone, and that the scoring that takes place

4  in 30 -- for Claim 30(b6) occurs in the Affiliate

5  Server.

6              It's all lumped -- it's altogether as one

7  accused device, the Sponsored Search.

8              THE COURT:  Okay.  Where does he

9  reference the Affiliate Server in his report?

10             MR. FENSTER:  In connection with

11  Claim 30.  Affiliate Server produces the case models in

12  order to process incoming electronic messages.  This is

13  at Paragraph 100 of his report.

14             (Bench conference concluded.)

15      Q.   (By Mr. Fenster) So, Dr. Rhyne, did you find

16  that Yahoo! Sponsored Search meets the case-based

17  knowledge engine?

18      A.   Yes.

19      Q.   Okay.  And did you find that Yahoo! Sponsored

20  Search meets both the rule-based and case-based

21  knowledge engine requirements of 26(b)?

22      A.   Yes, I did.

23      Q.   Now, we'll hear more in Claim 30 about the

24  case model aspect.

25             And does the evidence that we'll review with

1  respect to Claim 30 also support your findings with

2  respect to Sponsored Search meeting 26(b)?

3       A.   In that claim, because it had those six parts,

4  I go into much more detail about how the -- the

5  case-base comparisons of text and attributes and scoring

6  take place.

7       Q.   Okay.  And so may we check off that Yahoo!

8  Sponsored Search infringes Claim 26 -- or it meets the

9  elements of 26(b)?

10      A.   I was going to correct you.  I'm not asserting

11 infringement of Claim 26, but I have found that the

12 limitations of 26(b) are met in Yahoo! Sponsored Search.

13      Q.   That's right.  And that's -- and we're going

14 through these prerequisites, because they are dependent

15 claims that are not asserted?

16      A.   Yes, sir.

17      Q.   All right.

18           MR. FENSTER:  So 116, please.

19      Q.   (By Mr. Fenster) Now, before we go on to

20 26(c), the Court's claim construction says that the

21 steps of 26(a), (b), and (c) have to be done in order.

22           Now, does Yahoo! Sponsored Search meet that

23 limitation?

24      A.   Yes, they do.  They have interpreted the

25 electronic message both using the rule base to clean up

the query and the case-based knowledge engine to select

the appropriate queries.

And it's not until the very end of that

process, when they have the actual number of ads that

they're going to return, that they do a retrieval of one

or more of those ads corresponding to the interpretation

of the message from a repository for automatic delivery.

And they do that at the end of the process.  So the

ordering is met.

Q.   Okay.  So now, let's go to Claim

Element 26(c).

Is 26(c) met by Sponsored Search?

A.   Yes, it is.

Q.   And can you -- so as a reminder, this requires

retrieving one or more predetermined responses

corresponding to the interpretation of the electronic

message, retrieving those from a repository for

automatic delivery to the source?

A.   Yes.

Q.   All right.  So can you tell us how that's met?

A.   Well, I've used the Court's construction of

both predetermined response and repository.  And it's

met.  And if we go to 118, I've pulled together some --

some of the evidence that I cited in my report.

At the top is a deposition statement by

Mr. Kannan.  The question:  Where would that be done,
then?  What part of the system?

And he said:  In Elcaro.  It's -- it's a
place; it's a system called Elcaro, which is a
repository of the ads.

He actually used the word repository.

And then here, you can see on the right-hand
side of this system diagram, in the middle is that
Affiliate Server, okay?

And on the right-hand side is the Elcaro
system where the individual ads, which are, I believe,
to be one or more predetermined responses, each separate
ad, are held in that database.  And they are pulled from
that as part of a couple of steps.

When they're finding matching ads, there's
some use of that database.  And then later when they're
doing the last part of the process where they rank
price, filter, and determine placement, that's where
they do some additional pulling of the ads finally for
the purpose of sending them back to the Yahoo! front end
for the purpose of letting the searching person see
those advertisements along with their search results.

Q.   Okay.  So, Dr. Rhyne, if we can go back to
your slide, 104.  And this was your example of the
search on Texas Rangers, I believe.

1          Now, can you tell us where the predetermined

2    responses are on this slide?

3          A.    Each one of these little box points is an

4    individual predetermined response.  And when they pull

5    say the first one, the very top one -- or there's

6    another one over here that's a sponsored result.

7          Each of those is a predetermined response,

8    which is part of the Sponsored Search system, is

9    retrieved from Elcaro for the purpose of sending them

10   back to this screen in response to the search on Texas

11   Rangers.

12        Q.    Okay.  Now, the Court's claim construction

13   requires that there be a predetermined response.  It has

14   to have been prepared before receipt of the electronic

15   message?

16        A.    Yes.

17        Q.    So that's before -- that's before Yahoo!

18   receives the http search request?

19        A.    Yes.

20        Q.    Okay.  Now, where did each of these

21   database -- I'm sorry -- where did each of these ads

22   come from?

23        A.    The Elcaro database where they were entered.

24   For example, this first one is from a ticket reseller

25   called StubHub!.  They sat down and created that

1 advertisement using the Yahoo! advertiser interface. A

2 first line, a second line, et cetera. They put in

3 this -- it's called a URL -- this StubHub.com.

4 And they put that in maybe months ago or last

5 night, but they did that before the search came in.

6 Otherwise, their ad would not have been in the Elcaro

7 database to be returned for this search.

8 Q. Now, Dr. Rhyne, does this ad, or any ad, have

9 to be in the database already before it can be retrieved

10 and served on the search results page?

11 A. Yes.

12 Q. Now, you've read the report of Dr. Allan, who

13 is Yahoo!'s expert?

14 A. I haven't studied it in detail yet. I expect

15 I will, but I've read it at least once.

16 Q. Okay. And are you aware that he makes a -- he

17 makes an argument that the ads that Yahoo! serves are

18 not predetermined, because they're always being updated?

19 A. He said something like maybe during that

20 fraction of a second that -- between when I enter Texas

21 Rangers and click search and these ads appear on my

22 screen with the search results that somebody may have

23 entered a new ad.

24 I mean, I can't tell you that's impossible,

25 but I believe every one of these five ads were resident

in the Elcaro database before that search took place.

Q.   Now, what -- what's the approximate time period between the time that Yahoo! receives the http request and the time that it serves these ads?

A.   A fractional part of a second, something like two-tenths to a half of a second at the top.

Q.   And do you think it's likely, Dr. Rhyne, that someone entering or making changes at the advertiser side of the Yahoo! interface would be making a change in that split fraction of a second that would result in an ad here?

THE COURT:  Excuse me just a second.

MR. ROOKLIDGE:  Objection, report.

THE COURT:  Overruled.

A.   I think it's unlikely.  But frankly, even if that happened, it wouldn't affect my infringement position, because let's say that there was just this -- this first ad happened to come in during that fraction of a second.  Then I would look to the second ad that was in there last night as infringing the claim, so...

Q.   (By Mr. Fenster) Well, how can you do that?  What does the claim language actually say?

MR. FENSTER:  Let's go back to 117, please.

A.   It says -- excuse me.

1    Okay.  It says retrieving one or more

2  predetermined responses.  So as long as one of those ads

3  is an ad that was in there before I entered my request,

4  and even Dr. Allan didn't say that every single one of

5  those six or seven or eight ads, maybe up to eleven,

6  that Yahoo! returns came in during that tenth of a

7  second.

8    So the claim is met.  That limitation is met

9  when one of the ads was in the Elcaro database.  And we

10 saw the quote from Mr. Kannan who said Elcaro is the

11 repository of the ads.

12    Q.   (By Mr. Fenster) All right.  So have you

13 reached a conclusion that 26(c) is met by Yahoo!'s

14 Sponsored Search?

15    A.   Yes, I have.  It is.

16    Q.   Let's go ahead to 120 and move on quickly

17 through Claim 28.

18    So did you find that -- you found that all of

19 26 was met, so we can check off the preamble of 28; is

20 that right?

21    A.   Yes, you can.

22    Q.   All right.  Now, let's move on to 28(b1).

23    MR. FENSTER:  121.  Thank you.

24    Q.   (By Mr. Fenster) And remind us, we have two

25 sub-elements, two possible classifications?

1    A.    Yes.

2    Q.    Now, is -- does the claim require both, or is

3  one sufficient to satisfy?

4    A.    I believe because it says at least one of, (i)

5  and (ii), you can meet this limitation either by

6  classifying the message as being able to be responded to

7  automatically, or by classifying a query as requiring

8  assistance from a human operator, or both.

9    Q.    Okay.  So let's talk about that first little

10  classification, sub (i), classifying it being able to

11  responded to automatically.

12        Does Yahoo! Sponsored Search meet that

13  element?

14    A.    Yes, it does.

15    Q.    Okay.  And did you find evidence in the

16  testimony of Yahoo!'s own engineers?

17    A.    Yes.  Mr. Kolm.

18              MR. FENSTER:  123, please.

19    A.    He was asked the following three questions and

20  gave these answers:

21        So is it accurate to say that Yahoo! makes a

22  determination as to whether there are any ads that are

23  relevant and of sufficient quality to serve.

24        He said:  Relevant and of sufficient quality

25  and meet the advertiser's constraints, advertiser and

publisher constraints.

We're not dealing with the publisher side, so advertiser constraints are what I focused on.

And the next question: Okay. And if Sponsored Search determines that there are no ads that are relevant of sufficient quality and that meet the advertiser's constraint -- advertiser and publisher constraints, then what?

And he said: We return no ads.

The next question: Is this determination as to whether there are ads to serve that meet all the requirements that you just identified? Is that done automatically by software?

And he said: Yes, it is.

That's the decision that I believe classifies a query, a search request, which is the non-interactive electronic message as either being able to be responded to automatically, if there are ads of sufficient quality and sufficient match, or it's not able to be responded, if there aren't any ads.

Q. (By Mr. Fenster) So Yahoo!'s own engineer, Mr. Kolm, admitted freely that Yahoo! makes a determination as to whether it has ads to serve, right?

A. Yes.

Q. Can you remind us, going back to 122, what the

1  Court's claim construction is for classifying?

2      A.    The Court said classifying the electronic

3  message means determining whether the electronic message

4  falls into one or more categories.

5          And in this case, the categories are I have

6  ads that I can return automatically, or I don't have ads

7  that I can return automatically, which means I can't

8  respond automatically.

9      Q.    Okay.  So did you find that Yahoo! infringes

10  or meets the elements of Claim (b1), because it

11  satisfies the step of (b1)(i)?

12      A.    Yes.

13      Q.    And did you also do --

14              MR. FENSTER:  That's 124, please.

15      Q.    (By Mr. Fenster) And did you also analyze

16  whether Yahoo! Sponsored Search meets the second

17  classification, which is not required -- only one is --

18  but the second classification of (b1)(ii)?

19      A.    Yes, I did.

20      Q.    Okay.  And that requires classifying as

21  requiring assistance from a human operator?

22      A.    Yes.

23      Q.    And what did you find with respect to

24  Sponsored Search?

25      A.    Much like I found in the Google case, that

Yahoo! keeps records on what's happening with ads and clicks and queries in their system, and that they are concerned about click fraud and impression spam.

And particularly I'm focusing on impression spam, because that involves a query and some sequence of advertisements that that query brings up.

And Mr. Kolm was also asked about that.

Q. Okay.

MR. FENSTER: Let's go to 125.

A. The question was: So is it accurate to say that there is a set of programs that generate reports from which you can determine whether the engineering group needs to be involved to deal with cases of potential click fraud or impression spam?

And he said: Yes. There's -- missed a little grammar here -- there is reports generated, and if those reports look unusual, the engineering team will be asked to evaluate.

Q. (By Mr. Fenster) Okay. Now, the second classification step requires classifying as requiring human assistance?

A. Yes.

Q. So how does Yahoo!'s generation of these reports meet that limitation?

A. If impression spam is found to be likely to be

present, those reports cause the engineering team to be

asked to evaluate, and that's people, okay?  That's

people who work for a particular manager at Yahoo!, and

those -- those people are told:  Take a look at these

particular parts of the data that we've collected about

use of our Sponsored Search system and see if it's

something we ought to respond to.

Q.   Now, did you analyze -- actually, did you find

any other evidence that supported your conclusion with

respect to 28(b1)(ii)?

A.   Yes.  I found a -- sort of a PowerPoint set of

slides that apparently was a talk that was given by one

of the managers at Yahoo! who works in what they call

the Traffic Protection Group, which is their spam work.

And it --

Q.   Excuse me, Dr. Rhyne.

This is from Plaintiff's Exhibit 608.

A.   Right.

Q.   Go ahead.

A.   And it was interesting that he referred to the

system he was describing as the Traffic Protection and

Classification Platform.

He has -- you can see the interesting

terminology.  He has a traffic protection rule engine,

which is the rule system that looks in all that data.

And he says that that system enables consistent advanced

classification and filtering of searches -- clicks,

searches, and impressions.

And, again, impression is that impression

spam.  It's a combination of a query and a repetitive

sequence of bringing up the same ad.

So they, in their own terminology, refer to

that as a form of classification.

Q.    Now, Dr. Rhyne, with respect to this claim

element of 28(b1)(ii), did you analyze that for literal

infringement?

A.    I've looked at it for literal infringement,

and I've also looked at it as based on something that I

believe that Google or their experts may argue is a

non-infringement situation.

I've also looked at it from the point of view

under Doctrine of Equivalents.

Q.    Okay.  And did you -- did you find that

Sponsored Search literally meets Claim Element (b1)(ii)?

MR. ROOKLIDGE:  Objection, report.

Excuse me.  I withdraw that to this

question.  The Doctrine of Equivalents.

THE COURT:  Okay.  Insofar as literal

infringe is concerned.

THE WITNESS:  I found literal

infringement.

MR. FENSTER: May I have a moment?

THE COURT: Yes.

Q. (By Mr. Fenster) And did you also analyze --
and did you also make -- analyze Sponsored Search under
the Doctrine of Equivalents with respect to 28(b1)(ii)?

MR. ROOKLIDGE: Objection, report.

THE COURT: Okay. Approach.

(Bench conference.)

MR. FENSTER: Your Honor, because of
Yahoo!'s late production of documents related to click
protection, you authorized a supplemental report. This
was in the supplement report at Paragraph --

MR. GIZA: 20.

MR. FENSTER: -- 20.

THE COURT: Okay. Overruled.

(Bench conference concluded.)

Q. (By Mr. Fenster) So, Dr. Rhyne, did you reach
a conclusion with respect to whether Sponsored Search
meets 28(b)(ii) under the Doctrine of Equivalents?

A. I did.

Q. And what was your finding?

A. Well, as I understand the possible argument,
it was that in the Traffic Protection system, in order
to recognize impression spam, you have to group together

1  a sequence of queries.

2          Impression spam is likely to occur if you get

3  someone who enters the same query, the same search over

4  and over again in a short period of time and never

5  actually clicks on an ad that comes up.  They're just

6  trying to get somebody else's ad to appear and not be

7  clicked on, which makes it look less attractive.

8          So in order to recognize it, you don't look at

9  an individual query by itself, but rather you look at a

10 group of queries.

11         And if someone interprets this claim to

12 require that you have to look at each individual query

13 by itself without regard to anybody else, the way I set

14 forth my Doctrine of Equivalents argument is it's the

15 same function.

16         The way it's done is to group together a set

17 of queries, which basically identifies the whole group

18 and each and every individual query in that group as

19 being an example of impression spam.  That's a query

20 that needs to be looked at by a human being.

21         If you classify a group of queries, you

22 certainly have classified each individual query.  So I

23 don't see that as a substantial difference.  And the end

24 result is, you identify one query and a lot of other

25 queries collectively as needing human interaction.

1    And so I think even if someone interprets the
2 claim to require only looking at individual ones, you
3 still have identified each and every individual query in
4 that set.  So I think that would be infringement under
5 the Doctrine of Equivalents, even if the claim has
6 interpreted it that way.
7    Q.   So based on your review of all the evidence,
8 including the testimony from Yahoo!'s own engineers and
9 the review of their documents, you found that Yahoo!
10 meets 28(b1)(ii) both literally and under the Doctrine
11 of Equivalents?
12              MS. DOAN:  Objection, leading, Your
13 Honor.
14              THE COURT:  Pardon?
15              MS. DOAN:  Leading.
16              THE COURT:  Overruled.
17    Q.   (By Mr. Fenster) Is that right?
18    A.   That's true.
19    Q.   All right.
20              MR. FENSTER:  So let's go to 127, please.
21    Q.   (By Mr. Fenster) So with respect to (b1), can
22 we put a check by 28(b1)?
23    A.   Both parts.  That's why I have two checks put
24 on this slide.
25    Q.   Okay.  So now just a reminder, to infringe

1  (b1), only one of those needs to be done?

2      A.   Yes, that's my opinion.

3      Q.   Okay.  Now, with respect to the first

4  classification, does that determination requiring --

5  determining that it can be responded to automatically,

6  does that happen before step (c)?

7      A.   Yes.

8      Q.   Okay.  And what about the second

9  classification that Google -- that Yahoo! does, does

10 that happens before or after step (c)?

11     A.   As a computer guy, I would say, yes, it's one

12 of those two.  But it happens after, okay, because they

13 analyze that data some time later.

14          So it does not happen before step -- let me

15 put it on the record precisely.

16          The infringement that I have found for

17 step 28(b1(ii) does not occur before the retrieving step

18 of 28(c).

19     Q.   Okay.  Now, if the Court instructs the jury

20 that the step of 28(b)(i) has to be performed in order

21 before 28(c), do you find that that -- that 28 would be

22 met?

23     A.   I need to understand your question better.

24     Q.   Sure.

25     A.   If the Court -- you mean if Judge Everingham

1 instructs the jury that both -- that some part of (b1)

2 has to be performed?

3     Q.   Yes.

4     A.   Okay.

5     Q.   If he -- if he instructs the jury that the

6 steps of 28(b1) -- that (b1) has to be satisfied before

7 28(c), do you find that that -- that that limitation is

8 met?

9                MR. ROOKLIDGE:  Objection, report.

10                THE COURT:  Counsel, approach.

11                (Bench conference.)

12                THE COURT:  The first thing is this:

13 We're not going to have objections by committee,

14 Mr. Rooklidge.  Y'all need to appoint one person at your

15 table to make objections on behalf of your client, okay?

16                And I'm not fussing at either you or

17 Ms. Doan for doing that, but, you know, it's highly

18 irregular to have multiple people at counsel table

19 standing up and making objections when I know that only

20 one of you is going to be actually doing the

21 cross-examination.

22                So pick -- pick a person and assign that

23 task to that person.

24                Now, where is this in his report?

25                MR. FENSTER:  Your Honor, this is an

1  issue that just came up, as you know, yesterday.  So out

2  of an abundance of caution and to be absolutely

3  respectful of Your Honor's ruling, I'm trying to make it

4  perfectly clear for JMOL purposes and for the jury which

5  it meets and which it doesn't.

6              THE COURT:  Well, I understand.  In light

7  of the fact that -- the Court's claim construction

8  position, I don't recall being advanced on this by the

9  Defendants on this indefinite argument that I rejected

10 given the procedural posture through which this claim

11 construction issue has arisen.

12              I'm overruling the objection.

13              MR. FENSTER:  Thank you, Your Honor.

14              (Bench conference concluded.)

15      Q.    (By Mr. Fenster) Let me try to restate that

16 question.

17      A.    I do remember it.

18      Q.    Okay.  So if -- I'm not sure I do.

19              If the Court determines and instructs the jury

20 that the steps in 28 have to be performed in order, do

21 you find that 28 -- the steps in 28 are met by Yahoo!

22 Sponsored Search?

23      A.    Yes.  As far as -- because the first part of

24 (b1) -- and I believe it only requires that one of those

25 two parts be done -- it's definitely done before 28(c).

1    Q.   Now, 28(c) --

2              MR. FENSTER:  Let's go on to 28(c).

3    Q.   (By Mr. Fenster) 28(c) requires retrieving one

4    or more predetermined responses corresponding to the

5    interpretation of the electronic message from a

6    repository for automatic delivery to the source when the

7    classification step indicates that the electronic

8    message can be responded to automatically.

9              Did you make a finding with respect to

10   Sponsored Search meeting -- whether it meets

11   Claim 28(c)?

12   A.   I did.

13   Q.   And what did you find?

14   A.   Well, I'll reuse the same piece of evidence,

15   and this is only some of the evidence that's cited in my

16   report.

17             But here is the quote from Mr. Kannan about

18   that Elcaro is the repository of the ads, and I

19   identified the way the Affiliate Server pulls up ads and

20   returns them.  It gets them from Elcaro in order to send

21   them back, after the matching and selection process, the

22   scoring process have all been performed.

23             And I believe that that meets 28(c) in the

24   same way that 26(c) was previously met.

25   Q.   Okay.

           MR. FENSTER:  And if we can go back to --
I'm sorry -- 123.

     Q.   (By Mr. Fenster) This was Mr. Kolm, the Yahoo!
engineer's testimony, where he says it makes a
determination?

     A.   Yes.

     Q.   So is that ad returned only after a
determination is made that there is an ad to serve?

     A.   Obviously.  They have to find the ad.  And
they go through this -- find a set of matching ads and
then they score them, and they would have certainly
classified the ads as being able to respond when they
find it.

           So the ordering is met.

     Q.   Okay.  And with respect to -- and is that
predetermined -- is it a predetermined response?

     A.   Each and every one of the ads is a
predetermined response retrieved from the repository
that is Elcaro.

     Q.   And that's for the same reasons that we went
through with respect to 26(c)?

     A.   Absolutely.

     Q.   Okay.  And does -- do those predetermined
responses correspond to the interpretation of the
electronic message?

1    A.   Yes.  The reason that they're in that set

2  that's considered as possible ads to return is that the

3  matching and the scoring and all that taking place to

4  try to identify the best ads to send back, based on what

5  came in in the message.

6              MR. FENSTER:  And let's go to 127,

7  please.

8    Q.   (By Mr. Fenster) And we saw, with respect to

9  26(c), that they are retrieved from a repository?

10   A.   Yes, Elcaro.

11   Q.   And are they retrieved for automatic delivery

12  to the source?

13   A.   Yes.

14   Q.   And we already talked about when the

15  classification step indicates that the message can be

16  responded to automatically.

17          So did you find that Sponsored Search meets

18  all of the elements of Claim 28?

19   A.   Yes.

20   Q.   That's 129.

21          Now let's move on to Claim 30, which is

22  actually being asserted -- asserted for infringement

23  here.

24          So did you analyze whether Sponsored Search

25  meets Claim 30?

1    A.    I went through -- first, we've already been

2  through 28, and that depends on 26.  So having done 26

3  and 28, I'm now at the six elements or steps of

4  Claim 30.  And I've done all of them for Sponsored

5  Search.

6    Q.    Okay.  Now, how did -- and did you make a

7  finding as to whether Yahoo! Sponsored Search meets

8  Claim Element 30(b1)?

9    A.    I did.

10    Q.    Okay.  Can you walk us through that?

11    A.    Yes.  I've got a piece of -- again, I haven't

12  tried in these slides to show every piece of evidence

13  that I cite in my report and the charts that I've

14  produced, but if we go, I think, to 133.

15    Q.    Sure.

16    A.    Okay.  This is from a Yahoo! document.  You

17  can see this Bates number down here, YH-PSET0004304.

18  And it was just -- I liked it for the purpose of this

19  slide presentation, because it's a prose description.

20         It says how Sponsored Search works, an

21  overview, to obtain the best result set, Sponsored

22  Search employs several search technologies as specified

23  by the partner feed configuration.

24         Now that's -- the feed is -- that's their term

25  for these messages coming in.  And partners -- it's

interesting that Yahoo! refers to itself as a partner as well as other companies who may make use of Yahoo!'s search capabilities.

It says: Most search technologies use a canonical form of the raw query -- that's what's -- that's the message -- to find relevant ad listings -- and this is, again, a reference to the older database, Live Search database, but now it's been replaced by Elcaro -- as a function of bidded term values. Those are part of the advertisements. Others employ content-driven technologies to obtain eligible listings. This just is talking about the match. If we go to the next slide, it's a continuation of that. And the point I have here is that in addition to keyword match, they also use this geo-targeting graphical -- geographical targeting.

If I want my ad only to be shown to people in Texas, then that's what they do. They look at the query and say, what does the query identify as its location? And if the advertiser wants to match Texas to a querying person from Texas, that's what geo-targeting is.

MR. FENSTER: And this document, just for the record, is in evidence as Plaintiff's Exhibit 968.

Q. (By Mr. Fenster) Now, did you find any evidence in Yahoo!'s actual source code that shows them

1  meeting 30(b1)?

2      A.   I did.

3              MR. FENSTER:  Let's go to 135, please.

4      A.   I identified this in my report, but basically,

5  here's a sub-routine that's called parse, which is a

6  computer word for analyze or search through, the

7  arguments.  And they also have an access handler that

8  when you look at the details of the software, those two

9  functions, among others, parse the incoming query into

10 what are called keyword value pairs.

11             So a keyword would be like location, and the

12 value would be Texas, and another one would be search

13 term, and it would say pizza.  It goes through that for

14 both text and attributes.

15             MR. FENSTER:  And for the record, this

16 document that has the source code is in evidence as

17 Plaintiff's Exhibit 1060.

18     Q.   (By Mr. Fenster) Now, Dr. Rhyne, yesterday we

19 took a look at your summary charts, which was Exhibits

20 163, and you have evidence starting at Page 1 -- Page 33

21 of 47 for 30(b1); is that right?

22     A.   Yes.

23     Q.   And then that continues to Page 36.

24     A.   If you stop for a moment, that's some of the

25 cites to that software that I got encapsulated in the

1  previous graph.

2      Q.   And then it continues on Page 35.  This is all

3  still evidence for 30(b1), right?

4      A.   Yes.  That's that same drawing I was repeating

5  about the matching again.

6      Q.   And then this is evidence on Page 36, and this

7  is a document from Plaintiff's Exhibit 968.

8      A.   Right.

9      Q.   How did --

10     A.   This was about geo-targeting.

11     Q.   Okay.  And then last, on Page 37, you have a

12  quote from Plaintiff's Exhibit 964.

13     A.   Yes.

14     Q.   Now, Dr. Rhyne, Exhibit 163 has a lot of

15  evidence in it.

16          Did you prepare or direct the preparation of

17  an even more summary chart just setting forth the --

18  just citing the evidence that's in your -- in your

19  summary chart?

20     A.   Yes.  You asked me to go through and take the

21  previous chart that actually had all the citations from

22  the evidence itself and produce an even smaller chart

23  that just -- instead of copying in the text from the

24  references, just identified them by Bates numbers and

25  also included for deposition testimony, the questions

1    and answers that I thought were relevant.

2              And I think it reduced what previously was

3    about 50 pages by about half.  It's down to 25 pages now

4    for Yahoo!.  And I did a similar thing for Google, and

5    it's only 22 pages.

6         Q.    Okay.  And is that Exhibit 163A?

7         A.    Yes, it is.

8         Q.    And so, for example, for 26 in the preamble,

9    all you do is list the exhibit --

10        A.    Yes.

11        Q.    -- with the Bates number that you refer to,

12   the exhibit Bates number and the actual deposition

13   testimony that you relied on Q and A with a citation?

14        A.    That's correct.

15        Q.    And is that the only thing that appears in

16   this document?

17        A.    I believe so.  That -- that's what I've

18   attempted to do.

19        Q.    And this is a summary of the evidence that you

20   relied on -- is this a summary of the evidence from

21   Yahoo! that you relied on in forming your opinions?

22        A.    It is.  It's the same set of evidence that I

23   had in the more complete chart, but I just deleted from

24   this particular set of pages the actual text of the

25   citations.

1        I left the text of the depositions, but for

2   the other documents, I just gave you the exhibit number

3   and the Bates numbers of the pages.

4            MR. FENSTER:  Your Honor, I'd like to

5   offer -- move 163A into evidence.

6            MR. ROOKLIDGE:  Objection, hearsay.

7            THE COURT:  Objection?

8            Ladies and Gentlemen, I'm going to

9   receive into evidence 163A for the limited purpose of

10  providing you with a summary of the evidence on which

11  Dr. Rhyne relied for the purpose of forming his opinion.

12  You should limit your consideration of it for those

13  purposes.

14     Q.   (By Mr. Fenster) So, Dr. Rhyne --

15           THE COURT:  Be received for those

16  purposes.

17           MR. FENSTER:  Thank you very much, Your

18  Honor.

19     Q.   (By Mr. Fenster) So just so the jury will know

20  what this document is, and we'll have a similar one for

21  Google, when you see the evidence cited on the right

22  next to a claim element, what does that mean?

23     A.   It means that I went to that page of that

24  exhibit and found something that I felt was directly

25  supportive of my opinion, for example, that, in this

case, Step 26(a) was met by the Sponsored Search system.

Q.   And just as an example, since we're on 30(b1),
this is at Page 14 of Exhibit 163A.

MS. DOAN:  Is it A or B, Counsel?
Objection, Your Honor.

MR. FENSTER:  It's 163A.

THE COURT:  Okay.

Q.   (By Mr. Fenster) So with respect to -- so
what's listed -- or is this the evidence that you relied
on with respect to -- in forming your opinions with
respect to 30(b1)?

A.   Yes.  The first several are, I believe, based
on my recollection of the very low Bates numbers, are
printed pages from the software okay.

Q.   All right.

A.   And the others are -- the later ones in this
particular section on 30(b1) are other Yahoo! documents.

Q.   All right.  Thank you very much, Dr. Rhyne.
So going back to your Exhibit 136 --

A.   Changed places.  That's why.

Q.   All right.  Okay.  So may we place a check
next to 30(b1)?

A.   I had one put on the slide for that purpose to
indicate that I believe 30(b1) is met by Sponsored
Search.

1    Q.   All right.  And can you tell us, did you reach

2  a finding as to whether or not Sponsored Search meets 30

3  -- meets 30(b2)?

4    A.   Yes, I have.  I believe that it does.

5    Q.   All right.  And can you show us some evidence

6  that you relied on to meet that -- to reach that

7  conclusion?

8    A.   Well, a lot of evidence is in this

9  Exhibit 163A, but I pulled out a simple piece to point

10 to, this part of the testimony of Mr. Kolm that's on my

11 Slide 137.

12        And he was asked:  Okay.  And what information

13 about the query -- that's the electronic message or the

14 search -- is compared to the attributes of the ad?

15        And he said:  At a high level, any information

16 about the query we have, so we can look at the query and

17 look at a character basis, how often the character shows

18 up; we can look at it on a word basis; we can identify

19 words that are phrases that belong together.

20        And he's basically confirming that they go

21 through the query and produce a case model by finding --

22 the requirement in the Court's construction is text and

23 attributes, and the text would be the keywords, and the

24 attributes would be like the location of where the

25 person who sent in the query was found.

Q. Okay. And based on this testimony from Yahoo!'s engineer, Kolm, and the evidence summarized in Exhibit 163A, did you find that 30(b2) is literally met?
A. Yes.
Q. All right.
MR. FENSTER: Let's move on to 30(b3) and 138, please?
Q. (By Mr. Fenster) And did you find that Sponsored Search meets the requirement of flagging the attributes of the case model which are detected in the electronic message?
A. Yes.
Q. All right. Now, remind us, the electronic message is?
A. The http request, with all those characters, and the keyword that's in the search request that's sent to the Yahoo! front end.
Q. Okay. And flagging the attributes, what does that mean?
A. That's what -- when you go through that complex set of question marks and slashes and letters and you find the information, such as the resource locator that can be interpreted to give you a location, you're finding that characteristic of the message that's separate from the text.

1     Q.   Okay.  And did you find any evidence in

2 Yahoo!'s source code, their actual source code for

3 Sponsored Search, that shows that they meet the element

4 of flagging the attributes in (b3)?

5     A.   I did.  And I discussed this in more detail in

6 my expert report, but I will point specifically to

7 several functions that are found in that software, the

8 first of which is called prepare affiliate parameters.

9        That's in the affiliate server where it goes

10 in and looks for the parameters of the message.  It says

11 parse the afili -- in the affiliate the data and to get

12 UIP, which I believe, when I looked at the source code,

13 is associated with finding the location that's

14 identified by that universal resource locator that's

15 part of that http message.

16     Q.   Okay.  And in addition to that source code

17 that you just cited, did all of these Exhibits 937, 940,

18 1060, 1061, and all of these citations, did those

19 support your findings?

20     A.   Yes, they do.

21     Q.   Now, let's move on to 30(b4), comparing the

22 flagged attributes of the case model with the stored

23 attributes of the stored case model of the case base.

24     A.   All right.

25     Q.   All right.  Now, this is -- did you find that

1  that element is met?

2       A.   Excuse me.  I did.

3       Q.   All right.  Now, one thing that you cite here

4  is the Kannan depo at 29, 19 through 25?

5       A.   Yes.

6       Q.   Did that support your conclusion?

7       A.   It did, and I actually copied that in.

8       Q.   Actually, I think that --

9       A.   Okay.  I'm sorry.

10       Q.   -- I have the transcript right here.

11       A.   That's right.

12       Q.   This is from the deposition of Ashvin Kannan.

13  And I apologize.  I don't know how to pronounce that

14  name.  And this is from his June 24, 2010, deposition at

15  Page 29 -- Page 29, Lines 19 through 25.

16           It says:

17           QUESTION:  Okay.  So you also mentioned the

18  Yellowstone system.  Is that always used after the QBERT

19  system in Channel 1 or Feed 1?

20           ANSWER:  Yeah.  So -- yes.  So Yellowstone

21  is -- is actually the system that retrieves the ads.

22  QBERT in that Feed 1, that situation, just provides the

23  query formulations.

24           And was that part of the testimony that you

25  relied on?

1   A.  Yes.  And that feed that he's talking about is

2 the channel through which the queries that are entered

3 into the Yahoo! search system come from.

4   Q.  Okay.  Now, you started to go through this

5 deposition testimony that you actually cite in 163A, and

6 this is from Yahoo! engineer Kolm?

7   A.  Yes.

8   Q.  And what is this testimony?

9   A.  Well, he was asked:  And so King Kong --

10 that's another one of those software systems that select

11 advertisements as part of the preliminary advertisement

12 selection -- and he said -- the question was:  So King

13 Kong compares the raw query with what information from

14 the ad?

15     He said:  It can look at the ad's title, the

16 description, the display URL -- that's that universal

17 resource locator -- and the information on the landing

18 page that you would go to if you clicked on the ad.

19   Q.  So let me stop you there.

20     So it can look at the ad's title, the

21 description, the display URL, and the information on the

22 landing page?

23   A.  Uh-huh.

24   Q.  Are any of those things attributes of the ad?

25   A.  The URL -- well, the URL is in the ad, but at

1  that point, that's -- that's more the text of the ad, I

2  think.

3          The attributes of the ad would be like the

4  location restrictions and things like that that they

5  made, or if they said:  I don't want this ad to be shown

6  on my competitor -- you know, in response to a

7  competitor -- there are all these things that the

8  advertiser can say about where and what (sic) they want

9  their ad to be done.

10      Q.   And does Sponsored Search make a comparison

11 between text and attributes --

12      A.   Yes.

13      Q.   -- from the electronic message with text and

14 attributes of the ad?

15      A.   The -- an example of text would be keyword to

16 maybe the -- a line of the ad.  An example of attributes

17 would be that geo targeting that we looked at a little

18 while ago.

19      Q.   Okay.  And the evidence that you have to

20 support your conclusions for 30(b4) is on Pages 17 and

21 18 --

22      A.   Yes.

23      Q.   -- of Exhibit 163A?

24      A.   Yes.

25      Q.   All right.  And did you find that the -- that

1  Yahoo!'s Sponsored Search literally meets the elements

2  of 30(b4)?

3       A.    I did.

4       Q.    Now, did we look at 141, or did I take you

5  away from that too fast?

6       A.    This is just another quote from Mr. Kolm.

7       Q.    Okay.

8       A.    It says about the same thing that we saw.

9             He was asked:  Am I correct that the overall

10  relevancy score will generally increase the more

11  similarities there are between the text and other

12  information from the query and the text and other

13  information from the ad?

14            And he said:  Yes, that would be a fair

15  statement.

16            Now, we're going to talk about scoring in a

17  minute, but the point here is that he agreed that the

18  process of selecting ads, which ultimately does a

19  relevancy score, involves looking for similarities

20  between the text of the ad -- excuse me -- text and

21  other information from the query -- that's text and

22  attributes -- and the text and other information from

23  the ad -- that's text and attributes of the ad, which is

24  what we've been dealing with in working our way through

25  (b3), (b4), and (b5) of Claim 6 -- of Claim 30.

1  Q.  So when Dr. -- Mr. Kolm from Yahoo!, their own

2  engineer, admits that it compares text and other

3  information from the query, that is talking about text

4  and attributes from the query?

5  A.  Yes.

6  Q.  And he says that that's compared to text and

7  other information from the evidence.  And is that text

8  and attributes from the ad?

9  A.  Yes.

10  Q.  And does -- do you have an opinion as to

11  whether that's comparing the case model to an exemplar

12  case?

13  A.  Yeah.  The case model is the text and

14  information from the query which has been extracted out

15  of that http request by the software that Yahoo! has in

16  its front end of its -- the early part of their

17  Sponsored Search system.

18       And the stored case model are the ads and

19  attributes of the ads and other information that are

20  associated with them that are out in that Elcaro

21  database.

22  Q.  Okay.

23  A.  So this is exactly describing finding

24  similarities between the information about the query --

25  that's the case model -- and information about the ad --

that's the stored case model.

Q. Now, although the -- you cited this originally for 30(b4), does this quote also -- from Mr. Kolm also support your finding with respect to 30(b5)?

A. Interestingly enough, I'll come back to it for 30(b6) as well. He basically laid out the heart of what happens. This is the way in which the Sponsored Search system infringes Claim 30. It does exactly -- in that one sentence, in answering that question, he's encapsulated what they do.

Q. Now, in finding that Yahoo! Sponsored Search infringes Claim 30, are you basing your analysis only on this quote from Mr. Kolm?

A. Oh. Oh, no, no. You can go to -- I cited a number of software references and other things in my written report, and then I've also identified them in this Exhibit 163A.

Q. And do Yahoo!'s own documents support Mr. Kolm's statement?

A. Both the software and the -- and the documents do.

Q. All right. So let's go ahead back to your Slide 142. And can we check off 30(b4)?

A. Yes, you can.

Q. And I think we just talked about (b5). Did

1  you find that the Sponsored Search meets 30(b5) of

2  comparing -- comparing the text of the case model with

3  the stored text of the stored case model?  Did you find

4  that that element was met?

5      A.   Yes, I have.

6      Q.   And, in fact, does that quote from Mr. Kolm

7  support that as well?

8      A.   Exactly.

9      Q.   All right.  And the other evidence that you

10  have cited in 163 for 30(b5), does that also support

11  your conclusion?

12     A.   Yes.

13     Q.   All right.  So did you find that Yahoo!

14  Sponsored Search meets 30(b5)?

15     A.   Yes.

16     Q.   All right.  So that's 146.

17          Okay.  Now, you've already touched briefly on

18  30(b6).  Did you find that Yahoo! Sponsored Search meets

19  Element 30(b6) of assigning a score?

20     A.   Yes.  They do create a score.  A couple of

21  them, in fact.  They talk about a clickability score and

22  something they call the overall relevancy score as part

23  of their way of taking that subset of advertisements and

24  picking the ones that they think would be the best ones

25  to send back in the hopes that somebody will click on an

1  advertisement.

2      Q.   Okay.  So going back to 141, did Mr. Kolm's

3  testimony that we just looked at support that?

4      A.   Yes.  He said:  Am I correct that the overall

5  relevancy score will generally increase the more

6  similarities there are between the text and other

7  information from the query and the text and other

8  information from the ad?

9          He said:  Yes, that would be a fair statement.

10 So he's talking about this computed relevancy score.

11 And then he was asked:  And the lower the similarity

12 between those things, the lower overall relevancy score?

13          And he said:  Yes.

14     Q.   Okay.

15              MR. FENSTER:  Now, let's go back to 146

16 quickly.

17     Q.   (By Mr. Fenster) Okay.  So let's look at the

18 actual text of the -- what the claim requires.

19          So assigning the score, that was the overall

20 relevancy score?

21     A.   Yes.

22     Q.   And it says:  The score increasing when at

23 least one of the attributes and the text match the

24 stored case model.

25     A.   Yes.

1           MR. FENSTER:  So let's go back to 141.

2     Q.  (By Mr. Fenster)  QUESTION:  Am I correct that

3  the overall relevancy score will generally increase the

4  more similarities there are between the text and the

5  other information from the query?

6           Does that support your finding with respect to

7  this part of 30(b6)?

8     A.  Yes.

9     Q.  Now, 30(b6) then goes on to say:  And the

10  score not increasing when at least one of the attributes

11  and the text do not match the store case.

12           Does his testimony support that element?

13     A.  Yes.

14     Q.  Where so?

15     A.  He says in the second question:  The lower the

16  similarity, the lower the score.

17           I paraphrased.  Let me read it exactly.

18           QUESTION:  And the lower the similarity

19  between those things, the lower overall relevancy score?

20           And he said:  Yes.

21     Q.  Now, did you analyze -- so did you make a

22  finding with respect to Claim 30(b6) under literal

23  infringement?

24     A.  Yes.

25     Q.  And what did you find?

1    A.    I found, based on my analysis of a lot of

2  the -- all the references that are in this Exhibit

3  163A -- but this quote from Mr. Kannan, and we actually

4  have another -- I'm sorry -- from Mr. Kolm.  There's a

5  similar quote from Mr. Kannan on my Slide 143.

6         He just was asked the same basic question:  In

7  general, the better the match between the query and the

8  ad, the higher the overall relevancy score?

9         And he said:  Yes.

10         QUESTION:  And the worse the match between the

11 query and the ad, the lower the overall relevancy score?

12         ANSWER:  Yes.

13         MR. FENSTER:  Actually, let's take that

14 down, please.

15    A.    Oh, I'm sorry.

16    Q.    (By Mr. Fenster) That's -- that's okay.

17         MR. ROOKLIDGE:  Objection, Your Honor.

18 Move to strike.  That slide was agreed to be withdrawn.

19         THE COURT:  All right.  The jury will

20 disregard Dr. Rhyne's testimony considering the

21 immediately preceding slide.

22         MR. FENSTER:  I'm sorry.

23         THE COURT:  Sustain the objection.

24         THE WITNESS:  I'm sorry.  I didn't know.

25    Q.    (By Mr. Fenster) So -- but you did have other

1  text --

2      A.    I've actually looked at the software, and

3  they -- we haven't talked about it yet, but they use a

4  couple of scoring techniques:  Relevancy and

5  clickability.

6          But in the relevancy, they use a technique

7  called -- the acronym is GBDT, Gradient Base (sic) -- I

8  can't remember what the DT stands for, but they

9  basically set up a tree of decision nodes that as they

10 work their way looking for these similarities, they

11 finally come down to leaves, and at the bottom of these

12 leaf nodes, they have a set of coefficients.

13         We looked at the odds multipliers for Google

14 that they multiply together.  Yahoo! has information at

15 the leaves of this gradient tree, which they add

16 together to create that relevancy score.

17         And each one of those leaf values represents a

18 similarity or a lack thereof between the query or an

19 attribute of the query and the ad or an attribute of the

20 ad.

21     Q.    Now, you mentioned that the score that is

22 assigned that meets 30(b6) is the overall relevancy

23 score?

24     A.    That -- there are two.  There's also a

25 clickability.  And I think I -- in my report, I dealt

1  with both of them, but those two quotes -- well, the one

2  quote deals with the relevancy score.

3       Q.   Okay.

4            MR. FENSTER:  And 149, please.

5       Q.   (By Mr. Fenster) Now, the -- so the overall

6  relevancy score and the clickability score, where in

7  Yahoo!'s Sponsored Search are those scores assigned?

8       A.   In the Affiliate Server --

9       Q.   Okay.

10      A.   -- just before they decide -- that's the

11 process they use to figure out which particular ads to

12 pull out of the Elcaro database and send back to the

13 searching site, the source.

14      Q.   And which of the ads that are sent to the

15 Affiliate Server are scored?

16      A.   Every one of the ads that's sent to the

17 Affiliate Server in that set.

18           If I can, can I bring up 128?  It's the

19 picture of the query flow.  I don't believe there's been

20 an objection to that.  If we can take a look.

21      Q.   Yeah.  Go ahead.

22      A.   Okay.  And the Affiliate Server is this gray

23 box in the middle, and there's this step of finding the

24 matching ads.  And once those find -- there's large

25 numbers of ads in Elcaro, but in this find matching ads,

1   they get a subset, and then you can see they get the

2   clickability scores.

3         And that's also -- in this process of finally

4   producing the ads to go back, that's where they do the

5   relevancy score and the clickability score for every one

6   of those matching ads as I understand the process.

7      Q.   Okay.  So now going back to the claim language

8   in 149, did you find that Yahoo! Sponsored Search

9   assigned a score to each stored case model which is

10  compared to the case model?

11     A.   Yes.  In that Affiliate Server, they go

12  through a comparison and a scoring process.  And the

13  basis for the scoring process is that comparison.  They

14  use that to work their way through that Gradient

15  Boosted -- I remembered -- Decision Tree, is the DT, to

16  find those leaf node values.

17         To sum those up, that forms the relevancy

18  score.  They use the relevancy score then as an

19  alternate scoring mechanism to produce that clickability

20  score.

21     Q.   Okay.  And did you analyze the claim element

22  30(b6) under literal infringement?

23     A.   I did.

24     Q.   And did you find it was literally met?

25     A.   I did.

1    Q.   And did you also analyze the claim element of

2   30(b6) under the Doctrine of Equivalents?

3    A.   I did.

4    Q.   And what did you find?

5    A.   Well, again, I looked at what I believe may be

6   a non-infringement position that appears to be coming

7   from Yahoo!, which was that there may be some of those

8   leaf node values that work sort of opposite to what

9   these two -- from what the engineer from Yahoo!

10  testified.

11       He said, the more similarity, the more they go

12  up; the less similarity, they go down.  But there's -- I

13  guess because it's a statistical process, they may be

14  the way to identify a particular leaf node that goes the

15  wrong way.

16       But if there's -- given that it says the score

17  increasing when at least one -- in here, it's talking

18  about -- that would -- based on that, it's my belief

19  that if -- as long as there's one of those leaf nodes

20  that makes that change, even if the others -- somewhere

21  in there, there may be a different one that goes the

22  wrong way -- as long as one of them goes the right way,

23  and the great preponderance of them, if not all of them

24  actually do, then I don't consider it a substantive

25  difference if out of -- I think they say they may have

1  as many as 2 or 300 of these leaf node values.

2        Out of all of those, if virtually all of them

3  go the right way, the fact that one of them doesn't

4  (sic) go the wrong way, I don't consider to be a

5  substantial difference.

6        It's clear that the end result is to get good

7  ads that match well and have high quality to go back

8  with the search.

9        So the result is the same; the function is the

10  same; and the way -- if 195 out of 200 or 199 out of 200

11  go the right way, I don't consider that to be a

12  substantive difference.  And I have seen no data to

13  actually support that.

14      Q.   Okay.  So did you find that 30(b6) was met

15  both literally and under the Doctrine of Equivalents?

16      A.   I did.

17      Q.   All right.

18              MR. FENSTER:  Let's go to 31.

19      Q.   (By Mr. Fenster) Now --

20              MR. FENSTER:  Actually, stay on this

21  slide for just a minute.

22      Q.   (By Mr. Fenster) 30(b6) has the score

23  increasing when at least one of the text and attributes

24  match and decreasing -- that's similar to what's in 31.

25              So let's go ahead and move to Claim 31, which

1    is 150.

2              And did you find that Sponsored Search meets

3    Claim Element 31?

4         A.   I did.

5         Q.   And can you describe your analysis there.

6         A.   Well, if we go -- I would like to spend just a

7    moment on the Court's construction on 152.

8         Q.   Sure.

9         A.   What the Court identified the predetermined

10   match-weight to mean, a predetermined factor that a

11   arithmetically increases the stored case models match

12   score -- and remember, there's a typographical error in

13   this slide as well.  It should say a arithmetically

14   decreases.  It's just --

15                  THE COURT:  Same one that was there

16   yesterday.

17                  THE WITNESS:  I promise you I worked,

18   Your Honor, but I didn't work on that last night.

19                  THE COURT:  That's all right.  I didn't

20   either.

21                  THE WITNESS:  Okay.

22        A.   Well, those leaf nodes are what I focused on

23   here and that Gradient Boosted Decision Tree.  And those

24   leaf node values are computed beforehand, much like the

25   odds multipliers were computed beforehand.  They're

1 sitting in the tree.

2          And what happens when you make the comparison

3 is, you go down -- you can think of the tree as a bunch

4 of little forks in the road, and as they're doing the

5 comparisons, they get to a node in the tree, and they

6 say:  Well, now, what is that deal?  Well, does that

7 keyword match the first line or something like --

8 they'll go to the left or the right.

9          And the way it's going to work, according to

10 the engineer, is that if they match better, you're going

11 to get a bigger number, and that's going to

12 arithmetically increase the relevancy score.

13          And if they don't match as well, the leaf node

14 value, when you go the other way on the branch, is going

15 to be a smaller number, and as a result, you will get an

16 arithmetic decrease, which matches 31 exactly.

17     Q.   (By Mr. Fenster) Okay.  So just to clarify,

18 what exactly is the predetermined match-weight in your

19 view?

20     A.   It would be the difference between the leaf

21 node values based on that decision point in the tree.

22 In other words, if I -- if I get more similarity, if I

23 get down to the point where that thing is testing a

24 similarity, an attribute or a text, if I go with

25 similarity, I'll get a bigger value in the leaf node,

1 larger numerical value.  If I go the other way, I'll get
2 a smaller numerical value.
3         And the difference between those two values is
4 the predetermined arithmetic increase or decrease
5 factor, since you're adding them up.
6     Q.   Okay.
7     A.   I'll just make up a number.  I think it's got
8 to be smaller than this, but let's just say, if it's
9 more similar, it will be .5.  If it's less similar, it
10 will be .3.  The difference is .2.
11         That would be the predetermined arithmetic
12 increase or decrease, depending on which way you went in
13 that tree, the Gradient Based -- Boosted Decision Tree
14 process.
15     Q.   Okay.  And what's the predetermined
16 mismatch-weight?
17     A.   It would be the other way around.  If, when I
18 got to the node, I took the left branch, instead of
19 getting .5, I'd get .3, and that would be a mismatch.
20     Q.   And did you find any testimony from Yahoo!'s
21 engineers that supported your conclusion that Claim 31
22 is met?
23     A.   I found at least some.
24     Q.   And is that on 153 of your slide?
25     A.   I put that on 153.

1    Q.   Okay.  So this is from Kannan at 102, Lines 15

2  through 23.

3    A.   The top part.

4    Q.   Yeah.

5    A.   It said:  So -- the question:  So talking

6  about the overall relevancy score, does that mean there

7  is an equation that has inputs for each of the various

8  factors that are involved?

9         And he said:  Um, no.  I wouldn't put it that

10 way.

11        And then he was asked:  Is it the weighted sum

12 of functions of those input factors?

13        And he said:  Yes.

14        And then he was asked at Page 98, Lines 24

15 through 99/5:  What are all the inputs to the GBDT

16 model -- that's the Gradient Boosted Decision Tree

17 model -- that's used in the Affiliate Server to generate

18 the overall relevancy score?

19        And he said:  Um.  It uses features like, you

20 know, word overlap, diagram overlap, location of

21 overlap, and, you know, any scores that were provided to

22 it from, you know, the ads themselves.

23    Q.   Okay.

24    A.   So that's what the decisions in that tree are

25 leading to these leaf nodes at the bottom.

1    Q.   Okay.  And do you have additional evidence

2  that supported your conclusion summarized in your

3  Exhibit 163A?

4    A.   Yes.

5    Q.   All right.  And did you find that Claim 31 is

6  met?

7    A.   Yes.

8    Q.   All right.  So --

9              MR. FENSTER:  155, please.

10   Q.   (By Mr. Fenster) Now, did you analyze whether

11 Sponsored Search -- so -- actually, let me back up.

12             So you found -- based on all the evidence that

13 you reviewed, what was your finding with respect to

14 whether Sponsored Search meets -- infringes Claim 31 of

15 the '947 patent?

16   A.   Yes, it does.

17   Q.   Literally?

18   A.   Literally.

19   Q.   And with respect to 30(b6) -- oh, I'm sorry.

20 This is 31.  Yes.  Okay.  Excuse me.  Strike that.

21             Now, did you also analyze infringement with

22 respect to Claim 33?

23   A.   Yes.

24   Q.   And did you find that Sponsored Search

25 infringes Claim 33?

1    A.   Yes.

2    Q.   And did you analyze that under literal

3 infringement?

4    A.   Both literal and Doctrine of Equivalents.

5    Q.   Okay.  And what were your findings?

6    A.   I think it's literally met, but alternatively,

7 I think it's met under the Doctrine of Equivalents.

8    Q.   Okay.  Now, under -- what evidence did you

9 find that Yahoo!'s Sponsored Search meets the Claim

10 Element 33 that would be normalized and that would be

11 divided by a maximum possible score?

12    A.   Well, I base that on the testimony of

13 Mr. Kannan again.

14    Q.   Okay.

15         MR. FENSTER:  So 158, please.

16    A.   And he was asked about this relevancy score,

17 which is the sum of all the leaf nodes that you reach

18 based on following your way through the Gradient Boosted

19 Decision Tree.

20         And he said:  What's the range of the overall

21 relevancy score?

22         And he said:  It's a number -- that's a number

23 between 0 and 1.

24         And then he was asked:  So, theoretically, a

25 score of 1 for the overall relevancy score would mean

1 that it's exactly relevant?

2         And he said:  Yes.

3         So what they've done is they've normalized

4 those sums of all the leaf nodes so they fall between 0

5 and 1.

6         I believe I recollect correctly that he was

7 asked a little more about that, and he said:  Well, I

8 could make it be between 0 and 5 or 0 and 3 or something

9 like that, but they make it be between 0 and 1.

10         But what that means is, they've got to go

11 through every possible combination of adding up all

12 those leaf nodes that they might reach at the bottom of

13 this complex 2 or 300 trees and find out what's the

14 biggest value that they're ever going to get when they

15 add up all the combinations of leaf nodes, and then

16 they've got to come back and divide by that number to

17 scale it back into a 0-to-1 range, okay?

18         So they have normalized it such that the

19 biggest score you could ever get is 1, which means it's

20 exactly relevant.  And that, to me, is the way they've

21 normalized so that every time they add up those leaf

22 node values on the relevancy score, they get a range no

23 bigger than 1.

24         And it's been scaled so that the biggest they

25 could ever get was 1, and they've just divided it out.

1    If it came out to be 5, they'll divide
2 everything by 5 so that it will scale back to be 1.
3    Q.   (By Mr. Fenster) Now, was Mr. Kannan the
4 Yahoo! engineer -- Mr. Kannan, was he the only one that
5 testified that it was between 0 and 1?
6    A.   I may be remembering it to be someone else, to
7 be frank.  I just remember that particular statement,
8 and I don't remember who made it.
9    Q.   Well, we saw that it was just made by
10 Mr. Kannan, which you cite here.
11    A.   Yes.
12    Q.   And I'm showing you Exhibit 163A.
13    A.   I understand.
14    Q.   And we also -- you also have a cite to the
15 Kolm deposition --
16    A.   Okay.
17    Q.   -- at Page 97, Lines 21 through 24.
18    QUESTION -- okay.
19    MR. FENSTER:  I did that.  I'm
20 embarrassed by that.  All right.
21    Q.   (By Ms. Fenster)  QUESTION:  And what are
22 the -- what is the range of values for the probability?
23    ANSWER:  The probability itself, I believe, is
24 0 to 1.
25    And was that consistent with Mr. Kannan's

testimony?

    A.   Yes.

    Q.   And does that also support your finding that Yahoo!'s Sponsored Search normalizes by dividing by a maximum score?

    A.   Yes, literally.

    Q.   All right.  Now, did -- you said that you also found that Sponsored Search meets the claim elements of 33 under the Doctrine of Equivalents.

    A.   Yes.

    Q.   Can you tell me how?

    A.   Well, if -- if the claim is interpreted to actually require a division, okay, of the score -- of the whole score, to find the biggest score you get, calculate a score, and then divide the score you calculated by the maximum score that you get, the way that they use the leaf nodes, I don't think they may do that.

    But what they do, instead of dividing the overall score to scale it to 0 to 1, they divide each one of the leaf nodes by the maximum score to scale it to 0 to 1.

    And it's kind of like, mathematically, if I had an enumerator in a division that had A, B, and C, and I say I'm going to divide that by D, that's the same

1    thing as saying A over D plus B over D plus C over D.

2            If you take each of the contributors to the

3    sum in the enumerator and divide it by the same

4    denominator, it's mathematically equivalent.

5            So it's the same function.  The way may be

6    different, but it's mathematically equivalent, and the

7    result is the same.  You've scaled the sum of every

8    possible combination of leaf nodes to fall within the

9    range from 0 to 1.

10       Q.   Okay.  So did you find that Yahoo!'s Sponsored

11   Search meets -- infringes Claim 33 of the '947 patent?

12       A.   Yes.

13       Q.   Now, I'm going to switch gears because now

14   we've gone through the infringement case for both Google

15   and Yahoo! for each of the accused -- asserted claims.

16   I've got just a few other questions.

17            First, with respect to Google, did you also

18   prepare a similar chart like 163A summarizing the

19   evidence in Exhibit 161?

20       A.   Yes.  I went through the previous chart you

21   showed yesterday and pulled out every single detail cite

22   simply identifying the cites, except I retained the

23   listing, because I thought it was particularly useful,

24   of the deposition testimony questions and answers.

25       Q.   And is that Exhibit -- is this Exhibit 161A?

1    A.    Yes.

2    Q.    And does this summarize the list of evidence

3  that you relied on in forming your opinion?

4    A.    It does.

5              MR. FENSTER:  Your Honor, similar to

6  163A, I would move 161A into evidence for the limited

7  purpose and consistent with Your Honor's instructions

8  with respect to 163.

9              MR. VERHOEVEN:  Objection, Your Honor.

10  It's a demonstrative.

11              THE COURT:  Okay.  Overrule the

12  objection, and I'll receive it into evidence, and the

13  jury may consider it for the limited purpose of showing

14  in a summary fashion, the exhibits and the testimony on

15  which the expert relied in forming his opinions in this

16  case.

17              MR. FENSTER:  Thank you, Your Honor.

18    Q.    (By Mr. Fenster) Dr. Rhyne, I apologize, but I

19  need to ask you to revisit with me one -- two things

20  with respect to Google, so if we can go to your Slide

21  67.

22              All right.  So this is back on Google now, and

23  this was with respect to AdWords.  And you took us

24  through how Google AdWords meets 28(b1)(i) and (ii).  I

25  misstated that.  Both subsections of 21(b1) --

1    A.    Yes.

2    Q.    -- 28(b1).

3    A.    I did that.

4    Q.    Okay.  And yesterday I think I only asked you

5  about literal infringement for 28(b2) with respect to

6  Google.

7          Did you also analyze whether Google AdWords

8  meets Claim Element (b1)(ii) under the Doctrine of

9  Equivalents?

10   A.    I did, and I reported that in my expert

11 report.

12   Q.    And what did you find?

13   A.    Actually, it's the same analysis that I

14 described a few moments ago for Yahoo!.

15         The way that they do that human analysis where

16 they say, you know, we need to have some people look at

17 this for it's possibly impression spam is, again, they

18 group together a sequence of queries, and if those

19 queries seem to produce the same advertisement

20 impression, but nobody clicks on it, they say that looks

21 like impression spam.

22         So if this is -- limitation is viewed to

23 require dealing with the individual messages rather than

24 a group of messages, then that would not be literally

25 met by the human analysis for impression -- by the

software analysis for impression spam.

But what my -- my view of that would be that the function of doing them as a group is the same.  It's to identify searches that were potentially impression spam and ask somebody to take a look at it.

And if you identify a group of let's say 25 queries, you've certainly identified each and every individual query in that group as being potential impression spam.  And I think that that's not a substantial difference between doing it in a group or doing it individually for each member of a group.

And the result is the same.  You've identified one or more messages as being -- needing to be reviewed by a human.  And so I think that meets that alternatively under the Doctrine of Equivalents.

Q.  So just to be clear, Dr. Rhyne, did you find that Google AdWords infringes 28(b) -- or meets the element of 28(b1)(ii) literally, under the Doctrine of Equivalents, or both?

A.  Both.

Q.  I have one other question with respect to 30(b6) along the same lines.

MR. FENSTER:  Can we go to 87, please.

Q.  (By Mr. Fenster) With respect to 30(b6), assigning a score, yesterday you testified that Google

1   AdWords meet the element of 30(b6).

2           Did you also analyze whether Google AdWords

3   meets 30(b6) under the Doctrine of Equivalents?

4       A.   I did.

5       Q.   And what was that finding?

6       A.   Well, again, I have to -- I only view that if

7   I am aware of something that one of the experts for

8   Google, Dr. Fox, may raise.

9           And having read his report, he has identified

10  a possibility that one of those odds multipliers may go

11  the wrong way, that under the situation where there's

12  more of a match, the odd --

13              MR. VERHOEVEN:  Objection, report, Your

14  Honor.

15              THE COURT:  Overruled.

16      A.   The odds multiplier goes the wrong way; it

17  gets smaller.  The data that he presented in his report

18  shows a very small change.  The odds multiplier went

19  from about .9 to about 1.

20          And my view is that if they're looking at like

21  30 odds multipliers and the purpose of all those odds

22  multipliers is to give you a higher product, a higher

23  probability of clicking as an odds, that they've

24  identified possibly 1 out of a set of 30 or 32.

25              And first off, the claim literally requires at

least one of the attributes and the text match the

stored case model.  So that would be one of the

attributes.

        But even if you -- if one were to interpret

this that you had to have every single one of those odds

multipliers go up, well, literally, if there's one that

doesn't, that's -- that doesn't match.

        But if it's -- 31 out of 32 go the other way,

I don't think that's a substantial difference, and it's

clear that the result, which is to get good matching ads

back for each query, is certainly achieved in both

cases.

        So I think, if that interpretation is made,

that then that one would be met under the Doctrine of

Equivalents.

    Q.   (By Mr. Fenster) So to be clear, Dr. Rhyne, is

it your view that Google AdWords infringes Element

30(b6) literally, under the Doctrine of Equivalents, or

both?

    A.   Both.

        MR. FENSTER:  Your Honor, I'm just about

to switch to another topic that will take just a few

minutes.  This might be an appropriate time for a break.

        THE COURT:  Well, I was hoping you were

getting ready to pass him.

```
1                    THE WITNESS:  So was I.
2                    MR. FENSTER:  I will in no more than 10
3    minutes.
4                    THE COURT:  But it is -- you're right.
5    It's an appropriate time for a recess.
6                    Ladies and Gentlemen, take 20 minutes.
7    Be back at 25 till the hour.  Remember my prior
8    instructions, and don't talk about the case.
9                    LAW CLERK:  All rise.
10                   (Jury out.)
11                   THE COURT:  Step down.  Have a seat.
12                   Mr. Verhoeven, is your objection that the
13   Doctrine of Equivalents was not disclosed at all in his
14   report?
15                   MR. VERHOEVEN:  No, Your Honor, but this
16   is sum and substance of it right here, if I can
17   approach.
18                   THE COURT:  You may hand it up.
19                   MR. VERHOEVEN:  I believe this paragraph
20   here is the sum and substance.  I'm sorry, Your Honor.
21                   THE COURT:  That's all right.
22                   I'll let you renew your objection at the
23   time the case is submitted, and then I'll decide whether
24   or not to submit that both literally and under the
25   Doctrine of Equivalents, okay?
```

1           MR. VERHOEVEN:  Thank you, Your Honor.

2           MR. FENSTER:  Your Honor, that was in

3    response to Mr. Fox's report.

4           THE COURT:  I understood that, and I'll

5    take that into account.  I just wanted to make sure he

6    had a chance to fully explain to me his position, okay?

7           MR. FENSTER:  Thank you.

8           THE COURT:  All right.  What else do we

9    need to take up before we start the second half of the

10   morning?  Anything?

11          MR. VERHOEVEN:  Nothing.

12          THE COURT:  Okay.  I tabled some license

13   agreement exhibits, I believe, at the hearing we had

14   after voir dire until the damages expert.

15          MR. VERHOEVEN:  I thought there was a

16   ruling on the motion in limine on settlement agreements.

17          THE COURT:  Well, but I thought it was

18   some that the Plaintiff was going to use in the context

19   of its damages expert.  If I'm misrecollecting that, I

20   don't have to decide anything further, then I'm happy

21   not to.

22          MR. FENSTER:  We're grabbing Mr. Hueston.

23          THE COURT:  Well, that's fine.  I just --

24   I don't know if he's -- I don't think he's going to go

25   on before lunch, but I just want to make sure that --

1   you know, I've already issued an order on the Daubert

2   rulings, but I just want to make sure we don't interrupt

3   the flow.

4                   MR. ROOKLIDGE:  Correct, Your Honor.

5   Was it the issue of closing the courtroom during the

6   presentation of Yahoo!'s licenses or Yahoo!'s --

7                   THE COURT:  Well, that was one issue, but

8   I just had a recollection that when we had our evidence

9   hearing after jury selection, I had tabled a couple of

10  issues until later in the proceeding.

11                  I think one of those was the Williams'

12  e-mails, and the other one, I thought, was some license

13  agreements that were going to be used in the Plaintiff's

14  damages case.

15                  MR. CANDIDO:  I believe that's correct,

16  Your Honor.  If I recall correctly, one of the exhibits

17  is the Serviceware license agreement where there doesn't

18  exist a signed license agreement.  It's unsigned.

19                  THE COURT:  Okay.

20                  MR. CANDIDO:  And I think you were going

21  to take up whether that was admissible.

22                  THE COURT:  Okay.  I'll take up the

23  admissibility issue.  I thought I overruled it in the

24  context of a Daubert motion, but I'll take a look at it.

25                  All right.

1          MR. CANDIDO:  Thank you.

2          THE COURT:  Thank you.

3          LAW CLERK:  All rise.

4          (Recess.)

5          (Jury in.)

6          THE COURT:  Please be seated.

7          Ladies and Gentlemen, before we get

8  started, it was called to my attention over the recess

9  that there's apparently someone outside passing out

10 materials to passersby.

11         I know that some of you stay in during

12 the recesses, and some of you go outside, which is

13 certainly permissible.

14         I'll repeat my instructions to you at the

15 beginning of the case.  Do not discuss the case with

16 anyone, including your fellow juries -- jurors.  You

17 should not seek out information or receive any

18 information like may have been passed out in front of

19 the courthouse.

20         So if you did receive any information, I

21 ask you to disregard it at this time.

22         Also, I failed to give you one of the

23 instructions that I would normally give at the beginning

24 of the case.

25         The rules of the district prevent lawyers

from communicating in any way with members of the jurors

while a case is in progress, as well as the witnesses in

the case.

If you were to -- we are in fairly close

quarters around here. If you were to pass a lawyer in

the hall or one of the witnesses or one of the parties

to the case, a person looks at the ground and tries to

avoid your gaze, they're not trying to be rude to you.

They're trying to abide by the rules of the Court and

avoid any contact with you.

That type of contact would be improper,

so please don't hold it against the lawyers if they seem

unfriendly. They're just trying to do what I've told

them to do, okay?

All right. With that, please proceed.

MR. FENSTER: Thank you, Your Honor. And

we'll finish up quickly.

Q. (By Mr. Fenster) Dr. Rhyne, now that we've

gone through your infringement analysis in great detail

for Yahoo! and Google, I have two unrelated topics.

This next one is kind of unrelated. It

relates to -- it will relate to the damages phase.

Did you look at two other patents to compare

them to the patent at issue and see whether the

technology was related?

1    A.   Yes.  I was asked to do so.

2              MR. FENSTER:  Can you put up 161, please?

3    That's not it.  16 -- do you have 161?

4              All right.  I'll do it there.

5    Q.   (By Mr. Fenster) And this -- what is the

6    exhibit that's shown here?

7    A.   This is the front page of U.S. Patent

8    No. 6,285,999, which was issued as an inventor to

9    Mr. Lawrence Page, assigned to Stanford.  And it's a

10   patent that I was asked to take a look at.

11             Its title is Method of Node Ranking in a

12   Linked Database.

13   Q.   Now, this patent has nothing to do with the

14   infringement case, right?

15   A.   I haven't been asked to do any kind of an

16   infringement analysis, so I gather that's the case.

17   Q.   Okay.  You were asked to look at this for --

18   did you understand, for a damages analysis that will

19   happen later?

20   A.   I think I told one of the people who deposed

21   me that this wasn't my first rodeo, and I kind of

22   figured that's what it was -- the reason that you asked

23   me to.  But I was basically just asked to look at this

24   kind of as a technologist and what's this patent about

25   and does it have any relationship to the invention and

1    descriptions set forth in the Rice patent.

2        Q.   Okay.  And what did you find?

3        A.   I found it to be relevant.

4        Q.   Okay.  You found the technology was related?

5        A.   That's right.  It deals with, as I said, node

6    ranking, the ranking and scoring of documents, much like

7    we've been doing here in the Rice patent for electronic

8    messages relating to case models, but we've been

9    focusing for the infringement analysis on

10   advertisements.

11            And I saw technical similarities.

12       Q.   Okay.  And just for clarity, this has nothing

13   whatsoever to do with validity; is that right?

14       A.   I don't -- I don't believe this patent has

15   been advanced in any way relative to any question of

16   validity or lack thereof.

17       Q.   Did you analyze another patent, the '361

18   patent?

19       A.   I was also asked to look at this one other

20   patent.  It's U.S. Patent No. 6,269,361 issued to a

21   number of people.  I kind of think of this as the

22   goto.com patent, because you can see that the assignee

23   right here is goto.com, which was a company that was

24   involved in selling advertising.

25            And it's entitled A System and Method for

Influencing a Position on a Search Result List Generated

by a Computer Network Search Engine.

Q.   And did you compare the technology in the 361

patent to that and the patent at issue here?

A.   Yes.  I commented on that in my expert report.

And in both -- for both of these patents, I even

identified several specific places in the specifications

of the two patents that I thought were particularly

illuminating.

Q.   Thank you, Dr. Rhyne.

MR. FENSTER:  This will become more --

the relevance will become evident later, Ladies and

Gentlemen.

Q.   (By Mr. Fenster) So, Dr. Rhyne, I want to

switch gears quickly to the last line of questioning,

and that is, did you determine -- or what did you assume

with respect to the date of first infringement with

respect to both Google and Yahoo!?

A.   I was asked to investigate that and provided

some deposition testimony and documents.

And with respect to Google, relying on some

testimony of --

Q.   Is it Mr. Wright?

A.   Yeah.  I'm sorry.  I found it.

See the Wright deposition at Page 103, Lines

1  20 to 25.  He said that as of the first of July in the

2  year 2004, Google's SmartAd Selection System was

3  processing 90 percent of Google's search request

4  traffic.  They had switched over to this SASS system.

5  And since that system is a prominent part of what I have

6  pointed to in my infringement analysis, I believe that

7  would be the first infringement, as far as I'm

8  concerned, would have taken place as of July the 1st,

9  2004 for Google.

10      Q.   Okay.  And what did you find with respect to

11  the date of first infringement for Yahoo!

12      A.   For Yahoo!, I looked at a couple of press

13  releases, in particular one that was dated February the

14  18th, 2004, which dealt with the acquisition by Yahoo!

15  of a system named Overture, and the fact that they were

16  going to combine several systems, including this newly

17  purchased Overture system, into what they call in the

18  press release an integrated platform.

19          And since the press release was dated the

20  middle of February -- and I realize that it was going to

21  take some time to actually create that integrated

22  platform, I gave them six weeks.

23          And so I have said that I believe that a good

24  date for the date of Yahoo!'s first infringement, when

25  they had the integrated platform, would have been April

1 of 2004.

2     Q.   Now, Dr. Rhyne, in her opening, Ms. Doan put

3 up this slide, this timeline, and asserted that Yahoo!

4 started selling ads back in 1995, which was before the

5 '947 patent.

6           Do you recall that?

7     A.   Before the priority date --

8           MR. ROOKLIDGE:  Objection, report.

9           THE COURT:  Overruled.

10     A.   This was before -- there are two dates that

11 are critical, or two dates that are known here.  One is

12 the priority date, which is April the 3rd, I think, 1997

13 minus one year, '96.  And she did cite that before that

14 '96 date.

15     Q.  (By Mr. Fenster) Now, is Yahoo!'s assertion

16 that they were selling ads back in 1995 relevant in any

17 way to this case?

18     A.   It's certainly not relevant to my

19 infringement.

20           MR. ROOKLIDGE:  Objection, report.

21           THE COURT:  Overruled.

22     A.   It's not relevant to anything I've done that

23 would affect -- to the infringement analysis.  And I

24 don't think it's relevant to the validity analysis

25 either.

1     Q.  (By Mr. Fenster) Okay. Now, she also made a

2 point -- in fact, Google and Yahoo! both did -- of

3 saying that they began selling ads back in 2001, and the

4 patent didn't issue until 2002.

5        Do you remember that?

6     A.  Yes.

7     Q.  The fact that Sponsored Search was in use

8 before 2002 or the fact that Google was in use before

9 2002, does that have any relevance?

10     A.  No.  That's the date of issue -- that the

11 patent issued, the Rice patent issued.

12        But you get that priority date back to when

13 that provisional application was filed in 1996. So that

14 time period is sort of off limits. It's not where

15 infringement or invalidity or anything is at issue.

16 You always go back, for questions of validity or

17 infringement, to the date when the patent's priority is

18 established.

19        And for this patent, it's one year before --

20 as I understand it -- one year before April the 3rd of

21 1997.

22     Q.  So the relevance of this date, Dr. Rhyne?

23          THE COURT:  Hold on just a second.

24          MR. FENSTER:  Excuse me.

25          THE COURT:  You said the priority date

1  was one year before April of 1997?

2          THE WITNESS:  I could be off, but let me

3  take a quick -- well, the priority date is April of

4  1997.

5          THE COURT:  All right.  Thank you.

6          THE WITNESS:  Let me --

7          THE COURT:  I just wanted to make sure

8  that the record was clear.

9          THE WITNESS:  Okay.

10      A.   For prior art purposes, you go back one more

11  year.

12          THE WITNESS:  I misspoke.  Thank you.

13      Q.   (By Mr. Fenster) The one year prior was the

14  critical date?

15      A.   That's the critical date relative to when you

16  look for publications and usage.

17      Q.   Okay.  So the relevance of this date and

18  Yahoo!'s assertion that they were practicing -- that

19  they were using the accused system before 2002 when the

20  date -- when the patent issued, when is that?

21      A.   I think they're correct based on what they

22  say, but it has nothing to do with the issues of

23  infringement or validity.

24      Q.   Okay.  Now, Google and Yahoo! also held up a

25  bunch of patents, and they said they have a bunch of

patents.

Does that have any relevance to your analysis?

A.    No.

Q.    Does it have any relevance whatsoever to the issues of infringement?

A.    Well, you know, I mentioned that I worked at Motorola at one time.  I was in the intellectual property department, and we negotiated lots of patent licenses.  And the fact that we had patents didn't mean necessarily that we didn't infringe somebody else's patent.

And so the issue is the patent that's in hand, and that's the Rice patent.  And the question is whether or not the Rice patent infringes.

THE COURT:  Excuse me.  Yes?

MR. ROOKLIDGE:  Move to strike, non-responsive, and it's way beyond his report.

THE COURT:  Well, Ladies and Gentlemen, I previously instructed you that you heard some remarks about the Defendants having patents of their own.  And I allowed that in to show that they respect intellectual property.

And also, it may be relevant to your consideration on other issues in the case, such as damages as well.  But it does not bear on the question

1   of infringement in this case.

2                    MR. FENSTER:  Thank you, Your Honor.

3                    THE COURT:  Okay.

4        Q.   (By Mr. Fenster) Now, Dr. Rhyne, before I pass

5   you to the other side, can you just summarize your

6   finding with respect to Google AdWords and with respect

7   to Yahoo!'s Sponsored Search?

8        A.   Based on the study that I've done, both of

9   those systems infringe three claims of the Rice patent

10  literally or, in some instances, under the Doctrine of

11  Equivalents.  And those are Claims 30, 31, and 33.

12       Q.   Thank you, Dr. Rhyne.

13                   MR. FENSTER:  Your Honor, I pass the

14  witness.

15                   THE COURT:  Mr. Verhoeven.

16                   MR. VERHOEVEN:  Thank you, Your Honor.

17                   May I have just one second to set up,

18  please.

19                   THE COURT:  Of course.

20                   MR. VERHOEVEN:  Thank you.

21                   (Discussion off the record.)

22                   MR. VERHOEVEN:  I'm sorry, Your Honor.

23                   (Further discussion off the record.)

24                   MR. VERHOEVEN:  I apologize for that

25  delay, Your Honor.

1          THE COURT:  That's alright.

2                  CROSS-EXAMINATION

3 BY MR. VERHOEVEN:

4     Q.   Good morning, Dr. Rhyne.

5     A.   Good morning.

6     Q.   Now, you've provided your direct testimony on

7 the issue of infringement, correct?

8     A.   Yes, sir.

9     Q.   And you understand that in order for Google to

10 be liable for any particular claim that's asserted, that

11 it's the burden of proof on the Plaintiff's side to

12 prove infringement, right?

13     A.   Yes.

14     Q.   And you understand that in order for any given

15 claim, in order for them to prove infringement, they

16 must prove that every single element of that claim has

17 been met?

18     A.   Yes.

19     Q.   And you understand that if even one element

20 has not been met, that that -- the jury must return a

21 finding of non-infringement; is that right?

22     A.   Yes.

23     Q.   Okay.

24          MR. VERHOEVEN:  I'd like to put up DX

25 Demo 32, please.

1    Q.   (By Mr. Verhoeven) Can you see that okay,

2 Dr. Rhyne?

3    A.   Yes, sir.

4    Q.   Okay.  So over here, I have Claim 28.

5 Do you see that?

6    A.   Yes.

7    Q.   And on direct examination, you gave some

8 testimony about 28(b1), and we just brought that up to

9 make it bigger over here.

10        Do you see that?

11   A.   Yes.

12   Q.   And I'm going to refer to this as the

13 classifying step, okay?

14        Is it alright if I say that?

15   A.   That's fine.

16   Q.   Okay.  In the classifying step, would you

17 agree that it requires classifying the electronic

18 message as at least one of being able to be responded to

19 automatically or requiring assistance from a human

20 operator?

21   A.   Yes.

22   Q.   Okay.  Now, let's focus on the first one,

23 classifying electronic message as at least one of being

24 able to be responded to automatically.

25        On that one, what that's describing is the

1  system has to classify:  Can I respond to it

2  automatically or not?

3          Do you agree with that?

4      A.    What is the electronic message, I agree with

5  you.

6      Q.    Right.  So on this first (i), the

7  classification is looking at the electronic message and

8  asking the question:  Can I respond to that

9  automatically or not?

10          Do you agree with me there?

11     A.    Yes.

12              MR. VERHOEVEN:  Let's go to DX Demo 19,

13  please.

14              That's not the right one, Ryan.

15              This one here (indicates).

16     Q.    (By Mr. Verhoeven) Before -- you have seen

17  this illustration before, correct?

18     A.    I saw it during your opening, and I made

19  reference to it during my direct testimony.

20     Q.    Okay.  Now, in our illustration, this is the

21  person sitting there typing a search query.

22          Do you remember that from my opening?

23     A.    I believe so.

24     Q.    Okay.  And then that goes to the Google

25  system, right?

1    A.    To the Google web server, or GWS.

2    Q.    Right.  And then it splits into two parts,

3  right?

4    A.    Yes.

5    Q.    But the same electronic message that's

6  analyzed up here is down here, right?

7    A.    I really haven't focused for my work here on

8  the search system, but I believe that's correct.

9    Q.    Okay.  So the query is looked at against

10  Google's database and web pages, right?

11    A.    Yes.

12    Q.    And then the end result is a response, right?

13    A.    Yes.

14    Q.    Okay.  And isn't it true, sir, that 100

15  percent of the time there is always a response?

16    A.    There's -- they always provide a search

17  result, yes.

18    Q.    100 percent of the time?

19    A.    Yes.

20    Q.    Okay.  So Google never asks the question, can

21  I respond to that query automatically or not, because

22  100 percent of the time they provide back a search

23  result in response to the search query, true?

24    A.    With respect to the search path, that's

25  correct.

1     Q.   Okay.  Now, you -- when you testified about

2 this step being met, Dr. Rhyne, you focused on this part

3 of the system (indicates), right?

4     A.   That's where I --

5     Q.   Correct?

6     A.   -- focused the entirety of my infringement

7 analysis on, yes, sir.

8     Q.   But this -- these native responses are

9 responses to the search query, aren't they?

10    A.   In a different part of the system, yes, sir.

11    Q.   But they're responses to the search query,

12 right?

13    A.   I just agreed with you.  Yes, sir.

14    Q.   And the Google system never asks a question in

15 regard to those responses, can I respond automatically

16 or not, does it?

17    A.   I'm not aware that it does.

18    Q.   Okay.  So there's a search --

19    A.   Let me correct that.

20         I've actually entered some searches from time

21 to time where it says I have no results for that at all.

22    Q.   And that's a response, too?

23    A.   Well, it's a response that says I don't have

24 any response.

25    Q.   And it's an automatic response?

1       A.    I assume it's produced automatically.

2       Q.    It goes to the user automatically, right?

3       A.    It says I don't have anything to give you.

4       Q.    There's never a single instance ever in the

5  Google system where a user types a search query and

6  doesn't get back an automatic response, is there, sir?

7       A.    They will get something back, yes, sir.

8       Q.    So you agree with me?

9       A.    Yes.

10      Q.    Okay.  Now, when you were focusing on this

11 part of the system, you talked about deciding whether or

12 not an advertisement will be returned, right?

13      A.    Yes.

14      Q.    But that doesn't address the fact that these

15 search results are returned 100 percent of the time,

16 does it?

17      A.    I haven't dealt in my infringement analysis

18 with the native search results in any way.

19      Q.    Would you agree with me, if you have a system

20 that provides a response 100 percent of the time

21 automatically, that that system does not have a

22 classifying step to decide whether or not to respond

23 automatically?

24      A.    Not with respect to the ads part of that

25 system, but for the other part of the system, I've

1  already agreed with you.

2      Q.    Now, when you testified about your evidentiary

3  basis for this first part of the classifying step being

4  met --

5      A.    Yes.

6      Q.    -- Mr. Fenster showed you -- I'm going to try

7  to work this.  I hope I don't mess it up.

8            Is that upside down?

9      A.    Sideways.

10     Q.    Sideways?

11     A.    There you go.

12     Q.    Is that right?

13     A.    Yes, sir.

14     Q.    Now, I've highlighted -- I'm just going to

15  walk over here, if that's okay.

16     A.    Sure.

17     Q.    I have underlined something I think you relied

18  on yesterday.

19            Can you see that?

20     A.    Yes.

21     Q.    Kind of hard to read?

22     A.    I can see it.

23     Q.    And this is a Google document, right?

24     A.    It's what I call the Gilbert document, but,

25  yes, sir.

1          Q.    Uh-huh.  And it says, quote:  If GWS -- GWS

2   was that server at Google that we looked at, right?

3          A.    Google Web Server.

4          Q.    Right.  So if GWS gets search results before

5   it gets ads to go with them, it only waits 800 ms.

6                What does that mean?

7          A.    That's eight-tenths of a second, 800

8   milliseconds.

9          Q.    800 milliseconds.

10               So if Google GWS -- I'm just going to call

11  that the Google server.

12               Is that okay, for shorthand?

13         A.    I think Google calls it GWS.

14         Q.    Okay.  I'll call it GWS.

15               Are you more comfortable with that?

16         A.    Actually, I call it GWS, but it doesn't

17  matter.

18         Q.    All right.  We'll call it GWS.

19         A.    All right.

20         Q.    If GWS gets such results before it gets ads to

21  go with them, it only waits 800 milliseconds before

22  giving up.  If ads don't appear by then, GWS only

23  displays the search results.

24               Do you see that?

25         A.    Yes.

1    Q.    Now, you relied on that, right?

2    A.    On that quote, yeah.

3    Q.    And that is -- I have the actual document

4  here.  This is Defendants' -- this is Exhibit 401,

5  Plaintiff's Exhibit 401.

6         And can you see that's the document here?

7    A.    I'm having a little trouble seeing that.  If

8  you could zoom down just a little bit.

9    Q.    If I can work this.

10   A.    That's fine.

11   Q.    So here is the AdServer returns the selected

12 ads to GWS or to the content AdMixer.

13        And this is where it appeared in the Google

14 document, right?

15   A.    It appears that I did quote it correctly.

16   Q.    Yeah.  If GWS gets search results before it

17 gets ads to go with them, it only waits 800 milliseconds

18 before giving up.  If the ads don't appear by then, GWS

19 only displays search results.

20        Do you see that?

21   A.    Yes.

22   Q.    So what that's saying is the Google system is

23 only going to wait for ads for less than a second, 800

24 milliseconds, right?

25   A.    Yes.

1      Q.  And if it doesn't get them, it responds

2  automatically, right?

3      A.  It will send back the search results

4  automatically.

5      Q.  So it may wait for the ad, but if they don't

6  come in time, it always is responding automatically,

7  isn't it, sir?

8      A.  The first part of your question I don't agree

9  with.  It may wait for the ads.  It will --

10      Q.  It will wait 800 milliseconds?

11      A.  If it doesn't get any ads in 800 milliseconds.

12  But if it gets ads before that, it will go ahead and

13  send the ads back with the response.

14      Q.  800 milliseconds is not very long, right?

15      A.  It's eight-tenths of a second.

16      Q.  Right.  And it always, then, brings back the

17  ads automatically, right?  Or the search results

18  automatically, right?

19      A.  Yes.

20      Q.  And if the ads come in that short period of

21  time, it serves those up automatically, right?

22      A.  If it can find any ads, it will pick some ads

23  and send them back along with the search results

24  automatically.

25      Q.  And there's no human intervention during this

1  very short period of time, is there, sir?

2       A.   No.

3       Q.   It's entirely automatic, isn't it?

4       A.   I believe that's correct, to the best of my

5  current knowledge.

6       Q.   Now, the second part --

7            MR. VERHOEVEN:  Could you go back, Ryan,

8  to DX Demo 32?

9            Oh, I'm sorry.

10      Q.   (By Mr. Verhoeven) The second part of the

11 classifying step is whether or not the electronic

12 message requires the assistance of a human operator,

13 right?

14      A.   It's whether or not it would be classified as

15 requiring assistance, is the full language.

16      Q.   Right.  And so the way you read this

17 classifying step is, in order to infringe this, the

18 Google system would have to do at least one of these two

19 types of classifications, right?

20      A.   Yes.

21      Q.   We covered the first one, which was whether it

22 can respond automatically or not just now, right?

23      A.   I think you did.

24      Q.   So talking about the second one, classifying

25 whether or not the message requires assistance from a

1  human operator, I want to ask you a couple of questions

2  about that.

3            Are you ready?

4       A.    Sure.

5       Q.    Okay.   Isn't it correct, sir, that the Google

6  system, after receiving the search query and before

7  returning the response, never classifies that search

8  query as requiring assistance from a human operator?

9       A.    Yes.

10      Q.    Never does that, does it?

11      A.    Not during that time.

12      Q.    Okay.   So during that time period, this

13  element is not met, is it?

14      A.    Not during that time interval.

15      Q.    During that time interval, it's not met

16  literally, right?

17      A.    Literally.

18      Q.    And it's met turned under the Doctrine of

19  Equivalents, is it?

20      A.    I didn't address that time interval from the

21  Doctrine of Equivalents in my report, but I will agree

22  with you.

23      Q.    Okay.   Now, on your direct testimony, you

24  pointed to spam, I believe, as meeting that element?

25      A.    Impression spam.

1     Q.   But Google -- when Google looks at the spam

2 issue, that's not before a response to the query, is it?

3     A.   I think I agree with what you said.

4         It sounds like -- I think that's the same

5 question you just asked me.  They don't -- they don't

6 look -- well, they do have an online spam system, but I

7 didn't point to that.  I pointed to what they call an

8 offline spam system -- spam system which occurs later.

9     Q.   That's offline?

10    A.   Yes, sir.

11    Q.   Not part of the automatic process of

12 responding to search queries, is it?

13    A.   It doesn't occur during that period between

14 when the source sends in the message and they get their

15 response back.

16           MR. VERHOEVEN:  All right.  Let's go to

17 DX Demo 36.

18           Again, that's not the right one, Ryan.

19           Maybe it is.

20           I apologize, Your Honor.

21           THE COURT:  That's alright.

22           MR. VERHOEVEN:  If you will bear with me,

23 Your Honor, I have a little mechanical difficulty with

24 this.

25           THE COURT:  Take the time you need.

1      Q.   (By Mr. Verhoeven) What I would like to

2  address, Dr. Rhyne -- and I don't have a demonstrative

3  to make it easy to see, and I apologize for that.

4      A.   Don't worry about it.

5      Q.   You remember testifying about Claim 30 on

6  direct?

7      A.   Yes.

8      Q.   Do you remember that?

9          And there's an Element (b6) in Claim 30?

10     A.   Scoring element.

11     Q.   And I'll just grab the patent here, Dr. Rhyne,

12  and put it up so that the jury and you can see it.

13  I apologize.  This is my copy.  It's highlighted, so

14  ignore the highlighting.

15     A.   I'm not sure I can do that, but I don't feel

16  it will affect our discussion.

17     Q.   All right.  Do you see (b6) up there, sir?

18     A.   Yes, sir.

19     Q.   So I just want to focus on this language:

20  Assigning a score to each stored case model, which is

21  compared with the case model.

22         Do you see that language, sir?

23     A.   Yes.

24     Q.   Now, all of the claims in this case,

25  Claims 30, 31, and 33, require that this scoring step be

1  met, right?

2      A.   Because of the dependency, that's correct.

3      Q.   Right.  So if this isn't met, you'd agree with

4  me there's no infringement of any of those claims,

5  right?

6      A.   Yes.

7      Q.   And I forgot to ask that question about the

8  classifying steps.

9          Same is true there:  All of Claims 30, 31, and

10  33, the asserted claims, require the classifying step,

11  right?

12      A.   Yes.

13      Q.   So if the jury concludes that the class --

14  there isn't a classification between automatic or

15  non-automatic and that step is not met, then none of

16  those claims would be infringed, right?

17      A.   Well, there are two parts.  You only talked

18  about --

19      Q.   That's correct.

20          So let me rephrase the question.

21          So if the jury decides the classifying step,

22  both parts of it, aren't met, then none of the claims

23  would be infringed?

24      A.   I believe that's correct.

25      Q.   Is that a fair statement?

1      A.    I'm sorry.  I thought you were through.

2            Yes, that's a fair statement.

3      Q.    Okay.  So going back to 30(b6), is it your

4  understanding that in AdWords, millions, if not

5  billions, of ads are stored?

6      A.    I've heard that statement.  I don't disagree

7  with that.  And based on what I've seen in the way of

8  ads, that's probably correct.

9      Q.    And it's true, isn't it, Dr. Rhyne, that not

10  all of those ads are scored, are they?

11     A.    Yes.

12     Q.    You agree with me?

13     A.    Yes.

14     Q.    Okay.  Now, you gave some testimony about

15  AdMixer.

16           Do you remember that?

17     A.    Yes.

18     Q.    AdMixer is part of the AdWords process?

19     A.    Yes.

20     Q.    And the purpose of AdMixer is to develop an

21  initial set of candidate ads, right?

22     A.    Yes.

23     Q.    And AdMixer does this, according to you, to

24  narrow down the ads in the candidate set, right?

25     A.    Yes.  To make the candidate set by narrowing

1  down out of those, as you said, billions of ads.

2      Q.   All right.  And isn't it true, Dr. Rhyne,

3  that -- AdMixer does not score any ads, does it?

4      A.   I don't believe that it does.  If it does, I

5  have not relied on that as part of my infringement

6  analysis.

7      Q.   Okay.  So AdMixer doesn't score any ads, yes?

8      A.   I don't think that it does.

9      Q.   Okay.  But you would agree with me that

10  AdMixer is part of the process of returning ads in

11  response to a query, correct?

12      A.   From an overall point of view, that's correct.

13      Q.   Now, it's true, isn't it, Dr. Rhyne, that as

14  part of the process of returning add in response to a

15  query in AdWords, there are ads that are compared to the

16  incoming -- incoming query that are not scored?

17      A.   I -- I need to know a little more about

18  what you're -- I think I know what you're talking about.

19      Q.   Let me repeat the question.

20      A.   I understand the question.

21      Q.   And I'd like you to answer it yes or no.

22      A.   Okay.

23      Q.   Isn't it true, Dr. Rhyne, as part of the

24  process of returning ads in response to a query in

25  AdWords, there are ads that are compared to the incoming

1  query that are not stored (sic)?

2      A.   I believe that that's true in a part of the

3  system.

4      Q.   And in the process in which ads are returned

5  to end users, you agree there are ads that are compared

6  to the incoming queries that are not stored (sic),

7  right, sir?

8      A.   I think you misspoke.

9      Q.   Did I say stored?

10     A.   (No response.)

11     Q.   Did I say stored, Dr. Rhyne?

12          I apologize.

13     A.   That's what I heard, but I'm getting kind of

14  old.

15     Q.   Let me get a correct record, okay?

16     A.   Okay.

17     Q.   Isn't it true, Dr. Rhyne, as part of the

18  process of returning ads in response to a query in

19  AdWords, there are ads that are compared to the incoming

20  query that are not scored?

21     A.   Yes.

22     Q.   That's true, right?

23     A.   I believe that's true in AdMixer.

24     Q.   Okay.  Now, let's go on to Claim 31.

25              MR. VERHOEVEN:  If we could go to DX Demo

1   -- I'm going to have to push the button again.  Just one

2   second.  This is DX Demo 58 for the record.

3        Q.   (By Mr. Verhoeven) And I'd like to switch

4   subjects to Claim 31, Dr. Rhyne.

5             Are you with me?

6        A.   Yes.

7        Q.   So here we've put Claim 31 here on the

8   left-hand side, and I'd like to focus on this

9   highlighted element.

10            Now, when we were looking at Claim 30 -- well,

11  let me withdraw that question.

12            So this -- this element says:  When at least

13  some of the attributes and the text does not match the

14  stored case model, the score is decreased by a

15  predetermined mismatch-weight.

16            Do you see that?

17       A.   Yes.

18       Q.   And just for reference, immediately preceding

19  the element, it says:  When at least some of the -- at

20  least one of the attributes and the text match the

21  stored case model, the score is increased by a

22  predetermined match-weight.

23            Do you see that?

24       A.   Yes.

25       Q.   So when there is a match, the scores increase;

1  and when there is not a match, the score is decreased;

2  fair?

3      A.   Yes.

4      Q.   Okay.  And the Court's construction of

5  decrease is, quote, a predetermined factor which

6  arithmetically decreases a stored case model's match

7  score when a feature from the stored case model does not

8  match text and attributes from the presented case model.

9          Do you see that?

10     A.   I think you misspoke.  That's not a

11 construction of the single word, decrease.

12     Q.   Okay.  What's your understanding of it?

13     A.   I believe that's a construction of the

14 three-word phrase, predetermined mismatch-weight.

15     Q.   So if there's a predetermined mismatch-weight,

16 what the Judge is saying is, there's -- you have to

17 arithmetically decrease a stored case model's match

18 score, right?

19     A.   Yes.

20     Q.   Okay.  So you need -- what we need to do here

21 in this claim is to decrease the score, right?

22     A.   Arithmetically decrease it, yes, sir.

23     Q.   Okay.  Now, both Claims 31 and 33 require this

24 step, correct, sir?

25     A.   Yes.

1     Q.   So if the jury were to conclude that the

2 Plaintiff has not met its burden of showing that this

3 element is met, then they must find non-infringement as

4 to these two claims, right?

5     A.   As to Claims 31 and 33, yes, sir.

6     Q.   Okay.  Now, in your testimony about whether

7 this element is met or not, you focused on two

8 multipliers, correct?

9     A.   I don't know it was two.  I don't know why you

10 said two.

11     Q.   Well, you focused on multipliers.

12     A.   The odds multipliers.  There's a whole set f

13 them.

14     Q.   Odds multipliers.

15     A.   I think around 32.

16     Q.   And those odds multipliers multiply, right?

17 Yes?

18     A.   Okay.  Yes.

19     Q.   Okay.

20     A.   They are used as multiplicands in a multiply

21 operation.

22     Q.   Okay.  And it's your opinion that if there's a

23 mismatch, there's a lower multiplier; and if there's a

24 match, there's a higher multiplier, right?

25     A.   Yes.

Q.   Okay.

        MR. VERHOEVEN:  Let's go to DX Demo 198.

Q.   (By Mr. Verhoeven) So if you have a score

that's 40 and you have a match, you would use a

multiplier, right?

        Do you see this where this is illustrated at;

1.5 is the multiplication?

A.   What I don't understand is where you got the

original score of 40.

Q.   This is an example, sir, that I've created.

So can you assume you've got a score of 40?

A.   But the score is produced by multiplying all

the odds multipliers together.  So I don't understand

where you got the score 40 before you multiplied by

this -- what I believe you must mean another multiplier.

I'm sorry.

Q.   You know the claim talks about a score being

increased and a score being decreased?

A.   Yes.

Q.   Are you saying there's no score against

increase or decrease in the Google system?

A.   No.  I'm saying that chart doesn't reflect the

way the Google system works.  If it's an abstract chart

unrelated to Google, then I can follow you, I think.

Q.   All right.  Let's do that then just to move

1   along then, okay?

2           Let's say you have the score of 40.

3       A.    That you've previously produced.  Okay.

4       Q.    All right.  And if you have a match, you use a

5   higher multiplier, 1.5.

6           Are you with me?

7       A.    Sort of.  I mean --

8       Q.    Okay.  You see there's a multiplication symbol

9   in the --

10      A.    I can follow the math.

11      Q.    Okay.  So you have a higher multiplier, if

12  there's a match.  If you get a mismatch, there's a lower

13  multiplier, right?

14      A.    Okay.

15      Q.    And so you get a lower score.

16          Your testimony is that upon a finding of a

17  lower multiplier, it's the same thing as arithmetically

18  decreasing?

19      A.    In the Google system, there is no score

20  produced before you'd multiply all the multipliers

21  together, okay?

22          So you don't have a 40 over here.  You have

23  this list of all these multipliers, and you produce one

24  score, and in the process of multiplying all the odds --

25              THE COURT:  Well --

```
1              THE WITNESS:  I understand.
2              THE COURT:  -- just -- without regard to
3  the Google system, using his chart hypothetically, what
4  would be your answer?
5       Q.   (By Mr. Verhoeven) Is it your testimony this
6  is a subtraction?
7       A.   No.
8       Q.   Okay.  This is multiplication, right?
9       A.   Yes.
10      Q.   And it's an increase in the score, isn't it?
11      A.   In that sense, for whatever that is --
12      Q.   When you apply a multiplier, you're not
13 subtracting, are you?
14      A.   I haven't said anything about subtracting.
15      Q.   Okay.  You haven't said anything about
16 subtraction.
17      A.   No.
18      Q.   Not in your direct testimony or in your
19 evidence against Google.
20      A.   Not for Google.
21      Q.   Okay.  All you've pointed to is multipliers,
22 right?
23      A.   Yes.
24      Q.   And it's your testimony that the decrease is
25 met simply by a lower multiplier being used than when it
```

1  increased, right?

2      A.   Yes.

3      Q.   And according to you, that is -- well,

4  according to you, that's not subtraction, is it?

5      A.   I've never referred to subtraction with

6  respect to Google.

7      Q.   But you claim that a multiplier is an

8  arithmetic decrease?

9      A.   If you multiply by 1.2 --

10     Q.   Is that your testimony?  Yes or no, is it

11 arithmetic -- is a multiplier an arithmetic decrease?

12     A.   It can result in an arithmetic decrease.

13     Q.   It can result in one?

14     A.   Yes.

15     Q.   Okay.  But is it one?

16     A.   It causes one.  I --

17     Q.   Is a multiplier an arithmetic decrease?

18     A.   I don't know how to answer that.

19     Q.   It isn't, is it?

20     A.   It doesn't cause -- in and of itself, it's

21 just a number.

22              THE COURT:  Well, are there ways of

23 arithmetically decreasing the score, other than through

24 subtraction?

25              THE WITNESS:  Yes.  You can multiply it

1   by a smaller number.

2                   THE COURT:  Smaller than 1?

3                   THE WITNESS:  Well, you can multiply --

4   in computing the overall score, which involves a

5   sequence of multipliers, Your Honor, if one of those

6   multipliers is changed to be smaller than it would have

7   been otherwise, the overall score will be smaller.

8                   In other words, if I'm computing a score

9   and one of the products in that score is 1-1/2, then if

10  I come back and take everything the same and multiply by

11  1.2, the end number that I'm going to produce will be

12  smaller because I multiplied in that sequence of

13  multiplications by 1.2 instead of 1.5.

14                  THE COURT:  All right.  Move on.

15      Q.  (By Mr. Verhoeven) Let's go to the next

16  subject, Dr. Rhyne.  Let's go to Claim 33.

17                  MR. VERHOEVEN:  If we can put up DX60,

18  please.

19      Q.  (By Mr. Verhoeven) If you'll take a second to

20  look at that.

21      A.  (Complies.)

22      Q.  Is that Claim 33 that's up there, sir?

23      A.  Yes.

24      Q.  I'd like to focus on the highlighted language

25  in this element.

1          It says -- 33 says:  The method of Claim 31
2     wherein each score is normalized by dividing the score
3     by a maximum possible score for the stored case model.
4          Do you see that?
5     A.   Yes.
6     Q.   Very specific, what it says has to be done,
7     right?
8     A.   Yes.
9     Q.   And I believe the Court's claim construction
10    that's relevant to this term is, quote:  Wherein each
11    match score is divided by the maximum possible score for
12    the stored case model, right?
13    A.   Yes.
14    Q.   Now, you haven't identified any specific place
15    or algorithm in the Google code where Google divides a
16    score by a maximum possible score, have you?
17    A.   I don't think I agree with that.
18    Q.   Isn't it true that your testimony is that
19    Claim 33 only requires the same result as division?
20    A.   That's part of my testimony.
21    Q.   Okay.  Well, let's look at what you showed to
22    the jury on your direct examination.
23              MR. VERHOEVEN:  Can we put up DX Demo 60?
24    Well, I'm sorry.  Could you show, Ryan, Slide 97?  There
25    we go.

1    Q.    (By Mr. Verhoeven) This is what was up

2  yesterday; is that right?

3    A.    I believe so.

4    Q.    Okay.  And is this what you point to as

5  meeting the step of dividing by the maximum possible

6  score?

7    A.    Yes.

8    Q.    Okay.  Now, is it your testimony that the

9  maximum score you can get in Google is 1?

10   A.    The maximum probability, if you express the

11 score as a probability, is 1.  If you express it as

12 odds, it's 1 plus the odds.

13   Q.    So the maximum probability is 1.  The highest

14 thing you could get is 1.  That's an exact match, right?

15   A.    Yes.

16   Q.    Now, isn't it a fact that the maximum possible

17 clickthrough rate is 1?  Is that right?

18   A.    The maximum clickthrough rate expressed as a

19 probability is 1.

20   Q.    And that would correspond to a 100 percent

21 chance of some user clicking on the ad?

22   A.    It would be an ad so compelling that if I ever

23 showed it to you, you would click on it, yes, sir.

24   Q.    And you can't have a 150 percent chance of

25 clicking on that ad, can you?

1     A.   No, sir.

2     Q.   But isn't it true that 1 plus odds, which you

3 have in this formula, will almost always be greater than

4 1?

5     A.   Yes.

6     Q.   So it's greater than this maximum possibility,

7 isn't it, sir?

8     A.   That -- that's when you're talking about the

9 odds multiplier side of the coin and not the probability

10 side.

11    Q.   It's greater than the maximum possibility,

12 isn't it?  It's greater than 1, isn't it?

13    A.   I'm sorry.  That's several questions in a row,

14 and I'm not sure --

15    Q.   It's greater than 1, isn't it, sir?

16    A.   What's the it?

17    Q.   The 1 plus odds that you have right here

18 (indicates), sir.

19    A.   That will be greater than 1.

20    Q.   Okay.  So in that scenario, you're dividing by

21 greater than 1, aren't you?

22    A.   When you're converting the odds multiplier to

23 a probability, yes, you are.

24    Q.   And you're dividing by something that's

25 greater than the maximum possible clickthrough rate,

1  correct?

2      A.   Yes, you are.

3      Q.   Okay.  Now, you stated that the result of this

4  division is that the system can compare and rank ads so

5  that the highest ranking ads will be displayed, right?

6      A.   That's the goal of what they're trying to do.

7      Q.   But isn't it a fact, sir, that AdWords does

8  not rank ads by the predicted clickthrough rate?

9      A.   That's part of what they ultimately use.  They

10 add the bidding process to it as well.

11     Q.   Isn't it correct, sir, that ad rank does not

12 rank ads by the predicted clickthrough rate?

13     A.   I don't know what you meant by ad rank.

14     Q.   You don't know what that means, ad rank?

15     A.   You used it in the first part of your

16 question.

17     Q.   Is it correct, Dr. Rhyne, that AdWords does

18 not rank ads by the predicted clickthrough rate?  Yes or

19 no.

20     A.   It's my understanding that they do as part of

21 the overall --

22     Q.   Okay.  That's your understanding?

23     A.   Yes, sir.

24     Q.   Okay.  Isn't it true that AdWords does not

25 rank ads by what you have identified as the normalized

1   score?

2        A.   I don't -- I don't agree with that.

3        Q.   You don't agree with that.

4        A.   To my current understanding, that --

5        Q.   I'm sorry.  Ad rank -- or excuse me -- AdWords

6   ranks ads using an auction, doesn't it, sir?

7        A.   Ultimately, they do that.

8        Q.   Advertisers bid an amount of money they're

9   going to pay for the ads, right?

10       A.   They do.

11       Q.   And the Google system compares those bids and

12  ranks the ads based on those bids, doesn't it, sir?

13       A.   They -- that's part of what they use in the

14  ultimate ranking.

15       Q.   And as part of that auction, Google looks up

16  the advertiser's maximum cost per click, right?

17       A.   Yes.

18       Q.   And that's the bid, right?

19       A.   If you'll just give me a minute to answer your

20  question, I'll try.

21       Q.   That's the bid, right?

22       A.   That's the bid that they've made on a click

23  for their ad, yes, sir.

24       Q.   Now, in this element as well --

25                 MR. VERHOEVEN:  If we could go back to

1  the slide.

2      Q.   (By Mr. Verhoeven) On 33 here, similar to the

3  other elements, if the jury were to find that the

4  Plaintiff didn't meet its burden of showing this

5  division, dividing by the maximum -- wherein each match

6  score is divided by the maximum possible score, if that

7  math isn't in there, they say, well, that math is not

8  there; I don't find it, then -- and that consequently,

9  this element isn't met, then they must find

10  non-infringement of this element, right?

11     A.   If they find that it's not met either

12  literally or under the Doctrine of Equivalents, I agree

13  with you.

14     Q.   Okay.

15          MR. VERHOEVEN:  Now, let's go to DX Demo

16  28, please.

17     Q.   (By Mr. Verhoeven) And this is Claim 26,

18  Dr. Rhyne, and I'm focusing on Element (b), which says:

19  Interpreting the electronic message using a rule base

20  and case base knowledge engine.

21          Do you see that?

22     A.   Yes.

23     Q.   And I'd like to focus on the part of it that

24  talks about a case base knowledge engine, okay?

25     A.   Okay.

1    Q.   So that's why I've just pulled out that

2  language up here.

3         And then there's a construction that relates

4  to that, right?

5    A.   Yes.

6    Q.   And I'll just read it.  It says, quote:  A

7  knowledge engine that processes electronic messages by

8  comparing them to a set -- excuse me -- by comparing

9  them to a stored set of exemplar cases.

10        That's the Court's construction, right?

11   A.   Yes.

12   Q.   Now, on this step, if the jury were to find

13 that the Plaintiff didn't meet its burden of proving

14 that this is -- that Google -- that there's evidence

15 that practices this, what would be the effect?

16   A.   All of the claims that I've been asserting,

17 30, 31, and 33, would not be infringed.

18   Q.   Okay.  So all of their asserted claims would

19 not be infringed unless the Plaintiff can prove that

20 this element is met, right?

21   A.   Yes.

22   Q.   Yes?  Okay.

23            MR. VERHOEVEN:  Let's go -- I'd like to

24 put up DX Demo 29.

25   Q.   (By Mr. Verhoeven) Now, this is a pullout from

Figure 1 of the patent.  Do you agree with me there?

We put highlighting on it and some other stuff, but the box here (indicates) --

A.   Yes.

Q.   -- this is the pullout from this page of the patent.  Would you agree with me there?

A.   Yes, sir, I do.

Q.   And this is just an example from the patent, right?

A.   This is part of what they refer to as the preferred embodiment.

Q.   Right.  And in the preferred embodiment, would you agree what I've highlighted here (indicates) is where they're illustrating this step in this example that we're talking about here?

A.   I think it illustrates more than that, but that would be something that was intended, in part, to illustrate that step.

Q.   You see here where it says case base (indicates)?

A.   Yes, sir.

Q.   And then here it says presented case model (indicates).

Do you see that?

A.   Yes.

1    Q.   And would you agree -- we added this

2 (indicates).  This isn't on the picture.  It says:

3 Non-interactive message.

4         Would you agree that's a fair addition there

5 to illustrate what we're talking about there?

6    A.   I would have put electronic message, but other

7 than that, I think it's -- that's what, I believe -- if

8 I compare the claims to the preferred embodiment, that

9 would be the non-interactive electronic message coming

10 in.

11   Q.   So in this example, they're calling it

12 presented case model, right?

13   A.   Yes.

14   Q.   And then there's this little picture, and in

15 this particular example, they're using e-mail; is that

16 right?

17   A.   Yes, sir.

18   Q.   Okay.  And then would you agree that they're

19 comparing it to the stored case models in the example?

20   A.   I think the example is -- that figure is much

21 more than that, but if you try to relate that figure to

22 that particular claim limitation, yes.  That -- this is

23 illuminative of that.

24   Q.   And this says stored case models right there

25 (indicates), right?

1        A.   It does.

2        Q.   And we used this phrase, exemplar cases,

3   because that comes from the Court's claim construction.

4   You know what I'm referring to with that phrase, right?

5        A.   Yes.   I don't agree with that, that the stored

6   case models are -- they are not the same.   They're --

7   they're related, but they're not the same.

8        Q.   You don't think these are exemplar cases in

9   this example?

10        A.   They can be, but there are parts of them --

11   there's more to them than just the e-mail.

12        Q.   They're parts of the exemplar cases?

13        A.   It's the other way around.   The exemplar cases

14   are -- can be parts of the stored case models, which

15   include both a previous problem and the previous

16   solution.

17        Q.   Okay.   And what do you think that these little

18   pictures represent?

19        A.   I think they -- they -- iconically, they

20   represent e-mails, but --

21        Q.   Okay.

22        A.   -- but there's another figure that explains

23   much more in detail what they have.

24        Q.   So there's a solution associated with each of

25   these?

1      A.   Yes.

2      Q.   Is that what you're saying?

3      A.   Yes.

4      Q.   Okay.  So, for example, if there's a close

5   enough match between the presented -- in this example,

6   presented e-mail and the stored e-mails, one of them,

7   and the system says, we can respond to this

8   automatically, then it won't return this exemplar case

9   here; it will return the associated response.

10          Is that what you're saying?

11     A.   It will look to what the previous solution was

12  and implement it.  It could be a direction like send

13  back a particular responsive e-mail automatically.

14     Q.   Okay.  So -- but you would agree that in the

15  illustration of the example, what it appears to be doing

16  is taking the non-interactive electronic message,

17  calling it presented case model, and then that gets

18  compared to stored cases with associated solutions, and

19  if there's close enough match, then it responds

20  automatically?

21     A.   I think that's the way the preferred

22  embodiment operated.

23     Q.   Okay.  Now, you've looked through a whole

24  bunch of Google documents, right?

25     A.   Yes.

1    Q.   And source code?

2    A.   Yes.

3    Q.   Okay.  Is it true that you didn't find a

4 single document that referred to anything in the Google

5 documents as a case model?

6    A.   I don't recall doing it, but -- I didn't

7 particularly make that search, but I don't recall seeing

8 that.

9    Q.   You can't identify any one, right?

10    A.   Unless there's one identified in my report or

11 in that -- among the documents that are shown in Exhibit

12 161A, I don't recall one right now.

13    Q.   And is it true, sir, that in all the documents

14 you looked at at Google and all the source code, you

15 didn't find a single document that referred to a case

16 base knowledge engine using those words?

17    A.   I don't recall that saying that at all.

18    Q.   You don't recall seeing that in any of the

19 documents?

20    A.   Sitting here today, I don't.  And I don't

21 remember citing it in my report.

22    Q.   Okay.

23         MR. VERHOEVEN:  Now, if we can to DX Demo

24 20, please.

25    Q.   (By Mr. Verhoeven) This is the illustration I

1  used in my opening, and you may remember it.

2          MR. VERHOEVEN:  If we could just go

3  to the -- keep going.  One more, Ryan.  I'm sorry.  Go

4  back.

5      Q.  (By Mr. Verhoeven) Okay.  So this was my

6  attempt to illustrate the AdMixer.  You saw that in the

7  opening?

8      A.  Yes, sir.  I don't remember what you linked to

9  it, but I think I saw this picture.

10     Q.  Now, would you agree with me that in the

11  AdMixer, what's happening is, a query -- a search query

12  that was sent by a user is processed against a database

13  of ads?

14     A.  Yes.

15     Q.  Okay.  And isn't it true that at no time in

16  the Google system is a search query processed against

17  exemplar search queries?

18     A.  By that, you mean prior search queries that

19  have been retained?

20     Q.  We can start with that, if you'd like.

21     A.  Well, otherwise, I don't understand your

22  question.

23     Q.  Okay.  At no time in the Google system is a

24  search query processed against prior search queries.

25     A.  I don't agree with that.

1    Q.   You don't agree with that.

2         At any time during the period of time in which

3    the user hits enter with a search query and the time the

4    user gets a response, is it your testimony that the

5    Google search -- that that search query is compared

6    against other search queries in the Google system?

7    A.   It's compared against exemplar cases.

8    Q.   That's not my question.  Let me ask it again.

9    I'm focusing on the time between when a user hits

10   send -- types in a query, hits send, and before the time

11   the user gets back the response.

12        You with me?

13   A.   It's not -- it's not -- that's why I asked you

14   for clarification.  It is -- that query that you show at

15   the top of this slide is not compared against previous

16   queries that have been received by the Google system.  I

17   agree with that.

18   Q.   Okay.  And let me see if I can get a clear

19   record on this.

20        Between the time -- I'm focusing on the time

21   between when a user hits send, after typing a search

22   query, and prior to the time the user sees the results.

23   A.   All right.

24   Q.   You with me?

25   A.   Yes.

1    Q.   And during that period of time, very short

2 period of time, right?

3    A.   Yes.

4    Q.   Less than a second, right?

5    A.   Typically.

6    Q.   Yeah.

7         During that period of time, at no place in the

8 Google AdWords system is the search query that the user

9 sends compared against search queries in the Google

10 system.

11   A.   Not against any previously-received search

12 queries.  That's the -- I will agree with that part of

13 your question.

14   Q.   Okay.  So you will admit that during this time

15 period I'm talking about, at least that search query is

16 never compared against prior search queries?

17   A.   I agree with that.

18   Q.   Okay.

19   A.   To the best of my current understanding.

20   Q.   All right.  And you think that it is compared

21 with some other type of search queries?

22   A.   Yes.

23   Q.   What?

24   A.   It's compared to the keywords of the ad, which

25 are sort of anticipated queries as the Google AdWords

1   interface tells you to think of those -- those keywords

2   when you assign them to your ad as things that people

3   who will see your ad in the future might have entered as

4   their keywords in their query and would be hot prospects

5   for clicking on your ad.

6       Q.   Okay.  So your testimony, then, is that this

7   element is met by taking a search query and comparing it

8   to keywords submitted by advertisers?

9       A.   Yes.

10      Q.   Is that what your testimony is?

11      A.   That's only part of it.  Also, I looked at the

12  geo targeting and some other attributes of the query.

13      Q.   Comparing it against geo targeting is not

14  comparing it against search queries, is it, sir?

15      A.   It's comparing an attribute of the query

16  against an attribute that the advertiser specified for

17  their ad.

18      Q.   When you say the word search query, are you

19  talking about a query sent in by a user?

20      A.   Yes.

21      Q.   And it's your testimony that in the Google

22  system, between this timeframe when the user sends the

23  query and the response, that at -- the keywords are

24  search queries sent in by users?

25      A.   Boy, I'm -- I can't even follow that question,

because there's two kinds of keywords.  There's the

keywords in the query, and there's the keywords that are

assigned by the advertiser.  And I don't know which one

you're talking about.

    Q.   Search queries are queries sent in by users,

right?

    A.   Yes.

    Q.   Okay.  But what you're saying is, this step is

met if a search query is matched against a keyword

submitted by an advertiser.

    A.   Yes.

    Q.   That's your testimony.

    A.   That keyword by that advertiser is an

exemplary case, is the language that I'm using.

    Q.   Now, would you agree with me that between the

time a user sends the query and the time the user gets

the response, that query in the Google system, AdWords

system, is never processed against search queries sent

in by other users at any time?

    A.   I agree with that.

    Q.   Okay.  And you agree that the AdMixer, which

is what we're trying to show up here -- this is just my

illustration, but -- you would agree with me that the

AdMixer does not match search queries -- let me withdraw

the question.

1          It's your testimony that the AdMixer does not

2   match a search query against stored search queries,

3   correct?

4       A.   Not previously entered queries sent from the

5   user, yes, I agree with that, if that's what you meant

6   in your question.

7               MR. VERHOEVEN:  Now, if we could go to

8   the -- Ryan, if we could go on to the SmartAds part of

9   the processing.  That's Step No. 3.

10      Q.   (By Mr. Verhoeven) I used this in my opening

11  as well, Dr. Rhyne, if you remember this.

12      A.   I do remember it.

13      Q.   Okay.  Now, I want to focus on the SmartAds

14  portion of the processing.

15      A.   Okay.

16      Q.   You've also accused this portion of meeting

17  this limitation?

18      A.   Yes.

19      Q.   Okay.  And this part of the processing happens

20  after the AdMixer has identified the subset of ads, a

21  couple of hundred maybe?

22      A.   The so-called candidate set of ads, yes, sir.

23      Q.   And the AdMixer then asks the SmartAd system

24  for predicted clickthrough rates, right?

25      A.   Yes.

1     Q.   Okay.

2     A.   But I don't understand your picture at all.

3     Q.   Okay.  Well, let me just ask some questions.

4     A.   Okay.

5     Q.   The SmartAd system does, in fact, calculate

6 predicted clickthrough rates for ads, right?

7     A.   I believe so, for the ads that are in that

8 candidate set, yes, sir.

9     Q.   Would you agree with me that the SmartAds part

10 of the processing does not compare an incoming search

11 query with a stored search query?

12     A.   Not a previously entered stored search query,

13 that's correct.

14     Q.   Now, you -- I guess you don't like my picture,

15 but would you agree there's a lookup table involved in

16 the SmartAds system?

17     A.   Well, I -- I -- I can't follow that figure at

18 all, because it's got predicted clickthrough rates that

19 are greater than 1, and I don't understand what you may

20 be illustrating there, so...

21     Q.   Well, let's take it down then, and -- if it's

22 too confusing for you, and let me ask you the question

23 again.

24     In the SmartAd system, would you agree that it

25 has a lookup table?

A.    I wouldn't disagree with that.  I don't
know -- recall focusing on the lookup table aspect of
it.  You would have to be more specific as to what
you're pointing to as the lookup table.

Q.    Do you know what a lookup table is?

A.    Oh, sure.

Q.    What is it?

A.    Oh, I -- it's typically a table that has a
couple of columns, and you work your way down one column
to look for a match, and if you find a match in that
column, then the stuff in the other column -- it would
be like a telephone directory.  I'm looking for Ryan,
and you look across, and there's the address and phone
number for -- for me.

Q.    Two or more numbers considered together that
can be an index of some kind, right?

A.    Say that again, please.

Q.    Well, let me just move on.

You would agree with me that a table lookup
would not fall into the rule book of case-based
reasoning, wouldn't you?

A.    I think I gave exactly that answer, that I
wouldn't generally think of a table lookup as being a
case-base, that -- I think I went on to say I could
understand how somebody might relate the two, but that's

1    not something I would immediately relate to.

2        Q.    So if that's what the SASS system, SmartAd

3    system, is doing to calculate these predicted

4    clickthrough rates, then that's not case-based

5    reasoning, is it, sir?

6        A.    I wouldn't make the decision as to whether

7    it's case-based reasoning along those lines.  I would

8    look to see whether it met the Court's construction of a

9    case-based knowledge engine.

10       Q.    Sir, if the -- if we prove to the jury, in the

11   SmartAd system, what it's doing is it's taking these

12   candidate ads and applying numbers through a lookup

13   table, that that would not be case-based reasoning.

14       A.    I don't agree with that.

15       Q.    You disagree with that.

16       A.    Uh-huh.

17       Q.    So applying numbers from a table, that's

18   case-based reasoning, too?

19       A.    Not automatically.  I think I would look, as I

20   did, carefully at the description and software of the

21   SmartAd Selection System in order to determine whether

22   or not I thought it met the Court's construction of a

23   case-based knowledge engine.

24       Q.    So sometimes it is, and sometimes it isn't?

25       A.    I think it always is.

1    Q.   So anytime you take numbers from a table and

2  apply them to ads, according to you, that's case-based

3  reasoning?

4    A.   No.

5    Q.   Okay.  It's not case-based reasoning.

6    A.   It might be.  I'd have to look at exactly what

7  it is that they're doing in that process to decide

8  whether it met the Court's construction.

9    Q.   Now, according to you, a case or an exemplar

10  case can simply be anything that's used for interpreting

11  a message.

12    A.   As -- as far as what I've tried to look for, I

13  believe that's correct.

14          Since I wrote my report and since I gave that

15  testimony, there's been some more clarification from

16  Judge Everingham, and I will always rely on what Judge

17  Everingham said these cases were or weren't.

18    Q.   Your testimony, in forming your opinions, was

19  you interpret exemplar cases as being something that

20  could be used for the purpose of interpreting a message.

21  That's it.

22    A.   Yes.

23    Q.   So that could be anything, couldn't it?

24    A.   It could have been until I got some further

25  direction from Judge Everingham, which narrowed me to a

```
 1  couple of things.
 2      Q.   Well, you formed your opinion based on that
 3  assumption, didn't you, sir?
 4      A.   Originally.
 5      Q.   Yeah.
 6                THE COURT:  Counsel, approach.
 7                (Bench conference.)
 8                THE COURT:  Let's limit it to questions
 9  of what his opinions currently are, okay?  I don't know
10  what -- how to clarify them in response to something
11  that I've done, but --
12                MR. VERHOEVEN:  Well, neither do I, Your
13  Honor, and that's the problem.
14                THE COURT:  Well, but --
15                MR. VERHOEVEN:  It's cross-examination,
16  and I don't want to give him an opening for a narrative.
17                That's the first time I'm hearing this,
18  Your Honor.  We took his deposition just last week.  We
19  took his deposition just, you know --
20                THE COURT:  Okay.
21                MR. VERHOEVEN:  -- literally the week
22  before trial.
23                THE COURT:  Well, I understand the
24  time --
25                MR. VERHOEVEN:  I'll move on.
```

```
1                    THE COURT:  -- but let's --
2                    MR. VERHOEVEN:  I can move on, Your
3   Honor.
4                    THE COURT:  Okay.  And another thing, Mr.
5   Verhoeven, don't push me with the side-bar comments
6   about being confusing to the witness, okay?  So let's
7   avoid any side-bars, okay?
8                    MR. VERHOEVEN:  Yes, Your Honor.
9                    THE COURT:  All right.
10                    (Bench conference concluded.)
11        Q.   (By Mr. Verhoeven) And I may have asked -- I
12   don't think I asked you on this particular claim, the
13   case-based reasoning claim --
14                    MR. VERHOEVEN:  Which if we could just
15   put up DX Demo 28 again, please.
16        Q.   (By Mr. Verhoeven) And if I did ask you about
17   it, I apologize.
18             So this element is not met -- did I ask you
19   about this already?
20        A.   You did.
21        Q.   I did.  Okay.  I'm sorry, Dr. Rhyne.  I just
22   wanted to establish that if this is met, there's no
23   infringement, right?
24        A.   You asked me, and I agreed with you --
25        Q.   Okay.
```

1      A.    -- if it's not met either literally or under

2  the Doctrine of Equivalents.

3      Q.    All right.

4            MR. VERHOEVEN:  So let's go to DX Demo

5  25.

6      Q.    (By Mr. Verhoeven) And I'd like to focus on

7  non-interactive.

8            So in Claim 26 is a method for automatically

9  processing a non-interactive electronic message using a

10 computer, and it has three steps, right?

11     A.    Yes, sir.

12     Q.    And then the first one is receiving the

13 electronic message from a source, and I'm focusing on

14 the part of this that says non-interactive.

15           You with me?

16     A.    I think.

17     Q.    Okay.  And the Court construed that, correct?

18     A.    Yes.

19     Q.    As, quote, an electronic message in which the

20 sender -- the sender would be -- what is your

21 understanding?

22     A.    The person who entered the query using their

23 browser and their computer, yes.

24     Q.    That person's computer and their browser?

25     A.    Yes, sir, and their internet connection.

1       Q.    Okay.   So an electronic message in which the

2  sender does not provide any additional information after

3  the message has been received and -- by whom?   Who's the

4  message received by?

5       A.    By the Google -- in this case --

6       Q.    Google --

7       A.    -- Google AdWords system.

8       Q.    Okay.   So what this is -- your understanding

9  of this is, it's saying non-interactive means an

10 electronic message in which the person sitting at the

11 computer does not provide any additional information

12 after the message -- electronic message has been

13 received by Google --

14      A.    That's correct.

15      Q.    -- is that right?

16            Okay.   And here also -- all the claims that

17 are asserted, 30, 31, and 33, depend on this element,

18 right?

19      A.    Yes.

20      Q.    And so if this element -- if the jury

21 concludes that the Plaintiff hasn't proven that this

22 element is met, in other words, that the message is

23 non-interactive, then they must find non-infringement,

24 correct?

25      A.    You misspoke.

1     Q.   Let me try it again then.

2         If the jury were to conclude that the

3 Plaintiff hadn't met its burden of proving the existence

4 of this non-interactive electronic message, for example,

5 that it's interactive, then none of those three claims

6 would be infringed, right?

7     A.   Correct.

8     Q.   And the jury must find non-infringement, if

9 they find there's an absence of proof there, right?

10    A.   Yes.

11    Q.   Okay.

12         MR. VERHOEVEN:  Now, let's put up DX Demo

13 26(a), I believe.

14    Q.   (By Mr. Verhoeven) Now, you've used the Google

15 search page a bunch of times in connection with

16 preparing for this case, right?

17    A.   More than a bunch.

18    Q.   Yeah.

19    A.   I use it almost daily, if not daily.

20    Q.   So I've got another example I'd like to go

21 through --

22    A.   All right.

23    Q.   -- okay?

24         So I'm a user, and I'm sitting at my

25 terminal --

1          MR. VERHOEVEN:  And let's go to the

2   next...

3       Q.   (By Mr. Verhoeven) And I just type in this

4   character M.

5            You see it?

6       A.   Yes, uh-huh.

7       Q.   Google automatically gives me back ten

8   suggestions, right?

9       A.   I think if you set your browser up to do that,

10  it will do that.

11      Q.   That's a default, isn't it?

12      A.   It must not be, because I don't generally get

13  them on my computer, and I don't -- I don't think I ever

14  went intentionally and stopped doing that.  So it may be

15  browser-dependent.

16           I use Internet Explorer.  This may be

17  something FireFox does all the time or something.  I

18  don't ever see this on my computer.

19      Q.   Do you know whether it's a default or not?

20      A.   I don't.

21      Q.   Okay.  Have you seen this happen?

22      A.   Yes.  Oh, yes.

23      Q.   Okay.

24      A.   Yes.  Yes.

25      Q.   This letter M gets sent from the user to

1 Google, doesn't it?

2     A.   They actually go ahead and echo it over to

3 Google.

4     Q.   And that goes over to Google, doesn't it?

5     A.   Yes.

6     Q.   That's an electronic message, isn't it?

7     A.   It's not the electronic message of the claims.

8     Q.   Is this an electronic message, sir?

9     A.   No.

10     Q.   Is it electronically sent?

11     A.   Yes.

12     Q.   Is it a message?

13     A.   No.

14     Q.   M is not a message?

15     A.   No.

16     Q.   Why not?

17     A.   Because there's more to come.  It's not a

18 message until you hit Google search.

19     Q.   Well, let's go back to the Court's claim

20 construction.

21         There's nothing in here that says that you

22 have to wait until there's more to come, right?  It just

23 says electronic message.

24     A.   It's got to be a message.

25     Q.   Okay.  And what -- and how do you understand

1 that, sir?

2     A.   That it's got to convey some information that

3 the person who's the sender intends to send to Google to

4 say:  I want to search on something.

5     Q.   So it's your understanding that in order for

6 something to be a message under this patent, that the

7 user has to intend to be sending a message?

8     A.   Yes.  There has to be a message, and M, at

9 least in that case, is not the message.  If they hit

10 Google search after typing M, then M would be the

11 message.  But if it's in the middle of it, it's not.

12     Q.   The claim construction doesn't say that the

13 user has to intend it to be a message, does it?

14     A.   I was trying to give you a definition of the

15 word message and why I don't think the single letter M

16 in that example is a message.

17     Q.   Well, let's just --

18             MR. VERHOEVEN:  If we could go back to

19 the next slide, please.  Next.

20     Q.   (By Mr. Verhoeven) If we assume that that is a

21 message, M is a message, the user -- when the user types

22 that in there --

23     A.   Yes.

24     Q.   -- it gets sent to Google, doesn't it?

25     A.   It does.

1    Q.    And what happens in less than a second?

2    Google comes back with all this, right?

3    A.    Yes, if you have your browser set up to do

4    that.

5    Q.    And then what --

6              MR. VERHOEVEN:  Ryan, go to the next one.

7    Q.    (By Mr. Verhoeven) The next character that the

8    user types in, another couple of characters gets sent to

9    Google, right?

10    A.    I would think only one more character gets

11    sent, but maybe it echoes both of them.  I don't know.

12    Q.    You don't know.

13              MR. VERHOEVEN:  I apologize, Your Honor.

14    Q.    (By Mr. Verhoeven) This is electronically

15    transmitted, right?

16    A.    Those letters are sent electronically.

17    Q.    Okay.  But you don't think that's a message?

18    A.    I do not.

19    Q.    And then Google automatically responds really

20    fast with these suggestions, right?

21    A.    Yes.

22    Q.    Okay.  And then the next character, the same

23    thing happens, right?

24    A.    A little different thing happens, but it's the

25    same general concept, that's correct.

1    Q.   There's interaction between the client

2 computer that the user's on, and the servers over at

3 Google, right?

4    A.   Well, the Google -- the R was sent to Google,

5 and Google did send back those other suggested messages.

6    Q.   That's an interaction, isn't it?

7    A.   It is.

8    Q.   This whole process is interactive, isn't it?

9    A.   It has data flowing back and forth.  It would

10 certainly be what I would generally characterize as

11 computer-to-computer interaction.

12    Q.   You wouldn't call it non-interactive, would

13 you?

14    A.   I wouldn't call it non-interactive in the

15 general sense of what's happening between those letters

16 and Google.

17    Q.   And then the next character, it changes again

18 with different responses, different suggestions, right?

19    A.   It sure does.

20    Q.   The next character, again, every single

21 character --

22           MR. VERHOEVEN:  Keep going, Ryan.

23    Q.   (By Mr. Verhoeven) -- until you're done, it

24 keeps making suggestions, back and forth, back and

25 forth, right?

1        A.    Sure does.

2        Q.    That's interaction.

3        A.    Until you're done is the keyword.

4        Q.    Okay.  If this were -- if we go back to just

5   putting in the M --

6        A.    Uh-huh.

7        Q.    -- if that were an electronic message, would

8   you agree that this process doesn't meet the claim?

9        A.    Well, that's kind of self-fulfilling prophesy

10  there.  I mean, I don't think it is.  If I agreed with

11  you -- I can understand what you're saying, but I don't

12  agree with you.

13       Q.    Well, just for the sake of argument, let me

14  ask the question.

15       A.    Hypothetically.

16       Q.    If -- hypothetically.  That's a better way to

17  say it.

18             Hypothetically, if the M is an electronic

19  message, this process would not be non-interactive,

20  would it, sir?

21       A.    I -- I --

22       Q.    Under these elements we just went through.

23       A.    If I thought that that M by itself were a

24  message, then I would say that there's some

25  interactivity going on.

1      Q.    Okay.

2                    (Pause in proceedings.)

3                    THE COURT:  Are you about to move into a

4   new area?

5                    MR. VERHOEVEN:  I am, Your Honor.

6                    THE COURT:  All right.  Well, in that

7   case, we're going to take our lunch recess before we get

8   into that.

9                    Ladies and Gentlemen, I'll excuse you for

10  lunch at this time.  Be back ready to go at 1:15.

11                   Remember my prior instructions, and don't

12  talk about the case.

13                   Thank y'all.

14                   LAW CLERK:  All rise.

15                   (Jury out.)

16                   THE COURT:  All right.  Be in recess

17  until 1:15.

18                   MR. VERHOEVEN:  Your Honor?

19                   THE COURT:  Yes.

20                   MR. VERHOEVEN:  Housekeeping matter.

21  I've been informed by Ms. Candido that we worked out the

22  document issue on the damages thing, so...

23                   THE COURT:  Okay.  All right.  Well, then

24  I'll assume you don't need me -- I'm in chambers usually

25  for lunch during trial.  If something comes up over the

1 lunch hour, send a delegation downstairs, and I'll be

2 happy to try to resolve it before we get started, okay?

3          MR. VERHOEVEN:  Yes, Your Honor.

4          (Lunch recess.)

5          *       *       *       *       *       *

6

7

8

9                    CERTIFICATION

10

11          I HEREBY CERTIFY that the foregoing is a

12 true and correct transcript from the stenographic notes

13 of the proceedings in the above-entitled matter to the

14 best of my ability.

15

16

17

18 /s/_____          _____

SUSAN SIMMONS, CSR                       Date
19 Official Court Reporter

State of Texas No.:  267
20 Expiration Date:  12/31/10

21

22

23 /s/_____          _____

JUDITH WERLINGER, CSR                    Date
24 Deputy Official Court Reporter

State of Texas No.:  731
25 Expiration Date:  12/31/10