<pre>
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                      MARSHALL DIVISION

3  BRIGHT RESPONSE, LLC        *    Civil Docket No.
                               *    2:07-CV-371
4  VS.                         *    Marshall, Texas
                               *
5                              *    August 4, 2010
   GOOGLE, INC., ET AL         *    1:15 P.M.
6
                    TRANSCRIPT OF JURY TRIAL
7         BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
                 UNITED STATES MAGISTRATE JUDGE
8

9  APPEARANCES:

10 FOR THE PLAINTIFF:      MR. ANDREW SPANGLER
                           Spangler Law
11                         208 North Green Street
                           Suite 300
12                         Longview, TX    75601

13                         MR. MARC A. FENSTER
                           MR. ANDREW WEISS
14                         MR. ADAM HOFFMAN
                           MR. ALEX GIZA
15                         Russ, August & Kabat
                           12424 Wilshire Boulevard
16                         12th Floor
                           Los Angeles, CA    90025
17
                           MR. DAVID M. PRIDHAM
18                         Law Office of David Pridham
                           25 Linden Road
19                         Barrington, RI   02806

20 APPEARANCES CONTINUED ON NEXT PAGE:

21
   COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
22                         MS. JUDITH WERLINGER, CSR
                           Official Court Reporter
23                         100 East Houston, Suite 125
                           Marshall, TX    75670
24                         903/935-3868

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
</pre>

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:        MS. ELIZABETH A. WILEY
                          The Wiley Firm
                          P.O.  Box 303280
                          Austin, TX    78703

                          MR. PATRICK R. ANDERSON
                          Patrick R. Anderson, PLLC
                          4225 Miller Road
                          Building B-9, Suite 358
                          Flint, MI    48507

                          MR. JOHN C. HUESTON
                          MR. ADAM S. GOLDBERG
                          Irell & Manella, LLP
                          840 Newport Center Drive
                          Suite 400
                          Newport Beach, CA    92660

FOR THE DEFENDANT:        MR. CHARLES K. VERHOEVEN
(Google)                  MR. DAVID A. PERLSON
                          MS. AMY H. CANDIDO
                          Quinn Emanuel Urquhart & Sullivan
                          50 California Street
                          22nd Floor
                          San Francisco, CA    94111

                          MS. JENNIFER PARKER AINSWORTH
                          Wilson Robertson & Cornelius
                          P.O.  Box 7339
                          Tyler, TX    75711

FOR THE DEFENDANT:        MS. JENNIFER HALTOM DOAN
(Yahoo!)                  Haltom & Doan
                          6500 Summerhill Road
                          Suite 100
                          Texarkana, TX    75503


APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:      MR. WILLIAM ROOKLIDGE
(Yahoo!)                Howrey, LLP
                        4 Park Plaza, Suite 1700
                        Irvine, CA   92614

                        MR. JASON WHITE
                        Howrey, LLP
                        321 North Clark Street
                        Suite 3400
                        Chicago, IL   60610


              *      *      *      *      *      *


                     P R O C E E D I N G S

              LAW CLERK:  All rise.

              (Jury in.)

              THE COURT:  Please be seated.
Mr. Verhoeven, proceed.

              MR. VERHOEVEN:  Thank you, Your Honor.

 VERNON THOMAS RHYNE, III, Ph.D., PLAINTIFF'S WITNESS,

                     PREVIOUSLY SWORN

              CROSS-EXAMINATION (CONTINUED)

BY MR. VERHOEVEN:

    Q.   Dr. Rhyne, before the break, I had asked you

about Claim 30(b6).

         Do you remember that generally?  That's the

claim that talks about scoring?

    A.   Yes.

1      Q.   And I'm not going to take the time to put it

2   back up.

3           Remember I had some difficulty getting the

4   claim up, but that's the claim that talks about scoring

5   ads that are compared in the ad-serving process

6   generally?

7      A.   Yes.

8      Q.   Okay.  And I believe -- and I asked you about

9   the extent of scoring.  You testified that as to

10  AdMixer, but I want to make sure we have a clear record.

11          So I want to ask you another follow-up

12  question, if I may.

13     A.   Sure.

14     Q.   It's true, isn't it, that as part of the

15  process of returning ads in response to a query in

16  AdWords, there are ads that are compared to the

17  income -- incoming queries that are not scored, correct?

18     A.   That's correct, in the AdMixer.

19     Q.   I'm talking about all of AdWords, not just the

20  AdMixer.

21     A.   Well, the Ad Mixer is part of the AdWords, so

22  in that part of it, that's true.

23     Q.   It's true that in response to a query in

24  AdWords generally, not just limited to AdMixer, there

25  are ads that are compared to the incoming query that are

1  not scored, right?

2       A.   If you exclude AdMixer, I don't agree with

3  that.

4       Q.   Okay.  I'd like to play from your deposition

5  of July 29th, 2010, Page 149, Lines 19 through 25.

6                 (Video clip playing.)

7                 QUESTION:  Thus, as part of the process

8  of returning ads in response to a query in AdWords,

9  there are ads that are compared to the incoming query

10 that are not scored, correct?

11                ANSWER:  Yes.

12                (End of video clip.)

13      Q.   (By Mr. Verhoeven) Now, Dr. Rhyne --

14                MR. VERHOEVEN:  I'd like to put up DX

15 Demo 55, please.

16      Q.   (By Mr. Verhoeven) And this is an illustration

17 of the Google response to query for baseball scores.

18           Do you see that, sir?

19      A.   Yes.

20      Q.   And I'd like to direct your attention over

21 here to this red box.  That's where the ads are served

22 up from the AdWords system; is that right?

23      A.   Yes, that's one place.

24      Q.   Okay.  Now, as you understand how AdWords

25 works, from the time period of first infringement, 2004

till today -- for alleged infringement from 2004 till today, Google only makes money from advertising if someone clicks on an ad, correct?

A.   That's my understanding.

Q.   Okay.  And isn't it true, sir, that clicking on an ad is an interactive communication?

A.   Yes, it is.

Q.   So the act of clicking on the ad isn't an infringing act, is it, sir?

A.   No.  I have not gone to that point.  I stopped with the display -- well, actually, not even the displayed ad.

Q.   So the answer to my question is yes, clicking on an ad is not an infringing act?

A.   I certainly did not point to that as part of my infringement analysis, no.

Q.   You'd agree with me then?

A.   Yes.

Q.   Okay.  Dr. Rhyne, I have no further questions.

A.   Thank you.

THE COURT:  Mr. Rooklidge, cross-examination.

MR. ROOKLIDGE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROOKLIDGE:

1      Q.   Good afternoon, Dr. Rhyne.

2      A.   Good afternoon, Mr. Rooklidge.

3      Q.   Now, at the beginning of your testimony, you

4  walked the jury through the relationship of the

5  different claims, the dependent claims and the

6  independent claims and the like.

7           One thing I just want to make sure gets

8  crystal clear, it's your understanding that if even one

9  step of the claim method that is not performed by the

10  Yahoo! Sponsored Search system, then the Yahoo!

11  Sponsored Search doesn't infringe that claim, correct?

12      A.   Yes.

13      Q.   Now, let's put up Slide 104 that you talked

14  about earlier.  I just want to make sure that we -- we

15  understand exactly what that response by the Yahoo!

16  system looks like.

17           This is the slide you testified about earlier?

18      A.   Yes, I believe so.

19      Q.   Okay.  Now, there are those red boxes around

20  the Sponsored Search results on the right-hand side of

21  the page.

22           Do you see those?

23      A.   Yes.

24      Q.   Okay.  Now, those aren't -- those red boxes

25  don't appear in the actual Yahoo! page, do they?

1    A.   I don't think they do.  I added those to

2 identify the ads, but I think that they just show up

3 without the red boxes.

4    Q.   Okay.  And also, those are somewhat colored in

5 within the red boxes.  On the right-hand side of the

6 Yahoo! page, they're not shaded, are they?

7    A.   I don't think they are.

8    Q.   Now, you testified earlier about certain

9 things in the Yahoo! system happening very quickly, like

10 in a tenth of a second.

11        You haven't performed any studies or done any

12 analysis of the exact timing of how long Yahoo! search

13 results take to return?

14    A.   I have not.

15    Q.   And you haven't done any analysis or conducted

16 any inspection of how often the ads in Yahoo!'s ad

17 database get refreshed, have you?

18    A.   I -- I don't think I understand that question

19 by the refreshed.

20    Q.   Do you understand that the -- the database in

21 which Yahoo!'s ads are stored is a dynamic database.

22 There are -- there are changes to that database

23 happening all the time, correct?

24    A.   I believe I recall some testimony about the

25 fact that new ads may come in, current ads may be edited

1  by the advertiser, or ads that are there may be deleted.

2          So if that's what you mean by dynamic, I agree

3  with that.

4      Q.   And do you recall the number of 10 million

5  changes a day?

6      A.   I believe I do, yes, sir.  That was testimony

7  of a Yahoo! deponent.

8      Q.   Now, you said in your direct testimony that

9  the Element 28(b1)(ii) was based -- your analysis of

10 that was based on Google's expert testimony.

11         Do you recall that?

12     A.   For Google, I did.

13     Q.   Okay.  Do you recall saying that for Yahoo!'s

14 analysis?

15     A.   If I did, I misspoke.

16     Q.   Okay.  So Google's expert never opined

17 anything about Yahoo! meeting that limitation?

18     A.   No.  If I said that, it just was a slip-up.

19     Q.   Okay.

20     A.   I think that the -- I thought -- we can look

21 at the slides, but that we pointed to some testimony by

22 one of the Yahoo! experts.

23     Q.   Now, you looked at a lot of Yahoo! documents

24 in preparing your opinion for this case, right?

25     A.   I think so.

1    Q.   Okay.  You didn't find any mention in those

2 documents of a case model, did you?

3    A.   I don't recall those words ever being used in

4 any of those documents, no, sir.

5    Q.   And in all those Yahoo! documents that you

6 looked at, you didn't see any mention of a case-based

7 knowledge engine, did you?

8    A.   I don't recall it.  I don't think I cited to

9 anything in my report, and I'm fairly certain if I had

10 found that specific cite, I would have.  So I don't

11 recall it.

12    Q.   Now, you're aware that Yahoo! has a feature

13 called Search Assist.  It's like the Google feature that

14 suggests the alternatives.

15    A.   During the -- while -- while you're typing in

16 the query message, you're saying -- it's giving you

17 suggestions, like we saw there with marinade.

18    Q.   Yes.

19    A.   Frankly, I'm not aware of it.  I don't think

20 I've ever seen it, but I accept your stipulation.

21    Q.   Now, at the end of your testimony, you talked

22 about the '361 patent, one of the two patents you looked

23 at?

24    A.   Yes, sir.

25    Q.   And that was a patent that was originally

issued to goto.com?

A.   Yes, sir.

Q.   And you're aware that goto.com changed its name to Overture?

A.   I -- I think I'm aware of that.

Q.   And then Overture was acquired by Yahoo!, correct?

A.   Yes.  I'm fully aware of the latter part of that.

Q.   Now, when you considered the '361 patent, did you consider any of the other related patents in the '361 patent family?

A.   No, sir.

Q.   Did you consider how many patents were in that '361 patent family?

A.   No, sir.

Q.   You didn't consider any of the other patents in Yahoo!'s Overture patent portfolio, did you?

A.   I don't understand.  Is that a different question?

I -- I looked at that one patent, and I'm not sure what other patents Yahoo! may have obtained when they purchased Overture.

Q.   And just to be clear, you haven't looked at any of Yahoo!'s other patents?

1     A.   Well, you mean -- I -- that's the only

2 Overture patent that I've looked at, and I don't recall

3 looking at any other patents that Yahoo! may have.  I

4 saw a big stack the other day, but I don't think I've

5 looked at any of those.

6     Q.   Let's -- let's turn back to Claim 28, the

7 predetermined response.

8             MR. ROOKLIDGE:  If we could have the

9 demonstrative up on that.

10    Q.   (By Mr. Rooklidge) Now, all of the asserted

11 claims, 30, 31, and 33, are dependent on Claim 28,

12 correct?

13    A.   Yes.

14    Q.   So if Yahoo! doesn't meet the limitation of

15 predetermined response in Claim 28, then therefore it

16 doesn't -- it doesn't infringe Claims 30, 31, and 33,

17 correct?

18    A.   You're talking about (c) when you refer to

19 predetermined response?

20    Q.   Correct.

21    A.   That would be true.  If you -- if they fail to

22 meet 28(c), then they don't infringe 30, 31, or 33.

23    Q.   Okay.  Let's take a look at the Court's claim

24 construction on that.

25         Now, you understand that the Court has

construed a predetermined response as a response that's

prepared prior to the receipt of the electronic message,

correct?

    A.   Yes.

    Q.   And, again, for Yahoo!'s Sponsored Search

system, you have defined the electronic message to be

the search query in the form of an http request,

correct?

    A.   Yes.

    Q.   All right.  Now, your direct testimony was

that the set of ads that Yahoo!'s Sponsored Search

returns to a user is not the response required by the

asserted claims, correct?

    A.   Yes.

    Q.   When we took your deposition last week for

Yahoo!'s Sponsored Search system, you admitted, did you

not, that the response in the asserted claims is, quote,

the set of advertisements that are returned, end quote,

not a single ad?

    A.   If I did, I was in error or maybe didn't

understand the question.

        But that certainly was not my understanding

before that deposition, and it's not my understanding

now.

                MR. ROOKLIDGE:  I'd like to play it from

1  the July 29th deposition of Dr. Rhyne at Page 212, Line

2  24 through 213, Line 10.

3                    (Video clip playing.)

4                    QUESTION:  And in this section, are you

5  identifying what you think are the predetermined

6  responses in the Yahoo! and Google accused systems?

7                    ANSWER:  Yes.

8                    QUESTION:  And so in both the Yahoo! and

9  Google accused systems, it's the set of advertisements

10 that are returned in response to the search queries that

11 is the quote response, correct?

12                    ANSWER:  Let me look at the claim

13 language again just to be sure.

14                    Yes.

15                    (End of video clip.)

16      Q.   (By Mr. Rooklidge) Dr. Rhyne, in the Yahoo!

17 Sponsored Search system, the set of advertisements are

18 not prepared prior to the receipt of the search query,

19 correct?

20      A.   Yes.  The mixture of the set of whole ads is

21 not.

22      Q.   In fact, in the Yahoo!'s Sponsored Search

23 system, the set of ads that are -- that are returned are

24 not determined until after the receipt of the search

25 query?

A. By set, you mean the particular -- that there are 10 or 11 of them, taking all the numbers of that set, yes, sir, that's correct.

Q. That set of advertisements is always sent together, correct?

A. I think there may be more ads than they can actually get on the screen. I'm not sure if there's like 10 or 11 of them.

But that set, as many of them as they can put on the screen, it's sent at one time.

Q. And, in fact, they send multiple sets of ads, don't they?

A. I think if you look for the follow-on screens, you'll get additional ads that are over and above the first set that you see on the first response page.

Q. So isn't that first set of ads one set of ads?

A. It is one set of ads.

Q. And aren't the subsequent set of ads or more set of ads?

A. They are other sets of ads, yes.

Q. Well, let's look, if we could, at Claim 26, particularly Claim 26(a).

Now, you testified that in the Yahoo!'s Sponsored Search system, the source of the non-interactive electronic message is the user's

1 computer and browser, correct?

2     A.   Yes.

3     Q.   Okay.  And that source sends an electronic

4 message in the form of an http request, right?

5     A.   Yes.

6     Q.   Now, when there is a partner website rather

7 than just a Yahoo!-owned and -operated website, the

8 user's http request gets sent to a partner's website,

9 correct?

10     A.   To a partner's server.

11     Q.   Yes.

12     A.   I wouldn't refer to that necessarily as their

13 website.  But for a non-Yahoo! partner, that's correct,

14 as long as you recognize that it's a computer system

15 serving as a server.

16     Q.   Let's put up a partner website graphic that

17 appeared in your report.

18           In the case of search queries -- while we're

19 waiting for that --

20     A.   Okay.

21     Q.   Okay.  Here's the -- you recall this from --

22 this diagram from your report?

23     A.   I do.  That's exactly the figure that I was

24 thinking about when I answered your question.

25     Q.   Okay.  And -- and this diagram shows over here

1 on the left the user sitting at the user's computer,

2 correct?

3     A.   Yes.

4     Q.   Okay.  And then there's an arrow that says

5 user's search term, correct?

6     A.   Yes.

7     Q.   All right.  And that goes to the partner's

8 website server?

9     A.   Yes.

10     Q.   In the form of an http request?

11     A.   Yes.

12     Q.   Now, from the partner's website server to

13 Yahoo!'s Search Marketing, there is what's called the

14 partner search request.

15         Do you see that?

16     A.   Yes.

17     Q.   That's a different http message than the

18 user's search request?

19     A.   Some parts of them are common, but it is not

20 exactly the same http request.

21     Q.   Correct.

22         As a matter of fact, some of the elements of

23 the user's search request gets stripped off; isn't that

24 correct?

25     A.   I'm not aware of that.

1    Q.   Okay.  And then the partner adds some of its

2  own elements to the partner search request?

3    A.   I am aware of that.  They add additional

4  information over and above things like the query itself,

5  but there is more added by the partner.

6    Q.   Okay.  So Yahoo! Search Marketing doesn't

7  receive the user's search request, does it?

8    A.   They don't receive exactly the same http

9  message as the one the user sent to the non-Yahoo!

10  partner.

11    Q.   And they don't receive that directly from the

12  user, correct?

13    A.   That's correct.  There's an intermediate

14  server.

15    Q.   All right.  They don't receive that directly

16  from the source, correct?

17    A.   That's correct.

18    Q.   Okay.  Now, you haven't expressed an opinion

19  on joint infringement in this case, have you?

20    A.   I don't know how to answer that question to

21  the negative.  I have not issued such an opinion.

22    Q.   All right.

23    A.   Or expressed one in my report or my testimony.

24    Q.   Okay.  So you've offered no opinion as to

25  whether that claim limitation requiring that the message

1   be received from a source is satisfied in the instance

2   of a partner's -- a non-Yahoo!-owned and -affiliated

3   partner's website, correct?

4        A.   I think I have offered that opinion.  And I

5   won't expand on that, but I don't agree with what you

6   just said.  I think I dealt with that in my report.

7        Q.   Okay.  And so when we have an electronic

8   message, a non-interactive electronic message, coming

9   from a source as the requirement, if the message doesn't

10  come directly from the source and the message that

11  arrives at Yahoo! Search Marketing isn't the source's

12  original message, that message cannot be from a source,

13  correct?

14       A.   I don't agree with that.

15       Q.   Let's go back to Claim 26.

16            Before we -- before we leave that, I'd like to

17  go back to your expert report dated July 6th, 2010.

18            I'd like to put this up on the ELMO, if I

19  could.

20            Oh, there it is, the miracle of modern

21  technology.

22            This is a -- do you recognize this page from

23  your report, Page 10 of your report?

24       A.   I can't read that, but I have the report here,

25  so if you'll give me just a moment, I'll get the actual

1  page and be able to deal with it.

2      Okay.

3      Q.   Does this refresh your recollection of whether

4  Yahoo! has a Search Assist function that as you're

5  typing in the search query, just like the Google system,

6  it suggests alternate search queries?

7      A.   I would say half and half.

8      What I'm not familiar with -- and it may be a

9  result of this.  If we're typing in A-T-T, clearly at

10 this point, the entirety has been typed in -- what I

11 just don't remember is that interactive process that

12 Mr. Verhoeven illustrated with a piece of video.  It may

13 be exactly that.

14     Q.   I just happen to have a demonstrative that

15 shows that, and we can walk through --

16     A.   That's fine.  I don't disagree that that's

17 available.

18         MR. ROOKLIDGE:  Why don't we turn to that

19 demonstrative, Allen, if we could.

20     Q.   (By Mr. Rooklidge) So we're going to start

21 typing.  The Yahoo! Search Assist feature is slightly

22 different from the Google Search Assist feature, because

23 when we start typing, the first two aren't going to get

24 us anything.

25         But after that, with the third character, you

1   see we start getting alternate search queries.

2        A.   Okay.

3        Q.   Do you have any reason to believe that's not

4   correct?

5        A.   Oh, no.  No.  No.  It's just not something

6   that I have up on my computer.  When I use Yahoo!

7   Search, that doesn't appear.

8        Q.   And that can indeed be affected by the

9   settings on your browser of your computer, right?

10       A.   Apparently it must be.  I mean, I haven't

11  intentionally disabled it or enabled it, but I just

12  don't get that, okay?

13       Q.   When you say you don't get that, it doesn't

14  appear on your screen, correct?

15       A.   Yes.  When I use Yahoo! for my search engine,

16  which I do occasionally, I don't see that on my screen.

17       Q.   Okay.  Very good.

18            So -- but the signals that come back and forth

19  between Yahoo! and your browser are not what's

20  necessarily reflected on your screen, right?

21       A.   There may be other signals besides the

22  messages that are coming back that are rendered by the

23  browser.

24       Q.   Correct.  But what I'm trying to get at is, if

25  you turn off that feature on your browser, it doesn't

1  turn off the communication between Yahoo! and your

2  browser?

3      A.   It could possibly work either way.  I don't

4  have an answer for that.  It may be that somehow that

5  they notify Yahoo! not to send it, or it may be that

6  Yahoo! sends it and they ignore it, either of those.  I

7  don't know which.

8      Q.   Let's go back, then, to non-interactive

9  message, Claim 26(a).

10         Step 26(a) requires receiving a

11  non-interactive electronic message.  Do you recall that?

12     A.   Yes.

13     Q.   Okay.  And once again, because that's in Claim

14  26, it's a required element for Claims 30, 31, and 33,

15  right?

16     A.   As far as 28(a) -- 26(a) and (b) are

17  concerned, yes, sir.

18     Q.   Okay.  So that if that claim element is met --

19  is not met, then Yahoo! cannot infringe Claims 30, 31,

20  and 33, correct?

21     A.   Yes.

22     Q.   Now, let's go to the Court's claim

23  construction of non-interactive electronic message, and

24  that is an electronic message in which the sender does

25  not provide any additional information after the message

1  has been received.

2         Do you see that?

3      A.   Yes.

4      Q.   Okay.  Let's then go to one of your -- your

5  expert reports, the validity expert report, at

6  Paragraph 86.

7         And there's a statement in there:  No action

8  by a searching user takes place in any of the accused

9  systems between the time a searching user transmits his

10  or her search query to the accused Defendants' system

11  and the time when they see the returned search results

12  and any returned advertisements.

13         That is the period of non-activity (sic)

14  required by Claim 26.  What happens after those results

15  are returned is of no relevance to the scope of that

16  claim.

17         Do you see that?

18      A.   Yes.

19      Q.   It's your opinion that the asserted claims

20  require that the non-interactivity of the electronic

21  message is limited to the time between when the user

22  hits enter, or carriage return as you said, on that

23  search query, and then the search results and

24  advertisements are returned back to the user, right?

25      A.   Looking at that sentence, I think I have

1  overstated it there.  That's a larger period than I

2  think the actual period required by Judge Everingham's

3  construction of non-interactive activity.  But it

4  appeared what the claim really deals with is inside that

5  period.

6          But for the point that I was making in the

7  validity report, which is a different subject that I

8  dealt with, that's not an incorrect statement.  It just

9  extends the period longer than I think the claim

10  actually requires.

11      Q.   Now, the phrase non-interactive electronic

12  message appears in all the asserted claims, correct,

13  through Claim 26?

14      A.   Yes.

15      Q.   Now, isn't it true that after a user submits a

16  search request to Yahoo!, they can click on an

17  advertisement provided by Yahoo!'s Sponsored Search?

18      A.   Yes.

19      Q.   And that click is an interaction, correct?

20      A.   Yes.

21      Q.   And the click is received by Yahoo!, right?

22      A.   Yes.

23      Q.   And Yahoo! charges advertisers per click?

24      A.   It's my understanding that's true as far as I

25  know for every advertiser.

1   Q.   So Yahoo!'s revenue model depends on users

2  clicking on the advertisements?

3   A.   As far as I know, yes, sir.

4   Q.   Well, let's then turn to -- back to Claim 26,

5  the rule base/case base, interpreting the electronic

6  message using a rule-based and case-based knowledge

7  engine.

8           Do you recall that?

9   A.   Yes.

10   Q.   And do you recall that the Court construed

11  what is a case-based knowledge engine?

12   A.   Yes.

13   Q.   All right.  The knowledge engine that

14  processes electronic messages by comparing them to a

15  stored set of exemplar cases.

16           Do you have that in mind?

17   A.   I'm familiar with that construction.

18   Q.   All right.  Now, in this case, you identified

19  the advertisements in Yahoo!'s Sponsored Search system

20  as the stored set of exemplar cases, correct?

21   A.   No.

22   Q.   Okay.  I'd like to play from your July 9th,

23  2010 transcript at Page 148, Lines 21 through 25.

24           (Video clip playing.)

25           QUESTION:  So the entire set of ads are

1  all exemplars?

2           ANSWER:  I think of each one of them as

3  being an example of what one might respond to for a

4  given query.

5           (End of video clip.)

6     Q.   (By Mr. Rooklidge) So you're alleging that

7  Yahoo! meets this claim limitation by comparing search

8  queries to a set of advertisements?

9     A.   No.  For the exemplar queries, as I've

10 carefully said in my direct testimony, the comparison

11 between the keywords of the advertisement and the

12 keywords identified by the advertiser for the

13 advertisement as well as, of course, attributes go.

14 I also pointed to the geo-targeting limitation.

15     Q.   Now, search queries are not advertisements,

16 are they?

17     A.   No.

18     Q.   And ads are submitted by advertisers?

19     A.   Yes.

20     Q.   And search queries are submitted by users?

21     A.   Yes.

22     Q.   Now, in Yahoo!'s Sponsored Search, during the

23 time between the user's entry of the search query and

24 the return of the ads, the user's query is not compared

25 to any previously received search queries from a user?

1    A.    That's correct.

2    Q.    Now, your infringement analysis doesn't accuse

3    the act of clicking on an advertisement of infringement,

4    correct?

5    A.    Yes.

6    Q.    And Search Assist that we talked about before,

7    that -- you'll agree with me that the Search Assist

8    function, that is a series of interactive messages?

9    A.    I wouldn't agree that those are messages.  I

10   would agree with you that it is interactive.

11   Q.    Let's go back to Claim 28.

12            MR. ROOKLIDGE:  Put up Claim 28, if you

13   would, Allen.

14   Q.    (By Mr. Rooklidge) And you'll see that 28(b1),

15   classifying the electronic message is at least one of

16   them, (i) and (ii).

17            MR. ROOKLIDGE:  And let's put up the

18   demonstrative of the Court's construction there on that

19   classification.

20   Q.    (By Mr. Rooklidge) Now, the Court has

21   construed that as determining whether the electronic

22   message falls into one or more categories.  And you

23   testified this morning that you applied that

24   construction in your analysis, correct?

25   A.    Yes.

1    Q.   Okay.  And you understand that the Court has

2  construed the term requiring assistance from a human

3  operator to mean requiring that a manual reviewer review

4  the electronic message or information derived from the

5  electronic message or review, revise, or compose the

6  response to be delivered to the source, right?

7    A.   Yes.

8    Q.   Now, your opinion is that classifying a search

9  request as requiring assistance from a human operator

10  requires that the search request be identified and

11  marked as this message needs to be looked at by a human

12  being or responded to by a human being, correct?

13    A.   Yes.

14    Q.   Now, Yahoo!'s Sponsored Search system does not

15  mark or flag any individual queries, does it?

16    A.   Only as a member of a set.  I discussed that

17  in explaining my Doctrine of Equivalents opinion, but it

18  doesn't do any individual queries all by themselves.

19    Q.    In fact, you don't have any evidence that

20  Yahoo!'s Sponsored Search system has ever marked or

21  identified any particular or specific search query as

22  requiring assistance from a human operator?

23    A.   Yes.

24    Q.   Now, if Sponsored Search doesn't classify the

25  electronic message as automatic or requiring human

1  assistance -- and let's assume that to be the case for

2  this hypothetical -- it wouldn't meet that classifying

3  claim element, right?

4      A.   Okay.  Let me be sure I understand your

5  question.

6           If it doesn't do (i) and it also never does

7  (ii), then I agree with you.

8      Q.   Now, your opinion is that every time Yahoo!'s

9  Sponsored Search automatically responds to a search

10 query, it has classified that search query, correct?

11     A.   My opinion is a little different from that.

12     Q.   Okay.

13     A.   And I can explain that differently to you.

14     Q.   Sure.  Go ahead.

15     A.   I looked at the point where earlier they --

16 they decide -- as their engineers testified, there's a

17 point where they say I have some ads to return, or it's

18 possible that they haven't found any ads to return.  And

19 that's the point at which I believe the classification

20 has been made.

21          Now, if they find some ads to return, then as

22 your question said, they will ultimately return those

23 ads.  But it's that point where, in looking for a set of

24 candidate ads, they either found some or they didn't

25 that I think that's the decision -- that classification

1  has been made.

2      Q.    But Yahoo!'s Sponsored Search system always

3  provides a response, doesn't it?

4      A.    Well, in some sense of that word.  I mean,

5  it's going to always return the search results, but

6  that's not what I focused on for my infringement

7  analysis.  That's something entirely different.

8      Q.    Now, you've stated that Yahoo!'s Sponsored

9  Search cannot provide an automatic response without

10  classifying the query, correct?

11      A.    Whenever somebody such as yourself asks me

12  that question, I'm fairly certain that's an answer from

13  some part of one of my depositions.  But I don't have

14  the context to either agree or disagree with that.

15          I'd have to understand kind of what I was

16  talking about, if I ever really did say that.

17      Q.    Why don't we take a look at your July 9th --

18      A.    Sure.

19      Q.    -- 2010 deposition transcript at Page 203,

20  Lines 1 through 15.

21              (Video clip playing.)

22              QUESTION:  So it's your opinion that you

23  cannot provide an automatic response without classifying

24  the inquiry?

25              ANSWER:  I -- again, if -- if -- if

1  you're providing automatic responses back, you're

2  classifying the queries that came in as being

3  satisfactory for providing automatic responses.

4  There may be queries out there that I don't even know

5  about that are so ill-formed or so destructive or

6  something that you can't even figure how to respond

7  something to it automatically.

8                    I just don't know, but -- what Yahoo!

9  does is what I've identified as meeting that requirement

10  of Claim 28.  And I don't -- I can't think of a way

11  other than to go to a manual response that would get

12  around that requirement.

13                    (End of video clip.)

14      Q.   (By Mr. Rooklidge) Now, you've also said that

15  a system that responds to every search query

16  automatically classifies every query as automatic,

17  right?

18      A.   If -- if every time it goes to look for ads it

19  finds one, then for every one of those queries it has

20  successfully classified that query as being able to be

21  responded to automatically, then that's what I think I

22  must have said.

23      Q.   Well, let's go back to my question.

24                    But didn't you say that a system that responds

25  to every query automatically classifies every query as

1  automatic?

2      A.   If the answer that I gave at that time was

3  with respect to respond, meaning responding with ads,

4  yes, that's what I would agree with.

5      Q.   Okay.  Well, let's -- let's take a look at --

6  at your answer to see that without the qualification.

7          Your July 9th, 2010 transcript at Page 205,

8  Lines 6 through 21.

9              (Video clip playing.)

10             QUESTION:  So my question is:  Isn't it

11 possible that you could have a system that automatically

12 tries to respond to every query without doing any

13 classification of the queries as they come in?

14             ANSWER:  Well, if -- if it responds -- if

15 it's able to respond automatically to every query that

16 comes in, then it has classified every query that came

17 in as being able to be responded to automatically.  And

18 that, to me, meets the limitations of that part of Claim

19 28.

20             QUESTION:  And you don't find that answer

21 to be circular?

22             ANSWER:  It has some degree of

23 circularity to it, but -- so, as my kids would say.

24             (End of video clip.)

25             MR. FENSTER:  Objection, Your Honor.  The

1   question that was read was half the question.  Again,

2   I'd ask just to be given just a minute to find it where

3   we can --

4                THE COURT:  Well, after you've identified

5   the page and line number before you play the clip, give

6   Counsel a second to be on the same page.

7                You can address any other concerns you've

8   got through redirect.

9        Q.   (By Mr. Rooklidge) Dr. Rhyne, do you agree

10  that the automatic classification step of Step 28(b1)(i)

11  has to be performed before the retrieval step 28(c),

12  correct?

13       A.   Yes.

14       Q.   And you'll agree that prior to the point at

15  which Yahoo! searches its ad database to look for ads

16  that may correspond to a given search query, Yahoo!

17  doesn't know whether it can provide advertisements in

18  response to that search query, correct?

19       A.   I think I agree with that as best I understand

20  what you're asking.

21       Q.   So what you've identified as the automatic

22  classification in Yahoo!'s Sponsored Search system

23  doesn't happen until after Yahoo! retrieves ads from its

24  database, correct?

25       A.   I don't understand that to be the case.

1    Q.    Now, every time a user types in a query, that

2  user is going to get a response in some form from

3  Yahoo!, correct?

4    A.    Yes.    That's part of why I questioned my

5  previous answer, because up until very recently, like

6  today, I had not heard anybody try to characterize the

7  search response as a response up until today.

8         I thought everybody was talking about ads as

9  the response, but that's why I'm being a little more

10 cautious.    There's been a new -- a new type of response

11 that's been raised today.

12   Q.    Those search results and ads that get sent

13 back from Yahoo!, they're sent back using less than a

14 second, correct?

15   A.    Yes.

16   Q.    And the search results are prepared and a

17 selection of the ads is all prepared automatically,

18 correct?

19   A.    Yes.

20   Q.    And the Court's claim construction doesn't

21 define the response as advertisements, does it?

22   A.    No.

23   Q.    Let's turn, then, to the limitation requiring

24 assistance from a human operator.

25   A.    All right.

1    Q.   And you remember the Court's claim
2 construction of requiring assistance from a human
3 operator as requiring that a manual reviewer review the
4 electronic message or information -- or information
5 derived from that electronic message and so on, correct?
6    A.   Yes.
7    Q.   Now, the only Yahoo! system that you
8 identified in your direct testimony as having human
9 involvement is Yahoo!'s Traffic Protection system,
10 correct?
11    A.   Yes, sir.
12    Q.   But the Traffic Protection system analyzes
13 data only after the return of the search results in the
14 advertisements, correct?
15    A.   Yes.
16    Q.   Now, because the Traffic Protection system
17 operates after the search results are sent back, that
18 should be -- or that is irrelevant to your infringement
19 analysis, correct?
20    A.   I don't understand what you're suggesting to
21 me.
22    Q.   Well, isn't it your opinion that anything that
23 happens in the Defendants' accused systems, after they
24 return search results and ads, is irrelevant to your
25 analysis for those claims, correct?

1    A.   I made that statement in one of my reports,

2  but I was specifically dealing with interactivity and

3  non-interactivity.

4    Q.   Okay.  You also made that statement in one of

5  your depositions, didn't you?

6    A.   I may be remembering it from my deposition

7  transcript, but that's correct.

8    Q.   Let's, then, turn to Claim 33.

9    A.   Okay.

10   Q.   Normalizing by dividing the score by a maximum

11 possible score.

12        Do you recall that?

13   A.   Yes.

14   Q.   All right.  Let's take a look at the -- the

15 demonstrative on this.

16        The claim says dividing the score by a maximum

17 possible score, right?

18   A.   Yes.

19   Q.   Okay.  Now, you admit that there are two

20 scores that you claim are normalized.  There's only two

21 scores that you claim are normalized in the Yahoo!

22 Sponsored Search system, right?

23   A.   I believe that's correct.

24   Q.   All right.  And those are the relevancy score

25 and the clickability score?

1     A.   I think it's called -- also called the total

2 relevancy score and the clickability score.

3              MR. ROOKLIDGE:  Why don't we put the

4 demonstrative up here?

5     Q.   (By Mr. Rooklidge) Now, you understand that in

6 the Yahoo!'s Sponsored Search system, the relevancy

7 score is used only to calculate the clickability score,

8 right?

9     A.   Yes.  It's a component of the clickability

10 score, which uses something like maximum entropy or some

11 other formula to achieve that.

12     Q.   Now, you understand that in the Yahoo!

13 Sponsored Search system, the final auction score is the

14 score that is used to actually rank the ads that are

15 returned for display?

16     A.   I think they multiply it by some sort of a

17 dollar amount or cents amount to finally decide which

18 ads they're going to send back, yes.

19     Q.   Right.  The final auction score is calculated

20 by multiplying that clickability score by the bid

21 amount, right?

22     A.   Yes.

23     Q.   Okay.  Now, you didn't offer an opinion that

24 the final auction score is normalized, did you?

25     A.   I don't know how to answer that question.

1  I did not offer that opinion.  I haven't -- I've

2  actually dealt with -- as far as I was concerned -- and

3  I'll mark it and you can see, if you want to take a

4  quick look at this -- well, you can see it on your

5  screen.

6        That's -- that's the scoring that I've looked

7  at rather than the final auction score.

8     Q.   Now, you agree that normalizing only a portion

9  or component of the final auction score does not meet

10  the limitation of Claim 33?

11     A.   I agree with that.

12     Q.   So you agree that there are ads in the Yahoo!

13  Sponsored Search system -- strike that.

14            MR. ROOKLIDGE:  I withdraw that question.

15     Q.   (By Mr. Rooklidge) Let's go -- let's shift to

16  a slightly different topic then.

17        There are ads in the Yahoo! Sponsored Search

18  system that get compared to a search query but that

19  don't get scored, correct?

20     A.   I -- I think that there are places in the

21  early part of -- of the identification of the candidate

22  set where there are comparisons performed, and those

23  ads, if they don't make it into that candidate set, do

24  not get scored.

25     Q.   Now, you haven't identified a maximum possible

1 score for that division process in the Yahoo! Sponsored

2 Search system, have you?

3     A.    I've been able to identify what I believe is

4 the maximum possible score that was used to normalize

5 both the leaf nodes on the trees and obviously for --

6 for a clickability percentage, you know that the maximum

7 score is 1, which would be a hundred

8 percent-clickability.  So in a sense I have.

9     Q.    Well, let's go back to your July 9th

10 deposition transcript at Page 190, Lines 2 through 9.

11                 (Video clip playing.)

12                 QUESTION:  In the Yahoo! Sponsored Search

13 system, what is the maximum possible score that is used

14 to divide into the given score?

15                 ANSWER:  I think the best I can answer

16 that is to say it would be whatever the score would have

17 been if they didn't apply the normalization process,

18 because they want it to come out to be 1.

19                 (End of video clip.)

20     Q.    (By Mr. Rooklidge) You haven't identified

21 anywhere in Yahoo!'s Sponsored Search system where

22 Yahoo! calculates a relevancy score and then calculates

23 a maximum relevancy score and then actually divides the

24 two, correct?

25     A.    All I've been able to identify is the end

result of that process, but I have not identified the

intermediate step.

Q. But Claim 33 cannot be literally satisfied

without that dividing step, correct?

A. That would be one way of interpreting the

claim. In part, I guess primarily part why I have also

offered a Doctrine of Equivalents analysis of that

claim.

Q. But are you basing your testimony on any

interpretation of Claim 33 that it can be literally

satisfied without a dividing step?

A. No. I -- I've identified a dividing step.

The question is, you know, when does it occur and does

it occur when the individual leaf nodes one at a time,

or does the division occur when you've added up all the

leaf node values and seen a value that's greater than 1,

and then you normalize it back to make all the leaf

nodes out to 1.

Q. When you say you've identified a dividing

step, but you haven't identified a dividing step where

Yahoo! calculates the maximum -- calculates the

relevancy score, calculates the maximum relevancy score,

and then actually divides the two?

A. I think I have, and -- and I can explain it

again, but it would just be the same explanation over

1  again.

2      Q.    Let's move on.  Let's move to assigning a

3  score to each stored case model, Claim 30.

4                MR. ROOKLIDGE:  If we could have that

5  language up, please.

6      Q.    (By Mr. Rooklidge) Now, you know this

7  limitation on assigning a score to each stored case

8  model applies to Claims 30, 31, and 33, all of the

9  accused infringed claims, correct?

10     A.    Yes.

11     Q.    So if the Yahoo!'s Sponsored Search system

12 doesn't assign a score to each scored case -- each

13 stored case model as is required by these claims, there

14 can't be any infringement, right?

15     A.    Not literal infringement; that's correct.

16     Q.    Let's take a look specifically at 30(b6).

17 That step requires assigning a score to each stored case

18 model which is compared with the case model, right?

19     A.    Yes.

20     Q.    You've told us that the component in Yahoo!'s

21 Sponsored Search system that assigns the score is the

22 Yahoo! Affiliate Server; is that correct?

23     A.    Yes.

24     Q.    Now, Yahoo!'s Sponsored Search system does not

25 assign a score to every ad in the database each time a

1 search query is received, correct?

2     A.   Yes.

3     Q.   And you agree that there are ads in Yahoo!'s

4 Sponsored Search system that are compared to a search

5 query that are not scored?

6     A.   There are some that are compared earlier than

7 the affiliate.

8     Q.   And Yahoo!'s Sponsored Search system uses a

9 set of filters to cull unacceptable queries and results

10 from the pipeline, correct?

11     A.   Yes.

12     Q.   Let's take a look at the clickability graphic.

13         Now, the Affiliate -- we showed this graphic a

14 few minutes ago -- the Affiliate Server develops this

15 advertisement overall relevancy score.

16         Are you familiar with that?

17     A.   Are you talking about the final auction score?

18     Q.   No.  I'm talking about the relevancy score,

19 upper left.

20     A.   I'm sorry.  I call that the total relevancy

21 score, but I'm familiar with that.

22     Q.   Okay.  Well, we'll call that the total

23 relevancy score then.

24         And rules are applied that reduce the number

25 of candidate ads before the scoring is done to achieve

1  the relevancy score, the total relevancy score, right?

2     A.   It's my understanding those rules are applied

3  before the Affiliate Server makes that decision, but

4  there are filters.  I think you just asked me about

5  that.  There are filters that can be applied, like adult

6  and gambling and things like that, geographic.

7     Q.   And so then those scores, both the relevancy

8  score and the clickability score -- now there's also

9  rules that are applied before the clickability score,

10  correct, that would weed out some -- that would reduce

11  the number of candidate ads before scoring?

12     A.   I'm not -- that may be the case, but I don't

13  recall dealing with that or seeing that in any of the

14  documents or the software.  I have no clear recollection

15  of that being the case.

16     Q.   The scores from the relevancy score are used

17  to produce the scores -- the clickability score,

18  correct?

19     A.   That's my understanding.

20     Q.   Now, if we go back to the -- to your basic

21  query flow document.

22          Now, if we look at the document that

23  identifies the Affiliate Server there --

24     A.   Yes.

25     Q.   -- and we see the four boxes in there for the

1  different things that are going on within the Affiliate

2  Server?

3      A.   Yes.

4      Q.   If we look at that bottom box, that identifies

5  rank, price, filter, and determine placement?

6      A.   Yes.

7      Q.   So there's data in that final step.  There's

8  filtering going on that's culling out potential

9  advertisements, correct?

10     A.   I think at the very end, as a result of -- you

11 can see the clickability scores were done before.  But

12 after that, before they actually decide which ads to

13 return, there is a filtering process that's applied.

14     Q.   Now, you took your position in a declaration

15 in this case that a piece of prior art, alleged prior

16 art, the Allen patent, does not meet the limitations of

17 Claim 30(b6) -- and we'll put that up -- because it,

18 quote, discloses only assigning scores to a subset of

19 the cases which are compared by the case-based inference

20 engine.

21         Do you recall that?

22     A.   Yes.

23             MR. ROOKLIDGE:  We don't need to put that

24 up.  Let's move on instead to Claim 30(b4).  Let's

25 highlight -- step 30(b4).

1    Q.    (By Mr. Rooklidge) Now, this step requires

2  comparing the flagged attributes of the case model with

3  stored attributes of stored case models.

4        Do you remember discussing that this morning?

5    A.    Yes.

6    Q.    Now, in your discussion of Step (b4) of Claim

7  30, I want to make sure that I understand what these

8  different components are that you're mapping to this.

9        What is the -- what is the case model in

10 Yahoo!'s Sponsored Search?

11   A.    It's the internally derived representation of

12 both the text and the attributes that were sent over in

13 the http request that was received by Yahoo! from the

14 source.

15   Q.    And what are the flagged attributes in

16 Yahoo!'s Sponsored Search system?

17   A.    I think I've talked -- again, I may be

18 confusing something I specifically said about Google.

19 But in that message, there are things like the text,

20 which is the keyword.  I think maybe I used Texas

21 Rangers or pizza in different cases.  And there are also

22 attributes, such as the deriving from the URL the

23 location of the query or where they sent their -- where

24 it's from, like Marshall or Richardson or somewhere.

25        There's other information that would be, for

1  example, as the Safe Search setting on -- setting at the

2  browser, those kinds of things.

3       Q.   What are the stored attributes in Yahoo!'s

4  Sponsored Search?

5       A.   The stored attributes would be part of the

6  stored case models where -- when they store the

7  advertisements, they also store other information as

8  well as the text of the advertisement, such as

9  specifically and very importantly, the keywords that the

10 advertisers assign as well as any geographic or other

11 types of constraints that the advertiser wants to place

12 on the display of their ads.

13      Q.   And so where --

14      A.   And attributes would be things other than the

15 text of the ad.  A good example would be a geographic

16 limitation.

17      Q.   And so what is the stored case model in this

18 step (b4)?

19      A.   It would be the added self as held in the ad

20 database of Yahoo! as well as the additional information

21 that's associated with the ad, such as the keywords,

22 such as the geographic and other types of limitations

23 that the advertisers set up when they created that ad

24 and stored it in the Yahoo!'s ads database.

25      Q.   So the attributes?

1     A.   I'm sorry.  I thought your question was the

2 stored case model.

3     Q.   Well, that's what I'm trying to get at.  It

4 sounds like what you're saying is the stored case model

5 is the ad and the attributes; is that correct?

6     A.   Well, it's the ad, the keywords, which are

7 text, and the attributes associated with the ads by the

8 advertisers, such as a geo-location requirement.

9     Q.   Now, in connection with Claim 30(b6), you talk

10 about Yahoo! performing geo-targeting.

11          Do you recall that?

12          I'm sorry.  Claim 30(b).

13     A.   That's right.  I -- I --

14     Q.   Let me withdraw that question.

15     A.   Okay.

16     Q.   I'm all confused.

17     A.   Well, so was I.

18     Q.   This morning you talked about Yahoo!

19 performing geo-targeting.

20          Do you recall that discussion?

21     A.   I did.  And if it will help you, I think I can

22 tell you which limitation I talked about it.

23     Q.   Okay.  In connection with your analysis of

24 Yahoo!'s geo-targeting, did you look to see whether

25 Yahoo! had any patents on geo-targeting?

1          A.    No.

2          Q.    Did you -- did you look at all at Yahoo!'s

3    Patent No. 7,257,570 or 7,428,522, which are Defendants'

4    Exhibits 745 and 759, respectively?

5          A.    Okay.  I just told you I didn't look at any,

6    so I will include into any -- I haven't looked at those

7    two either.

8                I'm sorry, Mr. Rooklidge.

9          Q.    Okay.  This morning, you also talked about

10   canonicalization.

11               Do you recall that?

12         A.    I did my best to talk about that.  That's a

13   hard word to pronounce for a Texan at least.

14         Q.    It's taken me a lot of practice as well.

15   Did you look to see whether Yahoo! has any patents of

16   its own on canonicalization?

17         A.    No, sir, I did not.

18         Q.    So you didn't look at U.S. Patent

19   No. 7,007,014 and 7,401,074, which are Defendants'

20   Exhibits 674 and 676, respectively?

21         A.    I didn't look at those in particular or any

22   other patents, except I now gather that you own the

23   Overture patent.  So I did look at it, but that's

24   apparently the only other patent I think I've looked at

25   for this case.

1          MR. ROOKLIDGE:  Your Honor, may I have

2    moment to check my notes?

3          THE COURT:  Yes.

4          MR. ROOKLIDGE:  No further questions.

5          THE COURT:  All right.  Redirect?

6          MR. FENSTER:  Yes.

7                   REDIRECT EXAMINATION

8    BY MR. FENSTER:

9      Q.   Good afternoon, Dr. Rhyne.

10     A.   Good afternoon.

11     Q.   Instead of asking you to bounce back and forth

12   between Google and Yahoo!, let's stay with Yahoo, shall

13   we?

14     A.   That's fine.

15     Q.   All right.  Now, Mr. Rooklidge and Yahoo!

16   keeps trying to remind the jury over and over and over

17   that Yahoo!'s got patents.

18          Is that relevant at all?

19     A.   Well, I don't know about the over and over and

20   over, but he certainly tried to ask me --

21          MR. ROOKLIDGE:  Objection, beyond the

22   scope of the report at all.

23          THE COURT:  Overruled.

24     A.   He certainly pointed that out when he asked me

25   if I had seen these patents that Yahoo! has.

1    Q.   (By Mr. Fenster) And the fact that Yahoo! has

2  any patents at all, is that relevant in any way to

3  whether they infringe the patent in this case?

4    A.   Not at all.

5    Q.   Is it relevant in any way to the validity of

6  the patent in this case?

7    A.   No.  Unless the Yahoo! patents were issued

8  ahead of the critical date, and they were pointed up to

9  be prior art.  And I don't think any of them have been.

10    Q.   Can you think of any other reason why they

11  might keep -- why they might be reminding the jury of

12  this, other than to distract them?

13              MR. ROOKLIDGE:  Objection, beyond the

14  scope.

15              THE COURT:  Overruled.

16    A.   I'm not going to speculate.  I don't want to

17  be placed in the position of being in an argument here.

18  The jury will have to make their own decision as to why

19  this comes up.

20    Q.   (By Mr. Fenster) I'd like to ask you about

21  predetermined.  And Mr. Rooklidge was making a

22  suggestion -- was asking you about whether the results

23  are predetermined.

24              Do you recall that?

25    A.   I do.

1    Q.   Okay.  And he put up -- actually, before we

2 get to your Slide 104, let's put up the claim

3 construction.

4            MR. FENSTER:  Yeah, let's go to

5 predetermined first.

6    Q.   (By Mr. Fenster) So on predetermined, the

7 Court's claim construction requires that the response be

8 prepared prior to the receipt of the electronic message,

9 right?

10    A.   I don't think those are the exact words, but

11 it certainly has language about retrieving the ad --

12 that the response has to be there before that step takes

13 place.

14    Q.   Okay.  Now, referring to your Exhibit 104,

15 which is an example of the search you did on Yahoo!, can

16 you identify what the predetermined response is for the

17 purposes of the claims?

18    A.   Yes.

19    Q.   What is it?

20    A.   I think it's each of those five individual ads

21 is a predetermined response.

22    Q.   Now, where did these responses come from?

23 Where does Yahoo! get them in order to put them on this

24 page?

25    A.   From the database where they were stored when

those different advertisers went to Yahoo!'s advertiser
interface, created those ads, and said store these away
for me.

Q.   And, Dr. Rhyne, is it your opinion that these
dates -- these ads, in order to be retrieved from the
database, had to be there already?

A.   Yes, it is.

Q.   And is it your opinion that --

MR. FENSTER:  Strike that.

Q.   (By Mr. Fenster) Does Yahoo! meet the
predetermined response limitation?

A.   Yes, they do.

Q.   Now, both Mr. Rooklidge and Mr. Verhoeven
asked you about this interactivity requirement, that
there be a non-interactive electronic message.

A.   Yes.

Q.   So let me put up your slide that has the
Court's construction for non-interactive electronic
message.

And it requires an electronic message in which
the sender does not provide any additional information
after the message has been received.

A.   Yes.

Q.   Now, referring back to your example in 104,
when is the message received?

1    A.    After I typed T-E-X-A-S, space, R-A-N-G-E-R-S,

2    and then did one of two things.  I either hit carriage

3    return, or enter, or I can move my mouse up and hit the

4    search button right here and cause that to go over.

5         That's when the message has been sent out of

6    my browser, and almost immediately it's received at

7    Yahoo! and Google.

8    Q.    Now, is there a message received before the

9    user presses enter?

10   A.    No.

11   Q.    Now, after the user presses enter and Yahoo!

12   does receive the message -- it's there -- does the

13   sender provide any additional information after that

14   message is received?

15   A.    No.

16   Q.    Once the user presses enter, what response is

17   served?

18   A.    This picture.

19   Q.    Okay.  Now, these ads, are they served after

20   the message is received without any further input from

21   the user?

22   A.    Yes.

23   Q.    All right.  Now, I want to go to an argument

24   that both Mr. Verhoeven and Mr. Rooklidge made.

25   A.    Okay.

```
 1      Q.   Now, when you press -- when someone enters a
 2  search query, there are two types of results that come
 3  back.
 4           There are the native results, right?
 5      A.   Yes.
 6      Q.   And then there's also the ads.
 7      A.   Yes.
 8      Q.   Okay.  And I want to show you this
 9  demonstrative.  It's DX Demo 19, is what Mr. Verhoeven
10  showed you?
11      A.   Yes.
12      Q.   Now, remember, there are two systems here.
13  There's a search system up at the top and an ad system
14  down here (indicates) --
15      A.   Okay.
16      Q.   -- right?
17      A.   Yes.
18      Q.   In his demonstrative.
19           Now, which of those two systems is at issue in
20  this case?
21      A.   All of my infringement analysis is built on
22  the ad system and the way it responds to the
23  non-interactive electronic message by producing and
24  sending back ads along with the search results, but I
25  haven't focused on the search results at all.
```

1      Q.   Now, is the search result system, is the

2 search system for either Google or Yahoo! relevant in

3 this case?

4      A.   No.

5      Q.   Is it at issue in this case?

6      A.   No.

7      Q.   Is it accused in this case?

8      A.   No.

9      Q.   Now, when -- so they were both pointing to an

10 automatic response being there are always the native

11 search results, right?

12      A.   Yes.

13      Q.   And they tried to make an argument that that

14 meant that the classifying step wasn't met?

15      A.   Something.  Maybe the non -- I -- I -- maybe

16 that was it, yeah.

17      Q.   Now, is anything that happens in that search

18 system relevant to what happens -- to whether the ad

19 system infringes?

20           MR. VERHOEVEN:  Objection.  This is all

21 leading, Your Honor.

22           THE COURT:  All right.  Sustained as to

23 leading.  Rephrase your question.

24           MR. FENSTER:  Yes, Your Honor.

25      Q.   (By Mr. Fenster) What is the relevance,

1  Dr. Rhyne, of anything that happens in the search system

2  to your infringement analysis and whether the ad systems

3  that are accused do meet that limitation?

4      A.   It has absolutely nothing to do with it.

5      Q.   Okay.  Now let's go to Mr. Verhoeven's

6  cross-examination with respect to Google.

7           And Google -- Mr. Verhoeven was asking you

8  whether -- he was talking about the predetermined

9  mismatch-weight in Claim 31.

10     A.   Yes.

11     Q.   Do you remember that?

12     A.   I do.

13              MR. FENSTER:  And can I ask to have

14  Defendant's DX Demo 198, please?

15              Thank you.

16     Q.   (By Mr. Fenster) Now, do you remember

17  Mr. Verhoeven put up this demonstration?

18     A.   Yes.

19     Q.   And he asked you about this?

20     A.   Yes.

21     Q.   Now, does this demonstration that

22  Mr. Verhoeven showed you, does this demonstrative

23  reflect anything accurately about the accused Google

24  system?

25     A.   No.  That's kind of what confused me about it

is that this is not in any way like what the AdMixer

system that's produced by Google works.  It doesn't

produce an intermediate score 40, and then after that,

go over and recompute to get scores of 60 and 48.

That's just not what they do.

     Q.   Okay.  Now, do you remember that he was using

this demonstrative to try to -- to try to get the point

across that you cannot arithmetically decrease something

by multiplying it?

          Do you remember that?

     A.   I finally began to understand that.  In fact,

when Judge Everingham asked me a question, it began to

become clear to me what the point he was trying to make

was.

     Q.   And, in fact, can you arithmetically decrease

something by multiplying?

     A.   Yeah, sure.  All you have to do is change this

to --

     Q.   Oh, I'm sorry.

     A.   -- to .9.

     Q.   Here.  Let me -- I did something very similar.

          Now, can you -- can you explain how you can

arithmetically decrease something --

     A.   Sure.

     Q.   -- by multiplying?

         A.    If the number you multiply by is greater than

1, you'll get something that's bigger.  If the number

that you multiply by is less than 1, you'll get

something that's smaller.

              And some of those odds multipliers are less

than 1, but, again, this particular calculation here is

not representative of what you actually do in the odds

multiplier multiplication, but it's certainly the case

that for any number that's less than 1, when you

multiply something by it, you get a smaller number.

         Q.    And does Google meet the predetermined

mismatch-weight limitation?

         A.    Yes, they do.

         Q.    All right.  Now, again, both Google and

Yahoo!, Mr. Rooklidge and Mr. Verhoeven asked you

questions about the final ranking of the ads?

         A.    Yes.

         Q.    And they suggested that the final ranking was

done by multiplying by an -- a bid amount, the dollar

signs.

         A.    Yeah.  They had a little -- each of them had a

somewhat different -- this is the Google illustration.

         Q.    Is that relevant at all to your infringement

analysis?

         A.    No.

1  Q. Why not?

2  A. Well, the claims don't require final ranking;

3 they don't require picking the best ad; they just say

4 that you go in and you score them and that the score

5 gets bigger when you have more of a match, and the score

6 gets smaller when you have less than a match.

7  And that's what -- although -- again, I think

8 Mr. Verhoeven had identified these numbers as

9 clickthrough probabilities, and they can't be, because

10 they're greater than 1.

11  But, regardless, whatever they are, those are

12 the scores that I looked at, and it would be, based on

13 the testimony of the Google engineers, that the guy with

14 9.4 would have more of a match between the query and all

15 the information associated with the query in that

16 particular ad.

17  The fact that you come in and multiply by

18 something else afterwards -- if you remember, I pointed

19 out that this is a comprising-type claim, and once

20 you've infringed it, the fact that you go on and do

21 something else that's beyond the claim is of no

22 consequence to my infringement analysis.

23  Q. Okay. Now, do you remember that

24 Mr. Verhoeven, on Google, was asking you about whether

25 the AdWords systems scores every ad in the database?

1      A.   Yes.

2      Q.   Now, where is the comparison that you're

3  pointing to for the comparing step for Google?

4      A.   It's in the SmartAd Selection System.  And

5  there's -- there's a comparison done in the AdMixer for

6  sure, but then there is a new and different comparison

7  that's made of the candidate ads in the SmartAd

8  Selection System, and all of those ads, to my current

9  understanding, are scored.

10      Q.   And that was my next question.  How many of

11  the ads that are compared in the SmartAd Selection

12  Server are scored?

13      A.   Every one that it receives from the -- and the

14  members of that candidate set that it gets from the

15  AdMixer.

16      Q.   Okay.  And now, I hate to do this to you, but

17  I'll switch back to Google -- to Yahoo!, because

18  Mr. Rooklidge asked you the same question.

19           So what is the comparing step with respect to

20  Yahoo! Sponsored Search that you were pointing to for

21  infringement?

22      A.   It's in the Affiliate Server -- well, it's --

23  it's -- the first comparison step is part of the

24  selection of the set of matching ads that are given to

25  the Affiliate Server.

1    And once those ads are reached, that very --

2 that sequence of blocks in the figure that we've used a

3 couple of times says, the next step is to do the

4 calculation of clickthrough rates, and that's where the

5 total score is done.

6    And so every one of those ads that makes it

7 into the Affiliate Server as a candidate ad from these

8 King Kong and Yellowstone and all the stuff that's out

9 here, every one of those ads is subsequently compared

10 again as part of the ranking process and scored.

11    MR. FENSTER:  Pass the witness, Your

12 Honor.

13    THE COURT:  Mr. Verhoeven?

14    MR. VERHOEVEN:  I have nothing further,

15 Your Honor.

16    THE COURT:  Mr. Rooklidge?

17    MR. ROOKLIDGE:  Just one question.

18    RECROSS-EXAMINATION

19 BY MR. ROOKLIDGE:

20    Q.   Dr. Rhyne, you've admitted, though, that the

21 Yahoo! Sponsored Search system always returns a response

22 to the user in response to a search query, correct?

23    A.   That's correct.  It will always return a

24 search response, that's true.

25    MR. ROOKLIDGE:  No further questions,

1  Your Honor.

2  　　　　　　　MR. FENSTER:  Nothing further, Your

3  Honor.

4  　　　　　　　THE COURT:  All right.  You can step

5  down.

6  　　　　　　　THE WITNESS:  Thank you.

7  　　　　　　　THE COURT:  Who will be your next

8  witness?

9  　　　　　　　MR. HUESTON:  Bright Response will call

10 Dr. Stephen Becker as its next witness, Your Honor.

11 　　　　　　　THE COURT:  Okay.  Was this witness

12 previously sworn?

13 　　　　　　　MR. HUESTON:  No, Your Honor.

14 　　　　　　　THE COURT:  Okay.  If you'll stand right

15 there to administer the oath.

16 　　　　　　　(Witness sworn.)

17 　　　　　　　THE COURT:  Okay.  Have a seat there for

18 me, and if you don't mind, talk into the microphone and

19 keep your voice up.

20 　　　　　　　Proceed.

21 　　　　　　　MR. HUESTON:  Thank you, Your Honor.

22 　　STEPHEN BECKER, Ph.D., PLAINTIFF'S WITNESS, SWORN

23 　　　　　　　　　　DIRECT EXAMINATION

24 BY MR. HUESTON:

25 　　　Q.   Good afternoon, Dr. Becker.

1    A.    Good afternoon.

2    Q.    Could you please give your full name for the

3  jury, please.

4    A.    Yes.  My name is Stephen Lewis Becker.

5    Q.    And do you understand why you have been called

6  as a witness today?

7    A.    Yes, I do.

8    Q.    And why is that?

9    A.    I've been asked to come here today and give

10  opinions regarding the damages that would be owed by

11  Google and Yahoo!, if this jury finds the Rice patent to

12  be valid and infringed.

13    Q.    All right.  And before we launch into that, I

14  notice there's a slide that's already up.  The jury can

15  ignore that for a moment.

16        Why don't we talk a little bit about your

17  personal life.  If you wouldn't mind sharing, sir, a few

18  facts about your family with the jury.

19    A.    Yes.  I am from Austin, born and raised in

20  Austin, have lived there all my life with the exception

21  of a few forays out of state to go to college and do a

22  little bit of work out of -- out of Texas.

23        I'm married.  I have two children, a

24  13-year-old girl and a 15-year-old boy.  So we're at an

25  interesting time in my life with youngsters in the

1  house.

2          I -- both my parents were schoolteachers.  My

3  dad was a professor at the University of Texas before he

4  left to basically be the head of a school, and my mother

5  was a teacher there.  My sister is in education.

6  And so that's really, kind of in a nutshell, where I've

7  been.

8          Q.    Thank you for that.

9          Have you prepared slides for the jury to see

10  to help you in explaining the damages in this case?

11          A.    I have.

12          Q.    All right.  And to start that, I'd like to

13  review with you some of your professional background and

14  qualifications to give testimony in this case, so I'll

15  draw your attention to this.

16          And, Dr. Becker, if you could please provide a

17  summary of some of your background, educational degrees

18  for this matter.

19          A.    Sure.  You'll see there, the first is, I have

20  an undergraduate degree in -- that BSEE is a Bachelor of

21  Science in Electrical Engineering, and it notes there

22  that that's from the University of Pennsylvania.

23          My parents knew that I would always come back

24  to Texas, and so when I graduated from high school, they

25  basically insisted that I could not go to the University

1  of Texas, had to get out of the state, and I chose to go

2  to Pennsylvania.

3          And you'll see then from the next two bullet

4  points that they were right.  I did come back to Texas

5  and got my master's degree in finance at the University

6  of Texas at Austin, and then later a Ph.D. in public

7  policy from UT-Austin.

8      Q.   Let me stop you there for a moment.

9          And in your study for that doctoral degree in

10  public policy, did you also have some emphasis in

11  economics?

12     A.   Yes.  My -- really the entire study that I did

13  for my doctorate was in the economics -- well, I was

14  studying a particular economic tool, and for the purpose

15  of illustrating the use of that tool, I applied that to

16  studying the economics of public elementary and

17  secondary education, primarily looking at that system in

18  Texas.

19     Q.   All right.  And we'll get to the time where

20  your parents are probably happy you eventually sort of

21  started earning a living after all these degrees, but

22  before we do that, I'm going to ask about some

23  professional memberships that you are a part of.

24     A.   Yes.  I am a member of the American Economic

25  Association, the American Finance Association, and

something called the Licensing Executive Society.  And

those allow me to keep in touch with what's going on in

the field of economics and finance and licensing.

Q.  All right.  And the final bullet point there,

you have 25 years and more of economic and financial

analysis.  I don't want to go through a blow-by-blow on

that, but could you give a summary of your professional

time spent doing economic evaluations and damages

analysis.

A.  Sure.

Fresh out of college, I -- as you can see, I

had an engineering degree, and I went to work for

Schlumberger, the oilfield services company.

I saw a guy in a Schlumberger set of coveralls

coming out of the hotel this morning, so I know they're

in the area here.  I worked as an engineer, as a

computer scientist for Schlumberger.

And then after that job, really everything

I've done since then has been economics and/or finance

where I'm looking at putting a value on things or

helping businesses understand how to -- how to do their

business better, essentially, how to make more money.

I've done that both as owning my own company

and for a while worked as a consultant with a very large

international consulting firm called Booz Allen that was

based in -- I was based in Dallas. They're all over the
world.

    Q.   All right. And what is your present
occupation?

    A.   I am a director of and really an owner of a
small company in Austin called Applied Economics. I
started that with my partner John, gosh, over 10 years
ago now, and we do nothing but economic and financial
analysis. Have about 18 people total working in our
office in Austin.

    Q.   All right. And as part of your professional
experience, and particularly at your firm, have you been
engaged to serve as an expert in cases like this, patent
litigations, to give opinions on damages?

    A.   Yes, many times.

    Q.   All right. And can you -- roughly, how many
times?

    A.   I've been hired to be an expert on patent
damages or patent infringement cases more than 20 times,
I'm sure, and have actually provided testimony in one
form or another more than a dozen times.

    Q.   And have you testified on behalf of
Plaintiffs, as well as Defendants in those cases?

    A.   Yes.

    Q.   Each in different cases?

A.    Yes.  I've been in this very courtroom within

the last six months on behalf of a defendant.

Q.    All right.

MR. HUESTON:  At this time, Your Honor,

we'd like to proffer Dr. Becker as an expert in damages

and particularly for compensation to Bright Response for

infringement on the part of Google and Yahoo!

MR. VERHOEVEN:  No objection.

MR. ROOKLIDGE:  No objection, Your Honor.

THE COURT:  The jury will hear his

opinion.

MR. HUESTON:  Thank you, Your Honor.

Q.    (By Mr. Hueston) Let me cover one more

background item before we launch into your analysis.

Sir, you -- have you been paid for your time

on this matter?

A.    Yes.

Q.    All right.  And how much have you been paid?

What's your hourly rate?

A.    My hourly rate is $450 an hour, and I've got

people in my firm that range from, I think, probably $60

an hour up to my rate.

Q.    All right.  And how much would you estimate

you've billed on this matter, including folks in your

firm, to date?

1        A.    I think the number to date is on the order of

2   $150,000.

3        Q.    All right.  And that's to do a damages

4   analysis for both the Google case and the Yahoo! case,

5   correct?

6        A.    Yes.

7        Q.    All right.  And just to make sure the jury

8   understands, is your pay on this case in any way

9   dependent on how this jury awards damages, if they do?

10       A.    No, in no way at all.

11       Q.    All right.

12             MR. HUESTON:  Let's move on to Slide 3,

13   please.

14       Q.    (By Mr. Hueston) Dr. Becker, is there a

15   governing legal principle that you are obliged to follow

16   in doing a damages analysis in this case?

17       A.    Yes, there is.

18       Q.    And what is that principle?  Is it up there on

19   this slide?

20       A.    Yes.  The U.S. law regarding patent

21   infringement damages is that that -- that amount will be

22   damages adequate to compensate for the infringement, but

23   in no event less than a reasonable royalty for the use

24   made of the invention by the infringer.

25       Q.    All right.  That's kind of a mouthful.  I

1  think you tried to highlight a smaller mouthful, but let

2  me even try a smaller part of that.

3         When we're talking about this legal

4  measurement for damages, let's talk about reasonable

5  royalty.  Can you explain to the jury, what does that

6  concept mean?

7      A.   Well, it's -- it's just what the words say.

8  It's reasonable.  I'm supposed to be assessing what's

9  reasonable, and I think you, as jurors -- you know, but

10 the whole concept is that it's not -- it's not a

11 situation where, because the patent's valid and

12 infringed, the patent-holder gets to sort of dictate the

13 terms, and conversely, it's not a situation where if the

14 company who's needing to take a license, the Defendant,

15 is big or has, you know, a lot of bargaining power, they

16 don't get to dictate the terms either.  It's a meeting

17 of the minds of reasonable -- or arrival at a number.

18     Q.   Okay.  And that's a reasonable royalty for a

19 patent or intellectual property, correct?

20     A.   Yes.

21     Q.   Can you think of an example, just in terms of

22 another type of property, say real estate, where you can

23 explain that reasonable royalty.

24     A.   Well, the one that's -- that I'd like to use

25 that's relevant, because I do a lot of work in the oil

1 and gas industry, is to think about the relationship

2 between a landowner and, say, an oil company that may

3 come to you, if you had a 200-acre farm out somewhere in

4 Harrison County, and they came knocking on your door

5 (knocking) and said:  We understand you own the

6 minerals; you own the rights to the minerals under your

7 land.  We think we'd like to do some exploring on your

8 land, and we'd like the right to come onto your land and

9 look for oil or gas on your land.

10          And the landowner would lease those rights to

11 that oil company.  And then they would go off and sort

12 of take their own risks.  They'd apply their own

13 expertise, and I'm sure when they do it, hope that

14 they're going to make some money.

15          The royalty -- the analogy for the royalty in

16 a patent or a patent license situation is analagous in

17 some ways to that royalty that the landowner says:

18 Look, if you actually sell any oil or sell any gas, a

19 fair compensation for that is to write into the lease

20 that you owe me some percentage royalty on the revenue

21 that you generate from the oil or the gas that you find

22 on my land.

23      Q.   So that's the -- and a similar example of what

24 you're trying to do here, what that patent-holder would

25 want is a reasonable royalty for that intellectual

1 property; is that right?

2     A.   Right.  So for the -- for their technology

3 that they're going to lease, in a sense, license to this

4 company to go use in whatever use they want to put of

5 it, what's a fair compensation back for their use of

6 that; just like what's a fair share of the benefits that

7 a gas company gets if they come and drill and find oil

8 or gas on your -- on your land.

9     Q.   Okay.  Let's talk next --

10           MR. HUESTON:  Slide 4, please.

11     Q.   (By Mr. Hueston) -- about the way that you

12 approached this case to figure out what a reasonable

13 royalty would be.

14           What considerations did you start with?

15     A.   Well, there are two very important things that

16 I have to -- sitting in this chair, have to do that are

17 very different from what Dr. Rhyne and -- sort of

18 everything, I think, that's gone on up to this point.

19           I have to assume that the patent is valid, and

20 I have to assume that it's infringed.  I understand

21 there will be a determination made by the Court or by

22 the jury as to whether the patent is valid, and there

23 will be a determination as to whether it is, in fact,

24 infringed, but that's completely irrelevant to me.

25           I start and end my process with an assumption

1   that validity has already been found and infringement's

2   already been found and that both the patent-holder and

3   Google and Yahoo! understand that.

4       Q.   All right.  And then going to that land

5   example, would it be fair sort of to equate that to the

6   landowner already knows:  Hey, there's a well on my

7   property; there's no dispute about that; now we need to

8   talk about what's fair, in terms of what I get from

9   this; is that fair?

10      A.   Yeah, I think that's -- that's a fair

11  statement, that this sort of infringement can be

12  analogized to, you know, they -- there's no question

13  that the well is on this particular piece of land.

14          There may have been a dispute in an earlier

15  part of the case about whether that well got set down on

16  somebody else's side of the property line or on your

17  side of the property line.

18          For the purposes of my analysis, I've assumed

19  that the well is on the Plaintiff's land, on Bright

20  Response's land, and we just have to figure out, now

21  that it's there, what is an appropriate amount of

22  compensation.

23      Q.   All right.  Now, what I'd like to do next is

24  have you summarize what you found when you went through

25  your analysis for Google, and then we'll get into the

 1    particulars of your analysis.

 2            So let's start first with --

 3                    MR. HUESTON:  Next slide, 5, please.

 4        Q.    (By Mr. Hueston) -- a summary of what you

 5    found to be appropriate with respect to Google.  We'll

 6    get to Yahoo! later.  That's going to be the second part

 7    of what you'll address today?

 8        A.    Yes.

 9        Q.    All right.  So focusing just on Google for the

10    moment.

11        A.    All right.  The -- the first thing, there is

12    the accused revenue.  And I'm not -- I haven't been here

13    in the courtroom all week, so I don't know whether

14    that's been explained, but when we talk about accused

15    revenue, that's the revenue that has been generated by

16    Google from this AdWords system.

17        Q.    All right.  And just let me stop you there, so

18    there's no misunderstanding.

19            So accused revenue, you said, just from the

20    AdWords system.  You're not talking about all the

21    revenue, all the money that Google has been making.

22    That's not what's at issue here for you to consider,

23    right?

24        A.    That's right.  That's -- things they do with

25    other products they have are not relevant to my

analysis.  We're just looking at AdWords.

Q.   All right.  And what is the amount of accused revenue in this case, in summary?  And we'll get to your specifics later.

A.   It's $27.7 billion measured over the point in time from the first date of infringement, when Dr. Rhyne says that's the first system of AdWords that he sees as infringing, through -- I think this is through March of this year.

Q.   And we'll get to the specifics, but 2004 through March 2010?

A.   Basically, yes.

Q.   All right.  And then running royalty, there's another -- I think of now we talk about royalty, and it's running.  So can you explain what that's supposed to mean.

A.   Right.  The running royalty means -- just like back to our oil and gas analogy -- that the amount is not set ahead of time.

That landman didn't come and say:  Look, I'm going to write you a check for a hundred thousand dollars, and that's it.  If we find gas, we find oil, we don't owe you another penny.  The royalty is an amount that's paid as a percentage of the revenue that's generated.

So in this case, the running royalty that I
have determined for -- if the Rice patent is valid and
infringed, is a quarter to a half percent.

Q. All right. And I know I always get mixed up
when I see percentages and points. You don't mean that
this is 25 percent to 50 percent, right?

A. No, sir.

Q. Okay. So that is literally less than 1
percent, a quarter of 1 percent up to a half of 1
percent; is that right?

A. Yes.

Q. All right. And then so what's this line down
here then, this last one where you put 64.2 million to
128.4 million?

A. That's just the math, the arithmetic, of
applying the $25.7 billion in revenue that they've
generated with the AdWords system over that time period,
applying -- in the case of the 64.2 million, that's the
quarter percent, and the 128.4 million is applying the
half percent.

So through -- you know, over this period, that
would be the amount of money that that running royalty
would generate.

Q. Okay. And have you created another
illustration to sort of show visually, you know, that

1  portion that you've determined to be the appropriate

2  royalty equivalent that that landowner would get for

3  that well and what's happening on the property?

4      A.   Yes.   I've got something to -- I've put that

5  in visual context.

6      Q.   Okay.

7          MR. HUESTON:  Let's move to Slide 6,

8  please.

9      Q.   (By Mr. Hueston) And if you could explain

10 this:  What is that big green circle supposed to

11 represent?

12     A.   Okay.   The big green circle, this is the --

13 this is U.S. AdWords revenue.  That's, again, the thing

14 we call the accused revenue.  This is the 25.6 billion

15 that they have generated with the AdWords system.

16     Q.   Okay.   And then moving to the next slide, I

17 see a small little sliver there with 64.2 M next to it

18 and 128.4 M.

19          What's that?

20     A.   Yes.   That's the resulting share of that total

21 pie of revenue that I found would be fair compensation,

22 reasonable compensation for the Rice patent.

23     Q.   Okay.   And I know I often like to think of

24 things like, well, how much on the dollar is this?  Have

25 you created an illustration to show that as well?

1    A.    Yes.

2    Q.    All right.

3            MR. HUESTON:  Next slide, please.

4    Q.    (By Mr. Hueston) So we talked about this is

5    less than 1 percent.

6            In fact, if we could move forward in the

7    slide, a quarter of a penny to a half penny on the

8    dollar?

9    A.    Yes.  That's what -- .25 percent is a quarter

10   of a penny for every dollar, and .5 percent is a half a

11   penny for every dollar.

12   Q.    All right.  Okay.  Let's move forward now and

13   talk about how you got there.

14           Let's first talk about, in general, the

15   evidence that you considered, the time you put in, and

16   the work that you did in reviewing documents in this

17   case to come to that ultimate conclusion.

18           MR. HUESTON:  Next slide, please, 9.

19   Q.    (By Mr. Hueston) Sir, this is a slide that

20   you've entitled Evidence Considered.  So can you please

21   provide a summary to the jury of the evidence?

22           And before you do so, is this -- by the way,

23   if we wanted to try to list every document you looked

24   at, how many slides would we have here?

25   A.    Oh, we'd be here all afternoon.  There are

hundreds and hundreds, if not thousands, of documents and pages of things that -- that my staff and I have looked at. And this is just a very high-level sort of categorical summary of the types of things that I've done.

Q. All right. Why don't we move through those.

A. Well, first is, I -- my staff and I looked sort of outside the information that was produced by the parties in the case to say, you know, let me do some independent research on this market, on page search advertising and what's going on at the appropriate time period in the -- in the internet in general and in advertising for this type of product.

I've also looked at things like SEC filings. When these companies file their financial statements and make representations to the investing public about how their business runs, there's some relevant information there.

Q. Let me just stop you really quickly.

So just so the jury is clear, Yahoo! and Google are publicly-traded companies, right?

A. Yes.

Q. And so periodically, at least every quarter, they have got to file certain information so the public can see it, right?

1    A.    Yes.

2    Q.    All right.  And that would include certain

3 financial information, right?

4    A.    Yes.

5    Q.    And you've looked at and considered portions

6 of those, right?

7    A.    Yes, I have.

8    Q.    All right.  Please go on.

9    A.    And then there's -- the next bullet point is

10 sort of all the internal documents, mounds and mounds of

11 paper and documents and testimony.  There's depositions

12 of witnesses.

13    Q.    What's a deposition?  I'm not sure anybody's

14 been told that.

15    A.    Well, we've seen some -- you've seen video

16 clips of Dr. Rhyne's deposition.  It's where, you know,

17 the witness sits in a conference room, and somebody asks

18 them questions, much like is happening here but without

19 everybody around.

20    Q.    Right.  And the next point:  Expert opinion of

21 Dr. Rhyne.  Why is that bulleted by itself?

22    A.    Well, I've relied on Dr. Rhyne for a couple of

23 important things.

24           One is, I'm not here to offer any technical

25 opinions to you, to the jury, as to how the -- how this

patent works; certainly not whether it's infringed or whether it's valid. I've assumed that.

And I'm also relying on Dr. Rhyne for an opinion about when the infringement -- when he sees the first instance of infringement for his analysis.

Q. Right. And I think the last item we haven't covered yet: License agreements entered into by both Plaintiff and Defendants. Can you explain just briefly -- we'll have more on that -- what that category is.

A. Yes. These -- these are -- in the work that I do, one of the steps that a patent damages expert almost always does is ask the question: Well, has this patent ever been licensed before?

Sort of like have you ever entered into any other oil and gas leases? Are there some leases in the area that we can look at that would give us an idea of what would be fair compensation for this well that we now have on your 200-acre farm?

Q. All right. So that covers the categories of evidence that you've considered. And with that, can you explain briefly -- we'll get into the specifics -- what sort of analysis you entered?

Is there something called a hypothetical negotiation -- there's another mouthful -- that you have

1  to get into to figure out, under the law, the

2  appropriate reasonable royalties in this case?

3      A.   Yes.  Yes.  This concept of the hypothetical

4  negotiation is what -- what I'm supposed to do is step

5  back and say:  All right.  The well's out there.  Can't

6  change that.  It's now 2010.  But what would the parties

7  have reasonably agreed to if -- before they sunk that

8  well on that land, if they had sat down and talked about

9  it?

10          So in this case, we'll see that for Google,

11  that's a sitdown, a negotiation, in the middle of 2004.

12  And for Yahoo!, it's a little earlier in 2004.  But that

13  they sit down and they negotiate for a royalty.

14          And that's what I'm supposed to imagine is

15  happening.  And that's -- in a technical sense, we call

16  that the hypothetical negotiation.

17      Q.   All right.  And let's start getting into that.

18               MR. HUESTON:  Let's go to Slide 11.

19      Q.   (By Mr. Hueston) Okay.  So the starting

20  point -- this one, your slide says:  Hypothetical

21  negotiation, timing, and you have July 2004.

22          How is it that you arrived at this date, July

23  2004, as the timing of the negotiation, as part of the

24  period that you're supposed to be looking at?

25      A.   Well, first, I'm relying on Dr. Rhyne's

opinion that the SmartAd Selection System is the thing that he sees infringing.

And both from Dr. Rhyne and from other evidence, I see that that system, the SmartAd Selection System, sort of went live, Google switched over to it, in approximately July of 2004.

Q. Okay. And you cite a deposition quote here, the Wright deposition, at Page 103, Lines 20 through 25, and I quote.

QUESTION: When did it eventually, all of the traffic, get switched over to the SmartAd Selection System?

ANSWER: I believe that on July 1st of 2004, 90 percent of the traffic was switched over to the SmartAd Selection System.

And that's a Google senior staff software engineer's deposition. Did you rely on this as well to help pinpoint the fair starting point, in terms of the hypothetical negotiation?

A. Yes. Yes, I'm relying on that. And that, you know, if they're 90 percent switched over, they need to be sitting down and talking at that point. So that's when I imagined this July 2004 date is happening.

Q. All right. Now, this is that SmartAd Selection System lit up, I think as you said, on July 1.

1          What was your understanding of what the name

2 of the system was before around July 1, 2004?

3     A.   I've seen Google documents that refer to that

4 prior system as their dumb ad selection system.

5     Q.   All right.  So this is when the Smart began;

6 is that right?

7     A.   Yes.

8     Q.   Okay.  Now, is it your assumption then, just

9 to make sure we all understand, like the well on the

10 property, that the SmartAd Selection System was using

11 the invention, the Rice invention, starting at around

12 this point in time?

13     A.   That's something that I have to assume.

14 Again, remember a couple of slides back, I have the

15 luxury of not having to get embroiled in this whole

16 discussion about whether AdWords does or doesn't use the

17 Rice patent.

18     Q.   Right.

19     A.   In my negotiation, when Bright Response and

20 Google walk into the room, they both understand that it

21 does, in fact, use -- that the SmartAd Selection System

22 is, in fact, using the Rice patent.

23     Q.   All right.  And are you -- is your

24 assumption -- just to make sure the jury understands, is

25 your assumption that the Rice patent invented the

1  SmartAd Selection System or simply that it adds

2  something, or it is part of that?

3       A.   That's correct.  I'm certainly not assuming

4  nor does that assumption about infringement require me

5  to assume that the Rice patent is the SmartAd Selection

6  System or that they invented the whole thing.  It's just

7  that it is part of what's going on in that system, and

8  it's adding something to that system.

9       Q.   Okay.  Next point.

10            MR. HUESTON:  Let's go to Slide 12,

11  please.

12       Q.   (By Mr. Hueston) Is it one of the first things

13  you have to do is to figure out how -- what type of

14  royalty will be paid, that running royalty we talked

15  about?  What -- is there another type of royalty that at

16  times is paid as well?

17       A.   Yes.  In -- in the patent licensing world,

18  there are two common ways of paying for a license to a

19  patent.  What's called a lump sum license or a lump sum

20  royalty and a running royalty.

21            And back to our analogy, that would be sort of

22  equivalent, on the lump sum side, if the landman came

23  and said:  Look, we don't want to get involved in having

24  to pay you a percentage of whatever we get down the

25  road.

1          Let's come up with an amount of money that's

2  just a check I can write you now, you can cash that

3  check, and we don't have to talk to each other again,

4  you know, regardless of what happens.

5          A running royalty, on the other hand, is one

6  where they agree to essentially ride along with the

7  success of the product that is going to be made using

8  the patent and pay a percentage of the revenue that's

9  going to be generated from that.

10     Q.   Okay.  And are there some factors that you

11  consider to determine in a particular case whether the

12  form of the royalty is more appropriately a running

13  royalty, where you go along for a ride with what happens

14  with that business, versus whether the most appropriate

15  form is a lump sum, getting that -- just getting cash

16  upfront, and we're done?

17     A.   Yes.  Yes.

18          First, on the right-hand side there on lump

19  sum, the -- one of the things that we see is often that

20  licensor, the party that's in Google or Yahoo!'s shoes

21  that's wanting to get the license, has some motivation

22  to just to write you a check, because they want the

23  accounting certainty.

24          They'll say:  You know, this is going to cost

25  me X amount of money.  I know for sure that's what it's

going to be.  We don't have to figure out next year or
the next year or the year after that how much it's going
to be.  So there's accounting certainty.

Weighing against that is that it -- because
you have that certainty, it's not going to reflect the
actual infringement.

So in the context of this -- back to our oil
and gas analogy, there's no way that that's tied to the
actual amount of gas or oil production that's going to
come off the land.  So that's one of the things that the
parties weigh.

Q.  All right.  Okay.  And with respect to the
lump sum payments, what about the notion that, you know,
when somebody might want to come onto your property and
drill or not, people might not really be clear what's
underground or what's going to happen; there could be
total uncertainty?

A.  Right.  There -- there's a lot of uncertainty
in any case.  I mean, it's rare in -- in -- that you
know exactly what the sales of the product are going to
be or that you have an exact forecast or any -- even a
pretty clear forecast.

Some products, you know, like toothpaste,
there's so many Americans, and everybody's brushing
their teeth every day, so being able to forecast the

1  revenues from sales of toothpaste is -- you know, give

2  or take a little bit, you can probably get pretty close.

3  In the internet world and for internet advertising and

4  particularly this search-related advertising, it was

5  definitely growing at the time, but there were -- pretty

6  big disparity in the forecast of how much it was

7  growing.

8          It's sort of like trying to forecast what the

9  price of oil is going to be.  You know, it may be -- we

10  may all know it's going up at some point, but, you know,

11  is it going to be $140?  Is it going to be a hundred?

12  There's a big difference there.

13     Q.   All right.  And then you talked about lump sum

14  of this.  What about running royalty considerations?

15  Some of them are just the opposite that you've just

16  talked about with lump sum.

17          There's also the idea of the administrative

18  costs in, you know, administering or writing a check and

19  monitoring how much each month it's going to be done.

20          How does that factor in?

21     A.   Well, in some licensing situations, after the

22  parties have kind of gotten together and said:  All

23  right.  I think we've had pretty well a meeting of the

24  minds that if we were going to pay on a sort of

25  as-you-go basis, the likely amount of these monthly or

quarterly checks is going to be a hundred dollars or a

thousand dollars.

In those situations, the parties may say:

Look, it's going to -- we're going to have to have an

account; you're going to have to send us an invoice;

we're going to send you a report.  You're going to have

to cash the check.  There's going to be all of this

administrative burden all for a couple of hundred

dollars or couple of thousand dollars.

Let's just figure out what that amount of

money is going to be over time and write it as just one

lump sum amount.  So that is a factor that comes into

play.

Now, when those periodic payments, those

royalty checks, if you went with a running royalty, are

pretty large, then sort of the administrative cost of

dealing with it is not something that really comes into

play.

Q.   Because it's very small compared to the

amounts?

A.   Right.  Yeah.  I mean, having an accountant

process a -- on either end, both from the person

receiving the royalty payments and maybe needing to

audit those, if there's -- if, in this case, where there

are millions of dollars, having somebody sort of look

1  after that is not something that would sway you towards

2  paying it as a lump sum.

3      Q.   All right.  And as part of looking at what

4  form of royalty is appropriate, did you look at the

5  companies and what kind of policies they had themselves

6  internally?

7      A.   Yes.

8      Q.   All right.  And did you do that with Google?

9      A.   Yes, I did.

10      Q.   All right.

11          MR. HUESTON:  Let's turn to Slide 13,

12  please.

13      Q.   (By Mr. Hueston) And you have a quote on here,

14  and this is from Mr. Jack Ancone, a Google

15  representative, from his deposition, Page 20, Lines 14

16  through 19, and I quote:  I'm not aware of any formal

17  licensing policies in place at Google around the

18  licensing or acquisition of -- of intellectual property.

19          And, in fact, it's my understanding that each

20  engagement that we consider is considered on a

21  case-by-case basis and negotiated on its own merits, end

22  quote.

23          And, Dr. Becker, why was that quote that you

24  put in there important to you?

25      A.   Well, that -- this tells me that Google's

person who's going to walk into this room back in July

of 2004 isn't restricted by some corporate policy that

says:  You know, I can't even look at the particulars of

this case, of this deal.  Under no circumstances am I

allowed to enter into a running royalty.  It must be a

lump sum.

Or vice versa.  I see that Google is saying

they would negotiate this deal on the merits -- on its

own merits.

Q.   All right.  And you've looked -- we'll get

into this in a few minutes.  You've looked at a number

of the Google licenses that they've entered into,

correct?

A.   Yes.

Q.   And a lot of them are lump sum, correct?

A.   Yes.  Yes.  I think really virtually all of

them are.

Q.   Right.  And so, you know, did you factor that

in?

A.   Yes, I did.

Q.   And -- well, as a preview, I mean, how -- how

is it that you kind of went down this running royalty

route, even though they had a lot of licenses that were

lump sum?

A.   Well, really two things.

1          One is, in my opinion, that the need to tie

2     the -- this reasonable royalty for the use made by the

3     infringer, the need to tie it to the amount of revenue

4     that's been generated, at least in some way -- doesn't

5     need to be tied exactly -- since in July 2004, there was

6     a -- really pretty difficult to predict that it was

7     going to be $25 billion worth of revenue.

8          And so that sort of outweighs any desire that,

9     I think, Google would have had, and clearly, has a

10    preference for lump sums.

11         Q.    All right.

12         A.    The other thing is that if -- when I look at

13    some of those agreements where they do have a lump sum,

14    there's elements of that that really aren't similar to

15    what I have to imagine in this negotiation.

16         Q.    And we'll get to that --

17         A.    Yes.

18         Q.    -- in some detail.

19         Did you also, in considering what kind of

20    royalty it should be, running royalty or lump sum,

21    consider other experts and what they have concluded?

22         A.    Yes.

23         Q.    And in particular, have you considered an

24    expert hired by Google in another case?

25         A.    Yes.

     Q.   All right.

               MR. HUESTON:  Let's turn to Slide 15,

please.

     Q.   (By Mr. Hueston) And this quote that you have

put here is, quote:  It's appropriate way -- the

appropriate way to think about and to calculate it, but

it can be expressed most often as a running rate, end

quote.

               MR. VERHOEVEN:  Objection, Your Honor.

               May we approach?

               THE COURT:  Yes.

               (Bench conference.)

               MS. CANDIDO:  You said this morning, Your

Honor, this is one of the slides that should not be used

because it contains a quote from a prior witness.

               THE COURT:  Go ahead.

               MR. HUESTON:  In response, the slide we

addressed this morning was the trial testimony slide,

which I am not putting in the presentation.  This is a

quote in the report, and that was not addressed this

morning.

               I understood all those other quotes in

the trial testimony were to be out, and I'm not

referencing those.

               MS. CANDIDO:  I made it very clear to you

1   before this morning and again this morning that it was

2   that slide and this slide that we had --

3                   MR. HUESTON:  No, I did not understand

4   that as the issue.

5                   THE COURT:  Hold on.

6                   MR. HUESTON:  And this is a -- the other

7   thing is a fragment, and he's going to just generally

8   talk about what we discussed.

9                   THE COURT:  All right.  You need to take

10  the slide down and address it with general questions,

11  okay?

12                  MR. HUESTON:  Okay.

13                  (Bench conference concluded.)

14      Q.   (By Mr. Hueston) So without --

15                  MR. HUESTON:  Let's put the slide down

16  for a moment.

17      Q.   (By Mr. Hueston) And without focusing on that,

18  in general, can you describe the importance to you of

19  what that prior expert did, the representative from

20  Google?

21      A.   Yes.  There is an expert out there who -- I

22  know the man.  He is -- serves as an expert just like I

23  do in cases.  And I'm aware of a case where he was hired

24  by Google as their expert to offer opinions about a

25  patent and the value of that patent.

1    And I note that in that case, he offered the

2 opinion that a running royalty was an appropriate way to

3 look at structuring the royalty.

4    Q.    All right.    Let's move now to how you came out

5 in favor of either a running royalty or a lump sum in

6 this case.

7    So putting up Slide 16, how did you balance

8 those factors?    If you could explain to the jury, and

9 how did you conclude that?

10    A.    Well, I think we've touched on most of the

11 things that I considered, and at the end of the day, the

12 thing that I give most weight to is that the extent of

13 use back in 2004, if they had been trying to agree on a

14 lump sum, the amount of money that they would be sort of

15 trading over without -- with this sort of great

16 uncertainty about how much revenue AdWords was going to

17 generate over the period through 2010, that uncertainty

18 can be resolved by just going to a running royalty.

19    Let's hitch our wagon to your star, and if you

20 sell a lot, then we get more money; and if you don't

21 sell as much, we don't get as much.

22    So because it reflects actual infringement and

23 it's the way that the parties can just sort of push off

24 the table and let the marketplace and let their own

25 success determine how much the royalty is going to be, I

1  determined that they should go with a running royalty.

2  Q. All right. And then as part of your royalty

3  analysis, do you look at what's called the royalty base,

4  what it's applied against, that percentage?

5  A. Yes. Yes.

6  Q. Okay.

7  A. That's the other sort of part of the equation

8  is: All right. If we're going to have it be a

9  percentage of the revenue, then I have to go in and

10  examine the record, examine the financial records, and

11  come up with an amount to provide to the jury that is

12  the base of revenue that that percentage would apply to.

13  Q. Okay. And did you calculate what that base --

14  the appropriate base revenue should be for your Google

15  calculation?

16  A. Yes.

17  Q. And is that illustrated on Slide 17?

18  A. Yes.

19  MR. HUESTON: Let's turn to that, please.

20  Q. (By Mr. Hueston) And if you could explain what

21  this slide is. It says: Google U.S. AdWords Revenue.

22  And, again, this is just the SmartAd system that kicked

23  in around July of 2004, the revenue from that, correct?

24  A. Yes.

25  Q. And this is your base.

1  A. So this is starting in July of 2004, over on

2 the left, by year, the dollar amounts that -- from the

3 records that Google produced in this case relate to

4 their U.S. AdWords system.

5  And when you total it all up through -- as I

6 said, I think this is through March of 2010, it's 25.7

7 billion.

8  Q. Okay.  So just looking at each of these boxes,

9 so 7/1/04, that's July 1st, 2004, correct?

10  A. Yes.

11  Q. It says .27 B.  Is that just a part of 1

12 billion, so 270 million?

13  A. Yes.

14  Q. And then the next year says 1.8 B.  That's 1.8

15 billion from this system in 2005?

16  A. Yes.

17  Q. And then all the other numbers.

18  Just so the jury can see this -- the way this

19 works, applying that .25 percent to half a percent

20 royalty rate -- if I could ask you to pull out a

21 calculator, tell me what it would be roughly per month

22 using that running royalty for 2004.  What would that

23 have come out to be?

24  A. Okay.  So back at the time -- and this will

25 help illustrate kind of the -- you know, when they're

sitting down, the size of the business is very different

than with the benefit of hindsight, what we know it to

be today.

If you take $270 million there for the last

half of 2004, that's six months.  So that's $45 million

a month.

At the quarter percent royalty, that's --

let's see.  That's 112,500 a month.

Q.   That would be the royalty month by month on an

amount that would come out to be $270 million of

royalty -- of the appropriate royalty from the Google

product in this case, the accused product?

A.   Well, the $270 million is the total revenue

that they generate from AdWords.

Q.   Right.

A.   So that's back to our gas well analogy.  We

went and looked, and we saw that they produced $270

million worth of gas from that well in the second half

of 2004.

And the royalty check on a quarter percent

running royalty for that $270 million in revenue would

be $112,000, and at a half percent, it would be

$225,000 --

Q.   All right.

A.   -- for each of those months.

1    Q.   In 2004?

2    A.   Yes.

3    Q.   That's an illustration of how it would work in

4 real-time?

5    A.   Yes.

6    Q.   Okay.  Let's now turn to the rules, I'll call

7 them, the rules of the game for this hypothetical

8 negotiation, some of the other considerations that kind

9 of frame your analysis so that you can go through them

10 and show the jury how you arrived at that rate.

11         MR. HUESTON:  Let's turn to Slide 18,

12 please.

13    Q.   (By Mr. Hueston) Some of this, I think you've

14 already discussed.  You have to assume that the patents

15 are already -- that there's infringement, the well's on

16 the property, and also that they're valid and

17 enforceable, correct?

18    A.   Yes.

19    Q.   We've covered that.

20         And discuss the other couple of factors here,

21 if you will, for just a moment.

22    A.   Well, really, it's that last thing.  There's

23 this case out there called the Georgia-Pacific case that

24 was a long time ago, a patent case that in the Court's

25 ruling on that, they outline a way or at least a set of

factors that damage experts like myself and courts

should consider in assessing what a reasonable royalty

would be.

          And it's not -- you know, there's not a hard

and fast set of rules.  It's not like you've got to do

it exactly at this way.  But it's a set of guidelines

that sort of -- like if you were a home appraiser,

you've a manual that would say:  Yeah, you know, you

ought to go get comparables, and you ought to measure

the square footage of the house -- and, you know,

there's some guidelines for how to do an appraisal of

the value.

     Q.   All right.  And, again, the slide said:

Imagine a negotiation between Orion and Google.  Just so

the jury is not confused, that's the predecessor company

of Bright Response --

     A.   Yes.

     Q.   -- for this hypothetical?

     A.   Yes.  I had to go back and say:  All right.

If this is happening in July of 2004, what was the name

of the company?  What entity actually owned it then?

And I think there have been timelines that have already

been introduced, but I went back and said:  Okay.  In

July of 2004, it wasn't Bright Response that owned it;

it was a company called Orion.

1       Q.   All right.

2            MR. HUESTON:  Let's jump to Slide 20.

3       Q.   (By Mr. Hueston) And take a brief look at

4  those 15 factors that you were to consider, and I'll

5  list them.

6            One is Orion's agreements.  Those are

7  licensing agreements?

8       A.   Yes.

9       Q.   Google's agreements is 2.

10           3 is the nature and scope of the license.

11      A.   Yes.

12      Q.   4, Orion's established policy, correct?

13      A.   Yes.

14      Q.   Commercial relationship is No. 5.

15      A.   Yes.

16      Q.   Convoyed sales, No. 6.

17      A.   Yes.

18      Q.   Duration/terms, 7?

19      A.   Yes.

20      Q.   Profitability and commercial success, No. 8?

21      A.   Yes.

22      Q.   9 is the advantage of the -- advantages of the

23  patented technology.

24      A.   Yes.

25      Q.   10, benefits to the user.

1  A. Yes.

2  Q. 11, Google's use of the technology.

3  A. Yes.

4  Q. 12, industry rates.

5  A. Uh-huh.

6  Q. 13, proportion of profit to be credited to the

7 technology.

8  A. Yes.

9  Q. 14, opinions of other experts.

10  A. Yes.

11  Q. And 15 is the actual hypothetical negotiation.

12 You're putting all of those things into play, right?

13  A. Yes.

14  Q. All right.  And just to be clear -- I think

15 you said it earlier -- in any particular case, first of

16 all, do you consider each one of these factors?

17  A. Yes.

18  Q. Give it some initial thought for every factor?

19  A. Yes.  It's sort of a checklist that -- you

20 know, I'll go down this, and at least ask the question,

21 does this factor apply, given the circumstances of this

22 case?

23  And frequently -- well, almost always, you

24 find that many of the factors are not applicable to the

25 circumstances of the particular case that you're doing.

1     Q.    So you wind up not applying a particular

2   factor to it once you see that it doesn't quite fit in

3   the round hole in a particular case?

4     A.    Yeah.  Either it doesn't fit, and it's just

5   not applicable, or it's not something that has a bearing

6   on the -- you know, it's not the thing that they would

7   be really seeing in the negotiation as that being the

8   critical factors.

9     Q.    All right.  So the one that jumps out at me,

10  because I recognize the first word, convoy -- convoyed

11  sales, what's that, and does that apply, for instance,

12  in this case?

13    A.    Yeah.  That's one -- for example, a good

14  analogy is razors and razor blades, that if you had a

15  patent on the actual razor, there was some way to make

16  the razor better, but the razor blades are not covered

17  by the patent.  But as we all know, you know, you sell

18  the razor, and you expect to sell a lot of razor blades

19  with it.

20          This factor says, you take that into

21  consideration when the parties -- if they were

22  negotiating over a license for a razor and the company

23  that sold the razor was saying, well, look, my razor

24  only sells for a dollar, the other party might say,

25  yeah, but you sell -- for every guy that buys a razor,

1    he buys $10 worth of razor blades.  You need to take

2    that into account in setting the rate.

3         Q.   All right.

4         A.   That's something -- we don't have that

5    situation here, so I X'd that one off as not being

6    applicable.

7         Q.   All right.  And so what is your list of the

8    most relevant factors?  Have you made a list of the ones

9    you think apply in this case?

10        A.   Yes.

11        Q.   And is that at Slide 21?

12        A.   Yes.

13             MR. HUESTON:  Let's turn to that, please.

14        Q.   (By Mr. Hueston) First one is popularity or

15   profitability of the AdWords product.

16             Just very briefly, what do you mean by that?

17        A.   Well, this -- the factor of the popularity of

18   the product kind of gets to the notion that if we're

19   sitting down -- excuse me -- and negotiating over a

20   royalty for a technology that's going to be used in a

21   product, if it's a popular product, that technology that

22   improves that product is going to be more valuable than

23   if nobody wants the product.  Kind of doesn't matter

24   what the patent does for the product if the product

25   itself isn't popular.

1          So in this case, the AdWords product is very

2    popular.  We've seen and we'll see some other evidence

3    that it was popular at the time and, you know, with the

4    benefit of hindsight, we know it was extremely popular.

5       Q.    All right.  And just listing the others -- and

6    we'll get into them in some detail as we go -- benefits

7    of the invention, and that's --

8       A.    Yes.  So, again, that's one of the factors

9    that was on there.  I think it was Factors 9 and 10.  It

10   was looking at the -- the question is:  Well, what is

11   this patent adding to the product?

12          So we may have a popular product.  Does the

13   patent add a lot or a little to it?

14      Q.    Right.  And then extent of use?

15      A.    Extent of use is, you know, is this something

16   that is used in every copy of the product that's sold?

17   Every time you sell the product, is the technology

18   coming to bear?  Whether it be a small improvement or a

19   big improvement, is it in every one, or is it only in a

20   few?

21          And so we've asked the question about extent

22   of use, and that's important here, because my

23   understanding from Dr. Rhyne is that the AdWords system

24   uses the Rice patent in its processing of every -- every

25   time it's returning a set of ads, it has used the Rice

1  patent.

2      Q.   Okay.  And then just --

3              THE COURT:  Well, before we go to the

4  next one, we're going to take our afternoon recess.

5              MR. HUESTON:  All right.

6              THE COURT:  Ladies and Gentlemen, take 20

7  minutes.  Be back at 20 till 4:00.  Remember my prior

8  instructions, and don't talk about the case.

9              LAW CLERK:  All rise.

10             (Jury out.)

11             THE COURT:  Y'all have a seat.

12             I'm going to get you some time

13 computations over the recess, so y'all will know how

14 much time each side has used, okay?

15             Probably be through Dr. Rhyne, and you'll

16 just have to figure out where you are based when Dr.

17 Becker hit the stand, all right?

18             LAW CLERK:  All rise.

19             (Recess.)

20             LAW CLERK:  All rise.

21             (Jury in.)

22             THE COURT:  Please be seated.

23             Continue.

24             MR. HUESTON:  Thank you, Your Honor.

25 You can put Slide 21 back up, please.

1    Q.   (By Mr. Hueston) Dr. Becker, when we left off,
2    you were quickly itemizing the most relevant factors.
3    We ran through extent of use.

4         What would be the next item?

5    A.   The contribution of non-patented elements.
6    This is the -- I recognize that Google had an AdWords
7    product before the SmartAd system, and they were -- they
8    are a successful company, and they have a lot of things
9    that are contributing to the success of this product.
10   It's sort of like the oil and gas company that comes
11   and, you know, they have their expertise in how to find
12   the oil, and that has to be taken into account when
13   figuring out how much is a reasonable amount to pay for
14   the patented technology.

15   Q.   All right.  And the last item?  I think we've
16   had some discussion on that.

17   A.   Yes.  Is at least to look at whether there are
18   any comparables licenses, and I've at least found one
19   that I find to be comparable.

20   Q.   Okay.  And with respect to the first factor --
21   we'll get into that now -- popularity and profitability
22   of the AdWords products.

23        Are there a few things you'd like to highlight
24   for the jury with respect to what factored on that for
25   you?

1      A.   Yes.  Yes.

2           First, I think with the benefit of hindsight

3  that we know, shoot, there's been $25 billion worth of

4  revenue generated by this, so it's obviously been very

5  successful.

6           The appropriate question, though, is back in

7  July of 2004, would -- you know, what was the condition

8  of the market then?  Did anybody really understand that

9  paid search advertising was going to be a big deal?  And

10 was it growing, or was this something that just sort of

11 cropped up in the last year or two?

12          And so I went and looked at market data, did

13 some market research on what was going on, not only what

14 was going on in 2004, but what were people expecting in

15 2004.

16     Q.   Do you have an example of that?

17     A.   Yes.  I think the next slide has that shown

18 graphically.

19               MR. HUESTON:  Let's go to 25, please.

20     A.   And what we've got here, this is a slide -- a

21 slide showing page search ad spending.  And the category

22 that they're looking at here, paid search advertising,

23 is more than just what the AdWords would be, but AdWords

24 would be a significant component of this.

25          And this is the entire U.S. market.  It's not

just Google.  And what we see is that in 2004, if we look sort of look right here (indicates), this market was large, had really taken off already, had grown from almost non-existent back in 2000 to over $3 billion in 2004.  And these are forecasts through 2008 showing the market growing to over $7 billion.

Q.   (By Mr. Hueston) Okay.  And so why -- for the people in that hypothetical negotiation room in 2004, why might this have been of interest, even though AdWords is just a part of one company in these statistics?

A.   Well, it's back to the point I made a minute ago that if you're -- the parties both understand that the product infringes the patent and that the patent is valid, then the question is, well, gosh, is this a popular product?  Is it something that's going somewhere?

And if so, that's going to have a bearing on the amount that both Bright Response would be asking for and that Google would be willing to pay.

Q.   All right.  Now, did you also consider as part of this the profitability of Google's paid search advertising?

A.   Yes.  Yes.

That's -- that's something -- you could have a

very popular product, but if nobody's making any money

on it, so back to our razors and our razor blades.

There may be hundreds of millions of razors sold every

year, but if there's no profit in selling the razor

itself, then when they sit down to negotiate for a

license to that, at least the manufacturer of that razor

is going to say, look, you know, I really don't make

much money on this.

So we have to take that into account in

setting the royalty rate.  So the profitability of

product is relevant.  And I looked at what the

profitability of Google's AdWords product is.

Q.   All right.

MR. HUESTON:  Let's go to Slide 27,

please.

Q.   (By Mr. Hueston) So was this slide, then, on

point for you?

A.   Yes.  This is reflecting Google's U.S.

operating margins.  We didn't have data down at this

specific AdWords product to know how profitable AdWords

itself is, but the sort of segment of their business

within which AdWords sits is making operating margins.

So that's sort of our profit before you get to taxes and

things like that of -- you can see north of 20 percent,

and in some years in excess of 30 percent.

1      Q.   All right.  As the next factor you considered,

2 did you look at the benefits of the invention of the

3 Rice patent?

4      A.   Yes.

5           MR. HUESTON:  Let's go to Slide 30,

6 please.

7           I'm sorry.  28.  I misspoke.

8      Q.   (By Mr. Hueston) If you could describe the

9 benefits as you understood them and on whom you relied.

10     A.   Yes.  As I understand talking to Dr. Rhyne,

11 the Rice patent, those steps that are outlined there and

12 the technology is speaking to the relevance and quality

13 of the match on the -- on the ads.

14          So we've got a patent and technology that

15 says, if you apply this, it's going to increase the

16 relevance of those results.  So if I'm searching for

17 pickup trucks in Marshall, Texas, I'm not going to get

18 ads for, you know, hair salons in New York City.  I'm

19 going to get stuff that's as close to being responsive

20 to I'm searching on pickup trucks in Marshall, Texas.

21 It might be a Ford dealer in Longview.  It might be some

22 used car dealer here in Marshall, but it's -- you know,

23 the whole idea is to get those matches as close as

24 possible.

25     Q.   And did you look at market data and other

surveys to see that users really cared about such

things?

    A.   Right.  So -- yes, I did.

       And I don't just take it as a given that if

the patent is addressing the question of relevance, I

step back and say, all right, that's interesting.

       Dr. Rhyne tells me that this patent speaks to

or impacts the relevance of these matches.

       I asked the question:  Does anybody care?  Do

the users on the internet care about relevance when

they're searching for things?

       And I went and looked at some market research

on that question.

    Q.   Okay.  And let's look at an example.

       Going to Slide 30, is this one of the data

points that you considered?

    A.   Yes.  So this was a study done in August of

2004.  So it's pretty close to being right at the time

that matters, July of 2004.

       There was a consumer research survey of

internet users, and they asked them what was important

in considering their search engines, like Google or

Yahoo!.  And we see that -- three of the top four

results, and really the very top two, are returns that

match your needs and returns very accurate results.  And

they want those results quickly.

Q.   All right.  Moving on to extent of use, did you consider that as a factor, and have you assembled a slide to show your high points on that?

A.   Yes.

MR. HUESTON:  Let's go to Slide 32, please.

A.   So, again, back to the question of is this something that's used occasionally over Google, if I assume validity and infringement, or is it used a lot?  And I found at least as of 2007, google.com is processing 10 billion matched ad queries a day.  I understand from Dr. Rhyne that the Rice patent is used in the core of the system that Google uses to serve these ads.

So 10 billion times a day, there's things going on in the SmartAd Selection System that are using the Rice patent, and that's generating, at least according to the source document that I got this from, $46 million a day in ad revenue.

Q.   (By Mr. Hueston) All right.  And that factors into what you think is a fair and reasonable royalty, right?

A.   Yes.  Well, it's one of the considerations back to -- you know, at the negotiating table, sometimes

1   you have a circumstance where the company that's accused

2   of using the patent would say, all right, I have to

3   assume when I walk in the room that you understand and I

4   understand that I'm using it, but, you know, I really

5   don't use it very much.

6           This is very relevant, if they're using it,

7   you know, 10 billion times a day.

8       Q.   All right.  Next factor was patented versus

9   non-patented elements, and do you have a slide

10  addressing that?

11      A.   Yes.

12              MR. HUESTON:  Let's go to 33, please.

13      A.   So it's important for me to consider that this

14  isn't an invention that's the whole thing.  It's not

15  like a razor or some widget where the patent -- the

16  patent is the product.  You go make what this patent

17  says and you have a whole ready-to-go product.

18          This is something that is contributing to.

19  It's an improvement on the AdWords system.  And so I

20  have to take into account the Google brand, the success

21  of their search capability, the fact that they have

22  hundreds if not thousands of employees and engineers,

23  and they're investing money in making their product

24  better.

25          All of that matters and factors into the

quantity or kind of the level of the royalty that would

be reasonable in light of the fact that we have to

assume the Rice patent is being used, but there's all

these other things being used as well.

Q. (By Mr. Hueston) Okay. And then separately, I

note you wrote Rice patent is one element of the SmartAd

system.

Explain what you mean by that.

A. Well, even if we narrow it down to just the

SmartAd system and we say, all right, we recognize that

there's more to Google than just the SmartAd system,

you've got the Google brand; you've got their search

engine; you've got all their engineers, all that stuff.

Even within the SmartAd Selection System, there's

obviously a lot going on there, a lot of things that

Google contributes to that.

The Rice patent wasn't the entirety of just

that new and improved SmartAd system. So I have to take

that into account.

Q. All right. Do you have an illustration that

kind of visually shows the slice that you then

considered outside of these other factors?

A. Yes.

MR. HUESTON: Let's go to Slide 34.

A. So, conceptually, if we sort of step right

before July 2004, Google had an ad system.  In June of
2004, I'm sure if we were sitting there today, you could
type in a search on Google and you would get results.
You would type in pickup trucks in Marshall, Texas, and
you would get results, and you would get some ads.  So
they were doing this.

They had a search engine.  It was successful.
They had the Google brand.  People know that brand in
2004, and all these other factors, they're all there in
2004 before the SmartAd system came into play.

MR. HUESTON:  And shift to the next
slide, 35, please.

A.   Now, we go to post-July 2004, and all those
things like the Google brand and their search
capability, they're still there.  And what has changed
from pre-July 2004 to post-July 2004 is they've gone
from this older ad selection system to what they call
their SmartAd Selection System.  And the important thing
is that there was an improvement in the overall results
from going from the dumb system to the Smart system.

Q.   (By Mr. Hueston) All right.  And did you
review the data to determine whether Google also
experienced an increase in revenue per search when they
switched from the dumb ad system to the SmartAd system?

A.   Well, I have seen data in the documents that I

reviewed that suggests that they -- you know, they --

they were testing this Smart system against the -- you

know, the baseline as they were getting ready to roll it

out and were finding, you know, measurable improvements

in the measures that they used to figure out whether

they're being successful.

And I think the basic metric that a company

like Google uses is called revenue per search.

MR. HUESTON:  Let's go to Slide 36

momentarily.

Q.   (By Mr. Hueston) And does that illustrate the

point you just made?

A.   Yes.  So, you know, you've got the -- whatever

contribution that Google brand is having before and

after, the search capabilities are having before and

after, what changed was creative post-July 2004 they had

switched to the Smart system.  And there's a significant

increase in revenue per search.

That tells me that this SmartAd system, that's

sort of the thing that then I focus on is that system

and the improvements to that system were creating value

for Google.

Q.   All right.  And once again, to be clear, are

you suggesting, sir, that the Rice patent made that box

leap up like that?

1     A.    Not entirely.  I think by my assumption

2 that -- I have to assume that Google's SmartAd Selection

3 System infringes, that it is, in fact, using the Rice

4 patent, and, therefore, it's one of the elements that's

5 in the SmartAd Selection System.

6     Q.    All right.  And on this topic of extent of

7 use, let me ask you this:  Do you believe that

8 relatively -- even a relatively small technological

9 improvement can sometimes result in a large economic

10 positive -- positive result for a company using that

11 improvement?

12     A.    Yes.

13               MR. HUESTON:  Let's go to Slide 37.

14     Q.    (By Mr. Hueston) And you've entitled this

15 Incremental Improvements Matter.

16          Can you explain this?

17     A.    Yes.  One of the things that I found

18 interesting in the data that I was looking at and the

19 documents is that when you've got billions of searches a

20 day going through this engine, very small changes to the

21 system can produce significant increases in the

22 profitability of the overall engine.

23          So there's testing data that suggests that in

24 a different system, something called AFC, which is ad --

25 I don't even remember -- I think it's AdSense for

Content, but it's not AdWords.  It's a different
product.

Just changing the size of the font.  So the
size of the letters on the screen, when those ads were
returned, didn't change anything else, just changed the
size of the letters, that increased the revenue per
thousand searches by 4 percent.

So a small tweak -- this engine is running so
fast that small tweaks to it can make a big difference.

Other testing results that I found interesting
and I think relevant to the question of whether a small
increment can have a big impact is that new default font
faces increased revenue by 2 percent.  That's a
2-percent improvement in the revenue per thousand
searches.  Doesn't sound like much, but when you're
doing billions of searches per day --

Q.   It's like changing the letter the way the
letter was?

A.   Yes.

And then the last one is that the tweak to the
blue bar spacing -- I think you guys have seen lots of
search results pages where you've got the actual results
of the search in the left-hand side of the page, and the
ads show up on the right-hand side of the page.

There is, at least on some browsers, a very

1  thin blue line that separates the ads from the search

2  results, and they just sort of tweaked how far those

3  things were apart, and that increased revenue by 1

4  percent.

5         Doesn't sound like much, but when you're doing

6  10 billion matched ad queries a day, a 1-percent change

7  is worth a lot.

8         Q.   And just to be clear, are you saying that the

9  Rice patent invented any of these small improvements?

10        A.   No.  No.

11        Q.   All right.

12        A.   This is just to give me a calibration of

13  what -- you know, even if one assumes that the Rice

14  patent is just a tweak, just a very small incremental

15  change to the performance of the ad, this SmartAd

16  Selection System, these -- you know, the system is

17  sensitive enough to changes in its performance that

18  small changes, tweaks, can have a big impact on the

19  profitability.

20        Q.   All right.  The next item you said you

21  considered were other agreements, comparable licenses,

22  right?

23        A.   Yes.

24        Q.   And before we get to what you thought was the

25  most comparable, let's go to Slide 38.

1          Did you create a list, a summary list, of all

2   the agreements you took a look at to try to find

3   comparability?

4       A.   Yes.   This list reflects a large number of

5   agreements that were produced in the course of the

6   litigation that related to Google's agreements that had

7   something to do with patents they had either licensed or

8   bought.

9       Q.   All right.   So over 20 or so?

10      A.   Yeah.   I -- I think it's probably over 20.   I

11  haven't counted them.

12      Q.   Okay.   And for you, when you took a look at

13  all this, did you come up with what you thought was the

14  most comparable?

15      A.   There's one that provides the most relevant

16  information for me.

17      Q.   And which one is that?

18      A.   That's the first one in that list, the

19  Google-Stanford agreement.

20      Q.   All right.   Let's turn to that?

21              MR. HUESTON:   And for that go to

22  Slide 39.

23      Q.   (By Mr. Hueston) If you could provide an

24  overview of this for the jury and why you found it most

25  comparable.

A.   So this is an agreement that was entered into in December of 1998.  It's a license agreement that was -- Google acquired from Stanford University a license to a U.S. patent application.  At that point, it was just an application for a patent.

It ultimately resulted in U.S. Patent 6,285,999.  I think there were some other patents that subsequently issued, four or five other patents that later issued.  But the '999 patent issued in 2001.

It also included rights to some source code, software, the Google logo and name, and was exclusive for an initial period of six years with some options to extend that.

Q.   Okay.  So this license was for a package of items, correct?

A.   Yes.

Q.   And you've listed them there.  And did you consider in trying to, as you looked at this and when you were trying to compare it to the Rice patent, make adjustments for the fact that there are some of these other items in there?

A.   Yes.  Yes.

The -- the first thing I did is note that this patent application related to something called page rank, which is a technique that Google uses to -- on the

search side of their business to rank the pages out

there on the internet as to how relevant they are to a

particular search.

And I talked to Dr. Rhyne about that patent

and whether that was comparable in the sense of its role

in the search technology. You know, is it in the same

area? Are we on the same playing field, at least as the

Rice patent?

And he indicated to me that it was

technologically in the same field of use and comparable

enough for me to at least consider the other terms of

this agreement to see whether they provided any

information.

Q. Now --

MR. ROOKLIDGE: Objection. May we

approach, Your Honor?

THE COURT: Yes.

(Bench conference.)

MR. ROOKLIDGE: That last testimony was

not limited to Google about the Google-Stanford license

agreement. He's not allowed to rely on that.

We have a proposed cautionary instruction

of not being able to use this.

THE COURT: I don't know --

MR. HUESTON: Look, I'll clarify it right

away.

THE COURT:  Well, I'm going to go ahead and just give them the instruction the way I would give it to them.  I didn't think you intended to offer it as against Yahoo!.  But for purposes of clarity -- so I'm going the give them one.

I don't know if I'll give this exact one, but I'm going to instruct them not to consider it in terms of the Google-Stanford license on the issue of damages sought against Defendant Yahoo!.

MR. HUESTON:  And I can make it clear also in my question.  Sure.

MR. VERHOEVEN:  Is that vice-versa for Overture and Google?

THE COURT:  Yeah, but I'll do it at the time the testimony comes in.  I just think it would be easy for the jury to follow.

(Bench conference concluded.)

THE COURT:  Ladies and Gentlemen, before going any further, you're hearing testimony about a license agreement that was entered into between Google and Stanford University.

You should limit your consideration of the terms of that license agreement to the issue of damages that are being sought against Google.  You

1  should not consider it in your consideration of any

2  damages that are being sought against the Defendant

3  Yahoo!

4              Proceed.

5              MR. HUESTON:  Thank you.

6      Q.   (By Mr. Hueston) Of course, we're just talking

7  about Google right now in this part of your

8  presentation?

9      A.   Right.

10     Q.   Later, we'll talk about what applies to

11 Yahoo!, correct?

12     A.   Right.

13

14

15         **REDACTED BY ORDER OF THE COURT**

16

17

18

19

20

21

22

23

24

25



REDACTED BY ORDER OF THE COURT

And I see it as being much more like a running royalty. In fact, it's even sort of more of a running royalty than a percentage of the revenue.

Q.   And how is that?

1     A.   Well, you're really hitching your wagon to

2  their star.  Unlike a lump sum where you say write me a

3  check, I'll take my money, and I don't need to know

4  anything about how -- the performance of your company or

5  how you -- what you sell.

6          If I get a percentage of your revenue, then

7  the success of your business of generating revenue is

8  what drives how much money I get paid for my license.

9          But, you know, you may be a bad business and

10 not put any of it on the bottom line.

11         If I had a share of the bottom line, I'm

12 really sort of hitching up with you as to the success of

13 the company.

14         So it's more like a running royalty, and we

15 can use sort of finance theory to connect the equity

16 stake for what an equivalent share of the top line

17 revenues of the company would be.

**REDACTED BY ORDER OF THE COURT**

**REDACTED BY ORDER OF THE COURT**

Q.   All right.

A.   And when I looked at it, I actually think that there are some adjustments that need to be made that in my opinion the right sort of equivalent running royalty for our circumstances is a quarter to a half percent.

Q.   And just briefly, what are those adjustments that you feel you had to make in light of a comparison between this license and the license in the hypothetical negotiating room involving the Rice patent?

A.   Well, first, if you just do the straight conversion from -- ▮▮▮▮▮▮▮▮▮ ▮▮▮ and you want to know what's that equivalent to in terms of a share of the top line, the revenue, you look at this sort of overall profitability.

In fact, you look at overall cash flow.

And I did that for Google and saw that if you just do the math, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ roughly, of the top line revenue of the company.

I then recognized that this Stanford license had some exclusivity.  So in our circumstance, Bright Response is not giving Google an exclusive license.  So that sort of says you've got to adjust down.

There was -- Google got more than just the

1  rights to the '999 patent and these other patents, so

2  I've got to adjust down for that as well.

3          There's some upward adjustments, though.  ███

4  ██ ███      **REDACTED BY ORDER OF THE COURT**      ███ ████

5  ███ ████ _ _____ __ ___ _____ _____ ___ ___█ █

6  ███ ███ ██ ███ ███████ ████████  And so in that sense,

7  the adjustment goes the other way.  It would make it

8  analogous that here you've got to go up.

9          And the final adjustment is that at the time

10 they entered into this license, it was just a patent

11 application.  Here we've got not only an issued patent

12 but one that we have to assume for the purposes of our

13 negotiation is known by both sides of the table to be

14 valid, enforceable, and infringed.

15     Q.   All right.

16     A.   So that's an upward adjustment.

17          The net of all those things, I come out at a

18 quarter to a half percent on the equivalent.

19     Q.   And one thing, and I'm not sure we touched

20 upon it, in figuring out whether one license or more was

21 comparable, did you consider whether there's evidence

22 that Google was actually using the invention at issue?

23     A.   Yes.

24     Q.   And why is that important?

25     A.   Well, that's -- an important element of this

license is that -- as we talked about a couple of slides

ago, I have to assume for this analysis that Google is

using the Rice patent in basically every search that's

processed.

What's comparable about this is that it's my

understanding of the role that this page -- this page

rank technology plays in Google's search engine is that

it also is being used in every search.

The other thing that's analogous is that the

page rank technique is one of many things that Google

does to process searches, just like the Rice patent is

one of many things that they do to take those queries

and match the ads and serve the ads.

Q.   All right.  Now, of the -- there were other

experts that you have reviewed depositions of in this

case, correct?

A.   Yes.

Q.   Are you aware of the Google expert's opinion

of the most relevant comparative licenses?

A.   Yes.

Q.   And they are which licenses?

A.   They are -- I think if you go to the next

slide, we've got --

Q.   Sure.

MR. HUESTON:  41.

1    A.    There's a license called Invenda that my

2 understanding from reviewing Google's expert's testimony

3 that he believes this is, along with another one, the

4 most relevant data point.

5         There's another one that we'll talk about in a

6 minute called Carl Meyer.

7    Q.    (By Mr. Hueston) All right.  Let's go look at

8 this.

9         So have you taken a look at these carefully to

10 determine whether these provide a fair comparison in

11 order to determine an appropriate royalty for the

12 assumed infringement by Google?

13    A.    I have.

14    Q.    And what did you conclude?

15    A.    Well, I concluded that they don't.  I don't

16 think they're comparable to the circumstance that we've

17 had here.

18

19

20         **REDACTED BY ORDER OF THE COURT**

21

22

23

24         And the big issue there is we don't know how

25 much Google is using this technology.  We don't even

know that they're using it at all.

So back to -- you know, we don't know that there's a well drilled on Invenda's land.  We don't know whether there's, you know, even any intent to have a well on Invenda's land.

So to look at the check that Invenda got from Google and say, is that a good data point to use when we know that the Rice patent is being used in every single response -- in serving a response to every single ad, every single query, I just don't think you can make the comparison.

MR. HUESTON:  Let's turn to Slide 44.

Q.   (By Mr. Hueston) I think the other license was known as the Carl Meyer license?

A.   Yes.  Carl Meyer is a similar thing.

They purchased some patents from Carl Meyer, and, again, just to summarize, the big thing -- problem that I have with taking the lump-sum payment that Google paid to Carl Meyer is that there's no evidence that Google actually practices this.  There's no evidence that they use it at all.

So they may have been buying -- it's sort of like a situation like, you know, I might want to drill a well at some point on your land.  It's kind of interesting to me, but, you know, I might not.  So let's

1   agree to a sum of money just to give me the ability to

2   do that.

3            That's not analogous to a situation where the

4   well is there.  We know we need -- we need a license.

5   We know we have to get a lease.  We're just trying to

6   negotiate over the royalty.

7        Q.   All right.

8            MR. HUESTON:  Let's move to Slide 45.

9        Q.   (By Mr. Hueston) Did you also consider a

10  number of agreements that Bright Response and the

11  earlier related company, Orion, entered into?

12       A.   Yes.  There are a large number listed here.

13  There are a large number of agreements that my staff and

14  I reviewed and at least considered.

15       Q.   And in summary, what did you think when you

16  took a look at these?

17       A.   Well, these -- the vast majority, if not all

18  of these agreements, are settlements of litigation.  So

19  these are the results of a dispute between Orion or

20  Bright Response and these other companies, and reflect,

21  yes, a license for some patents, but they're not a

22  circumstance where the parties come into the room with

23  an understanding that the patent's valid and infringed.

24  In fact, it's quite different than that.

25       Q.   All right.  We'll get to that in a moment.

1    Also in this list, are you aware one way or

2  the other whether the Rice patent was even involved in

3  all these agreements?

4    A.   Well, the Rice patent, in all these

5  agreements, I think you -- in this sort of broad

6  settlement when the parties settled the litigation and

7  said, look, we're just going to end our fight, they

8  received a broad either covenant not to sue or a license

9  to all of whatever Orion had.

10    But in many of these circumstances, the

11  dispute between the parties was not over the Rice

12  patent.

13    Q.   So if you can give me an example that comes to

14  mind.

15    A.   Well, like Harley-Davidson.  Orion or one of

16  those related entities has a patent that relates to

17  parts distribution.  And so there were a number of these

18  cases on here, these settlements related to the

19  infringement suit related to this parts distribution

20  patent.

21    And so Harley-Davidson was being accused of

22  infringing this parts distribution patent.  I think

23  Toyota and Oshkosh Truck, those sorts of agreements,

24  relate to a dispute over that other patent.

25    Q.   All right.  So let's turn now to the idea

1 where you said almost all of these were litigation

2 settlements and that makes it apples and oranges in some

3 ways, right?

4     A.    I think it's very much apples and oranges.

5     Q.    Have you created a couple of -- this is my

6 favorite part -- cartoon illustrations to help

7 illustrate the differences?

8     A.    Yeah.  I created two slides that I think

9 illustrate the stark differences for the circumstance

10 that I have to assume in a hypothetical negotiation and

11 what you have in a litigation settlement.

12     Q.    Okay.

13              MR. HUESTON:  Let's go to Slide 48.

14     A.    So when you've got a litigation over a patent,

15 the licensor, Bright Response, Orion, or whatever is on

16 the left-hand side, taking the position that, look, our

17 patent is valid; our patent's enforceable; you're

18 infringing; and you need a license.

19              The licensee, the other party to this

20 negotiation, the Defendant, is saying, you know, no,

21 your patent is not valid; your patent is not

22 enforceable; we're not infringing; we don't need a

23 license; go away.

24              And that's the circumstance that when they

25 walk into the room in a settlement negotiation or a

settlement of litigation that I think the factors that
are present, there's anything but an agreement about the
validity of the patent.

Q.    (By Mr. Hueston) Does that have some result on
the amount of money the parties are willing to pay?

A.    Right.  And if you're looking at what was the
amount of money that -- with these two very differing
views they arrived at, I don't think you can take that
and say that that's the amount that should be used in
the hypothetical negotiation or that it even informs
that in any way.

Q.    Well, let's look at your illustration of how
things change in the hypothetical negotiation.

MR. HUESTON:  Slide 49.

A.    So in the hypothetical, you still have the
licensor saying our patent is valid; our patent is
enforceable; you're infringing and you need a license.
And I have to assume the circumstance where the licensee
walks in and says, yes, we agree; we need a license;
let's talk about what would be reasonable.

And that's very different than the
circumstance of these settlements, and that's why the
settlements you just can't look at those dollar amounts
and say that it has a bearing on this circumstance
that's on the screen now, which is what we're supposed

1  to be doing.

2      Q.  (By Mr. Hueston) All right.  Let's turn now to

3  a different topic.

4          There's been some discussion in this case,

5  hey, there was an earlier sale of Rice and other

6  patents, you know, months -- just a number of months

7  before the hypothetical negotiation date.

8          Did you consider that and whether that should

9  be in your analysis?

10     A.  I was aware of that and considered it, and I

11  don't think that the price that -- in that transaction

12  provides a basis for determining royalty in this case.

13     Q.  Okay.  Let's take a -- let's dig a little

14  deeper into that.

15             MR. HUESTON:  Let's go to Slide 50 and

16  let's start with this.

17     Q.  (By Mr. Hueston) It's a deposition quote, and

18  I'll read it aloud.  It's from a -- the deposition of

19  Mr. Spangenberg.

20          Firepond was a distressed company that was

21  actually a very famous dot-com-era company.  And in

22  approximately 2003, they had put -- Firepond had put

23  itself up for sale.

24          What was the significance of that to you?

25     A.  Well, the sale -- there was sale of the

1   portfolio patents in -- I think it was January of

2   2004 -- where the Rice patent was part of this portfolio

3   of patents that Orion bought from Firepond.  And that

4   purchase price was approximately a million dollars.

5           And I think for me it's significant that

6   Firepond was -- this was a distress sale of this patent

7   portfolio, at least according to Mr. Spangenberg's

8   testimony.

9       Q.   And Spangenberg was the buyer?

10      A.   Yes.

11      Q.   And did you have any indication from him in

12  his depo testimony as to how he was valuing this

13  opportunity?

14      A.   Well, I understand from his deposition that he

15  placed a much higher value on it.  He was looking for --

16  in a sense, you know, looking for a value.  Let me see

17  if I can find something that I can buy for -- anytime

18  you're buying something, you want to pay -- get it for

19  less than you think it's worth.

20          MR. HUESTON:  Let's go to the next slide,

21  51.  Sorry.

22          MR. VERHOEVEN:  Objection, Your Honor.

23  If I could have a side-bar, I can tell you my objection,

24  Your Honor.

25          THE COURT:  Okay.  Sure.

```
 1                    (Bench conference.)
 2                    MR. VERHOEVEN:  Your Honor, the
 3   Spangenberg deposition that's being put up on the screen
 4   is not in evidence, and it's not clear to me that it's
 5   going to be put into evidence.  I don't know how Your
 6   Honor handles that with experts.
 7                    THE COURT:  Well, experts -- you know,
 8   they're allowed to rely on things --
 9                    MR. VERHOEVEN:  I understand.
10                    THE COURT:  -- in forming their opinions,
11   even things that aren't in evidence.
12                    Now, I'm going to allow them to show
13   excerpts of what he's relied on, but, you know, I've
14   already indicated on the record that I don't think he
15   was unavailable.
16                    MR. VERHOEVEN:  I understand.
17                    THE COURT:  That if they're not going to
18   be entitled to call him -- the witness by deposition.
19                    MR. VERHOEVEN:  So I guess my only -- the
20   reason I objected was because it's one thing to say I'm
21   relying on this.  It's another thing to put the actual
22   testimony that's not in evidence on the screen.
23                    THE COURT:  Well, I understand that.  But
24   the rule allows me to do that if I find that the
25   probative value outweighs the negative of unfair
```

1  prejudice.  Given the fact that it's sworn testimony,

2  I'm going to allowed it to be displayed to the jury, but

3  it's not in evidence, and he hasn't been called as a

4  witness.

5          MR. HUESTON:  Just for the record, I

6  previewed all these slides, and they went without

7  objection.

8          MR. VERHOEVEN:  That's okay.

9          THE COURT:  I'll overrule the objection.

10          (Bench conference concluded.)

11      Q.   (By Mr. Hueston) All right.  Dr. Becker, so in

12  addition to Mr. Spangenberg's deposition testimony, did

13  you also consider the owner of Firepond and what he said

14  about this sale?

15      A.   Yes.  We looked at what the seller said about

16  the sale.

17      Q.   Okay.  And is that right here, Slide 51,

18  testimony of a Mr. Croxall?

19      A.   Yes.

20      Q.   And I'll just -- I'll do the reading for you

21  in the first one.

22          Now, when you sold the intellectual property

23  of Firepond, did you attempt to get the best price you

24  could get?

25          Answer:  Probably not.

1          Question:  Why would you not try to get the

2 best price you could get?

3          Answer:  Because that was not my ultimate

4 goal.

5          And then later in the deposition:  Did you

6 hire any experts or consultants to perform a validity

7 analysis of any of the patents in connection with your

8 negotiation of the patent purchase agreement with Orion?

9          Answer:  I don't even know what a validity

10 report or whatever it is.  So, no, I didn't do that.

11          Was this of importance to you in trying to

12 figure out whether that was a data point that should

13 weigh on your calculation?

14     A.    Yes.

15     Q.    And how so?

16     A.    Well, it tells me that -- kind of back to our

17 oil and gas analogy.  If we had someone who sold their

18 farm but had not been considering anything about whether

19 there was oil or gas under there, and maybe they sold it

20 to somebody who was very savvy and knew that they were

21 going to go do some geological and geophysical work.

22          What I'm seeing in Mr. Croxall's testimony is

23 that he had not sort of gone and done any analysis to

24 understand what he had with respect to this patent.  He

25 was just selling it and wasn't -- he wasn't, as he said,

attempting to get the best price he could for the

patent.

Q. And when he references validity report, that

indicates he wasn't even sure validity or really what

was there.

So if you analogized your example with real

estate, that would be what?

A. Well, it's that the circumstances of knowing

that you had the mineral rights, knowing that you had

the right to actually lease that -- the drilling rights

to that particular piece of property, knowing where your

property vendors were.

He just apparently didn't know that and wasn't

considering that.

Q. Is there any evidence that you saw in the

documents that you reviewed showing that Firepond made

any investment at all to determine who was even

infringing this patent?

A. Not that I'm aware of.

Q. And any evidence that Firepond might have been

ready to go the distance and take folks to trial, if

necessary, if they were infringing the product?

A. Not that I'm aware of.

Q. Okay. Let's now move to the hypothetical

negotiation.

1          Just to review, these are your assumptions?

2     A.   Yes.

3     Q.   I'll let you launch into it.

4     A.   Yes.  We've got Google and Orion.  July of

5 2004, they are walking in assuming that the patent is

6 valid, assuming that the accused AdWords product

7 infringes the patent.  They're willing to agree, and

8 they must reach an agreement.

9     Q.   All right.

10          MR. HUESTON:  Let's move, then, to 53.

11    Q.   (By Mr. Hueston) Again, are these the

12 Georgia-Pacific Factors, the 15, that you felt were most

13 pertinent here?

14    A.   Yes.  So all the stuff we've talked about for

15 the last hour or so relates to these factors that are

16 highlighted here on the -- on the screen.

17          And so in the negotiation, I think those are

18 the things that they would have considered.

19    Q.   Okay.  The next slide, 54, have you created a

20 summary of what you think are the key high points to

21 your analysis?

22    A.   Yes.  That the accused AdWords system is

23 popular, profitable, growing rapidly, even back at the

24 time of the hypothetical negotiation.

25          The SmartAd system was a significant

1  improvement over the prior system, that even if the Rice

2  patent is just a small increment, this system is

3  sensitive enough to tweaks that they can make a big

4  impact on the profitability of the system.

5          Third is that the Rice patent enhances

6  relevance and helps prevent fraud.

7          And the comparable license rates I take from

8  that other -- from the Stanford agreement, after my

9  adjustments of a quarter to a half percent.

10     Q.   Okay.  Let's move to 55, which is your

11  conclusion slide.  If you can summarize, again, where we

12  land with this.

13     A.   So after considering that, I ultimately

14  determined that that quarter-to-half-percent range is

15  reasonable in light of the fact that this is one element

16  of a successful system, certainly not the whole thing.

17  That's why it's just a quarter to a half percent.

18          And when you apply that quarter to a half

19  percent to the 25,685,220,350-dollar base, you get the

20  reasonable royalty damages that I've shown here of 64.2

21  million and 128.4 million.

22     Q.   And then moving to Slide 56, that comes out

23  to -- if we can move through these graphics, we have a

24  quarter penny on the dollar?

25     A.   Yes.

1    Q.   All right.  Did you also prepare -- moving now

2  to the Yahoo! case that you did, did you prepare a

3  damages opinion with respect to Yahoo!

4    A.   Yes.

5    Q.   All right.  In this case, we discussed a lot

6  of groundwork and overarching principles, the

7  Georgia-Pacific Factors.

8         Did you bring the same sort of legal

9  considerations and hypothetical negotiation factors that

10 you described when you were beginning to discuss what

11 you started to do with Google?

12   A.   Yes.  The approach is the same, the types of

13 information that I considered is the same.

14        Again, we have a similar hypothetical

15 negotiation.  The parties have to walk into the room

16 with the same set of assumptions.  So the overall

17 structure and the details of how I went about my work

18 were the same between this in the Yahoo! side of the

19 world and the Google side of the world.

20   Q.   But you considered different agreements, and

21 we'll get to that, right?

22   A.   Yes.

23   Q.   Okay.

24        MR. HUESTON:  Let's go to Slide 61,

25 please.

1    Q.   (By Mr. Hueston) If you could summarize what

2  you came to in this Yahoo! determination, and then we'll

3  go through the specifics.

4    A.   Okay.  First is that the accused revenues --

5  again, this is the revenues generated by the system that

6  is accused of infringing.  In Yahoo!'s case, it's

7  something called Sponsored Search.

8         Over that same time period, early 2004 through

9  today, that's 5.5 billion.

10         My conclusion that we'll talk about on the

11  running royalty is the same patent, same licensor,

12  similar circumstances in terms of the market that

13  they're selling their product into, I come to the same

14  range of royalty of a quarter percent to a half percent.

15  And when we apply that quarter-to-half-percent range to

16  the $5.5 billion, we see 13.7 to 24 -- 27.4 million.

17    Q.   Okay.  Well, the first thing that jumps out to

18  me is this number, 13.7 to 27.4.  That's a lot smaller

19  than the last one.  And if you're using that same -- you

20  came to a similar conclusion as to the range, .25 to .5

21  percent, why are we at a smaller number with Yahoo!

22    A.   Well, it's because we're using a running

23  royalty, and that scales the total amount of payments to

24  the amount of revenues generated.

25         So this is sort of analogous to, you know,

this particular gas well didn't produce as much gas.  It

was only 5 billion dollars' worth of revenue, not the

amount we had in the Google situation.

Q.   So the percentage takes that into

consideration?

A.   Yes.  By using a running royalty, it takes

into account that Yahoo!'s -- I don't want to say Yahoo!

is not as big as Google, but at the time, they were

actually -- you know, I don't know the relative size,

but clearly, in terms of the accused part of their

business, Yahoo!'s sales are only 5.5 billion, so the

amount of the payment scales down with that.

Q.   Okay.  And very quickly, 62 and 63, using the

same sort of graphic on the pie, once again, .25 to .5

percent?

A.   Is just that small piece.

Q.   All right.

MR. HUESTON:  Let's move to Slide 64.

Q.   (By Mr. Hueston) Once again, same kind of

categories, Dr. Becker, of evidence?

A.   Yes.  Yes.  Same categories of evidence.

Again, relied on Dr. Rhyne for his opinion about the

technology.  And I looked to Dr. Rhyne for an opinion

about when he first sees Yahoo! using the Rice patent.

Q.   All right.  And just to be clear, deposition

testimony, now you're looking at Yahoo! employees and

not Google employees?

    A.    Yes.  Yes.

    Q.    And down here you're not looking at Google

agreements.  You're just looking at the time Yahoo!

    A.    Yes.

    Q.    As well as the Orion agreements, right?

    A.    Yes.  Correct.

    Q.    Okay.

              MR. HUESTON:  Let's move to 66.

    Q.    (By Mr. Hueston) Let's go right to the timing

of the negotiation this time.

        What set the date of first infringement for

you here, the beginning of your period of time?

    A.    The beginning of my analysis starts with April

2004, which I get from Dr. Rhyne and his understanding

that -- or that's when he first sees Yahoo!'s infringing

software.  And I get that directly from him.

    Q.    And namely, that the software that was rolled

out and kicked on was based on this Overture acquisition

that happened?

    A.    Yes.

    Q.    All right.  And that's what's quoted here in

the report that you relied on, right?

    A.    Yes.

1    Q.    Okay.

2                MR. HUESTON:  Let's go to 67.

3    Q.    (By Mr. Hueston) Once again, did you consider

4  independently for Yahoo! whether there would be

5  appropriately a running royalty versus a lump sum?

6    A.    Yes, I did.

7    Q.    And would you explain what the different

8  factors are?  Why don't we just get right to how -- how

9  you began boiling this down.

10                MR. HUESTON:  Let's go the Slide 68, if

11  we can.

12    A.    Right.  So here we've got testimony from

13  Yahoo!'s licensing representative that there's no

14  established policy and testimony that says they don't

15  have a particular preference for a lump sum versus a

16  running royalty form.

17    Q.    (By Mr. Hueston) Why is that important to you?

18    A.    Well, again, that sort of tells me what's in

19  the mind of the Yahoo! representative walking in.  Are

20  they going to be bound by some strict policy that

21  they're not allowed to enter into a license that isn't a

22  lump sum, or are they going to have a preference one way

23  or the other that I need to weigh?

24                And I see them -- their representative saying,

25  (a), they don't have a strict policy, and, (b), they

1  don't have a -- a -- at least he says here that they

2  don't have a preference.

3      Q.    And in your -- you reviewed Yahoo!'s licenses,

4  correct?

5      A.    Yes.

6      Q.    And did you observe what Yahoo! was doing when

7  it stood in the shoes of Orion in this case, when it was

8  the licensor?  What kind of agreements did they have

9  there?

10      A.    Well, by and large, what I observed was that

11  when Yahoo! is -- is on the side of the table of the

12  patent holder, it asks -- I can't say what it asks for.

13  I can just see the result of the licenses that it's

14  entered into, that those are running royalties.

15      Q.    Okay.

16            MR. HUESTON:  Let's go to 69.

17      Q.    (By Mr. Hueston) So how do you come out here

18  in terms of whether lump sum or running royalty would be

19  fair in this case?

20      A.    I come out on the side of a running royalty.

21      Q.    And very briefly, other than the factors we've

22  just discussed, what impacted your decision?

23      A.    Well, again, the size of these payments are

24  not so small that the administrative costs would start

25  to eat it up.  The -- this -- we're almost at the same

point in time, so the same uncertainties about how fast

this market is growing would be at play.

And weighing all that together, plus the fact

that Yahoo!, when it owns a patent and is licensing it,

gets running royalties, I come out on the side of a

running royalty.

Q.   Okay.  And Slide 70 you explained earlier how

the royalty base is important to your calculation.

Was it for you here as well?

A.   Yes.

Q.   And here's that same list.  You know, Ms and

Bs, so the 406 M, is that $404 (sic) million starting

from April of '04 to the end of '04?

A.   406 million and then 727 million, and you can

see that it grows.  Ultimately, that 2010 number is back

down to 253 million because that's just a --

Q.   Part year?

A.   -- part year.  It's, I think, through March.

And then in total, it's 5.5 billion.

Q.   Okay.  And if I ask you to do the same thing

here that you did the last time and pull out your

calculator, let's just show the jury how this would work

if you take Orion with Yahoo! with a running royalty

agreement and you had a .25- or .5-percent royalty on a

roughly per-month basis what that royalty is.

1    A.    Right.  I did this earlier.  I think it

2  actually works out that back there in 2004, the 406

3  million a month for 9 months is about the same, 112,000

4  to 225,000-dollar-a-month royalty.

5         So at the time, the monthly royalty that they

6  would pay is similar to the other circumstance.  But

7  given that their business didn't grow to $25 billion,

8  they don't pay as much.

9    Q.    It would have changed over time.

10   A.    Yes.

11   Q.    Again, that's the hitching your wagon part of

12 that with the running royalty, right?

13   A.    Yes.

14   Q.    All right.  So let's now jump to the

15 Georgia-Pacific Factors.  You've explained all those 15.

16        Let me just ask you.

17        With respect to Yahoo!, let's go to Slide 74.

18        What were the most important factors for you

19 for this analysis?

20   A.    First, the popularity and profitability of the

21 Sponsored Search product.  That's the product that's

22 accused of infringing.

23   Q.    That's the Yahoo! product.  AdWords is the

24 Google.  We're not talking about that.  It's Sponsored

25 Search here?

1      A.    Right.

2      Q.    Okay.

3      A.    Totally in Yahoo!  It's Sponsored Search.

4  Again, the benefits of the invention, the extent of use.

5  I looked independently at Yahoo!  Is this something

6  they're using occasionally or very frequently or in all

7  their searches and serving of ads, again, the

8  contribution of the non-patented -- patented elements

9  and comparable licenses.

10     Q.    Okay.  And you've already talked about the

11 benefits of the invention, so we're covered with No. 2.

12           While we're on here, for No. 1, the

13 popularity/profitability of the Sponsored Search

14 product, can you describe generally what you considered

15 there?

16     A.    Well, the popularity we've looked at those

17 same -- that was the sort of market research about where

18 paid search ad spending was in 2004 and what that growth

19 curve looked like.  That was that bar chart.

20           So on the popularity side, it's the same

21 independent research that I did that we talked about

22 earlier.

23           Excuse me.

24     Q.    Let's go to --

25     A.    On the profitability side, I looked

1  specifically at Yahoo!

2      Q.   At Yahoo!.  And that's what I was -- I was

3  going to ask you to turn to.

4                MR. HUESTON:  Let's go to Slide 79.

5      Q.   (By Mr. Hueston) This is, again, a U.S.

6  operating margin.  And what does the claim speak of

7  that?

8      A.   That's basically their profits, their bottom

9  line after their expenses, but before you get into taxes

10  and things like that.  So this is on their operations.

11  This is specifically related to Sponsored Search, and we

12  see that in 2004 at the time that they were negotiating,

13  their profit margin was 31.3 percent.  And we see over

14  the years that it's -- you know, it's been up or down.

15                In 2008, I honestly don't know what happened

16  to their business in' 08, but certainly back in 2004,

17  their margins on this product were over 30 percent.

18      Q.   Okay.

19                MR. HUESTON:  Let's go to Slide 83.

20      Q.   (By Mr. Hueston) And I'm going to ask you if

21  you also looked at whether ad quality and relevance,

22  some of the benefits you mentioned and you described,

23  applies in this situation, too, here with Yahoo!.

24      A.   Yes.  What I see in Yahoo!'s documents is that

25  they look at this metric of revenue per search.  That's

sort of how they're gauging the success of the business.

How much revenue are we generating every time somebody types in baseball scores or pickup trucks in Marshall, Texas, and hits enter.

Every time there's a search, they have an opportunity to show ads.

And what I see at the top half of this bar are the things that in this PowerPoint presentation from Yahoo!, the drivers, things that they say are driving their revenue per search.  And we see that expanded and better matching and more precise matching are two of the things that they acknowledge are driving their overall revenue per search.

Q.    All right.  And then did you also here consider the extent of use, assuming the infringement of the Rice patent -- of the Rice patent?  In the searches done here at Yahoo!, did you consider that?

A.    Yes.

MR. HUESTON:  Let's go to 85.

A.    So here I found some numbers that told me that Yahoo!, in 2005, is processing over 6.5 billion searches per month.  The ads served in response to those searches are generating over 120 million per month in 2005.

And based on our earlier royalty base slide, we see that it's generating over a billion dollars a

```
 1  year from Sponsored Search.
 2       Q.   (By Mr. Hueston) Okay.  And just so it's
 3  clear, when we're talking accused revenue, we're not
 4  talking about all the money Yahoo! makes; we're just
 5  talking about the Sponsored Search product, which is --
 6       A.   Right Sponsored Search is --
 7       Q.   -- roughly less than a quarter?
 8       A.   It's less than a quarter of all of Yahoo!'s
 9  U.S. rev.
10       Q.   All right.
11            MR. HUESTON:  Let's go to Slide 86.
12       Q.   (By Mr. Hueston) Did you also consider --
13            THE COURT:  Pardon me.
14            MR. ROOKLIDGE:  May we approach, Your
15  Honor?
16            THE COURT:  Yes.
17            (Bench conference.)
18            MR. ROOKLIDGE:  Your Honor, we addressed
19  this slide in chambers, and I thought he had told me --
20  or you had told him that he could say it was a small
21  portion, but he said --
22            MR. HUESTON:  It's the -- I'm sorry.
23            THE COURT:  Go ahead.
24            MR. ROOKLIDGE:  He just added the words
25  less than to this slide.
```

 1              MR. HUESTON:  No.  I -- less than a

 2    quarter.  I thought I said exactly what Your Honor said

 3    I could say.

 4              THE COURT:  Well, I said he could say it

 5    was less than a quarter, a small amount --

 6              MR. ROOKLIDGE:  I thought you said --

 7              THE COURT:  -- you know, less than a

 8    quarter.

 9              MR. HUESTON:  Yeah.  I tried to track the

10    very language.

11              THE COURT:  That's okay.  But I -- I

12    did -- that is exactly what I said.

13              MR. ROOKLIDGE:  Okay.

14              (Bench conference concluded.)

15       Q.   (By Mr. Hueston) And so, Dr. Becker, looking

16    at now the patented and what we call the non-patented

17    elements, did you take into consideration the fact that

18    there are lots of things that don't have anything at all

19    to do with Sponsored Search?

20              Did you put them aside and figure that into

21    the calculations?

22       A.   Yes.  Well, there's certainly lots of things

23    that are not in the technology of Sponsored Search that

24    have a bearing on the success of Sponsored Search.

25    And there are things like the Yahoo! brand and their

search capability that draws people to their pages.

Just that, you know, the success of their overall

product has a bearing on things.

    Q.    Okay.  So let's go -- you have, I think, some

illustrations to show this.

                MR. HUESTON:  87, please.

    Q.    (By Mr. Hueston) Did you break it up into

colored boxes again?

    A.    Again, it's similar to the -- the -- sort of

the conceptual way that I was looking at it with Google,

that you've got, clearly, the ad system itself, whatever

technology is in Sponsored Search to pick those ads.

And that whole sort of business model of the ads -- ad

side of the business is one element.  The -- and the

patent relates to that.

         But you've also got their search capability,

their brand, you know, all the other things that Yahoo!

brings to the table.

    Q.    All right.

                MR. HUESTON:  Moving to the next slide.

    Q.    (By Mr. Hueston) You have some language there.

    A.    Yeah.

    Q.    How does this factor in?

                MR. ROOKLIDGE:  Your Honor, may we

approach?

1          THE COURT:  Yes.

2          If you'll take the slide down.

3          (Bench conference.)

4          MR. ROOKLIDGE:  This is the point where

5   Yahoo! asks --

6          THE COURT:  That's right.  I think

7   that -- that was why I said take the next slide down.

8   I'm going to give them an instruction that says you're

9   going to get into some confidential business information

10  of one of the parties, and I'm going to have to ask

11  everyone sitting in the audience who's not cleared under

12  the terms of the Court's protective order to please exit

13  the courtroom, and I'll send for them as quickly as

14  possible.

15         Any objection to that instruction?

16         MR. HUESTON:  No objection.

17         THE COURT:  From Yahoo!, any of the

18  Defendants?

19         MR. ROOKLIDGE:  The Defendants have no

20  objection.

21         (Bench conference concluded.)

22         THE COURT:  All right.  My next remarks

23  are directed to those of you who are seated in the

24  audience.

25         We're about to get into an area of

1  testimony that involves some confidential business

2  information of one of the parties to the case, and if

3  you're seated in the audience and you're not cleared

4  under the terms of the Court's protective order that the

5  Court previously signed in the case, I need to ask you

6  to exit the courtroom at this time.

7         I promise you, I'll try to keep the

8  closure of the courtroom to a minimum, and I'll send

9  someone out there, as soon as we're done with this

10  portion of the testimony, to invite you back in.

11         Thank you for your courtesies.

12         (Audience out.)

13         THE COURT:  Go ahead and invite them back

14  in.

15         Mr. Warner, if you'll go back and invite

16  the spectators back in.

17         (Audience returned to the courtroom.)

18         THE COURT:  Cross-examination,

19  Mr. Verhoeven.

20         MR. VERHOEVEN:  Thank you, Your Honor.

21                CROSS-EXAMINATION

22  BY MR. VERHOEVEN:

23     Q.   Good afternoon, Dr. Becker.

24     A.   Good afternoon.

25     Q.   Now, you are not providing any technical

1  expert opinion in this case, are you, sir?

2       A.   No.

3       Q.   And you don't have an opinion about whether

4  the '947 patent is actually infringed, correct?

5       A.   Correct.

6       Q.   You also don't have any opinion about whether

7  the '947 patent is valid, correct?

8       A.   Correct.

9       Q.   You're just assuming that for the sake of your

10  damages opinion testimony?

11       A.   Yes, sir.

12       Q.   Okay.  And you're not here as a legal expert,

13  are you?

14       A.   No.

15       Q.   Okay.  Now, your ultimate opinion here is, if

16  I understand it right, to imagine a hypothetical

17  negotiation over a license to the patent, right?

18       A.   That's my approach; it's not my ultimate

19  conclusion.

20       Q.   That's the -- that's the framework that you

21  understand that you need to use, right?

22       A.   Yes.

23       Q.   So you have to imagine back in 2004, that on

24  the one side, there's Orion, and the other side, from my

25  client, there's Google, and they're negotiating a patent

1  license, right?

2      A.   Yes.

3      Q.   Now, isn't it true, sir, that in your entire

4  career, you have never personally negotiated a patent

5  license?

6      A.   That's correct.

7      Q.   So you've never done that yourself.

8      A.   That's correct.

9      Q.   Is it correct that you're not a certified

10  licensing professional, sir?

11      A.   That's correct.

12      Q.   And you don't belong to any professional

13  society -- societies in valuation, do you?

14      A.   No, I don't personally.  There are members of

15  my staff that do, but I don't personally.

16      Q.   And you don't belong to any professional

17  societies related to patent damages, do you?

18      A.   No.  I'm not aware that there are -- which

19  ones might be out there, but I'm certainly not a member

20  of anyone.

21      Q.   You don't hold any professional certifications

22  from any professional society, do you?

23      A.   No.

24      Q.   Now, it's your opinion that the hypothetical

25  negotiation in this case would have taken place with

1 this predecessor company called Orion and my client,

2 Google, in July of 2004?

3 A. Yes.

4 Q. Do you know --

5 MR. VERHOEVEN: I'll withdraw that

6 question.

7 Q. (By Mr. Verhoeven) Is it correct that you

8 don't actually know whether Google was practicing the

9 '947 patent prior to July of 2004, right?

10 A. That's right.

11 Q. Is it your understanding that for calculation

12 of reasonable royalty damages, if there is infringement,

13 it would begin -- you would calculate these damages on

14 the first day that Google began practicing one of the

15 claims of the '947 patent?

16 A. Yes. Well, that I would begin computing

17 damages on the first day that the Plaintiff accuses the

18 Defendant of that infringement.

19 Q. Not the first day of actual infringement?

20 A. Well, you know, in my experience, all we have

21 is the -- the first date of infringement that's been

22 able to be established by the technical experts.

23 Q. What if infringement was occurring 10 percent

24 of the time? Would that be the beginning?

25 Say -- say, hypothetically, that in 2003,

1  Google was practicing the elements of the '947 patent 10

2  percent of the time. Should we move the hypothetical

3  negotiation back to 2003 under the law, as you

4  understand it?

5      A.   Well, I mean, I'm not going to offer a legal

6  opinion. Just in my sort of practical approach in cases

7  where -- you know, if you said -- if there had been an

8  assertion that Google was -- began infringing in 2003,

9  and when I take my assumption that I have to assume that

10 the patent would be found to be valid and infringed, I

11 would move the date back to there and look at the facts

12 and circumstances of how much they were using it at that

13 time.

14     Q.   Who owned Orion in July of 2004?

15     A.   I don't know sort of exactly who owned the

16 company.

17     Q.   Did Mr. Erich Spangenberg -- Spangenberg own

18 it?

19     A.   It's my understanding that he is at least one

20 of the owners, if not the owner, of entities that

21 ultimately owned Orion.

22     Q.   And who owns the Plaintiff in this case,

23 Bright Response?

24     A.   It's my understanding that Mr. Spangenberg is

25 still in the chain of ownership there somewhere.

1    Q.   Okay.  Now, the hypothetical negotiation that

2  you're using as your framework, your understanding is,

3  that would be only for the one patent in this case, the

4  '947 patent, right?

5    A.   Right.

6    Q.   Okay.  And your understanding would be that

7  this would be a hypothetical negotiation for a

8  non-exclusive license, right?

9    A.   Right.

10    Q.   Can you explain to the jury the difference

11  between a non-exclusive license and an exclusive

12  license?

13    A.   Well, in an exclusive license, whoever gets

14  that license, they're the only entity that can practice

15  that invention, and they -- the company that owned the

16  patent and licensed it -- licensed it to them says:

17  We're not going to go give this technology to anybody

18  else.  We're not going to give it to them or license it

19  to anybody else.

20         So it's sole use of it, as opposed to a

21  non-exclusive.  Google would get the rights to use it,

22  but Bright Response or Orion could license it to as many

23  other people as they chose to.

24    Q.   So all else equal, getting an exclusive

25  license is more valuable than getting a non-exclusive

1　license, right?

2　　　　A.　Yes.

3　　　　Q.　And all else equal, purchasing the entire

4　patent is a lot more valuable than just a non-exclusive

5　license to the patent, right?

6　　　　A.　It's -- it's more valuable -- I would agree

7　with you that it's more valuable, and the circumstances

8　would dictate how much more valuable it is.

9　　　　　　　　MR. VERHOEVEN:  Let's go to Exhibit

10　DX404.  Can we put that on the screen, please?

11　　　　Q.　(By Mr. Verhoeven) And I -- we have a binder

12　I'd like to hand out to you, Dr. Becker.  I'll just --

13　　　　　　　　MR. VERHOEVEN:  If I could, Your Honor,

14　pass that up to him?

15　　　　　　　　THE COURT:  Yes.

16　　　　　　　　MR. VERHOEVEN:  Approach, Your Honor?

17　　　　　　　　THE COURT:  Yes.

18　　　　　　　　MR. VERHOEVEN:  May I come around, Your

19　Honor, again?

20　　　　　　　　THE WITNESS:  Thank you.

21　　　　Q.　(By Mr. Verhoeven) Have you seen DX Exhibit

22　404 before?

23　　　　A.　Yes, I believe I have.

24　　　　Q.　What is it?

25　　　　A.　This is the patent purchase agreement where

Orion is buying patents from Firepond that we talked

about -- or that I talked about a little while ago.

    Q.   And what's the date of this agreement?

    A.   28th day of January, 2004.

    Q.   What's the date of the hypothetical

negotiation, sir?

    A.   July 2004.

    Q.   This is pretty close to that date, isn't it,

sir?

    A.   Yes.

    Q.   Okay.  Now, what was the purchase price that

Orion paid to buy the '947 patent in this agreement?

    A.   I testified earlier that it was approximately

a million dollars, but let me see if I can find it.

    Q.   If you go to Exhibit -- Schedule B --

          MR. VERHOEVEN:  Ryan, can we go to

Schedule B, please, and put that on the screen.

    Q.   (By Mr. Verhoeven) All right.  It's up on the

screen, sir, if you want.

    A.   Okay.

          MR. VERHOEVEN:  If we can go to the next

page on Schedule B, that should be a patent purchase

agreement, Ryan.

    A.   Right.  I see that there is a purchase price

of $1 million.

```
 1        Q.    (By Mr. Verhoeven) And if you would just hold
 2   on one second, Dr. Becker, we'll try to get that up on
 3   the screen.
 4        A.    Okay.  I'm sorry.
 5              MR. VERHOEVEN:  I apologize, Your Honor.
 6   There we go.
 7              Now, if we could bring out the second --
 8   second paragraph of this, please, and the title, please.
 9        Q.    (By Mr. Verhoeven) So this is part of the
10   agreement, correct?
11        A.    Yes, it is.
12        Q.    And the title of this says:  Patent purchase
13   agreement, right?
14        A.    Correct.
15        Q.    And this is a -- and this is dated the same
16   date, January 28th, 2004, right?
17        A.    Yes.
18        Q.    And Orion is the one doing the purchasing,
19   correct?
20        A.    Yes.
21        Q.    And Paragraph 2 says:  Purchase Price of the
22   Patents -- or of Patents.  Quote:  The purchase price
23   for the patents shall be $1 million.
24              Do you see that?
25        A.    Yes.
```

1    Q.   So just -- how many months is that?  January

2  to July, five months, roughly?  Just five months before

3  the hypothetical negotiation, Orion bought some patents

4  for a million dollars, right?

5    A.   Yes.

6    Q.   And was one of those patents the patent at

7  issue in this case?

8    A.   It was.

9    Q.   The '947 patent?

10    A.   Yes.

11    Q.   And that wasn't all that Orion bought, was it?

12    A.   The '94 -- no.  They got a lot more than the

13  '947.

14    Q.   They got 13 other patents, right?

15    A.   Yes.

16    Q.   So five months before the hypothetical

17  negotiation between Orion and Google, Orion bought not

18  just the '947 patent, but 13 other patents, for a

19  million dollars, right?

20    A.   Yes.

21          MR. VERHOEVEN:  Let's turn to Schedule A.

22  And this is on Page 2167.

23    Q.   (By Mr. Verhoeven) And have I put up on the

24  screen the schedule?

25    A.   Yes.

1     Q.   Okay.  So what is this, sir?

2     A.   This is the schedule of patents that they

3 purchased under that agreement you had on the screen a

4 minute ago, the 14 patents, plus some patent

5 applications.

6     Q.   And do you see the '947 patent in there?

7     A.   Yes.  It's Item No. 12 on the list.

8     Q.   Okay.  So five months before the hypothetical

9 negotiation, Orion bought this patent that's at issue in

10 this case, together with 13 other patents, for a million

11 dollars, right?

12     A.   Yes.

13     Q.   Does that -- that averages out to a little

14 less than 50,000 per patent and application, right?

15     A.   Yes.

16     Q.   Yes?

17     A.   Yes.

18     Q.   Less than 75,000 on average per patent in this

19 deal?

20     A.   Yes.  I agree with that math.

21     Q.   Now, wouldn't you agree with me, sir, that

22 Firepond, the entity that sold these -- sold the '947

23 patent to Orion, wanted to and attempted to get the most

24 money it could under the circumstances for this patent?

25     A.   I would agree that given the circumstances

that it had, it got a price that it, obviously, thought
was fair for it.

    Q.   It wanted to and attempted to get the most
that it could under the circumstances, didn't it, sir?

    A.   Yes, under the circumstances.

    Q.   Okay.  And would you agree with me, sir, that
at least in January of 2004, a mere five months before
the hypothetical negotiation, the most this patent was
worth to Firepond was a million dollars?

    A.   Yes.

    Q.   And would you agree with me that the parties
to this transaction valued the '947 patent somewhere
between zero and a million dollars?

    A.   I wouldn't agree with the question the way you
phrased it, no.

    Q.   All right.  Well, let's -- you had your
deposition taken in this case, right?

    A.   Yes.

    Q.   And you understand a deposition is a
proceeding where you testify under oath, right?

    A.   Yes.

    Q.   Just like you're here today?

    A.   Yes.

    Q.   I'd like to play what you said in response to
that question on July 26th at your deposition.

1          MR. VERHOEVEN:  This is Pages 379 -- Page

2    379, Lines 12 through 15.

3               Before we play it, we -- okay?

4               (Video playing.)

5               QUESTION:  Would you agree that in that

6    transaction, the '947 patent is being valued at

7    somewhere between zero dollars and a million dollars?

8               ANSWER:  Yes.

9               (End of video clip.)

10        Q.   (By Mr. Verhoeven) Now, Dr. Becker, you would

11   also agree that Firepond on the one hand and

12   Mr. Spangenberg on the other believe the deal they

13   reached for the million dollars was fair, right?

14        A.   Yes.

15        Q.   And isn't it true that in the hypothetical

16   negotiation five months later that we're supposed to

17   imagine, we have to assume that Google would have known

18   that Orion had just bought the '947 patent, together

19   with these other 13 patents, for a million dollars?

20        A.   Yes.

21             MR. VERHOEVEN:  I have just a couple of

22   minutes before I switch subjects, Your Honor.  Can I

23   keep going or --

24             THE COURT:  Oh, yes.

25             MR. VERHOEVEN:  Okay.

1    Q.   (By Mr. Verhoeven) So you agree that Google

2  would have known about this transaction, right?

3    A.   Yes.

4    Q.   But it's your testimony that in this

5  hypothetical negotiation, even though Google knew that

6  Orion had bought this patent, this piece of land, as you

7  say, the '947 patent, for less than a million dollars,

8  that they would have agreed to pay $64 million?

9         Is that your testimony?

10   A.   Yes.

11   Q.   Are you a homeowner?

12   A.   Yes.

13   Q.   When you bought your home, did you look for

14  comps?

15   A.   I did -- well, I think I was asked this

16  question in my deposition.

17        I -- when I bought the current home I have, I

18  didn't look for comps.  Because it was such a good deal,

19  I made them an offer on the spot.  But I have looked at

20  comps in buying homes that I've had in the past.

21   Q.   If you saw a house listed for $64 million, and

22  you looked at the history of transactions of that house,

23  and you saw that five months earlier, it was purchased

24  for a million dollars, would you pay $64 million for

25  that house, sir?

1     A.    I would want to look at the circumstances

2 around the million-dollar supposed comp or that -- this

3 prior sale and understand what was driving the

4 difference.  I might still pay 64 million if I

5 understood the difference.

6     Q.    So it's your testimony to the jury that you

7 might pay $64 million for a house that was purchased

8 five months before for a million dollars?

9     A.    Under certain circumstances, yes.

10    Q.    Okay.

11              MR. VERHOEVEN:  Your Honor, I'm going to

12 switch subjects.  Do you want me to keep going?

13              THE COURT:  Please.

14              MR. VERHOEVEN:  Okay.  May I approach

15 just out of caution?

16              THE COURT:  Yes.

17              (Bench conference.)

18              THE COURT:  Pardon me.  I'm going to go

19 till about 5:30, okay?

20              But -- okay.  What's the issue?

21              MR. VERHOEVEN:  I just wanted to let you

22 know that based on the ruling on the motion in limine, I

23 intend to go into these settlement agreements, and I

24 just want to make sure we're okay with that, the lump

25 sum settlement agreements.

1              THE COURT:  Absolutely.

2              MR. VERHOEVEN:  Okay.

3              THE COURT:  I'm going to give an

4    instruction that they shouldn't consider it on the

5    issues of liability in this case, but they can consider

6    it on the issue of what would constitute a reasonable

7    royalty, bearing in mind that they're entered into to

8    resolve litigation, and other factors may drive that

9    decision other than the value of a reasonable royalty.

10             MR. VERHOEVEN:  Thank you, Your Honor.

11             THE COURT:  All right.  Any objection to

12   that instruction?

13             MR. HUESTON:  No, Your Honor.

14             (Bench conference concluded.)

15             THE COURT:  All right.  Ladies and

16   Gentlemen, we're going to break about 5:30 today, but

17   we're getting ready to get into some testimony about

18   license agreements that were entered into to resolve

19   litigation.

20             I'm going to allow you to hear this

21   testimony.  It's not admissible -- or not relevant,

22   rather, to the question of liability in this case, but

23   I'm going to allow you to hear this evidence on the

24   question of what would constitute a reasonable royalty

25   for licensing the patent-in-suit.

1            But they are license agreements that were

2 entered into to settle litigation, and you should

3 consider the fact that other things may drive decisions

4 to resolve litigation other than the actual value of an

5 arm's-length transaction over a reasonable royalty,

6 okay?

7            Continue.

8            MR. VERHOEVEN:  Thank you, Your Honor.

9    Q.  (By Mr. Fenster) Dr. Becker, you know that

10 Bright Response or some of its predecessor companies has

11 licensed this very patent in this case, the '947 patent,

12 a number of times, right?

13    A.  Yes.

14    Q.  Now, when you were talking about your analogy

15 equating a patent to a piece of property -- you remember

16 that generally?

17    A.  I remember my testimony.  I think I equated it

18 to a -- excuse me -- an oil and gas lease, not the piece

19 of property itself.

20    Q.  Part of a piece of property?

21    A.  Of rights to do something with a piece of

22 property.

23    Q.  And that piece of property has boundaries,

24 right?

25    A.  Yes.

1      Q.   It doesn't shift to another parcel, right?

2  It's the same parcel, right?

3      A.   Yes.

4      Q.   So you might have one gas company come up and

5  want to get a license, and another gas company might

6  come up and want to get a license.  It's the same piece

7  of land each time, right?

8      A.   Yes.

9      Q.   All right.  And the '947 patent is the same

10 patent --

11     A.   Yes.

12     Q.   -- right?

13          Okay.  So let's take a look at some of these

14 licenses that Bright Response and its related entities

15 has entered into for this piece of property, the '947

16 patent.

17     A.   Okay.

18               MR. VERHOEVEN:  Let's start with Exhibit

19 DX152.

20     Q.   (By Mr. Verhoeven) And you've seen DX152

21 before, right?

22     A.   Yes.

23     Q.   Can you tell the jury what it is.

24     A.   This is a settlement agreement between

25 Firepond and a company called Banter.  And I'm not sure

what the date is on it, but it's a settlement of a

patent infringement litigation that Firepond had against

Banter.

Q.   Direct your attention to the last page.  This

is the control number 1306.

A.   I see it.

Q.   Are you there?

A.   Yes, I'm there.

Q.   And if you look at the top --

MR. VERHOEVEN:  Ryan, if we could just

bring out the fax line at the top.  I think it's a fax

line.

Q.   (By Mr. Verhoeven) Does that look like a fax

line to you, sir?

A.   Right.  Yeah.  That's got a date of October

9th of 2003.

Q.   Okay.  And does this last page look like it's

a fax?

A.   Yes.

Q.   Do you remember the old days with faxes?

A.   Back in the good old days, yes.

Q.   Okay.

A.   And they put -- you know, whenever you faxed

it, it would put a big black line like this on it if

your fax machine wasn't clean.

1     Q.   Does that lead you to believe that this was

2   perhaps executed on that date?

3     A.   Certainly that would give some indication of

4   that, but -- you know, on that date or before then.

5     Q.   Right.  So October 2003.  The hypothetical

6   negotiation is July 2004, right?

7     A.   Right.

8     Q.   So it's pretty close.

9     A.   Pretty close.

10     Q.   Not as close as the Orion purchase agreement,

11   right?

12     A.   Right.

13     Q.   But pretty close.

14          And who are the parties to this agreement?

15     A.   Firepond on the one hand and Banter on the

16   other hand.

17     Q.   And this agreement licenses three patents,

18   doesn't it?

19     A.   (No response.)

20     Q.   If you look at the definition section, sir.

21   We'll bring that out for you.

22     A.   Licensed patents.  Yes, I see three patents.

23     Q.   Do you see them?

24               MR. VERHOEVEN:  And, Ryan, could you just

25   highlight those for us.

1    Q.   (By Mr. Verhoeven) All right.  Do you

2  recognize any of those?

3    A.   Yes.  The last one on the list is the '947

4  patent.  That's the Rice patent at issue in this case.

5    Q.   And that's the -- yes.  That's what I was

6  going to ask you.

7         So that's the patent at issue in this case,

8  right?

9    A.   Yes, sir.

10         MR. VERHOEVEN:  Can we bring up, Ryan,

11  Page 1306?

12         Oh, I've already done that.  I apologize.

13         Let's go to Page 1303.

14         And can we highlight the Paragraph 3 and

15  3.1?  Bring that up.

16    Q.   (By Mr. Verhoeven) And that says:

17  Compensation --

18    A.   Yes.

19    Q.   -- correct?

20         And 3.1 says, quote:  In consideration of the

21  license set forth in Section 2 above, Banter shall pay

22  $150,000 to Firepond.

23    A.   Yes.

24    Q.   You see that?

25         This is a lump-sum license to the '947 patent

1  and two other patents, right?

2      A.   Yes.

3      Q.   And the payment for this in or about -- or

4  before October of 2003 was $150,000?

5      A.   Yes.

6      Q.   That's a lot less than 64 million, right?

7      A.   It's -- yes, absolutely.

8      Q.   And for this $150,000, Banter didn't just get

9  the '947 patent, did it?

10     A.   No.

11     Q.   Got two other patents, right?

12     A.   Yes.

13     Q.   So that works about to $50,000 for the '947

14 patent, if we assume they're worth the -- all three are

15 worth the same, right?

16     A.   Yes.  Mathematically, if you make that

17 assumption, I would agree with that.

18     Q.   That also means that Firepond valued this

19 license to the '947 and the other two patents, at most,

20 at $150,000, doesn't it, sir?

21     A.   In a sense, it does.  It means they valued

22 settling this litigation at that, including licensing it

23 as part of the settlement of the litigation.

24     Q.   Now, you testified that even though Google

25 prefers lump sums and even though Orion prefers lump

1  sums, that you're not going to do a lump sum in your

2  opinion, right?

3       A.   That's right.

4       Q.   But this is a lump sum, isn't it?

5       A.   This is a lump-sum settlement of this

6  litigation.

7       Q.   And it's a non-exclusive license.

8       A.   Yes.

9       Q.   Just like the type of license we're supposed

10  to do in a hypothetical negotiation, right?

11      A.   Yes, it is.

12      Q.   All right.

13              MR. VERHOEVEN:  Going to the next one,

14  Your Honor.  Should I keep going?

15              THE COURT:  Please.

16              MR. VERHOEVEN:  Let's go to Exhibit

17  DX119.

18      Q.   (By Mr. Verhoeven) You've seen this patent

19  license agreement before as well, Dr. Becker?

20      A.   Yes.

21      Q.   And the title on its face says Patent License

22  Agreement, right?

23      A.   Yes.

24      Q.   And do you see the parties there in the first

25  paragraph are Orion and Keystone Automotive Operations?

1    A.   Yes.

2    Q.   And that it's dated June 30th, 2005.

3    A.   Yes.

4    Q.   Okay.  So this one is about 11 months after

5 the hypothetical negotiation?

6    A.   Yes, it is.

7    Q.   Okay.  And one of the parties to the agreement

8 is Orion, right?

9    A.   Yes, it is.

10   Q.   And that's the entity that's doing the

11 hypothetical negotiation, right?

12   A.   Yes.

13   Q.   Okay.

14        MR. VERHOEVEN:  Let's turn to Page 4,

15 Paragraph 3.1.

16   Q.   (By Mr. Verhoeven) And take a second and look

17 at that and let me know when you're ready to talk about

18 it.

19   A.   (Complies.)  All right.  I'm ready.

20   Q.   So this is a grant of a non-exclusive license,

21 right?

22   A.   Yes.

23   Q.   And it's a lump-sum license, isn't it?

24   A.   I believe it is lump sum.

25        MR. VERHOEVEN:  And let's go to

1  Exhibit A, if we could.  This is a -- Page 17093,

2  please.

3       Q.    (By Mr. Verhoeven) And we can put that up on

4  your screen, if you like.  You can look at it in your

5  binder as well.

6       A.    I see it.

7       Q.    Can you explain to the jury what Exhibit A is.

8       A.    Exhibit A is a list of Orion patents.  It's

9  actually the same list that we looked at a minute ago.

10 And I believe that this list, Exhibit A, is referenced

11 earlier in the agreement as the patents that Keystone is

12 obtaining a license to.

13      Q.    So there's 14 patents, and there's also 7

14 patent applications?

15      A.    Yes.

16      Q.    Do you recognize any of the patents?

17      A.    Yes.  No. 12 on the list is the '947 patent.

18      Q.    The patent at issue in this case, right?

19      A.    Yes; that's correct.

20      Q.    So this license between Orion and Keystone

21 Automotive includes the patent at issue in this case,

22 and if you take patents and applications, 20 other

23 patents and applications, right?

24      A.    Yes.

25      Q.    Let's look at what Keystone paid for this

1    license.  Can you turn to Page 5.  That's control

2    No. 085.

3         A.    I'm there.

4         Q.    And we put that up on the screen.  You see it

5    says Consideration?

6         A.    Yes.

7         Q.    And this is Section 4.1.

8               Quote:  In consideration of the license,

9    release, and covenants granted by Orion and the

10   Orion-related companies, Keystone agrees to pay to Orion

11   a total of $500,000.

12              Do you see that?

13        A.    Yes.

14        Q.    That's a lot less than 64 million, isn't it?

15        A.    Yes, it is.

16        Q.    That's a one-time lump-sum payment?

17        A.    Yes.

18        Q.    That averages out to less than $36,000 per

19   patent?

20        A.    Yes, if one simply divides the amount by the

21   number of patents.

22        Q.    So here we have a situation -- if I could just

23   summarize before the end of the day -- where you've got

24   a hypothetical negotiation of July 2004, right?

25        A.    Yes.

1    Q.   And five months before that, Orion purchased

2 these 14 patents for a million dollars, right?

3    A.   Yes.

4    Q.   You say that in July 2004, Google would have

5 paid 64 million for just one of those patents, right?

6    A.   Well, Google --

7    Q.   Yes?

8    A.   -- would have agreed to a running royalty of a

9 quarter to a half percent.

10    Q.   If you would net present value, that's $64

11 million, right?

12    A.   With the benefit of hindsight, I would agree

13 with you.

14    Q.   Okay.  And then flash-forward to this

15 agreement 11 months after -- or -- yeah -- 11 months

16 after the hypothetical negotiation, the company that

17 bought the patents for a million dollars are licensing

18 the same 14 patents for $500,000.

19    A.   Yes.

20    Q.   So they bought it five months before the

21 hypothetical negotiation for a million, and they gave a

22 non-exclusive license 11 months after the hypothetical

23 negotiation for $500,000, right?

24    A.   Yes.

25    Q.   But you say Google would still have paid 64

1  million?

2      A.   Well, I still say Google would have agreed to

3  a running royalty of a quarter to a half percent.

4      Q.   Which comes up to $64 million.

5               THE COURT:  All right.  We'll pick that

6  up tomorrow.

7               MR. VERHOEVEN:  Okay.

8               THE COURT:  I think the jury's got the

9  issue.

10              Ladies and Gentlemen, be back ready to

11  start at 8:30 in the morning.  Thank you again for your

12  patience.  I know these are long days and that you're

13  working hard, and the parties and the Court appreciate

14  that.

15              See you tomorrow.  Remember my prior

16  instructions.  Don't talk about the case.

17              LAW CLERK:  All rise.

18              (Jury out.)

19              THE COURT:  That's why they didn't

20  install backdoors in courthouses.  Y'all have a seat.

21              To be able to escape today.

22              What do we need to take up before

23  tomorrow?

24              From the Plaintiff?

25              MR. FENSTER:  Your Honor, Marc Fenster.

1    I believe that tomorrow we should get to Dr. Fox, and we

2    have some Daubert motions that are still under...

3                    MS. CANDIDO:  Your Honor, for Defendants,

4    we have our motion for reconsideration on the motion in

5    limine regarding non-infringing substitutes.

6                    THE COURT:  Okay.  For limine purposes,

7    I'm reconsidering the motion in limine with respect to

8    argument by either Defendant that the systems that were

9    in place before the date of the hypothetical negotiation

10   may be referred to as -- argued to be non-infringing

11   substitutes before the date of first alleged

12   infringement in this case.

13                   But beyond that, if you think you're

14   going to go into any technical details of design-arounds

15   or anything else, that's -- you need to approach the

16   bench and secure a ruling, because I'm not convinced

17   that was fairly disclosed, okay?

18                   Anything further?

19                   MR. VERHOEVEN:  Thank you, Your Honor.

20                   THE COURT:  But you don't need to

21   approach before you argue that the systems that were in

22   place before the date of the first alleged infringement

23   are not -- in light of the testimony that's already come

24   out in the case, about when they -- the experts first

25   discerned that infringement was occurring, okay?

1          MR. VERHOEVEN:  Thank you, Your Honor.

2          THE COURT:  Anything else?

3          MR. ROOKLIDGE:  Nothing, Your Honor.

4          THE COURT:  From the Plaintiffs?

5          MR. FENSTER:  No, Your Honor.

6          THE COURT:  Ms. Lockhart will give you an

7  additional time update, and we're going to -- off the

8  record.

9          (Discussion off the record.)

10          (Court adjourned.)

11          *      *      *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>CERTIFICATION</u>

2

3         I HEREBY CERTIFY that the foregoing is a

4  true and correct transcript from the stenographic notes

5  of the proceedings in the above-entitled matter to the

6  best of my ability.

7

8

9

10  /s/_____          _____
    SUSAN SIMMONS, CSR                Date
11  Official Court Reporter
    State of Texas No.:  267
12  Expiration Date:  12/31/10

13

14

15  /s/_____          _____
    JUDITH WERLINGER, CSR             Date
16  Deputy Official Court Reporter
    State of Texas No.:  731
17  Expiration Date:  12/31/10

18

19

20

21

22

23

24

25