1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3  BRIGHT RESPONSE, LLC        *    Civil Docket No.
                             *    2:07-CV-371
4  VS.                         *    Marshall, Texas
                             *
5                             *    August 5, 2010
  GOOGLE, INC., ET AL         *    8:30 A.M.
6
                 TRANSCRIPT OF JURY TRIAL
7       BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
              UNITED STATES MAGISTRATE JUDGE
8

9  APPEARANCES:

10 FOR THE PLAINTIFF:     MR. ANDREW SPANGLER
                        Spangler Law
11                       208 North Green Street
                        Suite 300
12                       Longview, TX   75601

13                       MR. MARC A. FENSTER
                        MR. ANDREW WEISS
14                       MR. ADAM HOFFMAN
                        MR. ALEX GIZA
15                       Russ, August & Kabat
                        12424 Wilshire Boulevard
16                       12th Floor
                        Los Angeles, CA   90025
17
                        MR. DAVID M. PRIDHAM
18                       Law Office of David Pridham
                        25 Linden Road
19                       Barrington, RI  02806

20 APPEARANCES CONTINUED ON NEXT PAGE:

21
  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
22                       MS. JUDITH WERLINGER, CSR
                        Official Court Reporter
23                       100 East Houston, Suite 125
                        Marshall, TX   75670
24                       903/935-3868

25 (Proceedings recorded by mechanical stenography,
  transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:     MS. ELIZABETH A. WILEY
                       The Wiley Firm
                       P.O.  Box 303280
                       Austin, TX    78703

                       MR. PATRICK R. ANDERSON
                       Patrick R. Anderson, PLLC
                       4225 Miller Road
                       Building B-9, Suite 358
                       Flint, MI    48507

                       MR. JOHN C. HUESTON
                       MR. ADAM S. GOLDBERG
                       Irell & Manella, LLP
                       840 Newport Center Drive
                       Suite 400
                       Newport Beach, CA    92660

FOR THE DEFENDANT:     MR. CHARLES K. VERHOEVEN
(Google)               MR. DAVID A. PERLSON
                       MS. AMY H. CANDIDO
                       Quinn Emanuel Urquhart & Sullivan
                       50 California Street
                       22nd Floor
                       San Francisco, CA    94111

                       MS. JENNIFER PARKER AINSWORTH
                       Wilson Robertson & Cornelius
                       P.O.  Box 7339
                       Tyler, TX    75711

FOR THE DEFENDANT:     MS. JENNIFER HALTOM DOAN
(Yahoo!)               Haltom & Doan
                       6500 Summerhill Road
                       Suite 100
                       Texarkana, TX    75503

APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:      MR. WILLIAM ROOKLIDGE
(Yahoo!)                Howrey, LLP
                        4 Park Plaza, Suite 1700
                        Irvine, CA   92614

                        MR. JASON WHITE
                        Howrey, LLP
                        321 North Clark Street
                        Suite 3400
                        Chicago, IL   60610

              *      *      *      *      *      *


                     P R O C E E D I N G S

              (Jury out.)

              THE COURT:  Be seated.

              All right.  What's the issue -- issues?

              MR. HUESTON:  Your Honor, I have been
informed by Yahoo! counsel that in cross-examination he
intends to get into the following:  That now having
received the benefit --

              MR. ROOKLIDGE:  Your Honor, if I might --
I'm sorry I have to interrupt -- but could we discuss
this outside the presence of the witness?

              THE COURT:  Well, for what purposes,
Mr. Rooklidge?

              MR. ROOKLIDGE:  This is about the
permissible scope of cross-examination of this witness.

In view of this Court's order, I don't want to get

anywhere close to a problem with this Court's order.

THE COURT:  Well, you know, I've been in

chambers since 10 till 8:00 this morning.  We could have

discussed it outside the presence then, but I'll allow

you to do it.

The time for this hearing is being

charged equally against both sides.

(Bench conference.)

MR. ROOKLIDGE:  Your Honor, I wanted to

make sure --

THE COURT:  Well, Mr. Rooklidge, he was

addressing me.  Wait until he's through.

MR. ROOKLIDGE:  Okay.

MR. HUESTON:  I've been informed that

Mr. Rooklidge would like to cross-examine the expert

witness.

Having received the benefits and watching

me abide by the Court's ruling and not questioning him

at all about any potential applicability of the Stanford

license to his Yahoo! calculation, he would now, after

the depositions went on where he, you know, talked about

the Google license, would now like to cross-examine him

and say:  Isn't it true that you used that

Google-Stanford license as a data point in your

1 calculation of the Yahoo! range?

2 And I think that's just inherently unfair

3 to have us redact it out of the direct and create a

4 direct where he's talked about how he fairly came to his

5 range and --

6 THE COURT: I understand the dispute.

7 How is this relevant?

8 MR. ROOKLIDGE: Your Honor, he admitted

9 in his deposition this was the basis for the royalty

10 range he's asserting today.

11 THE COURT: Well, I'm going to let you

12 do -- if you're going to go into that in

13 cross-examination and you're telling me that, then I'm

14 going to allow him -- well, no, I'm not. I'm not going

15 to let you go into that, Mr. Rooklidge.

16 MR. ROOKLIDGE: I'll stay away from it.

17 THE COURT: You know, y'all did receive

18 the benefit of that, and it's not been the basis for any

19 opinions given to the jury, you know, in the course of

20 this case. And I've instructed the jury they're not to

21 consider that.

22 I'm not going to let you go into that.

23 MR. ROOKLIDGE: Thank you, Your Honor.

24 MR. SPANGLER: Your Honor, while we're up

25 here, the -- on Monday, the Defendants identified a file

1  and went through a request to have an adverse inference

2  instruction on discovery.

3          Since that time, we have asked repeatedly

4  if they are, in fact, going to urge it so that we can

5  give a counter, if necessary.  And to date, they

6  haven't.  We just asked for an order to let us know if

7  they're going to submit one.

8          THE COURT:  Well, it's the Court's

9  charge.  If I decide to give an adverse inference

10 instruction about any discovery, it's going to be one

11 that takes into account the discovery violations, the

12 technical problems I've found existed throughout this

13 case, okay?

14          MR. SPANGLER:  Yes, Your Honor.

15          THE COURT:  And, you know, I just tell

16 you, the types of instructions -- I don't know which way

17 they cut, but any one that I would give adverse to

18 you-all would take into account the violations that I

19 previously had found occurred in this case as well as

20 with respect to at least one of the other Defendants,

21 that being the Yahoo! Defendants.

22          And I'm -- I'm still in the process of

23 considering the charge issues.  You're going to get a

24 draft of the charge before you leave tonight, but you

25 don't need to -- I mean, I know what the issue is.

1          MR. SPANGLER:  We're not going to seek

2    that, Your Honor, just to be clear on the record.

3          THE COURT:  Yes, sir, Mr. Pridham?

4          MR. PRIDHAM:  Your Honor, one issue has

5    come up that we need to address for this morning's

6    testimony.

7          The parties entered into a stipulation

8    related to the reexamination of the patent-in-suit.

9    There are two Plaintiff's exhibits that have not been

10   entered yet, Plaintiff Exhibit 3, Plaintiff Exhibit

11   1043.

12          I'm told that Google does not object to

13   the entry of these exhibits, and Yahoo! has not given us

14   a response.

15          MS. DOAN:  Well, we had looked at it,

16   Your Honor, like 30 seconds before we walked in, so I

17   don't have a problem with it as long as we can cross him

18   on the other documents with it as well and he doesn't --

19   if he's going to know about these, I'm assuming he's

20   going to know about all the reexam.

21          THE COURT:  I don't know where he's going

22   to go with it.

23          MR. PRIDHAM:  Again, as long as there are

24   communications with the Patent Office, we've already

25   told --

1                    MS. DOAN:  I don't have any --

2                    MR. PRIDHAM:  -- we don't have a problem

3    with it.

4                    MS. DOAN:  I don't know that he has

5    personal knowledge of any of these.  In his deposition,

6    he testified that his lawyers were handling those, and

7    he would look at it only for typos, and he would -- he

8    couldn't answer any questions about the reexam, other

9    than he knew it went through his lawyer.

10                    And I thought there was a motion in

11   limine that the 30(b6) depo -- from him to testify in

12   connection with the testimony they had already given.

13                    MR. PRIDHAM:  I'm sorry.  In his

14   deposition, Your Honor, Mr. Sheafe testified that he

15   manages that process, that he receives that process.

16   I'll get you the testimony.

17                    MS. DOAN:  I have it.

18                    MR. PRIDHAM:  But he said that he,

19   day-to-day, manages the reexamination, including looking

20   at all these documents and approving all these

21   documents.

22                    THE COURT:  As I recall, the debate about

23   the 30(b6) issues dealt with the issue of license

24   agreements.  So I'm going -- I'm assuming at this time

25   that there's no problem introducing those documents,

okay?

MR. PRIDHAM:  Thank you.

MS. DOAN:  Thank you, Your Honor.

(Bench conference concluded.)

THE COURT:  All right.  One other thing it appears that we've overstated the time the Plaintiff had used yesterday by four minutes.  The Plaintiff has used a total of 9 hours.

Defendants' time we found is accurate, and you have used a total of 4 hours and 3 minutes.

Y'all have each used an additional three minutes by virtue of this hearing.

Bring in the jury.

LAW CLERK:  All rise.

(Jury in.)

THE COURT:  Please be seated.

Mr. Verhoeven, you may continue your cross-examination.

MR. VERHOEVEN:  Thank you, Your Honor.

STEPHEN L. BECKER, Ph.D., PLAINTIFF'S WITNESS,

PREVIOUSLY SWORN

CROSS-EXAMINATION (CONTINUED)

BY MR. VERHOEVEN:

Q.   Good morning, Dr. Becker.

A.   Good morning.

1      Q.    I think we left off yesterday with the

2  Keystone Automotive license agreement?

3      A.    Yes.

4      Q.    Remember that?  And that was the license that

5  was approximately 11 months after the hypothetical

6  negotiation, and it was for a lump sum of $500,000?

7      A.    Yes.

8      Q.    You remember that?

9            Now, I'd like to move on to Defendants'

10 Exhibit 134, please.

11            MR. VERHOEVEN:  And if we could put up

12 the first paragraph of this.

13      Q.    (By Mr. Verhoeven) You have seen the

14 document -- this is also in your binder, Dr. Becker, so

15 you are free to turn to it, if you would like to.

16      A.    Yes, I have it.

17      Q.    You've seen this agreement before as well,

18 haven't you?

19      A.    Yes.

20      Q.    And this is an agreement between Kana Software

21 Company and a company called Polaris; is that right?

22      A.    Yes.

23      Q.    And that's a company that's owned by

24 Mr. Spangenberg as well, correct?

25      A.    I can't tell you who owns Polaris.

1    Q.   Okay.  I direct your attention to the Exhibit

2  A to this agreement.  The control number is 1324, sir.

3              MR. VERHOEVEN:  And, Ryan, if we could

4  put that up, please, and highlight the list of patents

5  in this agreement.

6    A.   Yes, I see them.

7    Q.   (By Mr. Verhoeven) There's three of them?

8    A.   Yes.

9    Q.   And one of those is the '947 patent, right?

10   A.   Yes, the one in the middle.

11   Q.   And that's the patent in this case?

12   A.   Yes.

13   Q.   And this is a patent license and settlement

14  agreement, right?

15   A.   Yes.

16   Q.   I direct your attention to the page bearing

17  Control No. 1315, sir.

18            And if we could look at the paragraph under

19  Consideration.

20   A.   Yes.

21   Q.   And you see there it says, quote:

22  Consideration of the license, release, and covenants

23  granted by Polaris and the dismissal of the Pol -- and

24  the dismissal by Polaris of the litigation hereunder,

25  Kana agrees to pay Polaris a total of 1 million U.S.

1  dollars.

2       A.   Yes.

3       Q.   Do you see that?

4       A.   Yes.

5       Q.   That's a lump-sum agreement?

6       A.   That's a lump-sum settlement agreement, yes.

7       Q.   That's a million dollars in total; is that

8  right?

9       A.   Yes.

10      Q.   And that's for a license to the '947 patent?

11      A.   It includes the license, yes.

12      Q.   That's the very patent at issue in this case?

13      A.   Yes.

14      Q.   And if each of those three patents are valued

15 equally, what would that come out to per patent?

16      A.   $333,000, roughly, per patent.

17      Q.   Okay.  I direct your attention to Defendants'

18 Exhibit 142 in your binder, please.

19      A.   I'm there.

20           MR. VERHOEVEN:  And, Ryan, would you

21 bring up the first paragraph.

22           Thank you.

23      Q.   (By Mr. Verhoeven) Now, you've seen this

24 agreement before as well as part of your investigation,

25 correct, sir?

1    A.    Yes.

2    Q.    And this is an agreement between a company

3 called Plutus IP Holdings and Black & Decker Company.

4          Do you see that?

5    A.    Yes.

6    Q.    And Plutus IP Holdings, is that another

7 company that's owned by Mr. Spangenberg?

8    A.    It's a company that I understand to be related

9 to Orion in some way, but I can't tell you who owns it.

10    Q.    So it's your understanding it's related to

11 Orion; is that right?

12    A.    Yes.

13    Q.    And Orion is the entity that the jury, in your

14 opinion, should be thinking of in terms of the

15 hypothetical negotiation, right?

16    A.    Yes.

17    Q.    I direct your attention to Exhibit C.  This

18 has Control No. 2502.

19              MR. VERHOEVEN:  Ryan, put that up,

20 please, and highlight the text.

21              Thank you.

22    Q.    (By Mr. Verhoeven) Do you see Exhibit C, sir?

23    A.    Yes.

24    Q.    Do you see there's a list of 13 patents?

25    A.    I'm going to take your representation that

1 there are 13. I see the list.

2     Q. Okay. Do you recognize any of those patents?

3     A. Yes. I recognize the '947, about two-thirds

4 of the way down at the top.

5           THE COURT: Counsel, approach briefly.

6           (Bench conference.)

7           THE COURT: Two things. How many of

8 these do you intend to go through?

9           MR. VERHOEVEN: I have to get my thing

10 and tell you, but it's right there on the list -- no,

11 it's not.

12           Can I just get it for you? It's like

13 another four or five, I think.

14           THE COURT: It's going to be about seven

15 or eight total. Let's try to restrict it to about five,

16 okay?

17           It's going to be cumulative by the time

18 you get through, and also don't ask about who Plutus is

19 or suggest it, okay?

20           MR. VERHOEVEN: Yes, Your Honor.

21           THE COURT: Mr. Verhoeven, counsel, you

22 may ask him who owns Plutus and what it is, but don't

23 suggest what Plutus represents. You understand?

24           MR. VERHOEVEN: I won't even go into it,

25 Your Honor.

```
 1                    THE COURT:  You can ask who owns it, what
 2   his understanding is.
 3                    MR. VERHOEVEN:  I don't need to.  I'll
 4   just go to who has the '947 in it.  That's all I need to
 5   do.
 6                    I'm sorry, Your Honor.  Just one more.
 7                    THE COURT:  All right.
 8                    MR. VERHOEVEN:  I was going to do three
 9   more.  Is that too many?
10                    THE COURT:  No, that's fine.
11                    I understand what you're doing, and you
12   can ask him to sum up at the end.  I'm suggesting that
13   the balance of them would have, you know, similar
14   numbers in them, but I'm just not going to --
15                    MR. VERHOEVEN:  I understand, Your Honor.
16                    THE COURT:  I don't want to slog through
17   the whole body of them, okay?
18                    (Bench conference concluded.)
19        Q.   (By Mr. Verhoeven) Okay.  Dr. Becker, we're on
20   Exhibit C.
21             Are you with me there?
22        A.   Yes.
23        Q.   And one of the patent license is the '947,
24   correct?
25        A.   Yes.
```

1    Q.   And if you go to Page 4 of this agreement,

2   which has Control No. 2490, sir.

3              MR. VERHOEVEN:  If you'll bring up 5.1,

4   Ryan.

5              Thank you.

6    Q.   (By Mr. Verhoeven) You'll see this section

7   talks how much was paid for the license for all of those

8   patents?

9    A.   Yes.

10   Q.   And the total comes out to $650,000; is that

11  right, sir?

12   A.   Yes.

13   Q.   This is a lump-sum payment?

14   A.   Well, it's a fixed amount.  It's -- typically,

15  a lump sum is paid in one -- one payment.  This is

16  spread out over eight payments, but it's a fixed amount

17  of money.

18   Q.   Fixed amount of money?

19   A.   Yes.

20   Q.   Let's go to Defendants' Exhibit 141, please.

21             MR. VERHOEVEN:  Ryan, if we could bring

22  up the first page.

23   Q.   (By Mr. Verhoeven) Are you with me,

24  Dr. Becker?

25   A.   I am.

1    Q.   Okay.  You've seen this agreement before as

2  well, right?

3    A.   I have.

4    Q.   And this is also a patent license and

5  settlement agreement, correct?

6    A.   Right.

7    Q.    Between Plutus IP and a company called

8  Whirlpool Corporation and Maytag Corporation?

9    A.   Yes.

10    Q.   And I direct your attention to Exhibit C of

11  this agreement, sir, which is on Page 2393.

12    A.   I'm there.

13    Q.   And do you see there's a list of 19 patents on

14  this page?

15    A.   I do.

16         MR. VERHOEVEN:  It's kind of hard to see,

17  Ryan.  Could we bring up just the left page?  Okay.

18    Q.   (By Mr. Verhoeven) And do you see Item 12

19  there, sir?

20    A.   I do.

21    Q.   And can you tell the jury what patent's listed

22  there?

23    A.   That's the '947 patent.

24    Q.   Okay.  And I direct your attention back to

25  Page 5 of this agreement, sir, Page 2380.

1     A.   I'm there.

2     Q.   And this is what was paid for this license for

3 all those patents, including the '947, right, sir?

4     A.   Yes.

5     Q.   And the total is 1.5 million?

6     A.   Yes.

7     Q.   That's a lump sum?

8     A.   Yes.

9     Q.   Comes out to less than a hundred thousand per

10 patent?

11     A.   If one simply does the math, yes.

12     Q.   I direct your attention, sir, to Defendants'

13 Exhibit 192.

14     Let me know when you get there, sir.

15     A.   I'm there.

16     Q.   You've seen this license agreement as well,

17 haven't you?

18     A.   Yes.

19     Q.   This one's between Orion and Bloomingdale's

20 and Macy's; is that right?

21     A.   Yes.

22     Q.   And I direct your attention to Exhibit A, sir.

23 This is Page 9851.

24     MR. VERHOEVEN:  Ryan, could you highlight

25 that, please?

1             Thank you.

2        Q.   (By Mr. Verhoeven) This is a list of the

3   patents subject to the license agreement, sir?

4        A.   Yes.

5        Q.   Up at the top, it says List of Orion Patents?

6        A.   Yes.

7        Q.   And you see that there's the '947 patent

8   included in the list of 14 patents?

9        A.   I do.

10       Q.   Okay.  So the '947 is licensed in this

11  agreement as well?

12       A.   Yes.

13       Q.   Direct your attention to Page 5 of this

14  agreement, which has Control No. 9842, sir.

15       A.   I'm there.

16       Q.   And you see under Section 5.1, it's the amount

17  that got paid for this patent license; is that right?

18       A.   Yes.

19       Q.   And the total is $900,000, right?

20       A.   Yes.

21       Q.   For 14 patents?

22       A.   Yes.

23       Q.   Including the '947?

24       A.   That's correct.

25       Q.   And if you average that out, that's about

1  $65,000 per patent?

2       A.   Yes.

3       Q.   And this is a lump-sum agreement?

4       A.   Yes.

5       Q.   Okay.  I direct your attention to Defendants'

6  Exhibit 994.  It's towards the back of your binder, sir.

7       A.   I'm there.

8       Q.   You see this is a patent license and

9  settlement agreement -- excuse me -- withdraw that

10 question.

11          Do you see this says Patents-in-Suit

12 Settlement Agreement?

13      A.   Yes.

14      Q.   And if you go back into it at Exhibit G -- and

15 this is at Control No. 4344, sir.

16      A.   I'm at 4344.

17      Q.   Okay.  You see there there is a limited

18 covenant not to sue between Bright Response and a

19 company called Apple, Inc.

20      A.   Yes.

21      Q.   And then if you go to the back of this Exhibit

22 G, Attachment 1, Page 356, sir.

23          Did you find it?

24      A.   I've got it.

25      Q.   Okay.  The patents subject of this agreement

1  looks like there's three patents and one application; is

2  that right?

3       A.   Yes.

4       Q.   And one of those patents is the '947 patent,

5  the same patent in this suit, right?

6       A.   Yes.

7       Q.   And if you go back to Page (sic) 4, Page 347,

8  sir.

9       A.   I'm there.

10          MR. VERHOEVEN:  This is Page 347, Ryan,

11  the bottom, Control No. 347.

12      Q.   (By Mr. Verhoeven) Just one second,

13  Dr. Becker.  We'll get it up on the screen.

14      A.   All right.

15      Q.   Section 4.1 is Consideration.  That's the

16  amount of money they got paid, right?

17      A.   Yes.

18      Q.   And $20,000?

19      A.   Yes.

20      Q.   Okay.  That's a lump sum?

21      A.   Yes.

22      Q.   Okay.

23          MR. VERHOEVEN:  Let's put up DX Demo 71,

24  please, Ryan.

25      Q.   (By Mr. Verhoeven) So this is a summary of the

1  agreements we went through yesterday afternoon and this

2  morning, sir:  The Banter agreement, Keystone

3  Automotive, the Kana Software, Black & Decker,

4  Whirlpool, Macy's, and Apple.

5          Do you see that?

6      A.   I do.

7      Q.   And all I've done here is summarized the

8  agreements we went through.

9          Do you see that, in terms of the amount of

10  money paid?

11      A.   I see what you're doing here, yes, sir.

12      Q.   So to Banter, the payment was a lump sum of

13  $150,000, right?

14      A.   Yes.

15      Q.   Keystone was $500,000, correct?

16      A.   Yes.

17      Q.   Kana Software, a million dollars?

18      A.   Yes.

19      Q.   Black & Decker, a series of lump-sum payments

20  totaling 650,000?

21      A.   Yes.

22      Q.   Whirlpool is 1.5 million?

23      A.   Yes.

24      Q.   Macy's, 900,000?

25      A.   Yes.

1    Q.   And Apple, 20,000?

2    A.   Yes.

3    Q.   These are real-world agreements that -- in

4  which the '947 patent was licensed, correct?

5    A.   They're real-world settlements of litigation,

6  yes.

7    Q.   They're real-world agreements in which the

8  '947 patent was licensed, sir, correct?

9    A.   Yes.

10    Q.   Yes?

11    A.   Yes.

12    Q.   Okay.  And -- but nevertheless, it's your

13  opinion that in a hypothetical negotiation between Orion

14  and Google, which it only involves one patent, doesn't

15  involve purchase -- a non-exclusive license, what they

16  call a bare license, it's your testimony that Google, in

17  June of 2004, would have agreed to pay $64 million,

18  right?

19    A.   No.  I think I've said this several times.

20  They would have agreed to a running royalty that as we

21  sit here today, based on their revenues, would total $64

22  million.

23    Q.   $64 million?

24    A.   Yes.

25    Q.   Okay.

1          MR. VERHOEVEN:  Let's go to DX Demo 72,

2   please.

3      Q.   (By Mr. Verhoeven) Now, this is another

4   demonstrative exhibit that we have prepared, Dr. Becker,

5   that concerns some agreements that Google was a party

6   to.

7          In the interest of time, I'm not going to go

8   through every single exhibit and bring it up and go

9   through the terms.  They're in your binder, if you need

10  to look for them.  But let's see if we can just do this

11  in a more abbreviated form.

**REDACTED BY ORDER OF THE COURT**



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

Q.   Now, you've offered some testimony about a Stanford University license, correct?

A.   Yes.

Q.   If you would like to reference that, that's in your binder as Defendants' Exhibit 174.

The Stanford license agreement was entered into in 1998, right?

A.   Yes.

Q.   Would you agree with me that the internet was a completely different place in 1998 than it was in 2004?

A.   Yes.  It was much smaller and had not yet sort of exploded the way it has today.

1    Q.    And Google was much earlier in its life cycle

2  in 1998?

3    A.    Yes.

4    Q.    And had it just been formed?

5    A.    Yes.

6    Q.    Google was only worth $8 million back in 1998,

7  right?

8    A.    The -- there was a financing transaction at

9  that point that put the value at --

10    Q.    8 million?

11    A.    Yes.

12    Q.    Okay.  And as part of the Stanford license,

13  there was a license to a patent application, right?

14    A.    Correct.

15    Q.    And that application resulted in six different

16  patents, right?

17    A.    I think as we sit here today, there have been

18  that many patents, yes.

19    Q.    A hypothetical negotiation between Orion and

20  Google would be for one patent, right?

21    A.    One issued patent, yes.

22    Q.    And it would just be a non-exclusive license

23  to just the patent, right?

24    A.    Yes.

25    Q.    No technology, right?

1    A.    Correct.

2    Q.    No employees?

3    A.    Correct.

4    Q.    Have no trademarks?

5    A.    Correct.

6    Q.    Okay.  Now, the Stanford license was an

7  exclusive license, right?

8    A.    For a period of time.

9    Q.    Not a non-exclusive license?

10   A.    Correct.

11   Q.    And what Google got as part of the Stanford

12  agreement was a lot more than just a bare, non-exclusive

13  license patent, right?

14   A.    Yes.

15   Q.    Stanford also gave Google source code, right?

16   A.    Yes.

17   Q.    You didn't evaluate the value of the source

18  code, did you, sir?

19   A.    Not specifically, no.

20   Q.    And Google received rights to the Google name

21  and logo --

22   A.    Correct.

23   Q.    -- right?

24         Trademarks, right?

25   A.    Yes.

1    Q.   And Google also received rights to technology
2  for clustering and to split results into clusters of
3  similar topics, right?
4    A.   Yes.
5    Q.   And Google also received a license for
6  technology for scanning paper materials and indexing
7  them, right?
8    A.   Yes.
9    Q.   Now, in the hypothetical negotiation, Google
10 would know that Orion, the company Orion, doesn't have
11 any -- besides the patents, doesn't have any technology,
12 right?
13   A.   Correct.
14   Q.   They don't have employees that built an
15 embodiment of the patent, do they?
16   A.   Correct.
17   Q.   They don't have people that write code, right?
18   A.   At least not that I'm aware of at that time.
19   Q.   Okay.  They don't have trademarks that they're
20 licensing, right?
21   A.   Correct.
22   Q.   So it's fair to say, sir, isn't it, that the
23 Stanford license agreement is much more than just a bare
24 patent license; it's a non-exclusive license?
25   A.   Yes.

 1      Q.   Okay.  Now, I'd like to conclude by going to

 2  DX Demo 55.

 3           Have you seen this document before or this

 4  illustration before, sir?

 5      A.   I believe I have.  I've seen one like it.

 6      Q.   This was up when I was cross-examining

 7  Dr. Rhyne.

 8           Were you in the courtroom for that?

 9      A.   Yes.

10      Q.   Did you hear Dr. Rhyne say that when a user

11  clicks on ads that that is outside of infringement?

12      A.   Yes.

13      Q.   Said it's irrelevant to infringement, right?

14      A.   That's correct.

15      Q.   So this act of clicking on the ad, you're

16  not -- you're not the infringement expert, right?

17      A.   That's correct.  I'm not.

18      Q.   But you had heard Dr. Rhyne say this act of

19  clicking on the ad is non-infringing, right?  It's

20  interactive?

21      A.   I heard him say that that doesn't -- that's

22  beyond the steps that are necessary for infringement.

23      Q.   Now, isn't it true that every single penny

24  that Google has made that you used in your royalty

25  analysis comes from clicking on ads?

1      A.    Yes.

2      Q.    And that's the very action that Dr. Rhyne says

3  is not infringing?

4      A.    That's correct.

5            MR. VERHOEVEN:  No further questions,

6  Your Honor.

7            THE COURT:  All right.  Thank you,

8  Counselor.

9            Mr. Rooklidge.

10                    CROSS-EXAMINATION

11 BY MR. ROOKLIDGE:

12     Q.    Good morning, Dr. Becker.

13     A.    Good morning.

14     Q.    Your approach to writing your damages report

15 relating to Yahoo! was the same as your approach to

16 writing your damages report relating to Google, correct?

17     A.    Yes.

18     Q.    And the substantive analysis that you did for

19 Yahoo! in that report was the same as the substantive

20 analysis you did for Google, correct?

21     A.    It was very similar.  It wasn't identical.

22     Q.    And currently, as we sit here today, you

23 cannot identify an agreement that demonstrates that

24 Yahoo! has paid a quarter to a half percent of its

25 revenue for a patent license under a single patent,

1  correct?

2      A.    Correct.

3      Q.    You talked yesterday about the hypothetical

4  negotiation under the Georgia-Pacific Factors.

5            Do you recall that?

6      A.    Yes.

7      Q.    And you considered in your report in

8  connection with Yahoo!, in connection with Factor 2 of

9  the Georgia-Pacific Factors, the Overture patent

10  portfolio.

11            Do you recall that?

12      A.    Yes.

13      Q.    Now, Factor 2 is, and I quote:  The rates paid

14  by the licensee for the use of other patents comparable

15  to the patent-in-suit, end of quote.

16      A.    Yes.

17      Q.    Now, Yahoo!, in this hypothetical negotiation

18  that's going on here, is the licensee, correct?

19      A.    Yes.

20      Q.    But Yahoo! was not the licensee for the

21  Overture patent portfolio licenses, correct?

22      A.    Correct.

23      Q.    Yahoo! was the licensor?

24      A.    Correct.

25      Q.    That means that Yahoo! was licensing the

1  patents out to someone else, correct?

2      A.   That's correct.

3      Q.   Okay.  In other words, in those circumstances,

4  Yahoo! wasn't paying money; it was receiving money?

5      A.   That's correct.

6      Q.   Now, at the time of the hypothetical

7  negotiation, which is just before the April 2004 date of

8  first infringement, Yahoo! had an up and running

9  business and a very successful Sponsored Search program,

10 correct?

11     A.   Yes, it did.

12     Q.   Now, Yahoo! acquired the Sponsored Search

13 product from a company called Overture, right?

14     A.   Yes.

15     Q.   And Overture had developed an entire portfolio

16 of patents around that Sponsored Search product, hadn't

17 it?

18     A.   Yes.

19     Q.   And the Over -- the Overture patent portfolio

20 and the technology that that portfolio covered was the

21 basis for the Sponsored Search system that Yahoo! began

22 using from Overture back in 2001, correct?

23     A.   Yeah, I think that's a fair statement.

24     Q.   Now, you relied yesterday on the Overture

25 patent portfolio licenses for setting a 3.75 to

1  5 percent upper limit on the reasonable royalty for

2  Yahoo!, correct?

3      A.   Yes, I think that's a fair statement, although

4  I -- in -- in setting that, it's -- it's a data point

5  that right when I said it, there's a recognition that

6  there has to be an adjustment down, because that

7  represents a portfolio.

8          So I would never suggest that the '947 Rice

9  patent would be at that upper limit of 3.75 to 5.

10     Q.   Right.  And that Overture patent portfolio

11  considers not just the initial patent applications that

12  were filed, but extensions, divisions, foreign

13  counterparts, continuations, divisionals, continuations

14  in part?

15     A.   Yes, absolutely.

16     Q.   And -- and those other patents, including

17  foreign counterparts and extensions, may well have

18  separate economic value from the original patent in the

19  family, correct?

20     A.   They may.

21     Q.   Now, even though the Overture patent portfolio

22  licenses contain many patents, you never checked to

23  determine how many, correct?

24     A.   No.  At the time that I did my analysis, I

25  recognized that it was a portfolio of patents, and the

1  number of patents was not relevant.

2    Q.   And you didn't perform any analysis of that

3  Overture patent portfolio to determine how the values of

4  the various patents compare to each other or to

5  determine if the patents in that portfolio, if any of

6  those patents are more valuable than any of the others?

7    A.   No, I didn't perform any technical analysis.

8  I think I indicated in my report that there seems to be

9  a general recognition in the industry that the '361

10 patent is kind of the kingpin of that portfolio.

11       But beyond that, I didn't do an analysis of

12 one patent versus another.  I looked at the portfolio as

13 a whole.

14   Q.   And you admitted on your direct yesterday that

15 the Overture patent portfolio was much broader than the

16 '947 patent that's involved in this case, correct?

17   A.   Yes.

18   Q.   Now, you admit that you need to make a big

19 downward adjustment from the royalty rates in the

20 Overture portfolio to arrive at a rate for the

21 incremental contribution in this case, correct?

22   A.   Yes.

23   Q.   And you said yesterday that you considered a

24 number of factors in making that downward adjustment,

25 right?

1    A.    Yes.

2    Q.    You said you considered that Yahoo!'s

3 Sponsored Search is a very popular service, right?

4    A.    Yes.

5    Q.    But Yahoo! Sponsored Search was a very popular

6 service back well before the April 2004 hypothetical

7 negotiation date, wasn't it?

8    A.    It was popular, not nearly as popular as it

9 has become, or it became after April 2004.

10    Q.    Now, you said that you considered Yahoo!'s

11 Sponsored Search to be a profitable service, didn't you?

12    A.    Yes.

13    Q.    Now, Yahoo!'s Sponsored Search service was a

14 profitable service for Yahoo! back before the April 2004

15 hypothetical negotiation date, correct?

16    A.    Yes.

17    Q.    Now, you said that you considered the benefits

18 and the extent of use of the '947 patent, but you didn't

19 quantify those benefits and extent of use, did you?

20    A.    I did not -- I would agree that I didn't

21 quantify the -- the benefits specifically.

22          The extent of use, I do have some

23 quantification to that in the sense the royalty base

24 quantifies the extent of use.

25    Q.    But you haven't placed any dollar numbers on

the benefits of the '947 patent to Yahoo!, have you?

A.   Not beyond my ultimate royalty rate, if any.

Q.   Okay.  And you said yesterday that you had considered advertisement, quality, and relevance in connection with your downward adjustment, correct?

A.   Well, in connection with setting my overall -- reaching my overall opinion, the importance of relevance was something I considered.

Q.   But you didn't qualify in dollar terms how the '947 patent affects Yahoo!'s ad quality or relevance, did you?

A.   That's correct.  We don't have a specific quantification of the impact of the '947 in a precise way.

Q.   You didn't do any specific economic quantification that led you to bring the royalty rate down to a quarter to a half a percent, correct?

A.   Not any specific quantification.  It was a consideration of all the relevant Georgia-Pacific Factors together to get to that rate.

Q.   You didn't use any complicated formulas or any demand curves or economic analysis to -- to reach that -- that conclusion?

A.   I would agree with that.  We don't have any specific -- there's no complicated formulas here.  This

1  is a situation where we don't have specific testing

2  data, for example, related to the '947.  So I would

3  agree with that.

4      Q.    Yesterday on direct, you testified about the

5  benefits of the '947 patent.

6          Do you recall that?

7      A.    Yes.

8      Q.    And you haven't offered an opinion that either

9  Yahoo!'s or Google's alleged use of the '947 patent is

10  the reason -- the reason that customers use their search

11  engines?

12      A.    No.  I think I have offered evidence that

13  customers -- there's -- there's specific evidence I've

14  cited that the relevance is one of the factors that

15  drives people to use a particular search engine?

16          And relevance is one of the factors that

17  drives people to respond to ads.  But beyond noting and

18  providing evidence of the connection between customers'

19  demand for relevance in general, I haven't provided any

20  evidence that specifically ties that to the '947 patent.

21          I'm relying on Dr. Rhyne's analysis or his

22  providing me with the understanding that the '947 patent

23  is providing tools or enhancement to the relevance.

24      Q.    You haven't offered an opinion that either

25  Yahoo!'s or Google's use of the '947 patent is the sole

reason that advertisers bid for ads on either Sponsored

Search or AdWords, correct?

     A.    That's correct.

     Q.    And you've admitted that Yahoo!'s and Google's

use of the '947 patent is an incremental improvement to

their system?

     A.    Yes.

     Q.    The '947 patent is an improvement patent,

correct?

     A.    Yes.

     Q.    Now, you've -- you've had to rely on

Dr. Rhyne's opinion about the scope of the invention of

the '947 patent, correct?

     A.    Yes.

     Q.    Okay.  And you're aware that Dr. Rhyne has

testified that the '947 patent did not disclose a new

method of normalization?

     A.    I recall that, yes.

     Q.    And you're aware that Dr. Rhyne has testified

that the patent did not come up with new techniques for

flagging attributes?

     A.    Yes.

     Q.    And you agree that the incremental

contribution of a patent can be informed by a review of

the prior art?

1      A.    It can be, yes.

2      Q.    And you've not taken any steps to identify

3  what distinguishes the '947 patent's claimed invention

4  from the prior art?

5      A.    That's correct.

6      Q.    And you're not able to express an opinion

7  about what distinguishes the '947 patent's claimed

8  invention from the prior art?

9      A.    Correct.

10      Q.    In fact, you don't have an understanding of

11  exactly what the '947 patent even adds to the prior art?

12      A.    That was outside the scope of my analysis.

13      Q.    So you've never precisely quantified the

14  incremental benefit of the '947 patent over the prior

15  art?

16      A.    Correct.

17      Q.    And you don't specifically quantify the

18  increase in revenue or profits to either Yahoo! or

19  Google from using the '947 patent to increase the

20  relevance of its ads?

21      A.    Correct.

22      Q.    You've not taken into consideration the extent

23  to which the prior art techniques that are used by

24  Yahoo! and Google improve the relevance and, therefore,

25  the value of the advertisements served by either Yahoo!

or Google?

A. Well, I -- I think I have taken into account that there are many other factors that are improving -- contributing to the success of each company's systems, but I haven't specifically quantified the -- you know, that versus the '947 patent.

Q. And you've never quantified the degree of greater relevance that's contributed to either Yahoo! or Google by using the '947 patent?

A. That's correct.

Q. Now, the claimed invention in the '947 patent isn't the only way to improve the relevance of advertisements, is it?

A. My understanding of the way these systems works is that there's other steps that are taken that also contribute to the relevance.

Q. And Yahoo! has its own patents on those steps that contribute to the relevance, correct?

A. Sure. Yes.

Q. And you were here in the courtroom when I asked Dr. Rhyne about the fact that Yahoo! has patents, for example, on geo-targeting, correct?

A. Yes.

Q. And I referred to Defendants' Exhibit 745 and 759.

1      A.    Yes.  I was here for that.

2      Q.    And you were also here when I discussed with

3  Dr. Rhyne the fact that Yahoo! has its own patents on

4  canonicalization, expressly Defendants' Exhibit 676 and

5  674?

6      A.    I'll agree, if I don't have to say that word.

7      Q.    I wouldn't put you through that.

8      A.    Thank you.

9      Q.    It took me long enough to learn that.

10           Now, your Slide 83 --

11                MR. VERHOEVEN:  If we could put up your

12  Slide 83 from yesterday.

13      Q.    (By Mr. Verhoeven) This is a slide you used in

14  direct testimony, suggested that Yahoo!'s use of the

15  '947 patent improved Yahoo!'s speed in returning search

16  results.

17           Do you recall that?

18      A.    I guess I -- on this slide, are you asking me

19  did I testify that this slide is representing that speed

20  is a factor?

21      Q.    Well, yesterday at all, did you represent that

22  speed is a factor?

23      A.    I had another slide that said that speed

24  mattered to customers, but this slide isn't the one that

25  I showed that had anything to do with speed.

1   Q.   Unfortunately, my numbers were different from

2   the numbers that Plaintiff's counsel was using.

3        But you will agree with me that the '947

4   patent has absolutely nothing to do with the speed that

5   the native search results are returned, correct?

6   A.   That's correct.

7   Q.   And both Yahoo! and Google have many

8   techniques for improving the speed and returning the

9   native advertising search results, correct?

10  A.   Yes.

11  Q.   And Yahoo! has patents on its techniques for

12  improving the speed of returning its native search --

13  search advertising results?

14  A.   Yes.

15  Q.   Okay.  Now, once again, you haven't discussed

16  with Dr. Rhyne any -- any patents in the Overture

17  portfolio, other than the '361 patent, correct?

18  A.   That's correct.

19  Q.   And you haven't discussed with Dr. Rhyne --

20          (Cell phone ringing.)

21  Q.   (By Mr. Verhoeven) You haven't discussed with

22  Dr. Rhyne any other Yahoo! patents besides the Overture

23  portfolio, correct?

24  A.   Correct.

25  Q.   Now, Yahoo! has made a number of non-patented

1  contributions to its Sponsored Search service, hasn't

2  it?

3      A.   Yes.

4      Q.   One of those contributions is the fact that

5  Yahoo! was commercially successful before April of 2004,

6  correct?

7      A.   That's correct.

8      Q.   And another of those contributions was that

9  before April of 2004, Yahoo! was the second-ranked

10  search engine, correct?

11      A.   Yes.

12      Q.   And another of those contributions is that

13  Yahoo! has made investments to enhance its software and

14  hardware infrastructure continuously since before April

15  2004, correct?

16      A.   Yes.

17      Q.   And another contribution is the fact that

18  Yahoo! was going out and acquiring businesses, for

19  example, Overture and its Sponsored Search technology in

20  business, correct?

21      A.   That's correct.

22      Q.   Another one of Yahoo!'s contributions was the

23  acquisition of companies related to popular social

24  networking sites?

25      A.   Yes.

1     Q.   And so Yahoo! brings a lot to the table in

2  terms of contributions to the success of Sponsored

3  Search, including its methods for driving traffic to

4  Yahoo! search pages?

5     A.   Yes.

6     Q.   And the same holds true for Google, correct?

7     A.   Yes.

8     Q.   Now, you've not done any quantitative analysis

9  of Yahoo!'s and Google's contribution to improving the

10  relevance and, therefore, the value of the

11  advertisements, correct?

12     A.   Not any specific quantification.  I think I

13  outlined in my direct the considerations that I made in

14  the George -- Georgia-Pacific Factor analysis, which

15  included some quantitative considerations but nothing

16  specific in terms of a direct measurement of the

17  contribution.

18     Q.   Now, the economic benefit to Yahoo! and Google

19  is supposed to be the focus of your analysis, at least

20  from the side of Yahoo! and Google in this hypothetical

21  negotiation, correct?

22     A.   Yes.

23     Q.   And your analysis is supposed to focus, in

24  part, on what Yahoo! and Google gained by having the

25  rights to practice the '947 patent that would result

1 from this hypothetical negotiation?

2     A.   Yes.

3     Q.   Now, the revenue base that you used in your

4 calculation was all of the revenue from Yahoo!'s

5 Sponsored Search and Google's AdWords, correct?

6     A.   Yes.

7     Q.   And you didn't perform any apportionment of

8 that royalty base for either Yahoo! or Google, did you?

9     A.   I didn't take a subset of that revenue and say

10 this subset is going to be the royalty base.  It is

11 accounted for in the form of the running royalty being

12 at the level that it is.

13     Q.   Let's go back to the royalty base.  Let's

14 focus on my question.

15     My question was, you didn't perform any

16 apportionment of the royalty base for either Yahoo! on

17 or Google?

18     A.   Not of the base, no.

19     Q.   Now, you agree that a determination of a

20 reasonable royalty for the '947 patent must recognize

21 that Yahoo! and Google should be credited with the

22 elements of the success of the accused products that are

23 not patented and that they brought to the table?

24     A.   Yes.

25     Q.   And you agree in the hypothetical negotiation

with Orion back in April of 2004, July of 2004, that
both Yahoo! and Google brought a vast array of
technical, intellectual, and financial assets to bear in
creating their highly successful business models?

     A.   I do agree with that.

     Q.   In fact, you stated that in your report,
right?

     A.   Yes.

     Q.   And you agree that the '947 patent does not
describe an entire search engine?

     A.   It doesn't even talk about search.  It's
certainly not an entire search engine.

     Q.   Okay.  And you agree that both Yahoo! and
Google had successful internet search and advertising
businesses back before the date that Bright
Response's -- Bright Response alleges that they began
infringing the '947 patent?

     A.   Yes.

     Q.   Now, at the time of the hypothetical
negotiation, you said in your report that Google was a
top-ranked search engine and Yahoo! was number two,
correct?

     A.   Yes.

     Q.   And the fact that they provide highly relevant
search results is important to the success of Yahoo!'s

1  Sponsored Search system and Google's AdWords system,

2  correct?

3     A.   It -- it is a driver, because it helps drive

4  traffic to those search pages.

5     Q.   And, in fact, those search functions, the

6  native search functions of both Yahoo! and Google, are a

7  more important contributor than the '947 patent to the

8  success of those systems, correct?

9     A.   Well, certainly to the success of their search

10  products.  There's a less direct impact on the success

11  of the ad products.  But without the search traffic, you

12  wouldn't have any ads, so I think that's a fair

13  statement.

14     Q.   And just like you didn't quantify the degree

15  of greater relevance that's contributed by the '947

16  patent to Yahoo!, you didn't quantify that for Google

17  either, did you?

18     A.   Correct.

19     Q.   And just like you didn't quantify the increase

20  in revenue to Yahoo! from using the '947 patent, you

21  didn't quantify the increase in revenue from using the

22  '947 patent to Google, correct?

23     A.   Not a quantification in isolation, no.

24     Q.   And, likewise, for neither Yahoo! nor Google

25  did you quantify the increase in profit from using the

1  '947 patent, correct?

2      A.   That -- that would follow from that, yes.

3      Q.   And you didn't perform a market survey to

4  measure the benefits of the '947 patent to either Yahoo!

5  or Google, correct?

6      A.   Well, I did look at market research on the

7  importance in the -- in the -- to search engine users of

8  the importance of relevance, and the '947 contributes to

9  relevance.

10          But, again, I -- as to a sort of specific test

11 of -- if you peel out just the '947, we don't have the

12 benefit of that kind of data.

13     Q.   Now, you discussed earlier this morning with

14 Mr. Verhoeven that Google's AdWords revenue all comes

15 from users clicking on advertisements.

16          Do you recall that?

17     A.   Yes.

18     Q.   Okay.  Now, likewise, you know that Yahoo!

19 Sponsored Search revenue all comes from users clicking

20 on advertisements, correct?

21     A.   Yes.

22     Q.   Okay.  And you have based your royalty

23 calculations against Yahoo! solely on the revenue that

24 Yahoo! has received from users clicking on

25 advertisements, correct?

A.   Yes.   Ultimately, those ads that are displayed get clicked on, and that's the revenue-generating source.

Q.   Okay.   And you were in the courtroom yesterday when Dr. Rhyne admitted that clicking on Yahoo!'s Sponsored Search advertisements does not infringe any claims of the '947 patent, correct?

A.   That's correct.

Q.   Okay.   So the revenue base on which you are relying for your damages calculation against Yahoo! is based on a non-infringing act, correct?

A.   Well, I wouldn't agree with that.

The revenue is -- there's an infringing act that -- that is involved in the process of putting those ads up there.   If you didn't have the ad, there wouldn't be an ad to click on.

It's the same as saying, if you have an infringing process to make a running shoe and it's sitting on the shelf at Wal-Mart, but the claims of the patent for this -- how to make this running shoe don't describe the act of walking to the cash register and checking out and actually paying for the shoe, sure, the claims don't cover the act of turning that into a sale.

But if you had a royalty base of sales of shoes, it would still relate to the infringing act.

Q. But, Dr. Becker, let's go back to my question. There is no -- there is no revenue unless the user clicks on the -- on the advertisement that's returned by Sponsored Search, correct?

A. Yeah. There's no revenue unless someone clicks on one of the infringing ads.

Q. And that's a -- that by itself is a non-infringing act, correct?

A. Absolutely.

Q. All right. Now, you don't dispute that Yahoo! has been providing its Sponsored Search service since 2001.

A. That's correct. I don't dispute that.

Q. And the Sponsored Search service that Yahoo! was using back in 2001 is not accused of infringement in this case.

A. That's correct.

Q. Now, in 2003, Yahoo! purchased Over -- Overture, who had been providing to Yahoo! the equipment and the mechanism to provide its Sponsored Search system, correct?

A. Yes.

Q. Okay.

A. Yes.

Q. And -- but you and Dr. Rhyne both say that the

date of first infringement didn't occur until the next

year, April of 2004, correct?

    A.   Correct.

    Q.   You don't know what, if anything, Yahoo! did

to change its March 2004 Sponsored Search service into

its April 2004 Sponsored Search service to turn it from

a non-infringing service to an infringing service, do

you?

    A.   I don't know what that system prior to April

2004 was in any specific way.  That's outside the scope

of my work, to look at that system.

    Q.   And you didn't ask Dr. Rhyne about the

apparent inconsistency between his belief that the '947

patent is core to Yahoo!'s Sponsored Search and his

assertion that the date of first infringement was April

of 2004, which was three years after Yahoo! had begun

offering Sponsored Search.

    A.   That's correct.

    Q.   And you didn't ask Dr. Rhyne about the

apparent inconsistency between his belief that there are

no viable alternatives to the '947 patent and the fact

that Yahoo! wasn't using the '947 patent before April

2004.

    A.   Well, I didn't ask him about the pre-April

2004 thing.  I don't agree that it's an inconsistency,

but I didn't ask him about the pre-April 2004 system.

Q.   Let's go to the issue of lump sum versus running royalty.

You mentioned yesterday that Yahoo!'s licensing attorney, Luke Yeh, testified that Yahoo! doesn't have a policy or a preference for lump-sum agreements when taking licenses on other companies' patents, correct?

A.   Correct.

Q.   Okay.  And you used a slide in connection with that, which I believe is Slide 68.  We'll see if that's the slide.  Great.  That's the slide.

Do you recall that slide?

A.   Yes, I recall this slide.

Q.   Okay.  And this slide quotes from the deposition transcript of Mr. Yeh, correct?

A.   Yes.

Q.   All right.  Now, you didn't read the entire transcript of the deposition of Mr. Yeh, who was Yahoo!'s licensing attorney that testified about licensing, correct?

A.   Right.  Not every word of it, no.

Q.   Okay.  Now, Mr. Yeh described a number of factors that favor the use of lump-sum royalty over a running royalty, correct?

1     A.   Yes.  I did read that part of his deposition.

2     Q.   Okay.  And one of the factors that Mr. Yeh

3 explained favors a lump-sum royalty over a running

4 royalty is that Yahoo! does not like to disclose to

5 licensors any revenue figures for any specific services

6 other than the figures that it has to disclose to the

7 Securities and Exchange Commission, correct?

8     A.   Correct.

9     Q.   Okay.  And Yahoo! does not have to disclose to

10 the SEC the revenue figures that you use in your

11 analysis as accused revenue, correct?

12    A.   That's correct.

13    Q.   Okay.  Now, let's take a look back up here at

14 Slide 68.  Let me get my pointer.

15        Now, we see here in the second excerpt here,

16 the question was:  Does Yahoo! have a preferred

17 preference for a lump-sum form of royalty in the license

18 that it negotiates?

19        And then we see an answer:  From my knowledge

20 or my experience with the company, Yahoo! doesn't have

21 any preference with regard to in-licenses, period.

22        Do you see that?

23    A.   Yes.

24    Q.   Okay.  And then it goes on actually to another

25 answer where he's talking about out-licenses, right?

1      A.   Yes.

2      Q.   Okay.  So in-licenses are where Yahoo! is

3 taking a license from another company and paying them

4 money, correct?

5      A.   Yes.

6      Q.   And out-licenses is where Yahoo! is providing

7 a license on its patents to another company and

8 receiving money, correct?

9      A.   That's correct.

10     Q.   The hypothetical negotiation in this case,

11 Yahoo! is in the position -- or would be in the position

12 of taking an in-license, correct?

13     A.   I agree with that, yes.

14     Q.   Yahoo! would be receiving a license to the

15 '947 patent for Orion and giving Orion money, correct?

16     A.   Yes.

17     Q.   Okay.  So the most relevant portion of his

18 answer up here is this section right here (indicates).

19 From my knowledge or my experience with the company,

20 Yahoo! doesn't have any preference with regard to

21 in-licenses.

22          Do you see that?

23     A.   I see that.

24     Q.   Okay.  And that was the end of his answer with

25 respect to in-licenses, right?

1    A.   You know, I'd have to see the whole transcript

2 to see whether --

3    Q.   Well, why don't we put up that transcript, and

4 let's take a look at that section and see what he says.

5         Here's where we're talking, whether Yahoo! has

6 a preference for a lump-sum form of royalty.

7         I, from my knowledge or experience with the

8 company, Yahoo! doesn't have any preference with regard

9 to in-licenses.

10         That's the end of your quote on the slide,

11 isn't it?

12    A.   Right, because I'm quoting the --

13    Q.   Right?

14    A.   -- his statement about their preference, not

15 their practice.

16    Q.   Right.  So then we go on -- this is the point

17 that was cut out of your slide, wasn't it?

18         It says:  But I will add that as far as I know

19 or as far I'm aware, Yahoo! has only entered into

20 lump-sum in-licenses.

21         Do you see that?

22    A.   That's correct.  They have.

23    Q.   Why did you delete the rest of his answer from

24 your slide?

25    A.   Because the point I was making was about their

preference and policy, not the practice.

Q.   In other words, their preference or policies, not what they actually do in practice?

A.   Well, what they have actually done -- I've certainly reviewed all their licenses, and we've discussed those licenses, that the ones that have been produced in this litigation, by and large, on an in-licensing basis are lump sum.

Q.   Yesterday you mentioned the VPS license and suggested in your testimony that it implied that Yahoo! would pay a running royalty of 1 to 3 percent.

Do you recall that?

A.   I recall that section of my testimony, and I don't agree that I implied that they would -- that that said they would pay a running royalty; I think I said that it indicated that in setting the lump sum, there was a running royalty component used.

Q.   Yahoo! never agreed to pay 1 to 3 percent under the VPS license, did it?

A.   That's correct.  They didn't.  That was an optional part of that agreement.

Q.   That agreement was, in fact, a lump-sum license, wasn't it?

A.   Yes.  Even the portion that talked about the 1 to 3 percent would have been -- if they had exercised

that option, they would have gone through the running

royalty math and then paid a single amount.

Q.   Yahoo! agreed to pay a lump sum in that

agreement of $450,000, correct?

A.   Correct.

Q.   Okay.  And that was not just for one patent,

was it?

A.   That's correct.  It was for a number of

patents.

Q.   It was for two patents and all related U.S.

and foreign patents and applications, correct?

A.   Correct.

Q.   Now, yesterday Mr. Verhoeven established with

you that Orion, the party to the hypothetical

negotiation with Yahoo!, bought the '947 patent, along

with 13 other patents and seven patent applications, for

a million dollars in January of 2004, correct?

A.   Correct.

Q.   Okay.  And so that was just three months

before the hypothetical negotiation with Yahoo!,

correct?

A.   Yes.

Q.   And you concede, don't you, that during that

hypothetical negotiation with Orion, Yahoo! would have

known about that purchase agreement, correct?

1    A.    Yes.

2    Q.    Okay.  Now, Mr. Verhoeven went on to review

3 with you a number of license agreements, both yesterday

4 and today, that related to Orion or otherwise to the

5 '947 patent, correct?

6    A.    Yes.

7    Q.    And the parties to the Yahoo!/Orion

8 hypothetical negotiation would be assumed to have known

9 about those agreements as well, correct?

10    A.    Yes.

11    Q.    And that includes DX157, the agreement under

12 which Apple received a lifetime covenant not to sue

13 under the '947 patent for $20,000.

14    A.    Yes.

15    Q.    Now, you said in Paragraph 90 of your report

16 that you didn't rely on any of the Yahoo! settlement

17 agreements, correct?

18    A.    Correct.

19    Q.    And you said in Paragraph 58 of your report

20 that you didn't rely on any of the Bright Response

21 agreements that licensed the '947 patent, correct?

22    A.    Correct.

23    Q.    And you didn't rely on any of the Orion

24 settlement agreements, correct?

25    A.    Correct.

1    Q.   And you didn't rely on the Keystone agreement

2  of the '947 patent, correct?

3    A.   That's correct.

4    Q.   And you didn't rely on any of the prior

5  license agreements that cover the '947 patent, correct?

6    A.   Correct.

7         And I -- let me just amend that to say, when

8  I'm saying correct, in terms of relying, they don't end

9  up being relevant to the setting of the rate in the

10 negotiation.

11        I certainly relied on them in the form of --

12 in the sense that I considered all of them in doing my

13 analysis and ultimately reached the conclusion -- with

14 respect to each of the categories of agreements that

15 you've just mentioned, reached the conclusion that they

16 were not relevant to the circumstances of the

17 hypothetical negotiation and the setting of the rate.

18   Q.   And those agreements could be relevant to

19 indicate different things in a reasonable royalty

20 analysis, correct?

21   A.   Sure.

22   Q.   For example, in addition to the royalty rate,

23 they could also be relevant to the form of the payment

24 of the agreement, correct?

25   A.   Yes, they can.

1    Q.   So, in other words, all these agreements, even

2  apart from the amount of payment, could be relevant to

3  whether the parties would have entered into a lump sum

4  or a running royalty form, correct?

5    A.   Other agreements could.  But I have

6  consistently taken the position that I don't think

7  settlement agreements even inform the form of royalty.

8    Q.   But as to the rate of those settlement

9  agreements, every single one of those settlement

10  agreements that cover the '947 patent were entered into

11  for less than the cost of the -- defending the lawsuit

12  being settled, correct?

13    A.   I think I've testified that I don't know what

14  the cost of those litigations were, but they were

15  entered into for the amounts that we talked about.

16    Q.   Let's -- let's go back to your deposition

17  transcript of July 22nd, 2010, Page 219, Lines 22

18  through Page 220, Line 22.

19            THE COURT:  Hold on just a second.

20            Counsel approach.

21            (Bench conference.)

22            THE COURT:  What's the deposition clip

23  going to address?

24            MR. ROOKLIDGE:  He's going to eventually

25  concede that those agreements were entered into for less

1    than the cost of defending the lawsuit.

2                    This is my last question.

3                    THE COURT:  Well, let's -- let's -- I'm

4    not going to get into what the relevant cost is of

5    defending lawsuits, because I'm not going to let you get

6    into what amount of money you guys have put in defending

7    this lawsuit.

8                    They have -- I mean, we're not going to

9    address the cost in an unrelated case.  We don't have

10   any foundation of what was involved in those cases, the

11   extent of infringement, or anything.

12                   So wind it up.

13                   MR. ROOKLIDGE:  This was going to be my

14   last question, Your Honor.

15                   THE COURT:  Well, then you wind it up

16   without playing a clip that discusses what the relative

17   cost of other cases -- defending other cases is.

18                   (Bench conference concluded.)

19                   MR. ROOKLIDGE:  Pass the witness.

20                   THE COURT:  Thank you, Mr. Rooklidge.

21                        REDIRECT EXAMINATION

22   BY MR. HUESTON:

23        Q.   Good morning, Dr. Becker.

24        A.   Good morning.

25                   MR. HUESTON:  Let's put up Slide 48,

1  please.

2            And as they do that, I'll grab my water.

3      Q.   (By Mr. Hueston) Defense counsel, both of

4  them, went over some settlement agreements with

5  licenses?

6      A.   Yes.

7      Q.   Lawsuit settlement agreements, right?

8      A.   Yes.

9      Q.   And they included a Banter agreement for about

10  $150,000?

11     A.   Yes.

12     Q.   And Kana for a million?

13     A.   Yes.

14     Q.   And Black & Decker, 650,000?

15     A.   Yes.

16     Q.   Whirlpool, 1.5 million?

17     A.   (No response.)

18     Q.   Yes?

19     A.   Yes.

20     Q.   Macy's, about 900,000?

21     A.   Yes.

22     Q.   They showed a little chart where everything is

23  about a million or less or a million-and-a-half or less,

24  right?

25     A.   Yes.

1    Q.   All right.  Now, let me show you a few that

2  the Defense didn't reveal to you and the jury.

3            MR. HUESTON:  Let's take a look at

4  Defendants' Exhibit 406.  If you can pull that up,

5  please.  See if you can pop it up on the screen.

6    Q.   (By Mr. Hueston) Okay.  Take a look at that,

7  Dr. Becker.  Are you familiar with this?  Is this one of

8  the --

9    A.   Yes, I'm familiar with this agreement.

10    Q.   All right.  One of the ones you viewed --

11  viewed in that long list of settlement agreements that

12  you reviewed on direct examination?

13    A.   Yes.

14    Q.   All right.  And this is between Triton and

15  SAP, a company named SAP, right?

16    A.   Yes.

17            MR. HUESTON:  Let's go to Page 7 of that

18  agreement.

19    Q.   (By Mr. Hueston) That's the consideration

20  section or what's paid, and what's the amount of money

21  there on this agreement?

22    A.   4,625,000.

23    Q.   All right.  And that also was for a group of

24  patents, correct?

25    A.   Yes.

1     Q.   But the 4,600,000 is a lot higher than the

2  ones you saw from defense counsel, right?

3     A.   Yes.

4     Q.   All right.

5            MR. HUESTON:  Let's go to Defense Exhibit

6  405.

7     Q.   (By Mr. Hueston) And this is an agreement with

8  Oracle Corporation.  Do you remember looking over that

9  one between Triton and Polaris and Oracle?

10     A.   Yes.

11     Q.   And let's go -- there it is.  Is that it right

12  there, Defense Exhibit 405, a lawsuit settlement

13  agreement with Oracle?

14     A.   Yes.

15     Q.   Okay.

16            MR. HUESTON:  Let's go to Page 6 of this

17  agreement, which has the amount of money under the

18  consideration section.

19     Q.   (By Mr. Hueston) And what's the amount of

20  money here?

21     A.   $5 million.

22     Q.   Okay.  And just to make sure we're fair, this

23  involved a group of patents as well, a number of the

24  patents, right?

25     A.   Yes.

1    Q.   All right.  The 5 million is a lot higher than

2 the ones they showed you, right?

3    A.   Yes.

4    Q.   All right.  And one last example.

5              MR. HUESTON:  Let's go to Defense Exhibit

6 196.

7    Q.   (By Mr. Hueston) And this is the settlement

8 agreement with Microsoft.  Did you review that as part

9 of your analysis in this case?

10    A.   I reviewed it, yes.

11    Q.   All right.

12              MR. HUESTON:  And to Page 7 of this

13 document, please.

14    Q.   (By Mr. Hueston) Here's the payment section.

15 This is Microsoft shall pay Triton $4,500,000 right?

16    A.   Yes.

17    Q.   All right.  A lot higher than the other ones

18 you were shown, correct?

19    A.   Yes.

20    Q.   Okay.  Now, I've shown you three at 4 to $5

21 million.  Does that change your opinion in this case?

22    A.   No.  These are still settlement agreements, so

23 I think -- whether they're high or low, I don't think

24 they're relevant, because -- back to the cartoon we

25 had -- the circumstances of the negotiation for the

settlement are just too different.  They're not what

we're supposed to do in the hypothetical negotiation.

    Q.   Well, what else is -- what's involved in

lawsuit settlements that makes it an apples and oranges

comparison, that makes it difficult for you, if not

impossible, to use those to set some kind of rate?

    A.   Well, one of the things that we don't have in

the settlement is back to this concept that we don't

know how much revenue is at issue.

        So you may have one that sits there looking

like a low amount because it's 150,000-dollar

settlement, but if the parties -- you know, the company

that is getting the license only had, let's say, a

million dollars a year of revenue, that's actually,

effectively, a much higher royalty than I'm suggesting

here at a quarter to a half percent.

        If you have a million dollars a year revenue,

your royalty payment at the quarter to half percent

would be $2500 a year to $5,000 a year.  So at $150,000,

you've bought decades of coverage on that patent.

        So you really can't tell unless you know how

much revenue there is.

    Q.   Because that could be a lot of money for that

company, given the involved revenue, right?

    A.   Yes.

1    Q.   Let's -- let me see if I can get a couple of

2  examples out of the exhibits and things you've looked

3  at.

4              MR. HUESTON:  Let's look at Defense

5  Exhibit 135.

6    Q.   (By Mr. Hueston) And this is a Bright response

7  lawsuit settlement agreement with a company called Art

8  Technology Group.

9              Did you review that, sir?

10   A.   Yes.

11             MR. HUESTON:  If we can you pull that up,

12 please.

13   Q.   (By Mr. Hueston) And let me start -- is that

14 it right there?

15   A.   Yes.

16   Q.   Bright Response/Art Technology Group.  We'll

17 go back to the first page in a moment.

18             MR. HUESTON:  Let's pop right over to

19 Page 4.

20   Q.   (By Mr. Hueston) Now, in the money paid

21 section here, Defendant agrees to pay Plaintiff a total

22 of $38,000, just $38,000 for this.

23             And do you remember how many patents were

24 involved in this agreement?

25   A.   I think there were two or three.  We'd need to

look at Exhibit C.

Q.   All right.  Let's just assume two.  Does that

mean -- would you conclude, sir, that, gosh, the most

that those patents could be worth, then, is 15,000

$16,000?  Is that a fair statement, based on throwing

that lump-sum amount out at you?

A.   No, I don't think that's fair at all.  We

don't know how much revenue there was.  This may

actually be a higher effective royalty than I'm

suggesting for Google and Yahoo!.

Q.   Well, actually, in this agreement --

MR. HUESTON:  Let's go back to Page 1.

Q.   (By Mr. Hueston) -- there is a clue in this

settlement agreement, sir.

MR. HUESTON:  Let's go to Page 1.

Q.   (By Mr. Hueston) -- in terms of what revenue

may have been involved here.

MR. HUESTON:  Let's go under the second

paragraph.

Q.   (By Mr. Hueston) This says:  Whereas Defendant

has represented that approximately $380,000 in revenue

has been generated in the United States from the sale of

products accused of infringing the Plaintiff patents by

Plaintiff in the litigation.

Does that statement have significance to you

1  in trying to get a bead on and understand that

2  38,000-dollar amount?

3      A.   Yes.  It's extremely significant.

4      Q.   How so?

5      A.   This is -- this -- this agreement actually has

6  the kind of information that all those other ones that

7  I've been asked about don't have; namely, some clue as

8  to the amount of revenue that was implicated by the

9  patent lawsuit.

10         And here we have a representation by the

11 Defendant that they have $380,000 in revenue that would

12 have been infringing the patent if it -- you know, if

13 you assume it was valid, and they're paying $38,000 for

14 that.

15     Q.   $38,000 is what percentage of $380,000?

16     A.   10 percent.

17     Q.   10 percent.

18         And now, this agreement talked about using it

19 in a forward setting as well.  But have you looked at

20 this, and can I ask you to do some sort of rough, you

21 know, running royalty equivalent here?

22     A.   Well, I mean, if one wanted to turn this into

23 a running royalty equivalent, you would say, well, they

24 got a license.  They basically got this $380,000

25 excused, plus the future.

                    THE COURT:   What?

                    MR. VERHOEVEN:   Objection, scope, report.

                    THE COURT:   Well, overruled.

      A.   So --

                    THE WITNESS:   Can you pop back out, so I
can see the date of this?  I think it's in '07 or in
'08.

      Q.   (By Mr. Hueston) I'll represent it's June
30th, 2008.

      A.   Okay.  2008.  Just doing a sort of back of the
envelope on this, I think I come up with -- if you
assume that that $380,000 had been over -- and the
patent issued in 2002, but -- and we don't know how many
years it was, but let's say that they're at $100,000 a
year, and they've got ten more years, from 2008 to 2018,
that they're buying the license to this.  So they've got
380,000 plus probably another million dollars of
revenue.

                    And so that's $1.388 million, and they're
paying $38,000 for the license to that.  That's about
2.8 percent effective royalty, if you want to take this
as a data point.

      Q.   Right.  If you want to go into the arena of
lump-sum lawsuit settlements, you could have made that
kind of calculation and -- and -- and used that to set a

1  rate.  But did you do so in this case, sir?

2      A.   No.  I think settlements are -- the parties

3  are agreeing to end their dispute in a way that is not

4  relevant to the hypothetical negotiation.

5      Q.   2.8 percent is a whole lot higher than the

6  quarter penny to a half percent you've recommended in

7  this case, sir?

8      A.   Yes.

9              MR. VERHOEVEN:  Objection, leading.

10             THE COURT:  Sustained.  Avoid leading on

11  redirect.

12             MR. HUESTON:  Thank you, Your Honor.

13     Q.   (By Mr. Hueston) Would it have -- in your

14  view, sir, would it have been fair to try to use that

15  percentage to set the rate against the Defendants in

16  this case?

17     A.   Well, I think I've been consistent in saying

18  that I think the settlement agreements are -- there's

19  too many other things going on.

20             I think if one is going to wade into the arena

21  of settlement agreements and use them, you have to take

22  these data points along with the other ones and consider

23  that, if nothing else, this type of agreement where we

24  do have some clues illustrates how misleading it can be

25  to look at the lump sums and the other settlements

without those clues.

You're just sort of taking a lump sum and saying:  I think this is applicable to Google and Yahoo! when the size of the companies are so different.

Q.   Okay.  I want to give you one last illustration.

MR. HUESTON:  Let's go to Defendants' Exhibit 146, which is an agreement with Amazon.com.

Q.   (By Mr. Hueston) Did you consider that as part of your effort in this case?

A.   Yes.

Q.   All right.  Now, this one, down on --

MR. HUESTON:  Let's go right to Page 5.

Q.   (By Mr. Hueston) The money here agreed to by Amazon.com was $400,000; is that right?

A.   Yes.

Q.   Again, does that mean, to your thinking, that $400,000 --

MR. VERHOEVEN:  Sorry, Your Honor.

Objection.  This agreement in its entirety is not in the report.

THE COURT:  Well, approach.

(Bench conference.)

THE COURT:  Is it in evidence?

MR. VERHOEVEN:  Is it in evidence?

1          MS. CANDIDO:  Here's a list of the --

2          MR. VERHOEVEN:  Is it in evidence, is the

3 Judge's question.

4          MR. HUESTON:  Mine is listed as Defense

5 Exhibit -- I'm using this for illustration purposes

6 only.

7          THE COURT:  Right.  Are you going to

8 limit it to the face of the agreement?

9          MR. HUESTON:  Yes.

10          THE COURT:  Okay.  That's overruled.

11          (Bench conference concluded.)

12     Q.  (By Mr. Hueston) Okay.  Continuing,

13 Dr. Becker, so here at Page 5, it says:  Consideration,

14 $400,000; is that right?

15     A.  Yes.

16     Q.  And then going to the front of the agreement

17 under the same front section, there's a paragraph there.

18 Defendant represents that, from inception to effective

19 date, gross revenues from the Clickriver advertising

20 program operated by the Defendant company is less than

21 $4 million, such representation having been relied upon

22 by Plaintiff in entering this agreement.

23          Does that data point put the 400,000 in

24 perspective?

25     A.   Yes.  Just -- just like the other one where,

you know, on the surface, a 38,000-dollar agreement

looks like it's vastly cheaper than a 400,000-dollar

agreement, but we can see that effectively Art

Technologies at $38,000 and Amazon at $400,000 are

paying about the same rate.

        I mean, both of these amounts are 10 percent

of the revenue that they represent was implicated by the

patents.

    Q.   Great.  Okay.  Let's move on to a different

topic.

        Now, one of the things that counsel for Google

asked you, he asked you a series of questions whether

you owning a house would pay $64 million.

        You answered that -- you had been talking

about the running royalty, not 64 million.  The running

royalty of .25 to .5 percent.

        Do you remember that line of questioning?

    A.   Yes.

    Q.   And then -- he then asked you, going back to

your analysis:  Well, sir, what was the net present

value?

        Remember that?

    A.   Yes.

    Q.   All right.  I'm going to ask you a couple of

questions about that.

1    When parties agree to a running royalty, do
2  they know -- do they know, sitting there, what that
3  running royalty will bring in?

4    A.   No.

5    Q.   Can you explain that to the jury.

6    A.   Well, it's -- I mean, that's the whole point,
7  that you're sort of hitching your wagon up with them and
8  saying:  Look, instead of us writing a check now, small
9  check, big check, any kind of check, we're going to
10  agree that -- like on the oil and gas lease, we're going
11  to wait and see if you find anything and wait and see if
12  any gas comes out, and you'll pay a percentage of the --
13  of the revenue that's generated by that process.

14    Q.   So in your hypothetical negotiation, Google
15  and Orion, is there some sort of guarantee by Google at
16  the end of that negotiation for 60 million bucks?

17    A.   No.  No.  In fact, when they walk out of the
18  room, they haven't written a check for anything.

19    Q.   Their obligation is zero when they're stepping
20  from the table.

21    A.   They -- they -- they have not yet incurred any
22  payment yet.  That's going to come due as they generate
23  revenue under the agreement.

24

**REDACTED BY ORDER OF THE COURT**

25

**REDACTED BY ORDER OF THE COURT**

I've read in the press that later when Stanford sold that stock, they sold it for, I think, 330 plus million dollars.

Q.   But, again, in a running royalty calculation, there was no deal for 300-and-something-million dollars at that table, was there?

A.   No.   No.   They agreed to hitch their wagon to Google and see how it turned out.

Q.   All right.   Let's go to a different topic.

You had testified -- you've been asked about -- questions about the Firepond sale shortly before the first date of infringement in this case, right?

A.   Yes.

Q.   All right.   And now, in this case --

MR. HUESTON:   If we could put Slide 49

1 up, please.

2      Q.   (By Mr. Hueston) In this case, the negotiation

3 you must consider involves parties which know and agree

4 that the patent has been infringed; is that right?

5      A.   Yes.

6      Q.   Okay.  And this is the scenario that's --

7 you're supposed to be in in considering damages --

8      A.   Yes.

9      Q.   -- in the hypothetical negotiation?

10      A.   Yes.

11      Q.   All right.  So here what the jury -- is it

12 true that the jury is supposed to be assuming that

13 Yahoo! is saying yes here?

14      A.   Yes.

15      Q.   And that Google is saying yes?

16      A.   Yes.

17      Q.   Now, you were asked to compare this to the

18 Firepond sale with Doug Croxall, which you talked about

19 was, you know, a situation of a company in distress.

20           Let me ask you, from your review of

21 information and depositions in this case, was Firepond

22 even aware that Yahoo! was infringing the '947, the Rice

23 patent?

24      A.   I'm not aware of any evidence that they could

25 have known.

1     Q.   And similarly, any evidence that you've seen

2  that Doug Croxall or Firepond was even aware that Google

3  was infringing --

4     A.   No.

5     Q.   -- the Rice patent?

6     A.   No.

7     Q.   So Firepond didn't have a Google

8  representative coming up to them saying:  We infringe.

9  Let's talk about licenses.

10     A.   No.

11     Q.   No evidence of that, right?

12     A.   That's right.

13     Q.   Same with Yahoo!?

14     A.   That's right.

15     Q.   From your review of the evidence, did the

16  owner of Firepond, unlike Bright Response in this case,

17  take any steps to figure out if Google infringed?

18     A.   Not that I'm aware of.

19     Q.   Same with Yahoo!; any steps that Yahoo!

20  infringed?

21     A.   None that I'm aware of.

22     Q.   Any evidence that they gathered source code --

23     A.   No.

24     Q.   -- at the Firepond stage?

25     A.   No.

1   Q.   In your opinion, does a patent owner get less

2   money in negotiation if the owner does not even know if

3   other companies are using the invention?

4   A.   Yes.

5   Q.   Can you -- do you have -- you know, an example

6   that you can share with the jury to illustrate that

7   concretely?

8   A.   Well, you know, I hate to beat the oil and gas

9   analogy to death, but in these parts, I think it -- it's

10  what I'm aware of.

11        You know, this notion of are you aware of the

12  patent being valid and infringed, I think, is analogous

13  to what happened with they Haynesville Shale in East

14  Texas and Western Louisiana.

15        Prior to 2008, before Chesapeake and other

16  companies came in and proved up that, boy, there's this

17  shale play under parts of Panola County and Harrison

18  County and Bossier, Louisiana, lease bonuses for acreage

19  around these parts were under $500 an acre.

20        And when the awareness of that play being

21  valid were brought to the market, the lease bonus prices

22  for acreage where you had shale went to over $20,000 an

23  acre.  In fact, I'm aware of one transaction at $30,000

24  an acre.

25        And that happened in the space of a very short

amount of time simply because of that awareness of the

validity of the shale play.

    And so it is entirely consistent that you

could have a valuation being done without this knowledge

of validity and infringement that's vastly different

than a valuation that is perfectly reasonable with the

assumption of validity and infringement.

    Q.   Okay.  Thank you.  Let me move to another

topic.

    You were brought through a line of

questioning, did you consider this agreement and that

agreement and that agreement, a whole list of stuff.

I want to ask you:  What were -- you've gone through

this scenario where it has to be assumed that the

company's saying:  Yes, we agree that we are infringing.

We're using -- we're using the invention.

    Which agreements, Dr. Becker, in the evidence

was it clear to you that the -- that Google and Yahoo!

were using the invention?

    A.   On the Google side, the only one that I'm

aware of that there's clear statements that they have

used the technology is the patents related to the

Stanford agreement.

    And on the Yahoo! side, the questions I was

asked about that make it clear that -- that the '361,

1  the Overture patent portfolio, is something that is used

2  in the -- in the -- I think they described it as in the

3  corps of Sponsored Search.

4          So those two situations we know -- I think

5  they would say:  Yes, we agree.  We're using it.  I'm

6  not aware that in any of the other ones that we've

7  talked about there's clear evidence that they're

8  actually using the technology.

9      Q.   And why is that an important point for you?

10     A.   Well, it -- it has a bearing on -- on what the

11 license is worth.

12         If you're -- if the parties are getting a

13 license to say:  Well, you know, we might use it, or if

14 it's being used a little bit, then that impacts the

15 royalty base, and we have the same situation that, you

16 know, what looked like a low amount, the 38,000-dollar

17 settlement, when you actually brought in -- well, it's

18 only 380,000 in revenue.  It's not being used a lot or

19 they're not a very big company, it has a huge bearing on

20 what that rate really is.

21     Q.   All right.  You were asked a number of

22 questions by Yahoo! counsel about the Overture license,

23 right?

24     A.   Yes.

25     Q.   And words to the effect of important to the

business or fundamental.

Do you remember that?

A.   Yes.

Q.   Okay.  And royalties for the Overture licenses that you discussed range in the 3 point, I believe, 75 range up to 5.

THE COURT:  Counsel, approach.

(Bench conference.)

THE COURT:  I was trying to interrupt you before you said that, because I thought that that was part of the area that you wanted me to close the courtroom, so...

MR. HUESTON:  Oh.

THE COURT:  Well, he's asked it now, but can you just move to something that doesn't ask -- I mean, I can't unring the bell, but I was trying to do that for you before he asked the question.  Just avoid those --

MR. HUESTON:  One -- one thought.  I was going to just keep the question to the percentages, which is what he asked on direct, so I don't think -- I mean, I think --

THE COURT:  Well, it's during direct, though.

MR. HUESTON:  I mean -- I'm sorry --

1 during cross.

2            THE COURT: During cross -- well, I

3 thought that -- stay away from the percentages, if you

4 don't mind. Just say that the range has been outlined.

5            MR. HUESTON: Okay. Good. Then I can

6 proceed on that.

7            THE COURT: Proceed with that, okay?

8            MR. HUESTON: Okay. Good. Good.

9            THE COURT: Thank you.

10            (Bench conference concluded.)

11     Q. (By Mr. Hueston) Dr. Becker, with that range

12 of the percentages in mind for those -- for those

13 licenses, have you suggested to the jury that the Rice

14 patent should get that same range of royalty?

15     A. No, absolutely not.

16     Q. All right. Why not?

17     A. Because it's -- it's one patent. It's one

18 element of the system. It's -- you know, and I think

19 my -- the rate that I have suggested as the reasonable

20 rate would put that as a small component of the system.

21     Q. In fact, what you've recommended is between

22 1/10 and 1/20 as much, correct?

23     A. Yes.

24     Q. Let's go on to another topic.

25            MR. HUESTON: Let's put up Slide 73,

please.

Q.   (By Mr. Hueston) You were asked a number of

questions concerning -- about -- concerning what you

considered and what you didn't consider --

A.   Yes.

Q.   -- right, Dr. Becker?

A.   Yes.

Q.   So just for your ease and convenience, I put

the 15 Georgia-Pacific Factors back up.

Can you remind the jury, what are you supposed

to be considering in terms of the body of your analysis?

A.   Well, as a first step, I'm supposed to

consider all of these factors and determine which ones

are applicable in a particular case.  Which ones do we

have evidence for?  Which ones are the circumstances,

like the razors and razor blades, say that Factor 6 are

out?

So you're supposed to consider them all and

weigh them together to arrive, in Factor 15, at a

negotiation for a reasonable rate considering those

different factors.

Q.   Okay.  And I think Mr. Rooklidge asked you,

did you consider economic demand curves?  Do you

remember that question?

A.   Yes.

1      Q.   Is that specifically on the list?

2      A.   No.

3      Q.   You were asked if you considered, I think,

4 quote/unquote, complicated formulas, end quote.

5           Do you remember that question?

6      A.   Yes.

7      Q.   Is that specifically on the list?

8      A.   No.

9      Q.   Okay.  What about mathematical quantifications

10 of the improvement?  Is that specifically on the list?

11     A.   No.

12     Q.   All right.  Now, I do want to ask you this:

13 Is -- there are a number of questions about trying to

14 quantify the amount of an improvement.

15           Is that quantification, from your experience,

16 and with reference to this analysis, required under the

17 Georgia-Pacific analysis?

18     A.   No.  I think you look at the evidence that you

19 have, and there are cases where you have very precise

20 testing and laboratory data that can tell you how much a

21 chemical patent, for example, may contribute to a

22 process.

23           But in patents that are sort of more

24 business-oriented, it's rare that you have a precise

25 scientific or sort of laboratory quantification of the

1  impact of a patent.

2      Q.    Any such information provided to you to allow

3  you to make that kind of analysis?

4      A.    No, not that -- where anybody said:  Let's

5  flip the '947 patent on and off and look at what it does

6  to Google or Yahoo!'s system.

7      Q.    And in your experience, who provides that

8  information?

9      A.    Well, in a situation like this, the -- the

10 only party that would be able to do a test like that

11 would be a Yahoo! or a Google since that's where the

12 system is.

13         You can't sort of take a copy of it and run

14 it.  You would need to replicate millions and millions

15 of queries coming in.  And the systems are just too big

16 for anyone else to test them other than the companies.

17     Q.    And in this case, did you consult with an

18 expert to try to get a sense of the type of improvement

19 in this case?

20     A.    Yes.

21     Q.    And who was that?

22     A.    That was Dr. Rhyne.

23     Q.    And with that information and other points,

24 were you able to make what you thought was a fair

25 comparative analysis?

1     A.   Yes.

2     Q.   Let me ask you about lump sum versus running

3 royalty for just a few moments.

4          Between lump sum and running royalty, your

5 opinion is running royalty, correct?

6     A.   Yes.

7     Q.   Was that consistent with what the Google

8 expert in another case expressed?

9     A.   Yes.  Mr. Mike Wagner, who's an expert that I

10 know and respect, was an expert for Google and

11 offered -- or his testimony was that a running royalty

12 was an appropriate --

13              THE COURT:  Just a second.

14              MR. VERHOEVEN:  Objection, move to

15 strike.

16              THE COURT:  I'll sustain that.  Let's

17 limit the questions to the Google-Stanford license.

18     Q.   (By Mr. Hueston) And Mr. Wagner, did he opine

19 as to --

20              MR. VERHOEVEN:  Objection.

21              MR. HUESTON:  Side-bar, Your Honor?

22              THE COURT:  Yes.

23              (Bench conference.)

24              MR. HUESTON:  Your Honor, I think it's

25 fair to mention a name.  I'm not going to get into

1  anything more than that without a name. It just sounds

2  like it's just --

3              THE COURT: A name of what?

4              MR. HUESTON: A name of the man, not the

5  case, the result or anything like that. I didn't hear

6  anything keeping that out of bounds.

7              THE COURT: No. That's permissible, but

8  I just didn't understand what question you were going to

9  ask.

10             MR. HUESTON: Oh, I'm just going to ask,

11 did Mr. Wagner -- what did he say with respect to the

12 Stanford.

13             THE COURT: So I overrule the objection.

14             (Bench conference concluded.)

15     Q.   (By Mr. Hueston) And, Dr. Becker, what did

16 Mr. Wagner say was the appropriateness of a conversion

17 analysis for that Stanford-Google agreement?

18     A.   He felt that treating the equity grant that

19 Stanford received as being equivalent to a running

20 royalty was appropriate.

21     Q.   And is that one of the factors you've taken

22 into consideration in determining if a running royalty

23 is appropriate in this case?

24     A.   Yes.

25     Q.   Now, you were asked by counsel -- I think by

1 Yahoo! and perhaps by Google -- I don't quite recall --
2 if you just click on the ad, it's outside of what's
3 being accused here, right?
4      A.   Yes.
5      Q.   And you admit that's something that you've
6 accounted for in your analysis, right?
7      A.   Yes.
8      Q.   How come that doesn't affect your analysis,
9 the fact that the click is outside the infringement?
10 That's where they get the money, so how can that not be
11 separated from the money that you're asking the jury to
12 return in this case?
13      A.   Well, it -- you know, the issue is that the --
14 I have to assume that the patent is used -- that the
15 product AdWords or Sponsored Search is infringing.
16 You know, the fact that sort of when you go ringing a
17 cash register isn't described by the claims in the
18 patent, I don't think that's really relevant.
19           I mean, the question is whether the product
20 that is being presented to people to generate revenue
21 with is infringing.  And we have -- I have to assume
22 that it is.
23      Q.   All right.  Let's go to -- the next line of
24 questioning I have for you, sir, I want to -- you had a
25 number of questions where you were asked about how you

size the quarter to the half penny royalty, so I want to

address that for a moment.

                MR. HUESTON:  Let's put up Slide 37,

please.

    Q.   (By Mr. Hueston) You had spent -- you had been

asked about the sizing of the royalty.  Let me ask you

this:  If you converted these changes to pennies on the

dollar, how do these changes, incremental

improvements -- as you were telling Mr. Rooklidge, it's

incremental on improvement here with the Rice patent,

how does this translate?

    A.   Well, that first one is 4 cents on the dollar.

The second one is 2 cents on the dollar.  And that tweak

to the blue bar spacing is a penny on the dollar, which

are all substantially larger -- multiples of what I have

at the quarter penny to a half penny.

    Q.   So just -- the first one -- so just changing

the size of the letter, that's a 4-penny-on-the-dollar

change?

    A.   Yes.

    Q.   But your recommendation for running royalty is

a quarter to half penny, right?

    A.   Yes.

    Q.   Changing the font face is 2 pennies on the

dollar --

1    A.    Yes.

2    Q.    -- right?

3          You're a quarter to a half penny, right?

4    A.    Yes.

5    Q.    Moving the little blue bar, that's a 1

6 percent, right?

7    A.    Yes.

8    Q.    One penny on the dollar?

9    A.    Yes.

10    Q.    And you're a quarter penny to a half penny,

11 right?

12    A.    Yes.

13          MR. HUESTON:  No more question.

14          THE COURT:  Hold on just a second.

15          Well, that's a good thing there's no more

16 questions, because we're taking our morning recess.

17          Take 20 minutes.  Be back at 10:30.

18          Remember my prior instructions.  Don't

19 talk about the case.

20          LAW CLERK:  All rise.

21          (Jury out.)

22          THE COURT:  Be seated.

23          Counsel -- hold on a second -- I directed

24 you to avoid leading on redirect.  I expect you to

25 follow my instruction.  Now, he's not going to have to

stand up and object to you violating my instructions.

Any question?

MR. HUESTON:  I apologize, Your Honor.

THE COURT:  My question to you is:  Do you have any questions of me about that instruction?

MR. HUESTON:  No, Your Honor.

THE COURT:  Okay.  Secondly, I gave Mr. Verhoeven a Miranda warning a couple of days ago about violating my order in limine.

Now, I thought that I had limited testimony about Mr. Wagner's opinion to his conversion of the Google-Stanford license, not that he opined further that Google had entered into an agreement or would have entered into a running royalty in that case.

Now, I'm -- you know, I'm -- that's the question that I thought that you had asked the witness on the stand.

Did I misunderstand something?

MR. HUESTON:  Your Honor, what I was trying to frame is the -- the -- just the Google-Stanford, what did he do?  It's a conversion with a running royalty.  I may have gotten gummed up.  It was not a broader question.

THE COURT:  Well --

MR. HUESTON:  It was just that.

                    THE COURT:  -- you have now got my
Miranda warning, okay?  I'm not going to give any
further instructions other than sustaining his objection
and instructing to strike.

                    MR. HUESTON:  All right.

                    THE COURT:  And I'm not suggesting that
you did it intentionally.

                    MR. HUESTON:  I did not, Your Honor.

                    THE COURT:  But the same instruction and
caution to you.  You need to exercise caution when you
get that close to a ruling.

                    MR. HUESTON:  Yes, Your Honor.

                    THE COURT:  Follow my instructions on
leading the witness on redirect, okay?

                    MR. HUESTON:  I will.

                    THE COURT:  All right.  Whose cell phone
went off?

                    MR. GOLDBERG:  Mine.

                    THE COURT:  Off the record.

                    (Discussion off the record.)

                    THE COURT:  All right.  We're in recess
until 10:30.

                    LAW CLERK:  All rise.

                    (Recess.)

                    LAW CLERK:  All rise.

1          (Jury in.)

2                    THE COURT:  Please be seated.

3                    Mr. Verhoeven?

4                    MR. VERHOEVEN:  Yes, Your Honor.

5                    THE COURT:  Additional cross-examination?

6                    MR. VERHOEVEN:  Just a few.

7                    RECROSS-EXAMINATION

8   BY MR. VERHOEVEN:

9       Q.   Dr. Becker, you testified on redirect about

10  the Stanford agreement.  Remember that?

11      A.   Yes.

12      Q.   The Stanford agreement does not concern the

13  '947 patent, does it, sir?

14      A.   It does not.

15      Q.   And you testified in connection with Yahoo!

16  about the Overture agreement generally.

17      A.   Yes.

18      Q.   You remember that?

19      A.   Yes.

20      Q.   The Overture agreement does not concern the

21  '947 patent, does it, sir?

22      A.   It does not.

23                    THE COURT:  Mr. Verhoeven, you may need

24  to switch --

25                    MR. VERHOEVEN:  Oh, thank you.

1          Put up DX Demo 71, please.

2          There we go.  DX Demo 71, please.

3          That's wrong.  I apologize, Your Honor.

4          There we go.

5     Q.   (By Mr. Verhoeven) Dr. Becker, you testified

6  on redirect about a couple of agreements that did

7  concern the '947 patent that I hadn't mentioned in my

8  cross that had language in the actual agreements that

9  represented how much revenue the licensee was saying

10  that was obtained.

11          Do you remember that generally?

12     A.   Yes.

13     Q.   Now, the agreements we went over, which I have

14  up here summarized on DX Demo 71, none of those

15  agreements have such representations in them, do they,

16  sir?

17     A.   That's correct.

18     Q.   There's no representation in the Banter's

19  license agreement that there's a limit on how much

20  revenue there was, right?

21     A.   No.  And I think in your question --

22     Q.   Is that right?  Is that right?

23     A.   As a limit, there's no mention of the revenue.

24  Those other ones weren't the limit.  They were the

25  representation of the amounts that was referenced.

1     Q.   Fair point.

2          There's no mention in the Banter agreement, no

3  representation about the amount of revenue in the Banter

4  agreements, correct?

5     A.   Correct.

6     Q.   Same is true for Keystone?

7     A.   Correct.

8     Q.   And Kana?

9     A.   Correct.

10    Q.   Black & Decker?

11    A.   Correct.

12    Q.   Whirlpool, Macy's, and Apple?

13    A.   Correct.

14    Q.   Okay.  Now, you did mention some other

15  agreements that we hadn't gone into:  The SAP agreement,

16  the Oracle agreement, and the Microsoft agreement.

17         Remember that?

18    A.   Yes.

19    Q.   And those are all agreements that concern the

20  '947 patent, right?

21    A.   Yes.

22    Q.   Would you agree with me that in all three of

23  those agreements, what was licensed was an entire

24  portfolio of patents?

25    A.   Yes.  There were multiple patents.  We would

1  have to look at the agreements to see whether it was the

2  fourteen or the two.  There were multiple patents.

3      Q.   There were fourteen patents and five

4  applications in each of those agreements, sir?

5      A.   I'll take your representation.

6      Q.   And that averages out to about $250,000 per

7  patent and application, if you do the math, right?

8      A.   If you just do the math.

9      Q.   Okay.  Now, the highest agreement that you

10  found -- the highest license agreement that you found

11  that involves the '947 patent is for a lump sum of 5

12  million, right?

13      A.   Yes.

14      Q.   Okay.

15      A.   In terms -- in terms of the lump-sum

16  settlement amount, yes.

17      Q.   There's a bunch of license agreements that

18  involve the very patent at issue in this case, right?

19      A.   Yes.

20      Q.   Okay.  And the highest lump-sum payment that

21  you saw in any of those agreements was $5 million,

22  right?

23      A.   Yes.

24      Q.   And that's for fourteen patents and five

25  applications, right?

1      A.    Yes.

2      Q.    Okay.  Now, $65 million is 1,300 percent

3 higher than $5 million, isn't it, sir?

4      A.    I'll take your representation on the math.

5      Q.    You don't disagree with that math?

6      A.    I don't disagree with that.

7                MR. VERHOEVEN:  Thank you, Your Honor.

8                No further questions.

9                THE COURT:  Thank you, Counselor.

10                Mr. Rooklidge?

11                MR. ROOKLIDGE:  Nothing further, Your

12 Honor.

13                THE COURT:  Any redirect?

14                MR. HUESTON:  Very briefly, Your Honor.

15                THE COURT:  All right.

16                    REDIRECT EXAMINATION

17 BY MR. HUESTON:

18      Q.    Dr. Becker, counsel for Google put that list

19 up.

20                MR. HUESTON:  If I could ask the help of

21 the Defense, if you could put the list back up, your

22 Slide 71, please.

23                Thank you very much.

24      Q.    (By Mr. Hueston) With reference to this, I

25 want to ask you, was there any representations that

1   you're aware of in these agreements about how much the

2   accused revenue was?

3       A.   No.  No.  That's my point as to why they're

4   difficult to use.

5       Q.   And can you explain that?  Is it harder or

6   easier to make a comparison, if accused revenue is

7   mentioned or not mentioned in a lump-sum settlement?

8       A.   Well, I think if it's not mentioned, it's

9   almost impossible to understand the effective amount

10  that's being paid.  And we saw that with the

11  38,000-dollar amount that on its face seems very small.

12  But when you understand the amount of revenue that's at

13  stake, it's actually a pretty substantial percentage

14  royalty.

15      Q.   In your analysis, Dr. Becker, have you been

16  asked to assume how much each company is using the

17  patented invention?

18      A.   Yes.

19      Q.   On a daily basis, how much is Google using the

20  patented invention?

21              MR. VERHOEVEN:  Objection.  Beyond the

22  scope.

23              THE COURT:  Overruled.

24      A.   Billions of searches.

25      Q.   (By Mr. Hueston) And Yahoo!?

1    A.    Billions of searches.

2    Q.    Looking at this, do you have any information

3  about how much these companies are using the patented

4  invention?

5    A.    No, no information at all.  That's the point.

6  We just don't know.

7                   MR. HUESTON:  No more questions.

8                   THE COURT:  Recross?

9                   MR. VERHOEVEN:  Nothing further, Your

10 Honor.

11                   MR. ROOKLIDGE:  Nothing further.

12                   THE COURT:  All right.  You may step

13 down.

14                   THE WITNESS:  Thank you.

15                   THE COURT:  Who will be your next

16 witness?

17                   MR. SPANGLER:  Your Honor, at this time,

18 the Plaintiffs will be calling Doug Croxall, who was the

19 Firepond owner at the time of the sale to Orion, and

20 Luke Yeh, who was a former witness for Yahoo!.

21                   THE COURT:  By --

22                   MR. SPANGLER:  By video.

23                   THE COURT:  -- video deposition?

24                   MR. SPANGLER:  Yes, Your Honor.

25                   THE COURT:  Ladies and Gentlemen, recall

my instructions about depositions -- depositions and the

procedure whereby for one reason or another the witness

can't be here in Court to testify.

You should consider the fact that the

witnesses are sworn, under oath.  You should give the

testimony, to the extent possible, the same weight that

you would give it as if it were given here in Court, but

it's procedure by which the lawyers for both parties can

go and ask the witness questions under oath.

Turn the lights down.

(Video clip playing.)

QUESTION:  Prior to your purchase of

Firepond, was there any valuation of the patents

performed?  The Firepond patents?

ANSWER:  No.

QUESTION:  Was there any valuation of the

'947 patent in particular performed prior to your

purchase of Firepond?

ANSWER:  No.

QUESTION:  How, if at all, did the fact

that Firepond owned this group of patents factor into

your purchase of the company?

ANSWER:  It didn't.

QUESTION:  Did you -- at the time of your

purchase of Firepond, did you have any business plan for

1  the group of patents that Firepond owned?

2                ANSWER:  No.

3                QUESTION:  Prior to your purchase --

4                (End of video clip for Mr. Croxall.)

5                (Video clip playing of Mr. Yeh.)

6                ANSWER:  I don't think we have

7  established that Yahoo! has any licensing policies.  I

8  would say that Yahoo! does not have any established

9  policies regarding patent licensing.

10               QUESTION:  I will ask it a different way.

11  Does Yahoo! have any -- you say that Yahoo! doesn't have

12  any established policies regarding patent licensing.

13               Does it have any standard practices

14  regarding patent licenses?

15               ANSWER:  What would constitute a

16  standard -- I'm sorry.  Did you say practice?

17               QUESTION:  Uh-huh.

18               ANSWER:  Standard practice as opposed to

19  a non-standard practice?

20               QUESTION:  Are there any particular

21  licensing terms that Yahoo! typically pursues when

22  negotiating patent licenses?

23               ANSWER:  I would say no.

24               QUESTION:  Does Yahoo! have established

25  preferences to the form of -- of -- of royalty in the

1  license agreements it negotiates?

2              ANSWER:  Aside from wanting the terms

3  that are the best for Yahoo!, there are -- there are

4  not.

5              QUESTION:  Does Yahoo! have a preference

6  for a lump-sum form of royalty in the in-licenses that

7  it negotiates?

8              ANSWER:  In -- could you -- when -- when

9  you say in-license?

10              QUESTION:  Where -- where Yahoo! is -- is

11  taking a license from another party.

12              ANSWER:  And receiving patent rights?

13              QUESTION:  Yeah.

14              ANSWER:  And I'm sorry, sir.  With

15  respect to in-licenses, the question was?

16              QUESTION:  Whether Yahoo! has a

17  preference for a lump-sum form of royalty.

18              ANSWER:  I -- from my knowledge or my

19  experience with the company, Yahoo! doesn't have any

20  preferences with regard to in-licenses.  But -- but I'll

21  add that as far as I know or as far as I'm aware, Yahoo!

22  has only entered --

23              QUESTION:  Where Yahoo! has -- has

24  granted licensing rights to other persons or entities,

25  does Yahoo! have a preference for a lump-sum form of

1  royalty in those agreements?

2           ANSWER:  Again, I don't think that Yahoo!

3  has a preference as to one form of license over the

4  other for out-licenses.

5           I'll also add that I'm aware of both lump

6  sum and running royalty base out-licenses at Yahoo!

7           QUESTION:  Does Yahoo! evaluate the terms

8  of each license agreement individually based on a number

9  of factors?

10           ANSWER:  Yes.

11           QUESTION:  Are you aware of any instance

12  in which Yahoo! is licensed in a single patent or a

13  handful of patents on a running royalty basis?

14           ANSWER:  No.

15           QUESTION:  As far as you're aware, then,

16  have all of Yahoo!'s licenses in a single patent or a

17  handful of patents been done on a lump-sum basis?

18           ANSWER:  Yes.

19           QUESTION:  Does the lump-sum payment

20  arrangement in those agreements reduce Yahoo!'s

21  uncertainty as compared to a running royalty

22  arrangement?

23           ANSWER:  Yes.

24           QUESTION:  Does the lump-sum payment

25  arrangement reduce Yahoo!'s ongoing administrative

1 burden and inconvenience of monitoring usage of the

2 invention or the other royalty base parameter?

3                    ANSWER:  Yes.

4                    QUESTION:  Does the lump-sum arrangement

5 avoid Yahoo! having to disclose its confidential

6 financial information to the licensor?

7                    ANSWER:  Yes.

8                    QUESTION:  Does the lump-sum royalty

9 arrangement allow Yahoo! to simplify its accounting by

10 treating the payment as a one-time expense?

11                    ANSWER:  Yes.

12                    QUESTION:  Does the lump-sum royalty

13 arrangement allow Yahoo! to cap its liability under the

14 licensed patent?

15                    ANSWER:  Yes.

16                    QUESTION:  So does the lump-sum royalty

17 arrangement give Yahoo! the ability to use the patented

18 technology for the rest of the term of the patent

19 without further expenditure?

20                    ANSWER:  Yes.

21                    QUESTION:  Does the lump-sum royalty

22 arrangement avoid difficulty in negotiating an

23 appropriate royalty base?

24                    ANSWER:  Yes.

25                    QUESTION:  Does the lump-sum royalty

1 arrangement simplify and speed up negotiation of the

2 agreement?

3                    ANSWER:  Yes.

4                    QUESTION:  In your experience, in the

5 past, has Yahoo! entered into licenses in a lump-sum

6 payment arrangement, because Yahoo! has benefited

7 economically from that arrangement?

8                    ANSWER:  Yes.

9                    QUESTION:  How so?

10                    ANSWER:  Yahoo! has been able to get a

11 more favorable payment.

12                    QUESTION:  And what do you mean by a more

13 favorable payment?

14                    ANSWER:  A smaller payment.

15                    QUESTION:  Has Yahoo! entered into

16 license agreements based on a lump-sum arrangement that

17 have also mentioned a royalty rate?

18                    ANSWER:  Yes.

19                    QUESTION:  Does the mention of a royalty

20 rate in a lump-sum license agreement suggest anything

21 about whether Yahoo! would actually agree to pay

22 royalties at that rate?

23                    ANSWER:  No.

24                    QUESTION:  In your experience, is it

25 common for patent licensors to seek to have a lump-sum

```
 1  license agreement mention a royalty rate that the
 2  licensor can later --
 3                    (End of video clip.)
 4                    (Video clip playing.)
 5                    QUESTION:  Counsel asked you about
 6  Exhibit 14, the Harrington agreement.  I put that
 7  agreement in front of you.
 8                    Do you see that agreement?
 9                    ANSWER:  Yes.
10                    QUESTION:  Was that a document that was
11  produced by Yahoo! in this litigation?
12                    ANSWER:  Yes.
13                    QUESTION:  Is that a document that's kept
14  in the ordinary course of business at Yahoo!
15                    ANSWER:  Yes.
16                    QUESTION:  And was that an agreement that
17  Yahoo! entered into?
18                    ANSWER:  Yes.
19                    MR. ROOKLIDGE:  No further questions.
20                    QUESTION:  You mentioned that you
21  discussed some advantages from Yahoo!'s point of view of
22  the lump-sum royalties with Mr. Rooklidge, correct?
23                    ANSWER:  Yes.
24                    QUESTION:  And one of those advantages
25  you said was that under a lump sum, Yahoo! would make a
```

1  small payment of royalties; is that correct?

2              ANSWER:  Based on what I'm -- I'm aware

3  of, yes.

4              QUESTION:  But in Yahoo!'s view, that

5  licensor will receive less money under the lump sum than

6  they would receive under a running royalty?

7              ANSWER:  Again, based on what I've seen

8  and based on my own opinion, that appears to be the

9  case.

10             (End of video clip.)

11             THE COURT:  Does that conclude the offer?

12             MR. SPANGLER:  Yes, Your Honor.

13             THE COURT:  All right.  Put the lights

14 back up.

15             Who will be your next witness?

16             MR. HUESTON:  Your Honor, Bright Response

17 calls Mr. Brad Sheafe as our next witness.

18             THE COURT:  All right.  Mr. Sheafe.

19 This witness was previously sworn, correct?

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  All right.  Come around, sir.

22             THE WITNESS:  Thank you.

23             MR. HUESTON:  Thank you, Your Honor.

24   LEE BRADLEY SHEAFE, PLAINTIFF'S WITNESS, PREVIOUSLY

25                       SWORN

<u>DIRECT EXAMINATION</u>

<u>BY MR. HUESTON:</u>

Q.   Good morning, Mr. Sheafe.

A.   Good morning.

Q.   Could you state your full name for the record, please.

A.   Yes, sir.  Lee Bradley Sheafe.  I go by Brad.

Q.   Thank you.

What is your current occupation?

A.   I am currently the Manager of Bright Response.

Q.   Before we get into that, I would like to cover some of your personal background.

Can you tell the jury, where do you currently live?

A.   I currently live in a small town outside of Champaign, Illinois.

Q.   And are you married?

A.   I am.

Q.   Do you have any kids?

A.   I do.  My wife and I have four children, all girls.

Q.   Sounds like you're outnumbered.

A.   Even my dog is a girl.

Q.   Where did you grow up?

A.   Actually, I grew up all over the place.  My

father was a Secret Service agent, and so during my time

at home, we moved a lot.  So I was in 10 different

places before I left for college.

Q.   All right.  Let's talk about college.  What's

your educational background?

A.   I graduated with a bachelor of science degree

in -- from the United States Air Force Academy.

Q.   And did you graduate with any distinctions?

A.   I did.  I graduated magna cum laude, and I was

recognized as the Outstanding Cadet in my department.

Q.   And going to the Air Force Academy, did you

serve in the Air Force?

A.   I did.

Q.   And where were you assigned after graduation?

A.   Immediately following graduation, I was

assigned to Goodfellow Air Force Base in San Angelo,

Texas, for training.  I was then assigned to Luke Air

Force Base, which is just outside of Phoenix, Arizona,

for my initial assignment.  And my final assignment in

the Air Force was to the Defense Intelligence Agency,

which is located in Washington, D.C.

Q.   And can you briefly describe what you did at

the Defense Intelligence Agency?

A.   Yes, I can.  I was assigned to a unit that was

responsible for activities in the Middle East.

1   Q.   What did you do after serving with the Defense

2   Intelligence Agency?

3   A.   Well, after my assignment to the Defense

4   Intelligence Agency, I separated from the United States

5   Air Force, and I accepted a position as a special agent

6   with the FBI.

7   Q.   Can you briefly describe the types of work you

8   did with the FBI?

9   A.   Sure.  Initially, all prospective agents go to

10  Quantico, Virginia, where the FBI Academy is.  And if

11  you successfully complete that academy training, you are

12  then assigned to a division within the FBI.

13         I was assigned to the Baltimore Division.  I

14  worked initially with gangs and drugs, and then once the

15  Bureau began to investigate cyber crimes as a separate

16  type of crime, I was assigned as a training agent to one

17  of the original cyber crime units within our squads

18  within the FBI.

19  Q.   Let me stop you for a moment.  What is

20  cyber -- cyber crimes?

21  A.   Well, there are -- there are a number of

22  different things that fall under the umbrella of cyber

23  crimes.  My specialty was in what is referred to as

24  computer intrusions where -- people, generally, are more

25  familiar with the term hacking.

1          So I would investigate both criminal hacking

2    events as well as national security hacking events.

3          Q.   And if you could proceed with just summarizing

4    what else you did with the FBI.

5          A.   Following 9/11, a special missions unit was

6    established under our Counterterrorism Unit.  Agents

7    were hand-selected from different divisions around the

8    country for assignment to that unit based on their

9    investigative specialties as well as having a tactical

10   background.

11          I had a tactical background coming out of the

12   military, a special operations background.  And so I was

13   assigned to that unit for three years.

14          And subsequent to that, I was selected to be

15   the liaison agent to the National Center for

16   Supercomputing Applications, which is in Champaign,

17   Illinois.  And that's why my family and I live just

18   outside of Champaign, Illinois.

19          Q.   All right.  How long did you serve with the

20   FBI, Mr. Sheafe?

21          A.   From February of 1997 to May of 2008.

22          Q.   We all remember where we were at 9/11,

23   Mr. Sheafe.  Where were you?

24          A.   I was actually out in Monterey, California, in

25   support of the FBI's hostage rescue team, which was

training on Fort Ord.  The hostage rescue team is the

FBI's Tier I counterterrorism tactical team.  Sort of

think about it as like an advanced SWAT team.

Q.   And what happened that day?

A.   Well, we were involved in night operations,

and so we had just gone to bed.  All of our pagers went

off.  Different agents' wives and spouses began to call.

And we came to realize the country had been attacked by

terrorists.

Q.   And were you mobilized?

A.   Well, we were.  We were in kind of an awkward

position.  The team is stationed in Quantico, Virginia,

and a significant portion of it was all the way out in

California.  So we had to get back to -- the hostage

rescue team's duty station in Quantico.

Q.   How did that happen?

A.   Well, we flew and we were the only aircraft in

the sky over the country that night.  It was surreal.

We had fighter aircraft off the wings the entire way.

Q.   And what happened, then, once you arrived?

A.   Well, once we landed, it was the middle of the

night of the following day.  We unpacked our own

equipment from the aircraft, and then each of the agents

went to their respective duty stations and began to

work.

1      Q.    Were you assigned to Ground Zero for a period
2  of time?
3      A.    I was.  Shortly thereafter, I was asked to go
4  up to New York, and I spent six weeks there as one of
5  the agents working that investigation.
6      Q.    All right.  Let's turn to Bright Response.
7            You mentioned you were Manager of Bright
8  Response?
9      A.    I am.
10     Q.    What is Bright Response?
11     A.    Bright Response is -- is a technology company,
12  and what it does is it evaluates and then invests in
13  patents.
14     Q.    All right.  And what is the primary focus of
15  Bright Response?
16     A.    I would say the primary focus of Bright
17  Response is in -- of all the patents that are out there
18  that we have access to seeing, we try to find those that
19  are undervalued, that for whatever reason the current
20  owner of the patent doesn't really recognize what they
21  have, and we have an opportunity to invest in that
22  patent.
23     Q.    All right.  And is there part of the business
24  that you focus on, Mr. Sheafe?
25     A.    There is.  I personally focus on taking the

opportunity to initially review the patents that are
made available to Bright Response through one way or
another, whether someone offers them to us or they're
for sale generally.

And I take that initial look to see if it's
something that Bright Response would be interested in,
to see if the -- in terms of its technology, to see if I
think that there may be some value in that patent that
the current owner is not recognizing. And if that sort
of passes that first sniff test for me, I then pass it
off to the experts that Bright Response contracts with
to further that investigation and make a decision.

Q.    Okay.  Let's talk a little bit about that.
How many employees are there at Bright Response?

A.    Employees, there are two.

Q.    All right.  And you mentioned folks that you
contract with.

Can you describe a little bit about that?

A.    Yes, sir.  We have a large number of folks
that we then contract.  So we have administrative
contractors.  We have financial contractors.  And then
we have sort of our expert contractors in terms of the
technology.

For instance, you've seen Dr. Rhyne in terms
of the damages.  For instance, Dr. Becker, as well as

1  our legal experts, which are adequately represented

2  right here in Court.

3      Q.   You mentioned part of what you do is looking

4  for undervalued patents.

5           In your experience, what are some of the

6  reasons why a patent might be undervalued?

7      A.   Well, it's a difficult thing to mine the value

8  out of a patent.  They are complex documents.  They are

9  a tough read.

10          I know you were asked to read the patent.  I'm

11 sure you've taken that seriously.  They don't -- they

12 certainly don't read like a story.  So you have to work

13 your way through that.

14          And oftentimes, patent owners don't have the

15 time, the desire, or the resources or the expertise for,

16 quite frankly, the world to fight to ensure that

17 companies respect the invention that's represented by

18 the patent.

19     Q.   All right.  And how long have you been with

20 Bright Response, Mr. Sheafe?

21     A.   I've been with Bright Response since March of

22 2009.

23     Q.   And have you held another position since that

24 time?

25     A.   I have.  I've been in a number of other

1  positions, similar positions, to include being the

2  President of the company that owns Bright Response,

3  which is TechDev Holdings.

4      Q.   Parent company?

5      A.   It is the parent company.

6      Q.   Okay.  And since March of 2009, though --

7  2009, where have you devoted your efforts?  In which --

8  in which of these positions?

9      A.   Well, my efforts have been primarily devoted

10 to my responsibilities as the President of TechDev

11 Holdings, and a significant portion of that time has

12 been dedicated to Bright Response.

13     Q.   All right.  Now, were you Manager of Bright

14 Response when it acquired the Rice patent?

15     A.   No, sir, I was not.

16     Q.   Do you have an understanding of how Bright

17 Response acquired the Rice patent?

18     A.   I do have a general understanding of how it

19 was acquired, yes, sir.

20     Q.   Okay.  And I'll just ask you the simple

21 question:  Is Bright Response the owner of the '947

22 patent?

23     A.   Yes, it is.

24     Q.   And do you know if there was a preliminary

25 patent application submission in connection with that?

1    A.    There was.  As we've seen testimony in Court,

2  there was a provisional application filed on April 3rd,

3  1997 by Chase Manhattan Bank.

4    Q.    Do you have an understanding of -- of how much

5  the Rice patent was acquired for?

6    A.    It's my understanding -- and, again, we've

7  seen a ton of testimony on this.

8             MS. DOAN:  Objection, Your Honor.

9             THE COURT:  What's the objection?

10            MS. DOAN:  Foundation, lacks personal

11 knowledge.

12            THE COURT:  Overruled.

13   Q.    (By Mr. Hueston) You can answer the question.

14   A.    Thank you.

15            It's my understanding that the patent was

16 acquired -- and, again, we've seen this time and again,

17 so I won't take more of your time -- it was acquired as

18 part of a group of patents by a company called Orion

19 from a company called Firepond.

20   Q.    And do you recall, roughly, the amount for

21 that patent and others?

22   A.    Again, we've heard testimony that it was a

23 million -- the cash compensation was a million dollars.

24   Q.    Okay.  Mr. Sheafe, do you believe that the

25 patent in this lawsuit is worth, at most, about a

1 million dollars?

2    A.    Absolutely not.

3    Q.    Why not?

4    A.    Well, at this point in time, we have mined the

5 value out of that patent.  The mine -- the Rice patent

6 is clearly an example of one of these undervalued

7 patents.

8         And at the time it was acquired, again, we

9 just heard testimony, it was a distressed company.  They

10 didn't -- it was our belief they didn't know what they

11 had.  And so that patent was acquired, and then we began

12 to put in the time and effort and resources and money to

13 determine what the true value of that patent was.

14    Q.    All right.  Let's turn to a different topic.

15         Are you familiar with the process of what's

16 called reexamination?

17    A.    I am generally familiar, yes, sir.

18    Q.    What's the basis of that familiarity?

19    A.    Well, in my role as the Manager of Bright

20 Response, I oversee -- when patents go through the

21 Patent Office -- you guys have heard this term in

22 Court -- that's called prosecution.

23         So for any patents that belong to Bright

24 Response, any prosecution issues, any matters that are

25 going on at the Patent Office, then I oversee them.

1      Q.   Okay.  And so what's your understanding of a

2  reexamination?  What is that?

3      A.   Well, a reexamination, you can kind of tell

4  from the word itself that it's a re -- we're going to do

5  something again -- examination.

6          So it's when someone requests that the Patent

7  Office take another look at a patent to see if -- if

8  it's valid.  They -- they -- they have found a document

9  of some sort that they believe may suggest that the

10  patent, in fact, not valid, that it shouldn't have been

11  issued.

12          And then they submit that to the Patent Office

13  in a request to say would you please take another look

14  at this patent, to test it again and see if it should,

15  in fact, be patentable.

16      Q.   And after that sale from Firepond, are you

17  aware of whether the Rice patent was put into that

18  reexamination process?

19      A.   Actually, requests have gone to the Patent

20  Office twice for the Rice patent to be reexamined.

21      Q.   Okay.  Well, let's go through them one by one.

22          Tell me about the first request.  Do you

23  remember, roughly, when that happened?

24      A.   I believe that request was submitted in May of

25  2008.

1    Q.   And who put in the request?

2    A.   Google did.

3    Q.   And let's take a look -- well, hold on a

4  minute -- for a second.

5        And do you have any understanding as to what

6  was the nature of the submission?  What was being

7  requested?

8    A.   Yes, sir.  Again, what's being requested is --

9  is someone thinks that some documentary evidence has

10 been discovered that might call into question whether or

11 not the invention should remain an invention, whether it

12 should remain as a patent.

13   Q.   All right.  And do you have an understanding

14 as to what was submitted by Google for the Patent Office

15 to consider in terms of the reexamination?

16   A.   There was a particular document that was

17 submitted by Google in that reexamination, and I will

18 refer to it as the Allen patent or the '664 patent.

19   Q.   All right.  I'm going to direct your attention

20 to the ELMO, which I have not successfully turned on.

21        Let me try it again.

22           COURTROOM DEPUTY:  You want me to do that

23 for you?

24           MR. HUESTON:  Yes, please.  Thank you.

25 Thank you so much.

1        COURTROOM DEPUTY:  Uh-huh.

2        Q.    (By Mr. Hueston)  Now, Mr. Sheafe, were you

3    here during opening statements?

4        A.    Yes, sir, I was.

5        Q.    Do you remember when Ms. Doan, counsel for

6    Yahoo!, put this up in the opening statement?

7        A.    I do.

8        Q.    Is this -- this says Allen patent.  Is this

9    the patent you're referring to?

10        A.    Yes, it is.

11        Q.    Okay.  And so is this submitted for

12    reexamination in that first effort?

13        A.    Yes.  This is at least one of the documents

14    that the Patent Office was requested to consider to

15    determine whether or not the Rice patent should remain

16    valid.

17        Q.    All right.  Now, once Google put in that

18    reexamination request, did Bright Response respond and

19    take a step backwards?

20        A.    We did.  The patent owner is allowed to be

21    involved in the reexamination of the patent that they

22    own.  So as I've said, Bright Response owns the Rice

23    patent.

24            And so I suppose you could see this as

25    something that, you know, might cause alarm.  Your

patent has been sent back into the Patent Office.

There's a possibility the Patent Office is going to come

back and say, well, wait a minute; we made a mistake; we

didn't recognize that this document existed; and so

we're going to invalidate your patent.

And then you lose it. It's one of the

business risks that we take, Bright Response.

But in this case, we saw it as an opportunity.

Q. What do you mean by that?

A. Well, there was a number of these documents,

like the Allen patent, that Bright Response had been

made aware of largely through the Defendants in this

case, Google and Yahoo!, who had provided us with

documents that they alleged were a collection of

documents that would call into question whether or not

the Rice patent should remain valid.

So we took the opportunity to send all of

those documents into the Patent Office, which we're

allowed to do, and ask that the Patent Office not only

consider what had been submitted in the request but also

consider all of these documents.

And our objective there was to ensure that

when the Rice patent came back out of the Office that

there could be very little question as to the validity

of that patent.

1       Q.   All right.  And did Google challenge, among

2    others, the claims that are at issue in this lawsuit?

3       A.   Yes, they did.

4       Q.   And what claims are they?

5       A.   Again, you've heard this a number of times.

6    They are Claims 30, 31, and 33.

7       Q.   What happened, to your understanding, as a

8    result of that reexamination process by the U.S. Patent

9    Office?

10      A.   The claims at issue in this patent, again, 30,

11   31 and 33, were confirmed by the Patent Office.  And

12   they have issued documents, which the Patent Office

13   obviously does, that show what claims were confirmed.

14           And the Claims 30, 31, and 33 were included in

15   those documents.

16      Q.   Okay.

17           MR. HUESTON:  Let's put up Exhibit 1043,

18   please.  And, hopefully, I've switched to the right

19   buttons to do that.

20               There we go.

21      Q.   (By Mr. Hueston) So, Mr. Sheafe, I direct your

22   attention to this exhibit.  This is the first page here.

23           If you could explain, what is this at the top

24   of the page?

25      A.   Well, it says United States Patent & Trademark

1  Office.  So we know that's where it's from.  And then

2  there's a ton of numbers on here, not all of which are

3  pertinent to our discussion.  There's a number for the

4  reexamination itself.

5          But we can see that the reexamination was

6  filed in May of 2008.  And then this particular document

7  was mailed from the Office actually back to the patent

8  counsel that represents Bright Response on July the 23rd

9  of 2010.

10      Q.   All right.

11          MR. HUESTON:  Let's go a couple of pages

12  in, please, on the exhibit.

13          All right.  And let's go to the first

14  highlighted section.

15      Q.   (By Mr. Hueston) Can you read and explain what

16  that says there?

17      A.   Yes, sir.  It says:  Ex parte reexamination,

18  advisory action before the filing of an appeal brief.

19      Q.   So --

20          MR. HUESTON:  And let's go further down

21  in the document, under Paragraph 6, please.  Let's pull

22  that up.

23      Q.   (By Mr. Hueston) And what is your

24  understanding of what this advisory action was stating

25  in this section?

1   A.   Well, in the highlighted section, it's stating
2   that there are certain claims that are patentable or
3   confirmed.
4        And included amongst that set of claims is a
5   block of claims, 30 to 37, which obviously includes 30,
6   31, and 33.
7   Q.   All right.  Now, just to make sure we're
8   covering it, there's also some claims rejected, right?
9   A.   That's correct.
10  Q.   Are those at issue in this case?
11  A.   No, they are not.
12  Q.   So Google challenged 30, 31, and 33, and they
13  were confirmed by the U.S. Patent Office?
14  A.   Google challenged actually all of the claims
15  in this patent, and Claims -- amongst others, Claims 30,
16  31, and 33 were confirmed.
17  Q.   You mentioned earlier there were two reexams,
18  right?
19  A.   Well, there were two requests --
20  Q.   Requests.
21  A.   -- to the Office to reexamine the documents.
22  Q.   Thank you for that clarification.
23       Let's -- tell the jury about the second
24  request.  What was that about?
25  A.   Well, it was much like the first request.

1                Again, a party, someone, asked that the Patent

2    Office take yet another look at the Rice patent and

3    provided other documentation that they believed showed

4    that it may not be valid, that it should be tested

5    again.

6        Q.    And who initiated that request?

7        A.    Yahoo! did.

8        Q.    The other party in this action?

9        A.    That's correct.

10       Q.    And are you aware of whether they -- what they

11   submitted -- what claims they submitted for

12   reexamination?

13       A.    They submitted Claims 31 and 33.

14       Q.    Two of the three claims at issue in this case?

15       A.    Yes, sir; that's correct.

16       Q.    And what was the result of that request?

17       A.    Well, in this case, it's a little bit

18   different.

19               So in the previous case where Google had

20   submitted the request, the Office granted the request.

21   They said, okay, we've seen what you've submitted; we

22   think there might be an issue here; and so we'll take

23   another look at it; we'll run it through the tests.

24               In this case, they took a look at what Yahoo!

25   submitted in terms of that documentation, and they said,

1   well, this doesn't even raise an issue for us, so we're

2   going to deny the request to even take that other look.

3        Q.   All right.  Let's take a brief look at that.

4             MR. HUESTON:  Let's take a look at

5   Exhibit 3, please.

6        Q.   (By Mr. Hueston) Is this the order -- up at

7   the top of the page, order granting/denying request for

8   ex parte reexamination?

9             Is this the document to which you were

10  referring?

11       A.   It is.

12       Q.   Okay.  And can you explain the block I'm

13  pulling out here, and in particular, that language

14  that's highlighted?

15       A.   Certainly.  The language that's highlighted

16  talks about the request that was being made, and that

17  request was made on the 29th of April 2010.  And it

18  talks about having been considered and a determination

19  has been made.

20            And then if you drop down to the second part

21  that has been highlighted, you'll see that Box No. 2 has

22  been checked, which simply says that the request for

23  ex parte reexamination is denied.

24       Q.   All right.

25            MR. HUESTON:  And let's go to the next

1  page, please.

2      Q.   (By Mr. Hueston) And there is a section in

3  this called Decision; is that right?

4      A.   Yes, sir, there is.

5      Q.   And what do you understand this part of it to

6  be?

7      A.   Well, I think better than even my

8  understanding, I will just read it, if that's okay.

9      Q.   Absolutely.

10     A.   Thank you.

11          It says:  No substantial new question of

12 patentability is raised by the request for reexamination

13 and prior art cited therein for the reasons set forth

14 below:

15          And then obviously it continues.

16     Q.   All right.

17          MR. HUESTON:  And if we can go to the

18 last page of this document.

19     Q.   (By Mr. Hueston) Are you aware of what prior

20 art was submitted by Yahoo! in this second effort at a

21 reexam?

22     A.   Yes, sir, I am.

23     Q.   And what was that?

24     A.   Well, there were a number of documents.  My

25 recollection is four; again, one of which was the Allen

1   patent.

2        Q.   Okay.

3             MR. HUESTON:  And if you can get to that

4   last page.

5        Q.   (By Mr. Hueston) Is there typically a notice

6   of references cited, listing documents?

7        A.   My experience has been that there's a --

8   there's a form.  It is a government organization.  So

9   there's, of course, a form, and the prior art is listed

10  on that form.

11       Q.   All right.

12            MR. HUESTON:  We appear to be having

13  technical difficulties with that, so I'm going to move

14  on.

15            Oh, there it is.  Let's blow up the first

16  part of that, please.

17       Q.   (By Mr. Hueston) This is the section you were

18  talking about, the references submitted and cited?

19       A.   Yes, sir.  This is what we just brought up,

20  the top half of the document.

21       Q.   Okay.  And what's your understanding of that

22  thing on the first line there with the number and then

23  the name?

24       A.   Well, this is the section that is captioned,

25  U.S. Patent Document, so if there are any that are

1  submitted, they would be listed here.

2          In this case, the Allen patent, the '664

3  patent, has been listed.

4      Q.   These reexaminations, they happened after that

5  sale by Firepond?

6      A.   Yes, sir.

7      Q.   Mr. Sheafe, on behalf of Bright Response, in

8  your own words, what is Bright Response seeking in this

9  case?

10     A.   We're simply seeking to get companies to

11 respect the rights that are represented by the patent.

12 We are seeking -- again, you've heard the term testified

13 to again and again -- a reasonable royalty, just what is

14 fair for the use of the invention.

15     Q.   And, Mr. Sheafe, just to make clear, have you

16 conducted your own expert analysis on those points?

17     A.   No, sir, I have not.

18     Q.   Who have you relied on?

19     A.   I have relied upon those contractors and

20 consultants that we hire and fully rely upon the

21 information that they provide me.  And that's how I make

22 my decisions.

23     Q.   You mentioned earlier you came to Bright

24 Response in about March of 2000; is that right?

25     A.   Yes, sir; that's correct.

1       Q.   And, roughly, how much of your time at Bright

2   Response has been devoted to this effort, the

3   proceedings leading to this trial?

4       A.   Of the time I have dedicated to Bright

5   Response, almost all of it.

6       Q.   Have you been able to do -- what else, if

7   anything, have you been able to do since March of 2009,

8   other than things connected with this case?

9       A.   Well, I have been able to review some of these

10  other patents.  I said we have oftentimes opportunities

11  to take a look at other patents and see if we think that

12  they are worthy of our investment, if we think they

13  might be those undervalued patents that we can mine the

14  value back out of.

15          And while we have a number of them that we

16  continue to take a look at, we have not purchased any

17  additional patents to this point in time.

18      Q.   Mr. Sheafe, coming from your background at the

19  FBI and the other service that you've given, why did you

20  decide to come work for Bright Response, to do the work

21  that you're currently doing?

22      A.   Well, one of the things I loved about being an

23  FBI agent, just being with the FBI in general, is that

24  we just never back down from an investigation.

25          No matter how complex that investigation was,

1  no matter who the bad guys were, whether it was an

2  organized crime boss or a drug lord, or, unfortunately,

3  sometimes even members of Congress, we pursued that

4  investigation and had the will to see it through to the

5  end.  And I just enjoy it.

6      Q.   You mentioned that this case has been taking

7  up almost all your time since March of 2009; is that

8  right?

9      A.   That's correct.

10     Q.   What do you hope to do with Bright Response

11 after this case is concluded?

12     A.   I hope to go back to doing more of what I had

13 intended to do originally, which is take a look at the

14 patents that we have an opportunity to review to see if

15 they are of interest to Bright Response, give it that

16 kind of a sniff test, and then pass it off to the great

17 team that Bright Response has, and let them tell me what

18 might be there that we can take advantage of.

19     Q.   Thank you.

20          MR. HUESTON:  Pass the witness.

21          MS. DOAN:  Your Honor, may I approach?

22          THE COURT:  Cross-examination.

23          MS. DOAN:  May we approach, Your Honor?

24          THE COURT:  Yes.

25          (Bench conference.)

1          THE COURT:  Use the microphone, okay?

2          MS. DOAN:  Your Honor, there are a couple

3 of things I want to make sure we don't violate any

4 motions in limine or anything you've said in here, Your

5 Honor.

6          Number one is, with respect to David

7 Pridham, David Pridham denied him at his deposition, and

8 Mr. Sheafe took the position that he did not hire the --

9 didn't have any consulting agreements with the

10 inventors, but this counsel did.  And we'd like to bring

11 that out.

12          We're taking the position that they

13 didn't, but their lawyers did.  And that's not fair,

14 Your Honor, to hide behind that.

15          And we would like to bring that out to

16 the jury.

17          THE COURT:  What's your response to that?

18          MR. HUESTON:  I see no relevance.

19          THE COURT:  If he does the consulting

20 agreements that are entered into by --

21          MS. DOAN:  His counsel.

22          THE COURT:  -- counsel --

23          MS. DOAN:  And the inventors.

24          THE COURT:  -- and the inventors, you can

25 ask him if he knows that, okay?

```
 1                    MS. DOAN:  Yeah.

 2                    THE COURT:  All right.

 3                    MS. DOAN:  Okay.  And then the second

 4  thing is, the fact that one of the documents that

 5  Mr. Hueston brought out, we'd like to be able to show

 6  the jury why they have rejected certain claims and why

 7  they have kept certain claims at issue and that's fair

 8  game.

 9                    THE COURT:  It's in evidence, but you can

10  ask him about the documents.

11                    MS. DOAN:  Sure.

12                    THE COURT:  Sure.  Anything else?

13                    MS. DOAN:  I think that's it.  If there's

14  anything else close, I will be up here.

15                    THE COURT:  All right.

16                    (Bench conference concluded.)

17                    CROSS-EXAMINATION

18  BY MS. DOAN:

19       Q.   Good morning, Mr. Sheafe.  How are you?

20       A.   I'm well, Ms. Doan.  And you?

21       Q.   Very well.

22            Now, Bright Response, the company for which

23  you're the manager, has two employees, right?

24       A.   That's right.

25       Q.   The second employee is Mr. Erich Spangenberg?
```

1      A.   Yes, ma'am; that's correct.

2      Q.   And is he the Vice President of Licensing?

3      A.   He is.

4      Q.   And Bright Response is not an inventor, is it?

5      A.   No, ma'am, it is not.

6      Q.   And Bright Response does not make anything;

7   it's not a manufacturer, is it?

8      A.   No, ma'am.  We don't make products at all.

9      Q.   And Bright Response does not sell any

10  products, does it?

11     A.   No, ma'am.  It simply licenses its patents.

12     Q.   In fact, it's never tried to -- Bright

13  Response has never been involved in marketing any of the

14  embodiments of the '947 patent, has it?

15     A.   The -- let me just make sure I understand

16  embodiment.  That would be a device that uses the

17  technology the patent represents?

18     Q.   Right.  You don't market any of those type of

19  products, do you, sir?

20     A.   No, ma'am, we don't.

21     Q.   And you told us that you live outside of

22  Champaign.  You live in Monticello, right?

23     A.   Yes, ma'am.

24     Q.   And, Mr. Sheafe -- Mr. Spangenberg lives

25  where?

1    A.    He lives in Dallas.

2    Q.    Okay.  So neither one of the two employees of

3 Bright Response live in Marshall, Texas; isn't that

4 correct?

5    A.    Yes, ma'am; that's correct.

6    Q.    You're also the President of TechDev Holdings,

7 and TechDev owns 99.5 percent of Bright Response; is

8 that right?

9    A.    I believe that to be the case, yes, ma'am.

10    Q.    Are you also still the Vice President of

11 Technology for nXn?

12    A.    No, ma'am, I am not.

13    Q.    TechDev owns several companies, does it not?

14    A.    It does.

15    Q.    And also Bright Response is not a Marshall,

16 Texas, company, you do have an office here in Marshall,

17 right?

18    A.    Bright Response does have an office in

19 Marshall, yes, ma'am.

20    Q.    Do you know where it is?

21    A.    I do, yes, ma'am.

22    Q.    Where is it?

23    A.    It's right down out here, if you were to walk

24 down Washington Street, it would be on your left.

25 There's a wine store there.  It would be just before

1    that.

2         Q.    And does it share that office with several

3    other Erich Spangenberg entities?

4         A.    Yes, ma'am, it does.

5         Q.    It's a two-room office; is that right?

6         A.    I guess it would be fairly broken down into

7    two rooms.  They're big rooms.

8         Q.    Okay.  Do you know the address of this office?

9         A.    I'm sorry?

10        Q.    Do you know the address of this office?

11        A.    Well, it's on North Washington Street.  I

12   believe the address is 2 -- either 207B or 207C.  I

13   don't ever mail anything there, so I just know where it

14   is.

15        Q.    You don't mail anything there because nobody

16   really works there permanently, right?

17        A.    Well, I don't mail anything there because I

18   don't have anything to mail there.

19        Q.    And no one works there permanently; is that

20   correct?

21        A.    That's probably fair.

22        Q.    Okay.  I mean, you don't have a secretary,

23   administrator; no one's there, right?  It's just for

24   use.

25        A.    Correct.

1          Q.   Okay.  And then the entities that you share,

2     not only Bright Response sometimes uses it for space, as

3     well as TechDev Holdings; is that right?

4          A.   Yes, ma'am, that's correct.

5          Q.   And Acclaim Financial Group also uses that for

6     space as well?

7          A.   I don't know.

8          Q.   You don't know that?

9          A.   No, ma'am, I don't.

10          Q.   And Clear With Computers also uses it for

11     space as well, 207C North Washington?

12          A.   I believe that it does.

13          Q.   It does, does it not?

14               How about EMS Technologies.  It does as well,

15     does it not?

16          A.   I'm not sure.

17          Q.   You're not sure?

18               EMS Technologies, that's one of your units

19     when you were President of TechDev Holdings, is it not?

20          A.   Yes, ma'am, it is.

21          Q.   You've never seen any of the contracts that --

22     and the agreements that EMS Technologies has entered

23     into where it represents it also offices at 207

24     Washington?

25          A.   Certainly, yes, ma'am, I have.  And I pay

attention to the business terms.  I leave the lawyers to

pay attention to the details.

Q.   That's right.  You're not telling this jury

that TechDev -- that EMS Technologies has not ever

represented that its office is based there, are you?

A.   Oh, no, ma'am, absolutely not.

Q.   Okay.  What about Manufacturing Systems

Technologies?  It also offices there, does it not?

A.   Yes, ma'am, I believe it does.

Q.   And SFA Systems, LLC, it also offices there,

does it not?

A.   Yes, ma'am.

Q.   And then Presentation Specialist Technologies,

it also offices there at 207C North Washington, does it

not?

A.   Yes, ma'am, I believe it does.

Q.   And so does Plutus IP, LLC.  It also offices

there, does it not?

A.   I don't think so.  I don't think Plutus

remains as a company.

Q.   When it was a company, it officed at 207C

North Washington, did it not, sir?

A.   Well, it's -- Plutus became TechDev Holdings,

so it's the same --

Q.   Same company?

1      A.   Yes.

2      Q.   Okay.  Just like Orion became Clear With

3 Computers, and when Orion was a company, it officed at

4 207C North Washington as well?

5      A.   Well, yes, ma'am, they're the same company.

6      Q.   In fact, Mr. Sheafe, you don't ever visit this

7 Marshall office for any reason that's unrelated to your

8 ongoing patent litigation here in Marshall, do you, sir?

9      A.   Ma'am, I come here when -- when we're here for

10 trial, and -- that's correct.

11      Q.   Okay.  And then of the other entities that

12 we've mentioned of which you own a portion or represent

13 a portion of as President of TechDev Holdings, they're

14 never at the Marshall address either, unless they're

15 here to pursue patent litigation; is that right?

16      A.   I don't know that.

17               MR. SPANGLER:  Your Honor, may I

18 approach?

19               THE COURT:  Yes.

20               (Bench conference.)

21               MR. SPANGLER:  Your Honor, we

22 specifically went into this at the pretrial, that they

23 were going to be able to talk about the corporate

24 structure but not the fact that these other entities are

25 involved in litigation.

1          She just went right into the fact that

2   the only reason he comes here is for all those other

3   entities being involved in litigation.  We specifically

4   addressed this.

5          MS. DOAN:  We did not, Your Honor.  We

6   mentioned the four things we couldn't go into was --

7   were specific names.  We have not done that.  We talked

8   about other specific litigation that we couldn't get

9   into.  All I said was, you're only here in town for

10  litigation purposes.

11          MR. SPANGLER:  Your Honor?

12          THE COURT:  Yes.

13          MR. SPANGLER:  What she said was, for

14  these other entities -- she had already talked about

15  Bright Response -- the only reason you're here is for

16  litigation.

17          THE COURT:  The other entities.

18          MS. DOAN:  I'll move on, Your Honor,

19  but --

20          THE COURT:  Well, this has nothing to do

21  with this case, so let's move on.

22          MS. DOAN:  Thank you, sir.

23          (Bench conference concluded.)

24     Q.   (By Ms. Doan) Now, Mr. Sheafe, you mentioned

25  you were the one at Bright Response who looks over the

1 PTO; is that right?  The PTO filing, the reexamination,

2 that's part of your duties?

3     A.    Well, I manage the process.  Bright Response

4 also has professional patent counsel that manages the

5 details of that process.

6     Q.    And that patent counsel would be -- is it

7 Hershkovitz & Associates?

8     A.    Yes, ma'am.  Hershkovitz & Associates.

9     Q.    Do you recall today who the attorney is at

10 Hershkovitz & Associates that Bright Response works

11 with?

12     A.    Well, there are a number of attorneys there,

13 and the -- I don't know whether he would technically be

14 considered the owner.  He's the lead guy there.  It's a

15 guy by the name of Abe Hershkovitz.

16         And I talk to him most frequently, but I don't

17 -- it's not my understanding that there's any one given

18 attorney that's assigned.  It's -- there are a number of

19 attorneys there that work on it.

20     Q.    Okay.  And I want to be completely open with

21 this jury about what the PTO reexamination holds, okay?

22         Have you reviewed all the PTO documents that

23 have been resubmitted for reexamination?

24     A.    I have reviewed them.  I look them over, and

25 if I have questions, I ask.  If there's a typo, I point

1 it out. I just -- I try to do my best to oversee that

2 process, so I can understand it to the extent that I

3 need to, to be able to manage by response, yes, ma'am.

4     Q. And so to be completely open with us, when

5 the -- when a party files for an ex parte reexamination,

6 Bright Response then responds to the Patent & Trademark

7 Office, correct?

8     A. Well, Bright Response responds to the Patent

9 Office through its prosecution counsel, Hershkovitz &

10 Associates.

11     Q. Through its counsel, who always represent you,

12 right?

13     A. (No response.)

14     Q. I mean, your counsel is acting on your behalf,

15 correct?

16     A. Oh, yes, ma'am.

17     Q. Okay. But Google and Yahoo!, other than

18 requesting a reexamination, are not involved in the

19 process, are they?

20     A. No. It's my understanding that -- we saw a

21 couple of times up there the word ex parte. And, again,

22 I'm not an attorney, but it's my understanding that what

23 that means is, once the party has requested it, if it is

24 granted, then they are no longer involved in the

25 process. It's simply a process between the Patent

1  Office and the patent owner.

2      Q.   And do you recall when reexamination was first

3  requested by Yahoo! in this case?

4      A.   I think we just looked at it.  It was May

5  21st, 2008.

6      Q.   And do you recall when it was first requested

7  by Google in this process?

8      A.   It -- isn't that the date -- my --

9      Q.   My first question was, but with respect to

10 Yahoo!.  Do you recall --

11     A.   Oh, oh, I'm sorry.

12     Q.   -- when a request for reexamination came out?

13     A.   With respect to Yahoo!.

14     Q.   Yes, sir.

15     A.   I'm -- I'm sorry.  That one was April -- we

16 just looked at it -- 29th, maybe, of 2010 (sic).

17     Q.   And what about with respect to Google, when

18 they first requested a request for reexamination?

19     A.   Well, to my recollection, it was May 21st,

20 2008.

21     Q.   And when did you file this lawsuit in this

22 action, sir?

23     A.   Well, as I've testified, I wasn't here, but I

24 believe it was late maybe fall of 2007.

25     Q.   2007.

1        So both requests for reexamination of the '947

2    patent came in after you sued Google and Yahoo!; is that

3    correct?

4        A.    Yes, ma'am.

5        Q.    And to be quite candid with this jury,

6    originally, Claim 30 was also rejected by the PTO,

7    correct?

8        A.    Well, yes, ma'am.  What happens is, you go

9    through a number of steps in the process.  It's not a

10   simple:  Here's the request.  Okay.  We'll look at it.

11   Boom, here's the answer.

12        There are number of -- and, again, I believe

13   this term has been testified to -- office actions.  And

14   so the Examiner will send an office action out, and

15   they'll either be non-final or final.

16        And so if they-are non-final, then the patent

17   owner has a chance to say:  Well, okay.  We see your

18   argument, but have you thought about this?

19        And so through our counsel, Bright Response

20   then sends back some arguments, and then the Examiner

21   will say:  All right.  You know, maybe I didn't consider

22   that, and then we'll -- maybe sends out another

23   non-final or maybe sends out a final office action.

24        Q.    And you had several interchanges between

25   Bright Response and the PTO, correct?

1       A.    Yes, ma'am, that's correct.

2       Q.    And Google and Yahoo! are not involved with

3  the interchanges between Bright Response and the PTO,

4  correct?

5       A.    No.   Again, as I just said, when it's

6  ex parte, it's simply between the owner of the patent

7  and the Patent Office.

8       Q.    And you told the jury that you submitted lots

9  and lots of documents when you got in the first request

10 from the PTO from Google to make sure you had everything

11 out there, correct?

12      A.    Well, my understanding is, is that what we

13 were aware of, we submitted to the office.   Certainly,

14 that was our intent.

15      Q.    Absolutely.

16            And so you sued Google and Yahoo! in 2007;

17 there was a request for the reexamination in 2008; and

18 then you submitted every piece of prior art that you

19 could think of to the PTO.

20            Do I have that right?

21      A.    Yes.   We had the opportunity.   As I said, by

22 the request coming in from Google, that opened the

23 opportunity for us to then submit that art, and we chose

24 to take that opportunity.

25      Q.    But you didn't submit the '361 Davis patent,

1  which was the Overture patent that Yahoo! purchased back

2  in 2003, did you, sir?

3      A.   To my knowledge, we didn't have reason to do

4  that.

5      Q.   And you didn't submit any of the Overture

6  family of patents that deal with search technology for

7  advertising, did you, sir?

8      A.   There were hundreds of documents.  I certainly

9  don't have them memorized.

10      Q.   Do you know any patent that you submitted that

11  had Yahoo! owns dealing with search technology

12  canonicalization, geo targeting, reordering of words, or

13  any other patent that Yahoo! has?

14              THE COURT:  Excuse me.

15              Objection?

16              MS. DOAN:  I'm sorry.

17              MR. FENSTER:  May we approach, Your

18  Honor?

19              THE COURT:  Yes.

20              (Bench conference.)

21              MR. VERHOEVEN:  I just want to know that

22  we've now got three different attorneys objecting on

23  this witness.

24              THE COURT:  Well --

25              MR. VERHOEVEN:  Thank you, Your Honor.

THE COURT: The same rule about objection by committee that I imposed on the other Defendants, so...

MS. DOAN: Judge, can Mr. Hueston not handle this since he's handling this witness?

THE COURT: Pardon?

MS. DOAN: Is Mr. Hueston going to handle this witness?

MR. HUESTON: Well, I'm here, but I --

THE COURT: We're at the bench, Ms. Doan.

MS. DOAN: I'm sorry.

THE COURT: Okay?

MS. DOAN: I'm sorry, Your Honor.

THE COURT: Yes?

MR. FENSTER: Your Honor, none of these patents have been even suggested as a basis for invalidity in this case, and Ms. Doan's questioning of the witness suggests that they --

THE COURT: Bring it out on redirect. I mean, that's the remedy for that. I was thinking the same thing.

MR. FENSTER: All right. Thank you.

THE COURT: Step back.

(Bench conference concluded.)

Q. (By Mr. Doan) I'm sorry, Mr. Sheafe. I

don't -- I'm not sure I got your answer.

Did you submit any of the Yahoo! patents for reexamination?

A.   Did you ask if we had submitted a patent related to canonicalization?

Q.   Any of the patents owned by Yahoo! dealing with a -- serving up an advertisement in response to keywords.

A.   I just wanted a chance to try and say it. Everybody has had a chance.

Q.   Canonicalization.  I'm fourth generation from here.  I think I've got it down.

A.   I was hoping.

To my knowledge -- again, there are hundreds of documents, so I don't want to -- I'm under oath.  I don't want to promise one way or the other, but to my knowledge, I don't know that we did, but we may have.

Q.   You can't point to us any one, can you, sir?

A.   Well, no, I don't have the list in front of me.

Q.   Okay.  And I just want to make sure that we've got clear what the PTO considers.

It considers only the prior art that's put in front of it, correct?

A.   What it considers in a reexamination -- to be

1 honest with you, I'm not sure.  I know in the initial

2 examination of a patent, a Patent Examiner will go and

3 try and find other things that weren't presented to the

4 office.

5          And that may be the case in a reexamination.

6 I'm just not sure.

7     Q.   Okay.  Do you know of anything else that the

8 PTO would consider other than the prior art that's put

9 in front of it?  You just don't know; is that fair?

10     A.   Well, I know they would consider prior art

11 that it is aware of, certainly that which is put in

12 front of it.

13     Q.   Okay.  And you know that it does not consider

14 prior public use.  The entire EZ Reader system being

15 employed at Chase Manhattan Bank, that's something that

16 the Patent Office does not consider, correct?

17     A.   Whether it was being used by the public before

18 is some of the discussion we've had previously, right?

19     Q.   That's not considered by the PTO, is it, sir?

20     A.   It's my understanding that it is not, that's

21 correct.

22     Q.   Okay.  And it's also not considered by the

23 Patent Office, the argument of written description.

24 These particular Claims 30, 31, and 33 being written too

25 broadly, that's not considered by the Patent Office, is

1  it, sir?

2      A.   Well, again, now, written description is --

3  again, it's kind of a legal term or a patent term, and

4  there's a bunch of rules that surround what has to be

5  discussed in the written description.

6      Q.   It's not --

7              THE COURT:  Hold on just a second.

8              MS. DOAN:  Yeah.

9              THE COURT:  Do you know one way or the

10 other whether it's --

11             THE WITNESS:  I'm sorry.

12             THE COURT:  -- it's considered on reexam?

13             THE WITNESS:  I don't think so.

14             THE COURT:  Okay.  All right.  Let's move

15 on.

16             MS. DOAN:  Okay.

17     Q.   (By Ms. Doan) And let's look at the document

18 you put up.

19             MS. DOAN:  1043, please, Alan,

20 Plaintiff's 1043.

21     Q.   (By Ms. Doan) And the mailing date that it has

22 on the first page there, that would be 7/23/2010; is

23 that right?

24     A.   Yes, ma'am.  Down on the right-hand side --

25 there we go.  The mouse was just there.

1      Q.    Sure.

2      A.    That's the date mailed.

3      Q.    And I think, to the best of my recollection,

4  that's maybe two weeks ago last Friday or maybe a week

5  ago last Friday?

6      A.    It was close, yes, ma'am.

7      Q.    Very soon here.  Okay.

8            MS. DOAN:  Alan, if you'll go a couple of

9  pages over.  It's BR11274.

10     Q.    (By Ms. Doan) You covered the claims that had

11  been confirmed, but I want to look at now the claims

12  that have been rejected.

13           MS. DOAN:  Do you have a pointer?

14     Q.    (By Ms. Doan) And the claims that have been

15  objected are right through here (indicates).

16     A.    There we go.

17     Q.    And specifically, at the top, it talks about

18  Claims 15 through 29 were rejected in the '947 patent;

19  is that correct?

20     A.    Yes, ma'am, that's correct.

21     Q.    And that includes Claim 26 and Claim 28,

22  right?

23     A.    Yes.  As Dr. Rhyne testified, we had to talk

24  about --

25     Q.    Is that correct, sir?

1    A.   It is correct.

2    Q.   Now, you mentioned as well that even though

3 these claims have been rejected by the PTO, you still

4 have to prove every element of that claim in order to

5 prevail on Claim 30.

6         Do you understand that, sir?

7    A.   Absolutely, yes, ma'am.

8    Q.   Okay.  And that includes having a

9 non-interactive electronic message from a source?

10   A.   Yes, ma'am.

11   Q.   And that includes having a system with rule

12 base/case base?

13   A.   I'm not the expert.  I'd really like for

14 Dr. Rhyne to speak to that, but certainly, I can answer

15 your question that every limitation of 26 and 28 have to

16 be met before you get down the road to 30.

17   Q.   Okay.  And that would also include having a

18 predetermined response?

19   A.   Yes, ma'am, I believe it would.

20   Q.   All right.

21        MS. DOAN:  And, Alan, if you'll go to

22 11 -- 11280, please.

23   Q.   (By Ms. Doan) And if we'll look at here:

24 Further, upon appeal, it says, the Examiner maintains

25 the rejection of Claims, and then it goes into 15

1  through 29.

2          Do you see that?

3      A.   Yes, ma'am, I do.

4      Q.   And it says they were mainly rejected under 35

5  USC 102(e) as being anticipated by -- and it's the

6  Patent No. '664, Allen; is that correct?

7      A.   Yes, ma'am.  Those patents you've highlighted,

8  the Office have said that the Allen patent makes -- it

9  didn't pass the test as to the Allen patent.

10     Q.   That's right.  And that's Bradley Allen's

11  patent, correct?  You understand that?

12     A.   I think his first name is Bradley, yes, ma'am.

13     Q.   And you understand that means that his patent

14  already anticipated these particular claims, 26 and 28,

15  right?

16     A.   Yes, exactly.  That's why we didn't assert

17  them in this case.

18     Q.   All right.  And if you'll look at Page --

19              MS. DOAN:  And, Alan, I'm going to 11282,

20  please.

21     Q.   (By Ms. Doan) And right here in the middle:

22  Regarding -- and this is the PTO responding to the

23  patent owner, your comments -- Regarding patent owner's

24  comments on Pages 24 and 25, the Examiner maintains that

25  Allen teaches a non-interactive electronic message and

1　fairly -- and fairly teaches classifying.

2　　　　Contrary to the statement found in '947 -- and

3　then it tells you where it is -- Allen does teach

4　classifying, and in some cases, a best match is found.

5　　　　Did I read that correctly?

6　　A.　Yes, ma'am, I believe you did read it

7　correctly.

8　　Q.　And then -- so it -- that is the basis for why

9　it rejected Claims 26 and 28 and continues to reject

10　those; is that right?

11　　A.　Well, certainly, that's part of the basis.　I

12　don't think any of us wants to go through all of it.

13　　Q.　And do you know any other basis besides Allen

14　that they continue to reject Claims 26 and 28?

15　　A.　I certainly don't want to talk -- I mean, I

16　would --

17　　Q.　That's right.

18　　A.　-- to review the documents.

19　　Q.　And when the PTO rejects a claim, that means

20　each element of that claim, non-interactive electronic

21　message, case base/rule base system, and predetermined

22　response, had already been found or anticipated in

23　another claim -- in another patent, according to this

24　document, correct?

25　　A.　We get into some legal terms there, but

1  that -- that -- that's my understanding.

2      Q.   Okay.  And it also found, in Claim 28, that

3  classifying had already been anticipated as well,

4  correct, by the Allen patent?

5      A.   Yeah.  I think it says it fairly teaches

6  classifying.

7      Q.   All right.

8           MS. DOAN:  Now, Alan, if you'll go to

9  11279.

10     Q.   (By Ms. Doan) Now, on Claim 30, it talked

11 about why Claim 30 was not rejected, correct?

12     A.   Yes.

13     Q.   It's confirmed.  Okay.

14     A.   Yes, ma'am.

15     Q.   And it was confirmed because the closest prior

16 art presented in reexamination failed to assign a score

17 in a stored case model.

18          Do you see that, sir?

19     A.   I do see that.

20     Q.   And that would be the prior art presented by

21 Bright Response, because Yahoo! and Google do not

22 present any prior art at this point, correct?

23     A.   Yes, ma'am, that's correct.

24     Q.   Okay.  And so the prior art that was presented

25 at this time was the Allen patent alone with respect to

1    Claim 30; is that correct?

2        A.    No.   I don't -- I think it included all of the

3    prior art that we had put out.   I think it was all of

4    it.   It certainly included the Allen patent, but the

5    rest of those, you know, dozens of documents.

6        Q.    But what had been presented to this date is

7    why it was not rejected and confirmed at this time,

8    correct, as of a couple of weeks ago?

9        A.    Yes.   I mean, only up to the Examiner's

10   response on the 23rd of July.

11       Q.    Because the PTO can only look at the prior art

12   that's presented to it by the patent owner, correct?

13       A.    Well, it can only look at the prior art that's

14   presented to it.   And Google presented some in the form

15   of the Allen patent, and Bright Response presented much

16   more in the form of the documents that it submitted.

17       Q.    But it can only consider what's presented to

18   it, right?

19       A.    That would be my understanding, yes, ma'am.

20       Q.    All right.   And the CBR manuals, the CBR

21   Express 2.0 manuals, they were never presented to the

22   PTO with respect to Claim 30, were they, sir?

23       A.    I don't know.

24       Q.    Okay.   So this jury is the first body to hear

25   this, as far as you know; is that right?

1      A.    As far as I know.

2      Q.    Okay.  And this jury is the first body to hear

3  the fact that the prior public use with the deployment

4  of the EZ Reader in the first quarter of 1996, they're

5  the first body to consider that, correct?

6      A.    Yes, ma'am, as far as I know.

7      Q.    And they're also the first body to consider

8  the written description arguments with respect to Claims

9  30, 31, and 33; is that right?

10      A.    That sort of goes beyond where I'm

11 comfortable, you know, saying for sure, but that's my

12 understanding.

13      Q.    Did Bright Response ever submit the testimony

14 of Bradley Allen to the PTO?

15      A.    Testimony to what?

16      Q.    Of Bradley Allen, the inventor of the Allen

17 patent?  Do you know whether he ever testified to the

18 Patent & Trademark Office regarding the '947 patent?

19      A.    I don't know.

20      Q.    Okay.  So this body, this jury, is going to be

21 the first to consider Bradley Allen and his testimony,

22 as far as you know, correct?

23      A.    Well, if he has testimony and it wasn't

24 presented to the PTO, or I guess anyone else, then this

25 jury would be the first, yes, ma'am.

1    Q.   And do you know whether Bright Response

2  submitted any testimony of Chuck Williams to the PTO in

3  the reexamination process?

4    A.   Certainly not to my knowledge.

5    Q.   Okay.  And so this body, this jury, that's

6  here with us today will be the first body to consider

7  Chuck Williams' testimony as well, correct?

8    A.   Well, I don't know, ma'am.  I don't who else

9  may have been submitted.

10    Q.   All right.  Now, let's look at the EZ Reader,

11  sir.

12         And Bright Response knows the EZ Reader was a

13  project that strove to implement some of the claims in

14  the '947 patent, correct?

15    A.   I think I may have had -- testified at some

16  point in time in a deposition to what EZ Reader tried to

17  do.  I'm not an expert on EZ Reader, but I do know it

18  was the provisional application for the patent.

19    Q.   Do you remember telling me, sir, on June 3rd,

20  2010, of this year, that the EZ Reader was a project

21  that strove to implement some of the claims in the '947

22  patent?

23    A.   I think that what -- were you there, Ms. Doan?

24    Q.   I'm not sure I was there, but I know our party

25  was there, sir.

1      A.    Okay.  Yeah.  I remember telling whoever was

2  taking my deposition that that was -- that was my

3  understanding, yes, ma'am.

4      Q.    All right.  And do you remember telling Yahoo!

5  and Google that you did not even remember who the

6  specific authors of the EZ Reader article were?  Fair?

7      A.    Yes, ma'am.

8      Q.    Okay.  And you remember saying, just like

9  Ms. Rice said the other day, that it's possible that

10 Ms. Rice could have written the article but not have

11 been involved in implementing the project at Chase,

12 correct?

13     A.    Did you say it's possible that --

14     Q.    Yes.  You said it was possible that the author

15 of the EZ Reader article, Ms. Rice, could have been --

16 could have written the article, but she might not have

17 been involved in implementing the project at Chase.

18     A.    I guess it's possible that someone could write

19 an article to include Ms. Rice and not be directly

20 involved in the implementation, but we've heard from

21 Ms. Rice, so...

22     Q.    And you also know that Bright -- that she has

23 told this jury that she has misrepresented facts that

24 she made in the EZ Reader article.  That's her story 15

25 years later.

1        MR. HUESTON:  Objection.  That's not the

2  witness' testimony.

3        THE COURT:  Sustained.

4    Q.   (By Ms. Doan) Did Bright Response do any type

5  of investigation to determine whether Ms. Rice's

6  statements were correct or incorrect in the EZ Reader

7  article?

8    A.   Not to my knowledge.

9    Q.   And it's Bright Response's understanding, at

10 least as of June 2010, that indeed the invention claimed

11 in the '947 patent was conceived and reduced to practice

12 between November 1995 and April 1996, correct?

13   A.   Those are legal terms conceived and reduced to

14 practice, and I'm not sure I completely understand them.

15   Q.   Do you recall being asked that specific

16 question, sir?

17   A.   I may have been.

18   Q.   Do you recall that you were at -- you were

19 noticed for subpoena as a representative of Bright

20 Response, and you spoke on behalf of the company with

21 respect to the entire company's knowledge?

22        Do you recall that?

23   A.   Yes, ma'am, I certainly remember that.

24   Q.   And you recall being deposed under oath, just

25 like you are here today, correct?

1    A.    Absolutely, yes, ma'am.

2              MS. DOAN:    And, Counsel, it's Page 192,

3    Line 24 through 193, Line 11.

4              MR. HUESTON:    No objection.

5      Q.    (By Ms. Doan) And the question at the bottom

6    reads there:    Does Bright Response know when in April of

7    1996 this conception and reduction to practice was

8    com -- was completed?

9              And there was an objection, and you testified:

10   No.    Again, it's Bright Response's understanding that

11   between approximately November of 1995 and April of

12   1996 -- so it's possible that it was completed.

13   It's our understanding it was complete -- it was

14   completed approximately between those months, where

15   within those months, what stages of conception or

16   reduction to practice occurred, Bright Response has no

17   further information.

18             Did I read that correctly, sir?

19     A.    Yes, ma'am.    Thank you.

20     Q.    Now I want to talk briefly about Bright

21   Response's assigning of the value of the '947 patent,

22   okay?

23     A.    Okay.

24     Q.    All right.    Bright Response does not have any

25   type of view as to which of the three patents it owns is

currently more or less favorable than its other patents,

does it?

        A.    We would -- you know, we attempt to get all

the value out of those patents that we can, and, you

know, I don't know that we would ascribe a higher or

lower value, because there would be a number of

variables that would apply as to which ones were

higher -- had the most value in a given situation.

        Q.    Sure.  And Bright Response owns three patents,

correct?

        A.    Yes, ma'am.

        Q.    Do you know those three patent numbers, sir?

        A.    I do.  I know them by their last three

numbers.

            They're the Rice patent, which is the '947

patent, which we've heard all this testimony about.

There's the '059 patent, which has the same set of

inventors that the Rice patent does.

            And then there's the '996 patent, and the lead

inventor on that patent is Richardson.

        Q.    Okay.  And that's -- those are the three

property -- the three patents that Bright Response owns,

correct?

        A.    Yes, ma'am.

        Q.    And the other entities of which are -- also

1  come under your purview as President of TechDev Holdings

2  that we mentioned earlier, EMS Technologies, et cetera,

3  they also own patents as well, correct?

4  THE COURT: Let's move along to something

5  relevant, Ms. Doan.

6  MS. DOAN: Sure.

7  Q.  (By Ms. Doan) But as far as the '947 patent,

8  Mr. Sheafe, you've not assigned any particular value to

9  that patent, have you, sir?

10  A.  Are you referring to a monetary value --

11  Q.  Yes, sir.

12  A.  -- as something we would sell it for this or

13  something like that?

14  Q.  You've not put a value on the '947 patent in

15  relation to the other patents that you have?

16  A.  Again, I would -- it just varies.  It depends

17  on the situation.

18  Q.  I mean, you don't have a view as to which

19  patent is more valuable than the others?

20  A.  Not -- not just -- without some context, I

21  certainly don't.

22  Q.  And how much did Bright Response pay for the

23  '947 patent?

24  A.  I don't know.  It was a transaction between

25  two related companies, and I just don't know.

1    Q.   Okay.  And was -- the company's name before

2  Bright Response was Polaris; is that right?

3    A.   Yes, ma'am.  We changed its name from Polaris

4  to Bright Response.

5    Q.   Okay.  And it changes names from Polaris --

6  was it IP, LLC -- to Bright Response in 19 -- in 2008;

7  is that right?

8    A.   I think it was 2008, yes, ma'am.

9    Q.   The year after you filed the lawsuit; is that

10  right?

11    A.   Yes, ma'am.  The lawsuit was filed in 2007, so

12  the next year would be 2008.

13    Q.   And the assignment to Polaris was for zero

14  consideration; isn't that correct?

15    A.   I don't know.

16    Q.   You don't know anything about that?

17    A.   Well, I know that it occurred.  I don't recall

18  what the actual consideration was, if I ever knew.

19    Q.   Do you recall me asking you about the

20  acquisition of the '947 patent, and you testified that

21  Polaris acquired the '947 patent in February 6th, 2006?

22       Do you recall that?

23    A.   You asking me that?

24    Q.   Yes.

25    A.   I don't recall you asking me that, no, ma'am.

1     Q.   Well, whether an attorney for Yahoo! or

2  Google -- is that the distinction you're making here,

3  sir?

4     A.   No.  I just want to make sure if we're talking

5  about today or if we're talking about some other time.

6     Q.   Okay.  Did Polaris acquire the '947 patent --

7  it acquired them in 2006, correct?

8     A.   I think that's when Polaris acquired the

9  patents, because that was the name at the time.

10     Q.   Right.  And then Polaris filed a lawsuit

11  against Yahoo! and Google in 2007, correct?

12     A.   That's my understanding, yes, ma'am.

13     Q.   And then Polaris decided to change its name to

14  Bright Response in 2008, correct?

15     A.   That's correct.

16     Q.   And you don't know if Polaris received any

17  type of documentation or information regarding the '947

18  patent as part of the purchase, do you, sir?

19     A.   No, ma'am.  I recall, with your attorney, we

20  discussed this, and I don't know what sort of

21  documentation was received.  I think we discussed the

22  fact it was a related company and whatever documentation

23  was probably passed along, but I don't know.

24     Q.   And you can't point Yahoo! or Google to any

25  type of consideration that Polaris paid in the

1  assignment -- receiving the assignment of the patent,

2  can you, sir?

3       A.   Certainly I can't, no, ma'am.

4       Q.   Okay.  And before -- and the acquisition was

5  between Circinus and Polaris.

6            Do you recall that?

7       A.   Yes, ma'am.  I think Circinus was another

8  company, and there was a merger there, I believe, where

9  Circinus became Polaris.

10      Q.   And I believe you testified under oath back in

11 June that you don't know of any transfer of funds for

12 the assignment between Circinus and Polaris.

13           Do you recall that, sir?

14      A.   Yes, ma'am.  I don't -- I don't know of any

15 transfer of funds.

16      Q.   And then Circinus acquired the patent from

17 Orion.

18           Do you recall that, sir?

19      A.   I believe that's the case, yes, ma'am.

20      Q.   And you don't know that -- if any type of

21 compensation was paid at all in the transfer between

22 Orion and Circinus of the '947 patent, do you, sir?

23      A.   Again, ma'am, I don't know.

24      Q.   Now, you told us that you're aware that the

25 name changed to Bright Response in 2008.  Do you

1 remember who came up with the name Bright Response?

2     A.    No, ma'am, I don't.

3     Q.    Were you involved with the decision to rename

4 Bright Response?

5     A.    No, ma'am, I was not.

6     Q.    Do you know who was involved with that

7 decision?

8     A.    No, ma'am, I don't.

9     Q.    And you're not in any way affiliated with the

10 product Bright Response, are you?

11     A.    No, ma'am.

12     Q.    Okay.  And you're also not affiliated in any

13 way with Brightware, the prior owner of the '947 patent,

14 are you, sir?

15     A.    No, ma'am, we're not.

16     Q.    So Brightware is a completely distinct entity

17 that has nothing to do with Bright Response.

18     A.    Well, was, yes, ma'am.

19     Q.    Was a complete distinct entity?

20     A.    Yes, ma'am.

21     Q.    Okay.  And Bright Response doesn't own any

22 type of trademarks either, does it, sir?

23     A.    Not to my knowledge.

24               MS. DOAN:  Just a second, Judge.  I'm

25 sorry.

1       Q.   (By Ms. Doan) I'm showing you, Mr. Sheafe,

2   what's been marked on the first page as Plaintiff's

3   Exhibit 595.

4               MS. DOAN:  Can you do that for me?

5               COURTROOM DEPUTY:  Uh-huh.

6       Q.   (By Ms. Doan) Do you see that, sir?

7       A.   I do.

8       Q.   Okay.  And it says Brightware, and it's got a

9   registered trademark here (indicates)?

10      A.   I do.

11      Q.   And you're aware that the registered

12  trademarks are issued by the Patent Office, the same

13  Patent Office for which patents are either approved or

14  rejected?

15      A.   Yes, ma'am.

16      Q.   And you're aware that Brightware is still the

17  owner of its Brightware trademark and mark?

18      A.   I don't know, ma'am.

19      Q.   You don't know that?

20      A.   No, ma'am, I don't.

21      Q.   You don't know that's a public record that

22  Brightware still owns its own trademark?

23      A.   It may be public record, yes, ma'am.

24      Q.   And you're aware that this is the slide that

25  your counsel put up at the beginning of this lawsuit?

1      A.    Yes, ma'am.

2      Q.    It's the first demonstration slides, and you

3  see it has the same mark that Brightware has?

4      A.    The same logo?

5      Q.    The same mark, yes, sir.  This with a star.

6      A.    Yes, ma'am, I do.

7      Q.    Same registered trademark that's still

8  registered to Brightware?

9      A.    I don't know.

10      Q.    Now, you're not trying to tell this jury that

11  somehow Bright Response and Brightware are in any way

12  affiliated or the same entity, because they're

13  distinctly different, aren't (sic) you, sir?

14      A.    No, ma'am.  I hope I've been clear.  We are

15  distinctly different companies.

16      Q.    In fact, when Yahoo! and Google lawyers

17  visited with you, you hadn't even read the '947 patent

18  at that time, as of June 2010, had you, sir?

19      A.    I believe what I said was I hadn't read it

20  cover to cover but that I had certainly been through it

21  a number of times.

22      Q.    You said you had read certain sections several

23  times, correct?

24      A.    Yes, ma'am.

25      Q.    I'm assuming those are Claims 30, 31, and 33.

1     A.   No, ma'am.  Those were the specification and

2 the claims.

3     Q.   Okay.  So you -- but you have read certain

4 sections, but you've not read the entire patent.

5     A.   I haven't read all the references and looked

6 at all of the figures and -- no, ma'am.

7     Q.   And as of June 2010, you had not spoken to any

8 of the inventors, had you, sir?

9     A.   No, ma'am.

10     Q.   Including Amy Rice.  You had never spoken to

11 her; is that right?

12     A.   That is correct.

13     Q.   And yet she sat with you at counsel table this

14 week, did she not?

15     A.   She did, yes, ma'am.

16     Q.   And Bright Response, you told us, had not paid

17 any money to any named inventor for consulting services;

18 is that correct?

19     A.   That's my understanding, yes, ma'am.

20     Q.   And yet you told us that your counsel had

21 entered into consultation agreements with the inventors

22 and had represented them as well, correct?

23     A.   I believe I said that was my understanding,

24 yes, ma'am.

25     Q.   Okay.  And so you're not trying to tell this

1 jury that somehow Amy Rice is in any way affiliated with

2 Bright Response.

3      A.   No, ma'am.

4      Q.   In fact, she's a consultant for Bright

5 Response, correct?

6      A.   Well, yes, ma'am, through -- through -- if

7 their relationship exists with the counsel, then --

8      Q.   Sure.

9      A.   -- it's fair to consider her a consultant for

10 Bright Response.

11      Q.   And I think we saw on Ms. Rice's

12 cross-examination that indeed she does have a

13 consultation agreement with one of your counsel at

14 counsel table, does she not?

15      A.   I think we did, yes, ma'am.

16      Q.   Now, Mr. Sheafe, it's true that Bright

17 Response didn't contact Google before it filed this

18 lawsuit, did it?

19      A.   Well, again, I wasn't at the company at the

20 time, but not to my knowledge.

21      Q.   And Bright Response didn't contact Yahoo!

22 before they sued them, did they?

23      A.   Same set of circumstances.

24      Q.   And as far as you know, Bright Response has

25 not done any type of analysis as to whether Google

infringed the '947 patent before it brought this
lawsuit, does it?

A.   Well, it's my understanding that some sort of
analysis has to be performed before you bring a lawsuit
or the lawyers get in trouble.

Q.   I'm not asking you to speculate, sir.
Under oath, did Bright Response -- do you know of any
analysis that Bright Response did, with respect to
Google and Yahoo!, as to whether they infringed the
'9 -- '947 patent before you filed this lawsuit?

A.   Well, other than that, no, ma'am.

Q.   You don't know of anything, do you -- do you,
sir?

A.   Well, I certainly presume my attorneys did
what they were supposed to do, but beyond that, no,
ma'am.

Q.   And I'm assuming that you don't have an
opinion as to whether a non-infringing -- what a
non-infringing alternative is, do you, sir?

A.   No, ma'am.  I rely on our experts for that.

Q.   And as far as you know, Bright Response did
not consider Yahoo!'s other patent portfolios with
Overture or with the Davis patent before it filed this
lawsuit against Yahoo!, did it, sir?

                    MR. HUESTON:  Objection, asked and

1  answered.

2          MS. DOAN:  I think we talked about the

3  PTO before, Judge.

4          THE COURT:  Overruled.  If you know.

5      A.   I'm sorry.  Ask me the question again.  I want

6  to make sure I answer it correctly.

7      Q.   (By Ms. Doan) Did Bright Response, before it

8  filed this lawsuit --

9      A.   Okay.

10     Q.   -- did it consider whether -- look for any

11 other patents that Yahoo! had, with respect to the Davis

12 patent -- did it consider the Davis patent; did it

13 consider the Overture patents; did it consider their

14 entire family of patents on search technology in

15 response to keyword searching and serving up ads?

16         MR. HUESTON:  Objection, relevance.

17         THE COURT:  Overruled.

18     A.   I don't get to say canonicalization again?

19 I would -- again, beyond that research that the

20 attorneys have to do in order to stay out of trouble, I

21 don't -- I'm not aware if there was any or not.

22     Q.   (By Ms. Doan) Did Bright Response consider

23 whether Yahoo! had still have been using the same

24 Sponsored Search system since 2001 before it filed a

25 lawsuit against it in 2007, sir?

A.   Again, beyond that research that the attorneys have to do, I'm not aware of whether there was or wasn't.

Q.   You can't -- you can't tell us of any analysis that Bright Response performed as to whether Yahoo!'s Overture system back in 2001 was any way different than the Overture system it's still using in 2004, which you think is the date of first infringement; that's correct, sir, right?

A.   Again, beyond what the attorneys have to do in order to file a fair lawsuit, I'm not aware of any.  It could have been or not.

Q.   And you don't know of any as you sit here on this stand; is that correct?

A.   No, ma'am, I wasn't there.

Q.   And you did not consider -- Bright Response did not consider Yahoo!'s system that had been serving up ads in response to keywords since 1996 before it filed this lawsuit against it, did it, sir?

A.   I'm going to -- I'll say the same thing.  I -- beyond --

Q.   You don't know of anything that was considered in your analysis; is that correct?

A.   I know the lawyers performed an analysis, and beyond that, I'm just not aware.

1    Q.   So Bright Response -- as far as your sitting

2 on the stand today, without deferring to your lawyers,

3 Bright Response did not consider that Yahoo! had been

4 serving up ads since 1996 in response to keyword

5 searches?

6    A.   I wasn't there.  I don't know.

7    Q.   Did Bright Response consider any of Google's

8 systems before it decided to file a lawsuit against

9 Google on the '947 patent?

10    A.   And, again, you want me to set aside the

11 research that's done by the attorneys; is that correct?

12    Q.   Can you tell us -- are you willing to tell us

13 what research the lawyers did right now, sir?

14    A.   I don't know.

15    Q.   You don't know of any that they did, correct?

16    A.   I know they did it.  I'm not involved in it,

17 no, ma'am.

18              THE COURT:  Well, Ladies and Gentlemen,

19 we're going to break for lunch at this time.

20              Be ready to come in the courtroom at

21 1:15.

22              LAW CLERK:  All rise.

23              THE COURT:  Don't talk about the case.

24              (Jury out.)

25              THE COURT:  All right.  You can step

1  down.

2                    Have a seat.

3                    Ms. Doan, Plaintiff's Motion in Limine

4  27:  Any reference to any other lawsuits filed by Bright

5  Response or by companies affiliated with Bright

6  Response.

7                    The ruling at the pretrial reference:  27

8  is granted.

9                    Ruling by written order of the Court:

10 27, granted.

11                   Motion in Limine 31:  Any reference to

12 other litigations involving Mr. Erich Spangenberg,

13 regardless of whether that involvement or connection of

14 that lawsuit, as individual or as managerial or other

15 corporate capacity, concerning any corporate entity,

16 regardless of whether it is a company affiliated with

17 the Plaintiff Bright Response.

18                   At the pretrial conference:  Orally, 31

19 is granted.

20                   By written order of the Court:  31,

21 granted.

22                   How are your questions regarding the only

23 time that the witness is in Marshall, Texas, is when

24 he's here in Marshall involved in other litigations, how

25 does that not fly right in the face of those two orders

1  in limine?

2              MS. DOAN:  Your Honor, I thought it was

3  specific litigations, to mention of specific names of

4  other litigations, and I don't recall asking any

5  question about Erich Spangenberg's litigations at all,

6  sir.

7              THE COURT:  Well, I will look at the

8  transcript.  It's certainly suggesting --

9              MS. DOAN:  Your Honor, I did not mean to

10  violate the motion in limine.  If I came close to it,

11  that's why I approached every -- before we ever started.

12              THE COURT:  You didn't approach at all

13  about --

14              MS. DOAN:  I didn't know it was close,

15  and I am terribly sorry, Your Honor, if it is, and I

16  just --

17              THE COURT:  And you just asked questions

18  repeatedly to the witness concerning what work his

19  counsel did discharging their Rule 11 obligations.

20              Now -- directly in the -- calling for the

21  revelation of privilege and work product.

22              MS. DOAN:  Your Honor --

23              THE COURT:  No, no, no.

24              MS. DOAN:  May I respond?

25              THE COURT:  Not just yet.

1          MS. DOAN:  Okay.

2          THE COURT:  I'll see you at ten after

3   1:00 with the instruction I intend to give.

4          LAW CLERK:  All rise.

5          (Lunch recess.)

6          *      *      *      *      *

7

8

9                    CERTIFICATION

10

11         I HEREBY CERTIFY that the foregoing is a

12   true and correct transcript from the stenographic notes

13   of the proceedings in the above-entitled matter to the

14   best of my ability.

15

16

17

18   /s/_____              _____

     SUSAN SIMMONS, CSR                      Date
19   Official Court Reporter
     State of Texas No.:  267
20   Expiration Date:  12/31/10

21

22

23   /s/_____              _____

     JUDITH WERLINGER, CSR                  Date
24   Deputy Official Court Reporter
     State of Texas No.:  731
25   Expiration Date:  12/31/10