<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3  BRIGHT RESPONSE, LLC        *    Civil Docket No.
                               *    2:07-CV-371
 4  VS.                         *    Marshall, Texas
                               *
 5                              *    August 6, 2010
    GOOGLE, INC., ET AL         *    8:30 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7        BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
                UNITED STATES MAGISTRATE JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:     MR. ANDREW SPANGLER
                          Spangler Law
11                         208 North Green Street
                          Suite 300
12                         Longview, TX    75601

13                         MR. MARC A. FENSTER
                          MR. ANDREW WEISS
14                         MR. ADAM HOFFMAN
                          MR. ALEX GIZA
15                         Russ, August & Kabat
                          12424 Wilshire Boulevard
16                         12th Floor
                          Los Angeles, CA    90025
17
                          MR. DAVID M. PRIDHAM
18                         Law Office of David Pridham
                          25 Linden Road
19                         Barrington, RI  02806

20  APPEARANCES CONTINUED ON NEXT PAGE:

21
    COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
22                         MS. JUDITH WERLINGER, CSR
                          Official Court Reporter
23                         100 East Houston, Suite 125
                          Marshall, TX    75670
24                         903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
</pre>

APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:          MS. ELIZABETH A. WILEY
                            The Wiley Firm
                            P.O.  Box 303280
                            Austin, TX   78703

                            MR. PATRICK R. ANDERSON
                            Patrick R. Anderson, PLLC
                            4225 Miller Road
                            Building B-9, Suite 358
                            Flint, MI   48507

                            MR. JOHN C. HUESTON
                            MR. ADAM S. GOLDBERG
                            Irell & Manella, LLP
                            840 Newport Center Drive
                            Suite 400
                            Newport Beach, CA   92660

FOR THE DEFENDANT:          MR. CHARLES K. VERHOEVEN
(Google)                    MR. DAVID A. PERLSON
                            MS. AMY H. CANDIDO
                            Quinn Emanuel Urquhart & Sullivan
                            50 California Street
                            22nd Floor
                            San Francisco, CA   94111

                            MS. JENNIFER PARKER AINSWORTH
                            Wilson Robertson & Cornelius
                            P.O.  Box 7339
                            Tyler, TX   75711

FOR THE DEFENDANT:          MS. JENNIFER HALTOM DOAN
(Yahoo!)                    Haltom & Doan
                            6500 Summerhill Road
                            Suite 100
                            Texarkana, TX   75503

APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:        MR. WILLIAM ROOKLIDGE
(Yahoo!)                  Howrey, LLP
                          4 Park Plaza, Suite 1700
                          Irvine, CA   92614

                          MR. JASON WHITE
                          Howrey, LLP
                          321 North Clark Street
                          Suite 3400
                          Chicago, IL   60610

                *       *       *       *       *       *


                    P R O C E E D I N G S

          LAW CLERK:  All rise.

          (Jury in.)

          THE COURT:  Please be seated.

          Good morning, Ladies and Gentlemen.

          Come back around, sir.

          MR. FENSTER:  Your Honor, we have no
questions for Mr. Nilsson.

          THE COURT:  All right.  Any other?

          MS. DOAN:  Nothing further, Your Honor.

          THE WITNESS:  That was quick.

          THE COURT:  You can step down.

          Amazing what a good night's rest will do.

          MS. DOAN:  Your Honor, we call Dave Kolm.

          THE COURT:  All right.  Has this witness

previously been sworn?

MS. DOAN:  He has, Your Honor.

THE COURT:  Come around, sir, if you don't mind working your way up to the witness box here.

Try to keep your voice up and speak into the microphone for me, okay?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

Proceed.

DAVID KOLM, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. DOAN:

Q.  Mr. Kolm, would you please introduce yourself to the jury.

A.  Yes.  My name is David Kolm.  I'm a Senior Engineering Director at Yahoo!, and I live in Los Altos, California.

Q.  Can you tell us briefly about your educational background, please, sir?

A.  Sure, I'd be happy to.

I've got a bachelor of science in computer science from the University of California-Santa Barbara.

Q.  How long have you worked in the computer science engineering field?

A.  I've been professionally working doing

software development or managing software development

teams for 32 years.  I started at age 16 while I was in

high school doing professional software development for

Hewlett-Packard.

Q.   Mr. Kolm, do you have any patent applications?

A.   I'm co-inventor on three patent applications,

all for the cell phone industry.

Q.   What does your job at Yahoo! cover?

A.   My team owns the Sponsored Search serving

system.  We own the software; we build it; and we

support it.

Q.   And can you tell us generally what Sponsored

Search is?

A.   Sure, I'd be happy to.

Sponsored Search is a software product that

allows businesses to create advertisements for the

products and services, and they enter bids on keywords

along with those ads.

We then select what ads we're going to display

in response to search requests based on the option

process.  And the option is determined based on the

relevancy of the ad and how much the advertiser is

willing to pay, if a user clicks on the ad with their

mouse.

Q.   And when did Yahoo! first start using the

Sponsored Search system?

A.    They started using the system in 2001, and
it's basically the same system we have today, same
system, same code.  Of course, we've done enhancement to
the system for the last nine years.

Q.    Now, let's briefly discuss the Sponsored
Search system.

Can you see this chart?

A.    I cannot.

That's fine.  Thank you.

Q.    Alright now?

Do you recognize this chart?

A.    Yes, I do.

Q.    Can you tell the jury what it is?

A.    This is a diagram that shows a high-level
overview of the Sponsored Search serving system.

Q.    And where is the Sponsored Search serving
system located?

A.    It's in six different data centers, computer
centers, around the world.  In the United States, we
have a major data center on the West Coast and a major
data center on the East Coast.

Q.    And tell me how many searches come in on
average per day in the U.S. market.

A.    On the U.S. market, we get about 360 million

1  search requests a day.  Works out to a bit over

2  4,000-plus every second.

3     Q.   It looks like there's a Yahoo! ads database on

4  the right side of this chart.

5          Can you describe this for the jury?

6     A.   Sure.  The database is actually a very dynamic

7  database.  It's holding about 200 million ads currently

8  and about 3 billion separate bids from businesses on

9  their ads.  It's getting about 10 million changes a day.

10 So about every 100th of a second a change is coming in

11 from an advertiser.  That could be creating a new ad,

12 deleting an ad, changing how much the bidding, changing

13 the text of the ad.

14    Q.   And how would you describe the Yahoo!

15 Sponsored Search system?

16    A.   I would say it's a fully automatic rules-based

17 system.

18    Q.   Did the Yahoo! Sponsored Search system ever

19 classify whether a message is automatic or not?

20    A.   No.  Everything we do is automatic.  It's 100

21 percent automatic.  It returns results -- typically, the

22 average time it takes from the start to the end is about

23 a hundred milliseconds.  And it will always return

24 results within that time.

25    Q.   All right.  Now, Mr. Kolm, let's start over

here with the user's computer, and can you walk us

through a general overview of a request coming from the

user's computer to the Yahoo! website to the Affiliate

Server?

A. Certainly. So if you're sitting at your

computer at your house or your office and you enter a

search in the search box, maybe pet supplies, and you

hit the search button, a request is going to be made

from your computer to the box that's labeled Yahoo!

website.

That request is basically a request for a

search. You're looking for information about pet

supplies. You're probably not looking for ads. You're

looking for web search information.

So the Yahoo! website, we'll see the message,

and we'll start the process of doing the web search for

you. In addition, they've made the decision that they'd

like to show ads on the page along with the search

results.

So they make an http request of a different

message from that server to the Sponsored Search system,

to the box you see called Affiliate Server. That's the

main server that controls the Sponsored Search system.

Q. Let me stop you there.

We have up on the screen a search for car

insurance.  Can you see the screen, Mr. Kolm?

     A.   Yes, I can.

     Q.   And can you tell the jury, is this the same
diagram that you previously were describing on the
right-hand side of this chart?

     A.   Yes, it is.

     Q.   All right.  And what is the first step here?

     A.   So the first step is that http request I
mentioned where the search -- in this case, car
insurance -- goes from your computer to the Yahoo!
website to do a search for car insurance.

     Q.   And what was that?  What does that search
request look like?

     A.   So I don't know if you can read it.  The
search request is in the gray.  That is the request
to -- the http request and you can see highlighted the
text, car insurance.  That's actually the full request
that's being made to do the search request.

     Q.   All right.  And then the next message, the
Yahoo! website, the Yahoo! Sponsored Search, what does
that search look like?

     A.   So the next message is from the Yahoo! website
to the Sponsored Search system asking for ads.  So you
will see it's much longer.  In fact, it doesn't fill in
the screen.  You see the dot, dot, dot.

1    The same query the user enters, car insurance,

2    is part of that query, and the IP address of user's

3    computer, which is the address of the computer on the

4    network, is included.

5    But in addition, there's a lot more

6    information that's included.

7    Q.   All right.  Now, let's skip all the way to the

8    response.

9    Does the Yahoo! Sponsored Search system always

10   return a response?

11   A.   It always returns a response, yes.

12   Q.   All right.  So let's look at this after it's

13   gone through the Affiliate Server in the system.

14   Can you tell the jury what this return is?

15   A.   Sure.  So this step, we've -- we've chosen

16   ads.  We've run the auction.  We've decided what ads are

17   going to be returned.

18   And I think if you go to the next slide, this

19   is actually the -- what Sponsored Search system sends

20   back to the Yahoo! website.  So you can see it says I

21   know the query is car insurance, and you can see that

22   the top line there, this is the first ad.  I think it

23   says esurance.com.

24   This is the first add.  You can see what it

25   will end up looking like down below.

1    Q.   Okay.  And then the next step between the

2  Yahoo! website and the user?

3    A.   So in this step, the Yahoo! website receives

4  the ads, but it also did the search, the web search.  So

5  it puts together the entire set of information that's

6  going to be displayed on the page, along with the Yahoo!

7  logo and everything else, and returns that to your

8  computer.  And that would go on for several pages' worth

9  of text.

10    Q.   Okay.  Now, let's look at an example where

11  there are no ads to return.  So, for example, if

12  somebody has put in carcarcar, okay?

13    A.   Yes.

14    Q.   On the return, what would that look like?

15    A.   So I think if you go to the next slide, it

16  will probably be easier to see.

17    Q.   Okay.

18    A.   This is the full response that gets returned

19  when there's no ads.  So in this case, the query is car,

20  carcarcar.  You can see that highlighted.  And if you

21  look carefully, you'll see down, about two-thirds of the

22  way down, it says results step zero.

23         There's just no ad.  Results steps is how many

24  results we have.  And in this case, we sent a response

25  back; we tell you we got your request; we tell you we

1 processed your request; and we tell you there's no ads

2 to return.

3 　　　Q.　All right.　And then from the Yahoo! website

4 to the user?

5 　　　A.　So in this case, you'll end up getting a web

6 page back, and it will have the natural search results.

7 There just won't be any ads.

8 　　　　　There we go.　I'm sorry.

9 　　　　　So in this -- in this case, you can see

10 there's no ads.　And this is the -- basically, the

11 message that was returned to paint the page.　And,

12 again, it has all the information, including referencing

13 to the Yahoo! logo.

14 　　　Q.　So it always returns a response automatically?

15 　　　A.　Always.

16 　　　Q.　Is -- is it possible that before the user hits

17 the send button or the enter button on their computer

18 that the response is already predetermined or preset?

19 　　　A.　No, ma'am.　It's pretty much impossible.

20 　　　Q.　Why?

21 　　　A.　Well, there's a whole set of reasons.　I'll

22 just give you a couple.

23 　　　　　One is I already mentioned the database.　The

24 database is changing a hundred times a second.　In

25 addition, we're getting 4,000 search requests every

1  second.  So every 4,000th of a second a new query is

2  starting.  And every 100th of a second the data is

3  changing.  It's basically always in flux.

4          Even if you put that aside, we're serving ads.

5  4,000 times a second, we're serving ads.  If we're

6  serving ads, people are either clicking on them or

7  they're not clicking on them.

8          The auction is driven by -- one of the primary

9  factors is whether people are clicking on them or not.

10  So unless and until we know exactly how the ads are

11  responding, and we don't know that until fairly late in

12  the process, you just don't know how the options are

13  going to turn out.

14          Also, since people are clicking on ads, money

15  is being spent.  Advertisers' budgets are going down.

16  They can run out of money, or as money is spent, the

17  budget changes.  And depending on the budget, we'll let

18  them in the auction, or we'll hold them back to make

19  sure the budget lasts a full day.

20      Q.   All right.  Let's go with a brief overview of

21  the Yahoo! Sponsored Search system.

22          When the request comes in to the Affiliate

23  Server, does it first do it through to a match driver

24  interface?

25      A.   Yes, it does.

1    Q.   Tell us briefly about that, please, sir.

2    A.   So the match driver interface is basically

3  just some software that talks to the match driver.  That

4  goes to a separate server.  The match driver does what

5  we call canonicalization.  Canonicalization simply means

6  we take the query and we convert it to a more simple

7  form, get rid of the extra white space, renew

8  punctuation, convert it all to lowercase.  And we get

9  rid of plurals.

10        So if your query had been pet supplies, we

11 change it to pet supply.

12   Q.   Why would you want to canonicalize a query?

13   A.   It makes the job of finding ads easier.  We

14 don't want to have to worry about what case it is.  We

15 don't want to have to worry about white space.  And we

16 don't want to worry about whether someone bid on pet

17 supply or pet supplies.

18   Q.   Okay.  And then does the request move down to

19 the ad selection interface?  And you've got exact and

20 advanced.

21        Can you tell us what exact is?

22   A.   Sure.  At this point, we've got the query, and

23 we want to find some ads.  Exact is exact match.  What

24 it means is we're going to find ads where the advertiser

25 has bid on exactly the same keyword as the query that

someone is entering.

So, again, if it's pet supply, we're looking for ads where the advertisers bid on just exactly that phrase.

Q.   And are the exact match ads scored when they're returned to the Affiliate Server?

A.   No.  They're not scored in any way.  Whatever data the advertiser entered is returned and stored in the ad selection interface.

Q.   Will you tell us briefly about advanced match?

A.   Sure.  Advanced match is an option for advertisers where they say they're giving -- telling us it's okay to display the ads, even if they didn't bid on exactly the right thing.

So maybe he bid on pet supplies, and someone did a search for pet food.  They tell us it's okay for us to show that ad, even though it's not exactly what they bid on.

Q.   Okay.  And then tell me briefly about filter.

A.   So we gather the ads from the exact and the advanced processing, and we have what we call the candidate set.  From the 200 million ads, the candidate accepts about 150 ads, about half exact, half advanced.  And then we run it through a filter step, which has six different rules that get run.  They do things like make

sure that the ad we're going to show isn't an ad for a
competitor of the website, or they take care of the
things like budgeting.  We want to make sure your budget
lasts the entire day.

          If we see you're spending your money too fast
and people are clicking on your ads, we will actually
pull you out of the auction and not let you compete, and
then let you try again next time someone does a search.

          Q.    Mr. Kolm, are any of the ads in the Yahoo! ad
database scored?

          A.    No, none of the ads in the database are
scored.

          Q.    And are all of the ads in the Affiliate Server
scored?

          A.    No, they are not.

          Q.    Okay.  So the exact ones are not and advance
ones are?

          A.    That's correct.

          Q.    Now, there's three blocks here in the middle
that are green.

          Can you take us through those, please, sir?

          A.    Sure.  So this is where we actually start
doing some math.  The very first step is a relevancy
calculation.  We look at the query that the user entered
and the text of the ad, and we decide how relevant the

ad is to the query.

We don't want to return ads that don't -- that aren't relevant. We don't really always trust the advertisers to make sure that they're advertising the right things. You can get bad ads in all sorts of things.

So we do a check there. And if it's not relevant enough, we throw out the ad at that point, and we won't consider it for the auction.

The next step is clickability. Clickability means you calculate probability that someone is going to click on the ad if we show it. This is -- this is different than the relevancy. We actually look at past history.

We're serving 4,000 ad requests a second. We have lots of information about how people are behaving to our ads. We look at what they've been doing, and we assume that past behavior will dictate future behavior. So if people are clicking on an ad, we think that's a signal that people like the ad. If they're not clicking on it, it's probably not a good ad.

To give you a good example, pet supplies. If the ad were pet suppliespetsuppliespetsupplies, very relevant. The relevancy filter will think it's great. It's not a very pretty ad. No one is clicking on that.

1  They're much more likely to click on an ad like pet

2  supplies, best deal in town, come here.

3          So the clickability score on the first one

4  would be very low, while the second one would be higher.

5      Q.   Okay.  And can you briefly tell us about

6  what's called the eCPM calculation?  What is that?

7      A.   Sure.  This is actually the auction.  This is

8  where we do our final score and decide what ads can be

9  on the top of the page, what's going to be next.

10  The eCPM stands for expected cost per mille.  Mille is

11  French for thousand.  So it's an estimate of the revenue

12  that the ad will bring in.  It's calculated by looking

13  at the probability someone is going to click on it and

14  multiplying that by how much the advertiser is willing

15  to pay, if someone clicks on it with their mouse.

16      Q.   Does the Yahoo! Sponsored Search system ever

17  normalize a score by dividing by the maximum possible

18  score?

19      A.   No, it does not, never.

20      Q.   Tell us what it does.

21      A.   So if we need the number to be in the range of

22  0 to 1, like a probability, we use something called a

23  sigmoid function.

24      Q.   I think we have an example of the sigmoid

25  function.

1          MS. DOAN:  Can you pull that up, Allen?

2          THE WITNESS:  There we go.

3     Q.   (By Ms. Doan) Can you tell us what this is?

4     A.   Sure.  So a sigmoid function, we call that an

5 S-shaped function.  It looks like an S.

6          And you can see on the left, it approaches 0

7 and actually never gets there, but it approaches 0.  And

8 on the upper right, it approaches 1.

9          The way we get any number to map between a

10 range of 0 to 1, is we apply this non-linear function

11 and basically look up the value on the X axis, the

12 function will return the value on the Y axis.

13     Q.   Okay.  Then if you could briefly take us

14 through page placement and format.  What happens there?

15     A.   Sure.  We run the auction.  We've decided what

16 ads is at the top, what ad is the second ad, what ad is

17 the third ad.  Then we decide where on the page we're

18 going to put them.

19          So we can put ads on the top of the page, on

20 the right of the page, or at the bottom of the page.

21 Page placement decides where that is.

22          Once we decide that, we format it up as a

23 single set of ads, and we format it for return to the

24 Yahoo! website, which you saw earlier on the slide.

25     Q.   Okay.  And so at any point in the Yahoo!

1    Sponsored Search system, does the system classify for

2    requiring human assistance?

3        A.   No, there's not.   There's no human involved.

4    And we have to turn a result in a hundred milliseconds,

5    so there's really not an opportunity for a human to be

6    involved.

7        Q.   Thank you, sir.

8             MS. DOAN:  Pass the witness.

9             THE COURT:  Cross-examination.

10                    CROSS-EXAMINATION

11   BY MR. GIZA:

12       Q.   Good morning, Mr. Kolm.

13       A.   Good morning.

14       Q.   Good to see you again.

15            Let's talk about the Sponsored Search system

16   and how it responds to a query.

17            Now, Elcaro is used for the retrieval of that,

18   right?

19       A.   Among other things, yes.

20       Q.   Are there individual ads stored in the

21   Yahoo!'s ad database?

22       A.   Yes, there are.

23       Q.   And you said that Sponsored Search takes on

24   average a hundred milliseconds to respond, right?

25       A.   That's correct.

1    Q.   The individual ads retrieved from Elcaro in

2 response to a particular query are stored in Elcaro

3 prior to the receipt of that query, correct?

4    A.   No, that's not necessarily correct.

5    Q.   The individual ads received from Elcaro in

6 response to a particular query are stored in Elcaro at

7 least a hundred milliseconds before they were retrieved?

8    A.   No, that's not correct either.

9         They only have to be in Elcaro by the time --

10 in the flow where you saw the exact and the advanced

11 box, when that goes out to Elcaro to fetch an ad.  That

12 is the point where the ad needs to be there and current.

13    Q.   Is it your testimony that the individual ads

14 in Elcaro are never stored in Elcaro prior to the

15 receipt of the query?

16    A.   There are certainly ads in the database prior

17 to the receipt.  However, the ads are constantly

18 changing, and the ads that are candidates for any

19 particular query aren't known or determined until we

20 talk to Elcaro during the ad selection process.

21    Q.   Is there at least one individual responsive ad

22 stored in Elcaro that is in Elcaro prior to the receipt

23 of the query?

24    A.   It's unknown.  It all depends on the

25 situation.

1    Q.   Your testimony is that there's no way to know

2 if an individual ad is stored in Elcaro prior to receipt

3 of a query?

4    A.   That's correct.

5    Q.   Okay.  Let's talk about the advanced match

6 systems.

7         Sponsored Search uses advanced match systems

8 to match ads to search requests, correct?

9    A.   Match search requests to ads.

10    Q.   But the answer is -- okay.  Sponsored Search

11 uses advanced match systems to match search requests to

12 ads, correct?

13    A.   Correct.

14    Q.   And the advanced match systems used by

15 Sponsored Search include QBERT, King Kong, QuAd, and

16 Yellowstone, correct?

17    A.   Yes; that's correct.

18    Q.   The advanced match systems like Yellowstone,

19 for example, look at the overlap between the query terms

20 and the bidded terms, right?

21    A.   They look at a number of different features

22 that we get from the query, and it compares them in an

23 index, basically a table, of the features we get from

24 the ad.  Among those are the text.

25    Q.   So can you answer my question fairly yes or

1  no, the advanced matched system look at the overlap

2  between query terms and bidded terms, right?

3       A.   That's one of the features that it uses, yes.

4       Q.   Let's talk about scoring.  Sponsored Search

5  ultimately determines an overall relevancy score for

6  each candidate ad that it evaluates, correct?

7       A.   No, it does not.

8       Q.   Now, you sat for a deposition in this case,

9  right?

10      A.   I did.

11      Q.   That was about a month ago?

12      A.   Yes, I did.

13      Q.   And you were under oath in that deposition?

14      A.   Yes, I was.

15      Q.   Okay.

16           MR. GIZA:  I'd like to read from his

17  deposition at Page 92, Line 21 to 93, Line 2.

18           MS. DOAN:  What lines?

19           MR. GIZA:  92, Line 21, 93, 2.

20           MS. DOAN:  I'm there.

21      Q.   (By Mr. Giza)  QUESTION:  And the -- that

22  Sponsored Search ultimately determines an overall

23  relevancy score for each candidate ad --

24           ANSWER:  Okay.

25           QUESTION: -- that it evaluates; is that right?

1          ANSWER:  Yeah.  The relevancy score that is

2   done after all the ad selection candidates are made,

3   yes.

4        A.   So -- no question yet.

5        Q.   Let's talk about Claim 30.

6             The overall relevancy score accounts for the

7   similarity between the text of the raw query and the

8   text of the ads, correct?

9        A.   That's generally true.

10       Q.   The overall relevancy score also accounts for

11  matches between other information related to the search

12  request and other information related to the ad,

13  correct?

14       A.   Yes, that's also true.

15       Q.   Now, with regard to my first question about

16  the similarity between the text and the raw query and

17  the text of the ad, Claim 30(b5) requires comparing the

18  text, right?

19       A.   I can't quite see it.  I'm sorry.

20       Q.   I'll move it for you.

21       A.   The stored text -- okay.

22            MS. DOAN:  Your Honor -- sorry.

23            THE COURT:  I'm going to allow him to

24  answer based on his knowledge of the systems.

25       A.   Can you -- can you repeat the question,

1   please?

2      Q.  (By Mr. Giza) Claim 30(b5) requires comparing

3   text, right?

4      A.   Yes.

5      Q.   And then you also said that the overall

6   relevancy score accounts or matches -- accounts for

7   matches between information related to the search

8   request and information related to the ad, right?

9      A.   That's also correct.

10     Q.   Okay.  And looking at Claim 30(b4), 30(b4)

11   requires comparing the flagged attributes, right?

12     A.   Yes, it does.  We don't flag attributes.

13            MR. GIZA:  Move to strike everything

14   after yes.

15            THE COURT:  Well, just try to limit your

16   answers to yes or no to the extent you can, okay?

17            Ms. Doan --

18            THE WITNESS:  Yes, Your Honor.

19            THE COURT:  -- will get a chance to ask

20   you some additional questions should you need to

21   explain, all right?

22            THE WITNESS:  Yes, Your Honor.

23     Q.  (By Mr. Giza) The overall relevancy score

24   generally increases the more similarities there are

25   between the text of the -- and other information from

1  the query and the text and the other information from

2  the ad, correct?

3       A.   That's a general statement.  There are

4  exceptions to that, but generally true.

5       Q.   Okay.  And looking at Claim 30(b6), that

6  requires assigning a score that increases when at least

7  one of the text and attributes match, right?

8       A.   I need to read it.

9            Well, 30(b6) refers to case models and such.

10 The statement you made is true, but 30(b6) uses a lot of

11 other terminology.

12      Q.   So the answer is yes?

13      A.   To the specific question you asked, yes.

14      Q.   Okay.  The lower the similarity between those

15 things, the lower the overall relevancy score, correct?

16      A.   Again, in general, that's true.  There are

17 exceptions.

18      Q.   And Claim 30(b6) requires not increasing the

19 score when at least one of the attributes and texts do

20 not match, right?

21      A.   Yes, it does.

22           MS. DOAN:  Your Honor, I object to the

23 this line of questioning.  He's not an expert witness.

24 He can say what the system does, but reading it on

25 the --

1          THE COURT:  All right.  Overruled.

2          MR. GIZA:  No further questions.

3          THE COURT:  Do you have additional

4  questions?

5          MS. DOAN:  Just a few, Your Honor.

6                REDIRECT EXAMINATION

7  BY MS. DOAN:

8      Q.  Mr. Kolm, with respect to Claims 30(b4) and

9  30(b6) and 30(b5), when you answered yes to Mr. Giza's

10  questions, were you answering -- what were you answering

11  there?

12     A.  I was answering his specific question, not

13  concerning the claim on the board.

14     Q.  Okay.  And when you said that Claim 30(b4),

15  you tried to explain you don't flag the attributes?

16     A.  That's correct.

17     Q.  Okay.  So were you answering yes, that's what

18  that claim says, but we don't do that?

19     A.  I was -- I was commenting that the question he

20  asked referred to comparing flagged attributes, and we

21  don't flag attributes.

22     Q.  On Claim 30(b6), it says assigning score to

23  each stored case model which is compared with the case

24  model.

25          Is that what you were acknowledging?

1    A.    No, I was not.  I was referring to comparing

2 the query with features of the ad that we have stored in

3 tables.

4    Q.    And when we are looking at queries and

5 features, is that through some type of -- what kind of

6 system is that?

7    A.    It's a rules-based system.

8    Q.    When you say the rules-based system with

9 tables, would you explain that to the jury?

10    A.    Sure.  So we look at the query and we figure

11 out a set of attributes, what the words are in it, how

12 many words there are.  We do a similar kind of thing on

13 the ads.  And we build tables with information about the

14 information on the ads.

15        We then basically take those attributes, and

16 we look through the table, and we find entries where

17 they match.  So if the attributes match the attributes

18 in the table, that gives us information that that ad is

19 relevant.

20    Q.    Now, I want to ask you a couple of questions

21 about what Mr. Giza covered with you with respect to the

22 relevancy score, okay?

23    A.    Yes.

24    Q.    Are each of the ads that come through the

25 Affiliate Server stored?

1    A.    No, they are not.

2    Q.    All of the ads that go through the relevancy

3  calculator and filter, are they scored?

4    A.    If they get to the relevancy calculator,

5  they're scored for relevancy.  They don't have a final

6  score, which is the auction store.

7    Q.    Okay.  And the auction takes place where?

8    A.    In the box with the eCPM.

9            MS. DOAN:  Thank you, Your Honor.  Pass

10  the witness.

11            THE COURT:  Okay.  Any additional

12  questions?

13            MR. GIZA:  No further questions.

14            THE COURT:  All right.  May this witness

15  be finally excused?

16            MR. FENSTER:  Yes, Your Honor.

17            MS. DOAN:  Yes, Your Honor.

18            THE COURT:  All right.  You may step

19  down.  Thank you for coming.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  Who will be your next

22  witness?

23            MR. ROOKLIDGE:  We would call Dr. James

24  Allan, Your Honor.

25            THE COURT:  Was this witness previously

1  sworn?

2          MR. ROOKLIDGE:  Yes, he was.

3      JAMES ALLAN, Ph.D., DEFENDANTS' WITNESS, PREVIOUSLY

4                          SWORN

5                   DIRECT EXAMINATION

6  BY MR. ROOKLIDGE:

7      Q.   Good morning, Dr. Allan.

8      A.   Good morning, Mr. Rooklidge.

9      Q.   Could you tell the jury your full name,

10  please.

11     A.   My names is James -- excuse me -- my name is

12  James Murray Allan.

13     Q.   And what do you do for a living?

14     A.   I'm a professor of computer science at the

15  University of Massachusetts in Amherst.

16     Q.   Let's talk a little bit about your background.

17          We've put up a demonstrative or we are in the

18  process of putting up a demonstrative that is your

19  resume.

20          Let's start with talking a little bit about

21  your -- is this the first page of your resume?

22     A.   Yes.  This is the first page of my CV, also

23  resume.

24     Q.   Okay.  And did you prepare this set of slides

25  to help you present your testimony to the jury today?

1    A.    Yes, I did prepare these slides for that

2  purpose.

3    Q.    All right.  Let's talk a little bit about your

4  computer experience.

5          When did you start working with computers?

6    A.    So I started working with computers when I was

7  in junior high and became very fascinated by them, and I

8  programmed computers for quite a few years after that,

9  and then got into my current work, which is still

10  computers.

11    Q.    Tell us about your educational background, if

12  you would.

13    A.    So after high school, I went to college in

14  Iowa, a small town, Grinnell College in Iowa, where I

15  earned a bachelor's in mathematics.  After college, I

16  worked for five years as a computer programmer in my

17  hometown at the local college, and then I went to

18  graduate school at Cornell University in New York.  And

19  there I earned a master's degree and a Ph.D. in 1991 and

20  1995, both in computer science at Cornell University.

21    Q.    And have you made a list of the experience

22  that you've had since you left Cornell?

23    A.    Yes.  I put down some key highlights of my

24  experience rather than walking through it.

25          So since I took my first course related to

search engines at Cornell University, I've had about 20

years of experience, academic research experience and

search experience -- actual experience building and

using search engines.

At the University of Massachusetts, I had been

part of something called the Center for Intelligent

Information Retrieval, the CIIR. That's a research

organization within the Computer Science Department that

I started out working in, and I now co-direct.

As part of my work both as a graduate student

and while I'm doing my research and working with my own

graduate students, I have built several search engines

or major parts of them and have been involved heavily in

the design of those search engines.

Shortly after I got to UMass, I was a

consultant with a soft -- small software startup company

called Sovereign Hill where I was involved in helping

them implement search algorithms as well as actually

building, designing, and coding some particular key

aspects of it for demonstrations to customers.

Q.   What are some of the courses you teach at

UMass?

A.   I have taught every year since 2000 a

Ph.D.-level course, so it's for graduate students in

information retrieval, which is the underlying theory

1  and practice associated with search engines.

2          I've also taught an advanced undergraduate

3  course in web search engines specifically.

4      Q.   Have you been involved in any professional

5  associations?

6      A.   Yes.  I'm a member of the Association --

7  Association of Computing Machinery.  It has a

8  suborganization called SIGIR.  I referred to that on

9  this slide here.

10          So SIGIR is the special interest group on

11 information retrieval or search engines, and I was

12 honored to be elected Chair of the Executive Committee

13 of that organization this year.

14          I'm also a member of the Association -- the

15 American -- the American Society for Information and

16 Science and Technology and the IEEE Computer Society.

17     Q.   Are you currently working on any projects

18 outside of your teaching that refers to or relates to

19 information retrieval?

20     A.   Yes, I am.  I have many outstanding projects.

21          I'm currently actively working with six

22 graduate students on six different projects.

23          One of the more interesting, recent projects

24 is that we have -- in cooperation with an organization

25 called the Internet Archive, we've downloaded a million

books, scanned pictures of the pages of books, and we're

building a search engine for -- to understand better

about how people search books and how we can make the

information more available to them.

Q.   Have you published any papers in this area?

A.   Yes.  As it says here, I hit a milestone of my

100th published conference or journal paper this summer,

and three of those papers have won awards.

Q.   Has any of this work related to the subject

matter of this case?

A.   Yes.  An important part of this case is Yahoo!

Sponsored Search, which is a search engine for ads.  And

all of my research for 20 years has been associated with

search engines and search engine technology.

Q.   Are you being paid for your time in this case?

A.   Yes, I am.

Q.   Okay.  And what is your rate?

A.   $300 per hour.

Q.   Does your payment depend in any way on the

outcome of this case?

A.   No, it does not.

Q.   Have you ever testified at trial before as an

expert?

A.   No.  This is my first time.

Q.   Do you work for a living as a consultant?

1    A.    No.   I'm a professor of computer science and
2    then an information retrieval search engine researcher.
3                    MR. ROOKLIDGE:   At this point, Your
4    Honor, Yahoo! would move to qualify Dr. Allan as an
5    expert in computer science.
6                    MR. FENSTER:   No objection.
7                    THE COURT:   All right.   The Court and
8    jury will hear his opinion.
9        Q.    (By Mr. Rooklidge) Dr. Allan, what patent did
10   you look at in connection with your work in this case?
11       A.    I looked at several patents, but mainly the
12   '947 patent that's been talked about in this trial.
13       Q.    Okay.   And does the demonstrative show the
14   first page of that patent?
15       A.    Yes, sir, it does.
16       Q.    All right.   Now, you were retained as a
17   technical expert for Yahoo! in this case, correct?
18       A.    That's true.
19       Q.    Could you explain to the jury what your
20   assignment was with respect to this case?
21       A.    Yes, sir.   My assignment has two major parts.
22   The first part was to look at this patent that's on the
23   screen, and to look at its claims and its associated
24   documents, and to look at Yahoo! Sponsored Search, the
25   accused product, and to look at its code and its

documentation to understand it.

    The second part of my assignment was to read the report that Dr. Rhyne filed alleging infringement by Sponsored Search and form my own opinion on infringement by Sponsored Search.

    Q.   Okay.  And did you do that?

    A.   Yes, I did, sir.

    Q.   Now, in forming -- did you look at any other materials in connection with this case?

    A.   Yes, I did.  And it's enough of them, so some highlights of the materials.

    As I said, I looked at the -- are shown here. I looked at the patent and its associated documents and reexamination.  I looked at Dr. Rhyne's report and his deposition, the depositions he has, transcripts of those, also, the Court's claim construction, which defines the terms in the claim, and Yahoo!'s source code and documentation and some other deposition transcripts and so on.

    Q.   Now, in formulating your opinions in this case, were you given the rules for what patent infringement requires?

    A.   Yes, sir, I was.

    Q.   And were you instructed regarding where to look to determine what those claims meant?

1    A.   Yes, I was.

2    Q.   And what instructions were you given?

3    A.   So in order to determine what the claims mean,

4 I first look to the Court's claim construction, which is

5 listed here, which defines very explicitly some of the

6 terms.

7         And after that, I would use the knowledge of

8 what's called a person of ordinary skill in the art to

9 understand the claims, given the Court's claim

10 construction.

11   Q.   Once you determined the meanings of the claim,

12 how did you determine whether or not Yahoo!'s Sponsored

13 Search system infringes those claims?

14   A.   So in order for a claim to be infringed, as

15 we've heard already several times, every single step of

16 that claim must be infringed, must be performed by the

17 accused product.

18        So in order to determine whether Sponsored

19 Search infringes any of the claims, I looked to see

20 whether Sponsored Search looks at its code and its

21 documentation and looks to see whether Sponsored Search

22 performed each step of each of the accused claims.

23   Q.   Okay.  And then what materials did you look at

24 to determine that?

25   A.   In order to determine whether the claim -- a

1 particular step was formed, I looked at the Yahoo!

2 source code and at the associated documentation and the

3 testimony of the Yahoo! engineers.

4     Q.   Did you perform any searches on Yahoo!.com?

5     A.   I did also -- yes, sir, I did.  I used Yahoo!

6 as one of my search engines, but I also used it in the

7 context of this case specifically to get a better

8 understanding of how Sponsored Search looks and works.

9     Q.   Let's go right to Claim 28(c).  This is the

10 claim limitation that requires a predetermined response.

11         Are you aware whether the Court has construed

12 the phrase, predetermined response?

13     A.   Yes, the Court has.  And I have -- yes.

14 So predetermined response is construed as responses

15 prepared prior to the receipt of the electronic message.

16     Q.   Does Yahoo! receive or retrieve predetermined

17 responses?

18     A.   Yahoo! does not.

19     Q.   Okay.  Why not?

20     A.   Yahoo! does not know what response, what set

21 of ads it's going to return until after the query has

22 been arrived at the site.

23     Q.   Okay.  And did you review Dr. Rhyne's opinion

24 on what he considered to be the predetermined response

25 in Sponsored Search?

1    A.    Yes, I did.

2    Q.    Let's take a look at his testimony.  This is

3 from his August 4th, 2010 deposition transcript at

4 Page 14, Lines 16 through 21.

5         You see where Dr. Rhyne was asked:  Dr. Rhyne,

6 in the Yahoo! Sponsored Search system, the set of

7 advertisements are not prepared prior to the receipt of

8 the search query, correct?

9         ANSWER:  Yes.  The mixture -- the mixture of

10 the set of whole ads is not.

11        Do you recall that?

12   A.    Yes, I do.

13   Q.    Now, are the set of advertisements that

14 Dr. Rhyne refers to prepared before the receipt of the

15 search query?

16   A.    No, they are not.  They are prepared -- they

17 cannot be prepared until after the query has arrived to

18 Sponsored Search.

19   Q.    Well, why doesn't Yahoo! Sponsored Search know

20 what set of advertisements will be sent in response to a

21 search query before the search query is received?

22   A.    As Mr. Kolm testified just a little earlier,

23 the database of ads is constantly in flux, a hundred

24 changes a second, I believe, is the number he gave.  So

25 that which ads are there is unknown before a query

1    arrives.

2            In addition to that, the auction, the

3    selection process that's done at that final scoring step

4    that Mr. Kolm referred to, that auction's based on a lot

5    of very dynamic information, not just the status of the

6    database and the advertiser's bid, but the time of day

7    and whether ads have been served regularly and so on.

8        Q.   What time does Yahoo! Sponsored Search system

9    know what ads are going to be returned in response to a

10   query?

11       A.   So Yahoo! Sponsored Search does not know which

12   ads it's going to return until it gets to the very last

13   step of the Affiliate Server, the bottom of that central

14   box that Mr. Kolm showed.

15       Q.   Now, did you review Dr. Rhyne's testimony on

16   when Sponsored Search knows what set of advertisements

17   will be returned?

18       A.   Yes, I did.

19       Q.   Okay.

20            MR. ROOKLIDGE:  Let's put that up.

21       Q.   (By Mr. Rooklidge) Up here, Dr. Rhyne was

22   asked:  Do you understand that the specific ads that are

23   returned in response to a query are only identified at

24   the time the query is received?

25            And the answer was:  Well, I think they're --

1  they're identified, to the best of my current knowledge,

2  after the query has been received, as the -- as part of

3  the rule base and case base processing that I discuss in

4  my report.

5          Do you recall that?

6      A.   Yes, I do.

7      Q.   Okay.  And do you agree with Dr. Rhyne that

8  the set of advertisements are only known after the

9  search query has been sent?

10     A.   Yes, sir, I agree.

11     Q.   Okay.  Now, Dr. Allan, what did you have for

12 breakfast this morning?

13     A.   This morning, I had a muffin, a banana, and a

14 cup of coffee.

15     Q.   Okay.  And now, what was your response to my

16 question about breakfast?

17     A.   Well, my response was a list of the things I

18 had for breakfast, which is what you asked.

19     Q.   Okay.  Your response wasn't a muffin?

20     A.   No.  My response was muffin, banana, and

21 coffee.

22     Q.   Okay.  But didn't you give me three different

23 responses?

24     A.   No.  I gave you one response.  They were all

25 grouped together as one response.

1    Q.   Well, but couldn't we view your response --
2  couldn't we break it down into words or into syllables,
3  muf-fin, cof-fee?
4    A.   No, sir.  My response is the things that are
5  grouped together, so the whole -- the whole thing as a
6  package is clearly the response in those cases.
7    Q.   And does Yahoo! send back the group of ads all
8  together?
9    A.   Yes, it does, as Mr. Kolm showed.
10    Q.   So is it your opinion that Step C of Claim 28
11 is not satisfied?
12    A.   It is my opinion that Step C is not performed
13 by Sponsored Search.
14    Q.   All right.  Let's turn again to Claim 28, but
15 this time to Step (b1).
16         Are you aware of whether the Court has
17 construed classifying the electronic message?
18    A.   Yes.  The Court has construed that.
19    Q.   Let's take --
20    A.   I believe I have a --
21    Q.   Let's take a look at that construction.
22    A.   And so classifying the electronic message is
23 construed as determining whether the electronic message
24 falls into one or more categories.
25    Q.   Does Yahoo! Sponsored Search classify the

1  electronic message in the manner that's required by this

2  claim step in the construction?

3      A.    No, sir, it does not.

4      Q.    Why not?

5      A.    Yahoo! Sponsored Search does not classify

6  queries.

7      Q.    Does Yahoo! Sponsored Search always provide an

8  automatic response to every search query?

9      A.    Yes.  As Mr. Kolm has indicated also, every

10 query that comes in is automatically responded to.

11     Q.    Even when there are no ads to return?

12     A.    Even when there are no ads, there is a

13 response that says no ads.  And Mr. Kolm showed an

14 example of what that response looks like.

15     Q.    Okay.

16          MR. ROOKLIDGE:  Could we put that up,

17 please.

18     Q.    (By Mr. Rooklidge) And so this was an example

19 of the response that Yahoo! Sponsored Search returns,

20 even if there are no ads?

21     A.    Yes.  As Mr. Kolm pointed out, you can see the

22 query in there.  That was that carcarcar example all as

23 one word.  There are no ads to be returned, but the

24 response includes all of this information.

25     Q.    And this -- what looks to me to be a whole lot

of gibberish, but I'm sure is very meaningful, this is

returned automatically?

     A.   That's correct.   This is automatic, in the

1/100 of a second.

     Q.   Okay.   Are you aware that Dr. Rhyne testified

that even if you're automatically responding to every

query every time all the time, that you are classifying

the query as being able to be responded to

automatically?

     A.   Yes, I'm aware of that.

     Q.   And do you agree with that?

     A.   I do not.

     Q.   Why not?

     A.   I believe that classifying requires an actual

step of making a decision that -- that a -- that an ad

needs to be responded to automatically, but Yahoo!

always responds to every query automatically.

     Q.   Now, do you also understand that Step

28(b1)(i) has to -- which is the classifying as being

able to be responded to automatically, has to occur

before the retrieving step of Claim 28(c)?

     A.   Yes.   The Court has construed that, yes.

     Q.   Now, do you understand that Dr. Rhyne has

testified that Yahoo! Sponsored Search performs the

classification only when it knows whether or not there

1  are any ads to be returned?

2      A.   Yes, he did say that.

3      Q.   Okay.  Now, when does Yahoo! learn whether or

4  not there are ads to be returned?

5      A.   As I said earlier, Yahoo! does not know what

6  ads will be returned or even if it will return ads until

7  the very bottom of the Sponsored Search, but it

8  retrieves the ads as one of the early steps whenever

9  that Elcaro database is called.  That's when it

10 retrieves the ads.

11     Q.   Okay.  Let's turn to the companion limitation,

12 which is (ii).

13          Are you aware of whether the Court has

14 construed requiring assistance from a human operator?

15     A.   Yes, it has.  On the screen, you can see the

16 construction is:  Requiring that a manual reviewer

17 review the electronic message or information derived

18 from the electronic message or review, revise, or

19 compose the response to be delivered to the source.

20     Q.   Does Yahoo! Sponsored Search ever classify a

21 search query as requiring human assistance?

22     A.   No, it does not.

23     Q.   Why not?

24     A.   Yahoo! Sponsored Search always replies --

25 responds to every query automatically.  There is never a

1  human response.

2      Q.   Now, you were in the courtroom when Dr. Rhyne

3  testified as to the traffic protection system?

4      A.   Yes, I was.

5      Q.   Okay.  Do you have an understanding of what

6  that is?

7      A.   I do.

8      Q.   And what is that?

9      A.   So the traffic protection system is the fraud

10  detection, the one that's looking for impression spam

11  and so on that's been talked about.  It's a system that

12  is run after queries have come in.

13          So long after a query has been received and

14  responded to, the traffic protection system analyzes the

15  results of these thousands or millions of queries to

16  determine what has happened.

17          This process happens, many times, hours or

18  days later, but the fastest that I know it happens is at

19  the five-minute mark, five minutes after a query has

20  been processed, which is many thousands of queries.

21      Q.   Did you review Dr. Rhyne's expert report

22  regarding what time he considered to be irrelevant for

23  his infringement analysis?

24      A.   Yes, I did.

25      Q.   Okay.  And does traffic protection occur

1  during the time period that Dr. Rhyne believes to be

2  irrelevant?

3      A.   It does not -- I'm sorry.  It -- I thought we

4  had a graphic I was expecting.  There we go.

5          Yes.  So Dr. Rhyne says -- you can see in the

6  left sentence -- that what happens after results are

7  returned is of no relevance to the scope of the claim,

8  and traffic protection is happening long after the

9  results are returned.

10     Q.   Regarding the classification step in Claim 28,

11 did you review his testimony regarding whether Yahoo!

12 Sponsored Search marks or flags any individual search

13 queries?

14     A.   Yes, I recall that.

15     Q.   Okay.  I see our demonstrative isn't available

16 on that.

17         Do you agree that Yahoo! Sponsored Search does

18 not mark or flag any individual search queries?

19     A.   I agree with you.

20     Q.   All right.  So does Yahoo! Sponsored Search

21 perform Step (b1) of Claim 28?

22     A.   Yahoo! Sponsored Search does not perform Step

23 (b1).

24     Q.   Okay.  Claim 33 requires normalization by

25 dividing, doesn't it?

1    A.    That's correct.

2    Q.    Does Sponsored Search compute a maximum

3    possible match score, let alone divide it?

4    A.    No.   Sponsored Search does not compute a

5    maximum score, and it does not divide.

6    Q.    And what does it do instead?

7    A.    The normalization step -- the only

8    normalization step that occurs in the scoring process is

9    the -- within the clickability scores converted into a

10   probability.

11         And as Mr. Kolm just testified, that

12   conversion is not done by a division by a number, which

13   would be a linear transformation.   You would get a line.

14   Instead, it uses this sigmoid function, which is the

15   S-shaped curve.

16         So it's an S-shaped transformation rather than

17   a straight line transformation.

18   Q.    Claim 30(b6) requires assigning a score to

19   each stored case model, which is compared to the case

20   model, correct?

21   A.    That is the -- the requirements of Step (b6)

22   of Claim 30.

23   Q.    Does Yahoo! perform that step?

24   A.    Yahoo! does not.

25   Q.    And so based on your review and analysis, have

1  you formed an opinion as to whether Yahoo! Sponsored

2  Search infringes the asserted Claims 30, 31, and 33 of

3  the '947 patent?

4      A.   It is my opinion that Yahoo! Sponsored Search

5  does not perform -- does not infringe Claims 30, 31, and

6  33.

7      Q.   And -- and why is that?

8      A.   Because as I have shown, Sponsored Search does

9  not perform several steps of that -- of each of those

10  claims at least.

11          MR. ROOKLIDGE:  Pass the witness, Your

12  Honor.

13          THE COURT:  All right.  Thank you,

14  Mr. Rooklidge.

15          Cross-examination, Mr. Fenster?

16          MR. FENSTER:  Yes, Your Honor.

17                  CROSS-EXAMINATION

18  BY MR. FENSTER:

19      Q.   Good morning, Dr. Allan.

20      A.   Good morning, Mr. Fenster.

21      Q.   Now, prior to this case, you've been retained

22  by Yahoo! previously; is that correct?

23      A.   Yes, that's true.

24      Q.   On one other occasion?

25      A.   That's correct.

1      Q.   And you have never been retained by anybody to

2  serve as an expert in any litigation other than Yahoo!,

3  correct?

4                THE COURT:  Counsel, approach.

5                (Bench conference.)

6                THE COURT:  Are we going into the

7  protections --

8                MR. FENSTER:  No.  Just to show --

9                THE COURT:  -- obviously, for litigation

10  purposes, Mr. Fenster?

11                MR. FENSTER:  Just to show lack of

12  experience, Your Honor.

13                THE COURT:  Well, you can do that by

14  saying that he's testified, and this is the only time

15  he's ever been in court.  That's -- that's --

16                MR. FENSTER:  Okay.

17                THE COURT:  I mean, that's just -- that's

18  the teeth of what I've already said, Mr. Fenster.

19                (Bench conference concluded.)

20                THE COURT:  Ladies and Gentlemen, whether

21  or not the expert has been retained by one or the other

22  of the parties in other cases is, again, irrelevant to

23  the decisions that you're going to be making in this

24  case.

25                So y'all disregard that testimony.

1     Q.  (By Mr. Fenster) And you testified on direct,

2 this is your first time testifying in court; is that

3 right?

4     A.  Yes, it is, and yes, I did.

5     Q.  Now, you were deposed in this case on July

6 26th, correct?

7     A.  I believe that's right, a Monday.

8     Q.  Right.  About two weeks ago?

9     A.  That's correct.

10     Q.  And as of that time, you had never heard that

11 it is improper to import limitations from the

12 specification into the claim; isn't that true?

13     A.  I -- I did not know what those words meant.

14     Q.  Now, you prepared an expert report in this

15 case?

16     A.  Yes, I did.

17     Q.  And in your report, you reference a

18 reexamination of the Rice patent, correct?

19     A.  That's true.

20     Q.  Now, at the time of your deposition, you

21 weren't aware that the asserted claims in this case were

22 confirmed, correct?

23     A.  What I said in my deposition was --

24          MR. ROOKLIDGE:  Objection, beyond the

25 scope.

1                    THE COURT:  Sustained.

2        Q.    (By Mr. Fenster) After the user presses enter,

3    Sponsored Search receives an http message, correct?

4        A.    Yes.

5        Q.    And after the user presses enter and that

6    message is received, the user does not provide any

7    additional information before he or she gets results,

8    correct?

9        A.    I don't think that's correct.

10                    MR. FENSTER:  Can we go --

11       Q.    (By Mr. Fenster) I'd like to read from your

12   deposition at Line -- at Page 38, Lines 17 through 21.

13                    MR. FENSTER:  And, Joseph, this is Clip

14   15, please.

15                    (Video playing.)

16                    QUESTION:  He or she gets results back,

17   correct?

18                    ANSWER:  That is correct.

19                    (End of video clip.)

20       Q.    (By Mr. Fenster) Now, the ads that Yahoo! --

21   let's talk about whether the ads are predetermined.

22   Whether -- withdraw that.

23            The ads that Yahoo! retrieves from the Elcaro

24   database are in the database before Yahoo! gets the http

25   request; is that true?

1          A.    That's not true.

2          Q.    I'd like to read from your deposition at Page

3    104, Lines 21 through 5.

4                     MR. FENSTER:  This is Clip 16, please.

5                     (Video playing.)

6                     QUESTION:  Is it true that the ads that

7    Yahoo! retrieves from the Elcaro database are in the

8    Elcaro database before Yahoo! gets the http request?

9                     ANSWER:  I do not believe so.

10                    (End of video clip.)

11         Q.    (By Mr. Fenster) Now, there's about one second

12   between the time when Yahoo! receives the http request

13   and the time that it returns ads, correct?

14         A.    Less than a second, yes.

15         Q.    Okay.  And it's your testimony that because

16   this is a dynamic database, some of those ads may not be

17   in the database before the message is received, correct?

18         A.    That's true.

19         Q.    Now, you don't have any evidence that any ads

20   actually served by Yahoo! were, in fact, received after

21   the http request was received by Yahoo!, correct?

22         A.    I have not done such an analysis, and I know

23   of no -- no such analysis.

24         Q.    And you've never talked to any Yahoo!

25   engineers who told you that that could even happen,

1   correct?

2       A.   That's not correct.

3       Q.   At Page 109, Lines 1 through 13 -- 19, please.

4                MS. DOAN:  One second.

5                MR. ROOKLIDGE:  What line?

6                MR. FENSTER:  1 through 13.

7                (Video playing.)

8                QUESTION:  Have you talked to any Yahoo!

9   engineers who would -- who told you that that could

10  happen?

11               ANSWER:  The engineer -- the discussion

12  with the engineers revolved around the speed with which

13  updates are happening and not specifically how long it

14  took for an ad to be inserted into the databases.

15               QUESTION:  So the answer is no, no -- no

16  Yahoo! engineer told you that could happen, correct?

17               ANSWER:  We did not -- we did not address

18  that question.  So, yes, no one told me that.

19               (End of video clip.)

20               MR. ROOKLIDGE:  Objection, Your Honor.

21  That's not proper.

22               THE COURT:  Well, develop it on redirect.

23      Q.   (By Mr. Fenster) Now, Dr. Allan, you have no

24  evidence of any particular case where any ad served by

25  Yahoo! in response to a search request was not in the

1  database prior to Yahoo! receiving the http request,

2  correct?

3      A.    As I said, I have no -- I have not done an

4  analysis on that.

5      Q.    You have no evidence that that has ever

6  happened, correct?

7      A.    That is correct.

8      Q.    Now, the claim is not -- is not limited to

9  requiring a single predetermined response, is it?

10      A.    It is not limited to retrieving a single

11  response, correct.

12      Q.    In fact, the claim language says retrieving

13  one or more predetermined responses, correct?

14      A.    Yes.  The claim language says one or more.

15      Q.    And Yahoo! Sponsored Search does retrieve one

16  or more ads, correct, when they're available and pass --

17  go through all the analysis and are determined to be

18  appropriate for serving, correct?

19      A.    Yes, sir.

20      Q.    Now, are those ads evaluated -- strike that.

21          All of those ads are evaluated and compared to

22  the query individually, aren't they, each one of them?

23      A.    Yes, they are.

24      Q.    Now, let's go to the classification step.

25  Class -- the Claim 28(b1) requires classifying a message

1  as being able -- as to whether it can be determined

2  automatic -- responded to automatically or not.

3            Do you recall that?

4       A.   Yes, I do.

5       Q.   And do you recall that Dr. Rhyne testified

6  that that element was met because Sponsored Search makes

7  a determination as to whether or not there are any ads

8  to serve?

9            Do you recall that?

10      A.   Yes, I recall that.

11      Q.   Okay.  And isn't it true that Yahoo! Sponsored

12 Search makes a determination as to whether there are any

13 ads that are relevant and of sufficient quality to

14 serve?

15      A.   No, it is not true.

16      Q.   You reviewed the deposition testimony of David

17 Kolm, who just testified?

18      A.   Yes, sir, I have.

19      Q.   Okay.  And isn't it true, sir, that at his

20 deposition on June 9th, 2010, Mr. Kolm testified as

21 follows.  This is at Page 27 of his deposition.

22           QUESTION:  So is it accurate to say that

23 Yahoo! makes a determination as to whether there are any

24 ads that are relevant and of sufficient quality to

25 serve?

1          MR. ROOKLIDGE:  Objection, Your Honor.

2     Improper impeachment.

3          THE COURT:  Overruled.

4     Q.   (By Mr. Fenster) His answer:  Relevant and of

5     sufficient quality and meet the advertiser's

6     constraints -- advertiser and publisher constraints.

7          QUESTION:  And if the -- and if Sponsored

8     Search determines that there are no ads that are

9     relevant of sufficient quality and that meet the

10    advertiser's constraints -- advertiser and publisher's

11    constraints, then what?

12         ANSWER:  We return no ad.

13         QUESTION:  Is this determination -- is this

14    determination as to whether there are ads to serve that

15    meet all the requirements that you just identified, is

16    that done automatically by software?

17         And he answered:  Yes, it is.

18         Did you review that testimony in forming your

19    conclusions?

20    A.   Yes, I did.

21    Q.   Now let's move on to the second step of

22    28(b1), and that is, (ii) that's classifying for human

23    review.

24         Do you recall that?

25    A.   I do.

1      Q.   Now, if Yahoo! gets a report that looks

2  unusual, it will trigger a review by human engineers,

3  correct?

4      A.   I -- I -- I -- I'm aware that Dr. Kolm --

5  Mr. Kolm's testimony said something along those lines.

6      Q.   I'd like to read from your deposition at Page

7  49, Lines 13 through 19.

8           MR. FENSTER:  This is Clip 23.

9           (Video playing.)

10          QUESTION:  So if you get a report of an

11  aggregated number of queries that looks unusual -- if

12  Yahoo! gets a report that looks unusual, it will trigger

13  a review by human engineers, correct?

14          ANSWER:  It may trigger one, yes.

15          (End of video clip.)

16      Q.   (By Mr. Fenster) I'd like to move to

17  comparison of text and attributes, okay?

18          Now, Sponsored Search compares the text of the

19  queries with the text of the advertisements, correct?

20      A.   Yes, it does.

21      Q.   And Sponsored Search also compares attributes

22  of the queries with attributes of the advertisements,

23  correct?

24      A.   Yes, it does.

25      Q.   And putting those together, Sponsored Search

1  compares the text and attributes of the queries with

2  text and attributes of the stored advertisements,

3  correct?

4      A.  I do not agree.

5      Q.  Let's read from your deposition at Page 97,

6  Lines 19 through 25.

7              MR. FENSTER:  Clip 27.

8              (Video playing.)

9              QUESTION:  So putting those together,

10  Sponsored Search compares the text and attributes of the

11  queries with text and attributes of the stored

12  advertisements, correct?

13              ANSWER:  Yes.  That's what you said

14  earlier, and I said yes.

15              (End of video clip.)

16      Q.  (By Mr. Fenster) Now, you prepared a report in

17  this case?

18      A.  Yes.  As you said -- as you asked earlier, I

19  did, yes.

20      Q.  Yeah.  And in Paragraph 37 of that report, you

21  drew the conclusion that the new problem to be evaluated

22  and the stored problem in the case base must be

23  equivalent, didn't you?

24              MR. ROOKLIDGE:  Objection, beyond the

25  scope of direct.

1  THE COURT: Overruled.

2  A. In Claim (sic) 37, I set forth that the claim

3  construction supported an argument I had made earlier,

4  that the problems were sent the same.

5  Q. (By Mr. Fenster) You said Claim 37. I think

6  you meant Paragraph 37?

7  A. Thank you for the correction. Paragraph 37.

8  Q. And, in fact, your conclusion in Paragraph 37

9  that the new problem and the stored problems must be

10  equivalent, that conclusion is incorrect, isn't it?

11  A. Yes, it was. It was based on what the meaning

12  of the word the was.

13  Q. And in fact, it was based on faulty reasoning

14  on your part, correct?

15  A. It was based on incorrect support for my

16  reasoning.

17  Q. I'd like to read from your deposition at Page

18  87, Line 24 through Page 88, Line 3.

19  MR. FENSTER: This is clip 43, please.

20  (Video playing.)

21  QUESTION: You agree that your logical

22  reasoning for your conclusion that's set forth in

23  Paragraph 37 is not good.

24  ANSWER: I believe there is an error in

25  what I have written, yes.

1          (End of video clip.)

2          MR. ROOKLIDGE:  Once again, Your Honor,

3    this isn't impeachment.

4          THE COURT:  Overruled.

5      Q.   (By Mr. Fenster) Now, let's talk about the

6    scoring steps.

7          As a result of the comparing of text and

8    attributes of the queries with text and attributes of

9    the ads, Sponsored Search calculates -- calculates a

10   relevancy score related to the ads, correct?

11     A.   That is -- that is not correct.

12     Q.   Okay.  Let's read from your deposition and see

13   what you said at Page 98, Line 3 through 98 through Line

14   10.

15         MR. FENSTER:  And this is Clip 44,

16   please.

17         (Video playing.)

18         QUESTION:  As a result of comparing the

19   text and attributes of the queries with the text and

20   attributes of the ads, Sponsored Search calculates

21   various relevancy scores related to the ads, correct?

22         ANSWER:  It calculates various scores,

23   one of which is a relevancy score.

24         (End of video clip.)

25     Q.   (By Mr. Fenster) And the Affiliate Server

1 calculates the overall relevancy score that Dr. Rhyne

2 testified about for each of the ads that it receives

3 from Elcaro, correct?

4     A.    That was my understanding at the time of my

5 deposition.  I have since seen Mr. Kolm's testimony, and

6 there is another round of filtering that happens.

7     Q.    Based on all the review and all the extensive

8 review of software and documents and talking with

9 engineers that you had done, as of the date of your

10 deposition just two weeks ago, you believed that to be

11 true, didn't you?

12     A.    At that time, yes.

13     Q.    And now, Mr. Kolm has come in today and

14 testified to something differently; isn't that right?

15     A.    He's provided additional information, yes.

16     Q.    Okay.  Now, Mr. Kolm, who we just heard from,

17 he testified at his deposition that the higher the

18 similarity between -- of match between the query and the

19 attributes of the ad, the higher the score, correct?

20     A.    I believe he said that was generally true.

21     Q.    And Mr. Kolm also testified that the lower the

22 similarity between the query and attributes of the ad,

23 the lower the score, correct?

24     A.    Same qualification.

25     Q.    Now, the advanced match systems in Sponsored

1  Search that Dr. Rhyne testified about -- those were the

2  King Kong, Yellowstone, and QuAd.

3          Do you recall that?

4      A.  I do.

5      Q.  Okay.  The advanced match systems in Sponsored

6  Search compare to find features that were derived from

7  the query to see if they were in common with the

8  features derived from the ad, correct?

9          MR. ROOKLIDGE:  Once again, Your Honor,

10 we're far beyond the scope of direct.

11          THE COURT:  Overruled.

12     A.  I'm sorry.  Could you repeat the question?  I

13 was distracted.

14     Q.  (By Mr. Fenster) Certainly.

15          The advanced match systems in Sponsored Search

16 compare to find features that were derived from the ad

17 with features that were derived from the query -- I

18 misstated that.  Let me try it over.

19          The advanced match systems in Sponsored Search

20 compare to find features that were derived from the

21 query to see if they were in common with the features

22 that were derived from the ad, correct?

23     A.  Yes, that's true.

24     Q.  And if there's a match between the features

25 from the query with the features from the ad, the score

1  will be adjusted by a weight, correct?

2      A.   That's true.

3      Q.   And for the advanced match systems, those

4  weights are calculated beforehand, correct?

5      A.   Yes.

6      Q.   In other words, they're predetermined?

7      A.   For the advanced match systems -- well, some

8  of the weights are calculated beforehand, yes.

9      Q.   Now, isn't it true, Dr. Allan, that the

10 majority of times when Yahoo! detects a match of a given

11 feature, the score will be adjusted by a positive

12 coefficient?

13     A.   At -- in -- in all of the matching systems, it

14 is not necessarily; there are some that don't return a

15 score.

16     Q.   Isn't it true that a majority of times when

17 Yahoo!'s detecting a match of a given feature, the score

18 will be adjusted by a positive coefficient?  Yes or no.

19     A.   No.

20     Q.   All right.  Let's read from your deposition at

21 Page 166, Line 22 through 167, Line 2.

22              MR. FENSTER:  This is Clip 63, please.

23              (Video playing.)

24              ANSWER:  That more of them are positive.

25              QUESTION:  The majority of times when

1  Yahoo! detects a match of a given feature, that the

2  score will be adjusted by a positive coefficient?

3                    ANSWER:  Yes.

4                    (End of video clip.)

5      Q.   (By Mr. Fenster) And that means that the score

6  will be increased by the coefficient, right?

7      A.   If that were true, yes.

8                    MR. ROOKLIDGE:  Objection, Your Honor.

9                    They cut the answer off.  Optional

10 completeness.

11                   THE COURT:  Okay.  Do you have the

12 reference?

13                   MR. ROOKLIDGE:  Yes, Your Honor.  At Page

14 167, Lines 1 through 2, the answer was:  Yes, that --

15 that is my expectation.

16                   THE COURT:  Okay.  All right.  Let's

17 proceed.

18                   MR. FENSTER:  Thank you, Your Honor.

19     Q.   (By Mr. Fenster) Now, let's talk about Claim

20 Element 30(b6) that you testified to on direct.

21                   Now, 30(b6) requires assigning a score to each

22 stored case model, which is compared, the score

23 increasing when at least one of the attributes and the

24 text match the stored case model, correct?

25     A.   That is correct.

1    Q.   At least one, right?

2    A.   Yes.  I see that.

3    Q.   Okay.  Now, it's true, isn't it, Dr. Allan,

4 that the overall relevancy score increases by a positive

5 coefficient when at least one or more of the features

6 are found to match, correct?

7    A.   That's not -- that's not true.

8    Q.   Let's read from your deposition at Page 168,

9 Lines 5 through 13.

10              MR. FENSTER:  Clip 58, please.

11              (Video playing.)

12              QUESTION:  Now, you'll agree that the

13 overall relevancy score does increase by the -- a

14 positive coefficient when at least one or more features

15 are found to match, correct?

16              ANSWER:  I agree that it is -- will

17 usually be the case, that if there is a feature that

18 matches, the score will increase.

19              So there is a -- there -- yeah.  Yes.

20              (End of video clip.)

21    Q.   (By Mr. Fenster) Okay.  Now, even though you

22 just admitted both -- in your -- in your deposition,

23 that the overall relevancy score increases when at least

24 one or more features match, you still think, and you

25 testified on direct, that Claim Element 30(b6) is not

met, correct?

    A.   I do not think Claim (b6) -- that (b6) is met.

    Q.   Okay.  Now, at your deposition, your assumption in reaching that conclusion was that the claim requires the score to always increase when there's a match, correct?  Isn't that what you assumed?

    A.   Yes, I did.

    Q.   And when that -- and that's inconsistent with the claim, isn't it?

    A.   I do not believe it is.

    Q.   All right.  Let's read from your deposition and see what you said at Page 168, Lines 19 through 170, Line 7.

               MR. FENSTER:  That's Clip 70.

               (Video playing.)

               QUESTION:  Having taken a closer look at the actual language of the claim, do you still believe that that's the proper way to interpret Claim Element 30(b6)?

               ANSWER:  I believe that my interpretation is correct.  I understand the interpretation you're attempting -- you're aiming for, and --

               THE COURT:  Stop it, please.

               (Video stopped.)

               MR. ROOKLIDGE:  Objection, improper

1  impeachment, Your Honor.

2              THE COURT:  Well --

3              MR. ROOKLIDGE:  It's not inconsistent

4  with his testimony.

5              THE COURT:  Complete the clip.  Let the

6  jury decide whether and to what extent any testimony

7  given by the witness' deposition is inconsistent with

8  any testimony he's given up here today.

9              (Video playing.)

10             QUESTION:  Having taken a closer look at

11 the actual language of the claim, do you still believe

12 that that's the proper way to interpret Claim Element

13 30(b6)?

14             ANSWER:  I believe that my interpretation

15 is correct.  I understand the interpretation you're

16 attempting, you're aiming for, and I'm -- I am having

17 trouble reconciling the two.

18             QUESTION:  You're having trouble

19 reconciling your interpretation of Claim Element 30(b6)

20 as requiring that the score always increase when there's

21 a match with the actual language of the claim that the

22 score increase when at least one of the attributes and

23 text match, correct?

24             You can't reconcile your interpretation

25 of Element 30(b6) with the actual language of 30(b6); is

that right?

ANSWER:  I believe that I am -- it's my opinion that I'm correct, but I cannot -- I cannot refute what you have stated.

QUESTION:  Well, can you reconcile your interpretation of 30(b6)'s requiring that the score always increase with a match?  Can you reconcile that with the actual claim language that says at least one of?

ANSWER:  As I --

ATTORNEY:  I object to form.

ANSWER:  As I sit here, I -- as I sit here, I am unable to do that on the fly.

(End of video clip.)

MR. FENSTER:  No further questions, Your Honor.

THE COURT:  All right.  Redirect?

MR. ROOKLIDGE:  A few questions, Your Honor.

<u>REDIRECT EXAMINATION</u>

<u>BY MR. ROOKLIDGE:</u>

Q.   Dr. Allan, you were questioned about whether you have performed any study to show or provide any evidence to show that ads that were retrieved were not in the database when the -- between the -- when the

1  search request was submitted, correct?

2      A.   That's correct.

3      Q.   Has Dr. Rhyne provided any evidence that the

4  ads that were retrieved were in the database before that

5  search query was sent or received by Yahoo!?

6      A.   No.  I know of no analysis of that, and

7  Dr. Rhyne did not point to or perform any analysis of

8  that himself.

9      Q.   Now, you were asked about your deposition

10  testimony, about your conversations with Yahoo!

11  engineers.

12          Do you recall that?

13      A.   I do.

14      Q.   Okay.  And that -- that question was about

15  conversations -- specific conversations with Yahoo!

16  engineers, correct?

17      A.   That's true.

18      Q.   And you've since heard Dave Kolm testify?

19      A.   Yes.  We all heard Dave Kolm's testimony an

20  hour ago.

21      Q.   Okay.  And does Mr. Kolm's deposition

22  testimony about determination do anything to change your

23  opinion about whether Yahoo! meets the classification

24  step?

25      A.   His testimony did not change my opinion.

1    Q.   Okay.  Now, you were also asked about human

2  review.

3    A.   That's correct.

4    Q.   Is -- is -- is any human review that Yahoo!

5  might do as part of the traffic protection system

6  targeted towards an individual query or information

7  derived just from that individual query?

8    A.   No, sir.  As I said, all of the traffic

9  protection analysis and all the reports related to fraud

10  are based on aggregate numbers of queries, so large

11  numbers of queries, not a one single query.

12    Q.   Is any comparison that Sponsored Search does

13  of features of advertisements to features of queries

14  performed by a lookup table?

15    A.   Yes.  Some of the comparisons are done by what

16  would be called a lookup table.

17    Q.   And is a lookup table a case-based knowledge

18  engine?

19    A.   No.  A lookup table is not at all a case-based

20  knowledge engine.

21    Q.   Now, you were asked about Step 30(b6) and

22  whether you still believe that 30(b6) was met.

23         You were focusing in your testimony today

24  about Step 30(b6) on a different part of 30(b6) than

25  Mr. Fenster was asking you about, correct?

1      A.    That's correct.

2      Q.    And you were -- you were focusing on

3  whether -- on the phrase each stored case model,

4  correct?

5      A.    That's what I testified to.

6      Q.    Okay.  And so did your colloquy with

7  Mr. Fenster suggest anything inconsistent with your

8  belief about whether Yahoo! meets that limitation

9  regarding each stored case model?

10     A.    No.  I -- that's -- exchange was irrelevant to

11  my testimony --

12             MR. ROOKLIDGE:  No further questions.

13     A.    -- today.

14             MR. FENSTER:  I have no further

15  questions.

16             THE COURT:  All right.  You may step

17  down, sir.

18             THE WITNESS:  Thank you, Your Honor.

19             THE COURT:  All right.  Call your next

20  witness.

21             MR. PERLSON:  Your Honor, we'd call James

22  Charles Williams.

23             THE COURT:  Okay.

24             MR. FENSTER:  May we approach, Your

25  Honor?

1             THE COURT:  Yes.

2             (Bench conference.)

3             MR. FENSTER:  Your Honor, this witness is

4  called out of order.  I had an agreement and a

5  requirement that the parties always disclose their live

6  witnesses in order.  Dr. Branting is -- Williams has

7  been disclosed after another three witnesses.

8             THE COURT:  Was that the agreement?

9             MR. PRIDHAM:  I think that's -- well, I

10  don't think it's --

11             MS. DOAN:  We did have the agreement.

12             MR. PERLSON:  I thought that we switched

13  them.

14             MS. DOAN:  We did have the agreement.

15  We revised the order last night because he's got to

16  catch a flight back to Hawaii tonight, and he can't get

17  there in time.

18             THE COURT:  When did you --

19             MS. DOAN:  Last night about 9:30 or

20  10:00, whatever the agreed time was.  We told him last

21  night, Judge.

22             MR. PERLSON:  And, Your Honor, the night

23  before we said that we may have to --

24             MS. DOAN:  That's right.  We also sent an

25  e-mail the night before that told them he would be first

1  up on Friday, because he had flight issues getting out

2  of here, Judge.

3            MR. FENSTER:  Your Honor, I need time to

4  prepare the cross-examination.  I was preparing these in

5  order based on our agreement.

6            THE COURT:  Well, now, wait a minute,

7  though.  What he's telling you is that they gave you

8  notice, what, two days ago, that he would be the

9  first --

10           MS. DOAN:  Yes.  That he would be the

11 first up Friday.

12           THE COURT:  -- on Friday.

13           MS. DOAN:  Right.  But that we wanted to

14 close our case first.  I can provide you with the

15 e-mails, Judge.

16           THE COURT:  Well, I'm going to break the

17 jury for the morning recess a little bit early today

18 until -- well, I'll break until 20 after, and y'all sort

19 out when you notified them.

20           MS. DOAN:  We will.

21           MR. PERLSON:  Thank you, Your Honor.

22           (Bench conference concluded.)

23           THE COURT:  Ladies and Gentlemen, before

24 we hear from Mr. Williams, we're going to take our

25 morning recess.

1          Take until 20 after the hour.  Be back
2   ready to come back in the courtroom at 10:20.  Don't
3   talk about the case.
4          LAW CLERK:  All rise.
5          JUROR:  (Speaking to the Court Reporter)
6   Look, it's only 74 degrees in here today.
7          (Jury out.)
8          THE COURT:  Be seated.
9          Apparently, one of the jurors has brought
10  a thermometer with him advising that it was only 74 in
11  here now.  So that was the communication that went on
12  with the court reporter.
13         Okay.  Mr. Williams, if you'll have a
14  seat outside, please.
15         (Witness leaves the courtroom.)
16         THE COURT:  All right.  What's the
17  parties' -- first of all, what is the parties' agreement
18  on when you have to notify on the order of witnesses?
19         MR. SPANGLER:  Your Honor, with respect
20  to witnesses, it's two days in advance, and I believe
21  it's 8:00 o'clock.
22         Wasn't that the agreement?
23         MR. PERLSON:  Two days in advance.
24         MR. SPANGLER:  Two days in advance.
25         THE COURT:  What was the parties'

```
1   agreement as to the order of witnesses?  Same agreement?
2                   MR. SPANGLER:  Yes, Your Honor.
3                   THE COURT:  Okay.  And when --
4                   MS. DOAN:  There's an e-mail, Your Honor,
5   from Amy Candido.  I'm still pulling it right now.  It
6   was sent the night before last advising the Plaintiff
7   that we were calling Mr. Williams out of order, putting
8   him first on Friday.
9                   And we ask that we be able to finish out
10  our case.  He's working on his schedule, and we'll be
11  able to work that out.
12                  We also disclosed the order of witnesses
13  again last night with Mr. Williams at the close of our
14  case --
15                  MR. SPANGLER:  Your Honor --
16                  MS. DOAN:  -- as opposed to earlier.
17                  MR. SPANGLER:  Your Honor, I did not see
18  the e-mail last night, but from two nights ago, I don't
19  remember saying -- I don't remember at all saying they
20  would call him first, but they did say that they might
21  have to call him out of order because of scheduling.
22  But I did not see the e-mail last night where they
23  actually confirmed the order.
24                  MR. PERLSON:  Your Honor, this is an
25  e-mail -- it is an e-mail from Wednesday night -- oh,
```

that's -- okay.  Okay.  This is an e-mail from Wednesday
in which we said:  However, due to scheduling issues, we
may need to interrupt the order to get Williams and
Allan done on Friday.

          So we notified them that the order --

          THE COURT:  Done on Friday.

          MR. PERLSON:  But -- and then last night,
we had changed the order to give them notice that
Williams would be in this order, I believe.

          Your Honor, I just don't have all the
e-mails in front of me, but I --

          THE COURT:  Well --

          MR. PERLSON:  -- I can get them before --

          THE COURT:  Come and see me when you've
got the e-mails.  We're in recess until 10:20.

          MR. PERLSON:  Okay.

          LAW CLERK:  All rise.

          (Recess.)

          LAW CLERK:  All rise.

          (Jury in.)

          THE COURT:  Please be seated.

          All right.

          MR. PERLSON:  Your Honor, we are
switching orders.

          THE COURT:  For scheduling purposes, we

1  are going to proceed with a different witness.

2             Who will be your next witness?

3             MR. PERLSON:  We would call, Your Honor,

4  Luther Karl Branting.

5             THE COURT:  Dr. Branting, come around,

6  please.

7             Have you been sworn previously?

8             THE WITNESS:  I have not.

9             THE COURT:  You have not.  If you will

10 stop here in front of Ms. Lockhart, she will administer

11 the oath.

12            (Witness sworn.)

13            THE COURT:  Come around, sir.

14    LUTHER KARL BRANTING, DEFENDANTS' WITNESS, SWORN

15                  DIRECT EXAMINATION

16 BY MR. PERLSON:

17    Q.   Good morning, Dr. Branting.

18         Can you please tell us your full name.

19    A.   Good morning.  My name is Luther Karl

20 Branting.

21    Q.   And where do you live, Dr. Branting?

22    A.   I live in Columbia, Maryland.

23    Q.   And can you just tell us a little bit about

24 yourself?

25    A.   I would be happy to.

1          I've been married for 26 years to the love of
2   my life.  My son got a job right out of college.  I'm
3   delighted to be back in Texas, even if it is a little
4   bit warm.  So I'm feeling very blessed this morning.
5        Q.   Okay.  And what do you do for a living,
6   Dr. Branting?
7        A.   I am a computer scientist.  I work at the
8   National Security Agency in Fort Meade, Maryland.
9        Q.   And what do you do for -- what do you do
10  there?
11       A.   I develop software programs that are used by
12  intelligence analysts.
13       Q.   And what type of work do these intelligence
14  analysts do?
15       A.   Well, the job of these intelligent analysts is
16  to get information about enemies of the United States,
17  people who want to do harm to everybody in this
18  courtroom and to our families.
19       Q.   And do you need security clearance to get at
20  your job?
21       A.   To work at the National Security Agency it's
22  necessary to have a TS -- what's called a TS/SCI --
23  clearance, and in order to obtain that, they do an
24  extensive background examination and what's called a
25  full-scope poly, which means that you are connected to a

lie detector and asked a series of questions about your

lifestyle.

          And under those circumstances, it's very hard

for anybody to conceal any misbehavior in their

background.

     Q.   Okay.  And what is the level of security

clearance you have?

     A.   So it's TS/SCI.

     Q.   What does that mean?

     A.   Top secret/sensitive compartmented

information.

               MR. PERLSON:  Go to slide -- the first

demo.

               Yes, thanks.

     Q.   (By Mr. Perlson) Now, Dr. Branting, is this

the first page of your CV?

     A.   Yes.  This is the first page of my resume.

     Q.   Okay.  What was the first college-level degree

you received?

     A.   In 1975, I received a bachelor's degree in

philosophy from the University of Colorado, magna cum

laude.

     Q.   Okay.  And then, did you ever get a computer

degree?

     A.   I did.  I got a master's degree from the

University of Texas at Austin in 1988 and a Ph.D. from
UT-Austin in 1991.

Q.   And what type of academic work did you have to
perform to qualify for your Ph.D. degree?

A.   Well, I had to take a range of computer
science courses, 48 semester hours, and I focused on
courses on artificial intelligence, machine learning,
computational linguistics, expert systems, so things
involving artificial intelligence, primarily.

Q.   And did you need to write a dissertation?

A.   Yes.  In order to obtain a Ph.D., it was
necessary for me to propose, write, and defend a
dissertation.

Q.   And what was the subject of that dissertation?

A.   The subject of my dissertation was a project
that determines whether injured workers are entitled to
workmen's compensation under Texas law.  So it was a
system that combined rules and cases.

So the rules in this case were statutes that
were passed by the state of Texas, and the cases were
decisions by Texas courts.

Q.   Now, I notice that you also have a JD from
Georgetown; is that right?

A.   That's right.

Q.   And do you still practice law?

1     A.   I do not.  In 1985 -- so I practiced for five

2 years.  But in 1985, I made the decision that -- to

3 change careers, because I felt like I wanted to spend my

4 days developing technology to make people's lives better

5 rather than participating in lawsuits.

6         With apologies to all the numerous lawyers

7 here.

8     Q.   And so you're here today to talk about

9 computers, not as a lawyer; is that right?

10     A.   That's right.  That's right.  I'm not.  I

11 haven't practiced law since 1985.

12     Q.   Okay.  Well, what type of work did you do --

13 well, let me back up.

14         What did you do after you received your Ph.D.?

15     A.   After I received my Ph.D., I became a

16 professor of computer science at the University of

17 Wyoming, and so I was an assistant professor for six

18 years.  Then I obtained tenure in 1996 and became an

19 associate professor.

20     Q.   Okay.  What kind of classes did you teach at

21 the University of Wyoming?

22     A.   Every year I taught classes in --

23 graduate-level classes in artificial intelligence as

24 well as related topics, like expert systems, machine

25 learning, and so forth.

1    Q.   Have you written any or published any papers

2  in the field of rule-based and case-based reasoning?

3    A.   I have.  I've written about 40 papers on the

4  subject of rule-based and case-based reasoning as well

5  as papers on other subjects.

6         And in addition, a book entitled <u>Reasoning</u>

7  <u>with Rules and Precedence</u>.  So in that title, precedent

8  is another -- that's another name for a case.

9    Q.   And have you written software programs that

10 use case-based and rule-based reasoning?

11   A.   I have.  I've written numerous programs that

12 use case-based and rule-based reasoning for

13 problem-solving.

14        So, for example, the system for Texas

15 Workmen's Compensation law that I did for my

16 dissertation, that was one -- one such system.

17        Another example is a system for giving advice

18 to renters about pest infestations.  So this was a

19 system that used, once again, both cases and rules and

20 other kinds of knowledge -- knowledge.

21        So it was deployed originally in 1996 just for

22 the state of Wyoming, but, subsequently, it's been --

23 it's development has been funded by the United States

24 Department of Agriculture, and it's now distributed for

25 10 western states.

1    Q.   Dr. Branting, are you being paid for the work

2  you are doing in relation to this case?

3    A.   I am.

4    Q.   And how much are you being paid?

5    A.   I'm being paid $350 an hour.

6    Q.   And is that your customary rate?

7    A.   That is my customary rate.

8    Q.   And does your payment depend in any way on the

9  outcome of this case?

10    A.   No.  I get paid the same however the case

11  comes out.

12    Q.   And --

13              MR. PERLSON:  At this time, Your Honor,

14  we would move to qualify Dr. Branting as an expert in

15  computer science.

16              MR. FENSTER:  No objection.

17              THE COURT:  All right.  We will hear his

18  opinions.

19    Q.   (By Mr. Perlson) Dr. Branting, let's go to the

20  subject of your retention here.

21              Can you explain to the jury what your

22  assignment was in connection with this case?

23    A.   Yes, I'd be happy to.

24              I was asked to -- to look at the '947 patent

25  and make -- form a judgment about whether it's valid in

light of prior art.

Q.   And based on that review, have you formed an opinion?

A.   I have.  It's my opinion that the '947 patent is not valid.

Q.   And did you analyze any materials to investigate whether the '947 patent is invalid?

A.   I did.  I examined the language of the patent itself, the Court's claim construction order, and a whole list of different kinds of prior art references. So this would be articles in journals, papers, prior patents.

Q.   And in formulating your opinions in this case, did you consider the rules of patent invalidity?

A.   I did.  I -- I considered two different standards.

So first, the standard for anticipation, which is that a claimed invention is invalid for anticipation if each element is disclosed by a single prior reference, and the rules for obviousness, that a claim is -- a claimed invention is invalid for obviousness if it would have been obvious to a person of ordinary skill in the art at the time of the invention.

Q.   Now, in connection with this case, were you told where you should look to determine the meaning of

1  the terms of the claims in the '947 patent?

2      A.   I was.  So I looked first to the Court's claim

3  construction order and then to the language of the

4  patent itself.

5      Q.   Okay.  And did you apply the Court's

6  construction in your analysis of the asserted claims?

7      A.   I did so.

8      Q.   Dr. Branting, do you have an opinion as to

9  what one of ordinary skill in the art of the field of

10 the patent-in-suit would be?

11     A.   I do.  In the context of this patent, which

12 involves taking an off-the-shelf software package and

13 configuring it for a particular application, I believe

14 that a person of ordinary skill in the art would be one

15 who has a bachelor's degree in computer science or some

16 equivalent training in software development, together

17 with two years' experience in using and configuring

18 knowledge engines.

19     Q.   Now -- now, Dr. Branting, is this the front

20 page of the patent you reviewed?

21     A.   It is.  That's the front page of the '947

22 patent.

23     Q.   And can you give the jury just a quick

24 description of -- just generally, about the patent?

25     A.   Okay.  So just generally, the '947 patent

describes a method for automatically interpreting and
responding to electronic messages using case-based and
rule-based reasoning.

Q.   Now, have applications use -- using case-based
and rule-based reasoning existed before the '947 patent?

A.   Yes.  This had been an active research area
for many years starting in the late '80s and sort of
peaking sometime in the '90s.  So -- so I went and
looked at the table of contents of a few proceedings
in -- in the late '80s and early '90s.  And I just
listed some -- just some typical applications.

So there were dozens and dozens of different
case-based and rule-based systems for a wide variety of
different applications.  So legal analysis, diagnosis of
disease, planning of various kinds, design, root
planting, numerous ones.

Q.   We don't need to go through every one of these
here.

A.   No, I'll --

Q.   Just a sample?

A.   I'll show you some mercy and not try to do
them all.

Q.   Now, in connection with forming your opinions
in this case, were there any specific prior art
references that you relied on to support your opinion

that the asserted claims are invalid?

     A.   Yes.   So I based my opinion on three specific prior art references.

          So the first is the EZ Reader system as described in the EZ Reader paper that I think that the jury has already heard about, a paper that was published in the IAAI in 1996 and which stated in the abstract that the system was deployed in the first quarter of 1996.

          The second prior art reference was a patent by the inventor, Bradley Allen, which is depicted in the second picture there, for a problem-solving system that used rule-based and case-based reasoning.

          And the third is the documentation for something called CBR Express, which was a case-based/rule-based problem-solving system that was popular in the '90s, probably the very most popular of these commercial systems.

     Q.   Okay.   Let's first talk about the EZ Reader.

          Can you just tell us real briefly what the EZ Reader was?

     A.   Okay.   So starting with the EZ Reader system, so the EZ Reader system was a system for automatically interpreting and responding to e-mail messages.  It was deployed at Chase Manhattan Bank.  According to the

1  paper, it was deployed in 1996.

2      Q.   And is this the -- the first page of the

3  article that you're referring to?

4      A.   It is.

5      Q.   Let's go through and just march through the

6  claims.  Let's first talk about Claim 26.

7          Dr. Branting, does the EZ Reader meet the

8  preamble of Claim 26?

9      A.   Yes.  So the -- so -- so tracking through the

10  claims of the '947 patent, the first one, No. 26, the

11  preamble, states that it's a method for automatically

12  processing non-interactive electronic messages.

13          If we look at the highlighted text that's been

14  excerpted from the EZ Reader paper, which describes the

15  system, it says it automatically classifies and responds

16  to incoming e-mail.  And e-mail is a kind of

17  non-interactive electronic message.

18      Q.   Okay.  And the next element is receiving the

19  electronic message from the source.

20          Is that met in EZ Reader?

21      A.   It is.  And so the little figure --

22  highlighted figure at the upper right-hand corner shows

23  the message being received from a customer by the

24  system, and the excerpted text below it states that the

25  customer sends an e-mail to Chase Manhattan Bank's

1  internet address.

2      Q.    Okay.  The next one, interpreting electronic

3  message using a rule-based and case-based knowledge

4  engine.

5          Is that met in EZ Reader?

6      A.    Indeed it is.  So this excerpt shows --

7  clearly states that the EZ Reader system interprets the

8  new e-mail by performing rule-based and case-based

9  processing.

10     Q.    Okay.  And 26(c), which is the retrieving

11 step, is that met in the EZ Reader?

12     A.    It -- it is.  The EZ Reader system retrieves

13 an automatic response from a Lotus Notes repository of

14 standard responses, as you can see from the highlighted

15 text excerpted from the paper.

16     Q.    Okay.  So, Dr. Branting, is it -- is it your

17 opinion that all the elements of Claim 26 are met in the

18 EZ Reader?

19     A.    Yes.  It's my opinion that all the elements of

20 Claim 26 are disclosed in the -- in the system.

21     Q.    And let's talk about Claim 28 now.

22          The first element is the classifying element

23 of Claim 28.  Is that met in the EZ Reader?

24     A.    Yes.  So the classifying element requires the

25 incoming electronic message to be classified as able to

be responded to automatically or requiring referral to a

human.

        And as you can see from the highlighted text,

this is clearly stated in the text of the EZ Reader

paper, that the EZ Reader classifies the incoming e-mail

and that one category is automatic response and the

other is referral.

        Q.    And 28(c), the retrieving step, is that met in

the EZ Reader?

        A.    Yes.  Once again, the highlighted text shows

that an automatic response is retrieved from the Lotus

Notes repository, and it consists of -- I prepared this

slide, so it's a predetermined response.

        Q.    Okay.  So, Dr. Branting, is it your opinion

that Claim 28 of the '947 patent is met by the EZ

Reader?

        A.    It is my opinion that each of the elements of

28 is disclosed by the EZ Reader system.

        Q.    Now, let's move on to Claim 30.  This is

one --

        A.    This is longer.

        Q.    -- is a little longer.  Let's just jump right

in.

        Is it your opinion that Claim 30(b1) that's

producing the case model step is met by the EZ Reader?

1    A.   Yes.  So the first -- the first element

2  producing the case model, it's just illustrated.  From

3  this excerpt, we can see two different cases there:

4  Case 001 and 002.

5         And as you can see, they have a series of

6  attributes that have been taken from the electronic

7  message, including things like is an address present or

8  isn't it, and plus a field.  That's the message text

9  itself, which is what the message contained.

10    Q.   Now, (b2) is detecting at least one of text

11  combinations of text and patterns of text of the

12  electronic message using character matching.

13         Is that met by the EZ Reader?

14    A.   It is as well.  The highlighted language shown

15  on this slide shows discloses detecting combinations of

16  prominent words and patterns of text in any order

17  throughout the incoming message.  So that's the text and

18  combinations of text.

19         And below that, the character matching with

20  trigrams.  That's the character-matching component.

21    Q.   Now, (b3), this is the flagging the attributes

22  step.

23         Is that matched in the claim -- in the EZ

24  Reader?

25    A.   It is.  And the highlighted text refers to

setting the features, and it gives an example of setting

do-not-call customer feature.  So those are the

attributes that are flagged in the case model.

Q.   (b4) --

A.   Based on the electronic messages.  Excuse me.

Q.   Sorry. (b4) -- is Claim 30(b4) met in the EZ

Reader?

A.   Yes, it is.  So in this excerpt, we can see

down below, here's a new electronic message that

contains an address.  So it says please send the Chase

direct sign-up kit to my home.  And there's an address.

And the highlighted text right at the bottom says that

EZ Reader performs a search against the case base.  And

it ranks case 001 higher than 002, because of the match

on the address field.

So if you look at 001, it has an address, and

so it matches the new message better than 002, which

lacks an address.

Q.   Okay.  (b5) is comparing the text of the case

model with stored text of the stored case models of the

case base.

Is that met in the EZ Reader?

A.   It is as well.  The highlighted text shows the

comparison, and EZ Reader is done using

character-matching with trigrams.  Trigrams are just

1  little sequences of three letters in a row, and they are

2  split up in these little three-letter sequences.  And

3  those things are compared.

4      So at the bottom excerpt, it says the trigrams

5  in the stored case are matched against the trigrams of

6  the presented case.  The presented case, that's the one

7  that you're getting.  That's the new e-mail message

8  that's just come in.

9      Q.  Okay.  The last one in Claim 30(b6), is that

10 met in the EZ Reader?

11     A.  Yes.  30(b6) refers to assigning a score to

12 each stored case model in which the score increases when

13 attributes or text match, but don't increase when they

14 don't match.

15     So the highlighted text says that score is

16 assigned to each stored case based on the number of

17 features.  The mismatch feature value is an absence of

18 feature values, and specifically, the value -- the value

19 of features match-weight is added.  If -- if it matches

20 the -- the incoming message and if it mismatches, then a

21 negative value score is added.

22     So if we add a negative score, then the match

23 does not increase.

24     Q.  So, Dr. Branting, is it your opinion that the

25 EZ Reader anticipates Claim 30 of the '947 patent?

1    A.   Yes.  It's my opinion that each of the

2  elements of Claim 30 is disclosed in the EZ Reader

3  system.

4    Q.   Okay.  Well, let's talk about Claim 30 now.

5    A.   31.

6    Q.   31.  Sorry.

7         Up on -- is Claim 31 met by the EZ Reader?

8    A.   Yes.  So Claim 31 -- so Claim 31 has two

9  parts; the first that the value of the score for the

10  incoming message goes up when there's a feature match.

11  And that's set forth in the highlighted text, once

12  again, which we've seen before.

13        The value of a feature in the stored e-mail

14  matches a value in the corresponding feature of the

15  incoming mail the case -- the feature's weight match is

16  added to the score.

17        So the score goes up when we get a match.

18    Q.   Now, this is the second part of Claim 31; is

19  that right?

20    A.   The second part is kind of the other side of

21  the coin, that if a feature doesn't match, then instead,

22  the score is decreased.

23        So the highlighted text says, if there's a

24  mismatch, the mismatch-weight, which can be negative, is

25  added to the score.  So that means that the score will

1  go down.

2      Q.   Okay.  So, Dr. Branting, is it your opinion

3  that Claim 31 of the '947 patent is met by the EZ

4  Reader?

5      A.   It's my opinion that the elements of Claim 31

6  are disclosed by the EZ Reader system.

7      Q.   All right.  Claim 33, this is the element

8  that -- or the claim that is the normalization step.

9  Is it your opinion, Dr. Branting, that Claim 33 is also

10  met by the EZ Reader?

11      A.   Yes.  So the highlighted text from the EZ

12  Reader paper states that the raw score is normalized by

13  dividing the raw score by the maximum possible matched

14  score for the case, which is the -- what's required for

15  Claim 33 -- for element -- for Claim 33.  Excuse me.

16      Q.   So, Dr. Branting, is it your opinion that

17  Claim 33 is anticipated by the EZ Reader as well?

18      A.   So -- yes.  So it's my opinion that Claim 33

19  is disclosed by the -- by the EZ Reader system.

20      Q.   So have we gone through all of the asserted

21  claims in this case --

22      A.   Yes.

23      Q.   -- of the EZ Reader?

24      A.   So -- so we've hit them all.  And the -- and

25  the conclusion that I reached is that the -- all of the

claims of the '947 patent are anticipated by the EZ

Reader system described in the EZ Reader paper.

Q.   Okay.  Well, let's move on to another

reference that you mention.  This is the Allen patent.

And, again, let's just jump right in.

This is Claim 26 again, and let's first talk

about the preamble.  Is that met by Allen?

A.   Yes, it is.  So Allen, a problem-solving

system that uses rules and cases.  We'll start with the

first of these elements, a method for automatically

processing non-interactive electronic messages.

So if we look at the highlighted text, it says

that the application retrieves the text string

description from the customer.  If the match quality is

high, the application performs a best-case step in the

following steps.  And that action, which the application

performs, is to provide an advice message back.

So it's automatically processing a

non-interactive electronic message.

Q.   Okay.  The next one is the step of receiving

the electronic message from a source.

Is that met by the Allen patent?

A.   It is.  If you look at the picture, the

highlighted picture in the upper right-hand corner, that

shows a user putting a problem into the interface.  So

1    that's the receiving step.

2           And if we look at the lower left-hand corner

3    there, the text says in the description step, the

4    application receives -- may receive a text string

5    description of the customer problem, which is the same

6    thing.  It's the system receiving a message from a

7    source.

8        Q.    The next one is interpreting electronic

9    message using a rule-based and case-based knowledge

10   engine.

11          Is that disclosed in Allen?

12       A.    It is.  So, once again, the figure shown in

13   the upper right-hand corner shows the case-based and the

14   rule-based components that are involved in the

15   processing.

16          And if we look at the highlighted text, it

17   says case-based reasoning techniques and rule-based

18   reasoning techniques are used to select the case, which

19   is the best match for the problem.

20       Q.    How about (c), the retrieving step of

21   Claim 26, is that met by Allen?

22       A.    It is.  The highlighted text, the upper

23   excerpt, says the inference engine determines the action

24   described by the best case.

25          And the second excerpt says the action which

the application performs is to provide the advice

message to the customer service representative.  So

that's the advice message associated with the best case.

So that -- that discloses Element (c).

Q.  So, Dr. Branting, is it your opinion that

Claim 26 is anticipated by Allen?

A.  Yes.  It's my opinion that Claim 26 is

anticipated by the Allen patent.

Q.  Well, let's go into Claim 28.  Now, for this

one, we have up here Claim 28 of the '947 patent is

obvious.

So is that your opinion as to Claim 28?

A.  So -- yes.  My opinion is that Claim 28 is

obvious.

Q.  Okay.  Well, let's talk about the first step,

which is the classifying step.

Is it your opinion that this step is obvious

from the Allen patent?

A.  It is.  So the Allen patent itself discloses

that it's a -- it includes a case-based reasoning

system.  So part of the Allen system is a case-based

reasoning system, and that the -- that the solutions

that are produced by the Allen patent are those that are

associated with cases that are matched to the incoming

message, so -- the incoming problem.

1    So -- and this illustration shows that how one
2 of ordinary skill in the art, somebody knowledgeable
3 about case-based reasoning, would realize that a
4 case-based reasoning system -- in order to solve this
5 particular problem, which is classifying an electronic
6 message as able to be responded to automatically or not,
7 a person of ordinary skill in the art would realize the
8 way you do that is you have cases that are examples of
9 each of those two possible classifications.  That's what
10 case-based reasoning is.
11    And so a person of ordinary skill in the art
12 would realize that -- that an incoming problem
13 consisting of an electronic message would be classified
14 based on its degree of match to cases in the case
15 library that illustrate those two categories.
16    So in light of that, it's my opinion that this
17 would be obvious to a person of ordinary skill in the
18 art.
19    Q.   And would that be the case even without a
20 specific disclosure of quote/unquote classifying in the
21 Allen reference?
22    A.   Yes.  Classifying is one of the basic tasks
23 that case-based reasoning is applied to.  A person of
24 ordinary skill in the art would realize that this is an
25 absolutely typical application.

1      Q.   So let's talk about the retrieving step, then,

2 of Claim 28(c).

3           Is that matched in the Allen reference?

4      A.   It is.  In the highlighted text, the upper --

5 upper part refers to determining the action prescribed

6 by the best case.  So that's the -- the solution that's

7 associated with the best-matching case.

8           And then the lower part says that that

9 solution can be to provide an advice message to a

10 customer service representative.

11      Q.   So, Dr. Branting, what is -- is it your

12 opinion that Claim 28 of the '947 patent is obvious?

13      A.   It -- I believe that the Claim 28 is invalid

14 for obviousness.

15      Q.   Let's move on to the next one, Claim 30.

16      A.   The long one.

17      Q.   And is it -- is it your opinion that Claim 30

18 is also obvious?

19      A.   It is.  So Claim -- let's start with -- with

20 the first element, (b1), which is producing a case

21 message.

22           So this is disclosed in the language of the

23 patent itself.  So if we look for the first -- first of

24 the three excerpts, it refers to a case template and to

25 attributes.

1    The second excerpt refers to attribute value

2  pairs that are obtained from the message.

3    And the third specifies that one of the

4  attributes is a text string value, and that's what --

5  that's what discloses the message text.

6    Q.   And the next one, the detecting step in (b2),

7  is that obvious from Allen as well?

8    A.   It is.  So -- so this element requires -- as

9  we just went through, it requires detecting one of text,

10  combinations of text, or patterns of text.  Each of

11  these three possibilities is spelled out in the language

12  of the Allen patent.

13    So string matching, word matching, character

14  matching, those correspond to those three types of -- of

15  detecting text.

16    Q.   How about (b3), is that in Allen?

17    A.   Yes, it is.  So flagging the attributes of the

18  case model.  So this is just -- it detects -- the

19  highlighted text refers to the attribute value pairs of

20  the case template.  So case template corresponds to the

21  case model, which corresponds as notable parameters of

22  the problem.

23    So the things that are important about the

24  incoming case are flagged in the case template, which is

25  a case model.

Q.   Okay.  And (b4), is that obvious from Allen?

A.   It is.  So if we looked at the -- at the highlighted text, once again, that's shown on the screen, that the -- the attributes of the case model are -- involving comparing -- sorry -- let me back up.

So (b4) involves comparing the flagged attributes of the case model to the stored case, and the excerpt refers to matching attribute value pairs.  So the match is between the new problem and the stored case.

Q.   (b5), is that met in Allen?

A.   Yes.  So Element (b5), comparing the text of the case model with the stored text, so that's the other thing I just was talking about comparing the attributes. This is comparing the text.

And, yes, the highlighted text shows that there's -- the text of the stored case as compared to the text of a new case in three ways:  Through string matching, word matching, and character matching. So that's exactly what's required for the patent.

Q.   Okay.  And 30(b6), is that disclosed in Allen?

A.   It is.  It's disclosed in Allen, and it's also -- it's also obvious.

Q.   Okay.

A.   So let's start with the disclosure --

1    Q.   Yeah.

2    A.   -- which states that -- so -- so Claim (b6)

3 assigns a score to each stored case which is compared to

4 the case model with a score increasing when the

5 attributes of text match, but doesn't increase when they

6 don't match.  A very commonsensical idea.

7        So in the upper excerpt, it says that the

8 match quality is determined as a weighted sum of the

9 evaluation of the attribute value pairs that match.  So

10 that's just another way of saying when we match

11 attribute values, we -- we -- we sum up the -- the

12 weight associated with each pair.  So how important

13 that -- that attribute is.

14        And the lower part excerpt just says that we

15 can do the same thing with matching text.

16    Q.   Okay.  Now, did you look at another reference

17 in connection with your obviousness analysis of -- of

18 30(b6)?

19    A.   I did.  I looked at the -- so the Allen patent

20 refers explicitly to the -- a document called the CBR

21 User's Guide.  It says that a preferred example of a

22 case-based reasoning system for providing user help in

23 call-in complaints is more fully described there.

24        So it's my opinion that a person of ordinary

25 skill in the art would understand, in view of this

1 reference, that the Allen patent should be read together

2 with the current version of the use -- of the CBR

3 Express documentation at the time of -- of an invention.

4     Q.   Okay.

5     A.   So they should be read together.

6     Q.   Now, you understand, Dr. Branting, that at the

7 time of the -- of the Allen filing -- let me just move

8 on.

9     So is this -- is this one of the -- some of

10 the CBR Express documentation?

11     A.   Yes.  This is the User's Guide and Reference

12 Manual, which, in my opinion, a person of ordinary skill

13 in the art would recognize should be read -- should have

14 been read in conjunction with -- together with the Allen

15 patent.

16     Q.   Okay.  And, again, you're just -- your opinion

17 is one of obviousness in combining these references?

18     A.   It's obviousness; that's right.

19     Q.   Okay.  And --

20     A.   That -- that --

21     Q.   You're not contending that there's an

22 anticipation for this element?

23     A.   No.  No, not -- because I believe the

24 copyright of this is 2010 -- sorry -- 1995.  So it's not

25 an explicit reference.

1           But incorporation by reference, but I think

2   it's clear, in view of this reference, that someone

3   looking at this patent would know to look at these

4   documents for additional information.

5       Q.   Okay.  Well, let's talk about what

6   Claim 30(b6), or what the CBR Express documents disclose

7   on 30(b6).

8           Do they disclose 30(b6)?

9       A.   Yes.  Yes.  Absolutely.

10          So the CBR Reference Manual and the passages

11  that are highlighted and excerpted says that if a case

12  feature exactly matches a stored feature... the raw

13  score of the matched case is incremented by the

14  match-weight of the question.  And the raw scores total

15  up for each of those.

16      Q.   Okay.  And so is it your opinion that the --

17  that Claim 30 is obvious in light of Allen and the CBR

18  materials?

19      A.   Yes.  In my opinion, this patent is obvious in

20  light of these -- these two prior art references that a

21  person of ordinary skill in the art would find this

22  patent to be obvious.

23      Q.   And let's move on to Claim 31?

24      A.   Jumped the gun.

25      Q.   Is that -- is it your opinion that that's

1  rendered obvious as well?

2      A.   Yes.   So Claim 31, which involves matching the

3  attributes of the -- the attributes and the text of the

4  stored case model wherein the score is increased by a

5  predetermined match-weight.

6          So the -- the excerpted language from the

7  Allen patent shown in red says that the match-weight is

8  the weighted sum of the evaluation of the attribute

9  value pairs that are matched.   That's just another way

10  of saying we're adding up to weight of each of the

11  attributes that are both in the incoming case and the --

12  the stored case.

13         And the lower excerpt says we're doing the

14  same thing with the text.

15     Q.   Okay.   And does it disclose the converse for

16  the second element of Claim 31 as well?

17     A.   Yes.   So the second element says that if

18  there's a mismatch, then we may have to -- then -- then

19  the match score should be decreased.   And so if we look

20  in the CBR Express Reference Manual, then the text

21  that's shown refers to decrementing the store's -- the

22  stored case's raw score if a feature doesn't match.

23         So this is just saying if we don't have a

24  match, the score will go down.

25     Q.   Okay.   So is it your opinion that the

1  combination of Allen and the CBR Reference Manual or CBR

2  manuals render Claim 31 of the '947 patent obvious?

3      A.   Yes.  In my opinion, Claim 31 is rendered

4  obvious by that combination of prior art references.

5      Q.   Now, let's move on to Claim 33.

6           Is it your view that Claim 33 of the '947

7  patent is obvious under that same combination?

8      A.   It is indeed.

9           So if we look at the language of Claim 33,

10 which refers to normalizing a score by dividing by the

11 maximum possible score, if we look at the text of the

12 CBR Reference Manual that explicitly refers to

13 normalizing the range of -- of points and in such a way

14 that the final value is confined to a range of 0 to 100.

15     Q.   So is it your opinion, then, that Claim 33 of

16 the '947 patent is obvious by the combination of Allen

17 and the CBR materials?

18     A.   Yes.  In my opinion, 33 -- Claim 33 is obvious

19 in light of that combination of prior art.

20     Q.   And is that true for all the asserted claims

21 in this case?

22     A.   Yes.  So -- so it's my opinion that all the

23 asserted claims of the '947 patent are obvious in light

24 of Allen and the CBR Express documents.

25     Q.   I think you mentioned this as to Claim 26 that

was anticipation; is that right?

A. Yes; that's right. Claim 26 is anticipated?

Q. Dr. Branting, did you prepare any summary charts of the information you relied on in connection with this -- formulating your opinion?

A. Yes. As part of my invalidity report, I had a summary chart that listed all the references that I felt were -- well, that I relied on in reaching my judgment about invalidity.

MR. PERLSON: Your Honor, may I approach?

THE COURT: Yes.

Do you have a copy for counsel?

MR. PERLSON: Uh-huh. I've already given it to him.

THE COURT: You are approaching the witness, correct?

MR. PERLSON: Yes. Got to get around the barrier.

THE WITNESS: Thank you.

THE COURT: It's put there for a reason.

MR. PERLSON: Fair enough.

Q. (By Mr. Perlson) So, Dr. Branting, is this your summary chart?

A. It is. Well, it's -- it's the chart with just the references.

1    Q.   Okay.

2    A.   And not the excerpts that were in the

3  original.

4              MR. PERLSON:  Your Honor, we would move

5  to admit Defendants' Exhibit 1016 as a -- to show the

6  materials that Dr. Branting relied on in forming his

7  opinions.

8              THE COURT:  Objection, for those limited

9  purposes?

10             MR. FENSTER:  No objection, Your Honor.

11             THE COURT:  All right.  It will be

12 received for the limited purpose of showing the

13 materials the expert relied on in forming his opinions.

14   Q.   (By Mr. Perlson) Dr. Branting, I know that

15 we've spent a lot of time going through the elements of

16 the '947 patent.  Let's just take a little step back.

17             Can you please tell the jury whether in your

18 opinion there's anything in the '947 patent that was new

19 in comparison to the prior art?

20   A.   I would be happy.

21             So it's my opinion that there's nothing in the

22 '947 patent that was -- that was novel, that was not

23 either anticipated or obvious in light of prior art.

24             And, indeed, when I was first contacted in

25 this case, I was just sent a copy of the patent.  And

when I looked at it, I felt extremely astonished that anyone would regard this patent as containing anything novel.

In my estimation, the patent consists of obvious combinations of techniques that were known to everybody of ordinary skill in the art at the time of the invention.

Q.    Dr. Branting, I think you may have misspoke at one point there.  I think you said it was not obvious in anticipation.

A.    Sorry.  That it is.  Sorry.  So I combined. -- so let me restate it.

That the -- my opinion is that the -- that the '947 patent is invalid for obviousness and anticipation, because I -- okay.

Did I answer the question?

Q.    You did.

MR. PERLSON:  No further questions, Your Honor.

THE COURT:  All right.

Cross-examination.

MR. FENSTER:  Very briefly, Your Honor.

CROSS-EXAMINATION

BY MR. FENSTER:

Q.    Good morning, Dr. Branting.

1      A.   Good morning, Mr. Fenster.  Hope you're well.

2                  THE COURT:  If you don't mind, listen

3   carefully to his question, and if it calls for a

4   yes-or-no answer, answer it yes or no.  That will help

5   us move along more quickly.

6                  THE WITNESS:  Yes, Your Honor.

7                  THE COURT:  If the Defendants' lawyers

8   need to ask you some additional questions, I promise you

9   I'll let them do that if you need to explain anything,

10  all right?

11                 THE WITNESS:  Okay.

12     Q.   (By Mr. Fenster) Dr. Branting, first let me

13  just clear something up with respect to EZ Reader.

14                 You had to assume for purposes of your

15  analysis that the EZ Reader was in public use before the

16  critical date, correct?

17     A.   Yes, I -- yes.

18     Q.   You have no -- you have no opinion as to

19  whether it was in public use prior to the critical date,

20  correct?

21     A.   Well, I do have an opinion, but I wasn't --

22  yes.  I wasn't asked to -- to make a judgment about the

23  credibility of the witnesses or anything like that.

24     Q.   And you understand that the EZ Reader

25  reference can only invalidate the Rice patent if the

1  Defendants prove by clear and convincing evidence that

2  it was actually deployed prior to the critical date of

3  April 3, 1996, right?

4      A.   It's my -- yes, it's my understanding that it

5  has to be established that it was in public use at

6  that -- at that time prior to the critical date.

7      Q.   Now, prior to this case, you had never been

8  retained as an expert, correct?

9      A.   This is my first experience as an expert

10 witness.

11     Q.   Prior to this case, you had never had any

12 experience with patents, correct?

13     A.   That is correct.

14     Q.   In fact, you never had any experience with the

15 standards for validity on which you opine today,

16 correct?

17     A.   That's correct, sir.

18     Q.   Now, you reached an opinion that the asserted,

19 Claims 30, 31, and 33, are invalid over the Allen

20 reference, correct?

21     A.   Are -- yes, I did -- well --

22     Q.   Based on the Allen reference, correct?

23     A.   Based on the Allen reference read with the CBR

24 Express documents.

25     Q.   That's right.

1          MR. PERLSON:  Your Honor, may we

2 approach?

3          THE COURT:  Yes.

4          (Bench conference.)

5          MR. PERLSON:  Your Honor, I'm not sure

6 where he's going, but it seems to me like he's doing --

7 Mr. Fenster is going to do the exact same thing he did

8 yesterday.  He's going to go into opinions of

9 anticipation --

10          MR. FENSTER:  Huh-uh.

11          MR. PERLSON:  -- like Dr. Branting did.

12          THE COURT:  He's telling me he's not.  So

13 step back.

14          MR. PERLSON:  Okay.

15          (Bench conference concluded.)

16      Q.   (By Mr. Fenster) So, Dr. Branting, you

17 testified on direct that the asserted claims, Claim 31,

18 30 -- Claims 30, 31, 33, are invalid based on Allen,

19 correct?

20      A.   They're invalid based on -- on -- well, for

21 obviousness based on Allen read together with the CBR

22 Express documents.

23      Q.   That's right.

24          You concluded that they -- that they -- that

25 the patents were -- that the asserted claims were

invalid based on the references of Allen and CBR

Express, correct?

    A.    Yes; that's right.

    Q.    Okay.  Now, you're aware that the Rice patent

has gone through a reexamination, correct?

    A.    That's what I understand.

    Q.    And you had those reexamination materials

available to you, correct?

    A.    I -- yes; that's correct.

    Q.    And you didn't consider either of the

reexamination proceedings in forming your opinions,

correct?

    A.    I did not.

    Q.    And you did not consider that the

reexamination examiner at the United States Patent &

Trademark Office also considered the Allen and CBR

references in confirming the validity of Claims 30, 31,

and 33, did you?

    A.    I'm -- could you repeat that question, please?

    Q.    Sure.

          You didn't consider that the reexaminer --

that the reexamination examiner specifically confirmed

the validity of Claims 30, 31, and 33, correct?

    A.    I -- I didn't consider the fact that he --

that she confirmed it?

1          Well, I formed an independent judgment, but it

2   was of obviousness, not anticipation, based on Allen.

3       Q.   Okay.  And when the USPTO confirmed the

4   validity of Claims 30, 31, and 33, they confirmed it

5   with respect to both obviousness and anticipation,

6   correct?

7       A.   I don't know that to be the case.

8               MR. FENSTER:  No further questions.

9               MR. PERLSON:  No further questions, Your

10  Honor.

11              THE COURT:  All right.  You may step

12  down, sir.  Travel safely.

13              THE WITNESS:  Thank you.

14              THE COURT:  Call your next witness.

15              MR. PERLSON:  Your Honor, now we call

16  James Charles Williams.

17              THE COURT:  Counsel, approach.

18              Has this witness previously been sworn?

19              MR. PERLSON:  No, Your Honor.

20              THE COURT:  While he's being sworn in, if

21  counsel will approach.

22              (Witness sworn.)

23              (Bench conference.)

24              THE COURT:  All right.  The request

25  yesterday to take the witness on voir dire outside the

presence of the jury for purposes of establishing

whether or not he had personal knowledge of --

deployment at Chase Bank, I'm going to require you need

to lay an appropriate foundation before you ask that

question.

And if it appears to me that -- I mean,

he can testify as to what he knows about his position at

Brightware, but -- I mean, if he wasn't on site at Chase

for that period, I mean, don't ask him if he knows what

was going on at Chase if he wasn't on site.  But you can

develop what you can.

Mr. Fenster, if he gets to a question you

think he doesn't have personal knowledge of, you need to

object at the time, okay?  I will sustain it, if I don't

think there's been an appropriate foundation laid or

overrule it.

You know, if you've got something you

want to ask that undermines his ability to recall what

was going on at this time period, I'm going to allow you

to develop that on cross, but I'm not going to let you

take him on voir dire, okay?

(Bench conference concluded.)

THE COURT:  Does the witness have a

binder, or is this for me?

THE WITNESS:  I believe I do have a

1  binder.

2          THE COURT:  I just wanted to make sure I

3  didn't have an extra notebook.

4  JAMES CHARLES WILLIAMS, DEFENDANTS' WITNESS, SWORN

5                  DIRECT EXAMINATION

6  BY MR. PERLSON:

7      Q.   Good morning, Mr. Williams.

8           Can you please state your full name for the

9  record.

10     A.   My name is James Charles Williams.  I

11  generally go as Chuck Williams.

12     Q.   Okay.  And can you tell us a little bit about

13  yourself, Mr. Williams?

14     A.   I live with my wife in Hawi, Hawaii, a small

15  town.

16          THE WITNESS:  Excuse me?  Start talking

17  more into the mic?

18          THE COURT:  Get closer to the mic.  Thank

19  you.

20     A.   Yes.  I life in Hawi, Hawaii, a small town in

21  Hawaii, with my wife.  We have three children.  We have

22  one son who's a software developer in Northern

23  California.  We have one son who's an artist in Dallas,

24  Texas.  And we have one daughter who is a reporter for

25  ABC News in Atlanta, Georgia.

1      Q.   (By Mr. Perlson) Now, Mr. Williams, what do

2  you do for a living?

3      A.   I'm currently the Chief Technical officer, of

4  CTO, of the subsidiary of Seagate Corporation,

5  responsible for a certain product line.

6      Q.   And how long have you been involved in the

7  computer industry?

8      A.   I've worked full-time in the software business

9  since I was 15 years old.  That's 37 years now.

10          Well, I guess that's disclosing my age.

11     Q.   Can you tell us some of the roles you've had

12 in the computer industry?

13     A.   Certainly.  I started as a software developer,

14 writing software.

15          I later became a researcher in the field of

16 artificial intelligence or AI, specifically in

17 knowledge-based technologies, like rule-based and

18 case-based technologies.

19          I later founded several companies.  I founded

20 Inference Corporation as its chief technical officer.

21          I co-founded Brightware.  I became more of a

22 business person then as its chief executive officer or

23 CEO.

24          And then I founded some more companies and

25 eventually returned to my technical roots, and I'm back

1  now building products again.

2      Q.   Okay.  Now, you mentioned Brightware.  That's

3  the company you started; is that right?

4      A.   I did co-found Brightware, that's correct.

5      Q.   Okay.  And that's different from the

6  Plaintiff, Bright Response, in this case.

7      A.   Yes, sir.  I have -- I had never heard of

8  Bright Response before this -- before I became aware of

9  this case.

10      Q.   Okay.  And are you familiar with rule-based

11  and case-based reasoning?

12      A.   Yes, I am.  I did original research in

13  those -- in knowledge-based AI, including those fields,

14  and I -- I, you know, created some of the first

15  commercial products.  I was responsible for some of the

16  first commercial products that used those technologies.

17      Q.   Can you give us a couple of examples of those

18  products?

19      A.   Sure.  I was the -- one of the lead developers

20  and the head of the team that created the original ART

21  product at Inference and then responsible for subsequent

22  products in that product line, including ART*Enterprise.

23  I was also -- and that used both rule-based reasoning

24  and case-based reasoning technologies.

25           I was also responsible for the development of

Inference's specific case-based reasoning product line,
including CBR Express and CasePoint.

And then later, at Brightware, we had a number
of tech -- of products that used those technologies as
well.

Q.   Okay.  And when was ART*Enterprise released?

A.   Let's see.  As I recall, ART*Enterprise was
released probably around maybe 1992 or 1993
approximately then.

Q.   And how about CBR Express?

A.   CBR Express was released probably at a similar
time, probably 1992/1993.

Q.   Okay.  And in 1995 and 1996, what was your
role at Brightware?

A.   I was the CEO of Brightware.

Q.   Okay.  And what were your responsibilities as
CEO?

A.   I was responsible for all of the operations of
the company, including sales, marketing, customer
service, consulting services, product development,
customer support, finance, and administration.  All of
the operations of the company reported to me.

In addition, I was the company's primary
outside spokesperson, and I served on the company's
Board of Directors.

1      Q.   Okay.  And what was Brightware's business?

2      A.   Brightware was originally a spinoff out of

3 Inference, and we started in the custom application

4 development business.

5           We later -- and, in fact, it was our intent at

6 the time we formed the company to create packaged

7 application products and to bring those products to

8 market.

9           So we had both the customs application

10 business unit, as well as a number of packaged

11 application products that we became well-known for.

12      Q.   And did Brightware -- well, can you identify

13 some of the case-based and rule-based products that

14 Brightware developed?

15      A.   Yes, I can.  And I think you may be using

16 products generally.

17           We developed some -- we developed some custom

18 applications, such as the EZ Reader application for

19 Chase.

20           We also developed some packaged products,

21 including the Brightware Answer Agent, the Brightware

22 Advice Agent.  And those -- those products and custom

23 applications are all examples of systems that use

24 case-based and rule-based technology.

25      Q.   Okay.  Mr. Williams, were you retained by

1    Google and Yahoo! as a consultant in this matter?

2         A.    Yes, I was.

3         Q.    And are you being compensated for your time?

4         A.    Yes, I am.

5         Q.    Okay.  And how much is that?

6         A.    I'm charging my standard consulting rate of

7    $625 per hour.  I don't consult very often, but when I

8    have consulted over the past 10 years, it's been the

9    same rate consistently for 10 years.

10        Q.    Okay.  And is your -- your consulting rate

11   tied at all to any outcome in this case?

12        A.    No, it is not.  I have no -- I have no

13   interest in the outcome of this case.

14        Q.    Okay.  Now, I'm sure it took you some time to

15   travel from Hawaii to here, but as a result of this, are

16   you missing any work so that you can testify here today?

17        A.    Yes, sir, I am.  I have -- I'm completing a

18   project with my current team to create a new software

19   product that is due to be released very soon, and my

20   whole team is in crunch mode, which means we're working

21   around the clock, and I'm -- I'm missing that to be

22   here, yes.

23        Q.    Okay.  Well, we very much appreciate you being

24   here today.

25        A.    Thank you.

1          MR. PERLSON:  Can you show Defendants'

2  Exhibit 29?

3      Q.   (By Mr. Perlson) Okay.  Now, you -- this is

4  the '947 patent issued in this case.  Are you familiar

5  with this patent?

6      A.   Yes, I am.

7      Q.   And how are you familiar with this patent?

8      A.   Well, a number of ways.

9           First, an earlier version of this patent was

10  originally filed by Chase, who was a customer of

11  Brightware, and it came to my attention because we got

12  into a dispute with them since we believe we owned the

13  technology, and they believed they owned the technology.

14  We resolved that dispute, and the technology rights were

15  assigned to Brightware.  And I was the person doing

16  that, settling that dispute, and I became quite

17  intimately familiar with -- with -- well, familiar with

18  the patent at that time.

19           And then later, more recently, I have reread

20  the entire patent in preparation for this case.

21      Q.   So is Brightware -- it says there the assignee

22  is Brightware.  Does Brightware still own the patent?

23      A.   No.  Brightware no longer exists.

24      Q.   Okay.  Sir, are you familiar with the

25  inventors of this patent?

1    A.    Yes, I am.  I believe there are five:  Amy

2  Rice and Julie Hsu, who were consultants in our

3  consulting organization of Brightware, along with three

4  of -- people who were then employees of Chase -- I don't

5  know what they're doing now -- Anthony Angotti and

6  Rosanna Piccolo, who were our direct customers at Chase

7  and worked with our project team, and Fred Cohen, who I

8  interacted with later.  I believe he was the attorney

9  who drafted the patent or was involved -- at least

10  involved in its prosecution for Chase.

11    Q.    Okay.  And are you familiar with the

12  Brightware software application that this patent is

13  based on?

14    A.    The EZ Reader application, yes, I am.

15    Q.    Okay.  And what was the EZ Reader?

16    A.    The EZ Reader was a custom application that we

17  created for Chase to interpret and process incoming

18  customer e-mails initially for ChaseDirect and later for

19  all inquiries about Chase businesses coming into

20  chase.com.

21        The application could interpret those

22  messages, decide appropriate responses, and either send

23  those answers back to customers automatically or refer

24  the messages with additional information to Chase's

25  employee -- employees for final disposition.

1     Q.   Okay.  Was the EZ Reader related at all to the

2 ART*Enterprise application that you mentioned earlier?

3     A.   Yes, it was.  EZ Reader was implemented in

4 ART*Enterprise and used the case-based reasoning and

5 rule-based reasoning components of ART*Enterprise.

6     Q.   Okay.  Well, let's talk a little bit about the

7 EZ Reader.

8         Do you recall the circumstances surrounding

9 your company's development of the EZ Reader?

10    A.   I do, yes.

11    Q.   And so how did that project begin?

12    A.   It began, as I recall, in -- well, there was a

13 -- there was a -- there was a section -- there was a

14 time period in May of -- May and June of 1995, where

15 Brightware consultants were working with Chase to

16 identify potential applications of artificial

17 intelligence technology for Chase.

18         And the EZ Reader emerged as one of about a

19 dozen potential applications that were identified during

20 that process.  EZ Reader was then selected for actual

21 development, and I believe that development began in

22 July of 1995.

23    Q.   Okay.  And -- now, ChaseDirect, what's that?

24    A.   ChaseDirect was a unit of Chase that, as I

25 understand it, offered PC banking services fairly early

1   on.  I'm not sure when they started, but I believe they

2   were operational in 1995.

3        Q.   And do you know if EZ Reader was ever in

4   production at ChaseDirect?

5        A.   Yes, sir, I believe it was.

6        Q.   Okay.  And do you know when that was?

7        A.   I believe it initially began use for

8   ChaseDirect --

9             MR. FENSTER:  Objection, Your Honor.  We

10  haven't laid personal foundation of involvement yet.

11            THE COURT:  Well, I'll sustain the

12  objection.

13       Q.   (By Mr. Perlson) Okay.  Mr. Williams, how were

14  you involved with the EZ Reader project?

15       A.   In a number of ways.

16            First, as the -- as the head of the company.

17  And we weren't that large a company then.  I don't

18  remember exactly how many employees we had, but maybe

19  around -- at that point in time, maybe around 50 or so.

20  And so I was generally aware of pretty much everything

21  going on inside the business, and I was getting general

22  management information about various projects and

23  efforts that we had underway.

24            In addition to that, at that time, we were

25  formulating our product strategy, and we were trying to

1  identify products that we would package and -- and sell

2  as general products rather than custom one-off

3  applications.

4          And one of the areas we were particularly

5  interested in was automated e-mail response.  In fact,

6  we did eventually develop an auto -- an automated e-mail

7  response product, and it became our most successful

8  product.

9          And the basis for making that decision was our

10 experience on the Chase EZ Reader application.  So that

11 particular application was the subject of consideration

12 and -- and discussion at the management levels of the

13 company.

14     Q.   And were you ever involved in -- was there any

15 press that was -- involved the EZ Reader that you were

16 involved in?

17     A.   Yes, there was.  There probably were a number,

18 but one that I recall is that I published an article

19 initially in the San Francisco Examiner, and I believe

20 it was later published in Chief Executive magazine about

21 the potential of AI technology on the internet, and the

22 EZ Reader is one of the applications I cited in that

23 article.

24     Q.   Okay.

25               MR. PERLSON:  And can you pull up

1  Defendants' Exhibit 999, please?

2           Okay.  Maybe just focus in here -- yes.

3       Q.   (By Mr. Perlson) Is this an e-mail from March

4  1996 from yourself?

5       A.   Yes, it is.

6       Q.   Okay.  And who's it to there?

7       A.   John Knightly.  He was a director in our

8  marketing organization.

9       Q.   And what was the purpose of your e-mail to

10  Mr. Knightly?

11      A.   Well, John was working with me on the key

12  points to be made in the article I just referred to, and

13  the purpose of this message was to make comments on

14  certain points that I thought were important that we

15  make in the article.

16      Q.   Okay.

17           MR. PERLSON:  And, Ryan, can you go to

18  Page 2 and zoom in at the top.

19      Q.   (By Mr. Perlson) And can you explain what --

20  what your -- what's being described here.

21      A.   Yes.  One of the important elements of the

22  article was to cite some real-world examples, because

23  for most people at the time, the concept of the internet

24  was new, much less the concept of AI applications on the

25  internet.

1         And I wanted some real-world examples to

2 highlight the points that were made in the article, and

3 I suggested several applications that would illustrate

4 those points effectively, and one of those was the Chase

5 EZ Reader application.

6               MR. PERLSON:  Ryan, can you highlight

7 that?  Well, that's fine.  It's just in that line.  We

8 can...

9    Q.   (By Mr. Perlson) Now, did you actually draft

10 a -- an article for The Examiner?

11    A.   Yes.

12    Q.   Okay.  And --

13    A.   Let me be a little bit more precise.  I

14 certainly wrote parts of it.  I couldn't say I drafted

15 the entire thing.

16    Q.   Right.

17    A.   I did have some support from my marketing

18 department.

19    Q.   Okay.

20               MR. PERLSON:  And if you could point --

21 if you could go to -- your Honor, may I approach?

22               THE COURT:  Yes.

23               MR. PERLSON:  Go around the barrier.

24    Q.   (By Mr. Perlson) So I've handed you what's

25 been marked as Defendants' Exhibit 1000.

1          Do you recognize this?

2     A.    Yes, I do.

3     Q.    And what is this?

4     A.    This is a draft of the article that I prepared

5 for publication initially in The Examiner.

6     Q.    Okay.  And when was this written?

7     A.    I believe this draft was written in April of

8 1996.

9     Q.    Okay.

10          MR. PERLSON:  And please turn to Page 2.

11    Q.    (By Mr. Perlson) You see the last paragraph?

12 And it refers to:  Is this just a pipe dream?

13    A.    Yes, I do.

14    Q.    Okay.  And does it say:  No.  It's already

15 happening.  Chase Manhattan Bank uses an AI system on

16 the internet to automatically respond to incoming e-mail

17 questions from customers and prospects?

18          MR. PERLSON:  Pull it down.

19    A.    Yes, it does say that.

20    Q.    (By Mr. Perlson) Okay.  And is this a true and

21 correct copy of the draft of the article that you had in

22 your possession?

23    A.    I believe it is.  It looks just like the copy

24 that is in my possession, yes.

25    Q.    Okay.

1          MR. PERLSON:  Your Honor, we would move

2   to admit Defendants' Exhibit 1000.

3               THE COURT:  Objection?

4               MR. FENSTER:  No objection, Your Honor.

5               THE COURT:  Okay.  It will be received.

6       Q.   (By Mr. Perlson) Okay.  And is the --

7               MR. PERLSON:  Can you blow it up?

8       Q.   (By Mr. Perlson) So on the second page there,

9   it's referring to artificial intelligence on the

10  internet.  And then below it, is that the excerpt that

11  we just read?

12      A.   I believe it is, yes.

13      Q.   Okay.  And what is that -- is that -- what is

14  that referring to?

15      A.   That's referring to the Chase EZ Reader

16  application.

17      Q.   Okay.  Now, Mr. Williams, when was -- so do

18  you know whether the EZ Reader was ever in production

19  for ChaseDirect?

20      A.   Yes, I do.  And I believe it was in production

21  for ChaseDirect.

22      Q.   Okay.  And when was that?

23              MR. FENSTER:  Objection, Your Honor.

24  Same objection, foundation, lack of personal knowledge.

25              THE COURT:  Overruled.

1    A.    I believe it was initially used for

2  ChaseDirect in January of 1996, and it was officially

3  deemed a production system in late March of 1996, and

4  then at the very end of March of 1996, extended for use

5  throughout chase.com.

6    Q.    Okay.

7              MR. PERLSON:  Can you pull up

8  Demonstrative 600, please?

9    Q.    (By Mr. Perlson) Now, this is the EZ Reader

10  article that you referred to earlier, and you'll note

11  that it says:  Phase 1 of the EZ Reader was deployed in

12  the first quarter of 1996 --

13    A.    Yeah.

14    Q.    -- and handles up to 80 percent of incoming

15  e-mail (sic) automatically, depending on message

16  content.

17              You see that?

18    A.    Yes, I do.

19    Q.    Okay.  And is that consistent with your

20  recollection of the deployment of EZ Reader?

21    A.    Yes, it is.

22    Q.    Now, we've heard some testimony regarding the

23  development of Lotus Notes in connection with the EZ

24  Reader.  Do you have an understanding of whether that

25  was used in connection with the EZ Reader?

     A.   Yes, I do.  The Lotus Notes integration was
essential to the operation of the application.  The EZ
Reader application would read incoming e-mails from
Lotus Notes and either respond to them through Lotus
Notes or refer them to Chase employees by submitting
them into Lotus Notes.  And so the application could not
function without that.  It was an integral part of the
application.

     Q.   Okay.

               MR. PERLSON:  And can you pull just the
EZ Reader article back up?  It's 600.  Defendants'
Exhibit 30.

               Yeah.  And go to the first page text.

               And if you could zoom in the bottom
right-hand corner.  Not the footnote, but right above
that in the text.

               Yeah.  There you go.  And if you could
highlight the Lotus Notes there.

     Q.   (By Mr. Perlson) So the article notes that to
address ChaseDirect's business problem, the knowledge
base team created EZ Reader and embedded AI application
operating as an invisible layer between the Lotus Notes
e-mail system and ChaseDirect.

               Do you see that?

     A.   Yes, I do.

1     Q.   Is that your understanding as to how the EZ

2   Reader worked?

3     A.   It is consistent.  It is one way to describe

4   it, yes.

5     Q.   Okay.  And -- and was that how it worked in

6   the first quarter of 1996?

7     A.   Yes, I believe it was.

8     Q.   Okay.

9           MR. PERLSON:  No further questions, Your

10   Honor.

11           THE COURT:  Thank you, Mr. Perlson.

12   Cross-examination?

13           MR. FENSTER:  Yes, Your Honor.

14                    CROSS-EXAMINATION

15   BY MR. FENSTER:

16     Q.   Good morning --

17     A.   Good morning.

18     Q.   -- Mr. Williams.

19           Now, Mr. Williams, you have no stake in this

20   litigation?

21     A.   I do not.

22     Q.   You came here all the way from Hawaii to

23   testify, correct?

24     A.   That is correct.

25     Q.   And you're only here because -- and you're

1    being paid as a consultant to be here, correct?

2        A.    That is correct.

3        Q.    Okay.  Now, you were not one of the primary

4    consultants on the EZ Reader project, correct?

5        A.    Not a person directly working on the project,

6    no, I was not.

7        Q.    In fact, Amy Rice and Julie Hsu were the

8    people who were directly working on that project at

9    Brightware, correct?

10        A.    They are the primary people that worked on

11    that project.  I believe there was some additional

12    involvement as well, but yes.

13        Q.    All right.  And above Amy Rice, there was

14    another manager above her, correct?

15        A.    That's correct.

16        Q.    And the manager -- and then that manager

17    reported to another person above him, Rich Barfus,

18    correct?

19        A.    I believe that's correct.

20        Q.    And then Rich Barfus reported to you, correct?

21        A.    That's correct.

22        Q.    So there were at least two, if not three,

23    levels of management between you and Ms. Rice working on

24    the EZ Reader project, right?

25        A.    All correct.

1    Q.   Okay.  Now, you recall you had your deposition

2  taken in Hawaii just a week or so ago, maybe two weeks?

3    A.   Might have been a little bit longer than a

4  week, but yes, not long ago, in the past couple of weeks

5  or so.

6    Q.   Okay.  And at your deposition, you testified

7  that the basis for your knowledge of when EZ Reader

8  deployed was your vague recollection -- isn't that

9  right, when you described your recollection as vague?

10    A.   I don't recall exactly what I stated about my

11  recollection at that time.

12    Q.   Okay.  Well, let's take a look at your -- at

13  your deposition.

14    A.   I might save you some time.  I -- I --

15    Q.   Well, that's okay.

16    A.   Okay.

17    Q.   So this is from the deposition of Charles

18  Williams, which took place on July 15.

19          MR. PERLSON:  What's the line you're

20  going to use?

21          MR. FENSTER:  We're going to read at Page

22  40, Line 16 to 41.

23    Q.   (By Mr. Fenster) And the question right above

24  that was:  Do you know whether or not EZ Reader was ever

25  deployed to send messages to a customer's e-mail?

1        And you answered:  Yes, I believe it was,

2  right?

3      A.   Yes.

4      Q.   And you were asked:  What's the basis for that

5  understanding?

6      A.   Yes.

7      Q.   All right.  And then you said:  The basis is

8  my recollection --

9              THE COURT:  Mr. Fenster, pardon me.  The

10 transcript is not visible on the screen.

11             MR. FENSTER:  Oh.  Thank you very much,

12 Your Honor.

13             THE COURT:  All right.  There you go.

14             MR. FENSTER:  Thank you, Your Honor.

15     Q.   (By Mr. Fenster) And you said that you had a

16 recollection that there were certain documents and that

17 there was a published article, right?

18     A.   That's correct.

19     Q.   And that's the article you referred to on

20 direct, right?

21     A.   Yes, that is correct.

22     Q.   In The Examiner?

23     A.   That's correct.

24     Q.   Now, do you know when that article was

25 actually published?

1    A.    I'm not certain, but I think perhaps in June

2  of 1996.

3    Q.    And then as you continued in your answer, you

4  summarized the basis for your understanding of when EZ

5  Reader was deployed, and you described it yourself in

6  your own words.

7         So kind of a combination of my vague

8  recollection and then reminding myself by looking back

9  at specific things I wrote -- that's your article; is

10 that right?

11   A.    It is among the things I had looked at at that

12 time.

13   Q.    Okay.  Now, it's not surprising that your

14 recollection from 14 years ago was kind of vague, right?

15   A.    That's correct.

16   Q.    Now, at your -- today, you testified that EZ

17 Reader was in use in January 1996, correct?

18   A.    Yes, I did.

19   Q.    Okay.

20   A.    That's my belief.

21   Q.    Now, at your deposition, you had -- you

22 testified that it didn't go live until March 30, 1996,

23 correct?

24   A.    I don't believe that's quite correct.

25   Q.    Okay.  Well, let's take a look.

1          Okay.  You were asked -- this is at Page 49

2   and 50 of your deposition.

3          You were asked when the EZ Reader went live.

4   Do you recall that?

5          And then Mr. Thompson said:  By going live,

6   we're referring to deploying the application to interact

7   with actual -- actual customers of the client; in this

8   case, Chase, right?

9          And you answered:  My understanding is that on

10  that weekend, which I think we've established is the

11  30th/31st weekend, the system went into production.

12     A.   Yes.

13     Q.   And prior to that:  I also understand it went

14  through extensive testing dating back four or five

15  months before that --

16     A.   Correct.

17     Q.   -- right?

18          Now the basis of this recollection was a March

19  29 e-mail from March 29, 1996, isn't it?

20     A.   I -- I -- I can't assert that.  I'd have to

21  see the e-mail, and -- perhaps what I can say --

22     Q.   Excuse me.

23          MR. FENSTER:  Your Honor,

24  cross-examination.

25          THE COURT:  Try to answer the question he

1  asks, okay?

2              THE WITNESS:  Okay.  Yes.

3              THE COURT:  Thank you.

4      Q.   (By Mr. Fenster) Isn't it true that you were

5  shown this document -- this is the March 29 e-mail, and

6  you were shown it at your deposition as Exhibit 2,

7  correct?

8      A.   That's correct.

9      Q.   Okay.  And this is a -- an e-mail that you

10  received on March 29th, 1996.

11      A.   I don't think I received it, actually.

12      Q.   Okay.  You testified about this e-mail at your

13  deposition, right?

14      A.   It was shown to me by the Plaintiff's attorney

15  doing the deposition, and he asked me for a comment on

16  it, which I gave, yes.

17      Q.   Right.  And this -- this e-mail refreshed your

18  recollection that the EZ Reader was not approved for

19  production until March 29th, 1996.

20      A.   Well, it refreshed my recollection that at

21  that time, it was approved officially for production,

22  that's correct.

23      Q.   Okay.  And after seeing this e-mail, you said

24  it didn't go live until March 30th, 1996, correct?

25      A.   If that's what it says I said in the

1  deposition.

2      Q.   That is what you said in the deposition.

3      A.   Okay.

4      Q.   We just read it.

5      A.   Okay.

6      Q.   So here's that e-mail on March 29, and you

7  testified that it happened in this narrow time period,

8  that weekend of March 30 and 31, correct?

9      A.   I -- I guess I did, yes.

10     Q.   Now, you also testified that prior to March

11 30th, 1996, it was not deployed, didn't you?

12     A.   I believe I testified that it may have been

13 used prior to that time, and I would have expected it to

14 probably have been used prior to that time.  I believe

15 that's what I stated in the deposition.  In fact, I

16 think you had the section up a moment ago where I said

17 something along those lines.

18     Q.   Okay.  And in your deposition -- this is at

19 Page 50, Lines 25 to Page 51, Line 6 -- 6 -- you were

20 asked specifically:  In all the documents that you have

21 received that you've reviewed in preparation for your

22 deposition in this case and as a consultant for the

23 Defendants, did you see anything that would suggest that

24 it went live with actual live customers prior to March

25 30, 1996?

1          Do you recall that?

2     A.   I will accept your representation that I said

3 something along those lines.  I --

4     Q.   Let's take a look at what you said.

5     A.   Okay.  Sure.

6     Q.   This is at Page 50, starting at Line 25.

7          QUESTION:  In any of the documents that you've

8 reviewed in the past two weeks, did you see anything

9 that would lead you to believe that, in fact, it had

10 been EZ --

11    A.   Can I see the -- can I see the question?  I

12 think it's cut off at the top.

13    Q.   Well, we started it.

14          THE COURT:  It's at the bottom of the

15 page there.

16    A.   I missed it.

17    Q.   (By Mr. Fenster) See right here?

18    A.   I see, yes.

19    Q.   Okay.  So it says:  In any of the documents.

20          Now, you recall that you were asked to produce

21 documents for your deposition?

22    A.   Yes, I do.

23    Q.   And you went and produced a lot of documents

24 and reviewed a lot of documents, right?

25    A.   No, that's not correct.  I produced many

1   documents, but I had reviewed almost none at the time of

2   the -- of the deposition or a very few.  Almost none.

3        Q.   In any of the --

4        A.   I had reviewed a few documents at the time of

5   the deposition.

6        Q.   In any of the documents that you have reviewed

7   in the past two weeks, did you see anything that would

8   lead you to believe that, in fact, it had been -- EZ

9   Reader had been utilized to respond to -- directly to

10  customers prior to being released for production in the

11  weekend of March 30 or March 31, 1996?

12            And your answer:  Not specifically, other than

13  that I do know that the full functions of the system

14  were tested beforehand, and it would not have been

15  unusual for some of that testing to include automated

16  response.

17            That was your -- that was your testimony at

18  your deposition, right?

19       A.   And that is correct, as I understood the

20  situation at that time.

21       Q.   Now, in fact, you testified that -- about the

22  EZ Reader article that was submitted to the AAAI, right?

23       A.   I may have.  I don't recall the details of the

24  deposition.  You'll have to show me.

25            You mean today I did or then I did?

1     Q.   Well, both.

2     A.   Yeah.

3     Q.   You don't recall what you testified to just

4 two weeks ago?

5     A.   I recall generally.  I don't recall every

6 question I was asked, no.

7     Q.   Remember you testified about this article that

8 was a AAAI article?

9     A.   Yes.

10    Q.   And you testified at your deposition that that

11 article was submitted in January 1996, correct?

12    A.   I believe so, yes.

13    Q.   And at your deposition, you testified under

14 oath, just like you're here today, that as of the time

15 the article was submitted, EZ Reader had not been

16 deployed, didn't you?

17           MR. PERLSON:  Objection.

18    A.   Yes, I did, and I believe that's correct.

19    Q.   (By Mr. Fenster) So under direct by

20 Mr. Perlson today, you ask this jury to believe it was

21 in use in January of 1996 when you testified in your

22 deposition that it was not deployed by the time that

23 article was submitted, correct?

24    A.   That is correct.  I believe both statements

25 are true.

1    Q.   Okay.

2             MR. FENSTER:  This is at Page 64.  Let's

3    get the full question at Page 63, Line 21.

4    Q.   (By Mr. Fenster)  QUESTION:  Is it your

5    understanding that when the paper was submitted, that

6    the EZ Reader application had been deployed?

7             That's what you were asked at your deposition,

8    right?

9    A.   Yes.

10   Q.   And your answer was:  Based on this

11   communication and the surmisal that the paper was

12   probably submitted in January or even February, it was

13   my understanding that the deployment had not yet

14   happened at that time, correct?

15   A.   That is what I said.

16   Q.   Under oath.

17   A.   Yes.

18   Q.   Now, you also testified at your deposition

19   that the members of the AAAI knew that the EZ Reader had

20   not yet been deployed at the time the article was

21   submitted, correct?

22   A.   I -- I believe I testified that certain people

23   on the program committee of the AAAI knew that fact at

24   the time the article was submitted.

25   Q.   That's right.

1          Now, how could they have known that fact, as

2   you just said, the fact that it wasn't yet deployed, if,

3   as you testify today, it was already in use?

4      A.   Well --

5      Q.   Do you have an answer?

6      A.   I do have an answer, and I think there are

7   several things -- a couple of things I need to say and

8   one point I need to clarify that I said earlier.

9      Q.   Well, isn't it true --

10              THE COURT:  Now, hold on a second.

11              You can answer.

12     A.   The -- there was a discussion between certain

13  people at Brightware, one in particular, Phil Klahr, who

14  was on the program committee for the conference that

15  year, and one of the program chairs of the conference

16  that year, Howard Shrobe, at the time we were

17  considering submitting the article, asking whether or

18  not it would be possible to submit the article before

19  the application was deployed.

20              And Mr. Shrobe responded that that would okay

21  if the deployment is going to be soon, and we will

22  validate the deployment at the time of the program

23  committee meeting.

24              Now, it turns out that -- as I understand now,

25  from further review of my own documents, the submission

1  of the article was actually delayed.  I don't believe

2  now that the article was submitted until the very end of

3  January or early in February.

4          So at the time the article was actually

5  submitted, I believe the application was in use.

6      Q.   (By Mr. Fenster) So your recollection wasn't

7  perfect at your deposition; is that right?

8      A.   That's correct.  I had very little opportunity

9  to refresh -- to review my own documents or refresh my

10  memory of events from things that happened 14 years ago.

11      Q.   Let's take a look at what you said at your

12  deposition.  This is Page 66, Lines 12 through 21.

13      A.   Okay.

14      Q.   QUESTION:  So it's your understanding that,

15  that -- that the IAAI was informed that or had knowledge

16  that EZ Reader had not been deployed when the EZ Reader

17  application was submitted.

18          The question was when it was submitted, not

19  when it was thinking about being, right?

20      A.   Right.

21      Q.   And your answer:  My understanding is that one

22  or, I think, two program committee members would have

23  had that knowledge that it had not been deployed on --

24  at the date the paper was submitted.

25      A.   Right.

1    Q.    And then you were asked:  Would one of those

2  program committee members be Howard Shrobe, and you

3  answered, right?

4    A.    Correct.

5    Q.    So you were -- you specifically testified at

6  your deposition that at the time the article was

7  actually submitted, the IAAA (sic) members knew it had

8  not yet been deployed, correct?

9    A.    I did, because at the time I wasn't aware

10  of --

11            THE COURT:  You've answered his question.

12            THE WITNESS:  Okay.  Thank you.  I'm

13  sorry.

14            THE COURT:  That's okay.

15    Q.    (By Mr. Fenster) Now, at your deposition, you

16  testified that the basis for your belief that it had

17  gone live on March 30, 1996, was an e-mail that you saw

18  saying that it was going to go live, right?

19    A.    I believe I stated that was one element of the

20  basis of my belief.

21    Q.    And, in fact, you were testifying about

22  Williams Exhibit 4, which is in evidence at 1027.  You

23  were shown this document at your deposition; is that

24  right?

25    A.    Yes, I was.

1    Q.   And this is an e-mail from Amy Rice at the

2    bottom dated March 28th, 1996, that says:  Actually,

3    this weekend they are going to turn on the Chase website

4    for the first time, and everyone is getting frantic.  It

5    should be interesting, right?

6    A.   That is correct.

7    Q.   And at your deposition, you testified that it

8    was your recollection that there was a document that

9    said EZ Reader was going live, didn't you?

10   A.   I believe I stated at my deposition that I had

11   other -- there were other documents I had seen at that

12   time that led me to the conclusions that I had, not just

13   this one e-mail.

14   Q.   The Chase website had not gone live prior to

15   March 28th, correct?

16   A.   I -- I -- I do not know that.  In fact, I

17   don't think it's true.

18   Q.   You don't know when it went live, right?

19   A.   I have reason to believe it went live -- the

20   actual Chase website went live --

21              THE COURT:  Well, the question is:  Do

22   you know of your own personal knowledge?

23   A.   I -- I -- I believe I have a good idea of when

24   the Chase website went live.

25   Q.   (By Mr. Fenster) And this article -- or this

e-mail says that the Chase website went live -- was
going live after March 28th.

    A.   No, I do not believe that's what the e-mail
means, and I believe I stated in the deposition I don't
believe that's what the e-mail means.

    Q.   You stated in your deposition that you thought
it was referring to the EZ Reader, and it wasn't,
correct?

    A.   I -- I -- well, I don't think I quite stated
that either.  I believe what I stated in my deposition
was I believe -- I believe that that e-mail, in that
context, meant that e-mail traffic coming into the Chase
website was going to be start -- start to be sent to the
EZ Reader application.

    Q.   Now, Mr. Williams, you testified that Chase
filed the original application, right?

    A.   Correct.

    Q.   Chase Manhattan Bank, right?

    A.   Correct.

    Q.   Now, is it your testimony that Chase would
have filed -- would have fraudulently filed a patent
application that it knew to be invalid?

    A.   I -- I have no way to make such a judgment.

    Q.   You have no reason to believe that they would,
right?

1        A.    No reason at all to believe that they would.

2        Q.    And then you testified that you took over the

3   application -- that Brightware took over the application

4   through litigation, right?

5        A.    Well, we -- whether or not we were technically

6   in litigation, I would leave to you lawyers to decide.

7        Q.    Okay.  But you got the application at

8   Brightware.

9        A.    The application was assigned to us by Chase,

10  that's correct.

11       Q.    And Brightware continued prosecuting the

12  patent until it became the Rice patent, correct?

13       A.    Well, I -- I do not believe it's correct that

14  Brightware continued prosecuting the application until

15  the patent was issued because I believe the patent was

16  not issued until after Firepond had acquired Brightware.

17       Q.    Right.  But all through the time up until the

18  acquisition of Brightware by Firepond, you did continue

19  to prosecute that application, correct?

20       A.    Brightware did.

21       Q.    Right.  And Brightware wouldn't have done that

22  if it had information that the patent was invalid,

23  right?

24       A.    That is absolutely correct.

25       Q.    And for all of the years up until --

1    A.   Well, I want -- I want to revise the answer,

2  though.   I didn't answer quite correctly.

3         I'm listening to your questions, and I'm

4  interpreting them.   Can I revise the answer?

5              THE COURT:   If something you've said is

6  incorrect, then please.

7    A.   Yeah.   I think you said Brightware would not

8  have prosecuted the application if it had information

9  that the application was invalid.

10         And what I would say more specifically is,

11  Brightware would never have knowingly prosecuted an

12  invalid application.   That I -- that I will assert and

13  testify to.

14         Whether or not someone in Brightware had

15  information that you could put together to figure out

16  something that a lawyer might deem rendered the patent

17  invalid, I cannot state.

18    Q.   (By Mr. Fenster) Well, you're trying to tell

19  this jury that back at the time the application was

20  filed, you had that knowledge, aren't you?

21    A.   No, I'm not.   I'm saying all I -- all I've

22  testified to today is my belief of the timeline for when

23  the application went live.   I had no idea whether or

24  not -- what that means relative to the validity of the

25  patent.   I'm not a lawyer.

         Q.   And for all of these years, you've never
asserted that the '9 -- that the '947 patent was
invalid, right?
         A.   I don't believe I have.  I didn't have any
reason to believe it was, and I don't believe I've
asserted that today.
         Q.   And it wasn't until today, within the last few
months when you were hired by the Defendants, that you
came forward with facts that you believe invalid -- that
they assert invalidate the patent, right?
         A.   You're -- you're juxtaposing a couple of
events together there.
              It wasn't until I carefully reviewed the facts
and refreshed my knowledge of the timeline, and then
somebody told me that that might mean the patent was
invalid.
              Frankly, that was a surprise to me.  I had no
idea that the -- that the timeline, as I understood it,
meant that the patent was invalid.
                   MR. FENSTER:  I have no further
questions.
                   THE COURT:  Redirect?
                   MR. PERLSON:  Yes, Your Honor.
And can we approach?
                   THE COURT:  Yes.

1            (Bench conference.)

2            MR. PERLSON:  I think you mentioned that

3 before we go into the e-mails with Plaintiff's counsel

4 that we should approach.

5            THE COURT:  You can ask the question

6 whether the Plaintiff previously tried to retain -- or

7 someone associated with the Plaintiff or representing

8 them previously tried to retain his services as a

9 consultant and the date on which that occurred or the

10 general time that occurred.

11            If he denies that, you need to approach

12 him with the e-mail.

13            But I think you opened the door to that

14 line of questioning with your last couple of questions,

15 Mr. Fenster, okay?

16            MR. PERLSON:  Okay.  And --

17            THE COURT:  You understand?

18            MR. PERLSON:  Yeah.

19            Can I say that he was told that he

20 thought he may be one of the only people who knew that

21 information at --

22            THE COURT:  Well, no.  Don't go into -- I

23 mean, just --

24            MR. PERLSON:  Just don't go into the

25 substance.

                    THE COURT:  Don't go into the substance.

Limit it to the fact that one of the lawyers

representing the Plaintiff previously sought to retain

his services as a consultant back in whatever the time

was, okay?

                    MR. PERLSON:  Okay.

                    (Bench conference concluded.)

                    <u>REDIRECT EXAMINATION</u>

<u>BY MR. PERLSON:</u>

     Q.   Now, Mr. Williams, I have a few questions for

you.  You were moving around pretty fast there, so let

me just try to get a couple of things clear.

          First of all, as regards to the IAAI, do you

have any reason to believe that they had any idea that

as -- as Plaintiff contends and Mr. Rice testified, that

the EZ Reader article was false on the date of

deployment of the -- of the EZ Reader?

     A.   I -- I -- I have every reason to believe they

would not believe any statement in the paper was false

or else they would not have accepted it and published

it.

     Q.   Okay.  In your experience in dealing with that

entity, would -- do you think that they ever would have

respond -- or would have published an article knowing

that it was false?

1    A.    Definitely not.

2              MR. FENSTER:  Objection, speculation.

3              THE COURT:  Overruled as to that

4    question.

5    Q.    (By Mr. Perlson) And I want to put on one of

6    the -- one of the parts of your testimony that

7    Mr. Fenster had showed me.  Whoops.  If I can get it in

8    the right direction.

9              Now, we were jumping around quite a bit, and

10   one of the things that --

11             THE COURT:  Come to his rescue,

12   Mr. Verhoeven.

13             MR. PERLSON:  Yes.  Yes.  Please, please

14   help me.  At the bottom.  That's why.  It was upside

15   down.

16   Q.    (By Mr. Perlson) Okay.  So if you look on

17   the -- on the -- on the bottom there, can you just read

18   this portion of your testimony starting here

19   (indicates)?  I think --

20   A.    Starting at:  So it is?

21   Q.    Yeah.  I think that we went above and below

22   quite a bit, and we were moving around a lot, but I

23   don't think Mr. Fenster ever actually allowed you to

24   read that.  So can you do that, sir?

25   A.    Sure.

1          My testimony was:  So it is -- I can't -- it

2   is quite possible it would have been responding to real

3   Chase customer e-mails before that date, if not

4   probable, but not have, quote, been deemed in

5   production.

6          My understanding was that it was deemed in

7   production on that weekend, the 30th and 31st.

8      Q.   Okay.  And -- but Mr. Fenster had shown you

9   this demonstrative with the critical date of April 3rd,

10  1996.

11         Remember that?

12     A.   I do now, yes.

13     Q.   Yeah.  And is March 30 and 31st before that

14  date?

15     A.   Yeah, I believe it is, last time I looked at

16  the calendar.

17     Q.   Okay.  And that's also consistent with the EZ

18  Reader article that says that the EZ Reader was deployed

19  in the first quarter of 1996; is that right?

20     A.   Yes, it is.

21              MR. PERLSON:  I have no further

22  questions, Your Honor.

23              THE COURT:  Okay.

24              Re-recross?

25                  RECROSS-EXAMINATION

BY MR. FENSTER:

Q.   Remember you testified at your deposition that you didn't specifically recall a single person telling you that it actually -- confirming that it had gone live on that date?

A.   That's correct.

MR. FENSTER:  No further questions.

THE COURT:  Anything in addition?

MR. PERLSON:  Yeah.

Let's just pull up Exhibit -- Exhibit -- what's the EZ Reader, 30?  Third page.

And enlarge the part right in the middle regarding the date.

REDIRECT EXAMINATION

BY MR. PERLSON:

Q.   Phase 1 of the EZ Reader -- of the EZ Reader was deployed in the first quarter of 1996 and handles up to 80 percent of incoming e-mail automatically depending on message content?

Do you see that?

A.   Yes, I do.

Q.   Is that consistent with your recollection?

A.   Yes, it is.

Q.   Okay.

MR. PERLSON:  No further questions, Your

Honor.

THE COURT:  Anything else, Mr. Fenster?

MR. FENSTER:  No, Your Honor.

THE COURT:  May this witness be excused to go back to Hawaii?

THE WITNESS:  Thank you.

MR. FENSTER:  Yes, Your Honor.

MR. PERLSON:  Yes, Your Honor.

THE COURT:  Thank you for coming.  Please travel safely.

All right, Ladies and Gentlemen.  We're going to break for lunch at this time.  Take an hour and 15 minutes.  I'll see you back at 1:15.  Remember my prior instructions, and don't talk about the case.

LAW CLERK:  All rise.

(Jury out.)

THE COURT:  All right.  Have a seat.

And I'll see you back at 1:15.  We've got the first draft of the Court's charge.  We'll convene after we finish evidence this afternoon for the purposes of having an informal charge conference.  Be about 5:00 or 5:15 or so in my estimation.

Yes, sir?

MR. SPANGLER:  Your Honor, can I approach?

1              We have reached an agreement with the

2 Defendants just to admit a few more pieces of evidence.

3              THE COURT:  Okay.  Housekeeping?  Is this

4 by agreement?

5              MR. SPANGLER:  Yes, sir.

6              THE COURT:  All right.

7              MR. PERLSON:  What is it?

8              MR. SPANGLER:  I was told it was agreed

9 to.  Mr. Hoffman --

10              (Sotto voce discussion.)

11              MR. SPANGLER:  Okay, Your Honor.

12              THE COURT:  Well, that's okay.  Just

13 address it over the lunch hour, and if there's a

14 problem, I'll be around to address it.

15              MR. SPANGLER:  All right.  Thank you,

16 Your Honor.

17              THE COURT:  Be in recess until 1:15.

18              (Lunch recess.)

19              *     *     *     *

20

21

22

23

24

25

CERTIFICATION


        I HEREBY CERTIFY that the foregoing is a

true and correct transcript from the stenographic notes

of the proceedings in the above-entitled matter to the

best of my ability.




/s/_____          _____
SUSAN SIMMONS, CSR                       Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10




/s/_____          _____
JUDITH WERLINGER, CSR                Date
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date:  12/31/10