1    IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3  BRIGHT RESPONSE, LLC          *    Civil Docket No.
                                 *    2:07-CV-371
4  VS.                           *    Marshall, Texas
                                 *
5                                *    August 6, 2010
   GOOGLE, INC., ET AL           *    1:15 P.M.
6
                   TRANSCRIPT OF JURY TRIAL
7       BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
              UNITED STATES MAGISTRATE JUDGE
8

9  APPEARANCES:

10 FOR THE PLAINTIFF:      MR. ANDREW SPANGLER
                           Spangler Law
11                         208 North Green Street
                           Suite 300
12                         Longview, TX    75601

13                         MR. MARC A. FENSTER
                           MR. ANDREW WEISS
14                         MR. ADAM HOFFMAN
                           MR. ALEX GIZA
15                         Russ, August & Kabat
                           12424 Wilshire Boulevard
16                         12th Floor
                           Los Angeles, CA    90025
17
                           MR. DAVID M. PRIDHAM
18                         Law Office of David Pridham
                           25 Linden Road
19                         Barrington, RI  02806

20 APPEARANCES CONTINUED ON NEXT PAGE:

21
   COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
22                         MS. JUDITH WERLINGER, CSR
                           Official Court Reporter
23                         100 East Houston, Suite 125
                           Marshall, TX    75670
24                         903/935-3868

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:     MS. ELIZABETH A. WILEY
                       The Wiley Firm
                       P.O. Box 303280
                       Austin, TX   78703

                       MR. PATRICK R. ANDERSON
                       Patrick R. Anderson, PLLC
                       4225 Miller Road
                       Building B-9, Suite 358
                       Flint, MI   48507

                       MR. JOHN C. HUESTON
                       MR. ADAM S. GOLDBERG
                       Irell & Manella, LLP
                       840 Newport Center Drive
                       Suite 400
                       Newport Beach, CA   92660

FOR THE DEFENDANT:     MR. CHARLES K. VERHOEVEN
(Google)               MR. DAVID A. PERLSON
                       MS. AMY H. CANDIDO
                       Quinn Emanuel Urquhart & Sullivan
                       50 California Street
                       22nd Floor
                       San Francisco, CA   94111

                       MS. JENNIFER PARKER AINSWORTH
                       Wilson Robertson & Cornelius
                       P.O. Box 7339
                       Tyler, TX   75711

FOR THE DEFENDANT:     MS. JENNIFER HALTOM DOAN
(Yahoo!)               Haltom & Doan
                       6500 Summerhill Road
                       Suite 100
                       Texarkana, TX   75503


APPEARANCES CONTINUED ON NEXT PAGE:

APPEARANCES CONTINUED:

FOR THE DEFENDANT:        MR. WILLIAM ROOKLIDGE
(Yahoo!)                  Howrey, LLP
                          4 Park Plaza, Suite 1700
                          Irvine, CA   92614

                          MR. JASON WHITE
                          Howrey, LLP
                          321 North Clark Street
                          Suite 3400
                          Chicago, IL   60610

                *      *      *      *      *      *


                    P R O C E E D I N G S

                LAW CLERK:  All rise.

                (Jury in.)

                THE COURT:  Please be seated.

                Who will be your next witness?

                MS. DOAN:  Your Honor, at this time, we

call Rosanna Piccolo, Chase employee.  We call her by

videotape.

                THE COURT:  All right.

                MS. DOAN:  Your Honor, this does have

both designations of the Plaintiff and the Defendant.

                THE COURT:  All right.  If you will lower

the lights, please.

                (Video clip playing.)

                QUESTION:  Can you please state and spell

1  your name for the record.

2              ANSWER:  First name, Rosanna,

3  R-O-S-A-N-N-A, last name, Piccolo, P-I-C-C-O-L-O.

4              QUESTION:  Okay.  If I refer to the '947

5  patent, do you know what that is?

6              ANSWER:  I believe it is the patent that

7  my -- my company, Chase Manhattan Bank, is part of with

8  the work that I performed when I worked for -- when I

9  worked for them.

10             QUESTION:  Okay.  And you understand you

11  are a named inventor on the patent?

12             ANSWER:  Yes.

13             QUESTION:  What is the EZ Reader?

14             ANSWER:  EZ Reader is the name of the

15  application that was given to this software application.

16             QUESTION:  The software application that

17  was eventually patented in the '947 patent?

18             ANSWER:  Correct.

19             QUESTION:  Okay.  What were -- what was

20  your position at the time of the development of the EZ

21  Reader?

22             ANSWER:  I was what you would call a

23  project manager.  I was the liaison between the

24  business, who we were developing this application for

25  within Chase, and the -- and the vendor that was

1  creating this application for us.

2             QUESTION:  Was the EZ Reader application

3  ever deployed at Chase?

4             ANSWER:  Yes.

5             QUESTION:  And when was that?

6             ANSWER:  I believe it was either late '95

7  or early '96.

8             QUESTION:  And what -- what forms the

9  basis for your recollection of that timeframe?

10             ANSWER:  I know that I participated in a

11  conference in '96, and I believe that the application

12  was already up and running in what we would call a

13  production environment.

14             QUESTION:  Okay.  And was it being used

15  to -- in this production environment, was it responding

16  to e-mails from customers at that point?

17             ANSWER:  Yes.

18             QUESTION:  Okay.  If you could look on

19  the same page down, I guess, in the -- in the first

20  paragraph here towards the middle in the abstract, it

21  says:  Phase 1 of EZ Reader was deployed in the first

22  quarter of 1996 and handles up to 80 percent of incoming

23  mail automatically.

24             You see that?

25             ANSWER:  Yes.

1          QUESTION:  Is -- is it your understanding

2 that that is accurate?

3          ANSWER:  I believe so.

4          QUESTION:  Okay.  And is this what you

5 were referring to earlier, when you were indicating that

6 you thought that the EZ Reader had been deployed in this

7 timeframe?

8          ANSWER:  Yes.

9          QUESTION:  Okay.  Does this article

10 that's in Cohen Exhibit 4 describe the EZ Reader product

11 that was deployed in the first quarter of 1996?

12          ANSWER:  To the best of my knowledge,

13 yes.

14          QUESTION:  Do you know why you were added

15 as an inventor?

16          ANSWER:  I believe because I was the

17 project manager for Chase.

18          QUESTION:  On the EZ Reader project?

19          ANSWER:  Correct.

20          QUESTION:  Referring to the EZ Reader, it

21 says:  The application combines preprocessing rules for

22 parsing and case-based retrieval with a domain specific

23 knowledge base.  Other text interpretation applications

24 have successfully used a hybrid approach.

25          Do you see that?

1          ANSWER:  Yes.

2          QUESTION:  Do you have any reason to

3 believe that that is not accurate?

4          ANSWER:  I -- I don't.  I have no -- no

5 comments.  I really don't -- I don't know.

6          QUESTION:  And just -- and I just want to

7 be clear, it's correct that the EZ Reader was used as

8 Chase's external public e-mail system to respond to

9 customers' e-mail prior to April, 1996?

10          ANSWER:  Correct.

11          QUESTION:  And so prior to April 1996,

12 the EZ Reader would have been used to respond to real

13 customers' e-mails?

14          ANSWER:  Correct.

15          QUESTION:  And by real customers, I mean

16 the actual customers of Chase?

17          ANSWER:  Correct.  Customers or potential

18 customers.

19          QUESTION:  Prior to April 1996, the EZ

20 Reader was receiving electronic messages from a source

21 such as a customer, right?

22          ANSWER:  Correct.

23          QUESTION:  And is it your understanding

24 that prior to April of 1996, that the EZ Reader would be

25 interpreting electronic messages using rule-based and

1  case-based knowledge engines?

2                ANSWER:  Yes.

3                QUESTION:  And is it your understanding

4  that prior to April of 1996, the EZ Reader would

5  retrieve one or more predetermined responses

6  corresponding to the interpretation of them by the

7  rule-based and case-based knowledge engine for delivery

8  back to the source, i.e., the customer?

9                ANSWER:  Yes.

10                QUESTION:  One of the things that you had

11  mentioned before that the EZ Reader did was -- that --

12  that sometimes the e-mail would be sent to a person to

13  review and respond, and then sometimes it would be

14  responded to automatically; is that correct?

15                ANSWER:  Correct.

16                QUESTION:  Okay.  And was that true in

17  the system that was deployed prior to April 1996?

18                ANSWER:  Yes.

19                MR. WEISS:  Before we continue, Rosanna

20  wanted to clarify a prior question you had asked her,

21  which was, was EZ Reader deployed prior to April 1996.

22                ANSWER:  And I based my answer on what I

23  recall, going to the conference, that AAAI conference in

24  August, September, and along with the documentation that

25  I -- that I reviewed, that I based my answer on that.

1   But I do not recall the specific month or day when it

2   was actually put into production.

3                   QUESTION:  If you look in the abstract,

4   it says in the middle of the page there, Phase 1 of the

5   EZ Reader was deployed in the first quarter of 1996, and

6   handles up to 80 percent of the incoming mail

7   automatically?

8                   ANSWER:  Correct.  I see it.

9                   QUESTION:  Okay.  And so -- so to the

10  best of your recollection, that's accurate, right?

11                  ANSWER:  I cannot say for certain -- with

12  certainty exactly when it was deployed.

13                  QUESTION:  Do you recall whether

14  Brightware made presentations to Chase on the EZ Reader?

15                  ANSWER:  Yes.

16                  QUESTION:  And how often did that occur?

17                  ANSWER:  This particular document, I see

18  the Chase logo is different, so I don't know whether

19  this was after the Chase/Chemical merger, because the

20  logo was changed.

21                  QUESTION:  Uh-huh.

22                  ANSWER:  I know that we made

23  presentations to the new technology management team that

24  consisted more of Chemical Bank senior executives.

25                  QUESTION:  Okay.  When did that merger

take place?

ANSWER:  Oh, I believe '96, '97.  I don't know specific -- specific dates.

QUESTION:  On Rice 359, August 15th, 1995, one of the -- one of the tasks for you, the third one down, says develop a document outlining decisions that need to be made regarding testing.

ANSWER:  Yes, I see it.

QUESTION:  Do you know what that is?

ANSWER:  Specifically, no.  I believe it was a test plan, to develop a test plan, but specifically, no, I don't recall the exact document that was created.

QUESTION:  Do you recall the timing of the test plan?

ANSWER:  No.

QUESTION:  So it -- was it deployed at the time -- was EZ Reader deployed at the time this manual was created?

ANSWER:  I believe so, but I cannot say with certainty specifically when it was deployed.

QUESTION:  And then underneath it says: I acknowledge the duty to disclose all information known to be material to patentability in accordance with Title 37, Code of Federal Regulations 156.

1                    Do you see that?

2                    ANSWER:  Yes.

3                    QUESTION:  Were you aware of the scope of

4    your duty to disclose pursuant to that title and section

5    at the time you signed this?

6                    ANSWER:  I believe that before I signed

7    it, it was reviewed by Chase Legal, and I was given the

8    approval to sign it.

9                    QUESTION:  Okay.  That's not really my

10   question.  My question is whether you personally

11   understood what your duty was to disclose information

12   under Title 37, Section 156 that's referred to there?

13                   ANSWER:  I believe so.

14                   QUESTION:  Why -- why do you believe

15   that?

16                   ANSWER:  Why do I believe it?

17                   It is not my practice to sign documents

18   before understanding what they are or before obtaining

19   prior approval.

20                   QUESTION:  I want to direct your

21   attention back to what has been marked as Exhibit

22   Cohen 5 as JP -- Production No. JPM30 on the front page

23   of it.

24                   And do you recall when -- referring to

25   the AAAI conference, do you recall when that conference

1  took place?

2  ANSWER:  I believe it was either August

3  or September of 1996.

4  QUESTION:  And are you basing that --

5  that answer on reviewing the cover page, or is that just

6  your general recollection of when you attended the

7  conference?

8  ANSWER:  It was based on looking on the

9  search itself, on the internet.

10  QUESTION:  So we've already established

11  that you can with certainty that was done -- that was

12  deployed before 2000.

13  Can you state with certainly that it was

14  deployed as of the time you attended the AAAI conference

15  in 1996, it being the EZ Reader software.

16  ANSWER:  Yes, I believe so.

17  QUESTION:  But prior to your attendance

18  of the AAAI -- excuse me -- AAAI conference in 1996, you

19  have no direct recollection of when the EZ Reader

20  software was deployed, correct?

21  ANSWER:  That is correct.

22  QUESTION:  Okay.  And this, again, is the

23  AAAI article, correct?

24  ANSWER:  Correct.

25  QUESTION:  And you are listed as a -- an

author of the document?

                    ANSWER:  Correct.

                    QUESTION:  And do you have any reason to

believe that the contents of Cohen Exhibit 4, this

article, are incorrect?

                    ANSWER:  No, I do not.

                    QUESTION:  And if you had noticed

something that was incorrect in a document that had your

name on it, would it have been your normal practice to

point that out and try to get it fixed?

                    ANSWER:  Yes.

                    (End of video clip.)

                    THE COURT:  Does that complete the offer?

                    MS. DOAN:  It does, Your Honor.

                    THE COURT:  Who will be your next

witness?

                    MS. DOAN:  Our next witness is Anthony

Angotti, and he -- we had a problem with the last

videotape, Your Honor, so we're going to read it in.

It's really short.

                    THE COURT:  Okay.

                    MS. DOAN:  He's a Chase employee as well.

                    THE COURT:  Are you going to be

presenting?

                    MS. DOAN:  I am going to do the questions

1    and have Mr. Thames read the answers. Is that okay?

2                    THE COURT: Well, for both sides of the

3    case?

4                    MS. DOAN: Yes, sir. That's my

5    understanding.

6                    THE COURT: All right. For convenience

7    purposes, Ladies and Gentlemen, she's going to read the

8    questions that were asked by both the Defense side of

9    the case as well as the Plaintiff's side of the case.

10   Let's proceed.

11                    (Excerpt read.)

12                    QUESTION: Good morning, Mr. Angotti.

13                    ANSWER: Good morning.

14                    QUESTION: Okay. Were you involved in

15   the development of a product called EZ Reader?

16                    ANSWER: Yes, I was.

17                    QUESTION: What was your role in that

18   project?

19                    ANSWER: My role in that project is

20   that -- that was one of the projects that I was -- I had

21   management responsibility for.

22                    QUESTION: Who was on the team that was

23   working on EZ Reader?

24                    ANSWER: I don't -- I don't think I can

25   recall every name, but the main group that was working

on it was Amy Rice, Julie Hsu, and Rosanna Piccolo.  I

was also a part of that subteam.  That was the main

nucleus group that carried on the day-to-day kind of

project.

There were other folks that got involved

in the business unit and an IT group, but, you know,

they played various support roles, project management

roles.

Connie Lynch was part of the team, not EZ

Reader per se, but she worked closely with Amy -- Amy

Rice, on the list of products that we were working on.

QUESTION:  And you said the EZ Reader was

deployed by the first quarter of 1996; is that right?

ANSWER:  Yes.

QUESTION:  Okay.  Understood.

You keep referring to the first quarter

of 1996.  Do you have any more specific recollection of

the deployment date for EZ Reader?

ANSWER:  I do, yes.

QUESTION:  What is that?

ANSWER:  I recollect seeing a date in the

AAAI article that was published.  I think it was March

20-something.  So it was -- that's the date that I

recall just having seen there, but I've always referred

to it as the first quarter.  That's consistent with my

1  project management.

2         QUESTION:  Right.  So based on your

3  memory and recollection, is it consistent that -- let me

4  start over.

5         Is this description consistent with your

6  memory of where the project stood as of the first

7  quarter of 1996?

8         ANSWER:  It's not consistent with my --

9  with my memory, because I had nothing to do with the

10  corporate side.  I -- that's just not -- you know, I

11  didn't have any role with, you know, chase.com.

12         QUESTION:  I see.  So you're not in a

13  position to say whether that happened or not?

14         ANSWER:  That's correct.  I am not in the

15  position to say that.  And, again, if this -- this

16  document is on or before -- on or after the date that's

17  written on here, it's -- again, my involvement was

18  really tailing off there.

19         QUESTION:  You have no reason to believe

20  anything in this document is not accurate?

21         ANSWER:  No.

22         QUESTION:  Is that correct?

23         ANSWER:  No.

24         QUESTION:  I mean, focusing just on that

25  paragraph then that we've been discussing?

1          ANSWER:  I just -- I don't have any basis

2    to comment either way.

3          QUESTION:  Got it.  Okay.

4          Do you recall if you reviewed the document

5    before it was published or submitted to the AAAI?

6          ANSWER:  Yes.  I did review it.  There's

7    certain policies within Chase about documents that go to

8    the external world, that they have to go through a

9    process of being reviewed.  And I was one of the

10   reviewers.

11         QUESTION:  So generally speaking, though,

12   had there been something in your review of this document

13   that jumped out at you as being not accurate with

14   respect to EZ Reader, would you have made sure that was

15   corrected before the article was sent outside the

16   company?

17         ANSWER:  Yes.

18         QUESTION:  That's fine.  Take your time.

19         Farther down in the paragraph, it says

20   that Phase 1 of EZ Reader was deployed in the first

21   quarter of 1996 and handled up to 80 percent of incoming

22   mail automatically depending on message content.

23         ANSWER:  Yes, I see that.

24         QUESTION:  Is that consistent with your

25   testimony earlier today that EZ Reader was deployed by

1  the first quarter of 1996?

2            ANSWER:  Yes, it is consistent.

3            QUESTION:  I believe this is the same

4  thing we were just looking at.  However, it has some

5  handwriting on it.

6            ANSWER:  The cover and -- and it has the

7  date on the cover, on the front page as well.  It looks

8  like --

9            QUESTION:  Oh, yes.

10           ANSWER:  -- it's either August 18th, 1996

11 or April.

12           QUESTION:  On the first page of text --

13 I'm sorry -- on the first page of text in the

14 handwriting at the bottom, it says August 4th through

15 8th, 1996.

16           ANSWER:  Okay.

17           QUESTION:  Is that consistent with your

18 memory and what it looks like on this first page?

19           ANSWER:  No, but it makes sense it would

20 be that.  I just recall that it's in 1996.  It's

21 consistent with my recollection.

22           QUESTION:  Did you provide any input on

23 what was actually claimed in the patent?

24           ANSWER:  Yes.  In terms of what the

25 patent is for?

1          QUESTION:  Yes.

2          ANSWER:  Yes.

3          QUESTION:  Do you believe that Chase

4 benefited by having deployed the EZ Reader system?

5          ANSWER:  I believe that Chase benefited

6 from having EZ Reader deployed in the first quarter of

7 1996 as follows:  For me, the purpose of the deployment

8 was to legitimize the application and to demonstrate

9 under fire, if you will, that it was capable of doing

10 the things that we were claiming that it would do and so

11 that -- you know, in the word deploy, I mean, these

12 words are used loosely based on, you know, who the

13 orator is in terms of the words.

14          To me, deployed means implementing in

15 ChaseDirect in a production environment to legitimize

16 the application and to prove that it worked and to prove

17 that it could get -- realize the benefits that we were

18 claiming, and so that's what we did.

19          QUESTION:  And when it was deployed, was

20 it used to respond to actual --

21          ANSWER:  Yes, it was.

22          QUESTION:  -- e-mail messages, correct?

23          ANSWER:  We needed to do that to

24 substantiate the claims.

25          (End of deposition clip.)

1            MS. DOAN:  Your Honor, that completes the

2  proffer of Anthony Angotti.

3            THE COURT:  Okay.  Who will be your next

4  witness?

5            MS. DOAN:  Your Honor, we call Phil Klahr

6  by video as well, and he was the program director for

7  the AAAI conference in 1996.

8            THE COURT:  All right.  Dim the lights.

9            MS. DOAN:  And it's a Plaintiff's and

10 Defense proffer, Your Honor.

11            THE COURT:  Thank you.

12            (Video clip playing.)

13            QUESTION:  You were involved at one time

14 with a organization called the AAAI, correct?

15            ANSWER:  Right.

16            QUESTION:  How long were you involved

17 with the AAA -- AAAI?

18            ANSWER:  As a member, I probably joined

19 in graduate school.  So probably in the late '60s, early

20 '70s, 1970s.  I was studying artificial intelligence.

21 And I have a Ph.D. in artificial intelligence, so that

22 was my principal organization that I was involved in.

23 I also started working on their behalf, for example, in

24 the various program committees, and one of them is the

25 conference that you're interested in, the Innovative

1 Applications of Artificial Intelligence Conference.

2     And I was on the program committee of

3 that conference from about 1991 to 2000. And being on

4 the program committee meant that I would review papers

5 for a conference and make decisions as to whether papers

6 should appear in the conference or not.

7     QUESTION: What does AAAI stand for?

8     ANSWER: Originally, it stood for the

9 American Association of Artificial Intelligence, but it

10 became more of a global organization. So it's

11 changed -- it did not change its acronym, but it changed

12 its name to Association for the Advancement of

13 Artificial Intelligence, also AAAI.

14     QUESTION: Can you give me a little bit

15 of an overview of the process of submitting a paper to

16 the AAAI conference in hopes of being published?

17     ANSWER: Sure. The conference would

18 issue a call for papers, which was a description of what

19 the conference was looking for from the papers, an

20 address in which to submit your papers, and a date for

21 which those papers needed to be submitted.

22     Papers would then be sent to the

23 conference. There was a program committee consisting of

24 about eight to ten professionals, each of which would

25 independently review some subset of those papers. Each

1  paper typically had two reviewers.

2  And then the program committee would then

3  meet together face-to-face and go through all of the

4  papers, the reviews of the papers, and make a decision

5  on each paper in terms of acceptance, rejection, or some

6  other disposition.

7  The authors of the papers would then be

8  notified, and for those papers that were accepted, they

9  had to provide the final versions of their papers to the

10  AAAI for publication in a book.

11  QUESTION:  Were papers that were

12  submitted to the IAAI kept confidential?

13  ANSWER:  Yes.

14  QUESTION:  Do you have any personal

15  knowledge about the EZ Reader project?

16  ANSWER:  No, other than what I've read in

17  the Rice paper.

18  QUESTION:  So you agree that at least as

19  of December 21st, 1995, Mr. Shrobe was likely aware that

20  the EZ Reader project was not deployed at that time,

21  correct?

22  ANSWER:  I would agree with that.

23  QUESTION:  Okay.  Do you have any

24  understanding of what Mr. Shrobe would likely have been

25  aware of after that time, December 21st, 1995?

1          ANSWER:  I do not.

2          QUESTION:  You would agree that at least

3 as of December 21, 1995, Mr. Shrobe encouraged a paper

4 like the Rice article be submitted to the IAAI

5 conference for consideration, correct?

6          ANSWER:  Yes.

7          QUESTION:  Do you have any personal

8 knowledge as to whether Mr. Shrobe or anyone else

9 actually checked to see whether the EZ Reader project

10 described in the Rice article was deployed at the time

11 of the PC meeting?

12          ANSWER:  No, I do not.

13          QUESTION:  Mr. Khlar, could you please

14 describe the purpose of the IAAI conference?

15          ANSWER:  Yes.  The IAAI conference was

16 created to showcase business uses of artificial

17 intelligence technology.  And the best way to do that

18 was to have papers that described applications that were

19 deployed in an operation within a business environment

20 and that had achieved business success.

21          And by encouraging papers of that sort,

22 it would broadcast to the business community the

23 relevance and importance of using artificial

24 intelligence technology in the business community.

25          QUESTION:  Were you on the 1996 IAAI

committee that considered the EZ Reader article for

publication?

ANSWER: I was.

QUESTION: Okay. I'd like you to look at

Khlar Exhibit 2, which is your declaration, and

specifically at Exhibit A.

What's the title of this document?

ANSWER: The title is The Eighth Annual

Innovative Applications of Artificial Intelligence

Conference Call for Papers, Panels and Invited Talks.

QUESTION: Do you recognize this

document?

ANSWER: I do.

QUESTION: Can you describe what the

document is?

ANSWER: The document describes the goals

of the IAAI conference, and more specifically, discusses

the criteria for admission of papers to the conference

and what the criteria are and what the program committee

is looking for in papers for this conference.

It also lays out invitations for invited

speakers that perhaps want to present or panels to

organize for the conference, as well as laying out the

dates of submission and the timetable and where to

submit papers and suggestions for the conference.

1    QUESTION:  Does this document describe

2  the guidelines and requirements that would have been

3  applied to the EZ Reader article that was submitted to

4  the IAAI in 1996?

5    ANSWER:  Yes, very specifically.

6    QUESTION:  Do you see the heading in this

7  document entitled IAAI Case Study Papers?

8    ANSWER:  I do.

9    QUESTION:  Can you please describe what a

10 case study paper is?

11    ANSWER:  Yes.  As it says explicitly,

12 papers must describe deployed applications with

13 measurable benefits.

14    QUESTION:  And what does it mean to

15 say -- or do you have any understanding of what this

16 paper means when it says deployed applications?

17    ANSWER:  Yes, I do.  It means that

18 applications are in use -- are being used in the

19 business environment by corporations, so actually

20 deployed, implemented, and in use in achieving benefits.

21    QUESTION:  Did the IAAI have any

22 requirements for publishing case study papers?

23    ANSWER:  The requirements are laid out in

24 this call for papers document.

25    QUESTION:  And what are those

1  requirements?

2          ANSWER:  The paper has to describe a

3  deployed application.  Again, an application that's used

4  in -- in business, not just being tested but actually in

5  use, and giving corporations some measurable benefits

6  for those particular applications.

7          It also lays out pretty much an outline

8  of what the paper should be and what the different

9  components of the paper should be, namely, a description

10  of the problem, a description of the program, the use,

11  the current use of the application and its payoff, how

12  it was built, what the development was like, and how the

13  application is being maintained now that it's in

14  deployment.

15          QUESTION:  Would the IAAI committee have

16  considered a case study paper for publication if it had

17  reason to believe that the system had not been deployed?

18          ANSWER:  For the 1996 conference, no.

19          QUESTION:  For the 1996 conference, would

20  the IAAI committee have considered a case study paper

21  for publication if it described a system that was being

22  tested with successful results but had not yet been

23  deployed publicly?

24          ANSWER:  No.  I mean, typically, the

25  recommendation would be to submit the paper again next

1  year once it was actually deployed.

2             QUESTION:  Are there any circumstances

3  under which the program committee would have waived its

4  requirement that case study papers describe an

5  application that was actually deployed?

6             ANSWER:  Not in '96, no.

7             QUESTION:  Were there any circumstances

8  in 1996 under which the IAAI would have allowed a paper

9  to be published if it had false or inaccurate

10  statements?

11            ANSWER:  Absolutely not.

12            QUESTION:  How seriously did the IAAI

13  consider its requirement to published papers to be

14  factually accurate?

15            ANSWER:  The IAAI organization is a

16  highly integrable organization, and there's no way they

17  would publish a paper knowing that there was false

18  information or inaccurate information in it.

19            QUESTION:  And how seriously did the IAAI

20  consider its requirement that published case study

21  papers describe an application that had already been

22  deployed in the field?

23            ANSWER:  It was a firm requirement.

24  Those were the papers we were looking for, and that was

25  whole purpose of the conference was to showcase deployed

1   applications.

2            QUESTION:  Okay.  I'd like you to please

3   turn to Exhibit B in your declaration.  Can you please

4   describe what you're looking at?

5            ANSWER:  I'm looking at the -- a copy of

6   the EZ Reader paper that appeared -- it looks like the

7   copy is directly from the proceed -- published

8   proceedings of that conference.  It lists page numbers

9   as well.  So it's a copy of the article from the

10  proceedings.

11           QUESTION:  Was this paper accepted for

12  publication by the IAAI?

13           ANSWER:  Yes.

14           QUESTION:  And do you have any

15  understanding of when the IAAI would have met to decide

16  whether or not to allow this paper to publish?

17           ANSWER:  It would be March 1996.

18           QUESTION:  Did this paper meet the

19  requirements of the IAAI for publication?

20           ANSWER:  It did.

21           QUESTION:  Are you aware of the IAAI

22  having any information that the statements in this

23  article were false or misleading?

24           ANSWER:  No.

25           QUESTION:  Were you personally aware of

1  any false or misleading statements in this article?

2                  ANSWER:  No.

3                  QUESTION:  Are you aware of any case

4  study articles that were published by the IAAI in 1996

5  that described a system that was not actually deployed?

6                  ANSWER:  No.

7                  (End of video clip.)

8                  MS. DOAN:  Your Honor, that completes the

9  proffer of Phil Khlar.

10                  THE COURT:  Okay.  Who will be your next

11 witness?

12                  MS. CANDIDO:  Your Honor, Defendants call

13 Chris Bakewell.

14                  THE COURT:  Mr. Bakewell.

15                  Was this witness previously sworn?

16                  MS. CANDIDO:  I don't think he has been.

17                  THE COURT:  All right.  Come around and

18 allow Ms. Lockhart to administer the oath.

19                  (Witness sworn.)

20 WILLIAM CHRISTOPHER BAKEWELL, DEFENDANTS WITNESS, SWORN

21                      DIRECT EXAMINATION

22 BY MS. CANDIDO:

23     Q.   Good afternoon, Mr. Bakewell.

24     A.   Good afternoon.

25     Q.   Would you state your full name for the record.

1    A.    My name is William Christopher Bakewell.  I go

2  by Chris.

3    Q.    Mr. Bakewell, please tell the jury where you

4  are from and a little bit about yourself.

5    A.    Well, I live in Sugar Land, Texas.  I am

6  married.  I've been married for 18 years.  I have three

7  children, an 8-year-old boy, a 10-year-old girl, and a

8  very complicated 13-year-old boy.

9    Q.    What do you do for a living?

10    A.    I am a management consultant.  I -- I focus on

11  the valuation of intellectual property assets.

12    Q.    Are you employed by a firm?

13    A.    I am.  I work for a firm called Duff & Phelps

14  where I am a managing director.

15    Q.    What is your area of expertise?

16    A.    My area of expertise is valuation of

17  intellectual property rights.

18    Q.    What is your educational background?

19    A.    Well, I received a bachelor's degree from

20  Bradley University in Peoria, Illinois.  That was in

21  business management and administration.

22          I received a master's degree from the

23  University of Maryland at College Park.  That was in

24  finance, an MBA in finance.

25    Q.    Did you receive either of those degrees with

1  honors?

2      A.   I did.  They both were with honors.  The

3  undergraduate degree was with high honors, and then

4  graduate school, I was a graduate fellow.

5      Q.   Have you been published in the area of

6  intellectual property valuation?

7      A.   Yes, ma'am, I have.  I've had several articles

8  published on the valuation of intellectual property in

9  peer-reviewed journals.  I've also had articles

10  published on licensing.

11      Q.   And do you have a chapter of a book coming out

12  soon?

13      A.   I do.  It will be out in a couple of months.

14      Q.   Have you ever negotiated any real-world patent

15  licenses?

16      A.   Yes, I have.  In my career, in my 20 years

17  that I've been working, plus or minus, I've spent about

18  eight years in industry where I had responsibility for

19  negotiating complex contracts, which included patent

20  licenses.

21          And then in my career as a consultant, I

22  advise companies as to decisions and financial aspects

23  of license agreements.

24      Q.   Do you have any professional certifications?

25      A.   Yes, ma'am, I do.  I am an accredited senior

appraiser focusing on business valuation, and in
particular, I focus on valuation of intellectual
property rights and IP-rich businesses.

I'm also a certified licensing professional.
That's a designation from the Licensing Executive
Society.  It's the type of licensing that we're talking
about here today.

Q.   Have you been qualified as an expert witness
in federal court before?

A.   Yes, ma'am, I have.

Q.   And have you ever worked as an expert witness
in a patent case with Google before?

A.   Yes, I have.  I think three times.

Q.   This is your third time?

A.   Yes, ma'am.

Q.   Have you been asked to perform a damages
analysis in this case?

A.   Yes, I have.

Q.   Is your firm, Duff & Phelps, being paid for
your time in connection with the case?

A.   My firm is paid $475 an hour for my time.

Q.   And what is the total amount that Duff &
Phelps has billed in connection with this matter to
date?

A.   Approximately $250,000.

1     Q.   Does your compensation in any way depend on

2 the outcome of this litigation?

3     A.   No, ma'am, not in any way.

4     Q.   Does the compensation of your firm, Duff &

5 Phelps, depend in any way on the outcome of this

6 litigation?

7     A.   No, ma'am, not at all.

8          MS. MS. CANDIDO:  Your Honor, Google

9 moves to qualify Mr. Bakewell as a qualified expert in

10 patent damages.

11         MR. HUESTON:  No objection, Your Honor.

12         THE COURT:  I will hear his opinion.

13     Q.   (By Ms. Candido) Mr. Bakewell, what was your

14 assignment in this case?

15     A.   Well, it was really twofold.

16     First was to review and analyze the opinions

17 of Dr. Becker, and the second was to form my own

18 opinions regarding damages in this matter.

19     Q.   And what are your opinions regarding damages

20 in this matter?

21     A.   Well, my opinions are for a lump-sum royalty

22 to the '947 patent for Google.  The appropriate

23 reasonable royalty is $2.5 million.  That's for the life

24 of the '947 patent.

25     And over the damages period, the six years

from the alleged date of first infringement until today,
$1.1 million.

Q. Now, you understand, don't you, that Google
believes that it does not infringe the '947 patent?

A. Yes, ma'am, I do.

Q. And you understand that Google believes that
the '947 patent is invalid, correct?

A. Yes, ma'am.

Q. And you understand that Google believes that
there should be no damages in this case?

A. I do.

Q. Do you understand that?

A. Yes, I do.

Q. So why are you calculating damages for Google?

A. Well, it's essentially an exercise in case the
jury finds that there is validity, enforceability, and
infringement of the '947 patent.

Q. So in the event that the jury finds that,
Google's asked you to present your view?

A. Then there would be -- in the event, that's
correct. That's correct.

Q. So in forming your opinions, you were asked to
assume that Google infringes the patent and that the
patent is valid; is that correct?

A. Yes, ma'am. That's an assumption that I have

made.

Q.   If the patent is not infringed or the patent is invalid, then what happens?

A.   Well, there's no damages.  My testimony doesn't really matter.

Q.   Like Dr. Becker, you've also issued expert reports and been deposed in this case; is that correct?

A.   Yes, I have.

Q.   And can you give us an idea of the type and amount of information that you've reviewed in order to form your opinions in this case?

A.   I can.  I think of it in a couple of different ways.

First, back in my office, I think we have some bankers boxes that have been floating around here in the courtroom.  I have about 13 or 14 of those.  And then a lot of the documents that I have are electronic.

I had somebody in my office perform just kind of a calculation as to how many pages there are, and he said 30,000.

Q.   And what type of information did you review?  Dr. Becker explained the nature of the some of the documents he looked at, didn't he?

A.   Yes.  I reviewed the financial data, licenses, a bunch of deposition testimony, correspondence, and

1  information like that.

2      Q.    And did you hear Dr. Becker testify when he

3  was on the stand the other day?

4      A.    Yes, ma'am.  Yes, ma'am, I heard him.

5      Q.    Are there any points on which you actually

6  agree with Dr. Becker?

7      A.    Well, we're required to make some of the same

8  assumptions, and so in that regard, I think that there

9  are some points.

10     Q.    Now, Mr. Bakewell, you prepared some slides to

11 use today to help you illustrate your testimony; is that

12 right?

13     A.    Yes.  Yes, ma'am, I have.

14     Q.    I'd like to pull up the first of those.

15          MS. CANDIDO:  Ryan, could we have DX Demo

16 Slide 552, please?

17     Q.    (By Ms. Candido) Mr. Bakewell, using this

18 slide, can you tell us the areas in which you and

19 Dr. Becker agree?

20     A.    Yes, I can.  This provides, I think, a good

21 summary.

22          First, as we discussed previously, we're both

23 -- Dr. Becker and I are both required to assume that the

24 '947 patent is valid, enforceable, and infringed.  And

25 without this assumption, there's no damages.

1    We're both required to use the Georgia-Pacific
2 framework, and we both have.
3    And I've assumed a July -- July 2004
4 hypothetical negotiation date between Orion and Google.
5    Q.   And that last bullet, that's the same date
6 that Dr. Becker assumed; is that correct?
7    A.   Yes, ma'am.
8    Q.   Now, I would like you to explain to the jury
9 some more significant disagreements that you have with
10 Dr. Becker's analysis.
11    And I think we have a slide on that as well.
12    A.   Okay.
13    MS. CANDIDO:  Ryan, if you could pull up
14 DX Demo Slide 553, please.
15    Q.   (By Ms. Candido) So would you please explain
16 to the jury some of those more significant disagreements
17 that you have with Dr. Becker?
18    A.   Yes, I can.
19    First, there is a transaction that occurred
20 some six months prior to the hypothetical negotiation
21 date where the '947 patent, along with 13 other patents,
22 was sold for $1 million.
23    I don't believe it's appropriate for
24 Dr. Becker to ignore that transaction.
25    I didn't see anyplace where Google -- where

Dr. Becker utilized any of Google's patent agreements,
other than one, and that's the Stanford license, my last
bullet. And that one we're going to discuss some issues
with that. I don't think it's comparable at all.

Then I think that Dr. Becker missed some
pretty important business concepts, such as operating
freedom and the idea of royalty stacking, which I'll
explain.

Q. Is there one of these disagreements that's
more important than the others?

A. In my mind, there is, because Dr. Becker's
damages analysis is totally dependent on one license. I
think it's the last one. But I have it last, because
there's some other things that I think that we'll
discuss prior.

Q. But you believe that the Stanford license and
its treatment is your main point of disagreement --

A. Yes, ma'am.

Q. -- with Dr. Becker?

A. Yes, ma'am.

Q. Mr. Bakewell, you said that Dr. Becker ignored
Orion's purchase of the '947 patent and 13 other patents
for $1 million in January of 2004; is that right?

A. Yes.

MS. CANDIDO: Ryan, could we see DX Demo

1  Slide 556, please?

2  Q. (By Ms. Candido) And were you referring to

3  this January 2004 patent purchase agreement between

4  Orion and Firepond?

5  A. Yes, ma'am. This is exactly it.

6  Q. Why was this purchase agreement relevant to

7  your analysis?

8  A. Well, it's not very often in a patent

9  infringement damages analysis that we have a data point

10  like this where an asset is sold just months before the

11  hypothetical negotiation is to occur.

12  I think it's true, really, in any intellectual

13  property valuation exercise.

14  And so when this type of data is available, I

15  think it's very, very important and critical, and it

16  provides important information as to the value of the

17  asset.

18  Q. So, specifically, what did this purchase

19  agreement tell you about the value of the '947 patent?

20  A. Well, since there were 13 other patents that

21  were sold along with the '947 patent, we can make an

22  assumption that all of the other patents are worth

23  nothing. And if we make that assumption, the most the

24  '947 patent can be worth is $1 million.

25  So under that reasoning, the most that the

1   '947 patent can be worth is $1 million.

2      Q.  Mr. Bakewell, next on your list of

3 disagreements with Dr. Becker was that he disregarded

4 Google's real-world patent agreements.

5       What did you mean by that?

6      A.  Well, there were a variety of licenses that

7 Google produced, 10 to 15 licenses.  And we heard

8 Dr. Becker say that he didn't consider any of them as

9 appropriate for his analysis.  And I disagree.

10       I think there are some attributes of many of

11 the licenses, and three of the licenses that are

12 actually licenses and purchase agreements that are very

13 important that make them comparable and informative of

14 the reasonable royalty in this case.

15      Q.  Backing up one step, could you explain to the

16 jury what real-world Google license agreements you

17 reviewed or you started your review with?

18      A.  Sure.  So as I understand it, Google agreed to

19 produce its patent licenses that relate to search,

20 advertising, and e-mail.  And so that's where I began my

21 analysis, was to review all of those licenses.

22       MS. CANDIDO:  Ryan, would you please put

23 up DX Demo Slide 558?

24    **REDACTED BY ORDER OF THE COURT**

25



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

         MS. CANDIDO:  Ryan, would you please pull
up DX Demo Slide 560?

    Q.    (By Ms. Candido) Mr. Bakewell, would you
please explain the calculations that you performed on
this slide?

    A.    I have.  In this slide, I'm comparing the
total royalties under the agreements that we just
covered, the three most comparable and then the other
agreements to Dr. Becker's 64-million-dollar, at least,
damages opinion.

         And I counted the number of times larger
Dr. Becker's royalty opinion is than each of these
agreements.

    Q.    And just so we're clear, the licenses and the
agreements listed on this slide, many of them included
more than one patent; is that right?

1    A.    That's right.  One example is this Disney

2 agreement that included rights to 17 patents, not just

3 one.

4    Q.    And you haven't made any adjustment for that

5 here in your calculation?

6    A.    No, I haven't.

7    Q.    So it's a very conservative approach?

8    A.    In that way it is, yes.

9         MS. CANDIDO:  Ryan, would you please pull

10 up DX Demo Slide 561?

11    Q.    (By Ms. Candido) Mr. Bakewell, would you

12 please explain to the jury what this slide shows?

13    A.    This slide shows Dr. Becker's damages opinion

14 in a graphical format as to how much larger it is than

15 each of the licenses that we saw before.

16         You can see that the axis actually in order to

17 make these agreements appear, I can only make it up to

18 $30 million, and Dr. Becker's damages opinion, as you

19 know, goes well beyond that.

20    Q.    Mr. Bakewell, you also mentioned in your

21 disagreements with Dr. Becker that operating freedom was

22 a concept that Dr. Becker had ignored.

23         What do you mean by that?

24    A.    Well, I believe that we -- we have some

25 deposition testimony that explains that.  I think that I

can also explain it as well.

Q.   Well, if you could just explain --

A.   Sure.

Q.   -- first what operating freedom is.

A.   So the concept of operating freedom is that when a company, particularly in a field where products change frequently -- we heard Mr. Huber and Mr. Furrow speak yesterday or two days ago about how Google develops its product and it changes them nearly every day, if not more than that.

In a situation where products are changing all the time, what a company -- its rational objective in entering into a license agreement is getting as much freedom to operate as it can.

So it wants to be able to either use or not use the technology and not have to worry about it.

That's what's called in the industry freedom to operate.

Q.   Have you seen evidence in this case that operating freedom is important to Google and its patent licenses agreements?

A.   Yes, I have.

Q.   And did you rely on any deposition testimony in that regard?

A.   This is what I was referring to earlier.

Q.   So this is Google's licensing witness, Jack
Ancone, again?

A.   Again, this is Mr. Ancone, yes.

Q.   And you had the portion highlighted that you
were interested in.  Could you explain that to the jury,
please?

A.   That's right.

He said two things.  First, he considers and
Google considers every license on a case-by-case basis.
But what they have in the front of their mind is this
business subject of operating freedom.  And in his
words, what he says is that they want the freedom to
either do what they're doing what they have, or what
they potentially would want to do in a particular space.

Q.   And you've been in Court for a couple of days.
Have you heard any other testimony from witnesses that's
relevant to the operating freedom importance to Google?

A.   Yes, ma'am.

Mr. Huber described how Google's business is
complicated and changes frequently and sort of puts that
quote into context.

And then I think that Mr. Furrow, who
testified after Mr. Huber, put kind of a practical tone
on that in terms of how often he's involved in making
changes to their products.

Q.   Let's turn now to the Stanford agreement,
since that's your most important point of disagreement
with Dr. Becker.

A.   Yes, ma'am.

Q.   Do you recall that when Dr. Becker testified,
he discussed converting an equity grant in the Stanford
license into a running royalty rate?

A.   He did.

Q.   Do you agree with that conversion?

A.   No, ma'am, I don't.

Q.   Okay.  Let's take a look at the actual
Stanford license.

          MS. CANDIDO:  Ryan, if you could bring up
DX Demo 174, please.

Q.   (By Ms. Candido) Mr. Bakewell, do you
recognize this exhibit?

A.   This is the Stanford license itself that's
been referred to fairly often, yes.

Q.   Okay.  Let's see what Google paid for the
rights that it got from Stanford.

          MS. CANDIDO:  Ryan, to do that, would you
please display Page 6 of the agreement and highlight
Section 8?

Q.   (By Ms. Candido) Mr. Bakewell, referring to
this paragraph, would you please -- or this section,

would you please explain to the jury what Google was

paid for the rights -- excuse me -- what Google paid for

the rights that it got from Stanford?

     A.   Sure.   And I think that we can walk through

this.   It's pretty straightforward.   It looks like a lot

of words, but the numbers just sort of -- I think we can

all follow them.

**REDACTED BY ORDER OF THE COURT**

**REDACTED BY ORDER OF THE COURT**

Q.   Now, Dr. Becker valued the Stanford license differently, right?

A.   He did not value the Stanford license in the way that it's laid out in this agreement, that's correct.

Does the Stanford license itself contain any running royalty rate provisions?

A.   No, ma'am, it doesn't.  These are the royalty -- this is the royalty provision in the license itself, and there are no running royalties.

A.   Well, this agreement was entered into in 1998, and this was the value of the compensation that the parties very clearly saw at that point in time, and it's laid out in the license itself.

It's just like if you own a stock.  I've owned stock, and I remember in 2008, the value of my stock

1 went down.  And the value of my stock was the value of

2 my stock on that specific day.

3          And that's a very important concept both in

4 business and valuation, as well as damages analysis.

5 The date of evaluation is critical for determining the

6 value of an asset.

7     Q.   What's the appropriate date to use, with

8 respect to the Stanford agreement, for when to calculate

9 the value of that license to Stanford?

10    A.   This was in December of 1998, if I'm not

11 mistaken.

12

13

14 **REDACTED BY ORDER OF THE COURT**

15

16

17

18

19

20

21

22

23

24

25

**REDACTED BY ORDER OF THE COURT**

Q.   Now, again, just to be clear, did that other litigation relate to the '947 patent that's at issue here?

A.   No, ma'am, it didn't.

Q.   Was AdWords the accused product in that other case?

A.   I don't believe that it was.

Q.   So putting aside you disagree with Dr. Becker about the valuation of the Stanford license, do you agree with Dr. Becker that the Stanford license is

comparable to the hypothetical negotiation between
Google and Orion?

    A.    No, ma'am.  I think it's very different.

    Q.    Why?

    A.    Well, there's a few reasons.

          First of all, the rights that were conveyed
under this agreement were much broader than what I call
a straight patent license.

          It included rights to much more than just one
patent.  I think that the technology even in that one
patent was different.

          And I think that the date is an important
consideration as well, in that it was a different point
in Google's history.

    Q.    You mentioned that the Stanford license
conveys other technology other than the patent.  I think
you have a slide on that, so --

    A.    I do.  I think I actually had to use two
slides, if I recall correctly.

    Q.    Okay.

          MS. CANDIDO:  Ryan, would you please
bring up DX Demo 562.

    Q.    (By Ms. Candido) So this is an excerpt of a
page from that Stanford license agreement; is that
right?

1  A. That's right. These are lists in that

2 agreement. It's an appendix that's explicitly called

3 out as to the other rights that were licensed, and you

4 can see there's a variety of other rights: Dynamic Data

5 Mining, the PageRank Citation Ranking, the Google logo

6 and name, which I think is important as well, some other

7 technology and software.

8  Q. So is the second-to-last bullet and the one

9 above that talk about technology for scanning paper

10 materials, such as books, and indexing them and then a

11 clustering technology?

12  A. That's right.

13  Q. Google got all of those rights?

14  A. They did.

15  Q. The next slide that you have is DX Demo 563.

16 So this is the next page of the Stanford agreement; is

17 that right?

18  A. That's right. And it's continuing. There's

19 even more rights that were conveyed under this

20 agreement: Source code and then some implemented

21 features.

22  And then I think another important difference

23 in that -- in this agreement is that the patent

24 application that was conveyed, from that patent

25 application, six patents, I believe, eventually issued

from it.  And one of them was the '999 patent that we've

heard people talk about.

Q.   You prepared a slide comparing what Google got

in the Stanford license to what Google would get in the

hypothetical negotiation with Orion, correct?

A.   I believe that I have, yes.

Q.   Okay.

MS. CANDIDO:  Ryan, would you please pull

up DX Demo 564.

Q.   (By Ms. Candido) Would you please explain what

you've done in this slide?

A.   Okay.  Well, this slide compares what's

involved in a hypothetical negotiation that's setting on

this, I guess, disk on the left or a disk that was part

of a scale, a non-exclusive license to one patent, the

'947 patent, whereas in the Stanford-Google agreement,

which is here, there's the six patent applications.

And that's different in that it was an

exclusive license to the six other -- the patent

application that resulted in six patents.

And then I grouped these technologies into

various buckets:  Ordering technology, clustering

technology; we saw the Google name and logo, as I'm

working up; we talked about scanning and indexing

technology, et cetera.

1    Q.    You mentioned that Google got an exclusive

2 license in the Stanford agreement, but it would only get

3 a non-exclusive license in the hypothetical negotiation.

4    A.    That's right.

5    Q.    What impact would that have on your valuation?

6    A.    Well, exclusive licenses -- because if you --

7 if you license something exclusively as a company, that

8 means you're the only company that can practice that

9 technology, and you can distinguish yourself in the

10 marketplace.

11        So an exclusive license to a patent or any

12 technology is more valuable than a non-exclusive

13 license.

14    Q.    I believe Dr. Becker testified that he took

15 this disparity into account.  Did he do that correctly

16 in your opinion?

17    A.    Well, he said that he did, but he didn't make

18 any mathematical adjustments whatsoever in order to do

19 that.  So, no, he didn't do that correctly, to answer

20 your question.

21    Q.    So did the expert that -- the other Google

22 expert that Dr. Becker referred to, when he converted

23 the equity interest into a running royalty, did he make

24 any adjustments to reflect for the difference between

25 exclusive license and non-exclusive license?

1    A.   He did.  He made a very specific adjustment.

2  And he also said something else, but let me start with

3  the exclusive-to-non-exclusive adjustment.

4       He reduced the rate that he calculated from to

5  half of 1 percent to a quarter of 1 percent just for

6  that difference alone to say that:  Look, an exclusive

7  license is going to be more valuable than a

8  non-exclusive license and I need to recognize that and

9  take the rate down by half.

10    Q.   So you took the rate from .5 to .25 percent?

11    A.   Just for the distinction between exclusivity

12  and non-exclusivity alone.

13       And then beyond that, he said explicitly that

14  there's other adjustments that would need to be made in

15  order to make any point of comparison in order to

16  account for these other things that are listed on this

17  side of the scale.

18    Q.   But --

19    A.   And he said that he did not make those

20  adjustments.

21    Q.   But Dr. Becker's range includes the half a

22  percent, right?  So it includes no adjustment at that

23  point?

24    A.   It doesn't include any specific adjustment for

25  exclusivity.  He didn't testify about any specific

1  adjustment that he made at all.

2      Q.   Did you consider whether the patent

3  application licensed in the Stanford agreement was

4  comparable technology to the '947 patent?

5      A.   Well, I did.  I considered it.  I relied upon

6  a couple of sources to make that determination, looking

7  at it from a commercial point of view.

8      Q.   What was your determination about the

9  technical comparability or not?

10     A.   Well, they're simply not comparable based upon

11 the technical evidence that I've seen from technical

12 experts and Google witnesses.

13     Q.   How important was the Stanford patent to

14 Google's business from the evidence that you've seen?

15     A.   They were very important.  I think we heard

16 Mr. Huber testify about how, in 1998, when the business

17 was formed, this license was essentially at the very

18 core of the very beginning of Google.  And, in fact, I

19 think he said that this was the fundamental technology

20 that Google was formed upon.

21     Q.   Did you rely on any testimony from Mr. Ancone,

22 Google's licensing witness, about the importance of the

23 Stanford technology to Google?

24     A.   I did.  He was asked about that as well.  He's

25 the licensing witness from Google again.

1     Q.   And I'll just read that to save a moment here.

2     A.   Okay.

3     Q.   Page 86 of this transcript, Lines 20 to 24, he

4 testified:  Yeah.  It's the license of technology to

5 Google for the technology that Larry and Sergey invented

6 while they were at Stanford University, sort of a

7 foundational technology that the company was built on.

8 And then on Page 87, Lines 6 to 8, he continued:  It's

9 my understanding that this technology is used in the

10 core of our business.

11        Do you recall that testimony?

12     A.   I do recall that.

13     Q.   You mentioned before, you also don't think the

14 date is comparable between the Stanford and the

15 hypothetical negotiation; is that right?

16     A.   That's right.  Just to back up one other

17 thing, I believe that Dr. Fox was asked, when he was on

18 the stand, about whether or not this patent was

19 comparable to the '947 patent, and he said no -- or the

20 patent rights that eventually became the '999 patent.

21 And to go to the date -- I think I talked a little bit

22 about that previously -- in 1998, Google was a very,

23 very different company than it was in July of 2004.

24 These rights were at the core of Google's business,

25 whereas the '947 patent was an incremental contribution

to Google by 2004 and an incremental contribution to a
business that had evolved into something that was very,
very sophisticated and well established.

Q.   Okay.   Did you review any of the licensing
agreements that Orion, the other party in the
hypothetical negotiation, entered into?

A.   Yes, I did.

MS. CANDIDO:   Ryan, could you display DX
Demo Slide 573, please -- I'm sorry -- 575.

Q.   (By Ms. Candido) And just briefly, would you
describe what you've done in this chart, please.

A.   Sure.   Let me get rid of these things.

Okay.   This lays out the compensation in the
settlement agreements of the -- of Orion and other
affiliated companies, I believe, that involved rights to
their '947 patent.

You can see it lays out the names of the
companies that were the licensees and the amount of the
lump-sum royalties that were included in the agreements,
and the highest was 5 million, and the lowest was
$38,000.

MS. CANDIDO:   So, Ryan, would you please
put up DX Demo 551.

Q.   (By Ms. Candido) And just to summarize, it's
your opinion that a reasonable royalty is less than 2.5

1  million; is that correct?

2      A.   That's right.

3      Q.   And that's for the life of the patents?

4      A.   Yes, ma'am, that's correct.

5      Q.   And what did you base that opinion on, just to

6  summarize?

7      A.   Well, to summarize, it was my review of the

8  Georgia-Pacific Factors.  It's real-world evidence that

9  I reviewed, including actual licenses, a review of the

10  commercial considerations, and other financial analysis.

11      Q.   All right.

12              MS. CANDIDO:  Pass the witness.

13              THE COURT:  Cross-examination.

14              MR. HUESTON:  Thank you, Your Honor.

15                  CROSS-EXAMINATION

16  BY MR. HUESTON:

17      Q.   Good afternoon, Mr. Bakewell.

18      A.   Good afternoon.

19      Q.   Mr. Bakewell, let's turn for a moment to the

20  prior Firepond sale.  It was a Mr. Croxall who sold the

21  '947 patent with some other patents, correct?

22      A.   Yes.

23      Q.   All right.  Do you have any basis to believe

24  that Mr. Croxall knew, at the time he sold the Rice

25  patent, that Yahoo! was infringing the Rice patent?

1     A.   Oh, no.

2     Q.   And do you have any basis to believe that

3 Mr. Croxall knew that Yahoo! was infringing the Rice

4 patent at a rate of billions of searches a day?

5     A.   No, I don't know.  No.

6     Q.   All right.  You would agree with the general

7 principle that licenses entered into as settlements of

8 litigation are often less probative of a reasonable

9 royalty than non-settlement licenses, because they can

10 be influenced by factors other than subject technology,

11 correct?

12     A.   Oh, yes, sir, absolutely.

13     Q.   All right.  Now, despite that, you did, in

14 fact, just show us a chart which had a list of

15 settlement agreements.

16     A.   I did.

17     Q.   And you actually put them all in a row from

18 low to high, right?

19     A.   I did.  That's right.

20     Q.   And you created an average, right?

21     A.   I believe that number was actually my damages

22 opinion --

23     Q.   Okay.

24     A.   -- the $2-1/2 million.

25     Q.   You would agree that trying to create some

1  sort of average of all those would be a bit like

2  throwing apples and oranges into a blender, correct?

3       A.   No, I wouldn't agree with that analogy at all.

4       Q.   Okay.  Well, let's think -- let's look at that

5  a little bit.

6            One of the settlement agreements in that

7  chart, at the low end, was amazon.com.

8            You're familiar with that agreement,

9  right?

10      A.   Yes, sir, I am.

11      Q.   And you're aware that in that agreement, that

12 the dollar amount of consideration agreed to was

13 $400,000.  That was on your chart, correct?

14      A.   That's right.  It was for a part of Amazon's

15 business, and it was $400,000.

16      Q.   All right.  And I'll be looking for just a yes

17 or a no to these.

18            And you recall, sir, do you not, that the

19 amount of infringing revenues, as stated in that

20 agreement, was $4 million?

21      A.   That's right.  For that part of the business,

22 that's right.

23      Q.   So the $400,000 that was agreed to be paid was

24 10 percent of the $4 million of infringing revenues.

25            You agree that that math is correct, yes?

1    A.   Of those -- of those past revenues, that's

2  correct.

3    Q.   All right.

4    A.   That math is --

5    Q.   And another --

6    A.   -- the math.

7    Q.   And another settlement agreement -- lawsuit

8  settlement agreement you considered was the eGain

9  lawsuit settlement between Orion and eGain, which called

10 for a 10-percent running royalty, correct?

11   A.   That was on that list, that's correct.

12   Q.   All right.  Now, let's -- the total amount of

13 Google's accused revenues in this case is approximately

14 $25 billion.

15        You understand that, right?

16   A.   Yes, I do.

17   Q.   And 10 percent of that amount would be

18 approximately $2.5 billion.

19        Do you agree with that math?

20   A.   That's the math, that's right.

21   Q.   And you would also agree that that 10-percent

22 amount, 2.5 billion, is far higher than the

23 approximately 60 million to 120 million that Dr. Becker

24 has calculated as a reasonable royalty in this case.

25   A.   Oh, of course it's higher.

1     Q.   All right.  And even if we cut that 10 percent

2  all the way down to 2 percent, trying to do my math

3  here, that's about $500 million on the accused revenues,

4  right?

5     A.   I think I follow your math.  That's correct.

6     Q.   All right.  And that 500 million is still far

7  more than the amount that Dr. Becker --

8     A.   Oh, sure, absolutely.

9     Q.   All right.  Has done in this case.  Thank you.

10          Now, all other factors being equal,

11  Mr. Bakewell, you agree that the more a company uses an

12  invention, there is an upward increase in value,

13  correct?

14     A.   That's right.  If we set everything else aside

15  and just look at that, I would consider that to be true.

16     Q.   All right.  And for purposes of your

17  calculation of a reasonable royalty in this case, you

18  must assume that the Plaintiff is correct in asserting

19  that the invention is used in the serving of every

20  AdWords ad, correct?

21     A.   I must assume infringement, that's correct.

22     Q.   All right.  That, in fact, Google is using the

23  invention every day, correct?

24     A.   That's the assumption, that's correct.

25     Q.   All right.  And part of what you're trying to

1    do is to make a comparison with the infringement, as

2    accused, with other licenses in order to come up with a

3    good comparable license, right?

4        A.    Well, there's a comparison, that's correct.

5        Q.    All right.  And you talked about the Invenda

6    licenses as being ones that you thought were more

7    comparable, correct?

8        A.    Those were two of the three.  One was a

9    purchase agreement, and one was a license.

10        Q.    All right.  And, in fact, one contained -- one

11    was called the Invenda-Google agreement and had two

12    patents, the '991 and '996, correct?

13        A.    I think that was the license, if I recall

14    correctly.

15        Q.    All right.  And that license involved two

16    patents, the '991 and '996, correct?

17        A.    That sounds familiar, yes.

18        Q.    Okay.  And you do not know Google's total

19    revenues from products practicing or using the '991

20    invention, correct?

21        A.    That's correct.  I would agree with that.

22        Q.    And you do not know Google's total revenues

23    from products practicing or using the '996 invention, do

24    you?

25        A.    I agree with that statement.  What you said is

1   correct.

2        Q.   And you do not know for certain, sitting here

3   today, whether Google has ever used the '991 or the '996

4   invention, correct?

5        A.   I think that's true as well.

6        Q.   All right.  And unlike the assumption you must

7   make for the patent in this case, you do not know

8   whether every dollar of AdWords has been generated with

9   the aid and assistance of the Invenda patents, correct?

10       A.   That's true.

11       Q.   All right.  Let's turn to the Meyer-Google

12  agreement.

13            Sir, you do not know if the Meyer patents are

14  used in every Google search, correct?

15       A.   That's true.

16       Q.   And you do not know whether Google practiced

17  the Meyer patent at the time it acquired them, correct?

18       A.   I agree.

19       Q.   And unlike what you must assume in your damage

20  analysis in this case, you do not know whether every

21  dollar of AdWords has been generated with the aid and

22  assistance of the Carl Meyer patents, correct?

23       A.   I agree with that, yes.

24       Q.   All right.  I'd like to put up a list of the

25  comparable agreements that you mentioned.

1      A.    Okay.

2              MR. HUESTON:  If we could have that up.

3  And I think we have a copy of the slide.  Ah, let me see

4  if I need to push the magic button.

5              COURTROOM DEPUTY:  It's on.

6              MR. HUESTON:  It is already switched.

7  Thank you very much.

8      Q.    (By Mr. Hueston) And this is a list that you

9  prepared of what you felt were the comparable

10  agreements, correct?

11      A.    I recognize that, yes.

12      Q.    All right.  For each one, can you tell the

13  jury exactly how much, if at all, Google was using the

14  patented invention at the time of the license?

15      A.    Oh, not specifically.  As I mentioned, what

16  they purchased with these licenses was the freedom to

17  operate and the freedom to not have to measure that, in

18  fact.

19      Q.    Okay.  So, sir, you cannot tell the jury how

20  much, if at all, Google was using the patented invention

21  at the time of license.

22      A.    I agree.  We discussed operating freedom, and

23  I agree.

24      Q.    Let's go to the demonstrative.

25              So --

1          MR. HUESTON:  Next slide.

2     Q.   (By Mr. Hueston) And so I'm putting a no

3 there, and you do not know and can't tell the jury the

4 total amount of use by Google of these inventions listed

5 in these comparable licenses, right?

6     A.   That's right.  All I know is that Google --

7          THE COURT:  Do you know or not?

8     A.   That's right.  I agree with him.

9     Q.   (By Mr. Hueston) Thank you.

10          Now, you also presented the jury with a list

11 of items that you said were contained in the Stanford

12 agreement.  You had a -- kind of a stack of boxes.

13          Do you remember that --

14     A.   Yes.

15     Q.   -- slide?

16          And you put the Rice invention as one little

17 box next to it, correct?

18     A.   Yes.

19     Q.   Now, each of those boxes, I noticed, were

20 exactly the same size, right?

21     A.   That's -- that's correct, yes.

22     Q.   All right.  Now, that was about 10 boxes you

23 put there on the Google - Stanford-Google agreement,

24 right?

25     A.   I agree.  That sounds correct.

1     Q.   All right.  You did not attempt to value each

2 of the ten items to determine if they were as valuable

3 as the Rice invention --

4     A.   No, sir.

5     Q.   -- in this case --

6     A.   No, sir.

7     Q.   -- correct?

8     Sorry.  Just for the record, if I could finish

9 my question.

10    A.   I'm sorry.  I thought you were finished.

11    Q.   All right.  And in fact, you knew, when you

12 made this chart and the calculations, assuming a 1/10

13 valuation, that they did not have equal value, correct?

14    A.   They likely don't have equal value, that's

15 true.

16    Q.   So you don't mean to tell this jury that your

17 math that you've come up with is based on an actual

18 assessment of value of each of those ten factors, right?

19    A.   No.  That slide is not to convey that the

20 value was equal, that's correct.  I agree with you.

21    Q.   Right.  And that Stanford agreement had ten

22 items, one of which was the Google -- Google logo,

23 correct?

24    A.   That's right.

25    Q.   And this is back in 1998 when Google was still

coming out of its garage, right?

  We've got a picture of the garage -- I think you were here in opening statements -- that your counsel showed.

 A. I was.  I remember, yes.

 Q. And tell the jury how much the Google logo was worth when those folks were sitting in their garage in 1998.

 A. Well, I can't provide a specific valuation of it --

 Q. You don't know.

 A. -- as I sit here today.

 Q. You don't know.

 A. No, I don't.  That's correct.

 Q. All right.  Let's turn to a different topic.

  Google, in fact -- let's strike that.

  You are aware that Mr. Wagner, an expert hired by Google in another patent litigation case, found that it was acceptable to convert an equity interest into a running royalty, correct?

 A. That's right.

 Q. All right.  And like Dr. Becker in this lawsuit, Mr. Wagner applied his conversion methodology to the Stanford patent in that other case, correct?

 A. That's right.

1   Q.   All right.  And you would agree that an expert

2   should not adopt or reject a finance theory depending on

3   which side hires him.

4          You agree with that, right?

5   A.   That's true, absolutely.

6   Q.   Okay.  And you would also agree that an expert

7   should never use a flawed or erroneous finance theory

8   just to try to convince the jury that the other side is

9   wrong, right?

10   A.   Oh, absolutely.  I agree.

11   Q.   Okay.  All right.  Let me ask you this:  Sir,

12   you have testified as -- in, I think, three other trials

13   before this, correct?

14   A.   That's true.

15   Q.   And in one of those trials, you testified on

16   behalf of Plaintiff, and in that trial, you --

17                MR. HUESTON:  I'm sorry.

18                THE COURT:  Just a second.

19                MR. CANDIDO:  Our objection is it's not

20   appropriate to be referring to other litigation.

21                THE COURT:  Well, approach.

22                (Bench conference.)

23                THE COURT:  What do you intend to ask?

24                MR. HUESTON:  I'm going to ask him if he,

25   in fact, recommended a form of running royalty in one of

1  the trials that he did, and I'd like to ask, without

2  reference to the name of the case, the amount as well,

3  the amount in another plaintiff's trial, compared to

4  what he has done in one defense trial and this case.

5  It just goes to bias, Your Honor.

6              THE COURT:  Okay.  I'll allow that, and

7  you can address it on redirect, Ms. Candido.

8              (Bench conference concluded.)

9      Q.   (By Mr. Hueston) Mr. Bakewell, in one of the

10 prior trials that you testified on behalf of plaintiff

11 for, you testified that a form of running royalty was

12 appropriate.

13     A.   Yes.  Yes, I did.  That's right.

14     Q.   Okay.  And, in fact, that -- in that case, you

15 testified that a total amount of 140 to 180 or $190

16 million was the range that would be appropriate in that

17 case, right?

18     A.   That's right.  That sounds about correct, yes.

19     Q.   And in another case where you testified on

20 behalf of plaintiff, you testified that the amount of

21 money that would be appropriate to award the plaintiff

22 in that was on the order of 20 to $25 million,

23 correctly --

24     A.   Yes, sir.

25     Q.   -- correct?

1    A.   Yes, sir.

2    Q.   Thank you.

3         You testified in one trial, before this one,

4    on behalf of defense, right?

5    A.   Right.

6    Q.   And in that case, you testified that the range

7    of appropriate damages in that case would be, low end 5

8    or 600,000, up to close to a million dollars, right?

9    A.   That sounds about correct, yes, sir.

10   Q.   And here, sir, in this trial, your fourth

11   trial, you're testifying on behalf of defense.

12   A.   That's correct.

13   Q.   And you're testifying that the range should be

14   somewhere of 1 to 2 million or so dollars, right?

15   A.   1 to 2.5 million, yes, sir.

16   Q.   All right.  Thank you.

17            MR. HUESTON:  No more questions.

18            THE COURT:  All right.  Redirect?

19                  REDIRECT EXAMINATION

20   BY MS. CANDIDO:

21   Q.   Mr. Bakewell, Mr. Hueston was just asking you

22   about testimony that you've given in prior cases --

23   A.   Yes.

24   Q.   -- where you determined that a running royalty

25   was appropriate.

1            Were the circumstances of those cases
2   different than this case?
3        A.    They were very different.  The licenses in
4   that case that the parties produced and the practices
5   were of a running royalty in that matter.
6        Q.    So in those prior times when you've opined
7   that a running royalty was appropriate, that was
8   consistent with the practices of the parties to the
9   hypothetical negotiation?
10       A.    That was consistent with the practices of the
11  parties, that's correct.
12       Q.    Mr. Hueston also asked you about your
13  knowledge of the revenue base with respect to Google's
14  license agreements or patent agreements.
15            Do you recall that?
16       A.    Yes, I do.
17       Q.    Does it concern you that you don't know
18  exactly how many dollars of AdWords' revenue was
19  associated with each of those licenses?
20       A.    No, not at all.  In fact, that's why I
21  discussed the concept of operating freedom.  Google,
22  when it enters into license agreements, that's exactly
23  the right that it purchases, is to use the technology or
24  to not use the technology, so it doesn't have to track
25  its usage and can focus on developing new products.

1    Q.   Is it unusual that a company wouldn't know

2  what the revenues are that are associated with every

3  patent that they license or own?

4    A.   No, it's not unusual at all.  It's normal

5  practice.

6    Q.   Mr. Hueston also asked you whether you had any

7  knowledge about whether Orion knew about Google's

8  infringement in January of 2004 when it purchased the

9  patents from Firepond.

10      Do you recall that question?

11    A.   That's right.

12    Q.   Now, the hypothetical negotiation date in this

13  case is July of 2004, right?

14    A.   That's right.  It's six months afterwards.

15    Q.   And that July 2004 date is supposed to be the

16  date that Plaintiffs contend Google first started to

17  infringe the patents; is that right?

18    A.   That's correct.

19    Q.   So do you understand his question about

20  whether Google's infringing in January of 2004?

21    A.   It's a bit of an odd premise.  I think I

22  understood the question, but it's not a premise if

23  accused infringement occurred after the date that the

24  patents were acquired.

25    Q.   So by definition, what Plaintiffs are

contending, Google wasn't infringing in January of 2004.

A.    I would agree with that, yes.

Q.    Mr. Hueston also asked you about some of the lump-sum settlement agreements that Orion had previously entered into.

Do you recall that?

A.    I do.

Q.    And he derived some royalty rate based on the lump-sum amount and stated amount of a previous use.

Do you recall that?

A.    I recall those, yes.

Q.    Is it appropriate to consider only the revenue base that was previously at issue to calculate a running royalty rate from those licenses?

A.    No, sir, not -- or no, ma'am, not at all. Those agreements were for -- they were for the lives of the patents, and the revenues in those agreements were historical revenues.

And so in order to do a calculation as Mr. Hueston suggested, you need to include all of the revenues, and that information simply is not provided in the license.

It's clear that that rate, to the extent that there is a running royalty rate that could be equated, is going to be lower and could potentially be much, much

lower.

Q.   Of all of the evidence discussed here today that you've observed in Court, in your opinion as an appraiser and certified licensing professional with over 20 years of business experience, what is the single most relevant data point that the jury should consider in any reasonable royalty analysis in this case?

A.   It's any past transaction involving the specific asset.  So in this case, it's the sale in January of 2001.

Q.   And that's the sale for a million dollars for 14 patents?

A.   $1 million for 14 patents, that's correct.

Q.   Have you seen any evidence in this case that Google would have agreed, in the hypothetical negotiation to pay Orion over 65 times as much money for a license to the '947 patent as Orion had paid to buy the '947 patent and 13 other patents only five months earlier?

A.   I've seen no evidence that would support that at all.

Q.   Have you seen any evidence in this case that supports a royalty to Bright Response of 64 to $128 million for a six-year license?

A.   None.

1    Q.   Have you seen any evidence in this case that a

2  license to the '947 patent is over 15 times more

3  valuable to Google than the $3.55 million that Google

4  paid to purchase three advertising patents from Carl

5  Meyer?

6    A.   No, ma'am, none.

7    Q.   If all the accused Google products are found

8  to infringe Bright Response's patent and Bright

9  Response's patent is found to be valid, in your opinion,

10 what is the maximum reasonable royalty that the jury

11 should award?

12   A.   $2.5 million.

13   Q.   Thank you.

14             THE COURT:  Additional recross?

15             MR. HUESTON:  No more questions, Your

16 Honor.

17             THE COURT:  All right.  You may step

18 down.

19             THE WITNESS:  Thank you.

20             THE COURT:  Who will be your next

21 witness?

22             MR. ROOKLIDGE:  Yahoo! calls Mary

23 Woodford, Your Honor.

24             THE COURT:  All right.  Proceed.

25  MARY WOODFORD, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. ROOKLIDGE:

Q.   Good afternoon, Ms. Woodford.

A.   Good afternoon.

Q.   Now, we've been, at the beginning of each witness' testimony been, giving them an opportunity to identify themselves, tell us a little bit about themselves before they start.

But from your accent, I suggest that, even more so than me, you're not from around these parts. Why don't you tell us about yourself?

A.   Well, my accent is somewhat described as the mid-Atlantic.  My father was English.  I'm an American citizen, but I was born in Germany and lived in Europe until I was 13; hence the accent.

Q.   Okay.  Why don't you tell us what you do for a living.

A.   Well, I -- my current role is as a senior advisor with an economic consulting firm.  I'm based in Washington, D.C.  The firm is called Cornerstone Research.  I'm currently the head of its intellectual property practice noted up here on the slide as IP, abbreviated.

I have been with the firm for eight years.  I have been in the business of assessing damages in

complex commercial litigation for more than 21 years.
And before that, I worked in a corporate environment in
various financial functions for 10 years, both here in
the U.S., as well as overseas.

Q.   And have you engaged in any practices relating
to patent damages besides your work at Cornerstone
Research?

A.   I have written articles on -- on -- in patent
damages, as well as other intellectual property damages
and some licensing issues.  I have given presentations
to business and legal audiences on those kind of
subjects.

I also had the privilege last year of
participating as a panel member on a project that was
trying to put together information for federal district
court judges on issues that arise in the trial of the
patent damages case.

Q.   Are you a member of any professional
associations?

A.   I am.  I'm an associate member of the American
Bar Association, and particularly, the IP section.
I told Mr. Hueston at my deposition that I'm not sure
that I've renewed my membership, and we've been so busy
for the last two weeks that I still have to say with
that cautionary note, but it's certainly my intention,

1   if I haven't.

2           And I'm a member of the Licensing Executive

3   Society.

4       Q.   And have you been engaged by Yahoo! to present

5   an infringement -- an opinion on damages in this case?

6       A.   Yes, I have.

7       Q.   And have you indeed formulated an opinion?

8       A.   I have.

9       Q.   Now, have you ever been qualified as an expert

10  witness in federal court before?

11      A.   Yes, I have.

12      Q.   And is that in patent damages cases?

13      A.   In both patent damages and in other kinds of

14  commercial disputes, such as breach of contract.

15                 MR. ROOKLIDGE:  Your Honor, Yahoo!

16  proffers Mary Woodford as an expert on patent damages.

17                 MR. HUESTON:  No objection, Your Honor.

18                 THE COURT:  All right.  We'll hear her

19  opinion.

20      Q.   (By Mr. Rooklidge) Ms. Woodford, by expressing

21  an opinion on damages, are you meaning to suggest that

22  Yahoo! is somehow liable for patent infringement in this

23  case?

24      A.   No, I'm not.  Excuse me.  As you heard

25  Mr. Bakewell say and as you heard Dr. Becker say

yesterday, all three of us have to make the same

assumption for the purpose of our analysis, which is

that there has been a finding of infringement and

validity with respect to the '947 patent.

That doesn't mean we believe it to be the

case; it just means that if that were not so, our

analysis would be beside the point.  It's just a point

of departure.

Q.   Are you going to be offering any opinions on

technical issues in this case?

A.   No, not at all.  To the extent that I sought

technical support in my work, I -- I had occasion to

consult with and read an expert report written by

Professor Allan, who spoke here this morning.

Q.   Now, let's move into the substance of what

you're going to be talking about.

We've had some discussion of it already, but

from your perspective, could you tell us about what the

hypothetical negotiation is.

A.   Well, you probably all know pretty much what

it is by now, but, in essence, Bright Response has

accused Yahoo! of infringing the '947 patent as of April

2004.

So my analysis goes to the question of, if

Yahoo! and Bright Response, actually, Orion, who owned

the patent at that time, had sat down around that date

or shortly before that date to negotiate terms of

compensation for a license to the rights -- for the

right to use that patent, the hypothetical negotiation

would form a construct for that situation.

Q.    And we've heard some discussion with regard to

the Georgia-Pacific case and the Georgia-Pacific

Factors.  Have you looked at those in this case?

A.    I have.  It's standard practice to look at

those factors in pretty much any assessment of a

reasonable royalty.

As you've heard others say, some are more

important than others in an individual case, but I have

looked at all of them.

Q.    Now, have you condensed those factors down on

a slide that focuses on the most important ones for this

case?

A.    I have, yes.

In particular, the ones that I think are

important is making sure that we give full consideration

to the available license agreements, both those for

Orion and other entities affiliated with the Plaintiff

that are -- and Bright Response.

Also, the value that Yahoo! has paid, not

charged, as a licensor, but for comparable licenses.

A key question here is also the apportionment
of revenue and also profit, which I should have put up
on the slide.  That gets to the question of what exactly
does it benefit Yahoo! for the presumed use of the '947
patent.

In this case, as you heard Mr. Bakewell say a
moment ago, we also have a unique fact, which is we have
a real-world transaction, an arm's-length transaction,
to purchase the '947 patent, along with 13 other patents
and associated applications.

Q.   Well, now, you mentioned apportionment of the
revenue.  What -- what is the importance of that?

A.   Well, the key question that we have to address
here is, what exactly is the value that the presumed use
of the '947 patent adds to Yahoo!'s Sponsored Search.

And in looking at that, you have to take into
account assets and abilities and capabilities that
Yahoo! also brings to the table, and also uniquely in
this situation, the admitted fact that the Sponsored
Search business was up and running and very successful
even before the alleged infringement began.

Q.   Why don't we shift gears a little bit and talk
about Dr. Becker's analysis.

MR. ROOKLIDGE:  If you would put up the
next slide.

1     Q.   (By Mr. Rooklidge) Have you heard Dr. Becker's

2 testimony at trial here this week?

3     A.   Yes, I have.

4     Q.   Do you agree with his opinion?

5     A.   I do not.

6     Q.   And why don't you agree with his opinion?

7     A.   Well, this slide summarizes a number of

8 high-level points of disagreement.

9     I disagree with Dr. Becker that there is any

10 justification for a running royalty rate based on

11 Yahoo!'s revenues.

12     Secondly, I think he came to a conclusion

13 about a specific royalty rate.  I have seen no basis in

14 the evidence for the rate that he finally comes to.

15     As you heard him testify yesterday, and we'll

16 talk about it a little bit more, he has not done any

17 apportionment analysis in a way that I consider a true

18 reflection of the analysis that should be done.

19     We also, just as a point of reasonableness,

20 have the point of -- the framework that -- I'm sorry --

21 the data point of the purchase of the '947 patent, along

22 with other patents, just four months before the

23 hypothetical negotiation.

24     And then finally, there are a number of

25 previous licenses and other agreements that both Yahoo!

and the Plaintiff had entered into with respect to the

'947 patent on the Plaintiff's behalf, and he has paid

very little attention to those.

Q. Now, you mentioned this one factor here, far

out of balance with the purchase agreement. Is that the

Firepond purchase agreement that Mr. Bakewell discussed

in detail during his testimony?

A. Yes, it is. And as he mentioned, and you've

heard before anyway, the purchase of the '947 patent,

along with 13 other patents and associated applications

was for a million dollars.

I looked at that slightly differently than

Mr. Bakewell did. We have testimony in this case that

there was no independent valuation of how you would look

at each of those patents that are part of the portfolio

that Orion acquired.

So you can either look at it and say: Well,

the '947 patent was worth somewhere between zero and a

million, and for the sake of having some kind of

estimate and absent any other evidence to the contrary,

I just divided that million by the number of patents.

I could have divided it by a larger number because of

the -- because of the applications that were also

included, but if you divide by the number of patents,

you can estimate that there was a price paid of about

1  $72,000 for the purchase of the '947 patent.

2     Q.   Now, do you have an opinion regarding what

3  would be more reasonable data points?

4              MR. ROOKLIDGE:  And let's move to the

5  next slide.

6     A.   I do.

7          Given the paucity of sort of really good

8  economic analysis that was offered on behalf of the

9  Plaintiff, what I have -- what we have to look to here

10 is a substantial number of licensing and other

11 agreements that both parties have entered into in the

12 past.

13         And the ones that I'm focusing on,

14 particularly with Yahoo!, are paid in sort of similar

15 circumstances.  And we're trying to look for comparable

16 bodies of intellectual property so that you're not

17 comparing an agreement that includes an entire patent

18 portfolio to the acquisition of a single -- a license of

19 a single patent.

20         And on the other side, I've looked at licenses

21 and -- as well as settlement agreements that Orion

22 entered into in connection with the '947 and other

23 patents.

24     Q.   (By Mr. Rooklidge) Okay.  Well, why don't we

25 drill down a little bit and look at your criticisms of

1   Dr. Becker's opinions in a little more detail.

2              MR. ROOKLIDGE:  Let's go to the next

3   slide.

4       Q.   (By Mr. Rooklidge) You said that Dr. Becker

5   failed to do what he should have done to justify the use

6   of a running royalty based on Sponsored Search revenue.

7   Can you explain that?

8       A.   Yes.

9              As I understood Dr. Becker's analysis, he made

10  an operating assumption that somehow there was a

11  connection with the revenues of Sponsored Search and the

12  alleged infringement of the '947 patent.

13             I don't think you can actually, following

14  appropriate methodology, begin and end the analysis

15  there.  What courts teach us is that you need to take

16  other economic indicators into account.

17             And what the particular question is, to what

18  extent does the use of the '947 patent drive demand for

19  Sponsored Search?

20             You heard Dr. Becker said that he had done no

21  analysis in that regard, and I certainly saw none.  So I

22  would say there is no proof that the '947 patent drives

23  the demand for Sponsored Search.

24             Secondly, we've also heard that there is no

25  direct connection between the presumed infringement and

1 click.  You actually -- the infringement stops, as you

2 heard Dr. Rhyne testify, before anybody clicks on an ad.

3          So while I don't dispute that the '947 patent,

4 we assume, is to some extent involved in Sponsored

5 Search, I have seen no proof that there is any

6 quantifiable effect on Sponsored Search revenue as a

7 result of the presumed infringement.

8          Given those two overriding criteria, I just

9 think it's bad methodology to base a running royalty on

10 Sponsored Search's revenues, as Dr. Becker has done.

11               MR. ROOKLIDGE:  Let's go to the next

12 slide.

13      Q.   (By Mr. Rooklidge) You said earlier that

14 Dr. Becker had no evidence for his quarter to a half

15 percent royalty rate as to Yahoo!.

16          Could you explain that?

17      A.   Yes.

18          I think you asked Dr. Becker the question

19 directly yesterday, whether he did, and he said -- and I

20 would agree with him -- that there is no single license

21 agreement that we have in this case that relates to a

22 half -- to a quarter to a half a percent rate with

23 respect to Yahoo!.

24          The only thing that we have -- and he base --

25 he based his royalty rate from the starting point with a

very different group of license agreements,

specifically, those for the Overture patent portfolio

that you have heard about, but that is a very different

group of patents, and it has a much greater -- different

significance to Yahoo! than the '947 patent.

Q.   In what way -- in what way is that a very

different group of patents, the Overture patent

portfolio?

A.   Well, the Overture patent portfolio, as I

understand it, represents technology that is really

foundational to Yahoo!'s Sponsored Search business.  It

has demo -- it has demonstrated its success in terms of

the -- associated with the bid auction process that goes

on for ads, at least in part.  And that is something

that you heard Mr. Kolm talk about this morning, and

that has a direct connection to revenue.

        Another reason why the Overture patent is --

patent portfolio licenses that Yahoo! has entered into

are not comparable in my view is they really represent

different kinds of transactions.

        In the agreements that we have, Yahoo! was

licensing those patents to other entities, not sitting

at the table saying:  I need to use these patents.

Yahoo! was already using and getting the benefit of

these patents.

1          So it's a different situation.

2     Q.    So I just want to be very clear on that.

3          Is there any evidence in this case against

4 Yahoo! that Yahoo! would have agreed to or Orion would

5 have demanded from Yahoo! a rate of a quarter to a half

6 a percent of revenue?

7     A.    I've seen none.  I think the number is -- is

8 arbitrary and speculative.

9          We also have heard the -- played a little bit

10 of the deposition testimony of Mr. Yeh, who was talking

11 on behalf of Yahoo! with respect to its licensing

12 practices, and the -- the application of a quarter to a

13 half percent running royalty, or frankly, the

14 application of a running royalty goes against the body

15 of its licensing practices when it actually has taken

16 licenses to comparable technology.

17               MR. ROOKLIDGE:  Move on to the next

18 slide.

19     Q.    (By Mr. Rooklidge) You mentioned earlier that

20 Dr. Becker had not done the required apportionment.

21          Can you tell us more about that.

22     A.    Well, it's not disputed in this trial that the

23 '947 patent is an improvement patent.  It does certain

24 things.  It combines certain steps that I won't -- I

25 won't define, because you've heard other people who have

more technical expertise explain them, but it's not a

new -- it's not a new invention, in terms of something

earth-shattering.

So when you have something like that, what you

really need to do is try to help answer the question:

What is it that the presumed use of this invention

actually adds by way of value to Yahoo!.

We know from -- from what we've heard, that

the Sponsored Search business was up and running before

April 2004, and it was not accused of infringement at

that time.

I have not -- I had not heard previously, and

I still haven't heard in this trial, and I've sat here

all week, some specific identification of something that

changed to turn that system from a non-infringing system

to an infringing system.

So I'm still waiting for an answer to exactly

what that specifically is.

The other thing that we need to recognize,

we've heard talk about another patent from Allen with

E-N, who is not professional Professor Allan, who spoke

to you this morning, but that is a -- that is a patent

that is considered and acknowledged as part of the prior

art that existed out there as the -- before the Patent

Office would be able to patent -- grant a patent to the

1  '947 patent.

2      So the question then becomes, well, what

3  exactly is different functionally and operationally

4  between the '947 patent and the Allen patent,

5  hypothetically, and the value that it imparts to

6  Yahoo!'s business?  I haven't seen that.

7      The last item on the list is everything else

8  that Yahoo! brings to the table, and that includes

9  patents.

10     Professor Allan did some analysis at my

11  request and looked at at least 80-some-odd or close to

12  90 patents that Yahoo! has in the search and advertising

13  and related space.

14     That represents intellectual property rights

15  that are available to Yahoo! to deploy in the relevant

16  business.

17     It, obviously, has demonstrated success even

18  before the infringement began and continuing since.

19     And it has -- another thing that it has that

20  it brings to the table is, even if you assume that the

21  '947 patent is infringed in Yahoo!'s business, it has

22  nothing to do with providing the ads.

23     I mean, going out and managing the business,

24  finding the advertisers, making the contracts, making

25  all of the changes, and setting up all the dynamic

changes that you heard Mr. Kolm talk about this morning,

that is another very dramatic contribution that Yahoo!

makes to its business, separate and apart from the

presumed infringement.

Q.   Ms. Woodford, let's skip ahead to Slide 9.

Is there anything that Dr. --

THE COURT:  Excuse me just a second.

Mr. Rooklidge, we're going to take our afternoon recess

at this time.  I've got a matter I need to tend to

downstairs.

Ladies and Gentlemen, be back ready to

start at 3:25.  Remember my prior instructions.  Don't

talk about the case.

LAW CLERK:  All rise.

(Jury out.)

THE COURT:  All right.  The time before

this witness got on the stand, the Plaintiff had used 12

hours and 17 minutes, and the Defendant had used 11

hours and 41 minutes.

We'll pick up there after the recess.

(Recess.)

LAW CLERK:  All rise.

(Jury in.)

THE COURT:  Please be seated.

Mr. Rooklidge?

1          MR. ROOKLIDGE:  Thank you, Your Honor.

2          THE COURT:  Proceed.

3      Q.   (By Mr. Rooklidge) Ms. Woodford, let's go to

4  Slide 10 here.

5          What does this slide show about the '947

6  license agreements that you looked at?

7      A.   This chart represents a summary of the

8  lump-sum payments that Orion received when it entered

9  into settlement agreements with the entities listed

10 here.

11         And the reason it's titled 3-Patent '947

12 Agreements is that this group of agreements included not

13 only the '947 but two other patents.  So what I've done

14 here, just to try to get a frame of reference, I

15 basically added up the total compensation here and come

16 up with an average per patent for each of the three

17 patents that is licensed in these agreements.

18         And I did that for the same reason I expressed

19 a moment ago.  The range is anywhere between zero and

20 the full price of the patent, so this is a midpoint

21 estimate.

22     Q.   And the average per patent number is?

23     A.   Just -- $64,556.

24     Q.   Okay.  Let's take a look at the next slide.

25         What does this slide show?

1    A.   This is a similar analysis, but this group of

2    settlement agreements -- this actually includes the

3    purchase agreement from Firepond as well.  But this

4    group of agreements includes not only the '947 patent

5    but 13 other patents.  It also includes other

6    applications.

7         But for the purpose of the calculation, I just

8    tried to calculate the average price per patent that is

9    represented by the lump-sum payments in all of these

10   settlement agreements.

11   Q.   And what was your conclusion as to the average

12   price per patent there?

13   A.   In the -- in this case, it's $122,582 per

14   patent.

15   Q.   Okay.  Let's go to the next slide then.

16        What does this slide show?

17   A.   This slide basically summarizes the range of

18   information that I found among the agreements that we

19   have available, whether they be Yahoo! or -- or Orion or

20   Plaintiff agreements.

21        All of these were lump-sum agreements in one

22   form or another.  And what I have arranged here is for

23   agreements that I think are comparable either in the

24   sense that they include the '947 patent, or in the case

25   of the VPS license, which is a Yahoo! license for the

1  Yahoo! -- there's three other single patent licenses

2  that I think are comparable.

3        I have basically arrayed the price of those

4  rights on the -- on the horizontal axis, and I've

5  actually compared that to the range of damages that

6  Mr. -- Dr. Becker is seeking, based on the running

7  royalty that he testified about.

8    Q.   What has your analysis led you to conclude

9  about the dollar amount of Dr. Becker's so-called

10 reasonable royalty?

11   A.   My conclusion is reasonable is not the right

12 way to describe it.  There's nothing I've seen that

13 would basically magically take this patent from

14 something that's worth $72,000 to 14 to $27 million,

15 depending on which royalty rate you apply.

16       It also tells me that when you look at a range

17 of real-world licenses entered into either by Yahoo! or

18 the Plaintiffs, (a) they're all lump sums, and, (b), the

19 maximum lump-sum payment that I have available is an

20 average actually of $590,000 per patent.

21   Q.   And what was your final conclusion about

22 Dr. Becker's use of a running royalty rate-style

23 agreement instead of a lump-sum form of payment

24 agreement?

25   A.   Well, it goes against the weight of the

evidence.  Not only do the Plaintiffs license agreements

basically, with very few exceptions, represent lump-sum

payments.  The relevant Yahoo! agreements similarly are

based on lump sums.

         So the structure of the compensation is very

consistent, except for the running royalty that

Dr. Becker applied.

                    MR. ROOKLIDGE:  Pass the witness.

                    THE COURT:  Cross-examination.

                    MR. HUESTON:  Yes, Your Honor.

                         CROSS-EXAMINATION

BY MR. HUESTON:

     Q.    Ms. Woodford, good afternoon.

     A.    Good afternoon.

     Q.    Now, under the .25-percent and .5-percent

royalty proposed by Dr. Becker, how much would Yahoo!

pay on the day that Yahoo! and Orion reached a license

agreement?

     A.    I have not done that calculation.

     Q.    Well, under a running royalty, the date the

agreement would be reached, the answer I would suggest

would be 0, correct?  There would be nothing to write a

check for?

     A.    On that very day, yes, perhaps not.

     Q.    All right.  And you would agree that under Dr.

1  Becker's suggested royalty, I ask you, how much money

2  would Yahoo! have owed after one year, if Yahoo! had, in

3  fact, made zero dollars on Sponsored Search?

4       A.   The answer would be zero.

5       Q.   And what would be the answer if after five

6  years Yahoo! had made no money, what would be the

7  royalty?

8       A.   If Yahoo! had no revenues for Sponsored

9  Search?

10      Q.   Yes.

11      A.   It would be zero.

12      Q.   Now, you criticized Dr. Becker's analysis

13 for -- because he did not do any apportionment.  Is that

14 your testimony?

15      A.   It is my testimony, yes.

16      Q.   Do you claim that he actually did no

17 apportionment analysis whatsoever?

18      A.   I didn't see any in his report.  There was

19 some recognition that there were contributions that

20 Yahoo! brings to the table, but I did not see -- and he

21 testified here and also at his deposition that he hadn't

22 done an apportionment analysis.

23           There were a line of questions from

24 Mr. Rooklidge.

25      Q.   And you, Ms. Woodford, did not personally

1  examine prior art in your apportionment analysis,

2  correct?

3      A.    No, I would not do that.  I'm not a technical

4  expert.

5      Q.    Is that a no, ma'am?

6      A.    Yes, that's a no.

7      Q.    Thank you.

8            In fact, you relied primarily on Dr. Allan for

9  the information for you to conclude about apportionment,

10 correct?

11     A.    Do you mean with respect to the Allen

12 patent --

13     Q.    Yes.

14     A.    -- because I would say overall the answer is

15 no.  With respect to the Allen patent, I just take note

16 what I learned from him about the Allen patent.

17     Q.    And you were sitting here while Dr. Becker

18 testified, correct?

19     A.    Yes, I was.

20     Q.    And you recall, do you not, that he stated

21 that he relied on Dr. Rhyne in order to apportion or

22 weigh the various factors when it came to the technical

23 points of his analysis, correct?

24     A.    I'm not sure that I remember his testimony

25 quite that precisely, but I do think it's fair to say

that he would rely on Dr. Rhyne to the extent that he

needed technical support.

    Q.   All right.  Now, you have talked about the

Overture licenses.  I want to ask you a couple of

questions about that.

        You would agree that Mr. -- sorry -- that

Dr. Becker conceded that the '361 patent, the Overture

patent, was more important to Yahoo! than the Rice

patent, right?

    A.   He did concede that, yes.

    Q.   And, in fact, you would agree that

Dr. Becker's recommended royalty rate for the Rice

patent in this case is between one-tenth and

one-twentieth as much as the royalty rates, the running

royalty rates, charged by Yahoo! for their own Overture

licenses, correct?

    A.   For those portfolios, yes.

    Q.   So it's your testimony, Ms. Woodford, it's

fair for Yahoo! to get a running royalty with respect to

its licenses but not for Bright Response in this case?

Is that right?

    A.   My opinion doesn't go to fairness, sir.  My

opinion goes to what is appropriate, given the

particular circumstances of the hypothetical

negotiation.

1    Q.   Thank you.

2             MR. HUESTON:  No more questions.

3             THE COURT:  Additional questions,

4    Mr. Rooklidge?

5             MR. ROOKLIDGE:  Just one, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. ROOKLIDGE:

8    Q.   Ms. Woodford, in your understanding of the law

9    as a patent damages expert, which party bears the burden

10   on apportionment?

11   A.   The Plaintiff does, and particularly with

12   respect to an improvement patent, such as the '947

13   patent, as I understand it.

14            MR. ROOKLIDGE:  No further questions,

15   Your Honor.

16            THE COURT:  Anything further?

17            MR. HUESTON:  No, Your Honor.

18            THE COURT:  All right.  You may step

19   down.

20            Who will be your next witness?

21            MR. VERHOEVEN:  Your Honor, Defendants

22   rest.

23            THE COURT:  Yahoo! rests?

24            MR. ROOKLIDGE:  Yahoo! rests, Your Honor.

25            THE COURT:  All right.  Counsel,

1  approach.

2            (Bench conference.)

3            MR. VERHOEVEN:  We do have one issue,

4  Your Honor.

5            I've been informed that the Plaintiff

6  wants to call their damages expert again and

7  characterize it as rebuttal testimony.

8            THE COURT:  Okay.

9            MR. VERHOEVEN:  We would object to that,

10 Your Honor.  They had the burden of proof.  They were

11 able to cross-examine our folks.  It's one thing for

12 Dr. Rhyne, when we had the burden on validity, to be

13 called again to rebut on the validity, which we were

14 expecting that they would do.

15           But we would -- we think it's

16 inappropriate to call a damages expert.  He's just going

17 to rehash the same stuff.  And just for the point of

18 having the last word, that's not appropriate rebuttal,

19 Your Honor.

20           MR. HUESTON:  And, Your Honor, he's not

21 being called to rehash the points.  Particularly,

22 Google's expert provided a new opinion that hasn't been

23 heard before, $2 million, and in the process of that

24 laid out some criticism of Dr. Becker.

25           I think Dr. Becker has a right to say,

1  does that opinion from Ms. Woodford change your

2  calculations here.  It's a very short answer to the new

3  information provided.  It is not a rehash.

4                    THE COURT:  Well --

5                    MR. VERHOEVEN:  May I -- I'm sorry.  May

6  I just respond briefly?

7                    Our damages expert testified within the

8  scope of his Rule 26 report, and there was no objection

9  that he went outside of it.  There's no surprise here.

10  It's simply they want to call on their expert to have

11  the last word.

12                    THE COURT:  Well, they've got the burden

13  of proof on damages.  I'm going to allow them to do

14  it --

15                    MR. HUESTON:  Thank you, Your Honor.

16                    THE COURT:  -- for that limited purpose.

17                    MR. HUESTON:  Uh-huh.

18                    MR. FENSTER:  With respect to

19  infringement, we also have the burden, but I think it's

20  appropriate that we have the right to respond to Fox and

21  Allan.

22                    THE COURT:  I agree.  Overruled.

23                    MR. SPANGLER:  Your Honor, do we have an

24  agreement or not with Cohen?

25                    MR. VERHOEVEN:  We do.

1            MR. SPANGLER:  We do have agreement on

2 this evidence.

3            THE COURT:  Okay.  But Yahoo! expressly

4 keeps the Overture stuff confidential.

5            MS. DOAN:  Wait on that one, Your Honor,

6 on the Overture licenses.  Keep them under seal or

7 something.

8            MR. SPANGLER:  Are we doing JMOLs after?

9            THE COURT:  That's why I called you up

10 here.

11            Mr. Verhoeven.

12            MR. VERHOEVEN:  Sorry, Your Honor.

13            THE COURT:  I called you up here to make

14 sure it was okay that we defer any motions for judgments

15 as a matter of law until close of all the evidence after

16 I have dismissed the jury today.

17            MR. VERHOEVEN:  Yes, Your Honor.

18            MR. ROOKLIDGE:  That's fine with us, Your

19 Honor.

20            (Bench conference concluded.)

21            THE COURT:  All right, Ladies and

22 Gentlemen, you heard now the evidence that the

23 Defendants have offered in their case-in-chief, and we

24 are now going to hear the Plaintiff's what's called or

25 referred to as the rebuttal case.

```
 1                    And so who will be your first rebuttal
 2  witness?
 3                    MR. SPANGLER:  Your Honor, we are going
 4  to present Fred Cohen by deposition.
 5                    THE COURT:  Okay.  Are you going to read
 6  both the questions and the answers?
 7                    MR. SPANGLER:  Yes, Your Honor.  It will
 8  be very brief.
 9                    THE COURT:  Introduce Mr. Cohen.
10                    MR. SPANGLER:  Mr. Cohen is one of the
11  listed inventors on the '947 patent.
12                    (Deposition excerpt read.)
13                    QUESTION:  So let's talk a little bit
14  about that.  So they brought you a draft of the
15  application and then what happened?
16                    ANSWER:  I read through the application
17  to see if it satisfied Chase's policies and practices,
18  and given my knowledge of Chase's operations to
19  determine whether or not it made appropriate claims,
20  given the little I knew from the face of the document
21  about the invention.
22                    And I gave no legal advice in that
23  context, because I'm not a patent lawyer.  I looked at
24  it.  It looked fine to me, but I said, wouldn't it be
25  appropriate to add this aspect of the invention.
```

And the attorney said, yeah, that seems appropriate.

Now we have to make you an inventor.

QUESTION: When you say this aspect, what aspect?

ANSWER: When the application came to me, it contemplated an input to a process only of electronic inquiries, e-mails, and other electronic inquiries.

Actually, I'm -- my memory is not specific as to other electronic inquiries, something that can't be e-mail inquiries.

And I said it shouldn't be limited to e-mail inquiries, given what I know of technology now.

For example, dictation software, it ought to be able to handle voice or voice recording just as well as it does in e-mail or electronic transmission of words. And they agreed and brought in the claims.

By the way, to my knowledge, I was a listed inventor on the initial Chase application.

(End of deposition excerpt.)

THE COURT: Okay. All right. Who will be your next witness?

MR. HUESTON: Thank you, Your Honor. Bright Response calls Dr. Becker as its first witness in rebuttal.

THE COURT: All right. Proceed.

MR. HUESTON:  Thank you, Your Honor.

STEPHEN L. BECKER, Ph.D., PLAINTIFF'S WITNESS,

PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. HUESTON:

Q.  Dr. Becker, have you been here in the courtroom to observe the testimony of Mr. Baker (sic) and Ms. Woodford in their testimony about damages this afternoon?

A.  Yes.

Q.  Has anything you heard today changed your opinion?

A.  No, it hasn't.

Q.  Why not?

A.  Well, I still believe that the approach that I am recommending, both in terms of a running royalty and the amount of that being a quarter to a half percent, is a reasonable compensation for the use made of the patent, if one assumes, as I must and as Mr. Bakewell and Ms. Woodford must, that the patent is valid and infringed.

Q.  And, Dr. Becker, is there anything you heard today that changes your opinion about the relevance of extent of use?

A.  Well, what I found notable in Ms. Woodford's

presentation and in Mr. Bakewell's presentation is that
the extent of use of the patent, the fact that we all
three have to assume that Yahoo! has over $5 billion of
revenue, that must be assumed to be generated with the
contribution of the '947 patent, and over 25 billion for
Google, that that extent of use appears to be of no
importance to them.

It doesn't seem to enter into their analysis.
That their approach is disconnected from that extent of
use.  And a running royalty, which I have used, hitches
that use to the -- to the royalty.

Q.   Does it account for, your approach, extent of
use?

A.   Yes, directly.

Q.   You heard Ms. Woodford and Mr. Bakewell
testified that you ignored the Firepond sale of the Rice
patent to Orion, and that the sale was a significant
real-world agreement available for comparison in this
case.

Do you agree with that assessment of your
analysis?

A.   I disagree with that.

Q.   Why is that?

A.   Well, they suggested that I ignored that
agreement, and I very much did not ignore it.  I

absolutely understand that Orion purchased the '947 patent and 13 other patents for $1 million.

But as I described in my direct testimony, it's my opinion that to look at that transaction as somehow limiting the value of the '947 patent in this circumstance is like back to our oil-and-gas analogy of you had bought a farm near Harrison County for a million dollars, it would be like the oil company showing up and saying, look, we've got a well on your property, but we're going to cap the amount we're going to pay you at a million dollars on your lease no matter how much gas we produce, because you paid a million dollars for that six months ago, nine months ago, some recent time period.

And I just don't think that it's relevant, if that prior transaction happened without the full awareness of the existence and validity of that -- of that patent, when the transaction occurred.

MR. HUESTON:  Pass the witness.

THE COURT:  Cross-examination?

MR. VERHOEVEN:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. VERHOEVEN:

Q.   Good afternoon, Mr. Becker.

A.   Good afternoon.

1    Q.   Now, you testified about extent of use.  You
2  have to assume 100 percent extent of use as part of the
3  hypothetical negotiation, right?

4    A.   Yes.

5    Q.   Okay.  And in the real-world when you're
6  looking at real-world agreements like those many
7  agreements we looked at that involve the exact same
8  patent in this case, you're not required to assume 100
9  percent of use, are you, sir?

10    A.   That's correct.

11    Q.   So your argument that, well, here it's a
12  hundred percent of use, but in these things we don't
13  know if it's a hundred percent of use, you can make that
14  argument in every single damages case, can't you, sir?

15    A.   Absolutely.

16    Q.   Okay.  Now, you said, well, you looked at the
17  Orion purchase.  Let's just remember that was -- that
18  was a purchase just five months before the hypothetical
19  negotiation for my client, Google, right?

20    A.   Yes.

21    Q.   And that was for a million dollars, right?

22    A.   Yes.

23    Q.   It wasn't a non-exclusive license.  It was for
24  the purchase of the whole patent, right?

25    A.   Correct.

1      Q.    And it wasn't just the '947 whole patent.
2  There were 13 other whole patents, right?

3      A.    Correct.

4      Q.    For a grand total of a million dollars, right?

5      A.    That's right.

6      Q.    Now, the damages amount -- the bottom range of
7  damages amount for Google that you're opining on is $64
8  million, right?

9      A.    That's right.

10     Q.    And your testimony to this jury is that in a
11 hypothetical negotiation five months later,
12 circumstances may have changed so that there would be
13 more money that's appropriate; is that right?

14     A.    Absolutely.

15     Q.    Okay.  Let's go back to my house example, all
16 right?

17     A.    Okay.

18     Q.    Say that you're looking for houses and there's
19 a house listed for $64 million, and you saw that that
20 house was sold together with 13 other houses 5 months
21 earlier for $1 million okay?

22     A.    Okay.

23     Q.    Can you explain to the jury what circumstances
24 would make you think that it's reasonable to pay $64
25 million for one of those 13, 14 houses?

1    A.   Absolutely I can.

2    Q.   Okay.  Do it.

3    A.   If in that intervening five months, someone

4 had come along and validated the existence, for example,

5 of a major oil-and-gas play underneath those properties,

6 it absolutely could be reasonable that 13 houses selling

7 for $1 million would be worth, after the validation of

8 that oil-and-gas play, $64 million.

9    Q.   Okay.  And the five months between the time

10 that the Orion purchase occurred in the hypothetical

11 negotiation, what change in circumstances can you

12 identify, sir, that would change the valuation of the

13 '947 patent to one-fourteenth of a million dollars to

14 $64 million?

15    A.   I can identify the assumption that I have to

16 make and Ms. Woodford and Mr. Bakewell have to make that

17 the '947 patent has been validated, its enforceability

18 has been proved up, and that Yahoo! and Google are known

19 to be infringing.

20    Q.   So you point to some legal assumptions.

21    What factual changes are you aware of

22 between -- during this five-month period, sir?

23    A.   Well, there are none.

24         MR. VERHOEVEN:  No further questions.

25         MR. ROOKLIDGE:  No questions, Your Honor.

1        THE COURT:  Any additional questions?

2        MR. HUESTON:  Yes, very briefly.

3                    REDIRECT EXAMINATION

4  BY MR. HUESTON:

5        Q.   Dr. Becker, you just pointed to the real-world

6  agreements that Defendants put up for you.

7             Did you see with all their real-world

8  agreements any evidence of actual use of the -- of the

9  inventions in those -- by these two Defendants with

10 those real-world agreements?

11       A.   No.

12       Q.   In comparison, was there any evidence that you

13 found of use by Google and of Yahoo! of the licenses

14 that you used for purposes of your comparison to come up

15 with your .25- to .5-percent running royalty rate?

16       A.   Yes.  The '361 patent with respect to Yahoo, I

17 think there's been ample testimony that that is used by

18 Yahoo!.

19            And with respect to Google, the Stanford

20 agreement that I used, there's, I think, been ample

21 testimony and evidence that that patented technology is

22 used in every search by Google.

23       Q.   Mr. Verhoeven, again, tried to use an analogy

24 of a sale for $64 million.

25            Have you talked about a lump-sum payment or

check to be written for $64 million in this case, or

have you talked about a quarter penny to a half penny

running royalty rate in this case?

A.   It's the latter.  It's my opinion that the

reasonable royalty should be a running royalty of a

quarter penny to a half penny.  And through today, that

turns out to be 64 to $128 million for Google, but

that's with the benefit of hindsight.

At the time, it would have just been an

agreement to pay that as time unfolded.

MR. HUESTON:  Pass the witness.

THE COURT:  Additional questions?

MR. VERHOEVEN:  No, Your Honor.

MR. ROOKLIDGE:  Just one question.

RECROSS-EXAMINATION

BY MR. ROOKLIDGE:

Q.   You mentioned the '361 patent, correct?

A.   Yes.

Q.   That is part of the Overture portfolio,

correct?

A.   Yes.

Q.   And were you here in the courtroom when I

showed the stack of patents that were related to the

'361 patent as part of a related family?

MR. HUESTON:  Objection.  Objection.  The

reference there, the predicate, none of that is in

evidence.

              THE COURT:  Overruled.

    Q.   (By Mr. Rooklidge) You were here when you saw

that big stack of patents that is the '361 patent

family, correct?

    A.   Yes.

    Q.   And you were here when I showed the other

stack of patents that's also part of the Overture U.S.

portfolio, correct?

    A.   Yes.

    Q.   And you were here when I pointed at that big

stack of patents on the floor that's the foreign

counterparts to the '361 Overture patents, correct?

    A.   Yes.

    Q.   The Overture patent portfolio, you admitted,

has many patents in it, correct?

    A.   Yes.

    Q.   Thank you.

        MR. ROOKLIDGE:  No further questions.

             REDIRECT EXAMINATION

BY MR. HUESTON:

    Q.   Dr. Becker, did you take the stack into

consideration in coming up with one-tenth to

one-twentieth of the royalty rate they charge on those

1  licenses?

2      A.   Yes.

3                  MR. HUESTON:  No more questions.

4                  THE COURT:  All right.  No further

5  cross-examination?

6                  MR. ROOKLIDGE:  Nothing further, Your

7  Honor.

8                  THE COURT:  Google?

9                  MR. VERHOEVEN:  Nothing, Your Honor.

10                  THE COURT:  You may leave --

11                  THE WITNESS:  Thank you.

12                  THE COURT:  -- and step down.

13                  All right.  Who will be your next

14  rebuttal witness?

15                  MR. FENSTER:  Your Honor, Bright Response

16  would like to call Dr. Vernon Thomas Rhyne back to the

17  stand.

18                  THE COURT:  All right.  Let's proceed.

19   VERNON THOMAS RHYNE, III, Ph.D., PLAINTIFF'S WITNESS,

20                      PREVIOUSLY SWORN

21                      DIRECT EXAMINATION

22  BY MR. FENSTER:

23      Q.   Good afternoon, Dr. Rhyne.

24      A.   Good afternoon.

25      Q.   Dr. Rhyne, before we get started, as I was

listening to all the other witnesses, I don't think you

had a chance to tell how long you've been married.

A.   Well, if my wife and I make it till the 4th of

June of next year, it will be 50 years.  And my

daughter's already planning the celebration, so I hope

we do.  We've got two kids and two grandkids.

Q.   All right.  So, Dr. Rhyne, have you been in

Court throughout the entire trial?

A.   I missed a little bit of Dr. Becker's trial

(sic) when I went to the dentist, okay?  But other than

that, I've been here all week.

Q.   Okay.  And did you see all the technical --

technical evidence that was put on in the Google case?

A.   I did, every bit of it.

Q.   And did you see all the technical evidence,

both fact witnesses and Dr. Allan, that was put on by

Yahoo!?

A.   I did.

Q.   Now, did any of the analysis or any of the

evidence that you saw in the trial over the course of

the last week change any of the opinions that you

developed?

A.   No.  And I was kind of gratified, because when

I work on a Plaintiff against companies like Yahoo! and

Google, I don't get to talk face-to-face with engineers

like Mr. Furrow or Mr. Kolm.  I have to develop my

understanding of their systems by studying their

software and documents and listening to the depositions

of those gentlemen.

And I don't think I've heard anything said yet

that says I didn't get a good and proper understanding

of the two systems.

What I've heard is that maybe I don't

understand how those systems relate to the claims.  But

as far as my technical understanding of AdWords and my

technical understanding of Sponsored Search that I seem

to have that pretty much on target.

Q.   What do you mean that what you heard was --

that the arguments relate to the application -- your

application of the evidence to the claims?

A.   Well, I guess what I've heard over and over

again, certainly from Dr. Fox and Dr. Allan, is that if

the claims mean what they say they mean -- I'm sorry --

if the claims mean what they say they mean, then they

don't think there's infringement.

But as I've told you and the jury several

times, I tried to follow the Court's constructions of

every single claim in great detail.  And I've been

through every limitation on that basis.  And I haven't

heard anything that changes my conviction that there's

infringement under the proper interpretation of each

limitation of each claim.

Q.   Dr. Rhyne, I'd like to walk you -- not walk

you through -- ask you about some of the -- some of the

arguments in evidence that has been raised by the

Defendants in this case.

One of them deals with the interactivity.

Google and Yahoo! have said that they don't meet the

requirement of processing a non-interactive electronic

message, and both of -- or Google, at least, put up a

slide similar to this?

A.   Yes.

Q.   And they said that this was interactive and,

therefore, not non-interactive, right?

A.   I -- I think -- that's the first time I had

seen it was in trial.  I hadn't seen it in any prior

reports.

But this -- this feature is called Google

suggestions.  And I think I told Mr. Verhoeven that I

don't have it on any of the computers that I use, and he

said, well, it's a default condition.  I went back and

checked and sometime in the long distance past, I must

have turned that default off.

He's correct.  It's the default position, but

I don't use it.

1            But if I understand it right, this is an

2   argument that when I type an M and I'm on my way -- I

3   think in this case it was to marinade -- that that M is

4   and of itself an interactive or some sort of

5   non-interactive electronic message sort of on the way to

6   marinade.

7        Q.   So, Dr. Rhyne, does the fact -- and it is a

8   fact -- that Google will offer these suggests as you go

9   along, typing in the search box, did that affect any of

10  your analysis and tell us how?

11       A.   Well, I went back and took a look at it.  You

12  know, all the way through what I have accused of being a

13  non-interactive electronic message has been the query,

14  the thing that you do, that you type in.

15           To me, it wasn't an interactive message until

16  I got to M-A-R-I-N-A-D-E, and I either pushed enter on

17  the keyboard or I clicked on search.

18           MR. VERHOEVEN:  Your Honor, I have an

19  objection.  May I approach?

20           THE COURT:  Yes.

21           (Bench conference.)

22           MR. VERHOEVEN:  Your Honor, I don't see

23  how following up on my cross-examination is rebuttal.

24  He's not talking about what Dr. Fox said.  It seems like

25  he's just getting another chance to try to fix what

happened on cross-examination.

THE COURT:  Well, how is this rebuttal?

MR. FENSTER:  Your Honor, this is -- all of their witnesses talked about this interactivity. Mr. Furrow and Dr. Fox talked about this being interactive and, therefore, not non-interactive.  And that's what he's responding to.

MR. VERHOEVEN:  Well, he's put up this -- I'm sorry, Your Honor.

THE COURT:  Well, what I'm trying to tell him is the witness rebuttal infringement and get to any rebuttal you've got on validity, if you have any, okay?

I will let you give brief rebuttal, since you've got the burden of proof, but we're not going to go rehash the entire infringement theories, okay?

MR. FENSTER:  Okay.

(Bench conference concluded.)

Q.   (By Mr. Fenster) Dr. Rhyne, very briefly, you said that you went and looked at Google search?

A.   I looked at Goggle Suggest.

Q.   And was this in response to evidence that you saw in Goggle's case?

A.   Yes, for the first time.

Q.   Okay.  And what did you find?

A.   Well, I studied it.  This is a page on the

Google website.  I searched Google Suggest on Google.

And I think it's revealing in terms of what's actually

going on as that suggest takes place.

          And if you start up there at the top right

there, it said -- okay -- as you typed in the search box

on Google web search, Google Suggests offered searches

by other users that are similar to the one you're

typing.  Start to type New York or even just any W,

space, Y, and you'll be able to pick searches for New

York, New York City, New York Times, and New York

University.

          So this document refers to the stuff that's

below those full query search terms as the search and

not to the N-E-W-Y as a search.

          And if you go down further, there's a

paragraph that says:  Get information fast.  And then it

says:  How Google Suggest works.

          It says as you type -- incrementally, as you

type, Google Suggest returns search queries based on

other user's search activities.

          So the point is that the stuff in the bottom

are the search queries, and if I like one of those

search queries, I can move my mouse down and click on

it.  But they're referred to what's happening up in the

search box as this -- you're typing along, and those are

1   not the queries.

2           And so I think that Google themselves

3   recognizes that those are not incremental queries or

4   messages of any type.

5       Q.   Just real briefly.  Dr. Fox testified that the

6   M as you type along was an electronic message.

7           Do you agree with that?

8       A.   It's a form of an electronic message, but it's

9   not the non-interactive electronic message that I've

10  accused of infringement.  It's only that last message,

11  which is followed by a carriage return or a click on

12  Google Search.

13          It is the part I focused on for my

14  infringement analysis.

15      Q.   Now, quickly, you heard from both Google and

16  Yahoo! that neither of them have a case-based knowledge

17  engine.

18          What's your response to the evidence as you

19  heard it?

20      A.   Frankly, I don't understand it.  I've relied

21  on the Court's construction, and I don't have it

22  memorized.  But it basically says something to the

23  effect -- I realize time is short.  I never used to like

24  to teach classes at 4:00 p.m. on Friday.

25          The -- it says you have a knowledge engine

that compares messages to the term -- the construct uses
exemplar cases.  And I pointed out to the jury two
specific examples of comparisons to exemplar cases.  One
of them was a comparison to the search terms entered by
the advertisers, and those are like -- those are, as I
said, searches that the advertisers hope somebody's
going to make a keyword, that -- whether it's pizza or
something.  They're looking for that as an exemplary
case.

     Q.   Dr. Rhyne, focusing on the evidence that you
heard or the testimony that you heard from Mr. Furrow
and Dr. Fox, did you hear anything in either of those
witnesses that either confirmed or called into question
your conclusions?

     A.   They confirmed it.  There were questions, I
think, of both Yahoo! and Google witnesses.  Well, when
you get there and you make the comparison, do you
compare the keywords?

          Yes.

          Do you compare it to other attributes of the
advertisements in the message?

          Yes, you do.

     Q.   Now, you heard from both Google and Yahoo!
witnesses that they testified that they all -- that
Google AdWords and Yahoo! Sponsored Search always

respond automatically.

     A.   Yes.  In fact, they put up a quotation from

one of my -- I can't remember which testimony it was,

but they said -- I was asked that question, do they

always provide some kind of response, and I said you bet

they do.

     Q.   How does that impact your infringement

analysis with respect to the classification step?

     A.   Not at all.  I think you actually had me point

to one of the early diagrams that had the search results

going up to the top and the ad results coming down here.

And the only part of either one of those systems that

I've accused of infringement has been the ad part,

AdWords and Sponsored Search.

          I'm not saying that there's any infringement

as a result of sending back what they call the natural

search results.  But there's no question -- in fact,

some of the exhibits that were shown by the Defendants

with their experts show the absence of advertisements.

          There was one that Dr. Fox used where he had

misspelled cowboys.  And if you look at that screen

shot, there are no ads, okay?  I guess they didn't know

how an ad for C-O-W-B-O-I-S.

          But that's the focus that I've been looking

at.  What is the response?  Is there an ad or is there

1 not?

2     Q.   Dr. Rhyne, in summary without going through

3 all the -- all the elements and all the arguments, did

4 you see anything from the Google witnesses or Dr. Fox

5 that changed any of your opinions or confirmed any of

6 your opinions with respect to Google?

7     A.   No.

8     Q.   What is your opinion, after having seen all of

9 the evidence with respect to both Google and Yahoo!?

10     A.   Bottom line, I still believe that Google

11 AdWords and Yahoo! Sponsored Search both infringe

12 Claims 30, 31, and 32 (sic) of the Rice patent.

13     Q.   I think you said 32.

14     A.   I'm sorry.  33.

15     Q.   Now, Dr. Rhyne, let's move to invalidity.

16     Were you here for the testimony of Dr.

17 Branting?

18     A.   Yes.

19     Q.   And you heard the other -- the rest of Google

20 and Yahoo!'s invalidity case?

21     A.   I have.

22     Q.   Now, did anything in that presentation affect

23 your -- well, actually just tell me what's your response

24 to their case?

25     A.   I think it actually confirmed it.  I heard Dr.

1  Branting say that he was not familiar with

2  reexamination.  I'm intimately familiar with

3  reexamination.  I've been to the Patent Office three

4  times to testify as a technical expert before a

5  reexamination panel, which it consists of three senior

6  Patent Examiners selected to be part of the

7  reexamination team.

8          And in this case here, the reexaminer has said

9  that as far as the Allen patent alone, Claims 30, 31,

10  and 33 are valid over that reference.

11          MR. VERHOEVEN:  Objection.  Move to

12  strike.  This witness is not classified as an expert in

13  PTO reviews.

14          THE COURT:  Overruled.

15      Q.   (By Mr. Fenster) Go ahead.

16      A.   As far as the second request for

17  reexamination, which Yahoo! filed which, as I recall,

18  was the combination of the Allen patent and those CBR

19  manuals for that early rule-based --

20          MR. ROOKLIDGE:  Same objection, Your

21  Honor.

22          THE COURT:  Likewise overruled.

23      A.   Okay.  What the Patent Office did at that

24  point was said there's no substantial new question of

25  invalidity, and they didn't even accept the

1  reexamination request.

2      Q.   Now, can you remind the jury what prior art

3  Dr. Branting relied on in one of his invalidity

4  conclusions with respect to the claims?

5      A.   Okay.  I think he relied on this Allen,

6  A-L-L-E-N, patent, Bradley Allen's patent independently,

7  and said that it anticipated or made obvious.

8          And then he also looked at the CBR -- there's

9  a user's manual in a separate document that's called the

10 Reference Guide.  I may have those backwards, User's

11 Guide and Reference Manual, I believe.

12     Q.   And did the Patent Office have a chance to

13 review those -- those references in determining --

14 confirming the validity of the asserted claims in the

15 case?

16     A.   Well, it wasn't quite that direct.  When

17 Yahoo! sent the documents in for the reexam, it's my

18 understanding that they sent in Allen and those CBR

19 manuals.  And it's not that they -- I guess in a sense

20 they reconfirmed it.  They just said that -- those prior

21 art references don't raise any question of invalidity.

22 It's just as valid as it was when we did the full reexam

23 the first time.

24          MR. VERHOEVEN:  Same objection, Your

25 Honor.

1          THE COURT:  Overruled.

2     Q.   (By Mr. Fenster) Now, Dr. Rhyne, what

3  experience do you have with validity analysis and the

4  standards for validity?

5     A.   I'm a patent agent.  I took and passed the

6  patent bar exam.

7     Q.   What does that mean?

8     A.   Well, it's an exam the Patent Office now gives

9  once a year.  I took it in 1999 and passed it the first

10  time.  And a major feature of that examination is how do

11  I, as a patent agent, take a look at the possible prior

12  art that might be invalidating to a patent application

13  that I'm about to make.

14          And you also -- during the process, you have

15  dialogue with the Patent Examiner when he or she says,

16  look, have you thought about this?  Have you thought

17  about that?  Maybe you want to modify your claims.

18  I think I understand that very well as a result of my

19  patent agency.

20     Q.   Okay.  Now, did you just rely on

21  reexamination, or did you -- did you do your own

22  analysis with respect to the asserted prior art by the

23  Defendant?

24     A.   No.  I -- I wrote an extensive rebuttal report

25  to Mr. Branting -- excuse me -- Dr. Branting --

Mr. Branting's report alleging invalidity over Allen and the CBR manuals. And I did a personal study of all of the claim limitations against Allen, and I essentially reconfirmed the difference that the reexaminer had made for my own self, independent of the fact that it had been through the reexam.

Q. And did you reach any conclusions as to whether the Allen patent, the '664 patent, anticipates any of the asserted claims, Claims 30, 31, or 33 of the -- of the Rice patent?

A. Yes, I did.

Q. And what was that analysis?

A. It does not.

Q. And why is that?

A. Because if you look in the Rice patent -- excuse me -- the Allen patent, it does a sort at the beginning of its analysis of the cases, and it selects a set of cases based on that initial comparison between the incoming case and the cases in the case base.

And when it passes that, it's called the matching set, where it found its. When it passes that set over, of all the things that it did the comparison for in the first place, only some of those cases get compared -- excuse me -- scored.

And if you recall, there's a claim

limitation -- I think it's 30(b6) -- that says, for each case that's compared, you have to do a scoring. And Allen absolutely does not do that.

Q.   And if Allen doesn't meet one or more elements of Claim 30, what does that mean with respect to whether it anticipates Claims 30, 31, and 33?

A.   Since 31 is dependent on Claim 30, if you miss 30(b6), you can't hit 31. And 33 depends on 31 and hits 30. So Allen doesn't anticipate any of the three.

Q.   Okay. Did you analyze whether any other references cited by Dr. Branting in his report anticipate of the asserted claims?

A.   Yes. I also looked at the CBR Manual and Guide, considering them together, as if they were an obviousness situation. And I went -- in my report, I explained why.

They failed to score in the proper way. They only scored the questions in a certain way and separately scored the text of the case. And they do not meet, again, 30(b6).

Q.   Okay. Now, did you analyze the asserted claim?

MR. FENSTER:   Let me withdraw that.

Q.   (By Mr. Fenster) Dr. Branting also asserted that the -- that the asserted claims were invalid for

1 obviousness?

2      A.   He did.

3      Q.   What's obviousness?

4      A.   Obviousness is a situation where you don't

5 have to have a single reference.  And there are really

6 two kinds, but the kind that he looked at was

7 multi-reference obviousness.

8           And you just sort of combine the teachings of

9 the two references or three or four to see whether or

10 not that multiple set of references discloses each and

11 every limitation of a given claim.

12      Q.   And did you analyze the asserted claims for

13 whether they were invalid for obviousness?

14      A.   I -- I essentially -- again, I was responding

15 to what he said in his report.  And so I went in and

16 took a look at the assertions he made.

17           And for each combination that he alleged

18 obviousness, I did my own independent analysis and found

19 at least one limitation of Claims 30, 31, and 33

20 missing, even in the combination of references that he

21 identified.

22      Q.   Did you consider any other indicia or

23 considerations in doing your -- your obviousness --

24 obviousness analysis?

25      A.   Yes, I did.  I -- I looked into what are

commonly called the secondary indicia of

non-obviousness.

Q.   What are those?

A.   Well, it's -- it's -- it always reminds me --

it's kind of like those Georgia-Pacific Factors.  There

was a case a number of years ago where somebody in a

court outlined -- there are things like recognition in

the industry.  And I looked at that.

There are cases like failure of others to

accomplish, and I looked at that.  I found that many

other people, while they were close to what was in the

Rice patent, had never quite hit that nail on the head.

I looked at things like success and -- because

I think that Google and Yahoo! both infringe the very

financial success that Google and Yahoo! have had using

that invention in their AdWords system and in their

Sponsored Search system, I think, can be credited back

to the usefulness of that invention.

Q.   Now, Dr. Rhyne, did -- so can you give a

summary of what your opinion was with respect to whether

or not -- actually, before we get there, can you remind

the jury what your understanding is as to the burden of

proof that the Defendants have in proving invalidity?

A.   You are going to have to correct me if I'm

wrong, but I believe theirs is clear and convincing as

opposed to, for infringement, it's preponderance --

preponderance of the evidence.

Q.   And do you think they met that, that the

Defendants met that burden?

A.   For invalidity?

Q.   Yes.

A.   Absolutely not.

Q.   And what was your ultimate conclusion with

respect to the validity of the asserted claims?

A.   For everything that was allegedly invalidating

of the Claims 30, 31, and 33 of the Rice patent, I don't

believe that that burden has been met.  I don't think

those claims are invalid over that body of prior art.

MR. FENSTER:  I'll pass the witness, Your

Honor.

THE COURT:  All right.  Mr. Verhoeven?

MR. VERHOEVEN:  Thank you, Your Honor.

THE COURT:  Cross-examination.

MR. VERHOEVEN:  Thank, Your Honor.

CROSS-EXAMINATION

BY MR. VERHOEVEN:

Q.   Good afternoon, Dr. Rhyne.

A.   Good afternoon, Mr. Verhoeven.

Q.   You stated that when using that marmalade

example that you and I talked about on cross-examination

1  the last time --

2      A.   Yes.

3      Q.   You with me?

4      A.   I'm familiar with it.

5      Q.   I believe you said just now that when a user

6  types an M, that is a form of electronic message, right?

7      A.   It is an http message that's sent in, that's

8  correct.

9      Q.   So it's a form of electronic message, yes?

10     A.   It is.

11     Q.   That's yes?

12     A.   Yes.

13     Q.   Okay.  And you agree with me that when a user

14 types that in, that gets sent from the source, which is

15 the human being, client computer and the browser, to

16 Yahoo!, right?

17     A.   I think it does.

18     Q.   And then automatically, almost immediately,

19 Google comes back with those ten suggestions, right?

20     A.   That's true.

21     Q.   And when the user types the next character, A,

22 that's a form of electronic message, sir, right?

23     A.   Yes, it is.

24     Q.   And that gets sent to Google, right?

25     A.   Yes.

1    Q.    And Google responds back, right?

2    A.    That's correct.

3    Q.    And so on and so forth, each character that

4  gets submitted, right?

5    A.    It's very different at the end, but for each

6  character en route, there is a transmission, and it

7  comes back.

8    Q.    And when the user -- say the user just wants

9  to type a search for marmalade.  That's it.

10  You with me?

11    A.    For marmalade.

12    Q.    The word marmalade, correct?

13    A.    Yes, sir.

14    Q.    When the user finishes -- and the last letter

15  of marmalade is E; is that right?

16    A.    Yes.

17    Q.    Okay.  So when a user finishes the E, that

18  goes to Google, the whole word goes to Google, doesn't

19  it, automatically, and Google responds automatically

20  with ten more suggestions, right?

21    A.    That may be true.

22    Q.    Okay.

23    A.    At that point, as I say, I always hit enter or

24  search to indicate that the search is taking place.

25    Q.    And that's the exact same query that gets sent

1  to Google if Google hits -- if the user hits search

2  after typing marmalade, right?

3       A.   No.

4       Q.   It's the same word.

5       A.   It is.  It's the same string of characters.

6       Q.   It gets sent to Google.

7       A.   I think it does.

8       Q.   And Google comes back with an automatic

9  response.

10      A.   Yeah.  But it's not the same as the final

11 message that they send in with the carriage return or

12 the search.

13      Q.   But the fact is, it's the same characters, and

14 it gets sent to Google, and Google comes back with a

15 response, right?

16      A.   I think it does send back those --

17      Q.   Is that yes --

18      A.   Yes.

19      Q.   -- or no?

20      A.   I'll give you a yes.

21      Q.   Okay.  Thank you.

22           Now --

23           MR. VERHOEVEN:  Your Honor, I forgot.  I

24 need to approach the bench, and now is a good time since

25 I'm switching subjects.

1          THE COURT:  Okay.  All right.

2          (Bench conference.)

3          MR. VERHOEVEN:  Really briefly, Your

4  Honor.

5          THE COURT:  Well, just a second.

6          MR. VERHOEVEN:  Okay.

7          THE COURT:  Let everybody make it up

8  here.

9          Okay.

10          MR. VERHOEVEN:  I wasn't aware that we

11  were permitted to talk about other lawsuits when I --

12  when we had that colloquy earlier today with the damages

13  expert.

14          I would like to be able, for bias

15  reasons, to question Dr. Rhyne about the fact that he

16  was adverse to Google in Function Media; he was adverse

17  to Google in PA Advisors; in this case; and also in

18  another case, PUM versus Google.

19          I think that's fair.  If they're allowed

20  to talk about other damages cases where different

21  positions were taken, sauce for the goose, sauce for the

22  gander.

23          So I just want to clear it up, though.

24  I'm not going to do it if you don't want me to.

25          MR. FENSTER:  We would -- I think that

his motion in limine says we can't talk about the

results of any of those cases.

THE COURT: Well, you're going to go into

the result, but I'll let you establish that this isn't

the only case he's been hired to testify against Google,

and you can tell the number -- ask him the number, but

don't get beyond that.

MR. VERHOEVEN: I can't tell which ones?

I shouldn't identify them?

THE COURT: I would rather you not

identify them.

MR. VERHOEVEN: Okay.

THE COURT: You don't need to identify

them, do you?

MR. VERHOEVEN: I guess I don't, but I

have one other query.

THE COURT: Okay.

MR. VERHOEVEN: Sorry about that.

Can I identify the subject matter of the

technology that's accused to show that it's similar?

THE COURT: Yes.

MR. VERHOEVEN: Thank you.

MR. ROOKLIDGE: Your Honor, just one more

question. It's a related question.

He -- I believe he opened the door by

talking about the commercial success of this.  May I ask

him if the entirety of the revenues that Bright Response

has received from this patent have been through

settlement of litigation?

MR. FENSTER:  I don't think he has any

foundation for that.  I don't think he testified to

that.

THE COURT:  Yes.

MR. ROOKLIDGE:  Thank you.

(Bench conference concluded.)

Q.   (By Mr. Verhoeven) Thanks for bearing with me,

Dr. Rhyne.

Let's switch to the issue of validity --

A.   All right.

Q.   -- okay?

First, I'd like to talk about the EZ Reader

system.

You familiar with that?

A.   I have actually been, I thought, precluded

from talking about the EZ Reader system.

Q.   Are you familiar with the EZ Reader system,

sir?

A.   Yes.

Q.   Okay.

MR. FENSTER:  Objection, Your Honor,

1    beyond the scope.

2                    THE COURT:  It's overruled.

3                    MR. FENSTER:  He had the motion in limine

4    on this.

5                    THE COURT:  Well, overruled.

6        Q.   (By Mr. Verhoeven) You don't dispute that

7    every element of the -- each of the asserted claims

8    existed in EZ Reader system, do you?

9        A.   At trial, I haven't offered any opinion either

10   way.

11       Q.   You don't dispute it, do you, sir?

12       A.   Yes, sir.

13       Q.   And, in fact, you would agree, wouldn't you,

14   sir, that the EZ Reader system does disclose every

15   element of the asserted claims of the '947 patent?

16       A.   I have not done an analysis of EZ Reader

17   against every limitation of every claim, but I have no

18   basis to say that isn't true.

19       Q.   Now, your deposition on validity was taken on

20   July 29th, 2010; is that right?

21       A.   Yes.

22       Q.   Let's see what you said when we asked you that

23   question at Page 93, Line 23.

24                    THE COURT:  Mr. Verhoeven, I think he

25   agreed with you.

1          MR. VERHOEVEN:  Well, let me ask the

2  question again, Your Honor.  Maybe I misheard.  If I

3  may?

4          THE COURT:  Okay.

5     Q.   (By Mr. Verhoeven) Would you agree, sir, that

6  the EZ Reader does disclose every element of the

7  asserted claims of the '947 patent?

8     A.   I have no basis to disagree with you.  You can

9  read that as an agreement.

10     Q.   So you do agree then; it does disclose it?

11     A.   Okay.

12          MR. VERHOEVEN:  Well, Your Honor, he --

13          THE COURT:  Do you agree or --

14          THE WITNESS:  Yes, as far as I know.

15          THE COURT:  Okay.  Let's move on.

16          MR. VERHOEVEN:  Thank you, Your Honor.

17     Q.   (By Mr. Verhoeven) Now let's talk about

18  case-based reasoning.

19     A.   Yes, sir.

20     Q.   Sometimes in the industry, it's called CBR,

21  right?

22     A.   That's true.

23     Q.   Okay.  As of 1997, you wouldn't have

24  considered yourself an expert in case-based knowledge

25  engines, would you, sir?

 1    A.   I wouldn't have offered myself up as an expert

 2  in a trial like this if it was pure case-based

 3  reasoning, and I certainly wouldn't have done that in

 4  1997.

 5    Q.   Would you agree with me that Dr. Branting has

 6  more experience with case-based reasoning than you do,

 7  sir?

 8    A.   Yes.

 9    Q.   Now, you talked about the reexamination --

10    A.   Yes, sir.

11    Q.   -- a little bit, sir.

12         Do you understand that in the reexamining

13  (sic) setting, the United States Patent & Trademark

14  Office does not address or assess whether a claim is

15  invalid based on prior public use?

16    A.   Yes.

17    Q.   That's not something they can even look at,

18  right?

19    A.   Yes.  You cannot bring that to them to

20  consider.

21    Q.   So this issue in this case about the public

22  use with the EZ Reader, that couldn't have been

23  presented before the Patent Office.  Would you agree

24  with me there?

25    A.   That's my understanding.

1          Q.   Okay.  Now, one of the things you look at when

2     assessing obviousness -- I'm switching again to

3     obviousness, so you can keep up with me.

4          A.   Okay.  Thank you.

5          Q.   So switching to that subject, one of the

6     factors that is relevant to look at is whether you can

7     point to any unpredictable results based on a

8     combination of elements that are known in the art,

9     right?

10         A.   I'm not sure which way your question went.

11         Q.   Okay.  I'll try it again.

12         A.   You sailed --

13         Q.   Let me try --

14         A.   I -- all right.

15         Q.   -- to be more clear.

16              One of the factors that you could look at in

17    forming an obviousness analysis is whether you could

18    point to unpredictable results that were obtained as a

19    result of the patent, right?

20         A.   Okay.  I think I agree with you, but it's

21    actually a factor, as I understand that particular case,

22    that you point to as it not being obvious.  And that's

23    what's giving me trouble.

24         Q.   Exactly.  So if there's un -- if there's -- if

25    there's unpredictable results, that tends to show it's

1  not obvious, right?

2      A.   I think there's been a case where the Court

3  said, if you -- if you could point to unexpected or

4  unpredicted -- predictable results, then that indicates

5  that some combination is not so obvious.

6      Q.   You can't point to any unpredictable results

7  of the claimed method of Claim 28, can you, sir?

8      A.   I have not tried to do that.

9      Q.   You don't have any opinion you can offer the

10 jury at this time on unpredictable results at all, do

11 you, sir?

12     A.   I haven't yet, and I won't offer one now.

13     Q.   Would you agree that before the priority date

14 of the '947 patent, that non-interactive electronic

15 messages existed?

16     A.   Yes, I think that's the case.

17     Q.   An e-mail certainly existed before the '947

18 patent, right?

19     A.   I wish I could remember when I first started

20 using it, but it's been a long time ago.  Before that.

21     Q.   Probably in the '80s?

22     A.   I bet I was using e-mail even well before

23 that.

24     Q.   Okay.  E-mail is a non-electric -- a

25 non-interactive electronic message?

1    A.    It can be, depending, to some degree, on how

2  the -- on the system that receives it and processes it.

3    Q.    There were e-mail systems way back when that

4  used non-interactive electronic messages, right?

5    A.    There were e-mail systems that processed

6  e-mail in a non-interactive way.

7    Q.    And would you agree with me, sir, that

8  rule-based knowledge engines existed before the '947

9  patent?

10    A.    Yes, sir.

11    Q.    And would you agree with me that case-based

12  knowledge engines existed before the '947 patent?

13    A.    I would.

14    Q.    And what about systems that combine both rule-

15  and case-based knowledge engines like in the '947

16  patent?  Those were around in the prior art before the

17  '947 patent, right?

18    A.    I have seen a couple of those, yes, sir.

19    Q.    Okay.  And what about these predetermined

20  responses that we've been talking about?  Would you

21  agree that in the prior art, there were systems that

22  retrieved one or more predetermined responses?

23    A.    Yes.

24    Q.    '947 patent is not the first system to

25  retrieve one or more predetermined responses, is it,

1  sir?

2      A.    I -- I have not contended that.  I don't

3  believe that to be the case.

4      Q.    And then if you're talking about Claim 31

5  where we talked about how, if there's a mismatch, it

6  decreases the score, and if there's a match, it

7  increases the score --

8      A.    Yes.

9      Q.    -- those notions of matching and increasing or

10 decreasing a score, those aren't new or inventive, are

11 they?

12     A.    I think when I was asked about that in my

13 deposition, I said I didn't have any specific evidence,

14 but I couldn't -- I think I kind of gave you a

15 non-answer answer.  I don't -- I don't know whether

16 there were systems like that before.

17     Q.    You're not telling this jury that that is new

18 and unique, are you?

19     A.    No.  I'm telling them -- I'm not offering an

20 opinion on that topic.

21     Q.    Okay.  And then remember the normalization

22 step?

23     A.    Yes.

24     Q.    What claim was that; do you remember?

25     A.    33, I think.

1    Q.    33.

2           Normalization existed before the '947 patent,

3    didn't it?

4    A.    Yes, sir.  Percentages is a good example, like

5    batting averages.

6    Q.    So you would agree that the '9 -- that this

7    Claim 33 --

8    A.    I believe so.

9    Q.    Okay.  You would agree that Claim 33 of the

10   '947 patent doesn't disclose any new mathematical

11   formula for normalization, right?

12   A.    Well, the claim just calls for it.  Did you

13   mean to ask me about the claim or the specification?

14   Q.    Well, I'm asking you, does Claim 33, the

15   new -- the added step in Claim 33, it talks about

16   normalization -- you remember that step?

17   A.    Yes.

18   Q.    That's not new or unique, is it, in isolation?

19   A.    If you take that step out in isolation, I

20   don't believe that it is.

21   Q.    Now let's put up --

22                 (Pause in proceedings.)

23                 MR. VERHOEVEN:  Having the technical

24   difficulties, Your Honor.

25   Q.    (By Mr. Verhoeven) This is the Allen patent up

1  on the slide.  You see it at the top?

2      A.   Yes.

3      Q.   You've seen that before, right?

4      A.   I have.

5      Q.   And then at Column 10, Lines 40 through 44,

6  you see where I've pulled out some text?

7      A.   Yes.

8      Q.   And it says:  A preferred example of

9  case-based reasoning system for providing user help on

10 call-in complaints is more fully described in, quote,

11 CBR Express user's guide, closed quote, available from

12 Inference Corporation in El Segundo, California, and

13 hereby incorporated by reference as fully set forth

14 herein.

15          You see that?

16     A.   Yes, sir.

17     Q.   You would agree with me, sir, wouldn't you,

18 that a person of ordinary skill in the art who's looking

19 at this patent, seeing this reference and incorporation

20 would be motivated to look at the CBR Express User's

21 Guide, together with the patent?

22     A.   The version of the CBR User's Guide that was

23 available at that time, I agree with you completely.

24     Q.   Okay.  Now, Dr. Rhyne, this isn't the only

25 case where you've testified for a plaintiff against my

1  client, Google, is it, sir?

2      A.    No.

3      Q.    How many cases have you been retained on where

4  you've taken on an assignment to testify against my

5  client, Google?

6      A.    Two others.

7      Q.    You sure it's not more than that?

8      A.    There may be more.  I don't recall them.

9              MR. VERHOEVEN:  Your Honor, may I

10  approach really briefly?

11             THE COURT:  Well, yes.

12             (Bench conference.)

13             MR. VERHOEVEN:  He's got the -- I wasn't

14  going to name names, but he's got the number wrong, and

15  I don't want to do it without permission.  And I'll do

16  whatever you say.

17             THE COURT:  Remind him of the names.

18             MR. VERHOEVEN:  Thank you.

19             THE COURT:  And, Counsel, don't refer to

20  whether or not they're represented by any of the same

21  counsel that are involved in this case, okay?

22             MR. VERHOEVEN:  Understood.

23             (Bench conference concluded.)

24      Q.    (By Mr. Verhoeven) Let me see if I can refresh

25  your recollection.

1    A.   Sure.  Obviously, I must not be remembering

2 one or so.

3    Q.   There's a case called Function Media versus

4 Google.  Do you remember that case?

5    A.   Yes.  That's one of the two I recall.

6    Q.   And you testified against my client, Google,

7 in that case?

8    A.   Yes, I did.

9    Q.   And that case involved search technology?

10    A.   I --

11    Q.   Let me ask you a different question.

12    A.   I -- I don't think it did.

13    Q.   Did that case involve AdSense for Content?

14    A.   Yes, it did that.

15    Q.   And that's advertising on the internet, right?

16    A.   Yes.

17    Q.   And have you ever heard of a case called PA

18 Advisors versus Google?

19    A.   Yes.  That's the second case that I remember.

20    Q.   And that's another case where you testified

21 against my client, Google?

22    A.   I testified at deposition.  Interestingly

23 enough that there was no infringement.

24    Q.   Well, you don't need to talk about the result

25 in that case.

1     A.   Okay.  Sorry.

2     Q.   We're not going to talk about results in any

3 of these cases.

4     A.   Okay.

5     Q.   But in that case, you testified against my

6 client, Google, as well, right?

7     A.   In deposition.  There was no trial.

8     Q.   And what technology was involved in that

9 trial?

10    A.   Some kind of search tech -- I think it was

11 just the pure search, not advertisement search, as I

12 recall.

13    Q.   These two cases I just mentioned were patent

14 cases?

15    A.   Yes, they were.

16    Q.   Okay.  And have you heard of a case called PUM

17 versus Google?

18    A.   Yes.  The reason I didn't list it is I'm

19 not -- I was not aware that my participation in that --

20 my agreement to participate as an expert in that court

21 has been made public.

22    Q.   Oh, you didn't know we knew about it.

23    A.   I had no -- I did not know.  I always am very

24 careful about when somebody asks me to be one of their

25 experts until they have formally announced it, but fine,

1 yes, sir.

2     Q.   That's another case where you've agreed to

3 testify against my client, Google, right?

4     A.   To this point, I've agreed to do that.

5     Q.   That's another patent case?

6     A.   Yes, it is.

7     Q.   And then there's this case, right?

8     A.   Well, I didn't -- when you say what other

9 cases, I didn't count this one, but yeah.

10     Q.   So we've got four --

11     A.   Yes, sir.

12     Q.   -- is that right, sir?

13     A.   I believe that's correct.

14             MR. VERHOEVEN:  No further questions,

15 Your Honor.

16             THE COURT:  Mr. Rooklidge?

17                CROSS-EXAMINATION

18 BY MR. ROOKLIDGE:

19     Q.   Good afternoon, Dr. Rhyne.

20     A.   Good afternoon.

21     Q.   Following up on that last point, this isn't

22 your first rodeo against Yahoo!, is it?

23     A.   I think I've had one other case against Yahoo!

24 that actually went that far.  It was that nXn case.  You

25 were Defendants as well.

1    Q.   Now, in your testimony, you linked the success

2  of Google's AdWords and Yahoo!'s Sponsored Search to the

3  use of the '947 patent.

4         Do you remember that?

5    A.   Yes.

6    Q.   Now, those services were very successful

7  before the alleged date of first infringement in this

8  case; isn't that correct?

9    A.   I'm not sure about the very, but I'm aware

10  that both Google and Yahoo! were making money with the

11  preceding systems before they implemented those other

12  systems.

13    Q.   In fact, Google at that time was the No. 1

14  rated search engine and Yahoo! was the No. 2 rated

15  search engine, wasn't it?

16    A.   Well, but that's search.  They were -- people

17  doing search, just to find search results, that's true.

18    Q.   Okay.  Now, you spoke about commercial

19  success.  You're aware that the only revenue received by

20  Bright Response under the '947 patent is for settlement

21  of litigation, correct?

22    A.   I'm not.

23    Q.   Now, you were here today for Dave Kolm's

24  testimony that Yahoo!'s Sponsored Search always returns

25  a response.

1          Did you hear that?

2     A.   Yes.

3     Q.   Okay.  Now, is it your testimony that Yahoo!'s

4 Sponsored Search does not always provide a response to a

5 search request?

6     A.   No.  They just -- well, again, I won't go

7 further.

8     Q.   Now, you were testifying about interactivity,

9 and you said M is a form of electronic message.

10     A.   It -- it -- yeah.  It's sent back to Google.

11 In a way, it is.

12     Q.   Now, you heard Fred Cohen's testimony being

13 read this afternoon, didn't you, where he testified that

14 he got to look at the patent application that had been

15 put together by the other four inventors, and they had

16 only mentioned e-mail, but he decided it would be best

17 to broaden that out to talk about voice data and

18 telephone codes, right?

19     A.   I heard it read.  I, frankly, didn't

20 comprehend a lot of what was read.

21     Q.   Now, you've also heard here from the inventor,

22 Amy Rice, that non-interactive electronic message can

23 include TV broadcasts.  We've heard about satellite

24 communications.  We've heard about Morse Code in this

25 trial.

1      A.    I don't recall all -- I remember hearing

2    somebody say something about television.  I don't

3    remember Morse Code.

4      Q.    At the time -- at the time of this claimed

5    invention, the http format was known, wasn't it?

6      A.    Yes, it was.  I think it's evolved, but there

7    was a version of http as a standard known at that time.

8      Q.    Okay.  And the inventors didn't mention http

9    messages in the patent, did they?

10     A.    Not specifically.

11     Q.    They could have mentioned http in the patent,

12   couldn't they?

13     A.    I know of nothing that prevented them from

14   doing that.

15     Q.    Do you know of any reason why they elected not

16   to mention http messages in the specification?

17     A.    I don't know what was in their heads, but they

18   definitely mentioned communication over the internet,

19   and that's the venue in which http was being utilized.

20     Q.    You testified about the reexamination that

21   Yahoo! filed.

22           Do you remember -- do you recall that?

23     A.    Yes, I do.

24     Q.    Now, you mentioned that they filed that

25   reexamination as to Claims 31 and 33, correct?

1     A.    Frankly, I had forgotten that, but now that

2 you say that, that refreshes my memory.

3     Q.    And Claim 30, which up until the point they

4 filed that reexamination, had been rejected by the U.S.

5 PTO, correct?

6     A.    I think during the give and take with the

7 reexamination panel, initially, that claim was rejected.

8     Q.    Right.  And it was -- it was subsequently

9 indicated as being allowed after Yahoo! filed its

10 reexamination request on Claims 31 and 33, correct?

11     A.    I don't know what the relative timing between

12 those two decisions was.

13     Q.    And the U.S. PTO rejected Yahoo!'s

14 reexamination request for procedural reasons, because

15 there was a missing link between Claim 28, which it had

16 rejected for anticipation under the Allen patent, and

17 Claim 31, the first claim of the reexam, because it had

18 just recently allowed Claim 30, correct?

19     A.    I understand exactly what you're saying, and

20 that -- that -- that's probably true.  I don't think

21 you're telling us something that's not correct.  But all

22 I remember, I think, is seeing the

23 no-substantial-question-of-invalidity statement.

24     Q.    No substantial question of patentability.

25     A.    Yes, sir.  I knew I wasn't quite saying it

1    right.

2        Q.   Okay.

3        A.   That's -- I think that's in the rejection of

4    the reexamination request.

5        Q.   Right.  And as we stand here today, Claims 26

6    and 28 stand rejected by the United States Patent &

7    Trademark Office over the Allen patent for anticipation,

8    correct?

9        A.   Yes.

10       Q.   All right.  Now, let's go back to secondary

11   considerations for a second.

12            You mentioned awards, didn't you?

13       A.   Yes.

14       Q.   And you're aware that Amy Rice received the

15   AAAI award for the article that she presented on the EZ

16   Reader at that conference, correct?

17       A.   Yes.

18       Q.   All right.  And are you aware that Ms. Rice

19   testified that the abstract of that article was added to

20   the paper in April of 1996?

21       A.   I don't recall that.

22       Q.   Well, let's take a look, if we could.  Let's

23   switch to the document camera.

24            MR. FENSTER:  Object, Your Honor.

25            THE COURT:  Sustained.  Counsel,

1  approach.

2              (Bench conference.)

3              THE COURT:  I had precluded him from

4  going into any discussion of public use.  I allowed

5  Mr. Verhoeven to elicit questions concerning whether the

6  EZ Reader system met all the limitations of the claim,

7  but, Mr. Rooklidge, it's not fair, after I have excluded

8  his giving opinions on whether it's public use or not,

9  to then go and get what you want out of him, okay?

10             Just move on to something else.

11             (Bench conference concluded.)

12             MR. ROOKLIDGE:  Thank you, Dr. Rhyne.  No

13 further questions.

14             THE WITNESS:  Thank you, Mr. Rooklidge.

15                 REDIRECT EXAMINATION

16 BY MR. FENSTER:

17     Q.   I have just a few brief questions.

18             First, with respect to the questions that

19 Mr. Verhoeven was asking you about as the user is typing

20 in -- I think his example was marmalade -- I think it

21 was marinade before, whatever -- as he's typing in

22 marinade, at what point does it become an electronic

23 message or a non-interactive electronic message as used

24 in the claims?

25     A.   I think at the very end.  It's a message

that's interpreted for the purpose of extracting a

predetermined response to return, and it's certainly

been the query that I have focused on, which comes at

the end of that sequence of M, M-A, M-A-R, et cetera.

Q.   What do you mean by the end?  What happens at

that time end?

A.   I click on enter, or I click on Google search,

and as a result, that http message that I have showed at

the very beginning of my discussion is created,

packaged, and sent back in order to be matched against

advertisements.

Q.   Now, Dr. Rhyne, Mr. Rooklidge was asking you

some questions about the disclosures with respect to

e-mail in the patent.

A.   Okay.

Q.   Okay.  Can you see this?

A.   Yes.

        MR. VERHOEVEN:  Is it okay if I move,

Your Honor?

        THE COURT:  Yes, of course.

        MR. SPANGLER:  I can move.

Q.   (By Mr. Fenster) Can you read this okay,

Dr. Rhyne?

A.   Depending on which part of it.  A little bit

further to my left.

1    Q.   Sure.

2    A.   Okay.   That's fine.

3    Q.   About right there?

4    A.   Uh-huh.

5    Q.   Okay.   What did the patent disclose with

6  respect to whether the electronic message was limited to

7  e-mail?

8    A.   In several places, not just here, it made it

9  very clear that the patent covers as its -- electronic

10  message is far more than e-mail.   It said here that it's

11  preferred that they are e-mail at the first paragraph,

12  but other types of electronic messages are contemplated

13  as being within the scope of the invention.

14          And then later it referred to preferably --

15  preferably an e-mail message.   But it says the invention

16  is not so limited.

17    Q.   Okay.   And based on these disclosures,

18  Dr. Rhyne, do you have an opinion as to whether one of

19  skill in the art would understand the scope of the

20  patent to be limited to e-mail?

21    A.   Oh, absolutely not.

22    Q.   And just for the -- for the jury, so they can

23  go back and find this later, can you tell them where in

24  the patent they can find these disclosures?

25    A.   Sure.   The first one was taken from Column 4,

Lines 10 through 13.

The second one is over at Column 11 very near the end of the patent at Lines 29 through 34.

Q.   Now, Dr. Rhyne, Mr. Rooklidge suggested correctly that at one point in the reexamination, the -- that Claim 30 did stand rejected.

A.   Yes.

Q.   Now, what was the U.S. PTO's final conclusion with respect to Claim 30?

A.   That it was perfectly valid over the Allen patent.

Q.   And what was the PTO's conclusion with respect to Claims 31 and 33?

A.   The same, that they were valid over the Allen patent.

Q.   Now, Dr. Rhyne, have you evaluated and given opinions with respect to the benefits -- the incremental benefits of the Rice patent over the prior art?

A.   I think to some degree, I have.

Q.   All right.  And what -- what benefit did -- what's your opinion, if any, as to what incremental benefits the Rice patent offered over -- when -- when Google moved from the dumb ad system to the SmartAds system in 2004?

A.   I think there was actually testimony to the

effect that using the smarter approach of the SmartAds

Selection System that Google obtained higher relevancy

and got more clickability out of the ads that were

presented back to people who really didn't ask for the

ads; they were doing searches.

        And if they searched for Las Vegas, as an

example, the quality of the ads, the relatability of the

ads, the matchability of the ads was improved enough

that they felt like that they were going to get

significant financial benefit out of it, because people

who were searching would be more likely to click on an

ad.

    Q.   Do you find that any of the revenue from

Yahoo!'s Sponsored Search is attributable to this

invention in the asserted claims?

    A.   I do.  I haven't done -- I'm not Dr. Becker or

any of the other two people, but, clearly, the reason

people clicked on ads is because they saw an ad that

interested them when they were probably about other

business.

        And having a more relative -- relevant ad

presented over on the side or at the top certainly is

likely to increase the clickability on those ads.

    Q.   And if it increases the clickability, what --

what effect on the --

1      A.   The advertiser makes more money, and Google

2  and Yahoo! make more money.

3                    MR. FENSTER:  Pass the witness.

4                    THE COURT:  Anything in addition?

5                    MR. VERHOEVEN:   Go to DX Demo 55.

6                    RECROSS-EXAMINATION

7  BY MR. VERHOEVEN:

8      Q.   Very briefly, Dr. Rhyne, and I'll be done.

9  So we were just talking about the clicking on the ads.

10     A.   Yes, sir.

11     Q.   Or Mr. Fenster was, right?

12     A.   (No response.)

13     Q.   Do you remember this picture I showed you on

14  cross?

15     A.   I think so.

16     Q.   Okay.  This is what happens when you get

17  search results back, right?

18     A.   Yes.

19     Q.   You get a screen like this?

20     A.   Yes.

21     Q.   Okay.  From my client, Google, right?

22     A.   Yes.

23     Q.   And here's where the ads are?

24     A.   Yes.

25     Q.   And you agree that if I'm a user and I click

1 on this ad, that's an interactive electronic message,

2 right?

3      A.   Yes.

4      Q.   That's not an infringing act, is it, sir?

5      A.   Well, if I under --

6      Q.   Can you answer that yes or no, sir?

7                MR. FENSTER:  Your Honor --

8      Q.   (By Mr. Verhoeven) Clicking -- clicking on

9 this ad is not an infringing act under any claim of the

10 '947 patent, correct?  Yes or no.

11     A.   I'm trying -- there's a lot of nos in there.

12 I think the answer is yes.

13                MR. VERHOEVEN:  No further questions.

14                    RECROSS-EXAMINATION

15 BY MR. ROOKLIDGE:

16     Q.   Dr. Rhyne, I think you and I both agree that

17 the term -- phrase, electronic message, is a very broad

18 term.

19     A.   I have not tried to describe any particularly

20 narrow term on it, given such things as the teaching in

21 the patent.

22     Q.   Right.  Now, the patent's preferred

23 embodiment, that -- it has a lot of disclosure about how

24 to handle is e-mails, correct?

25     A.   Yes.

1     Q.   And it has this -- this little section here

2  that mentions other types of electronic messages within

3  the scope of the invention, correct?

4     A.   Yes.

5     Q.   And the scope of the invention is dictated by

6  the claims, right?

7     A.   From a legal point of view, as I understand

8  the process, is each claim defines a scope of an

9  invention.

10    Q.   That's correct.  And the -- we agree.

11    A.   Thank you.

12    Q.   And the claims that are involved in this case

13  use the phrase electronic message rather than e-mail,

14  correct?

15    A.   Yes.

16    Q.   Okay.  And we've got this passage here about

17  the electronic messages, preferably an e-mail message in

18  ASCII text data format, as being understood that the

19  invention is not so limited.  Indeed, the electronic

20  message may take on a variety of data formats, including

21  digital formats, voice data, dual tone multifrequency

22  tones, and the like.

23         And then it goes on in a short passage in the

24  patent to talk about how you would apply this message to

25  voice data, right, voicemail?

1     A.   I don't remember that.  I haven't looked at

2  that paragraph --

3     Q.   Okay.

4     A.   -- passage in a while.

5     Q.   Is there any discussion in the patents

6  anywhere about how you take this e-mail system that's

7  the preferred embodiment, and you adapt it to make it

8  work with television broadcasts?

9     A.   I don't recall any, if there is.

10     Q.   Is there any discussion in the patent of how

11  to take this preferred embodiment e-mail system and

12  teach one of ordinary skill in the art how to adapt it

13  to satellite signals?

14     A.   I don't remember a specific citation to

15  satellite signal.

16     Q.   Morse Code?

17     A.   You asked me that earlier, and I said I don't

18  remember the context in which Morse Code has arisen.

19     Q.   Is there any teaching of how to take this

20  preferred embodiment e-mail system and adapt it so it

21  will work with http messages?

22     A.   I think it's much closer to that than, say,

23  Morse Code.

24     Q.   Is there any teaching in the '947 patent about

25  how to take the preferred embodiment, which is an e-mail

processing system, and adapt it so it can work with
search queries?

A.   I don't believe that -- that -- somebody asked
me whether search queries were mentioned, and I don't
recall ever seeing that at all.

Q.   Is there any teaching within the confines of
the '947 patent about how to take this preferred
embodiment e-mail system and adapt it to make it into a
search engine or an engine that will return search ads?

A.   I don't recall that as an -- as an example.
It seems to me, the only preferred embodiment was the
e-mail system.

          MR. ROOKLIDGE:  No further questions.

          THE COURT:  Mr. Fenster?

          MR. FENSTER:  Your Honor, I was really
ready to excuse the witness, but...

                REDIRECT EXAMINATION
BY MR. FENSTER:

Q.   Dr. Rhyne, are you familiar with the level of
a person of ordinary skill in the art as applied to this
patent?

A.   There have been some variances as to which
each of the experts have stated it, but, generally, I
am.

Q.   And do you have an opinion as to whether one

1  of skill in the art would have understood that the

2  patent fully supports the inventions disclosed in the

3  asserted claims?

4      A.   Yes.

5              MR. FENSTER:  Your Honor, I have no

6  further questions.

7              MR. VERHOEVEN:  Nothing further from

8  Google.

9              MR. ROOKLIDGE:  Nothing further from

10  Yahoo!, Your Honor.

11              THE COURT:  Okay.  Step down, Dr. Rhyne.

12              THE WITNESS:  Thank you.

13              THE COURT:  Who will be your next

14  rebuttal witness?

15              MR. FENSTER:  Your Honor, I'm very

16  pleased to report that Bright Response would rest.

17              THE COURT:  Okay.  You close?

18              MR. FENSTER:  Yes, we do, Your Honor.

19              THE COURT:  Defendant close?

20              MR. VERHOEVEN:  Yes, Your Honor.

21              MR. ROOKLIDGE:  Yes, Your Honor.

22              THE COURT:  All right.  Ladies and

23  Gentlemen, we're at a milestone.  All the evidence is

24  now in.

25              I've got some matters to take up with the

1  lawyers this afternoon.  The staff and I have been

2  working on the Court's instructions, and we will hear

3  final arguments starting at 8:30 in the morning, and

4  you'll get the Court's Charge.

5                    I suggested to you yesterday that I'm

6  available to stay if you want to begin your

7  deliberations tomorrow.  All I'm trying to tell you is

8  that after you get the Court's final instructions,

9  you're in charge of your own schedule.

10                   If you want to work part of the day

11 tomorrow, that's fine.  If you want to work a full day,

12 that's fine.  If you want to go back to your families

13 for the weekend, that's fine, too, and we'll just pick

14 up with deliberations on Monday morning.

15                   So that's -- I'm just -- the schedule is

16 up to you.  Just let me know sometime tomorrow morning,

17 after the case is submitted to you, what you wish to do,

18 okay?

19                   Thank y'all.  Please remember my

20 instructions, and don't talk about the case.

21                   LAW CLERK:  All rise.

22                   (Jury out.)

23                   THE COURT:  All right.  Y'all have a

24 seat.

25                   I've distributed to you a Court's first

1 draft of the jury instructions and verdict form. Can we

2 have a delegation downstairs in about 15 minutes to have

3 a Charge -- an informal Charge conference?

4             MR. VERHOEVEN: Yes, Your Honor.

5             MR. SPANGLER: Yes, Your Honor.

6             THE COURT: We'll do that, and what we'll

7 do is -- my procedure will be to hear you in chambers on

8 what your concerns are. We'll -- we may make some

9 revisions to the Charge after we visit in chambers, and

10 I'll have my clerks e-mail you a copy this evening.

11 That will be the one that most likely -- unless I hear

12 something in the morning that really causes me some

13 concern, that will be the one you need to plan on me

14 using.

15             I will -- you know, you can use copies of

16 the Charge in your final arguments. You can use the

17 verdict form. You can tell the jury how you think they

18 ought to answer the questions. All that's permissible

19 with me.

20             You can make blowup slides. I don't

21 care. It doesn't matter to me. But just bear in mind

22 that the copy you get this evening will probably be the

23 final copy that will be submitted to the jury.

24             MR. FENSTER: Your Honor?

25             THE COURT: Yes.

1          MR. FENSTER:  One inquiry, and I

2     apologize if we already addressed this at the pretrial.

3     Have we gotten timings for closing?

4          THE COURT:  I didn't address it at the

5     pretrial.  My -- I was going to give 40 minutes to the

6     Plaintiff, 20 to Google, and 15 to Yahoo! in accordance

7     with my prior order.

8          MR. FENSTER:  Thank you, Your Honor.

9          MR. VERHOEVEN:  Google would request 30.

10    It's going to be awful hard for me to do closing in just

11    20 minutes, Your Honor.

12         THE COURT:  I'll think about it.

13         MR. VERHOEVEN:  Thank you, Your Honor.

14         THE COURT:  I'm not going to -- the

15    Plaintiff's got a burden against both Defendants, so

16    whatever time I'm giving the Defendants collectively,

17    I'm going to give the Plaintiff the same amount of time.

18         MR. VERHOEVEN:  That's fine with us, Your

19    Honor.

20         THE COURT:  Well, I gathered that.

21         MR. ROOKLIDGE:  Your Honor,

22    correspondingly, Yahoo! would request 22-1/2 minutes.

23         MR. VERHOEVEN:  And one final --

24         THE COURT:  Then get some math performed.

25         MR. VERHOEVEN:  I'm sorry.  One final

1  thing.  Did you say we should stick around also for

2  argument?  We had a side-bar, and I wasn't sure.

3            THE COURT:  Oh, for motions for judgment

4  as a matter of law?

5            MR. VERHOEVEN:  Yeah.  Is that tonight

6  or --

7            THE COURT:  Well, I would prefer to do it

8  at 8:00 in the morning in conjunction with the final

9  Charge objections.  You're going to know what I'm going

10  to submit to the jury by then.

11            And I would -- I'm not going to entertain

12  another hour-and-a-half of argument on motions for

13  judgment as a matter of law.  I will allow you to

14  present short arguments, and I'll grant leave to both

15  parties -- both sides, rather, to more fully elaborate

16  on those in written submissions.

17            MR. FENSTER:  And, Your Honor, when would

18  you like to hear JMOLS from Plaintiff?

19            THE COURT:  At the same time.

20            MR. FENSTER:  At 8:00 o'clock.

21            THE COURT:  At the same time.  I mean,

22  it's -- you know, you can -- as long as you fairly state

23  the grounds on which you're moving, I'm okay with

24  allowing you to supplement it in writing.  What I don't

25  want to get is, when I see the written materials, it

1  includes completely new grounds, okay?

2                  MR. VERHOEVEN:  Understood, Your Honor.

3                  THE COURT:  All right.  I'll see you

4  downstairs in 15 minutes.

5                  LAW CLERK:  All rise.

6                  (Court adjourned.)

7                  *      *      *      *      *

8

9                          CERTIFICATION

10

11                 I HEREBY CERTIFY that the foregoing is a

12  true and correct transcript from the stenographic notes

13  of the proceedings in the above-entitled matter to the

14  best of my ability.

15

16

17

18  /s/_____                _____
    SUSAN SIMMONS, CSR                        Date
19  Official Court Reporter
    State of Texas No.:  267
20  Expiration Date:  12/31/10

21

22

23  /s/_____                   _____
    JUDITH WERLINGER, CSR                     Date
24  Deputy Official Court Reporter
    State of Texas No.:  731
25  Expiration Date:  12/31/10